Daniel Low, SBN 218387
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Fax: (202) 280-1128
Email: dlow@kotchen.com

Attorney for Plaintiff Steven Heldt

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| STEVEN HELDT, <br><br>                Plaintiff, <br><br>     v. <br><br><br> TATA CONSULTANCY SERVICES, LTD., <br><br>                Defendant. | **COMPLAINT** <br><br> FOR EMPLOYMENT DISCRIMINATION <br><br> CLASS ACTION <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Steven Heldt brings this action on behalf of himself and a class of similarly situated individuals to remedy pervasive, ongoing race and national origin discrimination by Defendant Tata Consultancy Services, Ltd. ("Tata"), and alleges as follows:

### NATURE OF THE ACTION

1.  Tata is an Indian company that employs approximately 14,000 employees in the United States. While roughly 1-2% of the United States population is of South Asian descent,[1] approximately 95% of Tata's United States-based workforce is of South Asian

---

[1] As used herein, "South Asian descent," "South Asian race and national origin," "South Asian workers," and the like refers to individuals of Indian, Bangladeshi, and

descent (primarily from India). This grossly disproportionate workforce is the result of Tata's intentional pattern and practice of employment discrimination against individuals who are not South Asian, including discrimination in hiring, placement, and termination decisions. For example, recruiters within Tata's United States recruiting unit have been explicitly instructed to focus primarily on hiring Indians for positions in the United States. Moreover, Mr. Heldt was told by a South Asian Tata manager, after Mr. Heldt was removed from a position, that he would have a hard time finding a new job within Tata because he was American and not South Asian.

2.  Indeed, Mr. Heldt's experience with Tata is representative of Tata's discrimination against non-South Asians. Mr. Heldt is an experienced and highly skilled information technology ("IT") professional. He was one of the few non-South Asians to gain employment with Tata. During the roughly 20-month time frame in which he was employed with Tata, however, Mr. Heldt:

- Was intermittently placed in five different positions that often involved only menial responsibilities (no position lasting more than 3 months) servicing large client organizations that hired Tata to perform IT services;

- Spent approximately 13 months "benched" with no substantive work to perform even while Tata continued to service the client organizations to which Mr. Heldt had been assigned, using approximately 99% South Asian workers;

_____

Nepali ancestry, ethnicity, and/or birth.

- Routinely applied for new positions within Tata and was denied by South Asian management within Tata;

- Was passed over and not hired (on information and belief) in favor of South Asians preferred by Tata;

- Experienced substantial anti-American sentiment – *e.g.*, being told by Tata management: "This is why I don't like dealing with Americans," being told that he would have difficulty finding work within Tata because he is American, and being told that Tata was not even looking for Americans to hire; and

- Ultimately was terminated.

3.    Tata's employment practices violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"). Mr. Heldt seeks, on his behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress Tata's pervasive pattern and practice of discrimination.

**PARTIES**

4.    Plaintiff Steven Heldt is a citizen of the United States, born in the United States, and of American national origin and Caucasian race, ancestry and ethnicity. Mr. Heldt is an experienced and highly skilled IT professional with considerable academic and work experience. Mr. Heldt has a Bachelor of Arts degree in Economics from the

3

University of North Carolina, Chapel Hill, a Masters of Information Technology degree from American InterContinental University, a Security+ certification from CompTia, and the CISA, CISM, CRISC, and COBIT 5 Foundations certifications from ISACA.

5. Mr. Heldt has been employed in the information technology field since 1996. As a result of his training and experience, Mr. Heldt has a wide array of skills that include expertise in project management, business analysis, software development, networking, IT operations, IT governance, IT Security, IT risk management, IT auditing, IT compliance, and business continuity and disaster recovery.

6. In addition, Mr. Heldt served with distinction in the 101st Airborne Division of the United States Army, was a squad leader, and was honorably discharged at the enlisted rank of Specialist E-4.

7. Mr. Heldt is a member of a protected class, as recognized by Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000e, *et seq.*) and the Civil Rights Act of 1866, as amended, (42 U.S.C. § 1981). Further, Mr. Heldt has exhausted his administrative remedies and complied with the statutory prerequisites of filing a Title VII complaint by filing a discrimination complaint against Tata with the U.S. Equal Employment Opportunity Commission ("EEOC"), and filing a timely claim of Title VII discrimination following receipt of a right to sue notice from the EEOC.

