1
2
3
4
5

Daniel Low (Bar #218387)
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Fax: (202) 280-1128
Email: dlow@kotchen.com

6

Attorney for All Plaintiffs

7
8

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

9
10
11
12
13
14
15
16
17

STEVEN HELDT,

BRIAN BUCHANAN, and

CHRISTOPHER SLAIGHT,

                          Plaintiffs,

        v.

TATA CONSULTANCY SERVICES, LTD.,

                          Defendant.

Case No.: 4:15-cv-01696-YGR

**THIRD AMENDED COMPLAINT**

FOR EMPLOYMENT DISCRIMINATION

CLASS ACTION

DEMAND FOR JURY TRIAL

18
19
20
21
22

        Plaintiffs Steven Heldt, Brian Buchanan, and Christopher Slaight ("Plaintiffs")

bring this action on behalf of themselves and a class of similarly situated individuals

to remedy pervasive, ongoing race and national origin discrimination by Defendant

Tata Consultancy Services, Ltd. ("Tata"), and allege as follows:

23
24

**NATURE OF THE ACTION**

25
26
27
28

        1.   Tata is an Indian company that employs approximately 14,000 employees in

the United States. While roughly 1-2% of the United States population is South

Asian, approximately 95% of Tata's United States-based workforce is South Asian

(primarily from India). This grossly disproportionate workforce is the result of Tata's intentional pattern and practice of employment discrimination against individuals who are not South Asian (or who are not of Indian national origin), including discrimination in hiring, placement, and termination decisions.[1] For example, recruiters within Tata's United States recruiting unit have been explicitly instructed to focus primarily on hiring Indians for positions in the United States. Moreover, Mr. Heldt was told by a South Asian Tata manager, after Mr. Heldt was removed from a position, that he would have a hard time finding a new job within Tata because he was not South Asian.

2.   Indeed, Plaintiffs' experiences with Tata are representative of Tata's discrimination against non-South Asians. For example, after Southern California Edison ("SCE") announced that it would transition much of its IT needs from in-house employees to Tata, Mr. Buchanan learned he would lose the SCE job he had held for many years. Mr. Buchanan applied for a job with Tata yet, despite being imminently qualified, Tata failed to hire him, choosing rather to staff its SCE project with an almost 100% South Asian workforce.

3.   The comparatively few non-South Asians that Tata does hire likewise face

---

[1] As used herein, "South Asian race" refers to individuals who trace their ancestry to the Indian sub-continent. *See, e.g., Fonseca v. Sysco Food Serv. of Az., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) ("Under 42 U.S.C. § 1981, discrimination based on ancestry or ethnic characteristics is prohibited" as discrimination based on race) (citation omitted). "Indian national origin" refers to individuals born in India, or whose ancestors came from India. *See Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*, 154 F.3d 1117, 1119 (9th Cir. 1998) (holding that "national origin" refers to both a person's place of birth, and the country from which his or her ancestors came).

discrimination. For example, Mr. Heldt began working for Tata in June 2012. Within a week of starting, Mr. Heldt was removed from a project he was well qualified for. Over his 20 months with Tata, Mr. Heldt was transferred between five different positions, often assigned only menial responsibilities, and spent approximately 13 months "benched" with no substantive work to perform even while Tata continued to service the client organizations to which Mr. Heldt had been assigned, using approximately 99% South Asian workers. While benched, Mr. Heldt was repeatedly passed over and not hired for positions, in favor of (upon information and belief) South Asian workers. Throughout his employment, Mr. Heldt experienced substantial anti-American sentiment – *e.g.*, being told by Tata management: "This is why I don't like dealing with Americans," being told that he would have difficulty finding work within Tata because he is American, and being told that Tata was not even looking for Americans to hire. He was ultimately terminated.

4.   Similarly, Mr. Slaight started with Tata in June 2012 as a software engineer. Over the following year, Tata assigned Mr. Slaight absolutely no substantive work. He was ultimately terminated after being benched for several weeks.

5.   Tata's employment practices violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"). Plaintiffs seek, on their own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-

3

judgment interest, attorneys' fees, and costs to redress Tata's pervasive pattern and practice of discrimination.

## PARTIES

6.  Plaintiff Steven Heldt is a citizen of the United States, born in the United States, and of American national origin and Caucasian race, ancestry and ethnicity. Mr. Heldt is an experienced and highly skilled IT professional with considerable academic and work experience. Mr. Heldt has a Bachelor of Arts degree in Economics from the University of North Carolina, Chapel Hill, a Masters of Information Technology degree from American InterContinental University, a Security+ certification from CompTia, and the CISA, CISM, CRISC, and COBIT 5 Foundations certifications from ISACA.

