# Kotchen & Low LLP

1745 KALORAMA RD. NW, STE. 101, WASHINGTON DC, 20009 | Tel: (202) 471-1995 | Fax: (202) 280-1128 | INFO@KOTCHEN.COM

*Via* CM/ECF                                                             January 18, 2017

Hon. Yvonne Gonzalez Rogers
United States District Court, Northern District of California
Oakland Courthouse, Courtroom 1 – 4th Floor
1301 Clay Street
Oakland, CA 94612

      *Re: Heldt, et al. v. Tata Consultancy Services, Ltd.*, No. 4:15-cv-01696-YGR (N.D. Cal.)

Dear Judge Gonzalez Rogers,

      On behalf of Plaintiffs Brian Buchanan and Christopher Slaight ("Plaintiffs") and the putative class, I write in opposition to Defendant Tata Consultancy Services, Ltd.'s ("Tata's") request for leave to file a motion for summary judgment. Summary judgment is inappropriate for two reasons. First, in accordance with *Teamsters*,[1] the extent to which Tata operates under a pattern and practice of discrimination must be addressed before consideration of individual employment decisions affecting Plaintiffs. Second, discovery is ongoing.  Tata just recently started to produce emails and late yesterday – exactly two weeks before Plaintiffs' class certification motion is due – produced employee data critical to Plaintiffs' class-wide pattern and practice claims.[2]

### A. Plaintiffs' Pattern and Practice Claims Must Be Resolved Before Consideration of Individual Employment Decisions Affecting Plaintiffs.

      Plaintiffs Buchanan and Slaight advance class claims that Tata engages in a pattern and practice of discrimination against non-South Asians in hiring and terminations. Under the two-phase framework established in *Teamsters*, the first phase – whether the defendant operates under a pattern and practice of discrimination – must be addressed first, before any consideration of the Plaintiffs' individual cases. *See, e.g., id.* at 342 n.24, 360 n.46; *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1108-09 (10th Cir. 2001). Where gross statistical disparities exist in an employer's employment practices, statistical evidence alone may establish a plaintiff's *prima facie* case – that the defendant operates under a pattern and practice of discrimination. *See, e.g., Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977); *Heldt v. TCS*, 132 F. Supp. 3d 1185, 1190 (N.D. Cal. 2015). Establishing a *prima facie* case creates a presumption that an employer's employment decisions were made pursuant to its pattern and practice of discrimination. *See, e.g., Teamsters*, 431 U.S. at 359 n.45, 361-62 ("the finding of a pattern and practice changed the position of the employer to that of a proved wrongdoer").

      Significant evidence exists that Tata operates under a pattern and practice of discrimination, including statistical and direct evidence of Tata's discriminatory preference for South Asians. For example, Tata's U.S. workforce is approximately 80% South Asian, a number drastically higher than the percentage of South Asians in the relevant workforce (Tata's South Asian workforce is disproportionate across its various worksites and job types). No plausible

---

[1] *Teamsters* refers to *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977).
[2] If the Court believes a hearing would be helpful, Plaintiffs are available to participate in a telephonic hearing on Monday, January 23.

Letter from D. Kotchen to Hon. Y. Gonzalez Rogers
January 18, 2017

argument exists that this disparity arose by chance. Rather, Tata achieves its grossly disproportionate workforce in at least two ways. First, Tata has an explicit corporate directive to favor its South Asian visa workers in staffing position in the United States. Over 70% of Tata's U.S. workforce is visa-dependent, and all – or the vast majority – of these visa-dependent individuals are South Asian (from India). Tata's corporate directive mandates that these visa workers be utilized to the "maximum extent." TCS057813-7818 at 7815 ("Leadership directive is to utilize every visa to the maximum extent – L1 B: 5 Yrs, H1 B: 6 Yrs & L1 A: 7 Yrs"). Thus, individuals with visas located in India are given preference for U.S. positions over qualified non-South Asians, as Tata's Resource Management Group ("RMG") is explicitly instructed to "map" individuals in India with "unutilized visas" to "onsite opportunities" in the U.S.:

> The visa utilization report is published every fortnight by Chennai Data Support.  It gives a view of the number of associates in the branch who have valid visas and work permits, and [are] currently at offshore. It also gives a split of how many associates have utilized their visas and work permits. You can split the data branch wise and visa type wise. RMG should try and map associates with unutilized visas and work permits for onsite opportunities.

RMG Instruction Manual at 35; *see also* TCS137485-7487 at 7485 ("Leadership Team has advised to utilize visa ready Associates at on site unless (1) There is no way the person can continue in the US because of one or more challenges related to visa validity / work authorization. (2) HR confirms that the personal / medical issues the Associate is facing are so grave that he must travel back."); TCS177617-7618, at 7617 (RMG Lead Ambika G: "Can we look at Visa ready or visa eligible cvs please."  Alok Bhalla:  "Visa Ready will be a preference."). Tata's explicit preference to fill positions with visa-ready South Asians disadvantages: (1) qualified non-South Asian applicants; and (2) the comparatively few non-South Asian Tata employees, who are routinely placed in a non-productive status (referred to as being "benched"), seek and are rejected for new positions within Tata in favor of visa-ready South Asians, and are subsequently terminated.

