Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
E-mail: dlow@kotchen.com;
E-mail: dkotchen@kotchen.com;
E-mail: mvk@kotchen.com

Attorneys for Buchanan, Slaight,
Webber, Masoudi, and Mandili

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

STEVEN HELDT, BRIAN BUCHANAN, and CHRISTOPHER SLAIGHT

Plaintiffs,

v.

TATA CONSULTANCY SERVICES, LTD.,

Defendant.

Case No.: 4:15-cv-01696-YGR

**CLASS ACTION**

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

Date: June 20, 2017
Time: 2:00 p.m.
Location: Courtroom 1, 4th Floor, Oakland

Hon. Yvonne Gonzalez Rogers

Complaint Filed: April 14, 2015

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that at 2:00 p.m. on June 20, 2017, in Courtroom 1, 4th Floor of the above-titled court, located at 1301 Clay Street, Oakland, California 94612, Plaintiffs Brian Buchanan, Christopher Slaight, Steven Webber, Seyed Amir Masoudi, and Nobel Mandili[1] will, and hereby do, move this Court pursuant to Federal Rule of Civil Procedure 23 to certify the following two classes:

A. Hiring Class: All individuals who are not of South Asian race or Indian national origin who sought a position with Tata in the United States and were not hired between April 14, 2011 and the date of class certification.

B. Termination Class: All individuals who are not of South Asian race or Indian national origin who were employed by Tata in the United States, were placed in an unallocated status and were terminated between April 14, 2011 and the date of class certification.

Plaintiffs further will, and hereby do, move for an order appointing Plaintiffs as representatives of the classes defined above, and appointing Plaintiffs' counsel as counsel for the class. As discussed in the accompanying memorandum of points and authorities, Defendant Tata Consultancy Services, Ltd. ("Tata") engages in a systematic pattern and practice of discrimination against non-South Asians and non-Indians in hiring and employment decisions across the United States in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. Plaintiffs satisfy all necessary elements of Rule 23, making certification appropriate under Rule 23(b)(2) and 23(b)(3), or, in the alternative, Rule 23(c)(4). Accordingly, Plaintiffs' Motion for Class Certification should be granted, the two proposed classes should be certified, and Counsel should be appointed Class Counsel on behalf of the certified classes.

---

[1] As outlined in Plaintiffs' Motion for Leave to File Fourth Amended Complaint (Dkt. #104) currently pending before the Court, Plaintiffs seek leave to add Steven Webber, Seyed Amir Masoudi, and Nobel Mandili as named plaintiffs in this case.

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION .................................. i
TABLE OF CONTENTS ............................................................................................ ii
TABLE OF AUTHORITIES ....................................................................................... iii
MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1
I. PLAINTIFFS SEEK CLASS CERTIFICATION ONLY FOR PHASE I ..............2
II. STATEMENT OF ISSUES TO BE DECIDED ...................................................3
III. STATEMENT OF FACTS ....................................................................................4
A. Tata Overview ..........................................................................................4
B. Tata's Corporate Policy and Practices ......................................................6
C. The Discriminatory Effect of Tata's Corporate Policy and Practices .........8
D. Discovery Misconduct ..............................................................................12
IV. PROPOSED CLASS DEFINITIONS ..................................................................13
V. LEGAL STANDARD ...........................................................................................14
VI. ARGUMENT .......................................................................................................14
A. The Proposed Classes Satisfy the Requirements of Rule 23 ....................14
1. Numerosity Is Satisfied Because the Classes Greatly Exceed 40 Members ..................................................................................15
2. Plaintiffs Raise Common Questions ...............................................15
3. Common Issues Predominate in Phase I Over Individual Issues .......................................................................................19
4. Plaintiffs' Claims Are Typical of the Claims of the Class ............20
5. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class .......................................................................................22
6. Plaintiffs Satisfy the Superiority Requirement ..............................22
7. The Proposed Classes Are Objectively Defined and Ascertainable ....................................................................................24
B. Alternatively, Certification Is Appropriate Under Rule 23(c)(4) .............24
C. Kotchen & Low LLP and Co-Counsel Should Be Appointed Class Counsel .................................................................................................25
VII. CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

**Cases**


*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........ 21

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) ........ 13, 15, 19

*Barefield v. Chevron, U.S.A., Inc.*, No. C 86–2427 THE, 1988 WL 188433 (N.D. Cal. Dec. 6, 1988) ........ 2

*Bates v. UPS*, 204 F.R.D. 440 (N.D. Cal. 2001) ........ 14

*Bazemore v. Friday*, 478 U.S. 385 (1986) ........ 16

*Beck v. Boeing Co.*, 60 F. App'x 38 (9th Cir. 2003) ........ 16, 19

*Bell v. PNC Bank, Nat'l Assoc.*, 800 F.3d 360 (7th Cir. 2015) ........ 22

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) ........ 3

*Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384 (5th Cir. 1983) ........ 17

*Brawner v. Bank of Am., N.A.*, No. C 14–02702 YGR (LB), 2014 WL 6845504 (N.D. Cal. Dec. 4, 2014) ........ 13

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015) ........ 16, 17

*Butler v. Sears, Roebuck & Co.*, 727 F.3d, 796 (7th Cir. 2013) ........ 19, 24

*Campbell v. Facebook, Inc.*, 315 F.R.D. 250 (N.D. Cal. 2016) ........ 15

*Carnegie v. Household Int'l Inc.*, 376 F.3d 656 (7th Cir. 2004) ........ 2, 23

*Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524 (N.D. Cal. 2004) ........ 21, 22

*Chi. Teachers Union v. Bd. of Ed. of City of Chi*, 797 F.3d 426 (7th Cir. 2015) ........ 15, 19

*Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12–cv–00824, 2015 WL 1292444 (D. Ariz. Mar. 23, 2015) ........ 15, 20

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ........ 15, 19

*Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984) ........ 16

*EEOC v. Gen. Tel. Co. of NW, Inc.*, 599 F.2d 322 (9th Cir. 1979) ........ 16

*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012) ........ passim

*Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330 (9th Cir. 1977) ........ 13

*Gray v. Golden Gate Nat'l Recreation Area*, 279 F.R.D. 501 (N.D. Cal. 2011) ........ 18, 20

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ........ 20

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) ........ 16

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) ........ 2

*Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015) ........ 14

*Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666 (N.D. Cal. 2011)........ 3

*Hopson v. Handesbrands Inc.*, No. CV–08–0844 EDL, 2009 WL 928133 (N.D. Cal. Apr. 3, 2009)........ 21

*Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258 (S.D. Cal. 1988)........ 14

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, ___ F.R.D. ___, 2016 WL 3770957 (N.D. Ga. July 12, 2016)........ 21

*In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013)........ 14, 18

*In re Live Concert Antitrust Litig.*, 247 F.R.D. 98 (C.D. Cal. 2007)........ 13

*Ingram v. Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001)........ 19

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)........ passim

*Johns v. Bayer Corp.*, 280 F.R.D. 551 (S.D. Cal. 2012)........ 3

*Kolstad v. Am. Dental Assoc.*, 527 U.S. 526 (1999)........ 2

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013)........ 13

*Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012)........ 15

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012)15, 18

*Moeller v. Taco Bell Corp.*, 220 F.R.D. 604 (N.D. Cal. 2004)........ 14

*Moore v. Napolitano*, 926 F. Supp. 2d 8 (D.D.C. 2013)........ 19

*Mullins v. Premier Nutrition Corp.*, Case No. 13-cv-01271-RS, 2016 WL 1535057 (N.D. Cal. Apr. 15, 2016)........ 19

*Nelson v. Avon Prods., Inc.*, No. 13–cv–02276–BLF, 2015 WL 1778326 (N.D. Cal. Apr. 17, 2015)........ 21

*Patel v. Trans Union, LLC*, 308 F.R.D. 292 (N.D. Cal. 2015)........ 23

*Rosales v. El Rancho Farms*, No. 1:09–cv–00707, 2012 WL 3763955 (E.D. Cal. Aug. 29, 2012)........ 21

*Ruiz v. XPO Last Mile, Inc.*, No. 5cv2125, 2016 WL 4515859 (S.D. Cal. Feb. 1, 2016)........ 20

