# Exhibit 1

Expert Report of

David Neumark

in the matter of

Heldt et al. v. Tata Consultancy Services, Ltd.

February 2017

## TABLE OF CONTENTS

TABLE OF CONTENTS ..... i
I. Introduction ..... 1
II. Summary of Findings ..... 2
III. Tata Disproportionately Hired South Asians ..... 4
a. Relevant Labor Market ..... 5
b. Null Hypothesis & Evidence on Discrimination ..... 6
IV. Tata Disproportionately Terminated Non-South Asians and Non-Indians ..... 9
a. Relevant Labor Market ..... 9
b. Null Hypothesis & Evidence on Discrimination ..... 9
V. Conclusion ..... 18
APPENDIX A – DATA ON ETHNICITY/NATIONAL ORIGIN ..... 19
APPENDIX B – MATERIALS CONSIDERED ..... 27
APPENDIX C – PUBLICATIONS ..... 28
APPENDIX D – OTHER CASES ..... 37

## I. Introduction

1. I am David Neumark, Professor of Economics at the University of California—Irvine. I am a labor economist who has done extensive research on labor market discrimination, including methods for measuring and testing for discrimination that have been adopted by many other researchers. I have published approximately 25 peer-reviewed journal papers on discrimination based on race, ethnicity, sex, or age, in journals including *American Economic Review*, *Contemporary Economic Policy*, *Economic Journal*, *Industrial Relations*, *Industrial and Labor Relations Review*, *International Economic Review*, *Journal of Human Resources*, *Journal of Labor Economics*, *Journal of Policy Analysis and Management*, *Review of Economics and Statistics*, *Journal of Political Economy*, and *Quarterly Journal of Economics*, as well as other studies in edited books, and a full-length book on sex discrimination and sex differences in labor markets (based on my papers). The goal of much of this research is to better understand the role of discrimination versus other explanations of differences in labor market outcomes by race, ethnicity, sex, or age. Appendix C provides an abridged CV listing my publications from the past 10 years.

2. I have previously held positions at the Federal Reserve Board, the University of Pennsylvania, Michigan State University, and the Public Policy Institute of California. I am a research associate of the National Bureau of Economic Research, and a research fellow at IZA (the Institute for the Study of Labor) in Germany. I also direct the Economic Self-Sufficiency Policy Research Institute (ESSPRI) at UC—Irvine.

3. I have been retained by the plaintiffs as a statistical expert to evaluate claims of discrimination at Tata Consultancy Services, Ltd. (hereafter "Tata") with respect to its hiring and terminations in the United States. Specifically, I have been asked to evaluate whether the data are consistent with discrimination against applicants and employees at Tata who were non-South

Asian (and, correspondingly, who were white, black, Hispanic, or other categories not in the South Asian group). I am compensated at the rate of $495 per hour.

4. It is important to note that this analysis is based on my best current understanding of the data with which I have been provided from Tata. The usual caveat applies – that it is possible that I will learn more about the Tata data, company procedures, and other matters in the course of this case, which could lead to changes in the analysis and findings. In this particular case this caveat is particularly important, because I have only recently received data and have not been supplied with explanatory documents that discuss the data. In addition, the data with which I have been supplied are incomplete, as, for example, I have not been supplied with data concerning promotions. Thus, I have not been able to analyze discrimination in promotions, which would otherwise be an appropriate area of analysis.

## II. Summary of Findings

5. To summarize the evidence, I find the following:

6. First, analysis of Tata and external benchmark data are strongly consistent with Tata discriminating in favor of South Asians in hiring employees for United States positions. Using data from 2011 through April 2015, I estimate that – depending on exactly how South Asians are classified – between 72.32% and 78.91% of Tata's United States workforce was South Asian,[1] while only 12.50% of the United States' Computer Systems Design and Related Services industry was South Asian (based on data through 2014). Thus, the share of South Asian workers in Tata's United States-based workforce, when compared to the relevant labor market, is between 197.61 and 215.87 standard deviations higher, and the statistical likelihood that this disparity is due to

[1] As explained in Appendix 1, there are alternative sources of information that can be used to classify Tata employees as South Asian. However, the results of five different ways of using this information to classify South Asians are qualitatively very similar.

chance – as opposed to a systematic difference in hiring favoring one group over the other – is less than 0.0000001%, or less than 1 in 1 billion using any of these estimates (Table 1).

7. Second, analysis of Tata's separations data provides evidence strongly consistent with Tata discriminating against non-South Asians in termination decisions. Depending on exactly how South Asians are classified – the percentage of non-South Asians who were terminated from 2011 through April 2015 was between 11.15% and 12.57%, whereas the percentage of South Asians who were terminated was between 0.21% and 0.97%. The estimated termination rates for non-South Asians are 47.27 to 57.15 standard deviations higher, and the statistical likelihood that this disparity is due to chance – as opposed to a systematic difference in hiring favoring one group over the other – is less than 0.0000001%, or less than 1 in 1 billion using any of these estimates (Tables 3a-3e).

8. The conclusion is similar when focusing only on terminations from the "bench."[2] Depending on exactly how South Asians are classified – the percentage of non-South Asians who were terminated from the bench was between 7.55% and 8.51%, whereas the percentage of South Asians who were terminated was between 0.15% and 0.65%. The estimated termination rates for non-South Asians are 38.86 to 46.66 standard deviations higher, and the statistical likelihood that this disparity is due to chance – as opposed to another factor, such as a systematic difference in hiring favoring one group over the other – is less than 0.0000001%, or less than 1 in 1 billion using any of these estimates (Tables 3a-3e).

9. To summarize, from 2011 through April 2015 (the majority of the period covered by the complaint) Tata employed 36,252 workers in the United States. Compared to the relevant labor

[2] The term "bench" (also known as "unallocated") refers to a Tata employee placed in a non-productive status where he or she is not assigned to a client project, and, therefore, is not earning revenue for the company. Kumar (30(b)(6)) Dep. Tr. 8:9-9:23, 14:19-21 (Jan. 25, 2017).

market, the Tata workforce was composed of a remarkably disproportionate share of South Asians. This percentage was approximately 75%, versus about 12.5% in the relevant labor market. From 2011 through April 2015, Tata involuntarily terminated 1,174 employees. Tata was far more likely to terminate non-South Asian employees than South Asian employees. The termination rate for non-South Asian employees was approximately 11-12%, compared to below 1% for South Asian employees. The statistical evidence is strongly consistent with Tata discriminating against non-South Asians in hiring and terminations.

### III. Tata Disproportionately Hired South Asians

10. My analysis of Tata and external benchmark data shows evidence strongly consistent with Tata discriminating in favor of South Asians in hiring employees placed in U.S. positions. There are three steps in this analysis. First, it is necessary to define the relevant labor market. Second, it is necessary to determine what Tata's workforce would look like absent discrimination in favor of South Asians. This is called the "null hypothesis." Third, and finally, it is necessary to compare the null hypothesis with the actual composition of Tata's United States-based workforce, and determine the statistical strength of the magnitude of the disparity between the two. This disparity can be measured in terms of "standard deviations."[3] The more standard deviations from the null hypothesis the representation of South Asians at Tata is, the less likely it is that a given result was

[3] "Standard deviation" as used here is the ratio of the estimate of the difference between the observed representation of South Asians and the representation under the null hypothesis (computed as the difference between what is observed at Tata, and what is observed in the ACS data), divided by the standard deviation of that estimated difference. Thus, if the estimated difference is, for example, 10 times as large as the standard deviation, we say that the estimated difference is equal to 10 standard deviations. The standard deviation of the estimated difference is computed using two-sample tests of proportions. In large samples, the ratio of the estimated difference to the standard deviation has a normal distribution with mean of zero and variance of one, which is the basis for statements about the likelihood of observing a value of the ratio (or equivalently, a number of standard deviations) by chance, if the null hypothesis were true.

due to chance, as opposed to a systematic difference in hiring. A disparity of two standard deviations is generally sufficient to show that a result is extremely unlikely (less than a 5% probability) to be caused by chance. A higher representation of South Asians than would occur, by chance, under the null hypothesis of no discrimination provides evidence that is, instead, consistent with discrimination in favor of South Asians. The more standard deviations away a disparity is from the null hypothesis, the stronger the inference of discrimination.

*a. Relevant Labor Market*

11. The relevant labor market is the market for United States' computing workforce. I define this as the Computer Systems Design and Related Services industry in which Tata operates, based on the company description at http://www.tcs.com/about/Pages/default.aspx, which describes Tata Consultancy Services as a leader in "IT services, digital and business solutions[.]"[4] Based on this description and the NAICS codes associated with Tata, the ACS data used to construct external benchmarks are restricted to the Computer Systems Design and Related Services industry – specifically, we use Census industry code 7380 in the ACS, which corresponds closely to the most common Tata NAICS code of 5415.[5] This definition of the labor market provides the "external benchmark" against which to compare Tata's workforce.

