Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
E-mail:  dlow@kotchen.com;
E-mail:  dkotchen@kotchen.com;
E-mail:  mvk@kotchen.com

Attorneys for Buchanan, Slaight,
Webber, Masoudi, and Mandili

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| STEVEN HELDT, BRIAN BUCHANAN, and CHRISTOPHER SLAIGHT<br><br>Plaintiffs,<br><br>v.<br><br>TATA CONSULTANCY SERVICES, LTD.,<br>Defendant. | Case No.: 4:15-cv-01696-YGR<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint Filed:  April 14, 2015 |

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S
MOTION FOR SUMMARY JUDGMENT......................................................................1

    I.      STATEMENT OF FACTS ...................................................................1

          A.    Tata's Discriminatory Scheme.................................................1

          B.    The Named Plaintiffs. .............................................................4

    II.    THE STATE OF DISCOVERY AND ITS IMPACT ON SUMMARY
        JUDGMENT ...................................................................................7

    III.   LEGAL STANDARD.......................................................................9

    IV.   ARGUMENT ...................................................................................9

          A.    Consideration of Plaintiffs' Individual Claims Is Premature.......................9

          B.    Ample Evidence Supports Plaintiffs' Prima Facie Pattern and
               Practice Claim, Precluding Summary Judgment. ......................................12

          C.    Tata Cannot Rebut the Teamsters Presumption That It
               Discriminated Against Plaintiffs................................................................20

    V.    CONCLUSION................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Adams v. Ameritech Services, Inc.*, 231 F.3d 414 (7th Cir. 2000).................................. 14, 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................................... 9

*Arden v. Kastell*, 553 F. App'x 697 (9th Cir. 2014) .............................................................. 9

*Barch v. Contra Costa Cnty. Health Servs. Dept.*, No. C-05-2461 EMC, 2007 WL 39305

    (N.D. Cal. Jan. 4, 2007) ................................................................................................ 9

*Bazemore v. Friday*, 478 U.S. 385 (1986) ........................................................................... 12

*Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395 (D.C. Cir. 1988).... 14

*Bockman v. Lucky Stores, Inc.*, No. CIV S 83-039 RAR, 1986 WL 10821 (E.D. Cal. Aug.

    11, 1986) ...................................................................................................................... 20

*Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384 (5th Cir. 1983) ............................................ 10

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015).................................................. 12, 14

*Cal. Expanded Metal Prods. Co. v. ClarkWestern Dietrich Bldg. Sys. LLC*, No. CV 12-

    10791, 2015 WL 5000133 (C.D. Cal. July 20, 2015) .................................................... 8

*Castaneda v. Partida*, 430 U.S. 482 (1977)........................................................................ 14

*Colindres v. Quietflex Mfg.*, No. 01-4319, 2004 WL 3690215 (S.D. Tex. Mar. 23, 2004)12, 20

*Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984)................................... 11, 12

*Craik v. Minn. State Univ. Bd.*, 731 F.2d 465 (8th Cir. 1984) .............................................. 11

*Diaz v. AT&T*, 752 F.2d 1356 (9th Cir. 1985) ............................................................. passim

*EEOC v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575 (9th Cir. 1989)....................................... 15

*EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000)........................................ 21

*EEOC v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872 (7th Cir. 1994) .............. 13

*EEOC v. Timeless Invs., Inc.*, 734 F. Supp. 2d 1035 (E.D. Cal. 2010)................................. 25

*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 482 (N.D. Cal. 2012)..................................... 12

*Fotino v. Quasar Co.*, 950 F.2d 389 (7th Cir. 1991) ......................................................... 18

*Franks v. Bowman Transp., Co.*, 424 U.S. 747 (1976).......................................................... 11

*Gantchar v. United Airlines*, No. 93 C 1457, 1995 WL 137053 (N.D. Ill. March 28, 1995) 11

*Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d 531 (9th Cir. 1982) .................... 14

*G-K Props. v. Redevelopment Agency of City of San Jose*, 577 F.2d 645 (9th Cir. 1978)...... 8

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) .................................... 13, 14, 19

*Heldt v. Tata Consultancy Servs., Ltd.*, 132 F. Supp. 3d 1185 (N.D. Cal. 2015) ............ 13, 19

*Hemmings v. Tidyman's Inc.*, 285 F. 3d 1174 (9th Cir. 2002) .................................. 15, 17, 19

*Howe v. Am. Honda Fin. Corp.*, No. CV 12-0035, 2013 WL 12119713 (C.D. Cal. Feb. 26, 2013) ..................................................................................................................... 9

*Int'l Bd. of Teamsters v. United States*, 431 U.S. 324 (1977)........................................ passim

*Keithley v. Homestore.com, Inc.*, No. C-03-4447 SI (EDL), 2008 WL 4830752 (N.D. Cal. Nov. 6, 2008) ........................................................................................................... 9

*King v. Gen. Elec. Co.*, 960 F.2d 617 (7th Cir. 1992) ........................................................ 11

*Mister v. Ill. Cent. Gulf R.R. Co.*, 832 F.2d 1427 (7th Cir. 1987) ........................................ 15

*Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475 (9th Cir. 1983) ....................................... 17

*Muntin v. State of Ca. Parks Dept.*, 738 F.2d 1054 (9th Cir. 1984) ..................................... 20

*N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447 (9th Cir. 1986)................... 8

*Norris v. City of San Fran.*, 900 F.2d 1326 (9th Cir. 1990) ............................................... 25

*Palmer v. Shultz*, 815 F.2d 84 (D.C. Cir. 1987)....................................................... 13, 14, 15

*Papaila v. Uniden Am. Corp.*, 51 F.3d 54 (5th Cir. 1995)................................................... 18

*Prod. Tool Corp. v. Emp't & Training Admin.*, 688 F.2d 1161 (7th Cir. 1982)................... 16

iii

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ............................................ 9

*Rollins v. Traylor Bros., Inc.*, No. 14-1414, 2016 WL 258523 (W.D. Wash. Jan. 21, 2016) 12

*Sagers v. Yellow Freight Sys., Inc.*, 529 F.2d 721 (5th Cir. 1976) ........................................ 13

*Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984) ......................................................... 11, 13, 21

*Shidaker v. Tisch*, 833 F.2d 627 (7th Cir. 1986) ......................................................... 10, 13

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) .............................................. 11

*Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) ............... 10, 11, 12, 20

*United States v. City of N.Y.*, 717 F.3d 72 (2d Cir. 2013) ................................................ 10, 12

*United States v. Lombardo*, 639 F. Supp. 2d 1271 (D. Utah 2007) ...................................... 17

*Vemuri v. Napolitano*, 845 F. Supp. 2d 125 (D.D.C. 2012) ................................................. 16

*Ventress v. Japan Airlines*, 486 F.3d 1111 (9th Cir. 2007) ............................................... 18

*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394 (7th Cir. 1997) ....................................... 18

*Williams v. Boeing Co.*, 225 F.R.D. 626 (W.D. Wash. 2005) ............................................... 20

*Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108 (9th Cir. 2010) ....................... 9

## **Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................ 9

Fed. R. Civ. P. 56(c) ........................................................................................................ 8

Fed. R. Civ. P. 56(d) ..................................................................................................... 1, 8

## **Regulations**

8 CFR § 214.2 ................................................................................................................ 17

iv

## PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S MOTION FOR SUMMARY JUDGMENT

Defendant Tata Consultancy Services, Ltd.'s ("Tata's") Motion for Summary Judgment should be denied. First, this is a pattern and practice case that must proceed under the *Teamsters* framework.[1] Under the *Teamsters* framework, Plaintiffs' and class members' claims are decided after resolution of the classwide liability phase. Given the order of proof, consideration of Plaintiffs' individual claims is premature. Second, ample statistical and documentary evidence exists that Tata operates under a pattern and practice of discrimination, raising a presumption that Tata discriminated against the Plaintiffs (and class members). Thus, even if Plaintiffs' individual claims were considered at this stage, Tata cannot overcome the presumption that it discriminated against them. Third, Tata has engaged in discovery misconduct, waiting until 2017 to produce the vast majority of its documents and data and continuing to withhold critical discovery. In this circumstance, the Ninth Circuit has found that summary judgment is "patently inappropriate." *Diaz v. AT&T*, 752 F.2d 1356, 1362-63 (9th Cir. 1985); Fed. R. Civ. P. 56(d).

