# Exhibit 34

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

STEVEN HELDT, BRIAN BUCHANAN AND CHRISTOPHER SLAIGHT,

PLAINTIFFS,

VS.

TATA CONSULTANCY SERVICES, LTD.,

DEFENDANT.

CASE No. 4:15-cv-01696-YGR

DEPOSITION OF
BRIAN J. BUCHANAN
Los Angeles, California
Wednesday, September 21, 2016

Reported By:
Judith Schlussel
CSR No. 4307
NDS Job No. 180734

**everything exactly. But what I am entitled to is your best estimate. Do you understand the difference between a guess and an estimate?**
A. Yes.
**Q. Okay. Just to be on the safe side we'll go over it. If I tell you, or if I ask you how long this conference table is, you can tell it's about 15 feet long. You've seen it, you've perceived it, so you can give me an estimate. If I ask you about the shape of the desk at my house, presumably you haven't seen my desk, you have no idea what shape it is and so if you gave me an answer, it would be a guess. Understand?**
A. Yes.
**Q. If you don't know something, a fine answer is I don't know. All right? But if you answer a question, we're going to believe it is your best estimate for an answer. Understand?**
A. Yes.
**Q. Do you have any questions for me before we begin?**
A. No.
MS. LA MAR: All right. First thing I'm going to do is mark as Exhibit 1 your notice of deposition in this case.

Page 13

(Deposition Exhibit No. 1 was marked for identification.)
**Q. BY MS. LA MAR: And if you could please review that. I'm actually going to ask you a very simple question. Have you seen this document before?**
A. Yes.
**Q. You're here pursuant to that notice, correct?**
A. Yes.
**Q. Thank you. All right. Let's go on to your educational history, educational background. What is the latest year of schooling you completed?**
A. It would be several credits towards a Bachelor's degree in business.
**Q. Where did you get the credit?**
A. I've got credits from several places, Fullerton College, University of Phoenix, UCI, University of California Irvine.
**Q. Okay. And when was the last course you took towards your bachelor degree? What year?**
A. Actually, taking certified class that goes towards it right now.
**Q. Where are you taking it?**
A. At UCI extension.

Page 14

**Q. University of Phoenix, that's online college?**
A. That's online. They also have a physical office. We actually went to a physical office and online. This was back a while.
**Q. Go ahead and tell me when that was.**
A. It was early '90s.
**Q. Where was the University of Phoenix based? Phoenix?**
A. Their home office is Phoenix.
**Q. Where did you go to classes?**
A. I went to classes in, I think it's either Murrieta -- I think it's Murrieta or Wildomar.
**Q. That was back in the '90s?**
A. Back in the '90s.
**Q. All right. What about -- is it Cal State Fullerton?**
A. No. It was Fullerton Junior College.
**Q. When did you go there?**
A. In the '70s.
**Q. You've been in California a long time?**
A. Since '70.
**Q. Where were you before that?**
A. Chicago.
**Q. What made you move to California?**

Page 15

A. My mother decided to follow my stepfather.
**Q. How old were you when you moved?**
A. 14.
**Q. Been a lot of changes around here, I bet, from your perspective.**
A. Yes.
**Q. All right. Let's talk about your professional training then. What type of professional courses have you taken while you were employed a**[redacted]
A. It pretty much ran the gamut. It was a myriad of courses from computer technology, server technology, printer technology, application technology.
**Q. Did you get any certificates?**
A. Yes.
**Q. What certificates?**
A. I have a myriad of certificates in microcomputing engineering and server engineering, printer engineering. I have a Microsoft certified professional, MCSE certification. A PMI certification for project management, an ITIL certification.
MR. KOTCHEN: You want to spell that.
THE WITNESS: It's I-T-I-L.

Page 16

**Q. BY MS. LA MAR: We don't know what it means. But how would we expect it to be spelled?**
A. It's an information technology certification.
**Q. Let's get some dates on these. Can we? You said you had a certification in microcomputers. When was that?**
A. The first one was in 1982 or '3, around that time frame.
And then I got -- I kept getting certifications throughout the years. When I came to California [redacted] I just continued on with the certifications that they allowed us to take.
**Q. What was the -- let's say the last two years of employment at [redacted] what certificates did you get during that period of time?**
A. The last two years I think the last one I got was the ITIL 3.0 certification.
**Q. When was that?**
A. I think it was about 2013. I don't recall the year.
**Q. But you are sure it's in the 2000s?**
A. Yeah. It was past 2010. Actually, I have



two ITIL certifications. We got 2.0 and then they came out with 3.0. So it was -- the last two or three years that I was there that I was certified in 3.0.
**Q. So what other certificates do you have during that period of time, the last two years?**
A. The last two years, that would be it, along with in-house, you know, normal stuff that [redacted] made you certify on, like ethics and stuff like that.
**Q. So HR type stuff?**
A. Yeah.
**Q. Okay. So now you were at [redacted] or 28 years; is that right?**
A. 28 plus, yes.
**Q. 28 plus years. How many plus years?**
A. 28 and seven months.
**Q. All right. Was really that the only job you held as a computer professional?**
A. No.
**Q. What other jobs did you hold?**
A. I started at State of the Art. It was a software developing company in 1982. That's how I got into computers. From there, I moved on to Computerland. And from Computerland, I -- I moved



on to Business Land. From Business Land, I moved on to [redacted]
**Q. So State of the Art, Computerland and Business Land, those are in the '80s?**
A. Yes.
**Q. All right. Let me start it this way. In 2012, what was your job title?**
A. IT Specialist 4.
MR. KOTCHEN: That's the number 4, right?
THE WITNESS: The number 4.
**Q. BY MS. LA MAR: Who did you report to?**
A. In 2012, I reported to [redacted]
**Q. What were your job duties?**
A. My job duties, we were part of the general apps group, general application support, and the job duties entailed being assigned an application, doing -- working with the architect or doing the architecture of the application, working with the developer, working with the client, working with the vendor, testing the application, building the test environment, building the sandbox environment if necessary, and then moving the application into production and then once the application was in production, we were responsible for maintenance.
**Q. When you talk about client, what client are**



**you talking about?**
A. It would be an internal client to IT or an external client to IT, but within [redacted]
**Q. So you were in-house -- you're an in-house group servicing other aspects of [redacted] you just call them clients, correct?**
A. Yes.
**Q. All right. And in 2012, how much did you make?**
A. I think it was about [redacted]
**Q. Did you supervise anyone?**
A. No. Technically, no.
**Q. Did you have, as you call them, team members?**
A. Yes.
**Q. How many team members did you have?**
A. Fluctuated because of the work and nature of contracting. Anywhere from 25 to 35.
**Q. Were these people on the same level as you, were they subordinates? How were they team members?**
A. They were -- some were on the same level, some were subordinate, different job titles.
**Q. So now you talked about what you would do as an IT specialist. Were you in charge of an**

**Q. So I'm -- I just want to make sure that I'm following you correctly. We have the IMT report.**
A. Yes.
**Q. We have management downsizing, we have some worker downsizing through March 2013.**
A. Yes.
**Q. After that time, you were notified that there was going to be outsourcing, correct?**
A. Yes.
**Q. But you were still told that your positions would not be eliminated; is that correct?**
A. No.
**Q. Okay.**
A. We were -- go ahead.
**Q. Go ahead, please.**
A. We were told that they were looking at everything inside of IT.
**Q. Okay. Did that take place at the same time you were told that the vendors had been hired for outsourcing?**
A. No.
**Q. In relation to when the vendors were hired for outsourcing, when did that occur?**
A. That occurred at the end of 2013.
**Q. And just to be clear, at the end of 2013,**



**they told you they were looking to see what was going to happen with IT; is that right?**
A. What they said was once they determined -- once they said, well, we are now looking at outsourcing, we're looking at everything under IT, which is middle of 2013. I said there was an RFP, there were eight vendors and then at the end of 2013, they came back, might have been end of 2013, beginning of 2014, said we've chosen two vendors, these are the two vendors that we're going to outsource with. We're still determining what areas are going to be outsourced. At that point they had everybody in IT update their resumes and they communicated that they would hold management meetings and determine what was going to be outsourced and what was not, and then they would start determining who was going to be outsourced and who was not.
**Q. I'm just trying to put a date on that. When did they tell you that?**
A. Beginning of 2014.
**Q. Were you involved in any of the meetings about who was going to be outsourced and who wasn't?**
A. We had a meeting. We lost our M2, management 2 who was [redacted] manager, we lost him as



part of the management downsizing in November of 2012. They determined that they were not going to replace him or backfill that position. So basically, until I think it was August of 2013 it was just [redacted] and then the director above.
We didn't have much interaction. Most of -- all the meetings were held either with [redacted] or an all-hands meeting with [redacted] We got [redacted]s came over as an M3. They decided that they needed somebody for the group. Essentially what was supposed to happen was they were supposed to have a champion that knew your group and knew what functions you provided, what value you provided to the company. And then they were supposed to go into the meetings, management meetings without us there and basically be your champion, yeah, we need these guys and this is why.
**Q. Who was your champion?**
A. Supposed to be [redacted] ut the first meeting he had, he introduced himself and we had -- everybody in the group was there, including [redacted] and [redacted] He came in, introduced himself, said he's an M3 [redacted] are going to be reporting to him and you guys are in the sweet spot, you're going to be outsourced, so whatever you need to do to find



another job inside the company or outside the company, you need to do it because you're going to be outsourced.
**Q. And when was this meeting?**
A. I think the first one we had was August 13, or August of '13, 2013 with [redacted] and -- when he was slid over into us, and then it continued on.
**Q. I'm sorry to interrupt you. I'm just trying to find out the meeting where he came in and said, you guys are in the sweet spot, you guys are going to be outsourced --**
A. I think the first one was August of 2013. Every meeting after that he said the same thing.
**Q. So what did you do in response to that?**
A. Well, we said, basically that's not what we were told. You know, we put together -- the team had put together what we do as functionality, because it appeared management didn't know, and the value we provided. And you know, why don't you champion this? He said, well, you know, he'll try and get it -- he'll try and get it before management. He must have said we were in the sweet spot, I don't know, over and over.
**Q. Did you think you were in the sweet spot because you were non-Indian?**

