# Exhibit 38

Brian Buchanan
31300 Arabasca Circle
Temecula, CA 92592

May 14, 2015

U.S Equal Employment Opportunity Commission
Roybal Federal Building
255 East Temple St., 4th Floor
Los Angeles, CA 90012

*Re: Buchanan v. Tata Consultancy Services, Ltd.*

Dear Sir or Madam:

My name is Brian Buchanan. Enclosed, please find my EEOC Charge for the above referenced matter and supporting documentation. Please copy my attorney Michael von Klemperer on all correspondence at: Kotcen & Low LLP, 1745 Kalorama Rd. NW, Ste. 101, Washington, DC 20009, mvk@kotchen.com.

Sincerely,

Brian Buchanan

Enclosures

Δ π EXHIBIT 14
Deponent Buchanan
Date 9-21 Rptr. JS
WWW.DEPOBOOK.COM

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented to: Agency(ies) Charge No(s):

___ FEPA
_X_ EEOC

________________________________ and EEOC
State or local Agency, if any

| Name (indicate Mr. Ms. Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Brian Buchanan | (951) 318-4056 | 1/7/56 |

| Street Address | City, State and ZIP Code |
|---|---|
| 31300 Arabasca Cir. | Temecula, CA 92592 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Tata Consultancy Services Ltd. | +501 | (818)333-1650 |

| Street Address | City, State and ZIP Code |
|---|---|
| 303 N. Glenoaks Blvd. Ste. 850 | Burbank, CA 95054 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (*Check appropriate box(es).*)

_X_ RACE ___ COLOR ___ SEX ___ RELIGION _X_ NATIONAL ORIGIN

___ RETALIATION ___ AGE ___ DISABILITY ___ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 7/14 Latest 2/15

___ CONTINUING ACTION

THE PARTICULARS ARE (*If additional paper is needed, attached extra sheet(s)*):

Please see attached document.

Please copy Mr. Buchanan's attorney Michael von Klemperer on all correspondence at:
Kotchen & Low LLP
1745 Kalorama Rd. NW, Ste. 101
Washington, DC 20009
mvk@kotchen.com, (202) 471-1995

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLANANT

5.14.15 — *Date*

[signature] — *Charging Party Signature*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*)

# UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Brian Buchanan

Complainant,

v.

Tata Consultancy Services, Ltd.

Respondent.

## ATTACHMENT TO EEOC CHARGE

Brian Buchanan states as follows with respect to this matter against Tata Consultancy Services, Ltd. ("Tata"):

1. Mr. Buchanan is a citizen of the United States of America, born in the Unites States, and of American national origin and ancestry. He is Caucasian. He was at all material times a resident of the United States. Mr. Buchanan is a member of a protected class, as recognized by Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, *et seq.*). Mr. Buchanan has advanced training and job experience in information technology services and project management, and has served in supervisor and manager roles at various times in his career.

2. Tata is a business that provides consulting, information technology ("IT"), and outsourcing services. Tata is headquartered in Mumbai, India and operates in the United States. Tata has approximately 19 offices in the United States, including in Burbank, California. Tata has over 305,000 employees worldwide, making it the third largest IT employer in the world. Tata is a subsidiary of the Tata Group, also headquartered in Mumbai, India. Tata made over $13 billion in revenue in the past fiscal year. Tata derives over 50% of its revenue from North America, the vast majority of which is from the United States.

3. Tata has about 14,000 employees in the United States, approximately 95% of whom are of South Asian race and national origin.[1] By comparison, only about 1-2% of the United States population is South Asian, with a similar proportion of IT workers being South Asian.

[1] As used herein, "South Asian race and national origin," "South Asian workers," and the like refers to individuals of Indian, Bangladeshi, and Nepali ancestry, ethnicity, and/or birth.

4. Tata's grossly disproportionate workforce is the result of a systematic pattern and practice of discrimination against non-South Asian job applicants and employees. Tata has used and continues to use a company-wide employment policy and practice of recruiting, hiring, retaining, placing, and promoting South Asian employees (including South Asian employees with H-1B visas, L-1 visas, B-1 visas, other visas, or lawful permanent resident status) over non-South Asian employees (or job applicants) with the same or better qualifications.

5. Tata achieves its discriminatory goals in at least three ways. First, Tata employs in the United States a large number of South Asian (primarily Indian) visa workers, including individuals with H-1B, L-1, B-1, and other visas. The United States' H-1B visa system is intended to be used to bring specialized foreign workers to the United States when there are insufficient United States workers to perform the jobs at issue. Tata is consistently one of the top three H-1B sponsors in the United States. For example, in 2013, Tata sponsored 8,701 new H-1B visas. In 2012, Tata sponsored 6,692 new H-1B visas. In 2011, Tata sponsored 5,365 new H-1B visas. Similarly, L-1 visas are intended to be used to bring management level employees to the United States for temporary assignments. Between 2002 and 2011, Tata sponsored 25,908 L-1 visas. On information and belief, Tata sponsored, all, or the vast majority, of these visas for South Asian workers. As illustrated below, Tata favors the employment of South Asian visa-holders over the employment of non-South Asian Americans.