8. Defendant Tata is a business that provides consulting, technology, and outsourcing services. Tata, headquartered in Mumbai, India, operates approximately 19 offices in the United States, including in Santa Clara, California. Tata employs roughly

14,000 persons in the United States.

## JURISDICTION

9.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331; 42 U.S.C. § 2000e-5(f), *et seq.*, and 42 U.S.C. § 1981(a).

10.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and a foreign corporation.

11.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

12.  This Court has personal jurisdiction over Tata because it engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State, including the operation of several offices here. Additionally, Mr. Heldt's claims arise, in part, out of Tata's activities in California.

## VENUE AND INTRADISTRICT ASSIGNMENT

13.  Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because Tata resides in this District, conducts business in this District and engaged in discriminatory conduct against Mr. Heldt in this District. Assignment in this Division is proper pursuant to Civil L.R. 3-2(c) because a

substantial part of the events giving rise to Mr. Heldt's claims occurred in this Division. For example, and as discussed further below, Mr. Heldt interviewed and was hired to assist with Tata's servicing of Kaiser Permanente in Pleasanton, California, in Alameda County. He relocated to and worked for Tata in Pleasanton. In addition, during periods of non-productive, benched time, Mr. Heldt interviewed – and was not hired – for positions in Northern California, including a position servicing Apple in Cupertino, California, a position servicing Cisco in Silicon Valley, and a position servicing Genentech in San Francisco. Additionally, Tata engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of an office in Santa Clara, California. During his employment, Mr. Heldt frequently reported to Jeevak Sharma, a Human Resources representative located at Tata's Santa Clara, California office.

## STATEMENT OF FACTS

14. Tata has engaged in a systematic, company-wide, pattern and practice of discriminating in favor of South Asians and against individuals who are not South Asians in hiring, job placement, and termination.

### *Tata's Grossly Disproportionate Workforce*

15. Tata provides consulting, IT, and outsourcing services to companies in the United States and throughout the world.

16. Tata is the third largest IT employer in the world and has about 14,000 employees in the United States. Tata made over $13 billion in revenue in the past fiscal

year. Tata derives over 50% of its revenue from North America, the vast majority of which is derived from the United States.

17. Tata's employment demographics stand in stark contrast with the population of the United States. During the 2010 census, all Asian subgroups combined made up 4.8 percent of the United States population. Individuals of South Asian descent made up 1-2% of the United States population.[2] Approximately 95% of Tata's United States-based workforce is of South Asian descent (primarily from India). This grossly disproportionate workforce demonstrates an intentional pattern and practice of discrimination, and cannot be explained by coincidence or business necessity.

*Tata's Senior Management Discriminates*

18. On information and belief, all or most of Tata's United States-based business units are headed by individuals of South Asian race and Indian national origin. Among these senior managers, there is a culture of hostility towards, and non-acceptance of American workers. These senior managers have resisted efforts to increase racial and/or national origin diversity among Tata's workforce. Because of anti-American and pro-South Asian sentiment by senior management, Tata's United States-based workforce has been, and remains, highly disproportionate, with approximately 95% South Asian workers in the United States.

---

[2] Available data also suggest that individuals of South Asian descent make up a very small portion of the IT professionals in the United States. The Association of Information Technology Professionals ("AITP") – an IT professional organization – conducted a demographic study of its members in 2007 and found that only 2% of the membership was of Asian ethnic origin.

19.  Tata maintains in the United States a recruiting unit called the Talent Acquisition Unit, which focuses on hiring employees for Tata's United States operations. M.P. Saravanan has served as the Vice President of Human Resources, overseeing the Talent Acquisition Unit. Mr. Saravanan has instructed the recruiters within the Talent Acquisition Unit to focus primarily on hiring Indians for positions in the United States.

20. For example, in front of recruiters and management, Mr. Saravanan has expressed his dislike for American workers. He has also stated that he believes Indians were smarter and better qualified than Americans. On at least one occasion, Mr. Saravanan gave explicit instructions to two recruiters in the Talent Acquisition Unit to hire only Indians, rather than Americans, for positions in the United States.  Similarly, while Tata typically allows South Asian employees to apply for and take different positions within different Tata business units (referred to as "verticals"), Tata typically does not allow the comparatively few "American Hires" (as locally hired, non-South Asian employees are commonly referred to within Tata) to apply for and take positions outside of the business unit to which these employees are assigned.