7.  Mr. Heldt has been employed in the IT field since 1996.  As a result of his training and experience, Mr. Heldt has a wide array of skills that include expertise in project management, business analysis, software development, networking, IT operations, IT governance, IT Security, IT risk management, IT auditing, IT compliance, and business continuity and disaster recovery.

8.  In addition, Mr. Heldt served with distinction in the 101st Airborne Division of the United States Army, was a squad leader, served in Fort McClellan, Alabama, and was honorably discharged at the enlisted rank of Specialist E-4.

9.  Plaintiff Brian Buchanan is a citizen of the United States of America, born in the United States, and of American national origin and ancestry. He is Caucasian. Mr.

Buchanan has over 30 years of advanced training and job experience in IT services and project management.

10. Mr. Buchanan has been employed in the IT field since 1982. Over the course of his career, Mr. Buchanan has filled many roles, including providing system availability, reliability, and data integrity for several IT and business unit projects, leading major and minor application implementation projects, and ensuring compliance with government processes, contracts, and regulations. In addition, Mr. Buchanan performed implementation, configuration, maintenance, and upgrades of enterprise server applications, network and management systems, and security systems, among other roles. In addition, Mr. Buchanan has served in supervisor and manager roles at various times throughout his career.

11. Plaintiff Christopher Slaight is a citizen of the United States, born in the United States, and of American national origin and ancestry. He is Caucasian. Mr. Slaight has a Bachelor of Science degree in Computer Information Systems and Database Management from DeVry University.

12. Plaintiffs are all members of a protected class, as recognized by Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000e, *et seq.*) and the Civil Rights Act of 1866, as amended, (42 U.S.C. § 1981). Further, Mr. Heldt and Mr. Buchanan have exhausted their administrative remedies and complied with the statutory prerequisites of filing a Title VII complaint by filing discrimination complaints against Tata with the U.S. Equal Employment Opportunity Commission

5

("EEOC"), and filing a timely claim of Title VII discrimination following receipt of their right to sue notices from the EEOC.

13. Defendant Tata is a business that provides consulting, technology, and outsourcing services. Tata, headquartered in Mumbai, India, operates approximately 19 offices in the United States, including in Santa Clara, California. Tata employs at least 14,000 persons in the United States.

## JURISDICTION

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331; 42 U.S.C. § 2000e-5(f), *et seq.*, and 42 U.S.C. § 1981(a).

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and a foreign corporation.

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

17. This Court has personal jurisdiction over Tata because it engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State, including the operation of several offices here. Additionally, Plaintiffs' claims arise, in part, out of Tata's activities in California.

## VENUE AND INTRADISTRICT ASSIGNMENT

18. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because Tata resides in this District, conducts business in this District and engaged in discriminatory conduct in this District. Assignment in this Division is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events giving rise to this matter's claims occurred in this Division. For example, and as discussed further below, Mr. Heldt interviewed and was hired to assist with Tata's servicing of Kaiser Permanente in Pleasanton, California, in Alameda County. He relocated to and worked for Tata in Pleasanton. In addition, during periods of non-productive, benched time, Mr. Heldt interviewed – and was not hired – for positions in Northern California, including a position servicing Apple in Cupertino, California, a position servicing Cisco in Silicon Valley, and a position servicing Genetech in San Francisco. Additionally, Tata engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of an office in Santa Clara, California. During his employment, Mr. Heldt frequently reported to Jeevak Sharma, a Human Resources representative located at Tata's Santa Clara, California office.

## STATEMENT OF FACTS

19. Tata has engaged in a systematic, company-wide, pattern and practice of discriminating in favor of South Asians and against individuals who are not South

7

Asians in hiring, job placement, and termination.

*Tata's Grossly Disproportionate Workforce*

20. Tata provides consulting, IT, and outsourcing services to companies in the United States and throughout the world.

21. Tata is the third largest IT employer in the world and has about 14,000 employees in the United States. Tata made over $13 billion in revenue in the past fiscal year. Tata derives over 50% of its revenue from North America, the vast majority of which is derived from the United States.

22. Tata's employment demographics stand in stark contrast with the population of the United States. During the 2010 census, all Asian subgroups combined made up 4.8 percent of the United States population. South Asians made up 1-2% of the United States population.[2] Approximately 95% of Tata's United States-based workforce is South Asian (primarily from India). This grossly disproportionate workforce demonstrates an intentional pattern and practice of discrimination, and cannot be explained by coincidence or business necessity.

*Tata's Senior Management Discriminates*

23. On information and belief, all or most of Tata's United States-based business units are headed by individuals of South Asian race and Indian national origin.