Tata argues that "treaty agreements" immunize its discrimination effectuated through the use of visa workers. Letter from M. La Mar to J. Gonzales Rogers at 1 n.1 & 2 (Jan. 13, 2017) (Dkt. #93) ("Tata Ltr."). Tata is wrong. *See, e.g.*, *Morelli v Cedel*, 141 F.3d 39, 43(2d Cir. 1998) (treaty "does not give [the employer] license to violate American laws prohibiting discrimination in employment") (citation omitted). Tata fails to identify a treaty applicable here. The General Agreement on Trade in Services ("GATS"), by its very terms, does not apply "to the movement of all categories of natural persons supplying services under the Agreement." GATS Annex on Movement of Natural Persons ¶¶ 1-4.[3] "Congress explicitly stated that '[n]o provision of [GATS], nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect.'" *United States v. Lombardo*, 639 F.Supp.2d 1271, 1289 (D. Utah 2007) (quoting 19 U.S.C. § 3512(a)(1)). Unsurprisingly, Tata does not cite a single discrimination case (or any case) addressing GATS. Further, this Court has already found that the use of visa workers does not immunize an employer from liability under Title VII or § 1981. *Heldt*, 132 F. Supp. 3d at 1189; *see also Koehler v. Infosys Tech. Ltd.*, 107 F. Supp. 3d 940, 948-49 (E.D. Wisc. 2015).

Second, Tata discriminates in "local hiring," *i.e.*, even when Tata hires individuals who reside locally in the United States, such persons are disproportionately South Asian. Tata utilizes

---

[3] Available at https://www.wto.org/english/docs_e/legal_e/26-gats.pdf.

Letter from D. Kotchen to Hon. Y. Gonzalez Rogers
January 18, 2017

third party recruiters and headhunters to locate local talent, and these entities predominantly refer South Asian candidates to Tata. *See e.g.*, TCS029451; TCS029462. Tata also utilizes these recruiters to locate South Asian contract workers who Tata eventually hires as full-time employees.

Rather than address its own statistical and direct evidence of discrimination, Tata's letter challenges the statistical allegations in Plaintiffs' complaint. *See* Tata Ltr. at 2. Tata does not, and cannot, argue that there is no genuine dispute of fact that its own data and documents demonstrate that it operates under a pattern and practice of discrimination. Accordingly, any consideration of Plaintiffs' individual claims is premature and procedurally improper. *See, e.g.*, *Thiessen*, 267 F.3d at 1106-09; *Colindres v. Quietflex Mfg..*, No. 01-4319, 2004 WL 3690215, at *6 (S.D. Tex. Mar. 23, 2004).

Even if the Court did consider Plaintiffs' individual claims, it must presume that Tata's adverse employment actions against them were taken pursuant to its pattern and practice of discrimination. *See, e.g.*, *Teamsters*, 431 U.S. at 359 n.45, 361-62. This presumption can only be overcome with clear and convincing evidence – a burden Tata cannot plausibly meet on summary judgment. *See, e.g.*, *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 n.22 (11th Cir. 2000) ("The employer may overcome this presumption only with *clear and convincing evidence* that job decisions made with the discriminatory policy was in force were not made in pursuit of that policy") (emphasis added) (citation omitted). Plaintiff Buchanan was a highly skilled and experienced IT worker at Southern California Edison ("SCE") who applied for a position with Tata after SCE contracted with Tata to perform IT services. Tata did not hire him (did not even interview him), and instead staffed its SCE services mostly with South Asian workers pursuant to its pattern and practice of discrimination. Similarly, Plaintiff Slaight was a well-qualified IT worker who was removed from a position servicing a client for Tata, placed on the bench, applied for another position which he did not receive, and was terminated several weeks later. As with Plaintiff Buchanan, Plaintiff Slaight was disfavored and harmed as a result of Tata's discriminatory preference for employing South Asians.

### B.  Summary Judgment Is Inappropriate Because Discovery Is Ongoing.

Discovery in this case is ongoing and far from complete. Tata only just began producing ESI (*e.g.*, email) from custodians in November, and that production is incomplete. These documents reveal the egregiousness of Tata's discriminatory practices and will require follow-up discovery. Further, data Tata produced late yesterday is critical to Plaintiffs' pattern and practice claims, and that data also requires follow-up discovery. At a minimum, the state of discovery warrants deferring consideration of any summary judgment motion. *See* Fed. R. Civ. P. 56(d).

Given the state of discovery, the requirements of the *Teamsters* framework, and Tata's burden, it cannot reasonably argue that no genuine dispute of material fact exists. Plaintiffs respectfully request that the Court deny Tata's request for leave to file a motion for summary judgment.

Sincerely,

Daniel Kotchen

3

Letter from D. Kotchen to Hon. Y. Gonzalez Rogers
January 18, 2017

## CERTIFICATE OF SERVICE

I certify that the foregoing document was served on all counsel of record through the Court's CM/ECF system.

Daniel Kotchen