*Schwartz v. Harp*, 108 F.R.D. 279 (C.D. Cal. 1985)........ 20

*Shepard v. Lowe's HIW, Inc.*, No. C 12–3893 JSW, 2013 WL 4488802 (N.D. Cal. Aug. 19, 2013)........ 23

*Smith v. Univ. of Wash. Law Sch.*, 2 F. Supp. 2d 1324 (W.D. Wash. 1998)........ 15

*Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107 (9th Cir. 2014)........ 18

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014)........ 15, 16, 23

*Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095 (10th Cir. 2001)........ 17

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016)........ 15, 18

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)........ 23

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)........ 13, 17

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) .................... 13

*Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223 (C.D. Cal. 2003) .................... 19

*Wilfong v. Rent-A-Center, Inc.*, No. 00-CV-680, 2001 WL 1795093 (S.D. Ill. Dec. 27, 2001) .................... 20

*Williams v. Boeing Co.*, 225 F.R.D. 626 (W.D. Wash. 2005) .................... 2, 19

*Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) .................... 3

**Statutes**

42 U.S.C. § 1981 .................... 1, 2

42 U.S.C. § 2000e .................... 1

**Rules**

Fed. R. Civ. P. 23 .................... passim

**Treatises**

2 W. Rubenstein, Newberg on Class Actions (5th ed. 2012) .................... 16

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Buchanan, Slaight, Webber, Masoudi, and Mandili[2], move to certify this case as a class action. Defendant Tata Consultancy Services, Ltd. ("Tata") favors South Asian Indian nationals in its U.S. workforce hiring and termination actions in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. Tata has an explicit corporate policy to staff U.S. positions with "visa ready associates," *i.e.*, South Asian Indian nationals. This policy pertains (a) to visa ready individuals working in India who are instructed to be "mapped" to available U.S. positions and (b) to "benched" employees, a non-productive status where the comparatively few non-South Asian employees are routinely placed and then terminated, as visa holding South Asians working in the U.S. are given preference for new positions. Tata's own corporate representative admitted that he would be "concerned" about a policy favoring visa ready individuals because "citizenship or nationality should not be the basis for determining a person is fit against a particular position." Similarly, third party recruiters who locate U.S. job candidates for Tata identify a candidate's nationality (*e.g.*, Indian) and "work authorization status" (*e.g.*, green card holder, visa holder, or citizen) for Tata's consideration, resulting in predominately South Asian/Indian hires from third party recruiters. As a result of Tata's corporate policy and practices, approximately 70% of Tata's U.S. workforce consists of visa holders and between 72.32% and 78.91% of its U.S. workforce is South Asian.

Tata's discriminatory rates of hiring and termination disfavor non-South Asians to such an extreme degree that the likelihood of them occurring by chance is less than 1 in 1 billion. *See* Expert Report of David Neumark ¶¶ 6-8 ("Neumark Report") (Ex. 1). Plaintiffs seek to bifurcate this case under the *Teamsters* framework into (1) a class-wide liability phase; and (2) an individualized remedial phase. Class certification is appropriate for the liability phase because Plaintiffs have satisfied the requirements of Rule 23.

---

[2] Plaintiffs moved to amend the complaint to add Plaintiffs Webber, Masoudi and Mandili as class representatives on January 31, 2017 (Dkt. #104).

## I. PLAINTIFFS SEEK CLASS CERTIFICATION ONLY FOR PHASE I

Under the *Teamsters* framework, pattern and practice cases are generally divided into two phases – a class wide liability phase and an individual remedial phase. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360-61 (1977) (establishing two-phase framework to be used in pattern and practice cases). A district judge presides over the first phase (the liability phase), and a special master or magistrate typically is appointed to preside over the individual remedial phase. *See, e.g.*, *id.*; *Carnegie v. Household Int'l Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

The *Teamsters* framework is appropriate here, as Plaintiffs allege a pattern or practice of discrimination in hiring and terminations. Plaintiffs seek class certification only for the Phase I liability stage of proceedings, which will involve a determination of: whether Tata engaged in a pattern or practice of discrimination in hiring and terminations; whether Tata's practices have a disparate impact on non-South Asians; and the availability of punitive damages[3] and injunctive relief. *Teamsters*, 431 U.S. at 360-61 (holding that determination of pattern and practice and injunctive relief is appropriate during Phase I); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 541-43 (N.D. Cal. 2012) (compiling cases on class punitive damages determinations, and finding that availability of punitive damages should be adjudicated during Phase I, with allocation of punitive damages reserved for Phase II); *Williams v. Boeing Co.*, 225 F.R.D. 626, 634, 638-39 (W.D. Wash. 2005) (dividing pattern and practice case into liability and damages phases).[4]

If Plaintiffs are successful during Phase I (*e.g.*, they have established that discrimination is Tata's standard operating procedure in hiring and/or terminations), Phase II will involve any defense

---

[3] Under Title VII, punitive damages are available where the employer "'engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 534 (1999) (quoting 42 U.S.C. § 1981a(b)(1)); *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1197-99 (9th Cir. 2002) (punitive damages available under § 1981).

[4] *See Ellis*, 285 F.R.D. at 542 ("'[t]he purpose of punitive damages is not to compensate the victim, but to punish and deter the defendant,' and thus the focus of a punitive damages claim is 'not on the facts unique to each class member, but on the defendant's conduct toward the class as a whole.'") (citation omitted); *see also Barefield v. Chevron, U.S.A., Inc.*, No. C 86–2427 THE, 1988 WL 188433, at *3 (N.D. Cal. Dec. 6, 1988).

of Tata's individual employment decisions, the allocation of punitive damages, and presentation of evidence of compensatory damages and back pay for class members. *See Ellis*, 285 F.R.D. at 539, 545 (certifying class and noting that "[a]lthough this case does present individualized questions with respect to any particular class member's entitlement to relief, Plaintiffs' proposed trial plan addresses these concerns by employing the *Teamsters* framework, in which individual class members will present their claims for relief in a second phase of trial if liability is established [and thus] … [t]he need for individualized hearings does not, on its own, defeat class certification"); *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("'[t]he amount of damages is invariably an individual question and does not defeat class action treatment.'") (quoting *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)).[5] Tata will also have an opportunity to present "individualized defenses with respect to each class member" during Phase II. *Ellis*, 285 F.R.D. at 539.

In deciding whether to certify a class for the first phase of a bifurcated proceeding, courts examine only whether plaintiffs have satisfied the Rule 23 requirements with respect to the issues in the first phase, and the existence of individualized issues in the second phase does not weigh against certification in the first phase. *See, e.g.*, *id.*; *Johns v. Bayer Corp.*, 280 F.R.D. 551, 555-56, 560 (S.D. Cal. 2012). As discussed below, Plaintiffs will use common evidence of Tata's discriminatory scheme to establish a common question of liability, rendering class certification for Phase I appropriate.

## II. STATEMENT OF ISSUES TO BE DECIDED

(1) Whether the Court should grant Plaintiffs' Motion for Class Certification as to the Hiring and Termination Classes.

---

[5] *See also Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 680 (N.D. Cal. 2011) ("individual damages issues typically do not bar class certification where common questions predominate over individual questions as to liability").

(2) Whether Plaintiffs Buchanan, Slaight, Webber, Masoudi, and Mandili[6] should be appointed as representatives of the certified classes.

(3) Whether Kotchen & Low LLP should be appointed Lead Class Counsel, and DVG Law Partner LLC and The Tidrick Law Firm should be appointed Class Counsel on behalf of the certified classes.

## III. STATEMENT OF FACTS

### A. Tata Overview

Tata provides IT consulting and outsourcing services and employs approximately 29,900 employees in the United States. Answer to 3d. Am. Compl. ¶ 13 (Dkt. #84); TCSLTD003463399 (active employee list) (Dkt. #96-1 at 2). Tata contracts with U.S. companies such as Southern California Edison, [redacted], and others to provide IT services. *See* 3d Am. Compl. ¶¶ 2, 34 (Dkt. #82); TCS061566 (Ex. 2). Once Tata secures a contract for a client, it hires individuals to fill U.S. positions to serve the client.[7] For these U.S. positions, Tata hires "visa ready" individuals in India who are working for Tata in other positions.[8] Tata also hires individuals residing in the U.S., who Tata calls "local hires."[9] Tata relies on third party recruiters for much of its "local" hiring.[10] Visa ready individuals and local hires must apply and interview for jobs in the U.S.[11]

---

[6] Webber, Masoudi, and Mandili's Motion for Leave to File Fourth Amended Complaint (Dkt. #104) is currently pending before the Court. If denied, the Court can still appoint Plaintiffs Buchanan and Slaight as representatives of the certified classes.