12. Data on the United States' computer work force is derived from the American Community Survey (ACS), for the years 2011 to 2014.[6] The ACS provides a large and detailed sample of the

---

[4] *See also* Answer to 3d Am. Compl. ¶ 13 (stating "that [Tata] provides consulting and technology services") (Dkt. #84).

[5] *See* https://usa.ipums.org/usa/volii/indcross03.shtml for the Census-NAICS cross-walk. The Tata NAICS codes are based on proprietary establishment-level data to which I have access.

[6] The latest hire date in the data with which we were provided was April 29, 2015. Given that the ACS data include interviews in all months, but do not identify month of interview, and given that

United States population. It surveys approximately 1% of the U.S. population each year. The sample sizes in the ACS are large enough to provide accurate estimates of the composition of the workforce by industry and occupation, for large industry and occupation categories. The ACS contains detailed information on industry and occupation of employment, and on race,[7] ethnicity, and birthplace. For the analysis using ACS data, I restrict attention to adults aged 18 to 65.

13. Data on Tata's workforce come from *TCSLTD003463394* and *TCSLTD003463395*. To the best of my knowledge, *TCSLTD003463394* lists active Tata employees who worked in the United States as of April 2015, and *TCSLTD003463395* lists employees who were separated from Tata in the United States between 2011 and April 2015, with the reason for separation included.

*b. Null Hypothesis & Evidence on Discrimination*

14. Using the definition of the relevant labor market based on the Computer Systems Design and Related Services industry, ACS data show that the United States' computer workforce consists of 12.50% South Asians and 87.50% non-South Asians. Under the null hypothesis of no discrimination based on ethnicity, I would expect Tata's United States-based workforce to consist of approximately the same percentages of South Asian and non-South Asian workers as in the relevant labor market.[8] However, as shown in Table 1, Tata's United States-based workforce

---

the last hire date in the Tata data is only in the fourth month of 2015, we use ACS data only through 2014.

[7] The ACS data contains the racial classification "Asian," but not "South Asian." My methodology for identifying those who are "South Asian" in the ACS is set forth in Appendix A.

[8] This is what we expect under the null hypothesis of no discrimination, in which case we would not expect the ethnic or national origin composition of a given company's workforce to deviate from the ethnic or national origin composition of the relevant labor market, except for the random variation that is accounted for in the statistical tests.

consists of approximately 75% South Asians, and only 25% non-South Asians.[9] The difference between the percentage of South Asians at Tata and in the actual United States-based workforce is between 197.61 and 215.87 standard deviations. These data are strongly consistent with Tata discriminating in favor of South Asians in hiring. The likelihood that we would observe a difference this large in the shares of South Asians vs. non-South Asians among Tata employees or hires under the null hypothesis of no discrimination is less than 0.0000001%, or less than 1 in 1 billion, using any of these estimates.

[9] As explained in Appendix A, because the Tata data do not provide an exact classification of South Asian employees, I have to estimate these percentages. However, the range of estimates is narrow – between 72.32% and 78.91% – and the conclusions do not depend on which estimate in this range is used.

**Table 1: Comparing ratio of South Asian employees to external benchmarks**

| | South Asian | Non-South Asian | Total | Two-sample test of proportions | |
|---|---|---|---|---|---|
| | | | | Standard deviations | Probability under null hypothesis of no discrimination |
| *External benchmark: Within Computer Systems Design and Related Services industry* | | | | | |
| ACS | **12.50%** | **87.50%** | 71,131 | | |
| | | | | | |
| *A. Identify South Asians based on nationality and base country (Appendix Table A1.a.i)* | | | | | |
| Tata employees | **72.32%** | **27.68%** | 36,252 | **197.61** | <0.0000001% |
| *B. Identify South Asians based on nationality and last name matching for Asian ethnicity (Appendix Table A1.b)* | | | | | |
| Tata employees | **75.25%** | **24.75%** | 36,252 | **205.74** | <0.0000001% |
| *C. Identify South Asians based on nationality and last name matching for Asian ethnicity with high share non-SA names recoded to non-SA (Appendix Table A1.c)* | | | | | |
| Tata employees | **75.20%** | **24.80%** | 36,252 | **205.60** | <0.0000001% |
| *D. Identify South Asians based on nationality and recoding Asian or race missing by last name as SA (Appendix Table A1.d)* | | | | | |
| Tata employees | **75.43%** | **24.57%** | 36,252 | **206.24** | <0.0000001% |
| *E. Identify South Asians based on nationality and recoding all non-SA as SA by last name (Appendix Table A1.e)* | | | | | |
| Tata employees | **78.91%** | **21.09%** | 36,252 | **215.87** | <0.0000001% |

Note: For the external benchmarks, South Asians are identified in the American Community Survey (ACS) based on the detailed race variable (*raced*). ACS estimates of the share South Asian are weighted using the *perwt* variable. The detailed race variable has no missing observations. Individuals who have the following values for the detailed race variable are coded as South Asian: Asian Indian (Hindu 1920-1940), Butanese, Bangladeshi, Pakistani, Sri Lankan, Nepalese. Note that Afghan and Maldivan do not show up as races in the ACS. The ACS sample used includes years 2011-2014. It is limited to the industry "Computer Systems Design and Related Services Industry" (industry code 7380) and individuals between the ages of 18 and 65 who are employed during that survey year. Panels A-E identify South Asian Tata employees corresponding with Appendix Tables A1.a-A1.e respectively. See footnotes of Appendix Tables A1.a-A1.e for details. Note the indicated probabilities (<0.0000001%) imply that the odds of observing differences this large under the null hypothesis of no discrimination are less than 1 in 1 billion.

## IV. Tata Disproportionately Terminated Non-South Asians and Non-Indians

15. Tata's raw data indicate a total of 1,216 involuntary separations, based on the "SeparationCategory" variable. Table 2a tabulates the frequency of reasons coded for separations in *TCSLTD003463395*, based on the variable "ReasonforSeparation." The most common reasons for separations that are coded as involuntary are "unallocated," "poor performance," and "disciplinary action." However, my separations analysis that follows (in Tables 3.a-3.e) is based on 1,174 employees whose separation type is classified as "Termination" based on the "SeparationType" variable. As Table 2b shows, there are 1,174 cases coded as terminations using this variable, and this coding appears to be a more reliable way to capture terminations/involuntary separations.[10] (Table 2a also reports on voluntary separations, on which I do not focus.)

*a. Relevant Labor Market*

16. The relevant labor market is Tata's workforce in the United States from 2011 to the present.[11] This labor market is appropriate because terminations can only occur among Tata employees.

*b. Null Hypothesis & Evidence on Discrimination*

---

[10] The difference of 42 between the 1,216 coded as involuntary by "SeparationCategory" in Table 2a and the 1,174 coded as terminated by "SeparationType" in Table 2b (who are the employees I treat as involuntarily separated/terminated) is explained as follows. First, 35 of the 1,216 have separation type reported as "Death" (see Table 2b), which is not an employer-initiated termination. Similarly, Table 2b shows that one employee has the reason coded as "Retirement," and 13 as "stopped attending without intimation," both of which are better interpreted as voluntary separations. On the other hand, as Table 2b shows, 7 employees have the type of separation coded as "Termination" but "SeparationCategory" coded as "Voluntary." I treat these cases as involuntary separations/terminations. Thus, from the 1,216 with "SeparationCategory" coded as "Involuntary," I recode 49 (35 + 1 + 13) as voluntary, and I recode 7 other employees from voluntary to involuntary (i.e., termination), which accounts, on net, for the 42 fewer involuntary separations/terminations relative to Table 2a.

[11] The Tata data covers the majority of the class period: 2011 through April 2015.

17. Tables 3.a-3.e report termination rates for employees of South Asian origin. Again, because the Tata data do not provide an exact classification of South Asian employees, I have to estimate these percentages. Hence, I have ranges of estimates of termination rates for South Asians and non-South Asians. But the ranges are narrow, and the conclusions do not depend on which estimates in these ranges are used. Depending on exactly how South Asians are classified – the percentage of non-South Asians who were terminated was between 11.15% and 12.57%, whereas the percentage of South Asians who were terminated was between 0.21% and 0.97%. The estimated termination rates for non-South Asians are 47.27 to 57.15 standard deviations higher, and the statistical likelihood that this disparity is due to chance – as opposed to a systematic difference in hiring favoring one group over the other – is less than 0.0000001%, or less than 1 in 1 billion using any of these estimates (Tables 3a-3e).

18. The conclusion is similar focusing only on terminations from the "bench" (which I understand to be those coded as unallocated). Depending on exactly how South Asians are classified – the percentage of non-South Asians who were terminated from the bench was between 7.55% and 8.51%, whereas the percentage of South Asians who were terminated was between 0.15% and 0.65%. The estimated termination rates for non-South Asians are 38.86 to 46.66 standard deviations higher, and the statistical likelihood that this disparity is due to chance – as opposed to a systematic difference in hiring favoring one group over the other – is less than 0.0000001%, or less than 1 in 1 billion using any of these estimates (Tables 3a-3e).