## I.    STATEMENT OF FACTS

### A.    Tata's Discriminatory Scheme.

Tata is a technology company that employs approximately 29,900 employees in the United States. Pls.' Responsive Separate Statement ¶ 1 ("Pls.' RSS"). Once Tata secures a contract for a client, it hires individuals to fill U.S. positions to serve the client. *Id.* ¶¶ 2-4. For these U.S. positions, Tata hires "visa ready" individuals in India who are working for Tata in other positions. *Id.* ¶¶ 2-4, 7. Tata also hires individuals residing in the U.S., who Tata calls "local hires." Tata's Statement of Material Facts ¶ 6 ("Tata's SMF") (Dkt. #106). Tata relies on third party recruiters for much of its "local" hiring. Pls.' RSS ¶¶ 2,4, 9. Visa ready individuals and local hires must apply and interview for jobs in the U.S. *Id.* ¶ 3.

When an individual is hired for a U.S. position, that position may come to an end when the work for the client is completed. *Id.* Once a position comes to an end, an individual must again seek a new position within Tata, going through another application and interview process. *Id.* Tata's

---

[1] *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 360-61 (1977).

Resource Management Group ("RMG") assists individuals in identifying new positions for which they can apply. *Id.* ¶¶ 3, 5; Tata's SMF ¶ 5 (Dkt. #106). RMG closely tracks when positions are scheduled to end, and individuals often promptly seek and are placed in a new position. Pls.' RSS ¶ 5. Individuals who are not immediately hired for a new position are placed in a non-productive status, referred to as being "benched" or "unallocated." *Id.* Tata closely monitors individuals who are in benched status. *Id.* If an individual is benched for too long, he or she will be terminated. *Id.*

Tata has an explicit corporate policy of favoring visa workers in staffing U.S. positions. *See, e.g.,* Pls.' Statement of Additional Material Facts ¶ 1 ("Pls.' SAF") (citing TCS057813-18 at 815 ("Leadership directive is to utilize every visa to the maximum extent – L1 B: 5 Yrs, H1 B: 6 Yrs & L1 A: 7 Yrs."); TCS137485-87 at 485 ("Leadership Team has advised to utilize visa ready Associates at on site")); Pls.' RSS ¶¶ 2-5, 7. Individuals in India who have "unutilized visas and work permits" are instructed to be "mapped" to open positions in the U.S.

> The visa utilization report is published every fortnight by Chennai Data Support. It gives a view of the number of associates in the branch who have valid visas and work permits, and [are] currently at offshore. It also gives a split of how many associates have utilized their visas and work permits. You can split the data branch wise and visa type wise. ***RMG should try and map associates with unutilized visas and work permits for onsite opportunities.***

Pls.' RSS ¶ 7 (quoting TCS007391-452 at 425) (emphasis added).

Tata meticulously tracks the availability of "visa ready" employees who can fill positions in the United States. *Id.*; Pls.' SAF ¶ 3. Hiring for positions reflects the directive to favor South Asian visa workers over others. Pls.' SAF ¶ 4. Likewise, Tata closely tracks the benched status of its employees to ensure that its visa workers are given first priority for open positions. *Id.* ¶ 3. Visa workers are either not placed on the bench at all or are rapidly moved off the bench to fill open positions, while Tata's comparatively few non-South Asian employees languish on the bench and are then terminated. *Id.* ¶ 5; Pls.' RSS ¶¶ 5-7, 40. As a result of its visa preference policy, approximately

PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S
MOTION FOR SUMMARY JUDGMENT - CASE NO. 4:15-CV-01696-YGR

70% of Tata's U.S. workforce consists of visa holders and virtually 100% of these individuals are Indian nationals.[2]

Tata itself recognizes that preferring "visa ready" individuals for U.S. positions is discriminatory, as reflected in the testimony of Tata's head of diversity testifying on behalf of the corporation:

> Q: As the head of diversity at TCS, would you be concerned if there was a leadership directive for positions to be filled with visa-ready individuals?
> A: Yes.
> Q: Why would you be concerned about that?
> A: Because as I said, citizenship or nationality should not be the basis for determining a person is fit against a particular position.

Pls.' SAF ¶ 7.

Tata also has a process to identify and favor South Asian Indian nationals in local hiring. Tata's third party recruiters forward resumes to Tata using a template in which the recruiter notes the "nationality" of job candidates found in the U.S. and/or the "work authorization status" of candidates (*e.g.*, green card holder, visa status, or citizen). *Id.* ¶ 8. Many resumes also include a candidate's Indian nationality and even a picture of the candidate, confirming the candidate's race. *Id.* Because Tata's preference for Indians is well-known, a substantial percentage of candidates third party recruiters refer to Tata are South Asian. *Id.*

The discriminatory effect of Tata's corporate policy and practices is reflected in the demographic make-up of its U.S. workforce. Tata's U.S. workforce is between 72.32% and 78.91% South Asian, despite the fact that the relevant labor market in the United States (the computer systems design and related services industry) is 12.50% South Asian – a difference of 197.61 or 215.87 standard deviations. Pls.' RSS ¶ 15 (citing Neumark Report ¶¶ 6, 14, Table 1). The likelihood of obtaining such a skewed workforce by chance is less than 1 in 1 billion. *Id*. This highly skewed

---

[2] Pls.' SAF ¶ 6; Pls.' RSS ¶ 6 (citing Jindal (30(b)(6)) Dep. Tr. 51:17-52:7 (Feb. 26, 2016) (Q: "From which country do most TCS visa workers come from[?]" A: "India." Q: "Would you say the vast majority comes from India?" A: "Yes."); TCSLTD005646947 (2013 list of 9,248 "Visa Ready" workers, all of whom are residing at a "Base Branch" in India); TCSLTD005646989 (2012 list of 10,290 "Visa Ready" workers, all of whom are residing at a "Base Branch" in India except for 60 who reside at a "Base Branch" in Singapore)).

3

workforce is a product of favoring South Asians in hiring, including the corporate directive to favor visa ready South Asian Indian national candidates to fill U.S. positions and the use of third party recruiters that forward to Tata a substantial percentage of South Asian Indian national candidates.

This discriminatory scheme also adversely affects Tata's relatively few non-South Asian employees. Between 2011 and 2015, Tata involuntarily terminated in the U.S. between 11.15% and 12.57% of its non-South Asian workers, while firing only a miniscule (by comparison) 0.21% to 0.97% of its South Asian workers. *Id.* (citing Neumark Report ¶¶ 7-8, 17-18, Table 3.a-3.e). This dramatic difference amounts to 47.27 to 57.15 standard deviations. *Id.* Most of the terminated non-South Asians were fired from the bench. *Id.* (noting that between 7.55% and 8.51% of Tata's non-South Asian employees are terminated from the bench, while only 0.15% to 0.65% of Tata's South Asian workforce is terminated from the bench). That is, as positions ended for the comparatively few non-South Asians Tata employed in the U.S., they were placed on the bench and often were unable to find new positions while visa holding Indian nationals were promptly placed in new jobs, per Tata's policy to favor visa holders in filling positions.

**B.    The Named Plaintiffs.**

Mr. Buchanan is a white American living in Temecula, California. Pls.' SAF ¶ 9. He is a highly skilled IT professional who has been employed in the IT field since 1982. *Id.* Mr. Buchanan is a Microsoft Certified Professional, and holds both project management and information technology certifications. *Id.* ¶ 10. Mr. Buchanan began working for Southern California Edison ("SCE") in 1986 as a networking specialist, and was promoted to an IT Specialist 4 in or around 2003. *Id.* ¶ 11; Pls' RSS ¶ 21. In that role, Mr. Buchanan served on SCE's Infrastructure General Application Support Team and personally supported approximately 25 different applications necessary to support SCE's day-to-day business. *Id.* His job duties included building, testing, and maintaining applications, as well as working with architects, developers, and internal clients at SCE on these applications. *Id.* Mr. Buchanan performed well in this role and received no criticism regarding his work. *Id.*

In 2013, Mr. Buchanan learned that SCE intended to contract out its IT Department, and at the beginning of 2014, SCE announced that it had selected Tata for the bulk of its IT needs. *Id.* ¶ 12;

4

Tata's SMF ¶ 22 (Dkt. #108). On July 21, 2014, Mr. Buchanan learned that he and about 400 other employees would be terminated. Pls' SAF ¶ 12. However, SCE asked Mr. Buchanan and a number of other employees to remain with the company for several more months to help train their Tata replacements. Pls.' RSS ¶ 23. Mr. Buchanan remained with SCE until February 2015, and trained three Tata employees "mapped" by RMG to take over his position. *Id.* Mr. Buchanan was not afforded the opportunity to compete for his position. *Id.* These Tata employees were South Asian visa workers from India who had little to no relevant experience. *Id.* While Tata was scheduled to take primary responsibility for most of SCE's IT needs by December 2015, many Tata employees did not arrive onsite until December or January due to visa issues, delaying the transition and extending Mr. Buchanan's final day with SCE from January 9 to February 6. Pls.' SAF ¶ 13. Tata's preference for filling positions at SCE with South Asians delayed the project to such an extent that as of February 6, 2015, Tata was still unable to take over primary responsibility for SCE's IT needs. *Id.*