**MR. KOTCHEN: Objection to form.**
**THE WITNESS: No. We thought we were -- we never thought we were in the sweet spot in the first place.**
**Q. BY MS. LA MAR: Did you believe tha**[redacted] **placing you as he termed it in the sweet spot, did you believe that was because you were non-Indian?**
A. I have no idea why he did that.
**Q. Was there any interactions with TCS or Infosys at that time?**
A. We interacted with Infosys because there were employees of Infosys onsite, so they were part of the development team. So we interacted with them on a daily basis on some of our projects and some of our apps. But as far as at that point, I don't believe a decision had been made to go with Infosys and TCS.
**Q. At the time that he told you that you were in the sweet spot the first time, the decision hadn't been made yet?**
A. Correct.
**Q. At some point in time, and I believe we talked about it, and I'm just trying to get the timeline from you, at some point in time you were notified that TCS and Infosys had been chosen as the**

Page 41

**vendors for outsourcing, correct?**
A. Yes, correct.
**Q. When was that?**
A. I don't remember the exact month. It was either November, December of 2013, whenever they made the decision, they notified people immediately, or the first quarter of 2014. It was really -- it was fairly quick once they made the decision.
**Q. Okay. At that point in time, were you concerned about your job?**
A. At this point in time, yes. We were all concerned about our jobs.
**Q. When you say we all, who are we talking about?**
A. Every member on my team.
**Q. Your team, these are your colleagues?**
A. Yes.
**Q. Not your subordinates?**
A. Yes.
**Q. What discussions did you have about that?**
A. Discussions were that we didn't know what was going to happen, because we were supposed to have a champion. And along with [redacted] and [redacted] were supposed to go into these meetings and say that this is what we do, this is our

Page 42

functionality, this is a value that we provide. So even though [redacted] had said what he said, you know, we still thought that we had opportunity for management, executive management to hear our management and present the case and say, you know what, these guys are off the table. We're going to -- there have been numerous case studies where people that outsource -- and our functionality was deemed critical to the company and to the core business, and wasn't outsourced. So it was hard to determine where [redacted] was coming from.
**Q. But Paul was right, wasn't he?**
**MR. KOTCHEN: Objection to form.**
**THE WITNESS: Well, no.**
**Q. BY MS. LA MAR: No. How was** [redacted] **ncorrect in his statement to you?**
A. Well, at the end, the very end, we were outsourced. But we don't know what went on in the meetings. We do know that other people who didn't have as critical functionality as we were kept, and their organizations were kept intact. Some of what happened was that we didn't really have representation in the meeting because [redacted] idn't represent us. [redacted] was supposed to represent us. [redacted] ad a medical problem. He went away. [redacted]

Page 43

was then given the whole entire group. [redacted] was supposed to represent us, ended up representing somebody else. [redacted] was then given the job. He only lasted two weeks and he quit.
**Q. So what I hear is I hear you saying that in your view, you didn't have appropriate representation with management at** [redacted]
A. Executive management during the course of who is going to stay and -- what functions were going to --
**Q. Did you think you didn't have appropriate representation because you were non-Indian?**
A. I have no idea. I can only speculate on that. I have no idea.
**Q. I don't want you to speculate. All right. Very good.**
**Was there a point in time that your duties started to change after you were notified that TCS and Infosys would be brought in on an outsourcing basis?**
A. No.
**Q. No, your duties did not change?**
A. No.
**Q. Never?**
A. No. The only thing that we were told is

Page 44

these people were going to be coming on board and we expect you to train them and adhere to the company principles. But, you know, our duties -- everything didn't change. It's just that now we were going to train people that were going to take our positions.

**Q. Well, so your duties stayed the same, but you had an addition that you were going to train people that were basically going to take over doing what you were doing, correct?**

A. Yes.

**Q. Did you have an understanding of whether it was a direct knowledge transfer or whether people were taking portions of what you were doing?**

**MR. KOTCHEN: Objection to form.**

**Q. BY MS. LA MAR: Do you understand my question?**

A. I think so. Yeah. We were supposed to do direct knowledge transfer, working with these people.

**Q. So who were the people that you had the direct knowledge transfer to?**

A. I had -- they were supposed to be here according to our management after they signed the contract, and they gave us formal notice on July 21st, who was staying and who wasn't staying.



Then we were told at a subsequent meeting that people from the outsourcing companies would be coming onsite at the end of August and sometime in September.

**Q. 2013, 2014?**

A. No. This was 2014.

**Q. Okay. Go ahead.**

A. And then once they were onsite, we were supposed to work with them, train them and in -- in October. Then in November, we were supposed to be primary on all of our applications and all our support. Then December, they were to be primary on all our applications and support. And then January 9th was our end date of 2015.

**Q. So what was your understanding of TCS's outsourcing arrangement with [redacted] Did you understand what was bid in the process?**

A. We were never given the contract. We were never told what was bid. Originally, they said they were going to save 20 to $25 million over the course of five years. And then [redacted] acked off on that, and said actually, after the contracts had been signed, he actually let it be known in meetings that we were not going to save any money and it was actually going to cost money.



But what happened was that -- how do I say this? I really don't know how to --

**Q. Let me go through it with you. I'm -- it's not the Spanish Inquisition. I'm not trying to catch you on your words.**

**MR. KOTCHEN: Do you want to take a break?**

**THE WITNESS: No.**

**Q. BY MS. LA MAR: So TCS went through a bidding process with [redacted] Did you have an understanding that TCS was going to be doing exactly the same thing as your group was doing?**

A. Yes.

MR. KOTCHEN: Objection to form.

**Q. BY MS. LA MAR: Yes, exactly the same thing?**

A. Yes.

**Q. They weren't changing anything, they weren't moving things around, moving locations, they weren't updating software systems, none of that?**

A. No. They were going to be doing -- it ran the whole gamut, all right. They were going to be doing what we were doing specifically in our group, but they were going to be doing what other groups were doing and also some other groups, process groups, they would be looking at the processes and



doing what they were doing or changing the process when applicable.

When they -- they came in, we had some preliminary meetings with TCS management. And the problems arose immediately. We would say we're doing this, this and this, and they would say, that's not in the contract, we're not doing that. And so -- well, we haven't seen the contract, we don't know what you're talking about. We would say do A, B and C. They would say we're only doing A. We're not doing B and C, that's not part of the contract. So we kept hearing this over and over and over. So we fed that up to our management and they fed it to executive management.

And consequently, they renegotiated the contract with TCS. So the people that were supposed to be here --

**Q. Supposed to be where?**

A. Onsite that we were supposed to train at our facilities in September and October didn't show up. They had some other legal issues that they couldn't get people from India over but the people didn't show up so they had to renegotiate the contract and I think that was done by end of October, beginning of November.

**Q. I just want to be clear. Sitting here today, you believe that TCS was brought on board to do exactly what your group was doing. There were no changes to it?**
A. Yes.
MR. KOTCHEN: Objection, form.
**Q. BY MS. LA MAR: And you believe you had two replacements, and a replacement in India; is that right?**
A. No. I was supposed to have more replacements, because the two replacements that did show up in January, I was training on one application. I was supporting 25 applications. So I was training these two guys on one application. And we were working with the young woman, and I don't know her age, but she sounded awfully young, was in India. And so we would teleconference which presented its own problems.
**Q. Did you believe that the applications were going to continue that you had been servicing?**
A. Yes. Absolutely. They hadn't been decommissioned when we did the move to the data center.
**Q. You didn't believe that there was going to be a transition of the applications from where they**

Page 49

**were when you worked at [redacted] and to where [redacted] wanted to go with them?**
**MR. KOTCHEN: Objection, form.**
**Q. BY MS. LA MAR: Do you understand my question?**
A. That had already occurred for the most part. Because we didn't want to move applications over to the new data center that were going to be abandoned or were going to be orphaned. So that was part of the whole integration process. Do we need this app? Do we not need this app? So the applications that I had been supporting at the end were still all viable production applications.
**Q. Do you know if TCS was brought in to actually streamline and change your applications and streamline and change the IT function a[redacted]**
A. Not to my knowledge.
**Q. What facts do you have, or what information do you have that that's not the case?**
A. The only information I have is that we were told by my management that, you know, turn everything over, train these guys, give them knowledge transfer, these are your applications, these guys are assigned to you, more people will be assigned, of course this was in September and then

Page 50

people didn't show up. And then so the people that I talked to said, yeah, okay, we're working on this application. I said, well -- I kept saying what about all these other applications, because now, you know, they had asked me in November, asked everybody, to stay extra time instead of going away January 9th, they asked us to stay until February 6. So at the time I asked to be -- I said this is not enough time. You tell us that you had at least a three, three-and-a-half-month program to bring people on board, sit down with us, let us be primary, let us teach them everything, let us give them all our knowledge transfer, let them then be primary, let us back them up, show them what they're doing wrong and help them to come up to speed, so now you've compressed that.
**Q. So you had a better plan than [redacted] management; is that right?**
**MR. KOTCHEN: Objection to form. Misstates his testimony.**
**THE WITNESS: I thought my plan made sense. My plan wasn't a better plan. It was the same plan. It was just that now instead of having from September to January 9th when the people were supposed to be on board onsite, they weren't there.**

Page 51

**They didn't show up until January. So now you're asking me to compress four months' worth of training into a month. So I'm saying no, that's not possible.**
**Q. BY MS. LA MAR: Did you think that that was TCS's fault?**
**MR. KOTCHEN: Objection; form.**
**THE WITNESS: I have no idea. I have no idea whose fault it was.**
**Q. BY MS. LA MAR: Did you think that anything about compressing that time was unfair?**
**MR. KOTCHEN: Objection to form.**
**THE WITNESS: No. It doesn't make sense. It just doesn't make business sense. We have critical functions, we have some applications that are dependent on reporting to federal and state agencies. And we were supposed to train them on this. They were supposed to already have these certifications, and we had no way of knowing or checking and I didn't care. It was just that I was supposed to -- I'm being asked to train somebody in one month instead of four.**
**Q. BY MS. LA MAR: You would agree with me that when you're training somebody in knowledge transfer, part of the process is to make sure that**

Page 52

**it's a seamless transition, even if you were going to change the operating systems or change the functionality of the applications, correct?**

**MR. KOTCHEN: Objection to form.**

**THE WITNESS: Yes.**

**Q. BY MS. LA MAR: Okay. And so do you have any information that what you were supposed to do was train TCS employees on existing systems so that they could ensure a seamless transition and then develop new applications and a new format?**

**MR. KOTCHEN: Same objection.**

**THE WITNESS: I -- I know that that's not correct because they weren't changing the OS. They weren't changing Microsoft operating systems. They weren't changing units. So OS, the foundation of what we were working on, was not going to change. It hasn't changed to this day.**

**Q. BY MS. LA MAR: Let me ask you this. Where are -- are you familiar with where the locations are that TCS employees operated while servicing** [redacted]

A. The three that I'm aware of are Rivergrade, general office, and I think there was a handful down in Irvine where I worked on, IOSS.