6. Second, as also illustrated below, Tata discriminates in "local hiring," *i.e.*, even when Tata hires non-visa dependent individuals who reside locally in the United States, such persons are disproportionately South Asian.

7. Third, for the relatively few non-South Asian workers that Tata hires, it disfavors these individuals in its employment decisions, including, for example, placement, promotion/demotion, and termination/retention decisions.

8. The end result of Tata's policy of discrimination is a workforce that consists of approximately 95% South Asians, a number grossly disproportionate with the demographic makeup of the United States (which consists of approximately 1-2% South Asians).

9. Mr. Buchanan's experience is representative of Tata's discrimination against non-South Asians.

10. Mr. Buchanan is an experienced and highly skilled IT professional with considerable academic and work experience. Mr. Buchanan has worked in the IT industry for over thirty years, starting in 1982.

11. Mr. Buchanan began working for Southern California Edison ("SCE")[2] in 1986 as a networking specialist. Over his nearly 30 years with SCE, Mr. Buchanan filled many roles in SCE's IT department, including providing system availability, reliability, and data integrity for several IT and business unit projects, leading major and minor application implementation

---

[2] SCE is the primary electricity supplier for southern California and employs about 14,000 people. It is a subsidiary of Edison International.

projects, and ensuring compliance with government processes, contracts, and regulations. In addition, Mr. Buchanan performed implementation, configuration, maintenance, and upgrades of enterprise server applications, network and management systems, and security systems, among other roles. In or around 2003, Mr. Buchanan was promoted to IT Specialist 4 – a senior IT position.

12. In that role, Mr. Buchanan served on SCE's Infrastructure General Application Support Team ("Mr. Buchanan's Team" or "the Team"), personally supporting approximately 25 different applications necessary for SCE's day-to-day business. These applications included, for example, an enterprise document management application, a records management application, a GIS mapping application, a building management system, an HR call recording application, IT Help Desk Apropos, and a SVY Vovici survey application.

13. Mr. Buchanan consistently received positive performance reviews from SCE and was never subject to disciplinary measures regarding performance or otherwise.

14. In or around May 2012, SCE decided to restructure its IT department. SCE decided it would drastically reduce the number of workers it directly employed and, in large part, contract-out its IT needs. By early 2014, SCE decided it would retain Tata to perform the bulk of its IT needs.

15. On July 21, 2014, SCE announced that Mr. Buchanan and about 400 others would be terminated. However, SCE asked Mr. Buchanan and many other employees if they would remain with the company for several more months to help perform a "knowledge transfer" – *i.e.*, training their replacements from Tata. Mr. Buchanan agreed to remain with SCE through January 9, 2015.[3] Under the terms of the SCE-Tata contract, Tata was scheduled to take primary responsibility for most of SCE's IT needs by December 2014.

16. As part of that transition, Mr. Buchanan was told that his Team, consisting of around 28 individuals, was to be terminated and all of the positions filled by Tata employees.

17. By late summer or early fall 2014, it became apparent that Tata would not be able to meet the December 2014 deadline of assuming the SCE work. Accordingly, the December 2014 deadline was pushed back. On or about November 3, 2014, SCE asked Mr. Buchanan to extend his contract until February 6, 2015. Though Mr. Buchanan asked for a longer extension, SCE refused to extend his contract beyond February 6, 2015.

18. By January 2015, Tata had assigned only two workers to Mr. Buchanan's Team in California. Both of these Tata employees were South Asian from India and in the United States on visas. Mr. Buchanan was tasked with training these employees, who would eventually take over some of his responsibilities. These employees had very little or no relevant experience, and performing the "knowledge transfer" was a challenge. For example, when an SCE server stopped working, Mr. Buchanan had to supervise these individuals' repair efforts. During this process,

---

[3] This employment end date was later extended into February 2015, after Tata was unable to meet its deadlines for taking primary responsibility of SCE's IT needs.

Mr. Buchanan had to repeatedly instruct them where and how to look for issues on the server, including the very basic steps of checking application log files, web log files, and the event viewer. log.