*Methods by Which Tata Achieves its Discriminatory Goals*

21.  Tata achieves its discriminatory goals in at least three ways. First, Tata employs in the United States a large number of South Asians (primarily Indian) visa workers, including individuals with H-1B, L-1, B-1, and other visas. Tata secures visas for these individuals. H-1B visas are intended to be used to bring specialized foreign workers to the United States when there are insufficient United States workers to perform the jobs

8

at issue. Tata is consistently one of the top three H-1B sponsors in the United States. For example, Tata sponsored 8,701 new H-1B visas in 2013, 6,692 new H-1B visas in 2012, and 5,365 new H-1B visas in 2011. Similarly, L-1 visas are intended to be used to bring management level employees to the United States for temporary assignments. Between 2002 and 2011, Tata sponsored 25,908 L-1 visas. On information and belief, Tata sponsored all, or the vast majority, of these visas for South Asian workers (primarily Indian).

22. Second, Tata discriminates in "local hiring," *i.e.*, even when Tata hires non-visa dependent individuals who reside locally in the United States, such persons are still disproportionately South Asian.

23. Third, for the relatively few non-South Asians workers that Tata hires, it disfavors these individuals in its employment decisions, including, for example, in placement, promotion/demotion, and termination decisions.

24. The end result of Tata's general policy of discrimination is a workforce that consists of approximately 95% South Asians, a number grossly disproportionate with the demographic makeup of the United States (which consists of approximately 1-2% South Asians).

*Plaintiff Heldt's Experiences*

25. Mr. Heldt interviewed with a manager recruiting for an IT GRC Project Manager position with Tata in June 2012, to service Tata client Kaiser Permanente in Pleasanton, California. The manager was located in Pleasanton, California. Mr. Heldt was hired,

relocated to Pleasanton from Los Angeles, and started working at the Kaiser Permanente client site under Tata supervision in July 2012 in the role of IT GRC Project Manager.[3] Of the several hundred Tata employees assigned to service Kaiser, Mr. Heldt was one of only three non-South Asians.

26. Within one week of starting with Tata, Mr. Heldt was removed by Tata from his IT GRC Project Manager position and was placed in another position to service Kaiser called an IT Project Manager – a position that had lesser responsibilities and was not commensurate with Mr. Heldt's advanced skill and experience.

27. In October 2012, Tata removed Mr. Heldt from the Kaiser Permanente account altogether and placed him on the "bench" – *i.e.* he was still employed by Tata but assigned no client work.

28. Over the next several months, Mr. Heldt applied for various positions within Tata. Tata advertised internally for open jobs. Mr. Heldt was granted interviews with Tata managers (all of whom were South Asian) for positions across the United States. For example, during this time, Mr. Heldt interviewed with a Tata manager for a position in the Silicon Valley area servicing Tata client Cisco. Though Mr. Heldt was well qualified for this position, Tata did not select him. Mr. Heldt also interviewed with both a Tata manager and a USAA client representative for a position in San Antonio, Texas

---

[3] The IT GRC Project Manager position involved the project management of an IT Governance Risk and Compliance ("GRC") system named Archer. The skills required to manage this position include traditional IT project management skills combined with more advanced skills related to the management of IT governance, risk and compliance.

servicing Tata client USAA. While the client representative liked Mr. Heldt and he was well qualified for the position, Tata did not select him for the position, over the client's objections.

29. At the start of his employment, Tata assigned Mr. Heldt to the Insurance and Health Care division or "vertical." This vertical was responsible for servicing insurance and health care companies, such as Kaiser Permanente. Mr. Heldt applied for and requested positions outside of the Insurance and Health Care vertical. Tata Resource Management Group ("RMG") lead Ambika G. refused to permit Mr. Heldt to interview for positions outside of his vertical, though Mr. Heldt was well qualified for these positions. Tata regularly permits South Asians to change positions when a position is available in a different vertical. However, it holds "American Hires" (as locally hired, non-South Asian employees are commonly referred to within Tata) to a different standard; American Hires like Mr. Heldt are typically not offered an available position in a different vertical.