---

[2] Available data also suggest that South Asians make up a very small portion of the IT professionals in the United States. The Association of Information Technology Professionals ("AITP") – an IT professional organization – conducted a demographic study of its members in 2007 and found that only 2% of the membership was of Asian ethnic origin.

8

Among these senior managers, there is a culture of hostility towards, and non-acceptance of American workers. These senior managers have resisted efforts to increase racial and/or national origin diversity among Tata's workforce. Because of anti-American and pro-South Asian sentiment by senior management, Tata's United States-based workforce has been, and remains, highly disproportionate, with approximately 95% South Asian workers (primarily from India) in the United States.

24. Tata maintains in the United States a recruiting unit called the Talent Acquisition Unit, which focuses on hiring employees for Tata's United States operations. M.P. Saravanan has served as the Vice President of Human Resources, overseeing the Talent Acquisition Unit. Mr. Saravanan has instructed the recruiters within the Talent Acquisition Unit to focus primarily on hiring Indians for positions in the United States.

25. For example, in front of recruiters and management, Mr. Saravanan has expressed his dislike for American workers. He has also stated that he believes Indians were smarter and better qualified than Americans. On at least one occasion, Mr. Saravanan gave explicit instructions to two recruiters in the Talent Acquisition Unit to hire only Indians, rather than Americans, for positions in the United States. Similarly, while Tata typically allows South Asian employees to apply for and take different positions within different Tata business units (referred to as "verticals"), Tata typically does not allow the comparatively few "American Hires" (as locally hired, non-South Asian employees are commonly referred to within Tata) to apply for

9

and take positions outside of the business unit to which these employees are assigned.

*Methods by Which Tata Achieves its Discriminatory Goals*

26. Tata achieves its discriminatory goals in at least three ways. First, Tata employs in the United States a large number of South Asians (primarily Indian) visa workers, including individuals with H-1B, L-1, B-1, and other visas. Tata secures visas for these individuals. H-1B visas are intended to be used to bring specialized foreign workers to the United States when there are insufficient United States workers to perform the jobs at issue. Tata is consistently one of the top three H-1B sponsors in the United States. For example, Tata sponsored 8,701 new H-1B visas in 2013, 6,692 new H-1B visas in 2012, and 5,365 new H-1B visas in 2011.  Similarly, L-1 visas are intended to be used to bring management level employees to the United States for temporary assignments. Between 2002 and 2011, Tata sponsored 25,908 L-1 visas. On information and belief, Tata sponsored all, or the vast majority, of these visas for South Asian workers (primarily Indian).  Tata is currently being investigated by the federal government for visa abuse.[3]

27. Second, Tata discriminates in "local hiring," *i.e.*, even when Tata hires non-visa dependent individuals who reside locally in the United States, such persons are still disproportionately South Asian.

28. Third, for the comparatively few non-South Asians workers that Tata hires, it

---

[3] Plaintiffs take no position on whether Tata's use of visa workers is a violation of visa law.

disfavors these individuals in its employment decisions, including, for example, in placement, promotion/demotion, and termination decisions.

29. The end result of Tata's general policy of discrimination is a workforce that consists of approximately 95% South Asians (primarily from India), a number grossly disproportionate with the demographic makeup of the United States (which consists of approximately 1-2% South Asians).

30. Tata's discrimination is intentional and done with malice and reckless indifference to Plaintiffs' federally protected rights. As a proximate result of Tata's willful and unlawful discrimination, Plaintiffs and other non-South Asians, have lost jobs, job opportunities (through Tata's failure to hire these non-South Asians), wages, benefits, and other financial and non-financial injuries, and have suffered emotional distress. Plaintiffs' experiences demonstrate the human toll of Tata's pattern and practice of intentional discrimination.

*Plaintiff Buchanan's Experiences*

31. Mr. Buchanan began working for Southern California Edison ("SCE")[4] in 1986 as a networking specialist. In or around 2003, SCE promoted Mr. Buchanan to IT Specialist 4 – a senior IT position.

32. In that role, Mr. Buchanan served on SCE's Infrastructure General Application Support Team ("Mr. Buchanan's Team" or "the Team"), personally

---

[4] SCE is the primary electricity supplier for southern California and employs about 14,000 people. It is a subsidiary of Edison International.

supporting approximately 25 different applications necessary for SCE's day-to-day business. These applications included, for example, an enterprise document management application, a records management application, a GIS mapping application, a building management system, an HR call recording application, IT Help Desk Apropos, and a SVY Vovici survey application.