[7] Ganapathy (30(b)(6)) Dep. Tr. 29:3-6, 31:20-32:5 (Mar. 16, 2016) (Ex. 3); Kumar (30(b)(6)) Dep. Tr. 38:7-39:14 (Jan. 27, 2016) (Ex. 4).

[8] Kumar (30(b)(6)) Dep. Tr. 38:7-39:14 (Jan. 27, 2016) (Ex. 4). "Visa ready" means Tata has already secured a visa for an individual, such that the individual is able to travel to the U.S. to fill a position, if hired. *Id.* 40:5-8; Kumar (30(b)(6)) Dep. Tr. 16:15-20 (Jan. 25, 2017) (Ex. 5).

[9] Kumar (30(b)(6)) Dep. Tr. 13:22-24 (Jan. 25, 2017) (Ex. 5).

[10] *See* Tata's Supp. Resp. to Pls.' Am. Notice of Rule 30(b)(6) Dep. at 4-5 (noting that from 2011-2016, 7,111 of Tata's 14,032 local hires (50.68%) were hired from third party recruiters) (Ex. 6).

[11] Kumar (30(b)(6)) Dep. Tr. 27:13-29:1, 43:22-44:5 (Jan. 25, 2017) (Ex. 5).

When an individual is hired for a U.S. position, that position may come to an end when the work for the client is completed.[12] Once a position comes to an end, an individual must again seek a new position within Tata, going through another application and interview process.[13] Tata's Resource Management Group ("RMG") assists individuals in identifying new positions for which they can apply.[14] RMG closely tracks when positions are scheduled to end, and individuals often promptly seek and are placed in a new position.[15] Individuals who are not immediately hired for a new position are placed in a non-productive status, referred to as being "benched" or "unallocated."[16] Tata closely monitors individuals who are in benched status.[17] If an individual is benched for too long, he or she will be terminated.[18]

---

[12] *Id.* 26:23-25.

[13] *Id.* 27:13-28:21.

[14] *Id.*; TCS038103-8110 at 8105 ("once your release [from a project] is approved, RMG will start exploring options for you. They will try to finalize your profile for one of the available open positions within TCS, if you get selected after internal/client interviews.") (Ex. 7).

[15] Kumar (30(b)(6)) Dep. Tr. 26:16-28:8 (Jan. 25, 2017) (Ex. 5); TCS007391-7452 at 7407-09 (noting that RMG "[redacted] and is responsible for [redacted]") (Ex. 8).

[16] TCS044201-4203 at 4202 ("I explained the bench policy to you wherein you will be unallocated once you're released from [the client project] and you will need to work actively with RMG … to find your next assignment") (Ex. 9); TCS038103-8110 at 8105 ("During gap between projects, [Tata] pays some weeks, called 'Bench Policy'. So, what is the 'Bench Policy' of TCS? – As discussed, once your release is approved, RMG will start exploring options for you. They will try to finalize your profile for one of the available open positions within TCS, if you get selected after internal/client interviews. You will get paid your regular paycheck even while you are unallocated.") (Ex. 7).

[17] Kumar (30(b)(6)) Dep. Tr. 17:10-12 (Jan. 25, 2017) (noting, through 30(b)(6) witness, that the unallocated reports "are generated on a daily basis.") (Ex. 5); Excerpt from TCSLTD0055447590 (unallocated report listing the name of each unallocated employee and his or her "number of days unallocated" and "no. of weeks [unallocated]") (Ex. 10).

[18] Kumar (30(b)(6)) Dep. Tr. 15:3-15 (Jan. 25, 2017) (Ex. 5); TCS055851-5854 at 5853 (noting "[t]here are 136 Local Hires currently unallocated. Out of that 100+ associates are more than one month unallocated. Request your help to take necessary action from HR to place these associates into project or release them.") (Ex. 11).

### B. Tata's Corporate Policy and Practices

Tata has a corporate policy of favoring visa workers in staffing U.S. positions. *See, e.g.*, TCS057813-7818 at 7815 ("Leadership directive is to utilize every visa to the maximum extent – L1 B: 5 Yrs, H1 B: 6 Yrs & L1 A: 7 Yrs.") (Ex. 12); TCS137485-7487 at 7485 ("Leadership Team has advised to utilize visa ready Associates at on site") (Ex. 13).[19] Individuals in India who have "unutilized visas and work permits" are instructed to be "mapped" to open positions in the U.S.:

> The visa utilization report is published every fortnight by Chennai Data Support. It gives a view of the number of associates in the branch who have valid visas and work permits, and [are] currently at offshore. It also gives a split of how many associates have utilized their visas and work permits. You can split the data branch wise and visa type wise. ***RMG should try and map associates with unutilized visas and work permits for onsite opportunities.***

TCS007391-7452 at 7425 (emphasis added) (Ex. 8).

Tata meticulously tracks the availability of "visa ready" employees who can fill positions in the United States.[20] Hiring for positions reflects the directive to favor visa workers over others.[21]

---

[19] TCS151793-1794 at 1793 (same) (Ex. 14); TCS153136-3138 at 3137 (same) (Ex. 15); Kumar (30(b)(6)) Dep. Tr. 80:23-81:5 (Jan. 25, 2017) (testifying, through 30(b)(6) witness, "we should use a person's visa to the maximum approval limit") (Ex. 5); TCS136893-6896 at 6893 (noting the L-1 visa worker cannot remain in the U.S. beyond the "max time period (7 years)" of his visa) (Ex. 50); TCS090008 ("Since I have completed 7 years of L1A, I will have to travel back [to India]") (Ex. 16); TCS148025-8027 at 8025 ("Leadership Team has advised not to send any visa ready associate back [to India] unnecessarily and utilize him/her here") (Ex. 17).

[20] Kumar (30(b)(6)) Dep. Tr. 54:13-19, 88:15-23 (Jan. 25, 2017) (testifying, through 30(b)(6) witness, to Tata's "weekly reports" of visa ready workers) (Ex. 5); *see, e.g.*, TCS007391-7452 at 7407-09 (noting RMG Unit Lead, Regional Lead and Associate Lead's duties include "[redacted]") (Ex. 8); TCS61414-1419 at 1414 ("We are working very closely on the Visa ready profile[s] at offshore Bangalore and other location also. . . . We are working closely to get more Visa ready profile[s], [and] will keep you updated.") (Ex. 18); TCSLTD005646989 (2012 "Visa Ready [List] for the next two months" noting a "Grand Total" of 10,290 visa ready employees) (Ex. 19); TCSLTD005646947 (2013 "Visa Ready [List] for the next two months" noting a "Grand Total" of 9,248 visa ready employees) (Ex. 20); TCS061566-1567 ("VISA ready list" for 22 client accounts, listing "Visa Type," "Petition Validity Date," "Visa Expiry," and "LCA Location" for 303 visa ready employees available to travel onsite) (Ex. 2).

[21] *See, e.g.,* TCS177617-7618, at 7617 (RMG Lead Ambika G: "Can we look at Visa ready or visa eligible cvs please[?]" Alok Bhalla: "Visa Ready will be a preference.") (Ex. 21); TCSLTD000181010-1015 at 1011 (Umesh Kumar, Senior Manager for RMG: "[redacted].") (Ex. 22); TCS150731-732

Likewise, Tata closely tracks the benched status of its employees to ensure that its South Asian visa workers are given first priority for open positions.[22] Visa workers are either not placed on the bench at all or are rapidly moved off the bench to fill open positions, while Tata's comparatively few non-South Asian employees languish on the bench and are then terminated.[23] As a result of its visa preference policy, approximately 70% of Tata's U.S. workforce consists of visa holders.[24] Virtually 100% of these individuals are Indian nationals.[25]

---

at 731 ("We have got [a] couple of Mainframe requirements[.] . . . Could you please share if any visa ready TCS expats [are] available?") (Ex. 23); TCS038825-8832 at 8826 ("For [redacted] we have 13 open positions @ onsite … for which we need VISA ready profiles[.] . . . Request you share the profiles ASAP") (Ex. 24); TCS151441-1443 at 1442 (listing positions to be closed by RMG, including a "Performance Tester" position with "Comments … Prefer expat") (Ex. 25); TCS148654-8655 at 8654 ("For this position, we are looking for Expats only.") (Ex. 26).