**Table 2a. Tabulation of reason for separation by separation category**

| Reason for separation | Separation category | | Total | Percent (%) involuntary |
|---|---|---|---|---|
| | Involuntary | Voluntary | | |
| Academic pursuit | 0 | 146 | 146 | 0% |
| Better | 0 | 19 | 19 | 0% |
| Better career opportunities - joining competitor | 0 | 921 | 921 | 0% |
| Better career opportunities - joining non-competitor | 0 | 4,290 | 4,290 | 0% |
| Better career opportunities- joining customer | 0 | 77 | 77 | 0% |
| Business exigency | 30 | 4 | 34 | 88% |
| Child care | 0 | 50 | 50 | 0% |
| Compromise agreement voluntary | 0 | 8 | 8 | 0% |
| Death | 35 | 0 | 35 | 100% |
| Denial of relocation request | 0 | 19 | 19 | 0% |
| Disciplinary action | 1 | 0 | 1 | 100% |
| Disciplinary action | 88 | 0 | 88 | 100% |
| Dissatisfaction with job / type of job | 0 | 147 | 147 | 0% |
| Dissatisfaction with company policies | 0 | 85 | 85 | 0% |
| Dissatisfied with supervisor | 0 | 24 | 24 | 0% |
| Dissatisfied with work conditions | 0 | 67 | 67 | 0% |
| End of contract | 0 | 9 | 9 | 0% |
| Entrepreneurship | 0 | 19 | 19 | 0% |
| Family circumstances | 0 | 625 | 625 | 0% |
| Family circumstances / personal reason | 0 | 49 | 49 | 0% |
| Higher compensation | 0 | 1,032 | 1,032 | 0% |
| Job abandonment | 52 | 0 | 52 | 100% |
| Joining govt. services | 0 | 3 | 3 | 0% |
| Joining spouse | 0 | 68 | 68 | 0% |
| Lack of recognition | 0 | 10 | 10 | 0% |
| Lack of overseas opportunities | 0 | 31 | 31 | 0% |
| Marriage | 0 | 10 | 10 | 0% |
| Medical reason | 0 | 111 | 111 | 0% |
| Poor Performance | 213 | 12 | 225 | 95% |
| Reasons not known/ other reason | 0 | 3 | 3 | 0% |
| Reasons not known/ other Reason | 0 | 1,132 | 1,132 | 0% |
| Relocation / moving from the Area | 0 | 120 | 120 | 0% |
| Retirement | 1 | 1 | 2 | 50% |
| Separation during PIP | 0 | 1 | 1 | 0% |
| To take care of family member | 0 | 40 | 40 | 0% |
| Transfer to affiliate | 0 | 2 | 2 | 0% |
| Unallocated | 796 | 0 | 796 | 100% |
| Voluntary redundancy | 0 | 8 | 8 | 0% |
| Total | 1,216 | 9,143 | 10,359 | 12% |

Note: Reason for separation in this table is based on the variable "ReasonforSeparation," and involuntary/voluntary is based on "SeparationCategory."

**Table 2b. Tabulation of separation category by separation type**

| | Separation category | | |
|---|---|---|---|
| | Involuntary | Voluntary | Total |
| **Separation type** | | | |
| Death | 35 | 0 | 35 |
| Lwp_Resignation | 0 | 16 | 16 |
| N/A | 0 | 3 | 3 |
| Resignation | 0 | 9,109 | 9,109 |
| Retirement | 1 | 1 | 2 |
| Stopped attending without intimation | 13 | 7 | 20 |
| Termination | 1,167 | 7 | **1,174** |
| Total | **1,216** | 9,143 | 10,359 |

Separation category is based on the "SeparationCategory" variable, as in Table 2a.
Separation type is based on the variable "SeparationType."

**Table 3.a. Share of South Asian and non-South Asian separated employees, using nationality, and base country if nationality coded as non-South Asian, to classify employees (method 1)**

| | **1. Whole sample** | | **2. South Asian (nationality then base country)** | | | **3. Non-South Asian (nationality then base country)** | | | **4. Two-sample test of proportions** | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | *N* | *Percent (%)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *Difference between SA and non-SA (conditional on non-missing)* | *Standard deviations* | *Probability under null hypothesis of no discrimination* |
| ***Involuntarily separated*** | | | | | | | | | | | |
| From non-bench | 378 | 1.04% | 17 | 0.06% | **0.06%** | 361 | 3.60% | **3.61%** | **-3.55%** | **29.77** | <0.0000001% |
| From bench | 796 | 2.20% | 41 | 0.16% | **0.16%** | 755 | 7.52% | **7.55%** | **-7.39%** | **42.85** | <0.0000001% |
| Subtotal | 1,174 | 3.24% | 58 | 0.22% | **0.22%** | 1,116 | 11.12% | **11.15%** | **-10.93%** | **52.53** | <0.0000001% |
| | | | | | | | | | | | |
| ***Voluntarily separated*** | 9,147 | 25.23% | 5,888 | 22.46% | **22.47%** | 3,259 | 32.48% | **32.57%** | **-10.10%** | **19.78** | <0.0000001% |
| ***Not separated*** | 25,893 | 71.43% | 20,262 | 77.29% | **77.31%** | 5,631 | 56.11% | **56.28%** | **21.03%** | **39.64** | <0.0000001% |
| Missing/dropped | 38 | 0.10% | 9 | 0.03% | | 29 | 0.29% | | | | |
| Total | 36,252 | 100% | 26,217 | 100.00% | 100.00% | 10,035 | 100% | 100% | | | |

Note: This table is generated using aggregated data compiled from active and separated data files and contains information on 36,252 employees (25,893 from Active and 10,359 from Separated). South Asian employees are identified using the procedure described in the note at the bottom of Appendix Table A1.a. Out of the full sample of 36,252 observations, 35 have the reason for an involuntary separation coded as "Death," and 3 have the reason for voluntary separation coded as "N/A" (see Table 2b). It is unclear whether these 38 cases should be included in the denominator of the separation rates, because it is not clear that the employer made a decision to retain these employees. I show results both ways but highlight the results excluding these cases and use those results for the statistical analysis (labeled "*Percent (%) (conditional on non-missing)*"). The small number of cases involved implies that the results are not materially affected by this decision. The first column is for the full sample of active and separated employees. Involuntary separation category "From bench" in this table identifies individuals for whom the "SeparationType" variable has the value "Termination" and the "ReasonforSeparation" variable is "Unallocated." The remaining terminated employees have some other code for "ReasonforSeparation." Voluntarily separated is defined by workers who leave the company and have the following values for "SeparationType": "Lwp_Resignation," "Resignation," "Retirement," or "Stopped Attending Without Intimation." There are 25,893 employees who are not separated; these are the employees in the active employee list. Note the indicated probabilities (<0.0000001%) imply that the probability of observing differences this large under the null hypothesis of no discrimination is less than 1 in 1 billion.

**Table 3.b. Share of South Asian and non-South Asian separated employees, using any match on South Asian names for those of Asian ethnicity to classify employees (method 2)**

| | **1. Whole sample** | | **2. South Asian (nationality and last name matching, Asian ethnicity)** | | | **3. Non-South Asian (nationality and last name matching, Asian ethnicity)** | | | **4. Two-sample test of proportions** | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | *N* | *Percent (%)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *Difference between SA and non-SA (conditional on non-missing)* | *Standard deviations* | *Probability under null hypothesis of no discrimination* |
| ***Involuntarily separated*** | | | | | | | | | | | |
| From non-bench | 378 | 1.04% | 17 | 0.06% | **0.06%** | 361 | 4.02% | **4.04%** | **-3.98%** | **32.15** | <0.0000001% |
| From bench | 796 | 2.20% | 41 | 0.15% | **0.15%** | 755 | 8.41% | **8.44%** | **-8.29%** | **46.41** | <0.0000001% |
| Subtotal | 1,174 | 3.24% | 58 | 0.21% | **0.21%** | 1,116 | 12.44% | **12.48%** | **-12.27%** | **56.87** | <0.0000001% |
| | | | | | | | | | | | |
| ***Voluntarily separated*** | 9,147 | 25.23% | 5,888 | 21.59% | **21.59%** | 3,259 | 36.32% | **36.43%** | **-14.84%** | **28.03** | <0.0000001% |
| ***Not separated*** | 25,893 | 71.43% | 21,323 | 78.17% | **78.20%** | 4,570 | 50.92% | **51.09%** | **27.11%** | **49.29** | <0.0000001% |
| Missing/dropped | 38 | 0.10% | 9 | 0.03% | | 29 | 0.32% | | | | |
| Total | 36,252 | 100% | 27,278 | 100.00% | 100.00% | 8,974 | 100% | 100% | | | |

Note: This table is generated using aggregated data compiled from active and separated data files and contains information on 36,252 employees (25,893 from Active and 10,359 from Separated). South Asian employees are identified using the procedure described in the note at the bottom of Appendix Table A1.b. See Table 3.a notes for details on separation type and other definitions.