In late October 2014, Mr. Buchanan attended a job fair sponsored by SCE for soon-to-be terminated employees. Pls.' RSS ¶¶ 27, 32. The job fair included a Tata booth. Pls.' RSS ¶¶ 27, 32. While at the job fair, Mr. Buchanan approached the Tata booth to apply for a job with the company. *Id.* ¶ 28. The booth was manned by 3 to 4 Indian employees speaking in Hindi with one another. *Id.* One gentleman stepped away from the conversation to briefly speak with Mr. Buchanan, and Mr. Buchanan informed this individual that he wished to apply to a general applications support position with Tata and handed him his resume. *Id.* ¶¶ 28, 29, 35, 37. The Indian gentleman was dismissive of Mr. Buchanan, provided him with little information regarding Tata, and was reluctant to accept Mr. Buchanan's resume. *Id.* ¶¶ 24, 27, 29, 30, 38 (quoting Buchanan Dep. Tr. 61:19-24 (Sept. 21, 2016) ("[a]t first they really weren't interested in taking the resume, and it was a brief, short conversation. He was dismissive. [He t]ook the resume almost … unwillfully, and turned back to the conversation that they were having with the other Indian gentleman, in Hindi, and that was it.")). SCE management informed Mr. Buchanan that Tata would follow-up with applicants regarding open positions, but Mr. Buchanan never heard from Tata and was never contacted, interviewed, nor selected for a position with the company. *Id.* ¶¶ 27, 31, 38. Tata hired only 5 of Mr. Buchanan's 28 team members, 3 of

5

1   whom were South Asian. Pls' SAF ¶ 15. The rest of Mr. Buchanan's team was replaced with South

2   Asian visa workers. *Id.* Mr. Buchanan's final day with SCE was February 6, 2015. Pls' RSS ¶ 23

3   Mr. Slaight is a white American living in Staten Island, New York. Pls' SAF 16. Mr. Slaight

4   graduated from DeVry University in February 2012 with a Bachelor of Science degree in Computer

5   Information Systems, Database Management. *Id.* ¶ 17. In April 2012, Mr. Slaight interviewed with

6   Tata and was hired as a Software Engineer shortly thereafter. Pls' RSS ¶ 44. Mr. Slaight then

7   completed Tata's 6-week Initial Learning Program in Cincinnati, Ohio, before starting 6 to 8 weeks

8   of training in Chennai, India. Pls.' SAF ¶ 18.

9   Mr. Slaight's assignment servicing AXA started on October 1, 2012. Tata's SMF ¶ 49 (Dkt.

10  #108). Mr. Slaight reported to Alok Bhalla, Tata's Business Relationship Manager, and Vignesh

11  Ramanan, Tata's Senior Engagement Manager, both of whom are South Asian. Pls.' SAF ¶ 19. While

12  Mr. Slaight was eager to begin working as a software developer and gaining real-world experience,

13  he was assigned little to no substantive work over the next 6 months, and often reported to work only

14  to sit at his desk and wait for an assignment, despite repeatedly requesting additional work and

15  training from his managers. *Id.* ¶ 20; Pls.' RSS ¶ 51. On the other hand, Mr. Slaight observed that his

16  South Asian colleagues were regularly assigned substantive work. Pls.' RSS ¶ 52.

17  On March 27, 2013, Mr. Slaight was removed from his position servicing AXA and placed

18  on the bench. Tata's SMF ¶ 57 (Dkt. #108). Mr. Slaight was told that his removal was due to the fact

19  that the AXA had not been expecting to receive two resources from Tata and did not have sufficient

20  work for Mr. Slaight. Pls.' SAF ¶ 21. Mr. Slaight remained on the bench for the next 3 weeks, despite

21  actively reaching out to Tata's recruiters and RMG for a new position. *Id.* On April 17, 2013, Mr.

22  Slaight interviewed for a performance testing position servicing Tata client ███████████ in

23  Pennington, New Jersey. Pls.' RSS ¶ 61. Two days later, while Mr. Slaight was awaiting feedback

24  from his interview and had just received an email from Tata informing him of his bonus, Tata

25  terminated Mr. Slaight's employment. Pls.' SAF ¶ 22. Tata provided Mr. Slaight with no explanation

26  for his termination. *Id.* While Tata generally allows workers to remain unallocated for 30 days while

27

28

PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S
MOTION FOR SUMMARY JUDGMENT - CASE NO. 4:15-CV-01696-YGR

searching for new positions, and many workers often remain on the bench for extended periods of time, Mr. Slaight was terminated after just three weeks on the bench. *Id.* ¶ 23.

## II.   THE STATE OF DISCOVERY AND ITS IMPACT ON SUMMARY JUDGMENT

Plaintiffs issued discovery requests to Tata on August 28, 2015. Tata waited to produce the vast majority of its documents until after the deadline to request to file for summary judgment, as reflected in the following:[3]



Tata's discovery practices have significantly impacted Plaintiffs' ability to respond to Tata's motion for summary judgment. First, even though Plaintiffs issued discovery requests in August 2015, Tata waited until January and February 2017 to produce over 4 million pages (1,800 GB) of documents (2 million pages of documents have been produced in February alone). Pls.' SAF ¶ 24. Reviewing millions of pages of documents prior to filing this brief – much less taking any follow-up discovery (*e.g.* depositions) – is simply infeasible, though the material Plaintiffs have reviewed to date reveal a corporate scheme that Tata's own head of diversity admits is discriminatory. In addition to these documents, Tata withheld from production until very recently critical workforce data that

---

[3] *See* Pls.' SAF ¶ 24 (citing Tata's Document Production Log).

PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S
MOTION FOR SUMMARY JUDGMENT - CASE NO. 4:15-CV-01696-YGR

Tata had repeatedly told Plaintiffs did not exist (data it collected in September or October). *Id.* ¶ 25. For example, on January 17 and 19, Tata produced two sets of employee data critical to Plaintiffs' expert analysis, and on February 9, Tata produced employee allocation data (containing information on employee work locations). *Id.* But Tata failed to produce a data dictionary along with any of the data it has produced thus far, and Tata's data contain undefined codes and present other issues that will require follow-up discovery before Plaintiffs and their expert Dr. Neumark can fully understand it.[4]

Second, even the critical data Plaintiffs recently received remains incomplete, as Tata inexplicably omitted various fields from its production. Pls.' SAF ¶ 24. Tata committed to producing complete employee data sets following a January 25, 2017 Rule 30(b)(6) deposition, but Plaintiffs have yet to receive it.

The Ninth Circuit has held that when statistical discovery is incomplete in discrimination cases, "summary judgment is patently inappropriate." *Diaz*, 752 F.2d at 1362-63 (reversing grant of summary judgment where plaintiff was denied opportunity to take discovery of statistical data concerning defendant's hiring and promotion patterns). To the extent the Court finds that Plaintiffs "cannot produce admissible evidence to support" any material fact, Fed. R. Civ. P. 56(c)(1)(B), Plaintiffs respectfully request that the Court defer ruling on this motion until the parties have completed discovery, or deny it. *See* Fed. R. Civ. P. 56(d); Pls.' RSS ¶¶ 40, 60 (citing Kotchen Decl. ¶¶ 2-3 (Mar. 6, 2017)). Moreover, Tata's withholding of discovery is sanctionable.[5]

---

[4] *See, e.g.*, *id.* (citing email to Tata with questions concerning the allocation data). In addition, Tata's belated production prevented Plaintiffs from moving for partial summary judgment, as Plaintiffs lacked key documents and data on January 13 – the deadline to seek leave to move for summary judgment. *See* Letter from M. La Mar to J. Gonzalez Rogers (Jan. 13, 2017) (Dkt. #93).

[5] *See, e.g.*, *G-K Props. v. Redevelopment Agency of City of San Jose*, 577 F.2d 645, 647 (9th Cir. 1978) ("Litigants who are willful in halting the discovery process act in opposition to the authority of the court and cause impermissible prejudice to their opponents"); *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) ("Last-minute tender of documents does not cure the prejudice to opponents"); *Cal. Expanded Metal Prods. Co. v. ClarkWestern Dietrich Bldg. Sys. LLC*, No. CV 12-10791, 2015 WL 5000133, at *3-4 (C.D. Cal. July 20, 2015) (permitting plaintiff to take additional discovery and amend its complaint where "defense did not produce [important] document and related materials to [plaintiff] until shortly before the discovery cutoff[,]" depriving

## III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should only be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party." *Howe v. Am. Honda Fin. Corp.*, No. CV 12-0035, 2013 WL 12119713, at *2 (C.D. Cal. Feb. 26, 2013); *see also Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010) (noting "the non-moving party … gets the benefit of reasonable inferences" drawn from the evidence). Summary judgment, however, "'does not denigrate the role of the jury . . . . Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Arden v. Kastell*, 553 F. App'x 697, 698 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255); *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe" *i.e.*, the court may only consider evidence favorable to the moving party that is "uncontradicted and unimpeached." *Reeves* 530 U.S. at 151; *Barch v. Contra Costa Cnty. Health Servs. Dept.*, No. C-05-2461 EMC, 2007 WL 39305, at *2 (N.D. Cal. Jan. 4, 2007).