**Q. Was there any offshore component?**



A. Yes.

**Q. Did** [redacted] **have an offshore component before?**

A. Yes.

**Q. Where was** [redacted] **offshore component?**

A. I think it was in Mumbai. I don't know that it was [redacted] I think it was Infosys that they contracted with. But I know, I happened to know personally because I dealt with a girl who was in Mumbai. So she was part of the three that I was training.

**Q. So sitting here today, your testimony is that there wasn't any change in service, there wasn't any change in applications, correct?**

A. To my -- to my area of responsibility.

**Q. Okay. Is it -- do you believe that your responsibilities were distributed to, or combined with other folks' responsibilities that were at** [redacted]

**MR. KOTCHEN: Objection to form.**

**THE WITNESS: I have no idea. Because they asked us to stay again from February 6, because it became -- they had a lot of problems in January. The CIO and CEO, name was** [redacted] **r of EIX, they had conversations with the CEO of TCS because the Help Desk implementation was a disaster on January 12th.**



**Q. BY MS. LA MAR: Who holds your position, who holds your former position at** [redacted] **right now?**

**MR. KOTCHEN: Objection to form.**

**THE WITNESS: I have no idea. The people that I trained, TCS, they're gone. That function was taken away from them because they weren't able to handle it and it was given to Infosys.**

**Q. BY MS. LA MAR: Who holds -- who held your position at -- your last position at** [redacted] **when you left?**

**MR. KOTCHEN: Same objection.**

**Q. BY MS. LA MAR: Who became --**

**MR. KOTCHEN: Did you answer that question?**

**MS. LA MAR: He didn't answer. I was trying to rephrase it.**

**MR. KOTCHEN: Okay.**

**Q. BY MS. LA MAR: Who became a -- what is your job title?**

A. IT Specialist 4.

**Q. IT Specialist Engineer 4. Who became an IT Specialist Engineer 4 when you left?**

**MR. KOTCHEN: Same objection.**

**THE WITNESS: Nobody became. We had some people that agreed to stay to March 6 on my team. Some people had already been hired by TCS on the**



**team and were starting to take over some of the applications.**

**Q. BY MS. LA MAR: What TCS employee was performing the services of an IT Specialist Engineer 4 when you left?**

A. The two that I know of were [redacted] who was formerly on our team, and he was hired by TCS.

**Q. He is a former** [redacted] **mployee, correct?**

A. He is a forme[redacted] employee.

**Q. Who else?**

A. [redacted] Those are two that I'm aware of.

**Q. They were both hired by TCS though, right?**

A. They were both hired by TCS.

**Q. They are both Americans, are they not?**

A. Yes.

**Q. They just --** [redacted] **e is Asian but not Indian, is he?**

A. Correct. He is from Korea.

**Q. And** [redacted] **is he Indian?**

A. He's Indian.

**Q. All right. And you believe these two people took over your job?**

**MR. KOTCHEN: Objection; misstates his testimony.**

**THE WITNESS: They did not take over my job. They were as part of the team. And I have no idea -- I trained the three people on the one application and made management aware that -- they knew I was going away. I had no other replacements from TCS or anywhere else, so who took over my responsibilities and my applications after I left February 6, I have no idea.**
**Q. BY MS. LA MAR: All right. I believe you said -- we kind of went through a bunch of different things in your statements. In some of your documents, you suggest that May or June 2014 you were notified that the IT Department would be outsourced. Is that incorrect?**
A. Yeah. I think we were notified before that. Early '14. Read the statement again.
**Q. It's okay. You say May or June 2014. I think you -- maybe just the date is wrong.**
A. Yeah, I don't know where that's coming from. Saying that we were notified we were going to be outsourced?
**Q. Yeah. At that point.**
A. I think you wrote it down wrong. It was '13.
**Q. 2013?**



A. Yeah.
**Q. All right. Now, why exactly are you suing TCS?**
A. Well, I feel that I was discriminated against from my former position, not given the opportunity to apply for it, and I also feel that for, you know, loss of wages.
**Q. So let's start with the first one that you feel you weren't able to apply for your position. I think we went through just a little bit ago that you don't know if your position even existed at TCS; is that right?**
A. No. My position existed at TCS because I trained three people on one application. So my position existed. So I trained those three people on that application. The other applications had to have been taken over and maintained by somebody. I have no idea who.
**Q. So what you're saying --**
A. TCS was responsible for my area of responsibility, they were responsible per the contract for all those applications.
**Q. But forgive me. Your salary was [redacted] a year, correct?**
A. Ending salary, yes.



**Q. Right. And you believe you trained three people on one application?**
A. I don't believe that. I did that.
**Q. And you believe that the other applications other TCS employees took over?**
A. I don't know. No one communicated to me who was going to do that, how it was going to be handled after I left February 6.
**Q. Okay. So again, I'm asking, I think we went through who took over the IT Specialist Engineer No. 4. And I thought you told me that you didn't know?**
A. I didn't know. I -- two people from our group -- there is more than one IT Specialist 4 in the group. It's a myriad of people. The functionality of the group was given to TCS.
**Q. Right.**
A. I had trained three people from TCS to take over one of my applications. There was supposed to be other people from TCS to take over the rest of the applications. After I left, I don't know how that was divvied up. TCS had the group. They were bringing people in. They had hired two former [redacted] employees, and they were supposed to either bring more people over from India or hire locally or



promote from within. I have no idea how they handled it.
(Mr. Otto enters the conference room.)
**Q. BY MS. LA MAR: So sitting here today, you -- I believe what you're saying is that you're aware that certain functions of your position were taken over by TCS, but you don't know if your position in entirety was replaced; is that right?**
**MR. KOTCHEN: Objection; misstates his testimony. Vague.**
**Q. BY MS. LA MAR: Do you understand?**
**MR. KOTCHEN: You can answer.**
**Q. BY MS. LA MAR: You can answer. Did you understand the question?**
A. Repeat the question.
**Q. Sure. I believe what you're saying is that although you're aware that certain functions of your position were taken over by the three people you trained, you are unaware of any person who took over all of your functions; is that right?**
A. Yes.
**Q. So you say that you weren't allowed to apply for the position that you held. Tell me about that.**
A. I attended a job fair that [redacted]

[redacted] put on after the determination had been made in, I think it was October -- it was two days, early October, I think it was 22nd, 23rd. They said that bring a lot of resumes, there is going to be 30 or so or more businesses from the L.A. area, and we're going to -- Infosys and TCS are going to be there, they may even be doing on the job -- on the spot interviews, so be prepared. So I attended that job fair. I approached the TCS booth, table at the time. It was manned by three or four employees of TCS. They were in conversation with other people from India. They were all speaking Hindi. I walked up and inquired about a position and talked to one of the persons, stepped away briefly, and talked to me, and I said that, you know, I'm interested, I'm going to be outsourced, I would like to apply for this position, and you know, this is what I do. Here's my resume.

At first they really weren't interested in taking the resume, and it was a brief, short conversation. He was dismissive. Took the resume almost by -- unwillfully, and turned back to the conversation that they were having with the other Indian gentlemen, in Hindi, and that was it.

**Q. Okay. So let's just back up on everything**



**you've said. First of all, the career fair wasn't the first opportunity to try to engage TCS in employing you, was it?**

**MR. KOTCHEN: Objection; form.**

**THE WITNESS: Actually, it was the first that -- they said they were holding or sent out an email saying that they were going to look at positions, and then they would -- you could apply for positions. I think eventually they sent out one or two emails that didn't have my position on it. And they -- they said they were going to hold some meetings, but I was either unavailable or meeting was in a location -- it didn't say anything about interviewing or hiring. It was kind of like before when we had the management, we were trying to determine what we did in that. It was kind of more of an informal of what are you doing and how can we be trained on making sure -- kind of making sure that we have everything that you're doing under scope.**

**Q. BY MS. LA MAR: Did you receive an email regarding a town hall meeting for employees o[redacted]**

A. I received multiple town hall meetings, but they were from [redacted]r and IT management.

MS. LA MAR: Go ahead and mark this next in



line. See if this refreshes your recollection.

(Deposition Exhibit No. 3 was marked for identification.)

MR. OTTO: Can I get a copy?

MS. LA MAR: We didn't know you were coming today. Perhaps Dan can share his exhibits with you.

MR. OTTO: Can I get a copy of all these exhibits sometime today?

MS. LA MAR: You can get a copy of the transcript and we can make copies of the --

MR. OTTO: I am a party to this action, right.

MS. LA MAR: We were surprised you were actually coming. We didn't know you were coming today.

MR. OTTO: You would be surprised a party wouldn't come late?

MS. LA MAR: We didn't have you at Mr. Slaight's depo.

(Discussion off the record.)

**Q. BY MS. LA MAR: Finished reading it?**

A. Yep.

**Q. Does this refresh your recollection that you received an email regarding a town hall meeting?**

A. No. I -- if at the time, if I did receive



this, which it's got my name on it so I'm assuming it came in my in basket, that I was unavailable, so I chose to go through other channels.