19. In late October 2014, Mr. Buchanan attended a job fair in Arcadia, California, which SCE had organized for its soon-to-be terminated employees. Tata also attended the job fair, manning a booth at which it met with and sought potential employees. The Tata booth was staffed with several individuals, all of whom were South Asian. Mr. Buchanan attended the fair and spoke with an individual at the Tata booth who identified himself as a Tata regional manager. This Tata representative informed Mr. Buchanan that Tata was hiring for positions servicing SCE, as well as for other positions in the Greater Los Angeles area unrelated to SCE. Mr. Buchanan gave the manager a copy of his resume and told him he was interested in positions with Tata servicing SCE, and in other positions with Tata. The manager said that Tata would contact him if Tata was interested in hiring him. Mr. Buchanan observed that the manager was dismissive and spent little time speaking with him. In comparison, Mr. Buchanan observed that the Tata employees spent considerably more time speaking with South Asian applicants and spoke to them in Hindi (an Indian language) about available positions. Tata did not hire Mr. Buchanan and did not contact him after the job fair, despite his excellent qualifications and considerable experience.

20. Tata had numerous openings for positions on Mr. Buchanan's Team, as well as for other positions servicing SCE. Tata also had openings for other positions in the United States that did not involve SCE. Of the twenty-eight individuals originally working for SCE on Mr. Buchanan's Team, Tata hired only five of them. Three of these individuals Tata hired were South Asian, all from India. The other two were Korean and Vietnamese. Tata replaced the other twenty-three original Team members with South Asians. Likewise, beyond Mr. Buchanan's Team, Tata replaced the vast majority of displaced SCE IT workers with South Asians.

21. Given his considerable experience and skill, Mr. Buchanan personally supported approximately 25 software applications for SCE. Despite his vast experience performing these tasks, Tata did not hire Mr. Buchanan. Rather, Tata hired less experienced South Asian employees to perform those tasks. Each was assigned to support approximately one application. Accordingly, on information and belief, Tata assigned numerous individuals, up to potentially 25, to fulfill the role Mr. Buchanan was performing single-handedly.

22. Despite the availability of qualified non-South Asian workers, Tata was not able to meet its deadline to take primary responsibility for SCE's IT needs by February 2015 because Tata was unable to secure a sufficient number of its preferred South Asian employees. Additionally, many of the South Asian employees it did secure were unprepared to take over responsibilities from out-going SCE employees. Because of these delays, SCE asked Mr. Buchanan to extend his contract for another month in early 2015. Mr. Buchanan asked that his contract be extended until June, but SCE refused. On February 6, 2015, Mr. Buchanan's employment with SCE ended. As of February 6, 2015, Tata remained unable to take over primary responsibility for SCE's IT needs.

23. Between July 2014 and February 2015, Mr. Buchanan observed that the vast majority of Tata's employees were South Asian, including those located in the United States.

24. For at least three reasons, it was apparent that Tata was interested in hiring primarily South Asians to service SCE and other organizations in the United States.

25. First, despite his excellent qualifications and considerable experience, Tata was dismissive of Mr. Buchanan at the job fair, and never contacted him about his application. In contrast, Tata spent considerably more time with, and showed considerably more interest in, South Asian applicants at the job fair.

26. Second, even though there were interested, qualified non-South Asian applicants for positions servicing SCE, including Mr. Buchanan, Tata chose instead to delay taking primary responsibility for SCE's IT needs, while it attempted to secure South Asian employees to fill those positions.

27. Third, despite Mr. Buchanan's qualifications and experience for the roles he was already performing at SCE, Tata chose to replace him with numerous less-experienced South Asian individuals, up to potentially 25, rather than hire him – a single person – to fulfill the same roles.

28. Tata's adverse actions against Mr. Buchanan include, but are not limited to, failing to hire him.

29. The effect of the practices complained of above has been to deprive Mr. Buchanan, and other non-South Asian individuals, of equal employment opportunities because of their national origin, race, ethnicity, and ancestry as non-South Asians.

30. The unlawful employment practices complained of above were intentional, and furthermore, were done with malice and reckless indifference to Mr. Buchanan's (and other non-South Asians') federally protected rights.

31. As a proximate result of Tata's willful and unlawful discrimination, Mr. Buchanan, and other non-South Asians, have lost jobs, job opportunities (through Tata's failure to hire these non-South Asians), wages, benefits, and other financial and non-financial injuries, and have suffered emotional distress.

32. Tata's policies, procedures, and actions described above have had a disparate impact on non-South Asian individuals, who are treated adversely as a result of these activities.

33. In submitting this charge, Mr. Buchanan requests the EEOC issue him a Right to Sue Notice, and permit him to pursue all damages and remedies available at law, on his own behalf, and on behalf of a class of individuals similarly affected by Tata's discriminatory employment practices.

Dated: May 14, 2015

Brian Buchanan