30. During his "benched" period, Mr. Heldt spoke with Mohan Reddy who supervised Mr. Heldt when he served as an IT GRC Project Manager servicing Kaiser. Mr. Heldt expressed to Mr. Reddy that he was concerned about the amount of time it was taking for him to find a new position within Tata. Mr. Reddy told Mr. Heldt that it would be difficult for him to find a new position because he was an American and not South Asian. Mr. Heldt also expressed concern that Tata was not allowing him to change verticals. Mr. Reddy responded that Tata usually does not permit "American

Hires" to change verticals. Mr. Reddy is of South Asian race and Indian national origin.

31. In March 2013, Mr. Heldt was finally given a new position to serve as an IT Project Manager servicing Humana Insurance in Louisville, Kentucky. Again, this position was not commensurate with Mr. Heldt's advanced skill and experience.

32. Mr. Heldt relocated to Louisville to assume his new position. Mr. Heldt, however, was never "on-boarded" when he arrived in Louisville. Rather, Mr. Heldt was required to sit in the office lobby and was assigned menial tasks such as signing for FedEx packages, opening the secured door to the lobby area for visitors, and directing people to other workers in the office area. Of the several hundred Tata employees servicing Humana in Louisville, Mr. Heldt was one of only eight or nine non-South Asians.

33. In May 2013, after repeatedly complaining about having no substantive work, Mr. Heldt was removed from his IT Project Manager position and placed again on the bench. With Tata's permission, Mr. Heldt relocated back to California. Mr. Heldt paid for his own moving expenses with the understanding that he would be reimbursed by Tata shortly after returning to California, per instructions from Tata's Human Resources department and according to Tata policy.

34. Upon returning to California, Mr. Heldt requested that he be reimbursed for expenses incurred during his move to and from Louisville, per Tata policy. Mr. Heldt also was still awaiting reimbursement for expenses incurred during his move to Pleasanton from Los Angeles, so he again requested this money. Mr. Heldt's total

COMPLAINT

expenses exceeded $21,000. Reimbursements were handled by Srinivas Malladi, a Human Resources manager and Mr. Heldt's contact person in the Tata Human Resources department. On information and belief, Mr. Malladi is of South Asian race and Indian national origin. In his interactions with Mr. Heldt, Mr. Malladi was extremely hostile, rude, and abusive and he refused to reimburse Mr. Heldt for his full expenses. He also questioned Mr. Heldt on why he moved to Louisville and asked, sarcastically, whether he had gone there for a vacation. Mr. Malladi also made a number of anti-American comments. For instance, Mr. Malladi stated that "Americans need to start getting in line [with Tata] and stop being so selfish and demanding." He also stated that Americans demand too much and do not do their jobs correctly. He also criticized Americans for trying to "exercise their rights." During this conversation, Mr. Malladi also stated, "[t]his is why I don't like dealing with Americans."

35. During his second benched period, Mr. Heldt again applied and interviewed for multiple positions within Tata, each time interviewing with a South Asian manager. For example, during this time, Mr. Heldt interviewed with a Tata manager for a position in San Francisco, California servicing Tata client Genentech. Mr. Heldt also interviewed with a Tata manager for a position in Cupertino, California servicing Tata client Apple. Though Mr. Heldt was well qualified for these positions, Tata did not select him for either.

36. Mr. Heldt requested that Ambika G. allow him to interview for open positions that were outside of his vertical. Ambika G. refused and was hostile and rude in her

responses to Mr. Heldt's requests.

37. In August 2013, Mr. Heldt was placed in a "General Project Manager" position to service Advanced Sterilization Products, a Johnson & Johnson company. Mr. Heldt was not properly on-boarded to the position by the local Tata manager, and he was not assigned work commensurate with his advanced skill and experience. Rather, Mr. Heldt was assigned a project creating an Excel spreadsheet to track project details.

38. Of the approximately 200 Tata employees assigned to service Advanced Sterilization Products, Mr. Heldt was the only non-South Asian. During a conversation, Saikat Gosh, Mr. Heldt's Tata manager at Advanced Sterilization Products, expressed concern to Mr. Heldt that he was having difficulty filling an open position in his group. Mr. Gosh stated that Tata was not even looking for Americans to fill the position. Rather, according to Mr. Gosh, Tata was waiting for a South Asian employee to become available to fill the position. Mr. Gosh is of South Asian race and Indian national origin. In September 2013, Mr. Heldt was removed from his General Project Manager position and was benched.