33. Mr. Buchanan consistently received positive performance reviews from SCE and was never subject to disciplinary measures regarding performance or otherwise.

34. In or around May 2012, SCE decided to restructure its IT department. SCE decided it would drastically reduce the number of workers it directly employed and, in large part, contract-out its IT needs. By early 2014, SCE decided it would retain Tata to perform the bulk of its IT needs.

35. On July 21, 2014, SCE announced that Mr. Buchanan and about 400 others would be terminated. However, SCE asked Mr. Buchanan and many other employees if they would remain with the company for several more months to help perform a "knowledge transfer" – *i.e.*, training their replacements from Tata. Mr. Buchanan agreed to remain with SCE through January 9, 2015.[5] Under the terms of the SCE-Tata contract, Tata was scheduled to take primary responsibility for most of SCE's IT needs by December 2014.

36. As part of that transition, Mr. Buchanan was told that his Team, consisting of

_____

[5] This employment end date was later extended into February 2015, after Tata was unable to meet its deadlines for taking primary responsibility of SCE's IT needs.

around 28 individuals, was to be terminated and all of the positions filled by Tata employees.

37. By late summer or early fall 2014, it became apparent that Tata would not be able to meet the December 2014 deadline of assuming the SCE work. Accordingly, the December 2014 deadline was pushed back. On or about November 3, 2014, SCE asked Mr. Buchanan to extend his contract until February 6, 2015. Though Mr. Buchanan asked for a longer extension, SCE refused to extend his contract beyond February 6, 2015.

38. By January 2015, Tata had assigned only two workers to Mr. Buchanan's Team in California. Both of these Tata employees were South Asian from India and in the United States on visas. Mr. Buchanan was tasked with training these employees, who would eventually take over some of his responsibilities. These employees had very little or no relevant experience, and performing the "knowledge transfer" was a challenge. For example, when an SCE server stopped working, Mr. Buchanan had to supervise these individuals' repair efforts. During this process, Mr. Buchanan had to repeatedly instruct them where and how to look for issues on the server, including the very basic steps of checking application log files, web log files, and the event viewer. log.

39. In late October 2014, Mr. Buchanan attended a job fair in Arcadia, California, which SCE had organized for its soon-to-be terminated employees. Tata also attended the job fair, manning a booth at which it met with and sought potential employees.

13

The Tata booth was staffed with several individuals, all of whom were South Asian. Mr. Buchanan attended the fair and spoke with an individual at the Tata booth who identified himself as a Tata regional manager. This Tata representative informed Mr. Buchanan that Tata was hiring for positions servicing SCE, as well as for other positions in the Greater Los Angeles area unrelated to SCE. Mr. Buchanan gave the manager a copy of his resume and told him he was interested in positions with Tata servicing SCE, and in other positions with Tata. The manager said that Tata would contact him if Tata was interested in hiring him. Mr. Buchanan observed that the manager was dismissive and spent little time speaking with him. In comparison, Mr. Buchanan observed that the Tata employees spent considerably more time speaking with South Asian applicants and spoke to them in Hindi (an Indian language) about available positions. Tata did not hire Mr. Buchanan and did not contact him after the job fair, despite his excellent qualifications and considerable experience.

40. Tata had numerous openings for positions on Mr. Buchanan's Team, as well as for other positions servicing SCE. Tata also had openings for other positions in the United States that did not involve SCE. Of the twenty-eight individuals originally working for SCE on Mr. Buchanan's Team, Tata hired only five of them. Three of these individuals Tata hired were South Asian, all from India. The other two were Korean and Vietnamese. Tata replaced the other twenty-three original Team members with South Asians. Likewise, beyond Mr. Buchanan's Team, Tata replaced the vast majority of displaced SCE IT workers with South Asians.

14

41. Given his considerable experience and skill, Mr. Buchanan personally supported approximately 25 software applications for SCE. Despite his vast experience performing these tasks, Tata did not hire Mr. Buchanan. Rather, Tata hired less experienced South Asian employees to perform those tasks.  Each was assigned to support approximately one application. Accordingly, on information and belief, Tata assigned numerous individuals, up to potentially 25, to fulfill the role Mr. Buchanan was performing single-handedly.

42. Despite the availability of qualified non-South Asian workers, Tata was not able to meet its deadline to take primary responsibility for SCE's IT needs by February 2015 because Tata was unable to secure a sufficient number of its preferred South Asian employees. Additionally, many of the South Asian employees it did secure were unprepared to take over responsibilities from out-going SCE employees. Because of these delays, SCE asked Mr. Buchanan to extend his contract for another month in early 2015. Mr. Buchanan asked that his contract be extended until June, but SCE refused. On February 6, 2015, Mr. Buchanan's employment with SCE ended. As of February 6, 2015, Tata remained unable to take over primary responsibility for SCE's IT needs.