[22] Kumar (30(b)(6)) Dep. Tr. 17:10-12 (Jan. 25, 2017) (noting, through 30(b)(6) witness, that the unallocated reports "are generated on a daily basis.") (Ex. 5); Excerpt from TCSLTD0055447590 (unallocated report listing 635 local workers benched for 4 or more weeks, as compared to just 158 expats) (Ex. 10); TCS055851-5854 at 5853 (noting "[t]here are 136 Local Hires currently unallocated. Out of that 100+ associates are more than one month unallocated. Request your help to take necessary action from HR to place these associates into project or release them.") (Ex. 11); *id.* (chart of unallocated employees, noting that only 62 expats are unallocated and that the majority of expats have been unallocated for less than one week).

[23] *See* Neumark Report ¶¶ 7-8, 17-18, Tables 3.a-3.e (Ex. 1); TCS069046-9047 (requesting RMG review the list of unallocated expats and "map each associate to two accounts and mark[] the priority 1 & 2. . . . Prioritized accounts will quickly evaluate and absorb associates into immediate billable roles.") (Ex. 27); Kumar (30(b)(6)) Dep. Tr. 60:6-19 (Jan. 25, 2017) (Q: "Is there a process for releasing expats from positions?" A: "[I]f the … project is getting over, there might be people on that project, right? What this e-mail suggests is to reassign [expats] for other projects." Q: "Is this to avoid these individuals being unallocated?" A: "Yes.") (Ex. 5).

[24] Kumar (30(b)(6)) Dep. Tr. 82:17-83:4 (Jan. 25, 2017) (testifying, through 30(b)(6) witness, that "[c]lose to 70 percent" of Tata's U.S. workforce is visa dependent and that "[m]ost" of these workers are from India) (Ex. 5); Tata's Supp. Resp. to Pls.' Am. Notice of Rule 30(b)(6) Dep. at 4, Ex. A (noting that since 2011, over 41,000 Tata employees have traveled from India to the U.S. on a visa to fill a position in the United States) (Ex. 6).

[25] TCSLTD005646947 (2013 list of 9,248 "Visa Ready" workers, all of whom are residing at a "Base Branch" in India) (Ex. 20); TCSLTD005646989 (2012 list of 10,290 "Visa Ready" workers, all of whom are residing at a "Base Branch" in India except for 60 who reside at a "Base Branch" in Singapore) (Ex. 19); *see* Jindal (30(b)(6)) Dep. Tr. 51:17-52:7 (Feb. 26, 2016) (Q: "From which country do most TCS visa workers come from[?]" A: "India." Q: "Would you say the vast majority comes from India?" A: "Yes.") (Ex. 28).

Tata itself recognizes that preferring "visa ready" individuals for U.S. positions is discriminatory, as reflected in the testimony of Tata's head of diversity testifying on behalf of the corporation:

> Q: As the head of diversity at TCS, would you be concerned if there was a leadership directive for positions to be filled with visa-ready individuals?
> A: Yes.
> Q: Why would you be concerned about that?
> A: Because as I said, citizenship or nationality should not be the basis for determining a person is fit against a particular position.

Ganapathy (30(b)(6)) Dep. Tr. 42:25-43:10 (Jan. 25, 2017) (Ex. 29).

Tata also has a process to identify and favor South Asian Indian nationals in local hiring. Tata's third party recruiters forward resumes to Tata using a template in which the recruiter notes the "nationality" of job candidates found in the U.S. and/or the "work authorization status" of candidates (*e.g.*, green card holder, visa status, or citizen).[26] Many resumes also include a candidate's Indian nationality and even a picture of the candidate, confirming the candidate's race.[27] As a result, a substantial percentage of candidates third party recruiters refer to Tata are South Asian.[28]

### C. The Discriminatory Effect of Tata's Corporate Policy and Practices

The discriminatory effect of Tata's corporate policy and practices is reflected in the demographic make-up of its U.S. workforce. Tata's U.S. workforce is between 72.32% and 78.91%

---

[26] *See, e.g.*, TCS038607-608 (vendor United Software Group noting the applicant's "Nationality" as "Indian" and his "visa status" as "H1B") (Ex. 30); TCS038987 (vendor Diverse Lynx LLC submitting a candidate with "Nationality" listed as "Indian" and stating "[h]e is in India, but if he gets a project, I can deliver him") (Ex. 31); TCS070759-768 at 765 (vendor [redacted] noting the applicant's "Nationality" as "Indian" and "Visa Status with Validity" as "H1 – Dec 2015") (Ex. 32).

[27] *See, e.g.,* TCSLTD000617804 (Ex. 33); TCSLTD000414255-4257 (Ex. 34); TCSLTD000400982-984 (Ex. 35).

[28] *Compare* TCS029451 (vendor applicant report noting that [redacted]% of [redacted] 2014-2015 candidate submissions were of "[redacted]" race) (Ex. 36) *and* TCS029462 (2015 applicant submissions from vendor [redacted], of which [redacted]% were Asian) (Ex. 37) *and* TCS029459 (2014-2015 submission status report of vendor [redacted] listing 144 of 267 submissions (54%) as Asian) (Ex. 38), *with* Neumark Report ¶¶ 6, 9, 14 (indicating that the relevant labor market is only 12.50% South Asian) (Ex. 1) *and* TCSLTD003466530-6534 (noting that Tata's Asian workforce [redacted] across all of its job categories) (Ex. 39).

South Asian, despite the fact that the relevant labor market in the United States (the computer systems design and related services industry) is 12.50% South Asian – a difference of 197.61 or 215.87 standard deviations. Neumark Report. ¶¶ 6, 9, 14, Table 1 (Ex. 1). The likelihood of obtaining such a skewed workforce by chance is less than 1 in 1 billion. *Id.*

This disparate workforce is a product of favoring South Asians in hiring, including the corporate directive to favor visa ready South Asian Indian national candidates to fill U.S. positions and the use of third party recruiters that forward to Tata a substantial percentage of South Asian Indian national candidates. The fact that these corporate practices result in an overwhelmingly South Asian U.S. workforce is understandable considering the percentage for which "expat" hiring and "third party recruiter" hiring accounts of Tata's overall U.S. hiring during the class period:

| **Year** | **Expat U.S. Hires[29]** | **Local Hires from Third Party Recruiters** | **Other U.S. Hires[30]** |
|---|---|---|---|
| 2011 | 7,028 | 697 | 629 |
| 2012 | 6,978 | 1,020 | 759 |
| 2013 | 7,413 | 965 | 1,743 |
| 2014 | 7,004 | 1,575 | 778 |
| 2015 | 6,894 | 1,339 | 1,246 |
| 2016 | 5,992 | 1,515 | 1,940 |
| **Percentage of Total** | 74.41% | 12.81% | 12.78% |

Tata's Supp. Resp. to Pls.' Am. Notice of Rule 30(b)(6) Dep. at 4-5, Ex. A (Ex. 6).

[29] Expat hires were calculated by subtracting U.S. citizens and green card holders ("USGC," "GCEAD," and "USCZ") from the "Grand Total" for each year in Exhibit A.

[30] "Other U.S. Hires" refers to individuals hired by Tata from non-vendor sources, such as employee referrals, campus recruiting, social networking, websites, *etc. See* TCSLTD000181010-1015 at 1011-12 (Ex. 22); Kumar (30(b)(6)) Dep. Tr. 38:12-39:14 (Jan. 27, 2016) (Ex. 4).

Tata's disparate workforce is also a product of disfavoring in terminations the comparatively few non-South Asians employed by Tata. Between 2011 and 2015, Tata involuntarily terminated in the U.S. between 11.15% and 12.57% of its non-South Asian workers, while firing only a miniscule (by comparison) 0.21% to 0.97% of its South Asian workers. Neumark Report ¶¶ 7, 17, Tables 3.a-3.3.e (Ex. 1). This dramatic difference amounts to 47.27 to 57.15 standard deviations. *Id.* Most of the terminated non-South Asians were fired from the bench.[31] That is, as positions ended for the comparatively few non-South Asians Tata employed in the U.S., they were placed on the bench and often were unable to find new positions while visa holding Indian nationals were promptly placed in new jobs, per Tata's policy to favor visa holders in filling positions.