**Table 3.c. Share of South Asian and non-South Asian separated employees, using any match on South Asian names for those of Asian ethnicity, but dropping common non-South Asian names for Asian employees, to classify employees (method 3)**

| | 1. Whole sample | | 2. SA by nationality and last name w/ non-SA names dropped (Asian ethnicity) | | | 3. Non-SA by nationality and last name (Asian ethnicity) | | | 4. Two-sample test of proportions | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | *N* | *Percent (%)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *Difference between SA and non-SA (conditional on non-missing)* | *Standard deviations* | *Probability under null hypothesis of no discrimination* |
| ***Involuntarily separated*** | | | | | | | | | | | |
| From non-bench | 378 | 1.04% | 17 | 0.06% | **0.06%** | 361 | 4.02% | **4.03%** | **-3.97%** | **32.10** | <0.0000001% |
| From bench | 796 | 2.20% | 41 | 0.15% | **0.15%** | 755 | 8.40% | **8.43%** | **-8.28%** | **46.37** | <0.0000001% |
| Subtotal | 1,174 | 3.24% | 58 | 0.21% | **0.21%** | 1,116 | 12.42% | **12.46%** | **-12.25%** | **56.81** | <0.0000001% |
| | | | | | | | | | | | |
| ***Voluntarily separated*** | 9,147 | 25.23% | 5,888 | 21.60% | **21.60%** | 3,259 | 36.26% | **36.37%** | **-14.77%** | **27.92** | <0.0000001% |
| ***Not separated*** | 25,893 | 71.43% | 21,308 | 78.16% | **78.18%** | 4,585 | 51.01% | **51.17%** | **27.01%** | **49.13** | <0.0000001% |
| Missing/dropped | 38 | 0.10% | 9 | 0.03% | | 29 | 0.32% | | | | |
| Total | 36,252 | 100% | 27,263 | 100.00% | 100.00% | 8,989 | 100% | 100% | | | |

Note: This table is generated using aggregated data compiled from active and separated data files and contains information on 36,252 employees (25,893 from Active and 10,359 from Separated). South Asian employees are identified using the procedure described in the note at the bottom of Appendix Table A1.c. See Table 3.a notes for details on separation type and other definitions.

**Table 3.d. Share of South Asian and non-South Asian separated employees, using any match on South Asian names for those of Asian ethnicity or other ethnicity to classify employees (method 4)**

| | **1. Whole sample** | | **2. South Asian (Nationality then name matching for Asian/missing race)** | | | **3. Non-South Asian (Nationality then name matching for Asian/missing race)** | | | **4. Two-sample test of proportions** | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | *N* | *Percent (%)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *Difference between SA and non-SA (conditional on non-missing)* | *Standard deviations* | *Probability under null hypothesis of no discrimination* |
| ***Involuntarily separated*** | | | | | | | | | | | |
| From non-bench | 378 | 1.04% | 17 | 0.06% | **0.06%** | 361 | 4.05% | **4.07%** | **-4.01%** | **32.31** | <0.0000001% |
| From bench | 796 | 2.20% | 41 | 0.15% | **0.15%** | 755 | 8.48% | **8.51%** | **-8.36%** | **46.66** | <0.0000001% |
| Subtotal | 1,174 | 3.24% | 58 | 0.21% | **0.21%** | 1,116 | 12.53% | **12.57%** | **-12.36%** | **57.15** | <0.0000001% |
| | | | | | | | | | | | |
| ***Voluntarily separated*** | 9,147 | 25.23% | 5,888 | 21.53% | **21.54%** | 3,259 | 36.59% | **36.71%** | **-15.17%** | **28.58** | <0.0000001% |
| ***Not separated*** | 25,893 | 71.43% | 21,391 | 78.22% | **78.25%** | 4,502 | 50.55% | **50.72%** | **27.53%** | **49.92** | <0.0000001% |
| Missing/dropped | 38 | 0.10% | 9 | 0.03% | | 29 | 0.33% | | | | |
| Total | 36,252 | 100% | 27,346 | 100% | 100% | 8,906 | 100% | 100% | | | |

Note: This table is generated using aggregated data compiled from active and separated data files and contains information on 36,252 employees (25,893 from Active and 10,359 from Separated). South Asian employees are identified using the procedure described in the note at the bottom of Appendix Table A1.d. See Table 3.a notes for details on separation type and other definitions.

**Table 3.e. Share of South Asian and non-South Asian separated employees, using any match on South Asian names to classify employees (method 5)**

| | **1. Whole sample** | | **2. South Asian (All non-SA name matched)** | | | **3. Non-South Asian (All non-SA name matched)** | | | **4. Two-sample test of proportions** | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | *N* | *Percent (%)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *N* | *Percent (%)* | *Percent (%) (conditional on non-missing)* | *Difference between SA and non-SA (conditional on non-missing)* | *Standard deviations* | *Probability under null hypothesis of no discrimination* |
| ***Involuntarily separated*** | | | | | | | | | | | |
| From non-bench | 378 | 1.04% | 91 | 0.32% | **0.32%** | 287 | 3.75% | **3.77%** | **-3.45%** | **26.30** | <0.0000001% |
| From bench | 796 | 2.20% | 187 | 0.65% | **0.65%** | 609 | 7.96% | **7.99%** | **-7.34%** | **38.86** | <0.0000001% |
| Subtotal | 1,174 | 3.24% | 278 | 0.97% | **0.97%** | 896 | 11.72% | **11.76%** | **-10.79%** | **47.27** | <0.0000001% |
| | | | | | | | | | | | |
| ***Voluntarily separated*** | 9,147 | 25.23% | 6,629 | 23.17% | **23.18%** | 2,518 | 32.93% | **33.04%** | **-9.86%** | **17.60** | <0.0000001% |
| ***Not separated*** | 25,893 | 71.43% | 21,685 | 75.81% | **75.84%** | 4,208 | 55.03% | **55.21%** | **20.63%** | **35.45** | <0.0000001% |
| Missing/dropped | 38 | 0.10% | 13 | 0.05% | | 25 | 0.33% | | | | |
| Total | 36,252 | 100% | 28,605 | 100% | 100% | 7,647 | 100% | 100% | | | |

Note: This table is generated using aggregated data compiled from active and separated data files and contains information on 36,252 employees (25,893 from Active and 10,359 from Separated). South Asian employees are identified using the procedure described in the note at the bottom of Appendix Table A1.e. See Table 3.a notes for details on separation type and other definitions.

## V. Conclusion

19. Tata's data related to employment and to terminations demonstrate strong statistical disparities between South Asians and non-South Asians. My external benchmarks analysis points to much lower representation of non-South Asians at Tata than in the relevant comparable labor market in the United States, and my analysis of terminations points to a much higher likelihood of terminations among non-South Asian Tata employees, also at an extremely high level of statistical significance.

## APPENDIX A – DATA ON ETHNICITY/NATIONAL ORIGIN

1. In the ACS, race is coded in broad categories of Asian, white, black, Hispanic, and other. The ACS also provides classifications of national origin, which allows me to identify South Asians. Specifically, individuals who have the following values for the detailed race variable are coded as South Asian: Asian Indian (Hindu 1920-1940), Butanese, Bangladeshi, Pakistani, Sri Lankan, and Nepalese.[12]

2. The Tata data do not directly identify South Asians. Rather, the data present me with a number of alternative options for classifying South Asians. None of these methods is perfect. But all of them have an underlying rationale. Moreover, they lead to similar classifications of Tata employees, so that none of my analyses differ materially depending on which classification method I use.

3. One method (method 1) of classification is to classify employees based on South Asian nationality when it is available, and to supplement this with employees whose base country is coded as South Asian, when nationality information is missing. As Appendix Table A1.a shows, 26,217 employees have nationality coded as South Asian. There are 4,977 employees with missing nationality data. However, none of these have base country coded as South Asian, so using this method results in no additional employees being classified as South Asian. Thus, using this method I code 26,217 employees as South Asian, 5,058 as non-South Asian (based on nationality), and the 4,977 with missing nationality data as non-South Asian since none have base countries coded as South Asian.

4. An additional source of information is the last names of employees. A reasonable

[12] Afghanistan and the Maldives are also South Asian countries. But neither is included in the relevant variable in the ACS; however, there are also no Tata employees with these countries listed as nationalities.

assumption is that if the last name of an employee who is not classified as South Asian (based on nationality) matches to the last name of an employee who is classified as South Asian, then that employee is South Asian. This method – a number of variants of which I consider – is intended to code Tata employees as South Asian who are, for example, born or naturalized in the United States, but are of South Asian origin.

5. The first method (method 2) I use is simply to recode as South Asian those not classified as South Asian whose last names match to those coded as South Asian, and who are coded as being of Asian ethnicity based on the variable "EEOformdetailsOnlyLocalHires" (of whom there are 1,973; see Appendix Table A2.) As Table A1.b shows, this method classifies 1,061 of the 4,977 missing cases as South Asian.