## IV.   ARGUMENT

**A. Consideration of Plaintiffs' Individual Claims Is Premature.**

As Tata recognizes, Plaintiffs advance pattern and practice class claims pursuant to the framework established in *Teamsters*. Tata's Mem. at 8 (citing 431 U.S. at 361) (Dkt. #106); *see* 3d Am. Compl. ¶¶ 67, 78-87 (Dkt. #82). Pursuant to the *Teamsters* framework, a class action involving pattern and practice claims will be resolved in two phases: a "liability stage," and a "remedial stage."

---

plaintiff "of the opportunity to amend its complaint"); *Keithley v. Homestore.com, Inc.*, No. C-03-4447 SI (EDL), 2008 WL 4830752, at *2, 10 (N.D. Cal. Nov. 6, 2008) (awarding sanctions where party produced "96% of their entire production" belatedly).

9

*Teamsters*, 431 U.S. at 361-62. In Phase I – the liability stage – Plaintiffs will establish their *prima facie* case through the presentation of statistical and other evidence that Tata "maintained a policy of discriminatory decisionmaking." *Id.* During Phase I, a defendant's "defense must … be designed to meet the prima facie case of the [plaintiffs,]" such as by showing that plaintiff's *prima facie* proof of a pattern and practice is "inaccurate or insignificant." *Id.* at 360 n.46; *United States v. City of N.Y.*, 717 F.3d 72, 105 (2d Cir. 2013) ("employer [must] show 'insignificance and inaccuracy'" of plaintiff's statistical proof); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1107 (10th Cir. 2001) (defendant must present "common defenses" to *prima facie* case at Phase I); *Shidaker v. Tisch*, 833 F.2d 627, 632-33 (7th Cir. 1986) ("Defendant[] may rebut a statistical *prima facie* showing … with statistical evidence of their own"); *Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384, 1393 (5th Cir. 1983) (rejecting attempt "to combat a prima facie case with evidence about a handful of promotion decisions" as "doomed to failure because a prima facie case of class-wide discrimination is not met by [defendant's] attempts to parry specific allegations of … discrimination") (citation omitted). If a defendant fails to make this showing a "court may then conclude that a violation has occurred" and "award … prospective relief" such as an injunction. *Teamsters*, 431 U.S. at 361.

Only after a defendant has addressed plaintiffs' pattern and practice claims do the parties and court move on to a remedial phase in which a defendant can raise defenses specific to individual plaintiffs or class members. *Id.* at 342 n.24. ("[I]ndividual proof concerning each class member's specific injury [i]s appropriately left to proceedings to determine individual relief"). But during this remedial phase, because the employer has been found to operate under a pattern and practice of discrimination, "an inference [attaches] that any particular employment decision … was made in pursuit of that policy." *Id.* at 361-62 ("the question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage of the trial."); *id.* at 359 n.45 (a "finding of a pattern and practice changed the position of the employer to that of a proved wrongdoer"). Given this inference, the burden of proof shifts to the employer "to prove that individuals … were not in fact victims of previous hiring [or termination] discrimination." *Franks v. Bowman Transp., Co.*, 424 U.S.

10

747, 772 (1976); *Teamsters*, 431 U.S. at 362 ("the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons"); *Thiessen*, 267 F.3d at 1106-07 & n.7 ("the individual plaintiffs reap a significant advantage for purposes of the second stage: they are entitled to a presumption that the employer had discriminated against them." (citing *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875 (1984))); *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 470 (8th Cir. 1984) (same). "In other words, the proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy," and the employer has the burden to show otherwise. *King v. Gen. Elec. Co.*, 960 F.2d 617, 628 (7th Cir. 1992) (citing *Teamsters*, 431 U.S. at 362). Thus, "in the class action pattern or practice case the strength of the evidence sufficient to meet this rebuttal burden will typically need to be much higher than the strength of the evidence sufficient to rebut an individual plaintiff's low-threshold *McDonnell Douglas* showing." *Segar v. Smith*, 738 F.2d 1249, 1269-70 (D.C. Cir. 1984) ("The bare articulation of a nondiscriminatory explanation, while sufficient to rebut an individual plaintiff's low-threshold *McDonnell Douglas* showing, generally will not suffice as a rebuttal to a typical class-wide showing of pervasive discrimination" (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)); *Thiessen*, 267 F.3d at 1106-09 (reversing grant of summary judgment where district court applied *McDonnell Douglas* framework, and thus deprived plaintiffs of significant "procedural advantage" afforded by finding that defendant operated under pattern and practice of discrimination); *Gantchar v. United Airlines*, No. 93 C 1457, 1995 WL 137053, at *2 (N.D. Ill. March 28, 1995).

Given the order of proof in a pattern and practice case, until the first stage is resolved, any motion for summary judgment "must focus solely on whether there is sufficient evidence demonstrating that defendants had in place a pattern or practice of discrimination during the relevant limitations period." *Thiessen*, 267 F.3d at 1109. Accordingly, in pattern and practice cases, courts have denied summary judgment motions filed before resolution of the pattern and practice stage of the case. *Id.* at 1108-09 (reversing grant of summary judgment on pattern and practice claim where district court analyzed claims under *McDonnell Douglas* framework, explaining that pattern and

practice cases "must be analyzed in light of the orders of proof peculiar to pattern-or-practice cases, and must be … considered at an appropriate stage of the proceedings"); *Colindres v. Quietflex Mfg.*, No. 01-4319, 2004 WL 3690215, at *6 (S.D. Tex. Mar. 23, 2004) (denying summary judgment on individual claims and explaining, "[i]n this case, plaintiffs' motion for class certification of their claims is pending before this court. An individual assessment of each plaintiff's intentional national origin discrimination claim under *McDonnell Douglas* is premature"); *cf. City of N.Y.*, 717 F.3d at 84 (in pattern and practice case "plaintiff need not initially show discrimination against any particular present or prospective employee").

Here, because Plaintiffs Buchanan and Slaight advance pattern and practice claims, it is premature for the Court to consider their individual cases, and Tata's individual defenses. *See, e.g.*, *Teamsters*, 431 U.S. at 342 n.24, 360 n.46 ("individual proof concerning each class member's specific injury was appropriately left to proceedings to determine individual relief"); *see also Cooper*, 467 U.S. at 876; *Thiessen*, 267 F.3d at 1108-09. Accordingly, the Court should deny Tata's motion for summary judgment to the extent it seeks to challenge Plaintiffs Buchanan and Slaight's individual claims. The only appropriate inquiry at this stage is whether Tata is entitled to judgment as a matter of law on Plaintiffs' *prima facie* pattern and practice case. It is not.

## B. Ample Evidence Supports Plaintiffs' Prima Facie Pattern and Practice Claim, Precluding Summary Judgment.

A pattern and practice "claim requires proof of a 'systemwide pattern or practice' of discrimination such that the discrimination is 'the regular rather than the unusual practice.'" *Brown v. Nucor Corp.*, 785 F.3d 895, 914 (4th Cir. 2015) (quoting *Teamsters*, 431 U.S. at 336); *Bazemore v. Friday*, 478 U.S. 385, 398 (1986); *Rollins v. Traylor Bros., Inc.*, No. 14-1414, 2016 WL 258523, at *7 (W.D. Wash. Jan. 21, 2016) ("'A prima facie case of a pattern or practice of discrimination is established by evidence that racial discrimination was the company's standard operating procedure – the regular rather than the unusual practice'" (quoting *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 482, 518 (N.D. Cal. 2012))). "The required discriminatory intent may be inferred upon such a showing." *Nucor Corp.*, 785 F.3d at 914 (citing *Teamsters*, 431 U.S. at 339-40). "A pattern of

discrimination, revealed through statistics and anecdotal evidence, can alone support a disparate treatment claim, even where the pattern is the result of discretionary decision-making." *Id.* at 915.