**Q. Well, is this not a detailed information about how to apply at TCS and what the careers are for TCS employees?**

A. It gives you information on who to talk to.

**Q. How to apply?**

A. Yeah.

**Q. You didn't think that was important?**

**MR. KOTCHEN: Objection; lack of foundation. Misstates his testimony.**

**Q. BY MS. LA MAR: Do you think it was important to know this information?**

**MR. KOTCHEN: Same objection.**

**Q. BY MS. LA MAR: You can answer.**

**MR. KOTCHEN: You can answer.**

**THE WITNESS: Yeah. But we had already had meetings to this effect, [redacted] management. These are the people -- these are the positions that they may have and at this point, they were talking about getting together a formal meeting with [redacted] management and TCS. This all seemed preliminary to most of us.**

**Q. BY MS. LA MAR: Are you aware how many**

**people attended the town hall meetings?**
A. No, I have no idea.
**Q. Would it surprise you that there were over 300 people?**
A. No. People were trying to -- if they had the time, they were trying to do what they could.
**Q. And do you know anybody who applied to TCS from these meetings that was also an [redacted] employee?**
A. No. Nobody mentioned it to me. I know that [redacted] didn't tell us. They told us that they applied with their contacts directly, you know, people they were training with later in the year. They didn't tell us until the very end that they were actually -- got the position at TCS and were working for them. They kept it secret to the end.
**Q. Are you aware that actually 105 people applied for positions through the town hall?**
A. No. There was never any follow-up emails or anything to that effect that I got or remember.
**Q. Are you aware how many people who applied through the town hall schedule, or through the town hall meetings were actually hired by TCS?**
A. No.
**Q. So then I take it you don't know whether or**

Page 65

**not this process favored Indians?**
**MR. KOTCHEN: Objection to the form.**
**THE WITNESS: No idea.**
**Q. BY MS. LA MAR: In your opinion, the town hall process and the application process, you didn't find that to favor Indians, correct?**
**MR. KOTCHEN: Objection to form.**
**THE WITNESS: I have no idea.**
**Q. BY MS. LA MAR: Because you didn't participate, right?**
**MR. KOTCHEN: Objection; misstates his testimony.**
**Q. BY MS. LA MAR: Did you participate in the town hall meeting?**
A. No.
**Q. Okay. In fact, you affirmatively declined to attend, didn't you?**
**MR. KOTCHEN: Objection; misstates his testimony.**
**THE WITNESS: I don't recall declining to attend. I had other -- in August, we were pretty busy and I was on vacation, so I might not have been able. I don't know what the time frame was.**
**MS. LA MAR: Actually, you declined shortly after the invitation was received, didn't you?**

Page 66

**Almost right away? Next in line, please.**
(Deposition Exhibit No. 4 was marked for identification.)
MS. LA MAR: I apologize, Mr. Otto. At a break we'll go ahead and make extra copies for you.
MR. OTTO: Thank you.
THE WITNESS: Yeah. Yes. That's a decline.
**Q. BY MS. LA MAR: So you declined within several hours of receiving the invitation, correct?**
A. Yes.
**Q. And do you know why you declined?**
A. I don't recall. We had vacation planned at the time, so --
**Q. Do you believe you were on vacation at that time?**
A. I don't recall. I don't know why. I had a lot of things going on.
**Q. All right. So now the next thing we talked about is you transitioning to the career fair. You said 30 other vendors were there, right?**
A. Approximately. I don't know. I didn't have a list.
**Q. Who else did you apply to?**
A. I dropped my resume off with anyone who

Page 67

would take it. Some vendors would not take it. I think there was one vendor that was doing online, I think Accenture was doing online applications.
**Q. Well, who did you drop your resume off with other than TCS?**
A. Accenture online, I interviewed for -- they did a spot interview for positions at Southern California Gas. I gave my resume and talked to everybody who would take it. I remember the interview from Southern California Gas, because they were interviewing, they were hiring. And it was kind of like a get to know you, it wasn't really a formal interview. It was what do you do, what do you have, what positions do you have, do you hire in this area type of thing, and so they took information.
There were several banks that took my resume. I don't recall the names offhand.
**Q. But these were -- if I understand what you're saying is, if I go and I subpoena these 20 or 30 participants, I will find that your resume has been distributed to them at the career fair; is that correct?**
A. If they kept records. I have no idea what they did with it. Most -- could have went in their

Page 68

file. They could have downloaded it. They could have brown basketed [sic] it. Who knows? I have no idea.
**Q. How many resumes did you distribute at the career fair?**
A. I brought 50. Because we didn't know who was going to be there. So I gave out at least 20. Some vendors would just say -- some people were honest. They said you know what, we're here because so and so at [redacted]hey asked us to be here, we're not hiring, we're not taking resumes. And that was -- that's the end of it. That was a brief, short conversation.
**Q. I'm sorry. Maybe I missed it. I thought I asked how many resumes you handed out?**
A. I -- approximately around 20 to 25. Whoever would take one.
**Q. Did you go to the fair alone?**
A. Yes.
**Q. Were you aware other people from [redacted] [redacted] were at the fair at the same time as you?**
A. Oh, yes. Yeah.
**Q. Are you aware of any of those people applying to the same group who was representing TCS**

Page 69

**at the fair?**
A. Yes.
MR. KOTCHEN: Objection; form.
**Q. BY MS. LA MAR: Who was that?**
A. I talked to [redacted] He said he didn't apply. He said he talked to them but he didn't apply. I talked to [redacted]. He said he talked to them. I talked to [redacted]y and there were several other -- I knew maybe a third of the people, 25 percent of the people in the room, somewhere around there. People said they were trying. The consensus was from the people that I talked to, that they were treated similar to my experience.
**Q. So is it your perception that none of the people that submitted resumes or were spoken to at the career fair were interviewed by TCS?**
A. I have no idea.
**Q. Did you feel that a process was -- that you experienced by TCS at the career fair -- did you feel that was discriminatory?**
A. Yes, I did.
**Q. Why was that?**
A. Well, they -- the way the conversation unfolded, you know, they were speaking Hindi and I

Page 70

was basically treated as being dismissive, and you know, they went back to that conversation. You know, he couldn't wait to get basically rid of me and back to the conversation he was having with the other gentleman.
**Q. What was the position you said you wanted to apply for when you went and spoke with the folks at the TCS booth at the career fair?**
A. It was general apps application support.
**Q. General apps application support. Do you know if TCS was hiring for that?**
A. No, I do not at the time.
MR. KOTCHEN: Michelle, in about five minutes, can we take a break.
MS. LA MAR: Yeah. You know what, we can take one now.
MR. KOTCHEN: I have that 11:30 call that won't take that long.
MS. LA MAR: I'm sorry. I don't know what time it is.
MR. KOTCHEN: 11:18.
MS. LA MAR: Let me go through this.
MR. KOTCHEN: Sounds good.
**Q. BY MS. LA MAR: Do you know [redacted] [redacted]**

Page 71

A. [redacted] doesn't sound familiar.
**Q. You don't know whether she was in the same email groups as you were?**
A. [redacted] Not -- she wasn't -- she may have been part of our group. People were coming and going. I don't recall. I don't recall ever talking to her, seeing her, emailing her.
**Q. What about [redacted]**
A. No.
**Q. You don't know who she was either?**
A. No. Oh, [redacted] I don't know. She may work at the Help Desk. There was a [redacted] at the Help Desk. I don't know what her last name was. She got married.
**Q. How about [redacted]**
A. Yes.
**Q. You know who he is?**
A. Yes.
**Q. Did you talk to him about his application at TCS?**
A. No.
**Q. Do you know he went to the career fair?**
A. No, I did not.
**Q. How about [redacted]?**
A. No.

Page 72

**career fair for which they received resumes.**
A. Uh-huh.
**Q. Do you have an explanation of why your name is not on the list?**
A. No, I have none.
**Q. You would agree with me that the majority of these people are not of Indian descent, correct?**
A. Yes.
**Q. Most of these people are non-Indians, correct?**
A. As far as I know, yes.
**Q. So I guess I'm just curious as to why your name wouldn't appear here.**
A. I have no idea.
MR. KOTCHEN: Object.
**Q. BY MS. LA MAR: Now you say you gave a resume to TCS. And I believe that your counsel has produced five resumes. Did you have the same resume for -- have you ever edited your resume?**
A. Yes.
**Q. When?**
A. We were told to when they first started the outsourcing, we were told to. And then we were given some pointers from [redacted] people about making some other changes early in the process.



**Q. When was this?**
A. End of 2013, 2014, we were told get your resume -- update your resume. I think it might have been 2013 after they decided to outsource, update your resume. And then they had some training and some pointers on doing further updates in 2014.
**Q. Okay. And so it is the 2013-2014 version of your resume that you submitted to TCS?**
A. Yes.
MR. KOTCHEN: Object.
MS. LA MAR: Did you want to take your break?
MR. KOTCHEN: Sure.
THE VIDEOGRAPHER: This is the end of Tape 1 with the continuing testimony of Brian Buchanan, Volume I. We are off the record at 11:27 A.M.
(Recess taken.)
THE VIDEOGRAPHER: This is the beginning of Tape 2 with the continuing testimony of Brian Buchanan, Volume I. We are on the record at 11:59 A.M.
**Q. BY MS. LA MAR: Mr. Buchanan, you understand that you're still under oath here today, correct?**
A. Yes.



**Q. Very good. Before we took a break, we were talking about the career fair that you attended. Where was this career fair?**
A. It was up close to the Rosemead general office. I think -- I'm not sure if the city was Arcadia or Baldwin Park. Those cities are all close.
**Q. Do you remember what hotel it was?**
A. No.
**Q. Now, you said that you had given out 20 to 30 resumes at the job fair; is that correct?**
A. Approximately, yes.
**Q. I understand that was your best estimate. I'm not trying to tag you with that.**
**Did you receive a response to any of the resumes that you had sent out?**
A. No. The only response I received was electronically from Accenture.
**Q. What did they say?**
A. They said that keep looking at the website, there's -- right now there is nothing -- there wasn't a position that matched my skills.
**Q. Did you believe that any other entity's lack of response was discriminatory?**
A. I have no idea.



**Q. Do you believe -- do you have any information to establish that it was based on the fact that you're white?**
A. I have no idea.
**Q. Do you believe TCS's lack of response to you was because you were white?**
**MR. KOTCHEN: Objection; asked and answered.**
**THE WITNESS: Yes.**
**Q. BY MS. LA MAR: Why is that?**
A. From the way that I was treated there and some of the comments and observing, you know, in the past their hiring practices and who was getting jobs and who was being hired. It was mostly Indian people or people of Asian descent.
**Q. Is your concern that TCS is hiring, or bringing over its existing employees from India on visa? Is that your concern?**
**MR. KOTCHEN: Objection to form.**
**THE WITNESS: No.**
**Q. BY MS. LA MAR: So the people -- the employees at TCS that are their existing employees and their utilization of them at [redacted] you do not find that to be discriminatory; is that right?**
**MR. KOTCHEN: Objection; compound. Vague.**

**And assumes facts not in evidence. Lack of foundation. Go ahead.**
**THE WITNESS: Okay. What was the question?**
**Q. BY MS. LA MAR: Let me rephrase it. You're familiar with TCS's workforce that was placed at [redacted] correct?**
A. Yes.
**Q. Okay. Do you know how many of those individuals that were placed at [redacted] by TCS were existing TCS employees?**
A. No, I do not.
**Q. Do you know how many of those employees were on visas?**
A. No. I just had a -- the people that I worked with that I trained specifically said they were, said they had come over from India. So I knew they were, and I had heard other people.
**Q. The employees you trained, let's stick with them, they were existing TCS employees when they came over, were they not?**
A. I have no idea. We didn't talk about that. We just talked about the fact that they were -- they came over from India.
**Q. Okay. So when I talk about your complaint being -- being a favoritism for existing TCS**

Page 81

**employees, is that what your complaint is? Are you complaining that TCS is utilizing its existing workforce and bringing it to the U.S.?**
A. No. I'm complaining that they discriminated against me because of my race and origin.
**Q. So you're contending then, and I'm just trying to understand your complaint -- you're contention revolves around TCS's local hiring then; is that correct?**
**MR. KOTCHEN: Objection. That misstates his testimony. It's vague and lack of foundation.**
**Q. BY MS. LA MAR: You can answer.**
A. What was the question?
**Q. Okay. So you said -- you just said that your complaint has nothing to do with TCS bringing over existing employees. Your complaint has to do with you --**
A. Yes --
MR. KOTCHEN: Wait a second. Before you say yes, let her finish the question. I'm going to object as misstating his testimony.
**Q. BY MS. LA MAR: So let's start over again. What is your complaint against TCS?**
A. That I was discriminated against.