39. From September 2013 through November 2013, Mr. Heldt applied for numerous positions within Tata and interviewed with multiple South Asian Tata managers. Mr. Heldt was well qualified for each position, but was not hired for any of them. During this period, Mr. Heldt again requested that Ambika G. allow him to interview for open positions that were outside of his vertical, but she refused and was hostile and rude in her responses.

40. In November 2013, Mr. Heldt was placed in a new position as an IT Project Manager helping to service Farmers Insurance Group. This position did not involve work commensurate with Mr. Heldt's advanced skill and experience. Of the approximately 100 Tata employees assigned to Farmers Insurance, Mr. Heldt was the only non-South Asian. Mr. Heldt was stripped of his position in December 2013 and again benched.

41. In March 2014, Mr. Malladi called Mr. Heldt and told him he was being terminated, as he had been on the bench for 3 months. Mr. Malladi also stated that Mr. Heldt was being released because Mr. Heldt would only accept positions in California. In truth, Mr. Heldt was willing to accept a position anywhere in the United States, and he informed Mr. Malladi of this fact. Nevertheless, Tata terminated Mr. Heldt.

42. Over his tenure with Tata, Mr. Heldt observed that approximately 99% of Tata employees were South Asian. This percentage was true across all the client sites he was assigned, and at Tata offices he visited, across the country. Additionally, at each of the client sites to which Mr. Heldt was assigned, he observed that South Asian employees were promptly on-boarded and assigned work that was more substantive than work assigned to non-South Asians. Mr. Heldt also observed that South Asians were regularly permitted to apply for positions outside of, and transfer between, verticals. Similarly, Mr. Heldt observed Tata's lack of interest in hiring non-South Asians to fill positions.

**CLASS ACTION ALLEGATIONS**

43. Mr. Heldt brings this Class Action pursuant to Federal Rule of Civil Procedure

23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for Tata's systematic pattern and practice of discriminatory employment practices based upon individuals' race and/or national origins. This action is brought on behalf of the following individuals:

> All individuals who are not of South Asian race or Indian, Bangladeshi, or Nepalese national origin who applied for positions within Tata in the United States and were not hired or selected and/or were employed by Tata in the United States and were demoted (in title and/or responsibilities) or discharged.

44. The class period runs from April 14, 2011 onwards.

45. Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Mr. Heldt, it is believed to be in the thousands. Furthermore, the class is readily identifiable from information and records in Tata's possession.

46. There are numerous questions of law and fact common to members of the class. Among the common questions of law or fact are: (a) whether Tata has intentionally discriminated against individuals who are not South Asian in making employment decisions; (b) whether Tata has intentionally favored South Asians in hiring, placement, promotion/demotion, and retention decisions and/or whether Tata has intentionally disfavored non-South Asians in hiring, placement, promotion/demotion, and termination decisions; (c) whether Tata's policy and practice of relying on South Asian visa and local workers is intentionally discriminatory against non-South Asians; (d) whether Tata's policy and practice of relying on South Asian visa and local workers have had a disparate impact on non-South Asians; (e) whether the disparate impact of

16

Tata's policy and practice is justified by business or commercial necessity; (f) whether there were alternative, objective means for recruiting, hiring, placing, promoting, and employing workers that would have had a less disparate impact on non-South Asians; (g) whether Tata has violated Title VII; (h) whether Tata has violated § 1981; (i) whether equitable and injunctive relief is warranted for the class and (j) whether compensatory and/or punitive damages are warranted for the class.

47. Mr. Heldt's claims are typical of the class. All members of the class were damaged by the same discriminatory policies and practices employed by Tata.

48. Mr. Heldt will fairly and adequately protect the interest of other class members because he has no interest that is antagonistic to or which conflicts with those of any other class member, and Mr. Heldt is committed to the vigorous prosecution of this action and has retained competent counsel experienced in class litigation to represent him and the class.

49. Mr. Heldt and the class he seeks to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of Tata's actions.

50. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Tata has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Mr. Heldt and the class as a whole. The class members are entitled to declaratory and injunctive relief to end Tata's systematic, common, uniform, unfair, and discriminatory policies and practices.

51. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the class is whether Tata has discriminated on the basis of national origin and race in their employment practices. This question is central to the case and predominates over individual issues among the members of the proposed class. Tata has engaged in a common course of discriminatory conduct in a manner that has harmed all of the class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently manageable as a class action. Mr. Heldt knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

52. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Mr. Heldt's claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Tata's discrimination. Certification under this rule is also appropriate to decide whether Tata has adopted a systemic pattern and practice of national origin and racial discrimination in hiring and employment decisions. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## COUNT I
### (Disparate Treatment)
### (Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)
### (On behalf of Plaintiff Heldt and the Class)

53. Mr. Heldt re-alleges each preceding paragraph as though fully set forth herein.

54. This claim is brought by Mr. Heldt on behalf of himself and the class.

55. Throughout the class liability period, Tata has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race and national origin by: (a) knowingly and intentionally favoring individuals of South Asian race and national origin in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (b) knowingly and intentionally disfavoring individuals who are not of South Asian race and national origin (including Mr. Heldt) in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 95% or more South Asian employees.

56. As a direct and proximate result of Tata's intentional discrimination, Mr. Heldt and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to placement, compensation, and/or continued employment with Tata.

57. Tata's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq.*

## COUNT II
### (Disparate Treatment)
## (Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)
### (On behalf of Plaintiff Heldt and the Class)

58. Mr. Heldt re-alleges each preceding paragraph as though fully set forth herein.

59. This claim is brought by Mr. Heldt on behalf of himself and the class.

60. Throughout the class liability period, Tata has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race, ancestry, ethnicity, and those of Indian, Nepalese, or Bangladeshi national groups by: (a) knowingly and intentionally favoring South Asian individuals in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (b) knowingly and intentionally disfavoring non-South Asian individuals (including Mr. Heldt) in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 95% or more South Asian employees.

61. As a direct and proximate result of Tata's intentional discrimination, Mr. Heldt and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to placement, compensation, and/or continued employment with Tata.

62. Tata's actions constitute unlawful discrimination in violation of 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Heldt and the class pray for relief as follows:

a.  Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b.  Designation of Plaintiff as representative of the class;

c.  Designation of Plaintiff's counsel as counsel for the class;

d.  A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.;

e.  A declaratory judgment that the practices complained of herein are unlawful and violate the Civil Rights Act of 1866, 42 U.S.C. § 1981;

f.  A permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

g.  Order Defendant to adopt a valid, non-discriminatory method for hiring, placement, termination, and other employment decisions;

h.  Order Defendant to post notices concerning its duty to refrain from discriminating against employees on the basis of race or national origin;

i.  Award Plaintiff and the class compensatory damages for the harm they suffered as a result of Defendant's violations of Title VII and § 1981;

j.  Award Plaintiff and the class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendant's discriminating against them in violation of Title VII and § 1981;

k.  Award Plaintiff and the class front- and back-pay, and such other equitable relief as the Court deems just and appropriate;

l.  Award Plaintiff and the class exemplary and punitive damages;

m. Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

n.  Award Plaintiff and the class such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Mr. Heldt and the class respectfully demand a trial by jury on all issues properly triable by a jury in this action.

DATED:    April 14, 2015                Respectfully submitted,

By: /s/Daniel Low

Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*
    forthcoming)
Michael von Klemperer (*pro hac vice*
    forthcoming)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Email: dlow@kotchen.com;
dkotchen@kotchen.com;
mvk@kotchen.com

Michael F. Brown (*pro hac vice*
    forthcoming)
**DVG LAW PARTNER LLC**
P.O. Box 645
Neenah, WI 54957
920-238-6781
920-273-6177 (fax)
mbrown@dvglawpartner.com

Vonda K. Vandaveer
**V.K. Vandaveer, P.L.L.C.**
P.O. Box 27317
Washington, DC 20038-7317
202-340-1215
202-521-0599 (fax)
atty@vkvlaw.com

Steven G. Tidrick, SBN 224760
Joel B. Young, SBN 236662
**THE TIDRICK LAW FIRM**
2039 Shattuck Avenue, Suite 308
Berkeley, California 94704
Telephone: (510) 788-5100
Facsimile: (510) 291-3226
E-mail: sgt@tidricklaw.com
E-mail: jby@tidricklaw.com

*Attorneys for Plaintiff Steven Heldt*

COMPLAINT