43. Between July 2014 and February 2015, Mr. Buchanan observed that the vast majority of Tata's employees were South Asian, including those located in the United States.

*Plaintiff Heldt's Experiences*

44. Mr. Heldt interviewed with a manager recruiting for an IT GRC Project Manager position with Tata in June 2012, to service Tata client Kaiser Permanente in Pleasanton, California. The manager was located in Pleasanton, California. Mr. Heldt was hired, relocated to Pleasanton from Los Angeles, and started working at the Kaiser Permanente client site under Tata supervision in July 2012 in the role of IT GRC Project Manager.[6] Of the several hundred Tata employees assigned to service Kaiser, Mr. Heldt was one of only three non-South Asians.

45. Within one week of starting with Tata, Mr. Heldt was removed by Tata from his IT GRC Project Manager position and was placed in another position to service Kaiser called an IT Project Manager – a position that had lesser responsibilities and was not commensurate with Mr. Heldt's advanced skill and experience.

46. In October 2012, Tata removed Mr. Heldt from the Kaiser Permanente account altogether and placed him on the "bench" – *i.e.* he was still employed by Tata but assigned no client work.

47. Over the next several months, Mr. Heldt applied for various positions within Tata. Tata advertised internally for open jobs. Mr. Heldt was granted interviews with Tata managers (all of whom were South Asian) for positions across the United States.

---

[6] The IT GRC Project Manager position involved the project management of an IT Governance Risk and Compliance ("GRC") system named Archer. The skills required to manage this position include traditional IT project management skills combined with more advanced skills related to the management of IT governance, risk and compliance.

For example, during this time, Mr. Heldt interviewed with a Tata manager for a position in the Silicon Valley area servicing Tata client Cisco. Though Mr. Heldt was well qualified for this position, Tata did not select him. Mr. Heldt also interviewed with both a Tata manager and a client representative for a position in San Antonio, Texas servicing Tata client USAA. While the client representative liked Mr. Heldt and he was well qualified for the position, Tata did not select him for the position, over the client's objections.

48. At the start of his employment, Tata assigned Mr. Heldt to the Insurance and Health Care division or "vertical." This vertical was responsible for servicing insurance and health care companies, such as Kaiser Permanente. Mr. Heldt applied for and requested positions outside of the Insurance and Health Care vertical. Tata Resource Management Group ("RMG") lead Ambika Gopal refused to permit Mr. Heldt to interview for positions outside of his vertical, though Mr. Heldt was well qualified for these positions. Tata regularly permits South Asians to change positions when a position is available in a different vertical.  However, it holds "American Hires" (as locally hired, non-South Asian employees are commonly referred to within Tata) to a different standard; American Hires like Mr. Heldt are typically not offered an available position in a different vertical.

49. During his "benched" period, Mr. Heldt spoke with Mohan Reddy who supervised Mr. Heldt when he served as an IT GRC Project Manager servicing Kaiser. Mr. Heldt expressed to Mr. Reddy that he was concerned about the amount of

17

time it was taking for him to find a new position within Tata. Mr. Reddy told Mr. Heldt that it would be difficult for him to find a new position because he was an American and not South Asian. Mr. Heldt also expressed concern that Tata was not allowing him to change verticals. Mr. Reddy responded that Tata usually does not permit "American Hires" to change verticals. Mr. Reddy is of South Asian race and Indian national origin.

50. In March 2013, Mr. Heldt was finally given a new position to serve as an IT Project Manager servicing Humana Insurance in Louisville, Kentucky. Again, this position was not commensurate with Mr. Heldt's advanced skill and experience.

51. Mr. Heldt relocated to Louisville to assume his new position. Mr. Heldt, however, was never "on-boarded" when he arrived in Louisville. Rather, Mr. Heldt was required to sit in the office lobby and was assigned menial tasks such as signing for FedEx packages, opening the secured door to the lobby area for visitors, and directing people to other workers in the office area. Of the several hundred Tata employees servicing Humana in Louisville, Mr. Heldt was one of only eight or nine non-South Asians.

52. In May 2013, after repeatedly complaining about having no substantive work, Mr. Heldt was removed from his IT Project Manager position and placed again on the bench. With Tata's permission, Mr. Heldt relocated back to California. Mr. Heldt paid for his own moving expenses with the understanding that he would be reimbursed by Tata shortly after returning to California, per instructions from Tata's

Human Resources department and according to Tata policy.