Testimony from non-South Asian former employees reflect how Tata's discriminatory policy impacted class members. For example, Mr. Giovanni was responsible for hiring Tata employees for new positions within Tata. Giovanni Decl. ¶ 2 (Feb. 20, 2017) (Ex. 41). Tata leadership prioritized Indian workers for open U.S. positions. *Id.* Virtually all of the resumes leadership provided Mr. Giovanni to consider for open positions were of individuals of Indian national origin, a number of whom were visa holders. *Id.* Mr. Giovanni was terminated from his position, placed on the bench, and – after unsuccessfully interviewing for new positions – was terminated from Tata. *Id.* ¶¶ 4-5. Other witnesses similarly testify to the common experience of being placed on the bench, overlooked for new positions in lieu of Indian nationals, and then terminated. *See, e.g.*, Webber Decl. ¶ 5 (Jan. 18, 2017) (replacing Mr. Webber on the Freddie Mac project with a less qualified Indian employee and terminating his employment after placing him on the bench) (Ex. 41); Masoudi Decl. ¶¶ 8, 10, 12 (Jan. 19, 2017) (replacing Mr. Masoudi with an H-1B visa worker, allocating him to the bench, and terminating his employment five months later) (Ex. 42); Mandili Decl. ¶¶ 3-6 (Jan. 18, 2017) (requiring Mr. Mandili to train the H-1B visa worker who assumed his role, placing Mr. Mandili on

[31] *Id.* ¶¶ 8, 18, Tables 3.a-3.e (noting that between 7.55% and 8.51% of Tata's non-South Asian employees are terminated from the bench, as compared to between 0.15% and 0.65% of Tata's South Asian workforce – a difference of 38.86 to 46.66 standard deviations); see also TCSLTD000181010-1015 at 1013 (noting only a [redacted]% attrition rate for expats in fiscal year 2013 (as compared to a [redacted]% attrition rate for local hires)) (Ex. 22).

the bench, and then terminating Mr. Mandili after 8 months on the bench) (Ex. 43); Nahshal Decl. ¶¶ 3-5 (Jan. 18, 2017) (terminating Mr. Nahshal after 5 months on the bench and favoring H-1B visa holders for open positions) (Ex. 44); Wilson Decl. ¶¶ 2, 5-6 (Jan. 19, 2017) (discussing bench policy favoring Indian employees and noting that Ms. Wilson remained on the bench for the vast majority of her employment with Tata) (Ex. 45); Peck Decl. ¶ 5 (Jan. 21, 2017) (remaining on the bench for almost one year prior to termination) (Ex. 46); Bedeiwi Decl. ¶¶ 4-5 (Jan. 25, 2017) (remaining on the bench for 5 months prior to termination, despite actively searching for jobs and relocating to Minnesota upon Tata's request) (Ex. 47).

Former employees also experienced hostility towards non-Indians, including racists comments and being left out of work-related communications because Indian employees spoke Hindi. *See, e.g.*, Masoudi Decl. ¶ 7 (Jan. 19, 2017) (targeted and treated poorly by his Indian colleagues at Tata, as Mr. Masoudi was "not one of them" because he was "not Indian") (Ex. 42); *id.* (noting that team members spoke Hindi to exclude Mr. Masoudi); Giovanni Decl. ¶ 3 (Feb. 20, 2017) (called a "typical American" by his Tata manager who spoke Hindi when discussing Mr. Giovanni with other Indian colleagues) (Ex. 40). Similarly, a job applicant who worked for Southern California Edison testified to (a) training and then being replaced by Indian employees from Tata (including many visa holders) after Southern California Edison contracted with Tata, and (b) receiving no response from Tata to his employment application notwithstanding his experience with Southern California Edison. Bradley Decl. ¶¶ 4-5 (Jan. 17, 2017) (Ex. 48).

**D. Discovery Misconduct**

Plaintiffs issued discovery requests to Tata on August 28, 2015. Tata waited to produce the vast majority of its documents until after the deadline to request to file for summary judgment and just before the due date for Plaintiffs' class certification motion, as reflected in the following:




In at least three different ways, Tata's production of documents has prejudiced Plaintiffs. First, even though Plaintiffs issued discovery requests in August 2015, Tata waited until the last six weeks to produce over 4 million pages of documents and over 1,800 GB of data (2 million pages of documents have been produced in February alone). This belated document production impacts Plaintiffs' opening and reply class certification briefs, as reviewing millions of pages of documents and incorporating the relevant documents into this briefing is not possible. (Plaintiffs' class certification reply brief is due on March 27.) In addition, Tata's belated production prevented Plaintiffs from moving for partial summary judgment, as Plaintiffs lacked key documents and data on January 13 – the deadline to seek leave to move for summary judgment. *See* Letter from M. La Mar to J. Gonzalez Rogers (Jan. 13, 2017) (Dkt. #93). As Tata's head of diversity acknowledges,

Tata's business practices are discriminatory, making a motion for partial summary judgment particularly appropriate.

Second, Tata's production of data remains incomplete. As outlined in Plaintiffs' Notice of Discovery Misconduct (Dkt. #96) and Motion for Leave to File Fourth Amended Complaint (Dkt. #104), Tata has withheld employee data critical to Plaintiffs' pattern and practice claims, and repeatedly assured Plaintiffs that such data was not available. On January 17 and 19, just two weeks prior to Plaintiffs' class certification deadline, Tata produced more robust data sets, which allowed for a more comprehensive statistical analysis, yet even this data was incomplete and was missing a number of fields that Tata inexplicably omitted from production. *See* Sharma (30(b)(6)) Dep. Tr. 30:1-22, 33:1-15, 51:14-52:3 (Jan. 25, 2017) (Ex. 49). Tata committed to producing complete employee data sets following Plaintiffs' January 25, 2017 Rule 30(b)(6) deposition, yet Plaintiffs have yet to receive this data.

Third, Tata's belated production precluded Plaintiffs from moving for a promotions class. Given the overwhelming statistical and documentary evidence demonstrating Tata's preference for hiring and retaining South Asians, the data almost certainly will demonstrate that Tata favors South Asians in promotions. But Plaintiffs have no way at this juncture of providing common evidence to the Court on this issue.

## IV. PROPOSED CLASS DEFINITIONS

Plaintiffs propose certifying the following two classes:

A. Hiring Class: All individuals who are not of South Asian race or Indian national origin who sought a position with Tata in the United States and were not hired between April 14, 2011 and the date of class certification.

B. Termination Class: All individuals who are not of South Asian race or Indian national origin who were employed by Tata in the United States, were placed in an unallocated status and were terminated between April 14, 2011 and the date of class certification.

## V. LEGAL STANDARD

"Employment discrimination based on race [] or national origin is by definition class discrimination[, and because] the purpose of Title VII is to eliminate such class based discrimination, class actions are favored in Title VII actions for salutary policy reasons." *Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1333 (9th Cir. 1977) (noting further that "class actions are consistent with the broad remedial purpose of Title VII"). To proceed as a class action under Federal Rule of Civil Procedure 23(a), a plaintiff "must [affirmatively] meet the four threshold requirements of … numerosity, commonality, typicality, and adequacy of representation." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013) (citing Fed. R. Civ. P. 23(a)); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). "Moreover, the proposed class must [also] satisfy [at least one of] the requirements of Rule 23(b), which defines three different types of classes." *Leyva*, 716 F.3d at 512. Class certification is "entirely proper in light of the general purposes of Rule 23" when judicial economy is served by "avoiding duplicative litigation." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). When ruling on such a motion, the district court "is not permitted to weigh the merits of the case at the class certification stage[,]" *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 142 (C.D. Cal. 2007), "however, '[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Brawner v. Bank of Am., N.A.*, No. C 14–02702 YGR (LB), 2014 WL 6845504, at *2 (N.D. Cal. Dec. 4, 2014) (quoting *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013)).