6. Next (method 3), I modify this procedure slightly to account for the possibility that someone whose nationality is coded as South Asian has a non-South Asian name, in which case I might not want to code everyone with that name as South Asian, although this is likely to be only a minor issue since I also require that their ethnicity be coded as Asian. (Nonetheless, though, I might have, for example, a person of South Asian nationality whose name is "Yang," but most Yang's are not South Asian.) Hence, in this modification I recode back to non-South Asian those employees whose names match to a South Asian, but whose name appears more frequently among those coded as non-South Asian than South Asian. Under this method, as Table A1.c shows, I classify 1,046 of the missing cases as South Asian (a small difference). The names coded back to non-South Asian using this method are listed Appendix Table A3.

7. Another modification I consider (method 4) is to broaden the employees for whom I use name matching, doing it for the 2,427 cases that are missing nationality data and ethnicity is coded as "Asian," "No Form," "Not Applicable," "Two or More Races," or "Undeclared," based on the

variable "EEOformdetailsOnlyLocalHires." Under this method, as Table A1.d shows, I classify 1,129 of the missing cases as South Asian.

8. Finally (method 5), I apply the name matching to all 4,977 cases missing nationality data as well as those 5,058 employees whose nationality is not coded as South Asian – I add the latter because these employees could still be of South Asian origin. Under this method, as Table A1.e shows, I classify 1,235 of the missing cases as South Asian.[13]

9. Appendix Table A4 shows, for each of methods 2-5, the number of employees who eligible to be reclassified ("Total"), and the number classified as South Asian based on the corresponding method ("Coded as South Asian"). Finally, Appendix Table A5 shows, for each of methods 1-5, the percentage of employees coded as South Asian. The range of percentages is small, from 72.32% to 78.91%.

[13] Note that under methods 4 and 5 I could have taken the step in method 3 of recoding some of those classified as South Asian back to non-South Asian, based on the name appearing for both South Asians and non-South Asians (for those with nationality coded). However, because this made little difference, I did not implement these other two alternatives.

**Appendix Table A1.a. Comparing nationality and base branch for active and separated employees (method 1)**

| | | SA (nationality) | | | |
|---|---|---|---|---|---|
| | | No | Yes | Missing | |
| SA (base country) | No | 5,026 | 2,092 | 4,977 | 12,095 |
| | Yes | 32 | 24,125 | 0 | 24,157 |
| | Missing | 0 | 0 | 0 | 0 |
| | | 5,058 | 26,217 | 4,977 | 36,252 |

Note: To identify South Asian employees, we first use data on nationality, which is available for 31,275, or about 86%, of the employees in the aggregated data. We code an employee as being South Asian if their nationality is any of the following: Afghanistan, Bangladesh, Bhutan, India, Nepal, Maldives, Pakistan, or Sri Lanka. The remaining 4,977 employees, whose nationality is unidentifiable due the nationality variable having missing observations, appear only in the active employee list (every employee in the separated data are classifiable based on their nationality), are classified as South Asian or non-South Asian according to the "BaseCountry" variable. Base country identifies the home branch location of the employee and is the location from where the employee is coming from when they are assigned to a project in the United States (as we understand). Every one of these 4,977 employees who were unclassifiable using the nationality variable are coded as non-South Asian since they are only coming from Canada (3), China (2), Mexico (26), U.S. (4,943), and Uruguay (3). There are no employees that are unclassifiable using nationality and base country variables combined.

**Appendix Table A1.b. Comparing nationality and last name matching for Asian ethnicity (method 2)**

| | | SA (nationality) | | | |
|---|---|---|---|---|---|
| | | No | Yes | Missing | |
| SA (last name) | No | 5,058 | 0 | 3,916 | 8,974 |
| | Yes | 0 | 26,217 | **1,061** | 27,278 |
| | Missing | 0 | 0 | 0 | 0 |
| | | 5,058 | 26,217 | 4,977 | 36,252 |

Note: For those individuals for whom nationality is missing (4,977), there are 1,973 employees who are of Asian ethnicity as identified using "EEOformdetailsOnlyLocalHires" (see Appendix Table A2). For these 1,973 individuals of Asian ethnicity, 1,061 have last names that are identical to last names for individuals identified as South Asian using the "Nationalityaspersystem" variable (there are 26,217 of these employees). These 1,061 recoded to South Asian based on last names are highlighted in bold.

**Appendix Table A1.c. Comparing nationality and last name matching for Asian ethnicity with high share non-SA names recoded to non-SA (method 3)**

| | | SA (nationality) | | | |
|---|---|---|---|---|---|
| | | No | Yes | Missing | |
| SA (last name) | No | 5,058 | 0 | 3,931 | 8,989 |
| | Yes | 0 | 26,217 | **1,046** | 27,263 |
| | Missing | 0 | 0 | 0 | 0 |
| | | 5,058 | 26,217 | 4,977 | 36,252 |

Note: This table is identical to Table 1.b except that among the 1,061 individuals who are identified as South Asian because they share a last name with a South Asian employee (as identified via nationality), some are recoded back to non-South Asian if their name appears more frequently among employees who non-South Asian than South Asian as determined by nationality. There are 15 individuals who are recoded (see Appendix Table A3). Thus, in this case, 1,046 of those missing nationality data are recoded to South Asian (highlighted in bold).

**Appendix Table A1.d. Comparing nationality and recoding Asian or race missing by last name as SA (method 4)**

| | | SA (nationality) | | | |
|---|---|---|---|---|---|
| | | No | Yes | Missing | |
| SA (last name) | No | 5,058 | 0 | 3,848 | 8,906 |
| | Yes | 0 | 26,217 | **1,129** | 27,346 |
| | Missing | 0 | 0 | 0 | 0 |
| | | 5,058 | 26,217 | 4,977 | 36,252 |

Note: For those individuals for whom nationality is missing (4,977), there are 2,427 whose ethnicity is coded as “Asian,” “No Form,” “Not Applicable,” “Two or More Races,” or “Undeclared,” using “EEOformdetailsOnlyLocalHires” (see Appendix Table A2). For these 2,427 individuals of either Asian or possibly Asian ethnicity, 1,129 have last names that are identical to last names for individuals identified as South Asian using the “Nationalityaspersystem” variable. These 1,129 recoded to South Asian based on last names are highlighted in bold.

**Appendix Table A1.e. Comparing nationality and recoding all non-SA as SA by last name (method 5)**

| | | SA (nationality) | | | |
|---|---|---|---|---|---|
| | | No | Yes | Missing | |
| SA (last name) | No | 3,905 | 0 | 3,742 | 7,647 |
| | Yes | **1,153** | 26,217 | **1,235** | 28,605 |
| | Missing | 0 | 0 | 0 | 0 |
| | | 5,058 | 26,217 | 4,977 | 36,252 |

Note: There are 10,035 individuals who are coded as either not South Asian (5,058) or unidentifiable (4,977) using nationality. For these 10,035 individuals, 2,388 have last names that are identical to last names of individuals identified as South Asian using the "Nationalityaspersystem" variable. Of these 2,388 employees who have a South Asian last name, 1,153 are coded as not South Asian using "Nationalityaspersystem." The remaining 1,235 employees are coded as missing using "Nationalityaspersystem." These 1,235 and 1,153 employees recoded to South Asian based on last names are highlighted in bold.

**Appendix Table A2. Tabulation of race for employees with no nationality data**

| EEO form details (only local hires) | N |
|---|---|
| American Indian | 9 |
| **Asian** | **1,973** |
| Black / African American | 384 |
| Hispanic / Latino | 209 |
| **No Form** | **102** |
| **Not Applicable** | **31** |
| **Two or More Races** | **90** |
| **Undeclared** | **231** |
| White | 1,948 |
| Total | 4,977 |

Note: This table presents tabulations of the "EEOformdetailsOnlyLocalHires" variable conditional on nationality being missing. There are 1,973 employees identified who are of Asian ethnicity. These 1,973 employees constitute the sample of Asian names used in Appendix Tables A1.b and A1.c whose South Asian status is determined by matching last names to the last names of individuals identified as South Asian using nationality. Employees with values "No Form," "Not Applicable," "Two or More Races," and "Undeclared" are included, in addition to "Asian," in the name matching used in Appendix Table A1.d.