Where gross statistical disparities exist in an employer's hiring practices and employment practices, statistical evidence alone may establish the plaintiff's *prima facie* case. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977); *Diaz*, 752 F.2d at 1363 ("Statistical data is relevant because it can be used to establish a general discriminatory pattern in an employer's hiring or promotion practices. . . . In some cases, statistical evidence alone may be sufficient to establish a *prima facie* case."); *EEOC v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994) ("Statistical evidence can … be sufficient to establish a pattern and practice of discrimination," and "statistical disparities alone may prove intent" as "[s]tatistics showing racial or ethnic imbalance" are "often a telltale sign of purposeful discrimination") (quotation omitted); *Heldt v. Tata Consultancy Servs., Ltd.*, 132 F. Supp. 3d 1185, 1190 (N.D. Cal. 2015) ("Gross statistical disparities or direct evidence of discrimination can each alone be sufficient to make a prima facie showing"). Thus, where sufficiently significant disparities exist, "a court will infer from the numbers alone that, more likely than not, the disparity was a product of unlawful discrimination[.]" *Palmer v. Shultz*, 815 F.2d 84, 91 (D.C. Cir. 1987) (citing *Hazelwood Sch. Dist.*, 433 U.S. at 307-08 and quoting *Segar*, 738 F.2d at 1278 ("statistically significant … evidence alone will be 'sufficient to support an inference of discrimination.'"); *see Diaz*, 752 F.2d at 1363 ("Statistics showing racial or ethnic imbalance are probative … because such imbalance is often a telltale sign of purposeful discrimination" (quoting *Teamsters*, 431 U.S. 340 n.20)).[6]

Courts have consistently found that a disparity of two or three standard deviations is a sufficient disparity to infer the existence of a pattern and practice of discrimination, and to establish

---

[6] *See also Hazelwood Sch. Dist.*, 433 U.S. at 307-08 ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); *Shidaker*, 833 F.2d at 632; *Sagers v. Yellow Freight Sys., Inc.*, 529 F.2d 721, 729 (5th Cir. 1976) (noting "that a prima facie case of racial discrimination may be established by statistical evidence alone, and that a violation of Title VII may be established by statistics as a matter of law").

a plaintiff's *prima facie* case. *Palmer*, 815 F.2d at 92-93, 96 (noting that a disparity of "1.96 standard deviations" would be sufficient "for a court to establish an inference of disparate treatment on the basis of this evidence alone.").[7] In *Adams v. Ameritech Services, Inc.*, the Seventh Circuit explained the importance of statistical calculations in discrimination cases:

> *Two standard deviations* is normally enough to show that it is extremely unlikely (that is, there is less than a 5% probability) that the disparity is due to chance, giving rise to a reasonable inference that the hiring was not race-neutral; the more standard deviations away, the less likely the factor in question played no role in the decisionmaking process.

231 F.3d 414, 424 (7th Cir. 2000) (citing *Hazelwood Sch. Dist.*, 433 U.S. at 308 n.14; *Castaneda*, 430 U.S. at 496 n.17) (emphasis added). While not required, a plaintiff may also present additional documentary and testimonial evidence to help "animate the statistical findings." *Nucor Corp.*, 785 F.3d at 908.

Citing Plaintiffs' complaint, and failing to address *any of its own data or documents* produced in this case, Tata argues that the allegations in Plaintiffs' complaint are insufficient to support Plaintiffs' pattern and practice claims. Tata's Mem. at 9. But Plaintiffs to do not rely on the allegations in their complaint – substantial evidence supports Plaintiffs' pattern and practice claims, and Tata cannot satisfy its burden on summary judgment.

First, the evidence includes overwhelming statistical, documentary and testimonial evidence demonstrating Tata's policy and practices of favoring South Asian visa workers in staffing U.S. positions and disfavoring its non-South Asian workforce in terminations. *See, e.g.*, Pls.' RSS ¶ 15 (discussing gross statistical disparities in Tata's hiring and termination decisions); Pls.' SAF ¶ 1 (citing evidence of Tata's explicit corporate policy of favoring visa holding Indian nationals in filling

---

[7] *See also Castaneda v. Partida*, 430 U.S. 482, 496 & n.17 (1977) ("proof … enough to establish prima facie case of discrimination" where the demographic difference of "two or three standard deviations" existed); *Hazelwood*, 433 U.S. at 311 n.17 ("fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to race"); *Nucor Corp.*, 785 F.3d at 908 (finding 2.54 standard deviation statistically significant in racial discrimination case); *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 (D.C. Cir. 1988) ("in most instances a difference of just under two standard deviations [rather than three] has been deemed sufficient to establish a prima facie case"); *Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d 531, 550-51 (9th Cir. 1982) .

14

U.S. positions); *id.* ¶ 8 (discussing Tata's use of third party recruiters to locate South Asian talent); *id.* ¶¶ 2-4 (discussing tracking of "visa ready" workers in order to prioritize South Asian visa holders for open positions); *id.* ¶ 5 (discussing the adverse impact Tata's practices have on its comparatively few non-South Asian workers). This includes direct evidence that Tata's scheme is discriminatory. *See, e.g.*, Pls.' RSS ¶ 2 (citing Ganapathy (30(b)(6)) Dep. Tr. 42:25-43:10 (Jan. 25, 2017)).

Second, Tata argues that Plaintiffs have failed to eliminate nondiscriminatory variables from their analysis. Tata's Mem. at 9. But it is Tata's burden to identify nondiscriminatory variables it actually "took into account" – *e.g.*, it must explain how its U.S. workforce is between 72.32% and 78.91% South Asian (of which, over 70% are visa holders), why these percentages are between 197.61 and 215.87 standard deviations from what one would expect absent discrimination, and why its termination decisions disfavor non-South Asians to such an extreme degree. Pls.' RSS ¶ 15 (citing Neumark Report and noting the statistical likelihood that this workforce disparity is due to chance is less than 1 in 1 billion); *id.* (noting that between 11.15% and 12.57% of Tata's South Asian workforce was terminated between 2011 and 2015, whereas only 0.21% to 0.97% of its South Asian workforce suffered the same fate - a difference of 47.27 to 57.15 standard deviations); Pls.' SAF ¶ 6; *Adams*, 231 F.3d at 424 (rejecting attack on plaintiff's statistical analysis for failure to account for explanatory variables, and explaining that "importantly, it was [the defendant] that had the responsibility of offering alternative explanations. The only one it actually advanced … was singularly unpersuasive"); *Hemmings v. Tidyman's Inc.*, 285 F. 3d 1174, 1188-89 (9th Cir. 2002) ("the defendant must 'produce credible evidence that curing the alleged flaws would also cure the statistical disparity'") (citation omitted); *EEOC v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575, 580-81 (9th Cir. 1989) ("the defendant cannot rebut an inference of discrimination by merely pointing to flaws in the plaintiff's statistics[,]" rather, the defendant must identify "'the missing factor'" and  introduce "'evidence to support the contention that the missing factor can explain the disparities as a product of a legitimate, nondiscriminatory'" process (quoting *Palmer*, 815 F.2d at 101)).[8] And these real variables must

---

[8] *See also Mister v. Ill. Cent. Gulf R.R. Co.*, 832 F.2d 1427, 1434-35 (7th Cir. 1987) (to carry its burden, the employer "must introduce facts sufficient in principle to explain what happened").

themselves not be discriminatory. *See Gen. Tel. Co.*, 885 F.2d at 580-81; *Mister*, 832 F.2d at 1434 (discussing "evidence that some counties, with relatively large black labor forces, had been skipped over while [defendant] hired from other, 'whiter' counties farther from its workplaces[,]" with the result that, per the defendant's analysis, "[d]iscrimination itself produces a statistical finding of no discrimination").

Tata fails to identify non-discriminatory variables it too into account in achieving a U.S. workforce that is between 72.32% and 78.91% South Asian. *See* Section I(A) at pp. 3-4, *supra.* No legitimate explanation exists for this disparity. *See* Section I(A) at 1-3, *supra.* Moreover, discovery is far from complete, such that any pretextual explanation Tata may now advance should be the subject of additional discovery. *See* Section II, *supra*; *Diaz*, 752 F.2d at 1362-63 (holding that "summary judgment is patently inappropriate" in these circumstances).

Third, Tata argues that Plaintiffs improperly include in their analysis visa-dependent individuals working in other positions in India who are then "mapped" to open positions in the United States. Tata's Mem. at 10; Pls.' RSS ¶ 4 (quoting TCS007391-452 at 425 ("RMG should try and map associates with unutilized visas and work permits for onsite opportunities.")). This is wrong, Tata contends, because these individuals are "hired from a completely different labor market" and thus cannot be used "to create a statistical disparity between TCS' workforce and the United States labor market." Tata's Mem. at 10. But excluding Tata's visa workers from the analysis makes little sense. Tata's U.S. workforce consists of approximately 70% visa workers, virtually all of whom are from India. Pls.' SAF ¶ 6. Just like other applicants, these visa workers must apply and interview for jobs in the United States. Pls.' RSS ¶ 3. Further, to obtain visas for individuals, Tata must go through a time consuming and expensive process, the express purpose of which is to enable the workers to ***"enter[] the labor market"*** in the United States. *Prod. Tool Corp. v. Emp't & Training Admin.*, 688 F.2d 1161, 1168 (7th Cir. 1982) (emphasis added).[9]  For this reason, Dr. Neumark defines the relevant

---

[9] *See also Vemuri v. Napolitano*, 845 F. Supp. 2d 125, 131 (D.D.C. 2012) (visa law exists "'to protect the American economy from job competition and from adverse working standards as a consequence of immigrant workers entering the labor market.'") (quoting S. Rep. No. 89-748).

PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S
MOTION FOR SUMMARY JUDGMENT - Case No. 4:15-cv-01696-YGR

labor market as the United States "Computer Systems Design and Related Services industry … which corresponds closely to the most common" positions at Tata. Pls.' RSS ¶ 18 (citing Neumark Report ¶ 11).[10] The Ninth Circuit confirms that this is correct, explaining that the relevant labor market "must be that of the local labor force possessing the requisite skills." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 482-83 (9th Cir. 1983).[11]

In addition, Tata's visa workers are not "temporarily" in the United States, as Tata argues. Pursuant to their H-1B visas, they can remain in the United States for up to six years[12] (or longer, if the worker obtains permanent resident status), and Tata has a "[l]eadership directive … to utilize every visa to the maximum extent." Pls.' SAF ¶ 1. Because these individuals enter the U.S. labor market, and perform work in the U.S. for U.S. clients, there is no reasonable basis to exclude visa workers when analyzing Tata's U.S. workforce.

Tata also argues that its discriminatory reliance on South Asian visa workers is permitted by an international agreement – the General Agreement on Trade in Services ("GATS"). Tata's Mem. at 10. But GATS contains no provision supporting this contention (including Article VI, the provision Tata cites). In fact, by its very terms, GATS does not apply "to the movement of all categories of natural persons supplying services under the Agreement." GATS Annex on Movement of Natural Persons ¶¶ 1-4, available at https://www.wto.org/english/docs_e/legal_e/26-gats.pdf.[13] Moreover, "Congress explicitly stated that '[n]o provision of [GATS], nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect.'" *United States v. Lombardo*, 639 F. Supp. 2d 1271, 1287, 89 (D. Utah 2007) (quoting 19

---

[10] When analyzing terminations at Tata, the relevant labor market is Tata's workforce in the United States. *Id.* (citing Neumark Report ¶ 16); *Hemmings*, 285 F.3d at 1186 ("the comparison pool for [statistical] analysis should be the group from which individuals will be chosen for the job action").

[11] Tata itself implicitly admits the United States is the appropriate relevant labor market for statistical comparison, stating that Plaintiffs' statistics should focus on "the demographics of qualified IT professionals in the United States." Tata's Mem. at 11.

[12] *See* 8 CFR § 214.2(h)(9)(iii)(A)(1), (15)(ii)(B)(1).

[13] Plaintiffs alerted Tata of this fact in their response to Tata's request for leave to move for summary judgment. *See* Letter from D. Kotchen to J. Gonzalez Rogers at 2 (Jan. 18, 2017) (Dkt. #94). Nevertheless, Tata raises the argument again here.

U.S.C. § 3512(a)(1)). Thus, even if GATS contained language that supported Tata's position, which it does not, GATS could not modify or supersede the discrimination laws at issue here.[14] Unsurprisingly, Tata does not cite a single case addressing GATS, let alone one supporting its contention that GATS permits Tata's discriminatory reliance on South Asian visa workers.[15]

Fourth, Tata argues that the allegations contained in Plaintiffs' complaint "are not focused on the demographics of technical workers in the United States." Tata's Mem. at 11. But Plaintiffs' statistical analysis, derived from data produced in discovery, defines the relevant labor market as "the Computer Systems Design and Related Services industry … which corresponds closely to the most common" positions at Tata, mooting Tata's argument. Pls.' RSS ¶ 18 (citing Neumark Report ¶ 11).

Fifth, Tata argues that Plaintiffs' statistical evidence should be dismissed because it is not focused on specific geographic regions. Tata's Mem. at 11. But Plaintiffs' pattern and practice claims are not limited to a specific geographic region – Tata's discrimination is nationwide and affects non-South Asian individuals everywhere, making nationwide data appropriate. See Diaz, 752 F.2d at 1363 (finding region-wide statistical data relevant where plaintiff alleged defendant "engages in a region-wide policy of discrimination").[16] Even if conducting a location-by-location analysis were

---

[14] Tata concedes as much, stating that trade agreements must be construed to be consistent with Title VII. Tata's Mem. at 10.

[15] The cases Tata cites are inapposite. As Tata's parenthetical acknowledges, Wallace v. SMC Pneumatics, Inc. concerned a Treaty of Friendship, Commerce and Navigation between the U.S. and Japan, not GATS, and, unlike GATS, that treaty authorized "companies of either nation to hire executive personnel of their choice in the other nation." See Tata's Mem. at 10 n.4 (citing 103 F.3d 1394, 1401 (7th Cir. 1997)). The treaty permitted Japanese companies to favor citizens from their own country, it did not permit national origin discrimination, which is prohibited under Title VII. Fotino v. Quasar Co., 950 F.2d 389, 392-93 (7th Cir. 1991); see also Ventress v. Japan Airlines, 486 F.3d 1111, 1117-18 (9th Cir. 2007) (holding that "district court erred by construing [treaty] to confer on Japanese employers blanket immunity from state employment law" as it confers "only the limited right to discriminate in favor of their fellow citizens for certain managerial and technical positions"). Papaila v. Uniden Am. Corporation involved the same irrelevant treaty. See 51 F.3d 54, 55-56 (5th Cir. 1995).

[16] Hazelwood School District, cited by Tata, does not hold otherwise. As Supreme Court held, the relevant comparison was between the employer's workforce and the "relevant labor market." Hazelwood Sch. Dist., 433 U.S. at 308. Nor does Gay, hold otherwise – that case involved discrimination in San Francisco, making data regarding the demographics in San Francisco appropriate. 694 F.2d at 550 (holding that "generalized statistical data is relevant and admissible" to

appropriate, Tata only produced employee allocation data on February 9, and failed to include a data dictionary, making it impossible for Plaintiffs effectively and thoroughly analyze it, and rendering summary judgment "patently inappropriate." Pls.' SAF ¶ 25; *Diaz*, 752 F.2d at 1362-63 (reversing grant of summary judgment where plaintiff was "denied the opportunity to discovery [statistical] data"). In any case, Tata's U.S. workforce is between 72.32% and 78.91% South Asian – a number that undoubtedly far exceeds the percentage of South Asians in any local IT labor force in the United States.[17]

Sixth, Tata argues that "a statistical disparity, by itself, will never suffice to establish Plaintiffs' ultimate burden of proving intentional discrimination." Tata's Mem. at 12. The Supreme Court, the Ninth Circuit, and this Court (in this case) have held otherwise. *Hazelwood Sch. Dist.*, 433 U.S. at 307 ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination"); *Hemmings*, 285 F.3d at 1184 ("Courts have long recognized that statistical evidence may be used to establish a prima facie case of disparate impact discrimination"); *Diaz*, 752 F.2d at 1363 ("statistical evidence alone may be sufficient to establish a *prima facie* case"); *Heldt*, 132 F. Supp. 3d at 1190 ("Gross statistical disparities or direct evidence of discrimination can each alone be sufficient to make a prima facie showing"). As discussed above, gross statistical disparities exist here. From 2011 through April 2015, between 72.32% and 78.91% of Tata's United States workforce was South Asian, while only 12.50% of the United States' Computer Systems Design and Related Services industry was South Asian – a

---

prove plaintiff's *prima facie* case). The plaintiff's statistics in *Piva v. Xerox Corporation* were lacking because there, unlike here, the plaintiff compared the demographics of the employer's workforce to the general population, not the population of workers possessing the relevant skills. 654 F.2d 591, 596-97 (9th Cir. 1981). Here, Dr. Neumark compares Tata's workforce demographics to the demographics of the Computer Systems Design and Related Services industry, Pls.' RSS ¶ 19 (citing Neumark Report ¶ 11), a relevant labor market that Tata itself concedes is appropriate. *See* Tata's Mem. at 11 (arguing that Plaintiffs should focus on the demographics of "qualified IT professional in the United States").

[17] Tata states that 43% of the IT workers in the LA area are "Asian." Tata's Mem. at 11. This observation has little probative value. This case involves discrimination in favor of *South* Asians and against non-South Asians. South Asians make up only 13.66% of the national IT labor market and 14.79% of the LA IT labor market. Pls.' RSS ¶ 20 (citing Neumark Decl. Table 1).