Page 82

**Q. Your complaint is you were discriminated against?**
A. Yes.
**Q. What do you mean by discriminated against?**
A. I was discriminated against that I wasn't hired because of my race and my American citizenship.
**Q. Okay. So your American citizenship, tell me about that. Why do you think that you weren't hired because of your American citizenship?**
A. I have just observed that for the most part people that they had hired were of Indian or Asian descent, and I don't know the exact number of people that they brought over. But it was over a hundred to several hundred.
**Q. So let's break this down. Is your complaint American citizenship or national origin?**
**MR. KOTCHEN: Objection; calls for legal conclusion.**
**Q. BY MS. LA MAR: What does national origin mean to you?**
A. It means a person born in that country, a native of that country.
**Q. So is your complaint based on being born in the -- in America versus being born elsewhere?**

Page 83

A. No. My complaint is being discriminated against because I'm of a white race.
**Q. And national origin or just white race?**
A. And national origin.
**Q. National origin is being born in --**
**MR. KOTCHEN: Object it calls for a legal conclusion.**
**Q. BY MS. LA MAR: You can --**
A. Yeah.
**Q. It's both, right?**
A. It's both, yes.
**Q. Your complaint based on national origin, is it based on the fact that TCS was utilizing personnel brought -- existing personnel brought over here from India on visas?**
A. No.
**Q. No?**
A. No.
**Q. Is your complaint of race based on the fact that TCS was bringing over existing employees?**
**MR. KOTCHEN: Objection; vague.**
**THE WITNESS: No.**
**Q. BY MS. LA MAR: No. It's based on TCS's hiring practices here in the U.S.; is that right?**
**MR. KOTCHEN: Objection; misstates his**

Page 84

**testimony.**
**Q. BY MS. LA MAR: Is that right?**
**MR. KOTCHEN: Same objection.**
**Q. BY MS. LA MAR: The way it works in a deposition is I ask a question, you answer. If you need to speak with your counsel, that's fine. You can go out and speak with your counsel. But otherwise, I just depose Daniel. I'm not willing to do that today.**
**So I need to know from you what the answer is to my question.**
A. What's the question?
MS. LA MAR: Can you read it back, please.
(Record read.)
MR. KOTCHEN: Same objection.
THE WITNESS: No. It's based on my personal experience.
**Q. BY MS. LA MAR: When you say your personal experience, right, I'm just trying to get your basis for your claim for discrimination. I am trying to find out which practice TCS engaged in that caused you to believe you were discriminated against. Okay?**
**Is it based on their use of existing TCS employees, or is it based on their hiring practices**



**in the U.S.?**
**MR. KOTCHEN: I'm going to object as vague, lack of foundation.**
**THE WITNESS: I have no idea.**
**Q. BY MS. LA MAR: What do you mean you have no idea?**
A. I don't have any idea why they discriminated against me. I just know that they discriminated against me because I'm white.
**Q. Why?**
A. Well, it was pretty evident that they were dismissive of me, they didn't respond to me.
**Q. Did you follow up with them?**
A. Did I follow up? I didn't meet those people again, so I have no idea.
**Q. Did you go to TCS's career portal?**
A. I didn't go to -- yeah. Actually, I went to the -- 'cause we got information, so I looked online and they sent out a couple emails about jobs being offered, but there was no job that was being offered for my specific skill set at that time. I don't know what happened after I left.
**Q. Did you apply through TCS's career portal for a position?**
A. The only application was at the job fair.



**Q. And the application again at the job fair was you dropped off your resume?**
A. I spoke to a gentleman and handed my resume.
**Q. Do you remember the gentleman's name?**
A. No.
**Q. Do you remember who else was manning the booth?**
A. No.
**Q. Do you remember if they were all male, if they were female?**
A. I believe there may have been one female, but I don't know if she was with TCS or if she was with Infosys or -- there was a group of people standing around.
**Q. This person told you -- what was his title that you found so dismissive?**
A. I don't remember titles. He was just --.
**Q. Did you try to talk to anyone else at the booth?**
A. No. They were engaged in a conversation. He was the only one who broke away and then immediately rejoined the conversation.
**Q. Did you find anybody else, any other entity that participated at the career fair for them to be**



**dismissive?**
A. I don't understand what your --.
**Q. You told me earlier that some people said that they were only there to support** [redacted]
A. Yes.
**Q. And that they weren't accepting any resumes?**
A. Yes.
**Q. Did you consider that to be dismissive?**
A. No.
**Q. Now, going back to your contentions about TCS's workforce, I believe -- correct me if I'm wrong -- but is it not your complaint that TCS has a high proportion of Indians working for them?**
A. My complaint is just based on the way that I felt they discriminated against me.
**Q. Individually?**
A. Yes.
**Q. You don't have any thoughts or contentions about TCS's workforce as a whole?**
**MR. KOTCHEN: Objection; form.**
**THE WITNESS: I know from internet statistics that they have a high percentage of Indians, I think it's over 90 percent or whatever. But -- in their workforce.**

**Q. BY MS. LA MAR: Do you know if those are locally hired employees or if those are Indians that are existing employees that are being brought over on visas?**
**MR. KOTCHEN: Objection; form.**
**THE WITNESS: From what I read, they're both.**
**Q. BY MS. LA MAR: So since you've read that and you know the distinction, is your complaint that TCS didn't hire you because they were utilizing their existing employees that they brought over or they had a favoritism for their existing employees that they brought over from India?**
A. I have no idea what their motivation was.
MR. KOTCHEN: I'm going to object to the form of the question.
**Q. BY MS. LA MAR: Do you believe that they were dismissive of you at the career fair because they wanted to hire an Indian?**
A. I -- I don't know. I have no idea what they were thinking. Maybe they just don't like old white bald men.
**Q. Okay. Would you think old white bald men would be something that they wouldn't want to hire?**
**MR. KOTCHEN: Objection; form.**

Page 89

**THE WITNESS: Who knows? I have no idea what they're thinking.**
**Q. BY MS. LA MAR: Why do you think it's discriminatory?**
**MR. KOTCHEN: Objection; asked and answered.**
**Q. BY MS. LA MAR: Answer.**
A. It's already been answered.
**Q. You can answer it again. I can ask a question all day long.**
A. I think they discriminated against me based --
**Q. No, no. My question was why do you think it was discriminatory? I don't need you to tell me that I was discriminated against again. I want to know why.**
**MR. KOTCHEN: Objection; asked and answered.**
**Q. BY MS. LA MAR: Go ahead.**
A. Because I'm a white person of U.S. national origin.
**Q. So other than you being a white person of U.S. national origin -- and I understand you're in that category, all right -- what other facts do you have to show that TCS discriminated against you?**

Page 90

**MR. KOTCHEN: Objection; asked and answered. Michelle, this is like the fifth time.**
**MS. LA MAR: He's not answering.**
**MR. KOTCHEN: He is. He has described it five times.**
**Q. BY MS. LA MAR: Go ahead. What are the facts?**
A. What was the question?
**Q. What other facts do you have that shows TCS discriminated against you?**
**MR. KOTCHEN: Same objection.**
**Q. BY MS. LA MAR: Other than the fact that you are white?**
A. Those are the predominant facts. I guess ancillary facts are their statistics.
**Q. Okay. So the fact that you're white and their statistics. That's the evidence that you have; is that right?**
**MR. KOTCHEN: Objection; misstates his testimony again. He has answered it previously.**
**MS. LA MAR: I don't think he did.**
**MR. KOTCHEN: Go ahead.**
**Q. BY MS. LA MAR: Is that it? Right?**
**MR. KOTCHEN: Objection; misstates his testimony.**

Page 91

**Q. BY MS. LA MAR: Go ahead.**
A. I don't know any other way to say it.
**Q. Okay. After the career fair, what did you do to secure a job at TCS?**
A. After the career fair?
**Q. Uh-huh.**
A. We were told that we would be contacted and there would be other opportunities. There would be jobs that were identified.
**Q. Who told you this?**
A. [redacted] management.
**Q. Did TCS tell you this?**
A. No.
MR. KOTCHEN: Finish your answer.
THE WITNESS: So there were meetings held, you know, over and over, like I said, multiple meetings all the time.
**Q. BY MS. LA MAR: With who?**
A. [redacted] management. And they were told that they were going through this process with TCS. We would be informed, there would be opportunities and there would be further emails as they went through the process, and positions became available; if they decided, TCS or Infosys, decided to hire from the [redacted] pool or if they were going to bring in from

Page 92

outside.
**Q. Are you aware if following the TCS career fair, if TCS actually did hire [redacted] folks?**
A. No. I know [redacted] people were hired, but I don't know if they were hired from the career fair or not.
**Q. No. Not from the career fair. After the career fair?**
A. After the career fair?
**Q. Let me rephrase the question. Are you aware of any [redacted] personnel that were hired by TCS after the career fair?**
A. You mean just after the career fair, not --
**Q. Any time --**
A. Because of the career fair?
**Q. I'm sorry. Any time after the career fair. I think you just went through an explanation that you didn't follow up with TCS because you were told by [redacted] management that TCS was going to come to you?**
A. I was aware -- made aware in January of '15 that two members of our team had been hired, [redacted] and [redacted]
**Q. Were you aware of any others that were hired?**