53. Upon returning to California, Mr. Heldt requested that he be reimbursed for expenses incurred during his move to and from Louisville, per Tata policy. Mr. Heldt also was still awaiting reimbursement for expenses incurred during his move to Pleasanton from Los Angeles, so he again requested this money. Mr. Heldt's total expenses exceeded $21,000. Reimbursements were handled by Srinivas Malladi, a Human Resources manager and Mr. Heldt's contact person in the Tata Human Resources department. On information and belief, Mr. Malladi is of South Asian race and Indian national origin. In his interactions with Mr. Heldt, Mr. Malladi was extremely hostile, rude, and abusive and he refused to reimburse Mr. Heldt for his full expenses. He also questioned Mr. Heldt on why he moved to Louisville and asked, sarcastically, whether he had gone there for a vacation. Mr. Malladi also made a number of anti-American comments. For instance, Mr. Malladi stated that "Americans need to start getting in line [with Tata] and stop being so selfish and demanding." He also stated that Americans demand too much and do not do their jobs correctly. He also criticized Americans for trying to "exercise their rights." During this conversation, Mr. Malladi also stated, "[t]his is why I don't like dealing with Americans."

54. During his second benched period, Mr. Heldt again applied and interviewed for multiple positions within Tata, each time interviewing with a South Asian manager. For example, during this time, Mr. Heldt interviewed with a Tata manager

for a position in San Francisco, California servicing Tata client Genetech. Mr. Heldt also interviewed with a Tata manager for a position in Cupertino, California servicing Tata client Apple. Though Mr. Heldt was well qualified for these positions, Tata did not select him.

55. Mr. Heldt requested that Ms. Gopal allow him to interview for open positions that were outside of his vertical. Ms. Gopal refused and was hostile and rude in her responses to Mr. Heldt's requests.

56. In August 2013, Mr. Heldt was placed in a "General Project Manager" position to service Advanced Sterilization Products, a Johnson & Johnson company. Mr. Heldt was not properly on-boarded to the position by the local Tata manager, and he was not assigned work commensurate with his advanced skill and experience. Rather, Mr. Heldt was assigned a project creating an Excel spreadsheet to track project details.

57. Of the approximately 200 Tata employees assigned to service Advanced Sterilization Products, Mr. Heldt was the only non-South Asian. During a conversation, Saikat Gosh, Mr. Heldt's Tata manager at Advanced Sterilization Products, expressed concern to Mr. Heldt that he was having difficulty filling an open position in his group. Mr. Gosh stated that Tata was not even looking for Americans to fill the position. Rather, according to Mr. Gosh, Tata was waiting for a South Asian employee to become available to fill the position. Mr. Gosh is of South Asian race and Indian national origin. In September 2013, Mr. Heldt was removed from his

20

General Project Manager position and was benched.

58. From September 2013 through November 2013, Mr. Heldt applied for numerous positions within Tata and interviewed with multiple South Asian Tata managers. Mr. Heldt was well qualified for each position, but was not hired for any of them. During this period, Mr. Heldt again requested that Ms. Gopal allow him to interview for open positions that were outside of his vertical, but she refused and was hostile and rude in her responses.

59. In November 2013, Mr. Heldt was placed in a new position as an IT Project Manager helping to service Farmers Insurance Group. This position did not involve work commensurate with Mr. Heldt's advanced skill and experience. Of the approximately 100 Tata employees assigned to Farmers Insurance, Mr. Heldt was the only non-South Asian. Mr. Heldt was stripped of his position in December 2013 and again benched.

60. In March 2014, Mr. Malladi called Mr. Heldt and told him he was being terminated, as he had been on the bench for 3 months. Mr. Malladi also stated that Mr. Heldt was being released because Mr. Heldt would only accept positions in California. In truth, Mr. Heldt was willing to accept a position anywhere in the United States, and he informed Mr. Malladi of this fact. Nevertheless, Tata terminated Mr. Heldt.

61. Over his tenure with Tata, Mr. Heldt observed that approximately 99% of Tata employees were South Asian. This percentage was true across all the client sites he

was assigned, and at Tata offices he visited, across the country. Additionally, at each of the client sites to which Mr. Heldt was assigned, he observed that South Asian employees were promptly on-boarded and assigned work that was more substantive than work assigned to non-South Asians. Mr. Heldt also observed that South Asians were regularly permitted to apply for positions outside of, and transfer between, verticals.  Similarly, Mr. Heldt observed Tata's lack of interest in hiring non-South Asians to fill positions.