## VI. ARGUMENT

### A. The Proposed Classes Satisfy the Requirements of Rule 23

The proposed classes satisfy the requirements of Rule 23(a) and 23(b)(3), namely that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a); (5) "questions of law or fact common to class

members predominate over" individual questions; (6) "a class action is superior to other" methods of resolving the controversy, Fed. R. Civ. P. 23(b)(3); and (7) the class is sufficiently ascertainable because it is clearly defined based on objective criteria.[32]

1. *Numerosity Is Satisfied Because the Classes Greatly Exceed 40 Members*

A class that includes at least 40 members typically satisfies the numerosity requirement. *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) ("As a general rule, … classes of 40 or more are numerous enough" to satisfy the Rule 23(a) requirement); *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 152-53 (N.D. Cal. 2015). "Plaintiffs do not need to state the exact number of potential class members, nor is a specific number of class members required for numerosity." *Bates v. UPS,* 204 F.R.D. 440, 444 (N.D. Cal. 2001). The court is permitted to make "common sense assumptions to support a finding that joinder would be impracticable[,]" *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 608 (N.D. Cal. 2004), and may draw this conclusion by "examin[ing] the specific facts of [the] case" *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013).

Here, the numerosity requirement is met because each proposed class includes thousands of class members who either (a) applied for a position with Tata and were not hired, or (b) who were terminated by the company. *See, e.g.*, TCSLTD003463396 (listing over 126,000 candidates submitted by headhunters alone in the years 2012 to 2015); Neumark Report Tables 3.a-3.e (noting that from 2011 to April 2015 Tata involuntarily terminated between 896 and 1,116 non-South Asian employees) (Ex. 1).

2. *Plaintiffs Raise Common Questions*

To satisfy Rule 23(a)(2), plaintiffs must present one or more common questions of law or fact. Fed. R. Civ. P. 23(a)(2). "[A] common question is one where 'the same evidence will suffice for each

---

[32] Certification is also appropriate pursuant to Rule 23(b)(2) for the award of injunctive and declaratory relief, as Tata has "acted … on grounds that apply generally to the class[es.]" Fed. R. Civ. P. 23(b)(2); 3d Am. Compl. Prayer for Relief ¶¶ d-h (requesting, *inter alia*, declaratory judgment and injunctive relief, enjoining Tata's discriminatory practices) (Dkt. #82).

member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-97 (5th ed. 2012)); *Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12–cv–00824, 2015 WL 1292444, at *11 (D. Ariz. Mar. 23, 2015) ("where 'the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members,' there is a common question" (quoting *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 756 (7th Cir. 2014))). A single company-wide discriminatory policy or practice can satisfy the commonality requirement. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) ("commonality only requires a single significant question of law or fact").[33] Plaintiffs need not prove their case at the certification stage, *Amgen.*, 133 S. Ct. at 1195, rather, they need only show that their *prima facie* case "is '*capable of proof at trial* through evidence … common to the class rather than individual to its members[.]'" *Campbell v. Facebook, Inc.*, 315 F.R.D. 250, 264 (N.D. Cal. 2016) (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430 (2013)).

During Phase I, Plaintiffs will seek to answer four common questions: (1) whether Tata has engaged in a pattern and practice of discrimination against non-Indians in hiring and/or terminations; (2) whether Tata's policies and/or practices have a disparate impact on non-Indians in hiring and/or terminations; (3) whether Plaintiffs and the classes are entitled to injunctive relief; and (4) whether punitive damages will be available. Each question is capable of proof with evidence common to the class.

First, a pattern and practice claim requires proof of a "'systemwide pattern or practice'" of discrimination such that the discrimination is "'the regular rather than the unusual practice.'" *EEOC v. Gen. Tel. Co. of NW, Inc.*, 599 F.2d 322, 332 (9th Cir. 1979) (quoting *Teamsters*, 431 U.S. at 336);

---

[33] *See also Chi. Teachers Union v. Bd. of Ed. of City of Chi*, 797 F.3d 426, 440 (7th Cir. 2015) (whether a defendant's practices "'cause racial discrimination … are issues common to the entire class and therefore appropriate for class-wide determination.'" (quoting *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489 (7th Cir. 2012)); *see Smith v. Univ. of Wash. Law Sch.*, 2 F. Supp. 2d 1324, 1342 (W.D. Wash. 1998) ("The question that is common to the putative classes as a whole is whether the defendant[] intentionally discriminated … on the basis of race").

*Bazemore v. Friday*, 478 U.S. 385, 398 (1986); *Ellis*, 285 F.R.D. at 518 ("a prima facie case of a pattern or practice of discrimination is established by evidence that 'racial discrimination was the company's standard operating procedure – the regular rather than the unusual practices'" (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984))). A plaintiff "need not prove absolute uniformity, but only a 'regular' practice … [or] '*pattern of* discriminatory decisionmaking.'" *Id.* (quoting *Cooper*, 467 U.S. at 876).[34] Plaintiffs will show that Tata engages in a pattern and practice of discrimination using statistical and documentary evidence, and testimony. *See Brown v. Nucor Corp.*, 785 F.3d 895, 915 (4th Cir. 2015) ("A pattern of discrimination, revealed through statistics and anecdotal evidence, can alone support a disparate treatment claim, even where the pattern is the result of discretionary decision-making.").[35] That evidence will include, *inter alia*, documents and testimony concerning Tata's policy of favoring visa ready Indian nationals in filling U.S. positions; documents and testimony concerning Tata's reliance on third party recruiters to source South Asian job candidates; and the testimony and analyses of Dr. Neumark concerning gross statistical disparities in Tata's hiring and termination practices (revealing an overwhelming preference for employing and retaining South Asians, at the expense of non-South Asians).[36] Tata may defend at this stage by

---

[34] *Suchanek*, 764 F.3d at 756 ("Neither Rule 23 nor any gloss that decided cases have added to it requires that *every* question be common").

[35] *See also Bazemore*, 478 U.S. at 398 (plaintiff's *prima facie* case will involve showing, by a "'preponderance of the evidence that racial discrimination was the company's standard operating procedure'" (quoting *Teamsters*, 431 U.S. at 336)); *Cooper*, 467 U.S. at 876 ("at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking") (citation omitted); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination"); *Beck v. Boeing Co.*, 60 F. App'x 38, 39 (9th Cir. 2003) (holding that proof of *prima facie* case of employment discrimination "may be done through statistics alone" (citing *Teamsters*, 431 U.S. at 339-40)).

[36] Importantly, discovery is far from complete, and Tata only just recently produced huge quantities of documents that Plaintiffs have had inadequate time to review and incorporate into this motion. Additional discovery will almost certainly provide further evidence of Tata's discriminatory practices.

presenting common defenses, *e.g.*, it may attack the plaintiffs' statistics, present its own statistics, and present its own anecdotal evidence.[37]

Plaintiffs common evidence of discrimination distinguish this case from *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). In *Dukes*, Plaintiffs challenged a corporate policy to give low-level decision makers full discretion in making employment decisions, which the Court described as "a policy *against having* uniform employment practices." *Id.* at 355 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of *allowing discretion* by local supervisors over employment matters … a policy *against having* uniform employment practices"). Here, by contrast, Plaintiffs are challenging: (1) Tata's "[l]eadership directive" to "utilize every visa to the maximum extent," and thus prioritize the placement of South Asian visa workers in U.S. positions over non-South Asians, and (2) Tata's use of third party recruiters to source South Asian candidates to staff U.S. positions. *See* Section II(B)*, supra*. These company-wide practices "set and enforced by upper management, provide the 'glue' the Supreme Court sought – but did not find – in *Dukes*." *Ellis*, 285 F.R.D. at 509, 530 (distinguishing *Dukes* when "Plaintiffs … identif[ied] specific employment practices [] implement[ed] companywide under the influence and control of top management"); *see also Nucor*, 785 F.3d at 914-15 (explaining that combination of statistical and anecdotal evidence "precisely the 'glue' of commonality that *Wal-Mart* demands[,]" as such evidence "suggests a pattern of engrained discriminatory decision-making that consistently disadvantaged" the disfavored class, and granting class certification); *Gray v. Golden Gate Nat'l Recreation Area*, 279 F.R.D. 501, 520 (N.D. Cal. 2011) (holding "Plaintiffs' declarations, and [other evidence] show general policies and practices" absent in *Dukes*).