**Appendix Table A3. South Asian matched names re-coded back to non-South Asian**

| | Last Name | Count SA | Count non-SA | Total | Percent non-SA |
|---|---|---|---|---|---|
| 1 | martin | 1 | 6 | 7 | 85.71% |
| 2 | martin | 1 | 6 | 7 | 85.71% |
| 3 | atluri | 1 | 2 | 3 | 66.67% |
| 4 | atluri | 1 | 2 | 3 | 66.67% |
| 5 | baig | 1 | 2 | 3 | 66.67% |
| 6 | baig | 1 | 2 | 3 | 66.67% |
| 7 | jackson | 1 | 2 | 3 | 66.67% |
| 8 | lam | 1 | 2 | 3 | 66.67% |
| 9 | lam | 1 | 2 | 3 | 66.67% |
| 10 | saleem | 1 | 2 | 3 | 66.67% |
| 11 | rahman | 5 | 9 | 14 | 64.29% |
| 12 | gill | 2 | 3 | 5 | 60.00% |
| 13 | gill | 2 | 3 | 5 | 60.00% |
| 14 | rajamani | 2 | 3 | 5 | 60.00% |
| 15 | islam | 3 | 4 | 7 | 57.14% |

Note: The 15 employees with last names in the list above are employees identified as Asian according to "EthinicityAsperEEOdata" and whose nationality is undeterminable using "Nationalityaspersystem," with names that match South Asian employees but also match a number of non-South Asian employees. Specifically, the list of 15 employees shown above are employees from the 1,061 identified as South Asian (Appendix Table A1.b.) but among whom their last names match to more employees identified as non-South Asian using nationality data than as South Asian. These are the 15 cases coded back to non-South Asian in Appendix Table A1.c.

**Appendix Table A4. Comparing coding of South Asians for different matches on last names**

| Coded as non-South Asian | Percent (%) | **Coded as South Asian** | Percent (%) | Total |
|---|---|---|---|---|
| **Panel 1.b. Any match for Asian ethnicity employees (method 2)** | | | | |
| 912 | 46.22% | **1,061** | 53.78% | 1,973 |
| **Panel 1.c. Dropping non-SA names for Asian employees recoded to SA (method 3)** | | | | |
| 927 | 46.98% | **1,046** | 53.02% | 1,973 |
| **Panel 1.d. Any match for Asian or missing ethnicity employees (method 4)** | | | | |
| 1,298 | 53.48% | **1,129** | 46.52% | 2,427 |
| **Panel 1.e. Any match for non-SA nationality employees (method 5)** | | | | |
| 7,647 | 76.20% | **2,388** | 23.80% | 10,035 |

Note: Each panel corresponds to Appendix Tables A1.b-A1.e. See notes to Appendix Tables A1.b-A1.e for details on the matching process used to code South Asians and non-South Asians.

**Appendix Table A5: Percent of employees coded as South Asian using alternative methods**

| **Method** | **% coded South Asian** |
|---|---|
| 1: Using nationality, and base country if nationality coded as non-South Asian | 72.32% |
| 2: Any match on South Asian names for those of Asian ethnicity | 75.25% |
| 3: Method 2, but drop common non-South Asian names for Asian employees | 75.20% |
| 4: Any match on South Asian names for those of Asian ethnicity or other ethnicity | 75.43% |
| 5: Any match on South Asian names | 78.91% |

Each panel corresponds to Appendix Tables A1.a-A1.e. See notes to Appendix Tables A1.a-A1.e for details on the matching process used to code South Asians and non-South Asians.

## APPENDIX B – MATERIALS CONSIDERED

- American Community Survey (ACS) Data: 2011 – 2014
- *TCSLTD003463394* – Active Employees
- *TCSLTD003463395* – Separated Employees
- IPUMS.org: Codes for Industry (IND) and NAICS Industry (INDNAICS) in the 2003-onward ACS/PRCS Samples, available at https://usa.ipums.org/usa/volii/indcross03.shtml
- TCS.com: About TCS, available at http://www.tcs.com/about/Pages/default.aspx
- Kumar (30(b)(6)) Dep. Tr. (Jan. 25, 2017)
- 3d Am. Compl. (Dkt. #84)

# APPENDIX C – PUBLICATIONS

## PEER-REVIEWED PUBLICATIONS:

McLaughlin, Joanne Song, and David Neumark, "Barriers to Later Retirement for Men: Physical Challenges at Work and Increases in the Full Retirement Age," forthcoming in Research on Aging.

Neumark, David, and William Wascher, "Reply *to Credible Research Designs for Minimum Wage Studies*," forthcoming in Industrial and Labor Relations Review.

Figinski, Theodore, and David Neumark, "Does Eliminating the Earnings Test Increase Old-Age Poverty of Women?" forthcoming in Research on Aging.

Neumark, David, "Experimental Research on Labor Market Discrimination," forthcoming in Journal of Economic Literature.

Neumark, David, and Diego Grijalva, "The Employment Effects of State Hiring Credits," forthcoming in Industrial and Labor Relations Review.

Neumark, David, Joanne Song, and Patrick Button, 2017, "Does Protecting Older Workers from Discrimination Make It Harder to Get Hired? Evidence from Disability Discrimination Laws," Research on Aging, pp. 29-63.

Neumark, David, Ian Burn, and Patrick Button, 2016, "Experimental Age Discrimination Evidence and the Heckman Critique," American Economic Review Papers and Proceedings, pp. 303-8.

Neumark, David, 2016, "Policy Levers to Increase Jobs and Increase Income from Work after the Great Recession," IZA Journal of Labor Policy, 5:6 (on-line).

Neumark, David, and Jennifer Muz, 2016, "The 'Business Climate' and Economic Inequality," Review of Income and Wealth, pp. 161-80.

Neumark, David, Cathy J. Bradley, Miguel Henry, and Bassam Dahman, 2015, "Work Continuation While Treated for Breast Cancer: The Role of Workplace Accommodations," Industrial and Labor Relations Review, pp. 915-954.

Neumark, David, and Helen Simpson, 2015, "Place-Based Policies," in Handbook of Regional and Urban Economics, Vol. 5, Gilles Duranton, Vernon Henderson, and William Strange, eds. (Amsterdam: Elsevier), pp. 1197-1287.

Neumark, David, J.M. Ian Salas, and William Wascher, 2014, "More on Recent Evidence on the Effects of Minimum Wages in the United States," IZA Journal of Labor Policy, 3:24 (on-line).

Neumark, David, and Patrick Button, 2014, "Did Age Discrimination Protections Help Older Workers Weather the Great Recession?" Journal of Policy Analysis and Management, 566-601.

Neumark, David, J.M. Ian Salas, and William Wascher, 2014, "Revisiting the Minimum Wage-Employment Debate: Throwing Out the Baby with the Bathwater?" Industrial and Labor Relations Review, 608-648.

Burnes, Daria, David Neumark, and Michelle White, 2014, "Fiscal Zoning and Sales Taxes: Do Higher Sales Taxes Lead to More Retailing and Less Manufacturing," National Tax Journal, 7-50.

Brueckner, Jan, and David Neumark, 2014, "Beaches, Sunshine, and Public-Sector Pay: Theory and Evidence on Amenities and Rent Extraction by Government Workers," American Economic Journal: Economic Policy, pp. 198-230.

Hellerstein, Judith K., Mark Kutzbach, and David Neumark, 2014, "Do Labor Market Networks Have An Important Spatial Dimension?" Journal of Urban Economics, pp. 39-58.

Neumark, David, Matthew Thompson, Francesco Brindisi, Leslie Koyle, and Clayton Reck, 2013, "Simulating the Economic Impacts of Living Wage Mandates Using New Public and Administrative Data: Evidence for New York City," Economic Development Quarterly, pp. 271-83.

Bradley, Cathy J., David Neumark, and Scott Barkowski, 2013, "Does Employer-Provided Health Insurance Constrain Labor Supply Adjustments to Health Shocks? New Evidence on Women Diagnosed with Breast Cancer," Journal of Health Economics, pp. 833-49.

Neumark, David, and Joanne Song, 2013, "Do Stronger Age Discrimination Laws Make Social Security Reforms More Effective?" Journal of Public Economics, pp. 1-16.

Neumark, David, 2013, "Spurring Job Creation in Response to Severe Recessions: Reconsidering Hiring Credits," Journal of Policy Analysis and Management, pp. 142-71.

Kolko, Jed, David Neumark, and Marisol Cuellar Mejia, 2013, "What Do Business Climate Indexes Teach Us About State Policy and Growth?" Journal of Regional Science, pp. 220-55.

Neumark, David, Hans Johnson, and Marisol Cuellar Mejia, 2013, "Future Skill Shortages in the U.S. Economy?" Economics of Education Review, pp. 151-67.

Neumark, David, Matthew Thompson, and Leslie Koyle, 2012, "The Effects of Living Wage Laws on Low-Wage Workers and Low-Income Families: What Do We Know Now?" IZA Journal of Labor Policy, 1:11 (on-line).

Bradley, Cathy, David Neumark, and Meryl Motika, 2012, "The Effects of Health Shocks on Employment and Health Insurance: The Role of Employer-Provided Health Insurance," International Journal of Health Care Finance and Economics, pp. 253-67.

Neumark, David, 2012, "Detecting Evidence of Discrimination in Audit and Correspondence Studies," Journal of Human Resources, pp. 1128-57.

Neumark, David, and Kenneth Troske, 2012, "Point/Counterpoint: 'Addressing the Employment Situation in the Aftermath of the Great Recession,' and 'Lessons from Other Countries, and Rethinking (Slightly) Unemployment Insurance as Social Insurance Against the Great Recession," Journal of Policy Analysis and Management, pp. 160-68, 188-91.