1   difference of between 197.61 and 215.87 standard deviations. Pls.' RSS ¶ 15. And similar disparities

2   exist when examining Tata's termination decisions. *Id.* (citing the Neumark Report and noting a

3   difference of between 47.27 to 57.15 standard deviations in non-South Asian vs. South Asian

4   terminations, and a difference of between 38.86 to 46.66 standard deviations when comparing

5   terminations of these groups from the bench).

6       Moreover, Plaintiffs' evidence is not limited to statistical evidence, as Tata suggests. The

7   evidence includes documents reflecting an explicit policy to discriminate – *e.g.*, "Leadership directive

8   is to utilize every visa to the maximum extent," "Leadership Team has advised to utilize visa ready

9   Associates at on site," Visa Ready will be a preference," Pls.' SAF ¶¶ 1,4, testimony from Tata's own

10  corporate representative admitting that the policy is discriminatory, *id.* ¶ 7, and documents evidencing

11  Tata's use of third party recruiters to locate predominately South Asian talent *id.* ¶ 8.

12  **C.  Tata Cannot Rebut the *Teamsters* Presumption That It Discriminated Against Plaintiffs.**

13      Having shown that Tata operates under a pattern and practice of discrimination in hiring and

14  terminations, employment decisions adverse to Plaintiffs Buchanan and Slaight are presumed to be

15  "'made in pursuit of [Tata's discriminatory] policy.'" *Williams v. Boeing Co.*, 225 F.R.D. 626, 638

16  (W.D. Wash. 2005) (quoting *Teamsters*, 431 U.S. at 362); *see also Thiessen*, 267 F.3d at 1107 (noting

17  that once a pattern and practice is established, plaintiffs are "entitled to a presumption that the

18  individual employment actions taken against them were the result of [] discrimination"); *Teamsters*,

19  431 U.S. at 359 n.45, 361-62 ("the finding of a pattern and practice changed the position of the

20  employer to that of a proved wrongdoer"). This presumption is fatal to Tata's summary judgment

21  motion, as consideration of Plaintiffs' individual claims is premature. *See* Section IV(A), *supra*;

22  *Thiessen*, 267 F.3d at 1108-09; *Colindres*, 2004 WL 3690215 at *6-7.

23      At the Phase II trial, Tata can rebut this presumption only with "'clear and convincing'"

24  evidence that its adverse employment actions against the Plaintiffs (and class members) were not

25  taken pursuant to its pattern and practice of discrimination. *Bockman v. Lucky Stores, Inc.*, No. CIV

26  S 83-039 RAR, 1986 WL 10821, at *7 (E.D. Cal. Aug. 11, 1986) (quoting *Muntin v. State of Ca.*

27  *Parks Dept.*, 738 F.2d 1054, 1056 (9th Cir. 1984)) ("once a Title VII class action proceeds to the

28

20

remedies stage, the burden of proof shifts to the defendant[.] . . . In the Ninth Circuit, this burden must be met by 'clear and convincing evidence.'"); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 n.22 (11th Cir. 2000) (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th Cir. 1986)) ("The employer may overcome this presumption only with *clear and convincing evidence* that job decisions made when the discriminatory policy was in force were not made in pursuit of that policy"); *see also Segar*, 738 F.2d at 1269-70 (in pattern and practice case evidence of "much higher … strength" is necessary to prove non-discriminatory explanation than that required in individual cases).[18] Tata does not, and cannot, rebut the presumption that its adverse employment actions against Plaintiffs Buchanan and Slaight were discriminatory.[19]

> 1.  *Tata's Rejection of Mr. Buchanan is Presumed to be Discriminatory, and Tata Presents No Unrebutted Evidence That Its Decision Was Non-Discriminatory.*

Tata advances a number of arguments as to why its decision not to hire Mr. Buchanan was non-discriminatory. First, Tata argues that "there is no evidence that [Tata] refused to select Buchanan for employment because of his race or national origin," Tata's Mem. at 13, and that Mr. Buchanan's belief that Tata discriminated against him is not supported by "any facts in the record." *Id*. at 15. Tata is wrong. Overwhelming statistical evidence demonstrates that Tata favors South Asians in its hiring decisions. For instance, from 2011 through April 2015, between 72.32% and 78.91% of Tata's United States workforce was South Asian, as compared to just 12.50% of the United States' Computer Systems and Design Related Services industry – a difference of between 197.61 and 215.87 standard deviations. Pls.' RSS ¶ 15. The statistical likelihood that this disparity is due to chance – as opposed to a systematic difference in hiring favoring one group over the other - is less than 1 in 1 billion. *Id.* Further, as discussed above, Tata has an explicit corporate policy to favor visa holding Indian

---

[18] Even if Tata could rebut this presumption here (which it cannot), Plaintiffs would be entitled to offer additional evidence that its purportedly non-discriminatory reason was pretextual. *Teamsters*, 431 U.S. at 362 n.50. Plaintiffs need not reach this issue here, as the presumption of discrimination is fatal to Tata's summary judgment motion and, even if considered, Tata cannot overcome this presumption for the individual Plaintiffs.

[19] While consideration of Plaintiffs' individual claims is precluded under the *Teamsters* framework and order of proof, Plaintiffs address Tata's arguments here solely out of an abundance of caution

PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S
MOTION FOR SUMMARY JUDGMENT - CASE NO. 4:15-CV-01696-YGR

nationals for open U.S. positions and to utilize visas "to the maximum extent." Pls.' SAF ¶ 1; Pls.' RSS ¶¶ 3, 6, 16. As a result, over 70% of Tata's U.S. workforce is visa-dependent, and nearly all of these individuals are South Asian. Pls.' SAF ¶ 6. Further, of the ■ employees hired by Tata for an Associate Consultant[20] role on the SCE client project prior to Mr. Buchanan's termination, ■ of these individuals (■%) were on a visa, and ■ of the ■ visa-independent employees (■%) were South Asian. *Id.* ¶ 15; Pls.' RSS ¶ 37. Tata also utilizes third party recruiters that primarily refer candidates of Tata's preferred South Asian race and Indian nationality. *Id.* ¶ 2.

Mr. Buchanan's claims are further supported by his, and other applicants' testimony concerning Tata's discriminatory practices. There is no question that Mr. Buchanan affirmatively sought, and applied to, a position with Tata at the SCE job fair, yet he was rebuffed by the recruiter, quickly dismissed, and never contacted for an interview.[21] Pls.' RSS ¶¶ 24, 27, 29, 30, 38. In Mr. Buchanan's own words, the Tata employee "couldn't wait to get … rid of me and back to the conversation he was having with the other gentleman." *Id.* ¶ 29. And despite having performed the IT Specialist 4 role at SCE since 2003, and having over 30 years of professional experience, Mr. Buchanan was not hired by Tata, and instead, Tata chose to staff the SCE project with inexperienced and lesser qualified visa workers from India that had been "mapped" to Mr. Buchanan's position without affording Mr. Buchanan the opportunity to compete for his position. *Id.* ¶ 7, 23; Pls.' SAF ¶¶ 9-11.

Second, Tata inaccurately argues that Mr. Buchanan failed to identify a job at Tata that he wanted and that that this failure is "fatal." Tata's Mem. at 13. Mr. Buchanan specifically identified,

---

[20] Two of Mr. Buchanan's former colleagues, ■■■■ and ■■■■■■ were hired by Tata to perform IT Specialist 4 roles at SCE and to take over the applications supported by Mr. Buchanan's group. Pls.' SAF ¶ 15. This is the same role that Mr. Buchanan performed at SCE. *Id.* ¶ 11. Tata identifies this role in its data as an "Associate Consultant" position. *Id.* ¶ 15.

[21] Tata argues that Mr. Buchanan "deliberately" refused to attend "any" of Tata's town hall meetings, Tata's Mem. at 13, but the meetings were held over a 4-day period, and Mr. Buchanan testified that he was on vacation during that time and unable to attend due to his busy schedule. Pls.' RSS ¶ 25, 33. Tata also incorrectly argues that Mr. Buchanan "never subsequently tried to apply at TCS," Tata's Mem. at 13, following the job fair, yet Mr. Buchanan did try to apply to jobs on Tata's online career portal, yet there were no openings that matched his skill set. *Id.* ¶¶ 26, 35.

PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S
MOTION FOR SUMMARY JUDGMENT - Case No. 4:15-cv-01696-YGR

and applied for, a general applications support position with Tata at the SCE job fair in October 2014. Pls.' RSS ¶¶ 35, 37. Mr. Buchanan knew that this position existed, as he worked as part of the general applications support group at SCE, and Mr. Buchanan's entire team of 25-35 individuals was contracted out to Tata. *Id.* ¶ 37; Pls.' SAF ¶ 15. Further, Mr. Buchanan's own position existed at Tata following SCE's entering into the contract with Tata, as he trained three Tata workers on just one of his 25 applications, Pls.' RSS ¶ 37, and two former SCE employees were hired by Tata to perform the "IT Specialist 4" role on the general applications support team. Pls.' SAF ¶ 15. Thus, Mr. Buchanan specifically identified a position at Tata that he wanted, and that was available at the time of his application.

> 2. *Tata's Termination of Mr. Slaight is Presumed to be Discriminatory, and Tata Presents No Unrebutted Evidence that Its Decision Was Non-Discriminatory.*

Tata argues that Mr. Slaight has presented "no evidence to overcome TCS' legitimate reason for terminating his employment, nor has he established that TCS' stated reason for his termination or the events giving rise to it were a pretext for discrimination." Tata's Mem. at 15. This is inaccurate. Tata's discriminatory policy favoring South Asian visa workers ensures that expats not benched at all or are quickly moved from the bench and placed in available positions, while non-South Asians remain unallocated, and are terminated at comparatively high rates. Pls.' SAF ¶¶ 1-5. As discussed above, Tata's Resource Management Group ("RMG") is instructed to "map" visa ready individuals working in India, and expats rolling off projects in the U.S., to available positions. *Id.* ¶ 2, 5; Pls.' RSS ¶ 7 (quoting TCS069046-47 ("map each [unallocated expat] to two accounts and mark[] the priority 1 & 2. . . . Prioritized accounts will quickly evaluate and absorb associates into immediate billable roles.")). Tata closely monitors and tracks the benched status of its employees to ensure that its South Asian visa workers are given first priority for open positions. *Id.* ¶ 3. Mr. Slaight, on the other hand, was contacted by RMG for just one interview while on the bench, and was quickly terminated shortly thereafter as he awaited feedback from his interview. Pls.' SAF ¶ 22; Pls.' RSS ¶ 61.

Statistical evidence confirms that between 2011 and 2015, Tata involuntarily terminated

between 11.15% and 12.57% of its non-South Asian workers in the U.S., while firing only a miniscule (by comparison) 0.21% to 0.97% of its South Asian workers. Pls.' RSS ¶ 15. This dramatic difference amounts to 47.27 to 57.15 standard deviations, and the likelihood that this gross disparity would occur by chance is less than 1 in 1 billion. *Id.* Further, most of the terminated non-South Asians were fired from the bench (between 7.55% and 8.51% of Tata's non-South Asian employees are terminated from the bench, as compared to between 0.15% and 0.65% of Tata's South Asian workforce – a difference of 38.86 to 46.66 standard deviations). *Id.* Testimony from other non-South Asians further supports Mr. Slaight's claims that his termination was discriminatory. *See id.* ¶ 40 (citing declarations of former Tata employees who were benched for prolonged periods of time and then terminated, while South Asian visa holders were promptly placed in new positions, per Tata's policy favoring visa workers).

Tata argues that Mr. Slaight's termination was non-discriminatory for three reasons, all of which are disputed. First, Tata argues that Mr. Slaight was removed from the AXA Equitable ("AXA") client project due to "performance concerns." Tata's Mem. at 15. But despite multiple requests, Tata failed to assign Mr. Slaight any substantive work, and informed him that his removal from the AXA project was because AXA had not been expecting to receive two resources from Tata, and did not have sufficient work for Mr. Slaight. Pls.' SAF ¶ 21. Second, Tata argues that Mr. Slaight confined Tata's search for an alternate position to the New York/New Jersey area. But Tata's U.S. headquarters is in New Jersey, and the New York/New Jersey area contains an immense IT market.[22] And while it is true that Mr. Slaight was unable to relocate due to family concerns, Tata maps its South Asian visa workers to multiple open positions, while non-South Asians are not afforded this same privilege due to Tata's discriminatory practices. *Id.* ¶ 5 (quoting TCS069046-9047 ("map each [unallocated expat] to two accounts and mark[] the priority 1 & 2. . . . Prioritized accounts will quickly evaluate and absorb associates into immediate billable roles."); Pls.' RSS. ¶ 59. Third, Tata argues

---

[22] *See, e.g.*, New York City's Growing High-Tech Indus. (Apr. 2014) (noting highlights including "100,000 jobs," and "[j]ob growth in the high-tech industry … four times faster than the rate in the rest of the City's economy), available at https://www.osc.state.ny.us/osdc/rpt2-2015.pdf.

that Mr. Slaight was not qualified for the ███████████ position for which he was interviewed and that he was "unaware" of other suitable positions. Tata's Mem. at 16. But less than one week after the interview, Mr. Slaight stated that he "felt that [he] could meet the requirements [of the position] and was eager to begin [working for ███████████ ]" Pls.' RSS ¶ 61. Further, it is RMG's responsibility to locate suitable positions for candidates on the bench, as it has access to open requisitions within the company. *Id.* ¶¶ 8-9. While Tata promptly locates new positions for South Asians, Tata's comparatively few non-South Asian employees languish on the bench and are then terminated. Pls.' SAF ¶ 5. Tata's shifting, contradictory, and illogical positions, at a minimum, place its explanation in doubt, and warrant a denial of summary judgment. *Norris v. City of San Fran.*, 900 F.2d 1326, 1331 (9th Cir. 1990) ("the fact that a defendant's rationale has shifted over time would seem likely to generate serious adverse inferences as to the pretextual nature of its explanations"); *EEOC v. Timeless Invs., Inc.*, 734 F. Supp. 2d 1035, 1063, 1065-66 (E.D. Cal. 2010) (denying summary judgment and noting that "[s]hifting reasons are fundamentally different justifications for an employer's action [that can] give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason.") (quotation omitted).

Finally, Tata inaccurately argues that Mr. Slaight does not believe his termination by Tata was discriminatory. Tata's Mem. at 16. However, Tata withheld from discovery until after Mr. Slaight's deposition its corporate policy of preferring visa holding Indian nationals and prioritizing these individuals for U.S. positions from its employees, including Mr. Slaight. Pls.' RSS ¶ 52. Tata also withheld until recently data demonstrating its disproportionately high rates of terminations of non-South Asians, as compared to South Asians, including from the bench. *Id.* ¶¶ 15, 62, 65. And Tata designated almost every document it has produced thus far "Attorneys' Eyes Only," precluding Mr. Slaight from reviewing them. *Id.* ¶ 66. However, having learned of the operation of Tata's scheme, Mr. Slaight believes his termination by Tata from the bench was the result of Tata's preference for South Asian visa workers. *Id.* ¶ 52 (citing Slaight Decl. ¶ 3 (Mar. 5, 2017)).

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Tata's motion for summary judgment.

25

1    Dated: March 6, 2017                            Respectfully submitted,

2
                                                     By: /s/Daniel Kotchen
3                                                    Daniel Kotchen (*pro hac vice*)
                                                     Daniel Low, SBN 218387
4                                                    Michael von Klemperer (*pro hac vice*)
                                                     **KOTCHEN & LOW LLP**
5                                                    1745 Kalorama Road NW, Suite 101
                                                     Washington, DC 20009
6                                                    Telephone: (202) 471-1995
                                                     Email: dkotchen@kotchen.com;
7                                                    dlow@kotchen.com;
                                                     mvk@kotchen.com
8

9                                                    Michael F. Brown (*pro hac vice* forthcoming)
10                                                   **DVG LAW PARTNER LLC**
                                                     P.O. Box 645
11                                                   Neenah, WI 54957
                                                     920-238-6781
12                                                   920-273-6177 (fax)
                                                     mbrown@dvglawpartner.com
13

14                                                   Steven Tidrick, SBN 224760
                                                     Joel Young, SBN 236662
15                                                   **The Tidrick Law Firm**
                                                     2039 Shattuck Avenue #308
16                                                   Berkeley, CA 94704
                                                     Telephone: (510) 788-5100
17                                                   Facsimile: (510) 291-3226
                                                     E-mail: sgt@tidricklaw.com
18                                                   E-mail: jby@tidricklaw.com

19
                                                     *Attorneys for all Plaintiffs Buchanan, Slaight,*
20                                                   *Webber, Masoudi, and Mandili*

21

22

23

24

25

26

27

28
                                          26

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system on March 6, 2017.

Dated: March 6, 2017                    /s/Daniel Kotchen
                                        Daniel Kotchen

PLAINTIFFS' OPPOSITION TO TATA CONSULTANCY SERVICES, LTD.'S
MOTION FOR SUMMARY JUDGMENT -  Case No. 4:15-cv-01696-YGR