A. No.
**Q. Are you aware of the percentage of people that went to the town hall that ultimately were hired by TCS?**
A. No.
**Q. Would it surprise you to learn that 44 people were hired?**
A. No.
**Q. So of those people, do you know how many are Indian?**
A. No.
**Q. Do you know how many are white?**
A. No.
**Q. Do you know how many were in your group?**
A. No. That information was never provided to anybody as far as I know.
**Q. Have you continued to look for a job since leaving TCS?**
A. Yes.
**Q. What efforts have you done?**
A. Networked with people, friends; gone online, gone to -[redacted] was the outplacement firm that [redacted] provided to everybody who was severed, and they helped you with job search, they helped you with updating your resume,



and any leads if they had them. And currently I'm in the TAA program; supposed to get a certificate in data science. I've got one class left starting in a week.
**Q. Did you invent a nose pore opener?**
A. Yes. Well, a friend of mine did.
**Q. And tell me about that.**
A. It's a product that a friend of mine thought up. It's a cosmetic product, primarily for women, but men also. And we designed it, we patented it, we tried to manufacture it. We were unsuccessful.
**Q. Sorry.**
A. Can't find a manufacturer in America. It's tough.
**Q. Did you try India?**
A. No. We tried -- we were told to try China. And we thought we had a contact. He was a consultant. He said he had contacts in China, but it didn't pan out.
**Q. Did you invest time and effort in that?**
A. Yes.
**Q. Did you try to apply for other IT jobs?**
A. Yes.
**Q. Where?**



A. All over. I've got my resume on Riverside County job site through the EDD sites. I mean it's just -- Indeed.com, Monster.com. I forget the other ones.
**Q. Have you subsequently tried to apply to TCS for any job?**
A. No.
**Q. Are you aware of the make-up of the [redacted] personnel that were onboarded by TCS?**
A. No.
MR. KOTCHEN: Objection; form.
THE WITNESS: Sorry.
**Q. BY MS. LA MAR: Do you know how many of the TCS personnel were brought over on visas? You can answer.**
A. I had heard that it was between 1- and 300. That's all I heard.
**Q. Where did you hear that from?**
A. I think it was at the [redacted] offsite 25th anniversary party, [redacted] who took over for [redacted] said that there was a news article about [redacted] bringing over 4- or 500 H-1B visa holders. He said that wasn't true. It was about -- he said about a third to 50 percent. He wasn't specific.

**Q. The last person that you said,** [redacted]
A. [redacted]
**Q. He also was hired February 9, 2015. Is that surprising to you?**
A. No.
**Q. Do you know that** [redacted] **went to the town hall meetings?**
A. No. I know he was at the job fair. But February 9th makes sense because they terminated their employment with [redacted] on Friday, the 6th, when I did.
**Q. So --**
A. But I didn't know that. I thought they had already been hired. Well, they had been hired, they had to have been hired. They started the 9th but they were hired before that.
**Q. Start date, right. They started the 9th.**
A. Right.
**Q. And I'm sorry.** [redacted] **was the other one?**
A. Yes.
**Q. You believe -- you are certain she was hired by TCS?**
A. That's what I thought she said. Maybe it was Infosys, but I thought she said TCS.
**Q. Do you know how many people turned down**

Page 109

**offers by TCS?**
A. No idea.
**Q. All right. So -- Dan, let me know if I'm getting close to 1:00 o'clock.**
**MR. KOTCHEN: We're fine. 25 minutes. Are you feeling okay for lunch?**
**THE WITNESS: Yeah.**
**Q. BY MS. LA MAR: If you feel you need to take a break, take a break.**
A. I'm good.
**Q. All right. At some point in time -- actually, let me strike that.**
**Your last day of work at** [redacted] **was February 6; is that right?**
A. Yes.
**Q. Did you retire?**
A. No. They retired me. They -- effectively, they fired me. Okay. But since I had time in service, years of service, they retire you, because I was eligible for retirement. So they automatically retire you. You don't have a choice.
**Q. Did you have a choice to sign a severance agreement?**
A. Yes.
**Q. Did you in fact sign a severance agreement?**

Page 110

A. Yes.
**Q. Did you release** [redacted] **rom any and all claims associated with your separation of employment at** [redacted]
**MR. KOTCHEN: Objection; lack of foundation. Go ahead.**
**THE WITNESS: Whatever the severance agreement says. I believe it's pretty thorough.**
**MS. LA MAR: Let's take a look at it then. Well, I have a very un-pretty document for you. It looks like somebody ripped off the side there. Yours is also un-pretty. They are exact matches.**
**MR. KOTCHEN: These are two different exhibits?**
**MS. LA MAR: I think one was attached on the front and -- it's going to be the same exhibit. Let's mark collectively as next in line.**
(Deposition Exhibit No. 8 was marked for identification.)
**Q. BY MS. LA MAR: I'm going to ask you some pretty simple questions. Have you seen this document before?**
A. Yes.
**Q. I'm talking about the separation agreement and release. And then are you also familiar with**

Page 111

**the February 6, 2015, it appears to be a cover letter?**
A. Yes.
**Q. And if I turn to the second page, EIX severance plan benefits, it looks like you got** [redacted] **when you retired from** [redacted]**; is that right?**
A. Correct.
**Q. And you received that in a lump sum?**
A. Yes. Minus a whole lot of taxes.
**Q. And if you turn back to the first document -- by the way, I don't want to know what counsel said, okay. I am not entitled to that information. But were you represented by counsel at the time that you executed this severance agreement?**
A. No.
**Q. Turning to the last page, is that your signature dated 2-11 of '15?**
A. Yes.
**Q. So you understood that by executing this, you could not bring any claims against** [redacted] **its agents, employees, assigns, correct?**
A. Yes.
**Q. And its affiliates; is that right?**

Page 112

**MR. KOTCHEN: Right. But he could have consulted him about -- the privilege would attach if he's looking for legal counsel trying to decide --**
**MS. LA MAR: If that was the case, I understand.**
**MR. KOTCHEN: Let's go talk.**
**THE VIDEOGRAPHER: Off the record?**
**MS. LA MAR: Off the record.**
**THE VIDEOGRAPHER: The time is 12:46 P.M. We're off the record.**
(The luncheon recess was taken at 12:46 P.M.)

Page 117

APPEARANCES OF COUNSEL:
(P.M. SESSION)

MICHELLE M. LA MAR, ESQ.
ERIN SMITH, ESQ.
DANIEL KOTCHEN, ESQ.
JAMES A. OTTO, ESQ.

ALSO PRESENT:

REBECCA R. HIRSCHKLAU, Tata Employment Counsel
TONY BRUNO, Videographer

REPORTED BY:

JUDITH SCHLUSSEL, CSR No. 4307

Page 118

(The deposition of BRIAN BUCHANAN was reconvened at 1:35 P.M.)

BRIAN BUCHANAN,
the witness, having been previously administered an oath by the court reporter, testified further as follows:

THE VIDEOGRAPHER: We are on the record at 1:35 P.M.
EXAMINATION (CONTINUING)
BY MS. LA MAR:
**Q. Great. Mr. Buchanan, you understand you're still under oath?**
A. Yes.
**Q. Very good. Going back quickly to the career fair. And I believe you answered this question, but I just want to make sure I fully understand your answer.**
**When you approached the TCS personnel at the TCS booth, which position did you say you were applying for?**
A. I said that I was applying for the general apps, application support.
**Q. Would that be SAP application?**

Page 119

A. No.
**Q. Would that be an infrastructure application?**
A. Infrastructure and other applications, yes.
**Q. Thank you. I just needed that clarification.**
A. Sure.
**Q. All right. You also said that your discrimination claim was based in part on statistics. Where did you get your statistics?**
A. Some of the statistics that we had were from the Bureau of Labor; just Googling it and going on the internet.
**Q. So Bureau of Labor. Do you know what year?**
A. No.
**Q. Do you know what job descriptions?**
A. No.
**Q. Do you know --**
A. I don't recall.
**Q. And that's how you came up with TCS has 90 percent --**
A. It was over 90 percent. They were in the news. There was an article about it on the internet somewhere, and something about TCS and Infosys having predominantly -- it was the size of their

Page 120

workforce and the percentage of their workforce. You know, what percentage was Indian and what percentage was not. They were both over 90 percent, I think, and I think TCS had 320,000 or so employees, and 93 percent of them were Indian or southeast --

**Q. I'm sorry. Do you know the name of the article that you're talking about?**

A. No, I don't.

**Q. Do you know what the basis is for those numbers contained in the article?**

A. No. I think -- I think the -- were doing just of like an IT perspective and what companies are doing IT and you know, world-wide. There were other companies, American and I think European and there was more than just the two Indian companies. I think there was four or five other companies that were in there. And it just showed the size of their workforce and their percentage of Indian employees versus other employees.

**Q. Are you familiar with any studies of the percentage of Indian employees versus other employees in the Northern California area?**

A. No.

**Q. Didn't see that. Are you familiar with the**



**percentage of Indian employees versus other employees in the IT positions around [redacted]**

A. No.

**Q. And again, just so I'm clear, you don't know what the basis is for these statistics or how they were calculated?**

A. No.

**Q. All right. Have you ever spoken with Christopher Slaight?**

A. Christopher Slaight? The name sounds familiar. But I don't recall.

**Q. He would be another named plaintiff in this action.**

A. Oh, okay. No, I've never spoken with him.

**Q. How about Steven Heldt?**

A. No, I've never spoken with him.

**Q. All right. Before we went on break, we had talked about your conversations with a lawyer named Jack Miano.**

A. John.

**Q. John Miano. Do we have -- do you believe that you sought advice from Mr. Miano?**

A. Everything that we talked about was related to the Save Jobs USA.



MS. LA MAR: I'm going to go ahead and show you a script prepared by your friend, [redacted] Mark it next in line, please.

(Deposition Exhibit No. 9 was marked for identification.)

THE WITNESS: What did you want to look at?

**Q. BY MS. LA MAR: Let's look at the first page. It appears that something has been added in brackets right under the line that says [redacted] (we're fighting back, man.) Do you see that paragraph?**

A. Yes.

**Q. Did you add that paragraph?**

A. I don't recall. I don't recall.

**Q. Did [redacted] have any involvement in Save Jobs?**

A. No.

**Q. Do you know where [redacted] ives?**

A. No idea.

**Q. Do you have a telephone number for [redacted]**

A. I think there was one attached to an email. I think she -- I'm not sure. Because we did speak on the phone, so I don't know if she called me, I don't recall.

**Q. What did you speak to her on the phone**



**about?**

A. We had a conversation. She introduced herself, found out about me, and you know, said she was writing the script and would it be okay if she sent me some of the script, or what she had, a page or two, and if I would provide technical assistance.