*Plaintiff Slaight's Experiences*

62. Mr. Slaight graduated in June 2012 from DeVry University with a Bachelor of Science degree in Computer Information Systems and Database Management. Mr. Slaight interviewed with a Tata Manager of College Recruiting & Relations in April 2012 and was hired as a software engineer shortly thereafter. Mr. Slaight attended orientation in May 2012, and started full time on July 9, 2012. Over the following two months, Mr. Slaight underwent training in Cincinnati, Ohio and Chennai, India.

63. Upon returning from India, Mr. Slaight was assigned to a client project in Jersey City, New Jersey servicing client AXA.

64. Mr. Slaight's assignment at AXA started October 1, 2012. He reported to work and was assigned to the AXA GIP COE Deployment Team, which was responsible for the deployment and maintenance of applications on the AXA server. Alok Bhalla, a South Asian of Indian national origin, was Tata's local Business Relationship Manager. Vignesh Ramanan, a South Asian of Indian national origin,

was Tata's Senior Engagement Manager and Mr. Slaight's direct Tata supervisor. Mr. Slaight was eager to begin working as a software engineer and looked forward to gaining real-world experience. However, over the next six months, Tata failed to assign Mr. Slaight any substantive work. Nor did Tata provide him with any training. Each day, Mr. Slaight reported to work, only to sit at his desk waiting for an assignment. Approximately every week to two weeks, Mr. Slaight approached Mr. Bhalla and/or Mr. Ramanan to request work. Yet neither Mr. Bhalla nor Mr. Ramanan ever assigned Mr. Slaight any work. On the other hand, Mr. Slaight observed that his South Asian colleagues were regularly assigned substantive work.

65. On March 29, 2013, after six months without substantive work, Mr. Slaight was removed from the client project and placed on the bench. Mr. Slaight reached out to Tata's internal recruiters and the HR department seeking a new placement. On April 17, 2013, Mr. Slaight interviewed with several local Tata managers servicing Bank of America in Pennington, New Jersey. Each of these managers was South Asian and, upon information and belief, of Indian national origin. Despite performing well during these interviews, Tata did not select Mr. Slaight for the position.

66. On April 19, 2013, HR representative Debojyoti Sen informed Mr. Slaight that his employment with Tata had been terminated. Throughout his entire employment with Tata, Mr. Slaight was never assigned any substantive work.

**CLASS ACTION ALLEGATIONS**

67. Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure

23

23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for Tata's systematic pattern and practice of discriminatory employment practices based upon individuals' race and/or national origins. This action is brought on behalf of the following individuals:

> All individuals who are neither of South Asian race nor Indian national origin who sought positions within Tata in the United States and were not hired or selected and/or were employed by Tata in the United States and were demoted (in title and/or responsibilities) or discharged.

In the alternative, this action is brought on behalf of the following two subclasses of individuals:

> A. All individuals who are neither of South Asian race nor Indian national origin who sought positions within Tata in the United States and were not hired or selected.

> B. All individuals who are neither of South Asian race nor Indian national origin who were employed by Tata in the United States and were demoted (in title and/or responsibilities) or discharged.

68. The class or subclasses exclude all individuals who are either of South Asian race or Indian national origin (as defined in footnote 1). Thus, the class or subclasses would exclude a person of South Asian race irrespective of that person's national origin, visa status, or citizenship. Likewise, the class or subclasses would exclude a person of Indian national origin irrespective of that person's race.

69. The class[7] period runs from April 14, 2011 onwards.

70. Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members

---

[7] All class allegations are alleged, in the alternative, on behalf of the two subclasses.

is unknown to Plaintiffs, it is believed to be in the thousands. Furthermore, the class is readily identifiable from information and records in Tata's possession.

71. There are numerous questions of law and fact common to members of the class. Among the common questions of law or fact are: (a) whether Tata has intentionally discriminated against individuals who are not of South Asian race or Indian national origin in making employment decisions; (b) whether Tata has intentionally favored South Asians (and individuals of Indian national origin) in hiring, placement, promotion/demotion, and retention decisions and/or whether Tata has intentionally disfavored non-South Asians (or individuals not of Indian national origin) in hiring, placement, promotion/demotion, and termination decisions; (c) whether Tata's policy and practice of relying on South Asian visa and local workers (primarily from India) is intentionally discriminatory; (d) whether Tata has violated Title VII; (e) whether Tata has violated § 1981; (f) whether equitable and injunctive relief is warranted for the class and (g) whether compensatory and/or punitive damages are warranted for the class.

72. Plaintiffs' claims are typical of the class. All members of the class were damaged by the same discriminatory policies and practices employed by Tata.

73. Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class litigation to

represent them and the class.