---

[37] *See Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1107 (10th Cir. 2001); *see also Teamsters*, 431 U.S. at 360. The presentation of individual proof is not appropriate at this Phase. *Teamsters*, 431 U.S. at 342 n.24 ("[I]ndividual proof concerning each class member's specific injury [i]s appropriately left to proceedings to determine individual relief."); *Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384, 1393 (5th Cir. 1983) (rejecting attempt "to combat a prima facie case with evidence about a handful of promotion decisions" as "doomed to failure because a prima facie case of class-wide discrimination is not met by [defendant's] attempts to parry specific allegations of … discrimination") (citation omitted).

Second, to prove their disparate impact claim, Plaintiffs must "identify *specific companywide employment practices* responsible for the disparate impact." *Ellis*, 285 F.R.D. at 531 (emphasis in original). "The plaintiff must also demonstrate a causal connection between those specific employment practices and the asserted impact on [the protected class]." *Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1114 (9th Cir. 2014). Plaintiffs will rely largely on the same evidence as that establishing their pattern and practice claim. However, an adverse impact claim does not require proof of discriminatory intent. *See, e.g.*, *Teamsters*, 431 U.S. at 348.

Finally, the availability of punitive damages and the appropriateness of injunctive relief is common to the class. *See id*. at 361 (where plaintiff establishes that defendant operates under pattern and practice of discrimination, injunctive relief, such as an "order against continuation of the discriminatory practice" is appropriate); *McReynolds*, 672 F.3d at 483, 492 (reversing denial of certification of discrimination class seeking injunctive relief under Rule 23(b)(2)); *Ellis*, 285 F.R.D. at 542 (certifying class and holding that "the availability of punitive damages should be adjudicated in Stage One of the trial, [while] determination of the aggregate amount and individual distribution of punitive damages should be reserved for Stage Two").

*3. Common Issues Predominate in Phase I Over Individual Issues*

Rule 23(b)(3)'s "predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common aggregation-defeating, individual issues." *Tyson Foods*, 136 S. Ct. at 1045 (internal quotation omitted); *see also In re High-Tech*, 985 F. Supp. 2d at 1187 ("Plaintiffs are not required to show that each element of the underlying cause of action is susceptible to classwide proof … only … that common questions will predominate with respect to their case as a whole"). "Where common questions 'predominate,' a class action can achieve economies of time, effort, and expense [and will] … permit adjudication of disputes that cannot be economically litigated individually." *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 236 (C.D. Cal. 2003); *see Chi. Teachers Union*, 797 F.3d at 444 (finding question "was the selection process discriminatory?" to predominate over individual questions because "it will

certainly be efficient and fair to answer the question once for all plaintiffs rather than in piecemeal litigation").[38]

Here, the common questions predominate because answering them will address "questions of liability common to the class[,]" *Comcast*, 133 S. Ct. at 1437, and thereby "achieve economies of time [and] expense," satisfying Rule 23(b)(3)'s predominance requirement. *Westways World Travel*, 218 F.R.D. at 236. Determining adverse impact and "'pattern and practice question[s] predominate[] because [they] ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to … monetary relief.'" *Ellis*, 285 F.R.D. at 538 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001); *see also Moore v. Napolitano*, 926 F. Supp. 2d 8, 33 (D.D.C. 2013) (finding predominance requirement met where "[a]ll members of the class will rely on the same statistical evidence to make the same claim"); *Butler v. Sears, Roebuck & Co.*, 727 F.3d, 796, 801 (7th Cir. 2013) (finding predominance requirement satisfied where "[t]here is a single, central, common issue of liability"). Moreover, individual issues such as damages and any alleged non-discriminatory reasons for individual employment decisions will not be addressed on a class-wide basis, but rather during Phase II, and therefore have no bearing on the predominance inquiry. *See, e.g.*, *Beck v. Boeing Co.*, 60 F. App'x 38, 39 (9th Cir. 2003) ("[Defendant] cannot defeat class certification at the liability phase by arguing that it is entitled to introduce individualized evidence that each of its employment decisions was motivated by a legitimate nondiscriminatory reason."); *Ellis*, 285 F.R.D. at 539; *Boeing*, 225 F.R.D. at 634, 636, 638-39.

### 4. *Plaintiffs' Claims Are Typical of the Claims of the Class*

Plaintiffs' claims are typical of the claims of the class. *See* Fed. R. Civ. P. 23(a)(3). "Courts assess typicality by determining 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class

[38] Importantly, a plaintiff need not prove that she will succeed on the merits of her claim at the certification stage – "'Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.'" *Mullins v. Premier Nutrition Corp.*, Case No. 13-cv-01271-RS, 2016 WL 1535057, at *2 (N.D. Cal. Apr. 15, 2016) (quoting *Amgen*, 133 S. Ct. at 1191).

members have been injured by the same course of conduct.'" *Ellis*, 285 F.R.D. at 533 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). A plaintiff's claim is typical if it "arises from the same event or course of conduct that gives rise to the claims of other class members and the claims are based on the same legal theory." *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985); *Gray*, 279 F.R.D. at 509 ("Although the claims of the purported class representative need not be identical to the claims of other class members, the class representative 'must be part of the class and possess the same interest and suffer the same injury as the class members.'" (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 156 (1982))).

Plaintiffs have been discriminated against under Tata's pattern and practice of discrimination against non-South Asians in hiring (Mr. Buchanan) and terminations (Mr. Slaight, Mr. Webber, Mr. Masoudi, and Mr. Mandili).[39] Plaintiffs' injuries are typical of all class members, who likewise, were either not hired or were terminated as a result of Tata's discriminatory preference for South Asians. *Collinge*, 2015 WL 1292444, at *14 (finding typicality where plaintiffs "allege that they were each subjected to defendants' uniform policies"); *Ruiz v. XPO Last Mile, Inc.*, No. 5cv2125, 2016 WL 4515859, at *8 (S.D. Cal. Feb. 1, 2016) (certifying class and noting "claims are typical of the putative class because Plaintiff and the putative class [] were subject to the same … company policies and procedures"); *Wilfong v. Rent-A-Center, Inc.*, No. 00-CV-680, 2001 WL 1795093, at *6 (S.D. Ill. Dec. 27, 2001) (finding typicality met where plaintiffs alleged defendant maintained "a company-wide policy of discrimination against women, encompass[ing] the claims of the class Plaintiffs seek

---

[39] Buchanan Dep. Tr. 58:2-16, 601:22-63:24 (Sept. 21, 2016) (failing to hire Mr. Buchanan when he sought employment with Tata at the SCE job fair and asked to apply for an open position, yet requiring Mr. Buchanan to train his Indian replacements) (Ex. 51); Slaight Dep. Tr. 162:7-24, 204:18-24, 206:25-207:2: (Sept. 17, 2016) (removing Mr. Slaight from the AXA client project, placing him on the bench, and promptly terminating his employment) (Ex. 52); Webber Decl. ¶¶ 4-6 (Jan. 18, 2017) (choosing to staff the Tata client project with a South Asian worker and terminating Mr. Webber's employment) (Ex. 41); Masoudi Decl. ¶¶ 3-4, 8-12 (Jan. 19, 2017) (replacing Mr. Masoudi with an South Asian visa worker on the Apple project, placing him on the bench, and terminating his employment) (Ex. 42); Mandili Decl. ¶¶ 3-6 (Jan. 18, 2017) (requiring Mr. Mandili to train his South Asian replacement before removing him from the Microsoft project, placing him on the bench, and terminating his employment) (Ex. 43); *see also* Proposed 4th Am. Compl. ¶¶ 51-79 (Dkt. #104-2).

to represent," and "the injuries the [p]laintiffs attribute to the alleged policy of discrimination are typical of those suffered by class members").

5. *Plaintiffs Will Fairly and Adequately Protect the Interests of the Class*

Plaintiffs will fairly and adequately protect the interests of the class, satisfying Rule 23(a)(4). "Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class." *Hopson v. Handesbrands Inc.*, No. CV–08–0844 EDL, 2009 WL 928133, at *4 (N.D. Cal. Apr. 3, 2009).