Mazzolari, Francesca, and David Neumark, 2012, "Immigration and Product Diversity," Journal of Population Economics, pp. 1107-37.

Bradley, Cathy, Sabina Ohri, David Neumark, Sheryl Garland, and Sheldon Retchin, 2012, "Lessons for Coverage Expansion: A Virginia Primary Care Program for The Uninsured Reduced
Utilization And Cut Costs," Health Affairs, pp. 350-9.

Hellerstein, Judith, Melissa McInerney, and David Neumark, 2011, "Neighbors and Co-Workers: The Importance of Residential Labor Market Networks," Journal of Labor Economics, pp. 659-95.

Neumark, David, and William Wascher, 2011,"Does a Higher Minimum Wage Enhance the Effectiveness of the Earned Income Tax Credit?" Industrial and Labor Relations Review, pp. 712-46.

Neumark, David, Brandon Wall, and Junfu Zhang, 2011, "Do Small Businesses Create More Jobs? New Evidence from the National Establishment Time Series," Review of Economics and Statistics, pp. 16-29.

Hellerstein, Judith K., Melissa McInerney, and David Neumark, 2010, "Spatial Mismatch, Immigrant Networks, and Hispanic Employment in the United States, Annales d'Economie et de Statistique, pp. 141-67.

Finlay, Keith, and David Neumark, 2010, "Is Marriage Always Good for Children? Evidence from Families Affected by Incarceration," Journal of Human Resources, pp. 1046-88.

Neumark, David, and Jed Kolko, 2010, "Do Enterprise Zones Create Jobs? Evidence from California's Enterprise Zone Program," Journal of Urban Economics, pp. 1-19.

Kolko, Jed, and David Neumark, 2010, "Does Local Business Ownership Insulate Cities from Economic Shocks?" Journal of Urban Economics, pp. 103-15.

Kolko, Jed, and David Neumark, 2010, "Do *Some* Enterprise Zones Create Jobs?" Journal of Policy Analysis and Management, pp. 5-38.

Neumark, David, 2008, "The Age Discrimination in Employment Act and the Challenge of Population Aging," Research on Aging, pp. 41-68.

Kolko, Jed, and David Neumark, 2008, Changes in the Location of Employment and Ownership: Evidence from California," Journal of Regional Science, pp. 717-44.

Bradley, Cathy, David Neumark, Lisa Shickle, and Nicholas Farrell, 2008, "Differences in Breast Cancer Diagnosis and Treatment: Experiences of Insured and Uninsured Patients in a Safety Net Setting," Inquiry, pp. 323-39.

Hellerstein, Judith, David Neumark, and Melissa McInerney, 2008, "Spatial Mismatch vs. Racial Mismatch?" Journal of Urban Economics, pp. 464-79.

Hellerstein, Judith, and David Neumark, 2008, "Workplace Segregation in the United States: Race, Ethnicity, and Skill," Review of Economics and Statistics, pp. 459-77.

Neumark, David, and William Wascher, 2008, "Minimum Wages and Low-Wage Workers: How Well Does Reality Match the Rhetoric?" Minnesota Law Review, pp. 1296-316.

Neumark, David, Junfu Zhang, and Steven Ciccarella, 2008, "The Effects of Wal-Mart Openings on Local Labor Markets," Journal of Urban Economics, pp. 405-30.

Neumark, David, Peter Barth, and Richard Victor, 2007, "The Impact of Provider Choice on Workers' Compensation Costs and Outcomes," Industrial and Labor Relations Review, pp. 121-42.

Bradley, Cathy J., David Neumark, Heather L. Bednarek, and Zhehui Luo, 2007, "Employment-Contingent Health Insurance, Illness, and Labor Supply of Women: Evidence from Married Women with Breast Cancer," Health Economics, pp. 719-37.

Bradley, Cathy J., David Neumark, Zhehui Luo, and Maryjean Schenk, 2007, "Employment and Cancer: Findings from a Longitudinal Study of Breast and Prostate Cancer Survivors," Cancer Investigation, pp. 47-54.

Furstenberg, Frank, and David Neumark, 2007, "Encouraging Education in an Urban School District: Evidence from the Philadelphia Educational Longitudinal Study," Education Economics, pp. 135-57.

Neumark, David, and William Wascher, 2007, "Minimum Wages and Employment," Foundations and Trends in Microeconomics, pp. 1-182.

Neumark, David, Junfu Zhang, and Brandon Wall, 2007, "Employment Dynamics and Business Relocation: New Evidence from the National Establishment Time Series," Research in Labor Economics, pp. 39-83.

Neumark, David, and Olena Nizalova, 2007, "Minimum Wage Effects in the Longer Run," Journal of Human Resources, pp. 435-52.

Neumark, David, Junfu Zhang, and Brandon Wall, 2006, "Where the Jobs Are: Business Dynamics and Employment Growth," Academy of Management Perspectives, pp. 79-94.

Neumark, David, and Elizabeth Powers, 2006, "Supplemental Security Income, Labor Supply, and Migration," Journal of Population Economics, pp. 447-79.

Neumark, David, 2006, "Evaluating Program Effectiveness: A Case Study of the School-to-Work Opportunities Act in California," Economics of Education Review, pp. 315-26.

Neumark, David, and Wendy Stock, 2006, "The Labor Market Effects of Race and Sex Discrimination Laws," Economic Inquiry, pp. 385-419.

Neumark, David, and Donna Rothstein, 2006, "School-to-Career Programs and Transitions to Employment and Higher Education," Economics of Education Review, pp. 374-93.

Neumark, David, 2006, "School-to-Work and Educational Reform Symposium: Introduction," Economics of Education Review, pp. 347-50.

Neumark, David, Wendy Cunningham, and Lucas Siga, 2006, "The Effects of the Minimum Wage in Brazil on the Distribution of Family Incomes: 1996-2001," Journal of Development Economics, pp. 136-59.

Holzer, Harry, and David Neumark, 2006, "Affirmative Action: What Do We Know?" Journal of Policy Analysis and Management, pp. 463-90.

**BOOKS:**

Neumark, David, and William Wascher, 2008, Minimum Wages (Cambridge: MIT Press).

Neumark, David, Ed., 2007, Improving School-to-Work Transitions (New York: Russell Sage Foundation).

**BOOK CHAPTERS:**

Neumark, David, 2015, "Increasing Jobs and Income from Work: The Role and Limitations of Public Policy," in Ten-Gallon Economy: Sizing Up Economic Growth in Texas, Pia Orrenius, Jesus Canas, and Michael Weiss, eds. (New York: Palgrave), pp. 15-31.

Neumark, David, 2013, "Ethnic Hiring," In International Handbook on the Economics of Migration, Amelie F. Constant and Klaus F. Zimmerman, eds. (Cheltenham, UK: Edward Elgar), pp. 193-213.

Neumark, David, 2013, "Do Minimum Wages Help Fight Poverty?" In The Economics of Inequality, Poverty, and Discrimination in the 21st Century, Robert S. Rycroft, ed. (Santa Barbara, CA: Praeger), pp. 323-42.

Hellerstein, Judith K., and David Neumark, 2012, "Employment Problems in Black Urban Labor Markets: Problems and Solutions," in The Oxford Handbook of the Economics of Poverty, Philip N. Jefferson, Ed. (Oxford: Oxford University Press), pp. 164-202.

Neumark, David, 2009, "Alternative Labor Market Policies to Increase Economic Self-Sufficiency: Mandating Higher Wages, Subsidizing Employment, and Raising Productivity," in Making the Work-Based Safety Net Work Better, Carolyn J. Heinrich and John Karl Scholz, Eds. (New York: Russell Sage Foundation), pp. 25-78.

Hellerstein, Judith, David Neumark, and Melissa McInerney, 2008, "Changes in Workplace Segregation in the United States between 1990 and 2000: Evidence from Matched Employer-Employee Data," in The Analysis of Firms and Employees: Quantitative and Qualitative Approaches, Stefan Bender, Julia Lane, Kathryn Shaw, Fredrik Andersson, and Till von Wachter, Eds. (Chicago: University of Chicago Press), pp. 163-195.

Holzer, Harry J. and David Neumark, 2008, "Affirmative Action," in The New Palgrave Dictionary of Economics, Steven N. Durlauf and Lawrence E. Blume, Eds. (United Kingdom: Palgrave Macmillan, 2008.

Hellerstein, Judith, and David Neumark, 2007, "Production Function and Wage Equation Estimation with Heterogeneous Labor: Evidence from a New Matched Employer-Employee Data Set," in Hard-to-Measure Goods and Services: Essays in Memory of Zvi Griliches, Charles Hulten and Ernst Berndt, Eds. (Chicago: University of Chicago Press), pp. 31-71.