**Q. Okay. But you remember editing this script, do you not?**

A. I remember doing some edits. But I didn't do wholesale edits. So I don't recall doing that.

**Q. Did you have a conversation with her about Jack Miano -- or John Miano?**

A. I think at the time, I think we may have discussed, you know, we're suing and who the lawyer was. I may have mentioned his name, but I don't recall.

**Q. Did you tell her that John Miano said you can sue TCS for discrimination based on national origin?**

A. No. Well, I don't recall. I don't recall saying that. This would have been a hypothetical script that she was writing.

**Q. So this is hypothetical, it just happens that the name is very similar to the lawyer that you retained for Save Jobs?**

They just got here and they were on a visa.
**Q. Okay. But you're saying in this particular paragraph, you say that "I was replaced by an H-1B worker supplied by management services company." Is that a statement about July 2014 or is it a statement that you believe to be accurate on April 15th, 2015?**
A. No. That was -- it says I was notified. That's -- I was notified that I was going to be replaced.
**Q. It says, '[redacted] notified me that I was being fired and that I was being replaced."**
A. Yes.
**Q. So in July 2014, you were saying that [redacted] told you that you're fired and you're being replaced by an H-1B worker; is that correct?**
A. Yes, correct.
**Q. Who told you that?**
A. The manager who was -- at the time was [redacted]
**Q. [redacted] told you that?**
A. Yes. They didn't say fired. They said you're being severed, but --.
**Q. Did anyone tell you that if you refused to train your replacement, that you would be**

Page 133

**terminated?**
A. Yes. There was a document to that effect. I can't find it. But in the meetings, they said that you were expected -- as part of the severance package, you were expected to train your replacement, to do knowledge transfer with your replacement, to provide all assistance and help and documentation, and perform to the company's ethics and standards, and that was a condition of employment until your separation date.
**Q. And this is from [redacted] again?**
A. Yes.
**Q. None of this comes from TCS; is that right?**
A. Correct.
**Q. None of these statements came from TCS?**
A. Correct.
**Q. You again don't know who your, quote/unquote, "replacement" was from TCS; is that correct?**
A. I don't recall the two gentlemen's names that I worked with.
**Q. You now believe that those two gentlemen replaced you in your job's entirety?**
**MR. KOTCHEN: Objection; misstates his testimony.**

Page 134

**Q. BY MS. LA MAR: I'm asking.**
A. They replaced me for the -- they were only -- in the past, and as far as I know to this day -- I don't know -- whenever somebody comes, we've been dealing with H-1B employees from India about from 1999. And every time they would come and they would be assigned an application, just one. And that's all they worked on. They have become very proficient and expert at what they were doing. That had been my experience and it's probably still going on today. I don't know.
But very rarely -- I can't even remember a time when they were assigned multiple applications. So it was always one. So I assumed that -- I trained these two gentlemen on one application. And the woman back in India, just the one application. They didn't ask about any other applications and they weren't responsible for any other applications. So they replaced me as primary on the one application out of the 24 or -5 I was supporting.
**Q. And was this application bigger than the other 24 or 25 that you were supporting?**
A. No. It was a technical application, but it was fairly small.
**Q. Okay. About how much of your time did you**

Page 135

**spend on that application?**
A. Once it was installed, a couple hours a month.
**Q. All right. You filed a Department of Labor complaint. Correct?**
A. Correct.
**Q. And you filed it at the end of April 2015; is that right?**
A. That sounds right. That area. I don't remember the exact month.
**Q. It was after you filed this affidavit, correct?**
A. I wouldn't -- I would have to look at -- I don't know. All that time frame I was doing a lot of stuff.
**Q. What were you doing?**
A. I was trying to find another job, I was with [redacted] I was working on my resume, I was attending some other school class. I was getting prepared, so I was, you know, I had my family, my grandkids.
**Q. Would you ever move out of the state of California?**
A. Did I?
**Q. No. Would you be willing to move out of**

Page 136

I was in the IOC, and wanted to schedule some meetings, even meet and greet. That was never accomplished. They were at the Rivergrade facility, [redacted] Rivergrade facility about 65 miles away. And we worked with remote access.

**Q. Looking now at Paragraph 20, it says, "Tata had numerous openings for positions on Mr. Buchanan's team as well as for other positions servicing [redacted] What were those positions?**

A. The other positions they opened?

**Q. The numerous openings for positions on your team?**

A. It would have been the same thing. IT specialist, essentially, whatever Tata calls it. I don't know.

**Q. You believe Tata had an equivalent position to IT specialist and there was numerous openings?**

A. Yes. They had to be.

**Q. Openings that were not filled by existing Tata employees or openings that they were hiring outside of their existing employees for?**

A. Openings that were not filled and that they were going to have to hire for. 'Cause we had, like I said, anywhere from 25 to 35 people on the team supporting 7- or 900 apps, whatever it was. They



were going to have to fill those positions, and you know, hire people to do it.

**Q. They didn't have any existing employees to do it as far as you know?**

**MR. KOTCHEN: Objection; lack of foundation.**

**THE WITNESS: No.**

**Q. BY MS. LA MAR: By the way, do you know how big Tata's workforce was in total in servicing [redacted]**

A. I had heard that the initial workforce, by [redacted] he said approximately 400 or so. He said they were just getting ramped up. They were bringing people in. So they -- I don't know, because all of the people that were severed by [redacted] weren't replaced just by TCS. Some were replaced by Infosys, but they said at the time it was approximately 400 and growing.

**Q. Sitting here today, do you have any idea how many TCS personnel are servicing [redacted]**

A. No. I do know that TCS was trying to -- I had heard that they had -- for every two they had here, they had one back in India, supporting. And they were trying to reverse that. They were trying to have for every one here, they were trying to have two back in India supporting, but I have no idea



what the number is.

**Q. Going down, it says "Of the 28 individuals originally working for [redacted] on Mr. Buchanan's team, Tata hired only five of them."**

**MR. KOTCHEN: Where are you, what paragraph?**

**MS. LA MAR: 20. Next line.**

**After this question we'll change the tape.**

**THE WITNESS: Okay.**

**Q. BY MS. LA MAR: Is that an accurate statement?**

A. As far as I know at the time, it was.

**Q. Who are the South Asians, the three South Asians that you now say TCS hired from your team?**

A. [redacted]

**Q. South Asian?**

A. Oh. You mean from India?

**Q. Well, I guess I'm asking what you mean. It says "Three of these individuals Tata hired were South Asian, all from India. The other two were Korean and Vietnamese."**

A. Yeah. Okay. So Indian and Korean and a Vietnamese. Yeah. I don't know the two other Indian names. They were on the team.

**Q. On your team?**



A. They were on the team but I forget the names. I know [redacted] s the only one, because I worked closely with [redacted] all the time. And the other two were [redacted] from Korea. And I heard, but I can't verify, I never talked to him, [redacted] who was Vietnamese.

**Q. This is all you know that TCS hired, correct?**

A. From my group. That's all I know, yes. Yeah.

**Q. It says between July 2014 -- I'm looking at Paragraph 23, "In February, 2015, Mr. Buchanan observed the vast majority of Tata employees were South Asian, including those located in the United States." You've only observed the ones located in the United States, correct?**

A. Yes.

**Q. You didn't go to India?**

A. No.

**Q. Okay. Then we go back to this, "For at least three reasons, it's apparent that Tata was interested in hiring primarily South Asians to service [redacted] and other organizations in the United States."**

A. Probably the same as the three reasons --

**Q. Actually, I was just looking. It's different. First, despite your excellent qualifications, they were dismissive of you and never contacted you about your application. You don't know who they hired from the job fair, do you?**
**MR. KOTCHEN: Objection; asked and answered.**
**THE WITNESS: No.**
**Q. BY MS. LA MAR: And so when you made this statement, it's basically just that they were dismissive of you, in your opinion, correct?**
A. Yes. Well, and also I knew that -- well, from my team, they just hired the South Asians and Asian people.
**Q. Well, is the problem Asians in total or Indians?**
A. Mostly Indian.
**Q. So the Asians who are non-Indian, you're representing them, correct?**
A. No.
MR. KOTCHEN: Objection; calls for legal conclusion.
**Q. BY MS. LA MAR: You're a class representative, correct?**
A. Yes.

Page 169

**Q. And so you are sitting here today and you filed your suit because you are seeking to protect everybody who is a member of your proposed class, correct?**
A. Yes.
**Q. Okay. And so does your proposed class, the people you're trying to protect, does it include everybody other than Indians?**
**MR. KOTCHEN: Objection; calls for legal conclusion.**
**THE WITNESS: I have no idea who would be in the class.**
**Q. BY MS. LA MAR: Well, do you consider that TCS favors Asians as a whole or just Indians?**
**MR. KOTCHEN: Objection; calls for legal conclusion.**
**Q. BY MS. LA MAR: You can answer.**
**MR. KOTCHEN: Assumes facts not in evidence.**
**THE WITNESS: I have no idea. I couldn't speculate on it.**
**Q. BY MS. LA MAR: You can't speculate?**
A. (Witness shakes head.)
**Q. We'll get to your complaint in a moment then.**

Page 170

**So Paragraph 26, you say, "Second, even though there were interested qualified non-South Asian applicants for positions servicing [redacted] Tata chose instead to delay taking primary responsibility for [redacted] T needs while it attempted to secure South Asian employees to fill those positions." What is your factual basis for that statement?**
A. Because they had -- they were supposed to be here in September and they had legal issues. They -- a lot of their people that they tried to bring over were delayed because of -- they couldn't clear FBI background checks and so instead of reaching out and trying to fill those positions with the people that were already doing it, they chose to delay having people onsite and bringing over the people that they had already chosen and wanted from India.
**Q. So are you under the impression that TCS hired people in India for the specific purpose of coming to work at [redacted]**
**MR. KOTCHEN: Objection; lack of foundation.**
**THE WITNESS: I don't know.**
**Q. BY MS. LA MAR: Is your complaint here that they should have hired existing [redacted] employees? Is**

Page 171

**that what you're complaining about in paragraph 26, that they should have hired existing [redacted] employees instead of utilizing their own existing workforce?**
A. They could have made an effort for positions that they had open, that they couldn't get people in. That's the business decision that they made. But I mean it didn't make any sense to delay a contract that you've signed when there's personnel available.
**Q. Who told you they delayed the contract?**
**MR. KOTCHEN: Objection; asked and answered.**
**MS. LA MAR: I don't think so.**
**THE WITNESS: [redacted] management.**
**Q. BY MS. LA MAR: Who in [redacted] management?**
A. [redacted]
**Q. Where is [redacted] now? Is he still there?**
A. He's CIO.
**Q. Okay.**
A. They had to say something, because people were told they were going to be there and they weren't showing up. So it was like where is everybody at?
**Q. Do you have any specific knowledge of that**

Page 172

**or just you know that they didn't show up?**
A. What I was told --
MR. KOTCHEN: Objection. Go ahead.
THE WITNESS: What I was told by our management and executives, [redacted]
**Q. BY MS. LA MAR: You don't have any independent knowledge other than what you were told by the executives, right?**
A. Yes.
MR. KOTCHEN: Objection; form.
THE WITNESS: Well, they didn't show up either when they were supposed to. So I have that knowledge.
MS. LA MAR: I'll get to that. We need to change the tape.
THE VIDEOGRAPHER: This is the end of Tape 2 with the continuing testimony of Brian Buchanan, Volume I. We are off the record at 2:45 P.M.
(Recess taken.)
(Mr. Otto leaves the conference room.)
THE VIDEOGRAPHER: This is the beginning of Tape 3 with the continuing testimony of Brian Buchanan, Volume I. We are on the record at 2:56 P.M.