74. Plaintiffs and the class they seek to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of Tata's actions.

75. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Tata has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the class as a whole. Members of the class are entitled to declaratory and injunctive relief to end Tata's systematic, common, uniform, unfair, and discriminatory policies and practices.

76. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the class is whether Tata has discriminated on the basis of race and national origin in their employment practices. This question is central to the case and predominates over individual issues among the members of the proposed class. Tata has engaged in a common course of discriminatory conduct in a manner that has harmed all of the class members.  Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each

individual class member. The instant case will be eminently manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

77. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Tata's discrimination. Certification under this rule is also appropriate to decide whether Tata has adopted a systemic pattern and practice of national origin and racial discrimination in hiring and employment decisions. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

### COUNT I
**(Disparate Treatment on the Basis of Race and National Origin)**
**(Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)**
**(On behalf of Plaintiffs Heldt and Buchanan and the Class)**

78. Plaintiffs Heldt and Buchanan re-allege each preceding paragraph as though fully set forth herein.

79. This claim is brought by Plaintiffs Heldt and Buchanan on behalf of themselves and the class.

80. Throughout the class liability period, Tata has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race and Indian national origin by: (a) knowingly and intentionally favoring individuals of South Asian race and Indian national origin in employment decisions, including

27

hiring, placement, promotion/demotion, and termination decisions, (b) knowingly and intentionally disfavoring individuals who are not of South Asian race and Indian national origin (including Mr. Heldt and Mr. Buchanan) in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 95% or more South Asian employees (primarily from India).

81. As a direct and proximate result of Tata's intentional discrimination, Plaintiffs Heldt and Buchanan and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to placement, compensation, and/or continued employment with Tata.

82. Tata's actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq.*

### COUNT II
**(Disparate Treatment the Basis of Race)**
**(Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**
**(On behalf of all Plaintiffs and the Class)**

83. Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

84. This claim is brought by all Plaintiffs on behalf of themselves and the class.

85. Throughout the class liability period, Tata has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race by: (a) knowingly and intentionally favoring South Asian individuals in employment decisions, including hiring, placement, promotion/demotion, and termination

decisions, (b) knowingly and intentionally disfavoring non-South Asian individuals (including Plaintiffs) in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 95% or more South Asian employees.

86. As a direct and proximate result of Tata's intentional discrimination, Plaintiffs and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to placement, compensation, and/or continued employment with Tata.

87. Tata's actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs and the class pray for relief as follows:

a.  Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b.  Designation of Plaintiffs as representatives of the class;

c.  Designation of Plaintiffs' counsel as counsel for the class;

d.  A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.;

e.  A declaratory judgment that the practices complained of herein are unlawful and violate the Civil Rights Act of 1866, 42 U.S.C. § 1981;

f.  A permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth

herein;

g.  Order Defendant to adopt a valid, non-discriminatory method for hiring, placement, termination, and other employment decisions;

h.  Order Defendant to post notices concerning its duty to refrain from discriminating against employees on the basis of race or national origin;

i.  Award Plaintiffs and the class compensatory damages for the harm they suffered as a result of Defendant's violations of Title VII and § 1981;

j.  Award Plaintiffs and the class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendant's discriminating against them in violation of Title VII and § 1981;

k.  Award Plaintiffs and the class front- and back-pay, and such other equitable relief as the Court deems just and appropriate;

l.  Award Plaintiffs and the class exemplary and punitive damages;

m.  Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

n.  Award Plaintiffs and the class such other relief as this Court deems just and appropriate.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs and the class respectfully demand a trial by jury on all issues properly triable by a jury in this action.

DATED:    April 20, 2016                 Respectfully submitted,

By: <u>/s/Daniel Low</u>

Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: (202) 471-1995
Email: dlow@kotchen.com;
dkotchen@kotchen.com;
mvk@kotchen.com

Michael F. Brown
**DVG LAW PARTNER LLC**
P.O. Box 645
Neenah, WI 54957
920-238-6781
920-273-6177 (fax)
mbrown@dvglawpartner.com

Vonda K. Vandaveer
**V.K. Vandaveer, P.L.L.C.**
P.O. Box 27317
Washington, DC 20038-7317
202-340-1215
202-521-0599 (fax)
atty@vkvlaw.com

Steven Tidrick, SBN 224760
Joel Young, SBN 236662
**The Tidrick Law Firm**
2039 Shattuck Avenue #308
Berkeley, CA 94704
Telephone: (510) 788-5100
Facsimile: (510) 291-3226
E-mail: sgt@tidricklaw.com
E-mail: jby@tidricklaw.com

*Attorneys for all Plaintiffs*

THIRD AMENDED COMPLAINT - CASE NO. 4:15-CV-01696-YGR