Here, all necessary elements are satisfied. Each Plaintiff shares common interests with other class members – *i.e.*, to recover monetary relief for Tata's discriminatory conduct, and to enjoin Tata's discriminatory preference for South Asians. Further, Plaintiffs Buchanan and Slaight have been actively engaged in the case and have fully participated in discovery. *See, e.g.*, *Rosales v. El Rancho Farms*, No. 1:09–cv–00707, 2012 WL 3763955, at *7 (E.D. Cal. Aug. 29, 2012). Finally, undersigned counsel have extensive experience with complex litigation, including class action litigation,[40] and have vigorously represented the interests of Plaintiffs and the putative class to-date. *See* Section C, *infra*.

6. *Plaintiffs Satisfy the Superiority Requirement*

In addition to Rule 23(b)(3)'s predominance requirement, discussed above, Plaintiffs satisfy Rule 23(b)(3)'s superiority requirement. Class actions are superior to individual actions where they "'would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated[.]'" *Nelson v. Avon Prods., Inc.*, No. 13–cv–02276–BLF, 2015 WL 1778326, at *8 (N.D. Cal. Apr. 17, 2015) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)); *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 527 (N.D. Cal. 2004) ("'The policy at

---

[40] *See, e.g.*, *In re Delta/AirTran Baggage Fee Antitrust Litig.*, ___ F.R.D. ___, 2016 WL 3770957, at *17, *24 (N.D. Ga. July 12, 2016) (certifying class of between 28 and 57 million members and appointing Kotchen & Low LLP as class counsel); *In re Wholesale Grocery Prods Antitrust Litig.*, No. 09-MD-2090, 2016 WL 4697338, at *15 (D. Minn. Sept. 9, 2016) (appointing Kotchen & Low LLP as class counsel).

the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action") (quoting *Amchem*, 521 U.S. at 617); *see* Fed. R. Civ. P. 23(b)(3)(A).

Each of these factors is promoted through class treatment here. First, if the class is successful at Phase I, having demonstrated that Tata engages in a pattern and practice of discrimination and/or that Tata's conduct has an adverse impact on the class, these issues will be resolved for the class as a whole, obviating the need for further litigation on these issues, saving judicial and class member resources, and avoiding the possibility of inconsistent judgments. *See, e.g.*, *Bell v. PNC Bank, Nat'l Assoc.*, 800 F.3d 360, 379-80 (7th Cir. 2015) (explaining that if the class prevails in demonstrating the defendant had an illegal policy, individual class member trials may follow, but "[a]t least it will not be necessary in each of those trials to determine whether [the defendant] had an illegal policy" affecting the class).

Second, "[g]iven the class's common questions affecting the class as a whole at the liability stages of this matter, and given class members' ability to opt out of the … class or to pursue their claims for relief in the second state of the proceedings under (b)(3), class members have a diminished interest in individually controlling the common portions of this action." *Ellis*, 285 F.R.D. at 539-40. Moreover, while the potential recovery for putative class members is not trivial, few class members could afford the substantial upfront costs of litigating a complex discrimination case against a defendant with multi-billion dollar revenues. For example, should a putative class member pursue an individual action, she would likely need to advance attorney fees, litigation costs, the costs of expert testimony of the type submitted with this brief, *etc*. Such expenses would likely nullify, if not exceed, any potential recovery. Under these circumstances, "few potential class members could afford to undertake individual litigation … [and] few class members would have any meaningful redress against [Tata] as a practical matter." *Chamberlan,* 223 F.R.D. at 527.

Third, there is little reason to believe that the difficulties in managing this case as a class action outweigh the benefits. *See* Fed. R. Civ. P. 23(b)(3)(D); *see Ellis*, 285 F.R.D. at 540 (finding class of 700 manageable). The Phase I trial will involve proof common to the class, and, should Phase

I be successful, the parties may settle at that stage, obviating the need for Phase II. *See Suchanek*, 764 F.3d at 760. If the parties do not settle, Plaintiffs are confident that the parties and the Court can structure Phase II proceedings to resolve individual questions in an orderly, efficient manner. *See Carnegie*, 376 F.3d at 661. There is little question that the alternative – thousands of costly, time-consuming, individual cases[41] involving overlapping proof – would be inferior.

*7. The Proposed Classes Are Objectively Defined and Ascertainable*

Rule 23's ascertainability requirement requires that "the class is so defined that its individual members can be readily identified. A class should be sufficiently definite and 'clearly ascertainable' by reference to objective criteria 'that it is administratively feasible to determine whether a particular person is a class member.'" *Patel v. Trans Union, LLC*, 308 F.R.D. 292, 301 (N.D. Cal. 2015) (quoting *Shepard v. Lowe's HIW, Inc.*, No. C 12–3893 JSW, 2013 WL 4488802, *2 (N.D. Cal. Aug. 19, 2013). Plaintiffs have clearly defined two classes based on objective criteria, namely: their race; national origin; and whether they applied to or were terminated by Tata during the class period. *See* Section II, *supra*. The ascertainability requirement is satisfied. *Patel*, 308 F.R.D. at 301.

**B. Alternatively, Certification Is Appropriate Under Rule 23(c)(4)**

"'Even if the common questions do not predominate over the individual questions' making certification under Rule 23(b)(3) unwarranted, 'Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues.'" *Ellis*, 285 F.R.D. at 544 (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)).[42] Accordingly, even if this Court does not find the Rule 23(b)(3) factors are satisfied, the case may be certified for a determination of common questions, including whether Tata engaged in a pattern and practice of discrimination in hiring, promotions, and terminations, whether Tata's practice result in an adverse impact on the class, whether punitive damages are appropriate,

[41] Or, more likely, no cases. *See Carnegie*, 376 F.3d at 661 ("The *realistic* alternative to a class action is not … individual suits, but zero [] suits").

[42] *See also Valentino*, 97 F.3d at 1234 ("Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues.").

and whether injunctive relief is appropriate. *See Butler*, 727 F.3d at 800 ("a class action limited to determining liability on a class-wide basis, with separate hearings to determine – if liability is established – the damages of individual class members … is permitted by Rule 23(c)(4) and will often be a sensible way to proceed").

### C. Kotchen & Low LLP and Co-Counsel Should Be Appointed Class Counsel

Rule 23(g) identifies four factors for a court to consider in appointing class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]" Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). Since the filing of the initial complaint, Kotchen & Low LLP, and co-counsel DVG Law Partner LLC and The Tidrick Law Firm (collectively, "Counsel") have vigorously prosecuted this case on behalf of the Plaintiffs and putative class, including expending considerable time and resources engaging in briefing numerous motions and oppositions, research, mediation, discovery, and have retained and advanced fees for an expert witness. Furthermore, Counsel is well qualified to serve as class counsel, having litigated numerous other complex cases, including class actions, and have extensive experience and knowledge regarding employment litigation.[43] Accordingly, Counsel requests that Kotchen & Low LLP be designated as Lead Class Counsel and that DVG Law Partner LLC and The Tidrick Law Firm be designated as Class Counsel.

## VII. CONCLUSION

For the foregoing reasons, the Court should grant this motion and certify the classes.

---

[43] Kotchen & Low LLP specializes in complex litigation, including class actions, while DVG Law Partner LLC focuses on employment litigation and immigration issues, and The Tidrick Law Firm focuses on class action employment litigation and other matters. *See* http://kotchen.com/representative-matters/; http://kotchen.com/attorneys/; http://dvglawpartner.com /about/; http://www.tidrick.com/firmprofile.html.

Dated: February 21, 2017

Respectfully submitted,

By: /s/Daniel Kotchen

Daniel Kotchen (*pro hac vice*)
Daniel Low, SBN 218387
Michael von Klemperer (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Email: dkotchen@kotchen.com;
dlow@kotchen.com;
mvk@kotchen.com

Michael F. Brown (*pro hac vice* forthcoming)
**DVG LAW PARTNER LLC**
P.O. Box 645
Neenah, WI 54957
920-238-6781
920-273-6177 (fax)
mbrown@dvglawpartner.com

Steven Tidrick, SBN 224760
Joel Young, SBN 236662
**The Tidrick Law Firm**
2039 Shattuck Avenue #308
Berkeley, CA 94704
Telephone: (510) 788-5100
Facsimile: (510) 291-3226
E-mail: sgt@tidricklaw.com
E-mail: jby@tidricklaw.com

*Attorneys for Plaintiffs Buchanan, Slaight, Webber, Masoudi, and Mandili*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system on February 21, 2017.

Dated: February 21, 2017

/s/Daniel Kotchen
Daniel Kotchen