Neumark, David, and Donna Rothstein, 2007, "Do School-to-Work Programs Help the 'Forgotten Half'?", in Improving School-to-Work Transitions, David Neumark, Ed. (New York: Russell Sage Foundation), pp. 87-133.

Neumark, David, 2007, "Improving School-to-Work Transitions: Introduction," in Improving School-to-Work Transitions, David Neumark, Ed. (New York: Russell Sage Foundation), pp. 1-23.

Neumark, David, 2006, "Productivity, Compensation, and Retirement," in The Oxford Handbook of Pensions and Retirement Income, Gordon L. Clark, Alicia H. Munnell, and J. Michael Orszag, Eds. (Oxford: Oxford University Press), pp. 721-39.

Hellerstein, Judith, and David Neumark, 2006, "Using Matched Employer-Employee Data to Study Labor Market Discrimination," in Handbook on the Economics of Discrimination, William Rodgers, Ed. (Great Britain: Edgar Elgar Publishing), pp. 29-60.

Adams, Scott, and David Neumark, 2006, "Age Discrimination in U.S. Labor Markets: A Review of the Evidence," in Handbook on the Economics of Discrimination, William Rodgers, Ed. (Great Britain: Edgar Elgar Publishing), pp. 187-211. Reprinted in Michael Selmi, Ed., Age and Equality Law Ashgate (2013).

Holzer, Harry J., and David Neumark, 2006, "Equal Employment Opportunity and Affirmative Action," in Handbook on the Economics of Discrimination, William Rodgers, Ed. (Great Britain: Edgar Elgar Publishing), pp. 260-87.

**SPECIAL ISSUES AND REPORTS:**

Neumark, David, 2014. "Employment Effects of Minimum Wages." IZA World of Labor, (Bonn, Germany: IZA), http://wol.iza.org/articles/employment-effects-of-minimum-wages-1.pdf.

Neumark, David, 2011, Will Workers Have the Education Needed for the Available Jobs? (Washington, DC: The AARP Foundation).

Kolko, Jed, David Neumark, and Marisol Cuellar Mejia, 2011, Business Climate Rankings and the California Economy (San Francisco: Public Policy Institute of California).

Neumark, David, 2011, How Can California Spur Job Creation? (San Francisco: Public Policy Institute of California).

Neumark, David, Matthew Thompson, Marsha Courchane, Timothy Riddiough, and Anthony Yezer, 2011, The Economic Impacts on New York City of the Proposed Living Wage Mandate, Charles River Associates.

Kolko, Jed, and David Neumark, 2009, Do California's Enterprise Zones Create Jobs? (San Francisco: Public Policy Institute of California).

Kolko, Jed, and David Neumark, 2007, Business Location Decisions and Employment Dynamics in California, (San Francisco: Public Policy Institute of California).

Neumark, David, Ed., 2006, "School-to-Work and Educational Reform Symposium," special issue of Economics of Education Review.

**OTHER PUBLICATIONS:**

Neumark, David, 2016, "Do women face age discrimination in the job market? Absolutely. Here's proof." April 26, http://www.latimes.com/opinion/op-ed/la-oe0426-neumark-age-women-discrimination-date-20160427-story.html.

Neumark, David, 2016, "A Minimum Wage Hike is the Wrong Fix." Op-ed, Los Angeles Times, March 17, http://www.latimes.com/opinion/op-ed/la-oe-0318-neumark-fair-wage-act-problems-20160318-story.html.

Neumark, David. 2015, "Reducing Poverty via Minimum Wages, Alternatives." Federal Reserve Bank of San Francisco Economic Letter, December 28, 2015.

Neumark, David. 2015, "The Effect of Minimum Wages on Employment." Federal Reserve Bank of San Francisco Economic Letter, December 21, 2015.

Neumark, David, 2015, "The Evidence is Piling Up that Higher Minimum Wages Kill Jobs." Op-ed, Wall Street Journal, December 15, http://www.wsj.com/articles/the-evidence-is-piling-up-that-higher-minimum-wages-kill-jobs-1450220824.

Neumark, David, 2015, "Using the Earned Income Tax Credit to Encourage Work and Increase Income from Work." Insight, pp. 16-21,

http://www.resourcelibrary.gcyf.org/sites/gcyf.org/files/resources/2015/gcyf_2015_fall_insight_using_the_tax_credit_to_encourage_work.pdf.

Neumark, David, 2015, "What Do We Know about Age Discrimination, and How Might We Reduce It?" Future of Work@50+, AARP, http://www.aarp.org/content/dam/aarp/ppi/2015/what-do-we-know-about-age-discrimination-and-how-might-we-reduce-it.pdf.

Neumark, David, 2015, "Why Market Forces will Overwhelm a Higher Minimum Wage." Op-ed, Los Angeles Times, May 9. http://www.latimes.com/opinion/op-ed/la-oe-neumark-minwage-20150510-story.html. Reprinted in Chicago Tribune (May 14, 2015) and Australian Financial Review (May 14, 2015).

Neumark, David, and Helen Simpson. 2015, "Do Place-Based Policies Matter?" Federal Reserve Bank of San Francisco Economic Letter, March 2, 2015.

Neumark, David, 2014, "Who Really Gets the Minimum Wage?" Op-ed, Wall Street Journal, July 7, http://www.wsj.com/articles/who-really-gets-the-minimum-wage-1404683348.

Neumark, David, and Diego Grijalva. "State Hiring Credits and Recent Job Growth." Federal Reserve Bank of San Francisco Economic Letter, February 24, 2014.

Neumark, David, and William Wascher, 2013, "The Minimum Wage Ain't What It Used to Be," New York Times, Economix Blog, Dec. 10, http://economix.blogs.nytimes.com/2013/12/09/the-minimum-wage-aint-what-it-used-to-be/?_r=0.

Neumark, David, 2013, "Minimum Wage Studies," New York Times, Letter to the Editor, Dec. 9, http://www.nytimes.com/2013/12/09/opinion/minimum-wage-studies.html?_r=1&.

Neumark, David, 2013, "Research Offers a Prognosis on Reform," Orange County Register, Nov. 4.

Neumark, David, and Jennifer Muz, "Job Growth and Economic Growth in California," Federal Reserve Bank of San Francisco Economic Letter, April 15, 2013.

Neumark, David, 2013, "Minimum-Wage Increases Will Lead to Lost Jobs," op-ed, San Diego Union-Tribune, February 8.

Neumark, David, and Jennifer Muz, 2013, "How Does California's Economic Performance Compare to Other States?" Next 10 Foundation.

Neumark, David, Jed Kolko, and Marisol Cuellar Mejia, 2012, "Assessing State Business Climate Indexes," Federal Reserve Bank of San Francisco Economic Letter, September 4, 2012.

Neumark, David, and Rob Valletta, 2012, "Worker Skills and Job Quality," Federal Reserve Bank of San Francisco Economic Letter, April 30, 2012.

Neumark, David, 2012, "Job Creation Policies and the Great Recession," Federal Reserve Bank of San Francisco Economic Letter, March 19, 2012.

Kolko, Jed, and David Neumark, 2011, "Development Subsidy Needs Overhaul," op-ed, San Francisco Chronicle, February 6.

Neumark, David, 2009, "Delay the Minimum Wage Hike," op-ed, The Wall Street Journal, June 12.

Neumark, David, 2008, "Just the Facts: Small Businesses and Job Creation," Public Policy Institute of California.

Neumark, David, 2008, "La Discrimination à l'Emploi des Seniors aux États-Unis," Connaissance de l'Emploi.

Neumark, David, 2008, "Reassessing the Age Discrimination in Employment Act," AARP Public Policy Institute.

Kolko, Jed, and David Neumark, 2007, "Are California's Companies Shifting Their Employment to Other States?" Occasional Paper, Public Policy Institute of California.

Richard A. Victor, Peter S. Barth, and David Neumark, 2006, "The Impact of Provider Choice on Workers' Compensation Costs and Outcomes," abstract, IAIABC Journal.

Neumark, David, 2006, "The Economic Effects of Minimum Wages: What Might Missouri Expect from Passage of Proposition B?" Show-Me Institute Policy Briefing.

Neumark, David, Junfu Zhang, and Jed Kolko, 2006, "Interstate Business Relocation: An Industry-Level Analysis," Occasional Paper, Public Policy Institute of California.

## APPENDIX D – OTHER CASES

Koehler et al. v. Infosys Technologies Limited, Inc., and Infosys Public Services, Inc., No. 2:13-cv-885, E.D. Wis.

Employment Opportunity Commission v. PMT Corporation; Civil Action No. 0:14-CV-00599, Minn. Dist.

Syverson, et al. v. IBM Corporation, 2006 WL 2506421 (9th Cir. Aug. 31, 2006)

Clifford L. Whitaker, et al. v. 3M Company, No. 62-C4-0412239, Minn. Dist., Ramsey Co.

City of Stockton seeking relief under Chapter 9 of the United States Bankruptcy Code, United States Bankruptcy Court for the Eastern District of California, Sacramento Division, case 2012-32118