Page 173

**Q. BY MS. LA MAR: So looking at Paragraph 27 now of the same exhibit we were looking at prior to break, it says here that Tata chose to replace you with numerous less experienced South Asian individuals up to potentially 25. What do you mean by that?**
A. Because like I said earlier, that it had been my experience that every time we --[redacted] brought one person in, it was -- they were dedicated to an application. So I was supporting approximately 25 applications, and had they followed their norm, they would have brought in up to 25 to support these applications.
**Q. Do you know if they brought in 25 to support --**
A. I have no idea.
**Q. -- the applications? You have no idea?**
A. I have no idea. But that would not be cost effective.
**Q. You had said that TCS employs 300,000 in the U.S.; is that right?**
A. No.
MR. KOTCHEN: Objection.
THE WITNESS: 300,000 plus world-wide. There was a big article --

Page 174

**Q. BY MS. LA MAR: I don't mean to cut you off but I am just trying to get an answer to my question. So are the 300,000 employees in the U.S. or are they world-wide?**
A. They were world-wide.
**Q. How many employees are employed in the U.S. by TCS, as far as you know?**
A. I don't have that information.
**Q. So when you said that 95 percent of those 300,000 employees were Indian, did that reference their entire world-wide workforce?**
A. Yes.
MR. KOTCHEN: Objection.
**Q. BY MS. LA MAR: You said that TCS brought on 400 employees at [redacted] s that right?**
A. That's what [redacted] had said at the 25th diamond club dinner. He said approximately that number.
**Q. Do you know how many remained in the U.S. and how many were here for just training?**
A. No.
**Q. So you don't know how many TCS employees were actually based in the U.S. for [redacted]**
A. No.
**Q. Now you said that there were FBI background**

Page 175

**checks for visa workers?**
A. That's what we were told.
**Q. When do you need an FBI background check to be a visa holder?**
A. I don't know. I didn't ask. I didn't speculate. These what we were told. I didn't say anything about it. It was just what I was told.
**Q. By [redacted] management again?**
A. Yes, some of the management.
**Q. Do you know if -- we've talked a lot about what [redacted] anagement seems to have relayed to you. Other than getting your information from [redacted] management, did you ever check what [redacted] management was telling you?**
**MR. KOTCHEN: Objection, form.**
**THE WITNESS: For the most part, no. Unless what they said, then they followed up with either action or communication.**
**Q. BY MS. LA MAR: Did they follow up with action or communication on the FBI background checks for visas?**
A. The ways they followed up with that was they delayed the arrival of the personnel. So --
**Q. [redacted] delayed the arrival of personnel or TCS delayed the arrival of personnel?**

Page 176

**entities outside of TCS, did you not?**
A. Yes.
**Q. And did they all respond to you?**
A. Not all, no.
**Q. Did they all invite you in for an interview?**
A. Not all, no.
MR. KOTCHEN: Objection; asked and answered.
**Q. BY MS. LA MAR: In fact, did any employer at the career fair call you in for an interview?**
A. No.
**Q. Did any of them send you a thank you but no thanks letter?**
A. No. They said keep hitting our website and, you know, apply if any positions come up that --
**Q. They told you that at the job fair?**
A. Some told me that. I got some responses, you know, saying nothing at this time, you know, but check back or whatever.
**Q. Did you get email responses?**
**MR. KOTCHEN: Objection; asked and answered.**
**MS. LA MAR: Actually, he hasn't answered**



**and they weren't produced. So let's find out.**
**MR. KOTCHEN: You asked about his responses this morning, that he received.**
**MS. LA MAR: He just said he got some.**
**THE WITNESS: I got from Accenture.**
**MR. KOTCHEN: Right.**
**Q. BY MS. LA MAR: Any others?**
**MR. KOTCHEN: Asked and answered.**
**THE WITNESS: No. I don't think so.**
**Q. BY MS. LA MAR: So when you just said you got responses, you were referring to Accenture?**
A. Accenture.
**Q. Correct?**
A. Yes.
**Q. All right. With respect to your asserted damages for TCS's inability to -- or unwillingness to hire you, okay, what do you estimate your loss to be?**
**MR. KOTCHEN: Objection; calls for legal conclusion.**
**THE WITNESS: I don't know. We'd have to figure it out.**
**Q. BY MS. LA MAR: Well, earlier today you said that you had a loss of wages.**
A. Yes.



**Q. What is that?**
A. Well, it would be just not only just wages, but it would be, you know, pension, 401(k), medical, vacation.
**Q. Do you believe TCS offers those things?**
A. I do. I don't know to what extent.
**Q. So when you're saying you have a loss here, are you basing your loss on what you earned at [redacted] or are you basing your loss on what pay and benefits TCS provides to U.S. workers?**
A. I don't have those statistics so it would be based on, you know, what I was earning and my classification.
**Q. Okay. So other than -- we kind of have a stay on the dollar amount for damages anyway. But other than loss of wages, what other category of injury do you believe you suffered?**
A. The benefits package.
**Q. Anything else?**
A. I don't know. You know, just be -- I don't know. At this point, I don't know.
MS. LA MAR: Okay. Give me two minutes.
THE VIDEOGRAPHER: The time is 3:40 P.M. We're off the record.



(Recess taken.)
THE VIDEOGRAPHER: We are on the record at 3:42 P.M.

EXAMINATION

BY MR. KOTCHEN:
**Q. Mr. Buchanan, I have just a couple of questions to follow up on some of the questions you were asked earlier today. With respect to Exhibit 14, which is your EEOC charge, in addition to the work that you did individually to prepare this charge, did you also rely in part on the assistance of counsel?**
A. Yes. I did.
**Q. There is a paragraph, Paragraph 6 of Exhibit 14 talks about local hiring, discrimination in local hiring. I just want to make sure we're clear what you meant by local hiring. Do you mean by local hiring the discrimination of local hiring is the discrimination Tata has in favor of individuals who are residing in the United States who are of South Asian descent?**
**MS. LA MAR: Objection to the form of the question.**
**THE WITNESS: Um --**

**Q. You do not?**
A. I don't recall the name.
**Q. Please look at Paragraph 23, 24, and 25 of your Complaint.**
A. Okay.
**Q. Focusing on the second sentence of Paragraph 23, it reads, "among these senior managers, there is a culture of hostility towards a non-acceptance of American workers." Do you see that?**
A. Yes.
**Q. Do you have any facts to support that statement?**
A. I -- I believe that -- I don't have any facts to support that statement offhand. But maybe the other two people in the lawsuit had facts to that.
**Q. All right. Let's go on to the next one, next sentence. "These senior managers have resisted efforts to increase racial and/or national origin diversity among Tata's workforce." Do you see that? Do you have any facts to support that sentence?**
**MR. KOTCHEN: Also object, lack of foundation.**
**THE WITNESS: Just the statistics, you**

Page 225

**know --**
**Q. BY MS. LA MAR: That we discussed earlier today.**
A. Yeah.
**Q. Fair enough. Moving down to Paragraph 24, it basically says, [redacted] has served as the vice-president of Human Resources and oversees the talent acquisition unit. Do you know if that's true?**
A. No, I don't know if that's true. I didn't deal with him.
**Q. Do you have any facts to -- strike that. I'm not going to ask that question now. It goes on to say, '[redacted] has instructed the recruiters within the talent acquisition unit to focus primarily on hiring Indians for the positions in the United States." Do you have any facts that would support that statement?**
A. Just the statistics that we went over earlier.
**Q. Just the statistics alone? Nothing else?**
A. Well, there were, again, you know, documents on the internet that people had basically witnessed, or said this is true.
**Q. That talked about [redacted]**

Page 226

A. I believe so. Saying that -- I may be wrong, but I thought I saw something that -- I don't recall the name, but it was senior VPs that essentially said this.
**Q. Do you even know if an [redacted] ever worked for TCS?**
A. I have no idea.
**Q. So you don't know whether this statement is accurate or not, do you?**
A. No, I don't.
**Q. Moving on to paragraph 25, it says, '[redacted] has expressed his dislike for American workers." Do you have any factual basis for that statement?**
A. No.
**Q. It says, "He has also stated that he believes Indians were smarter and better qualified than Americans." Do you have any basis for that statement?**
A. No.
**Q. Are you aware of on at least one occasion [redacted] gave explicit instructions to two recruiters in the talent acquisition unit to hire only Indians rather than Americans for positions in the United States?**

Page 227

A. Not firsthand knowledge. I don't know if, you know, the other people involved have these -- knowledge of this.
**Q. But you don't have any knowledge?**
A. No.
**Q. Going on, similarly, while Tata typically allows South Asian employees to apply for and take different positions within different Tata business units, referred to as verticals, Tata typically does not allow the comparative few, quote, "American hires," close quote, as locally hired non-South Asian employees are commonly referred to within Tata to apply for or take positions outside of the business unit. Do you have any information on that?**
A. Not personally, no.
**Q. So again, if there is any factual basis, it comes from the other two employees; is that right?**
A. As far as --
MR. KOTCHEN: Objection; misstates his testimony. Go ahead.
THE WITNESS: I don't know.
**Q. BY MS. LA MAR: You don't know?**
A. Well, as far as what this says here, if the facts -- if it's factual from the other two guys, yes. I've never --

Page 228