MICHELLE M. LA MAR (SBN 163038)
mlamar@loeb.com
PATRICK N. DOWNES (SBN 186461)
pdownes@loeb.com
LAURA A. WYTSMA (SBN 189527)
lwytsma@loeb.com
ERIN M. SMITH (SBN 235039)
esmith@loeb.com
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA  90067
Telephone: 310.282.2000

Attorneys for Defendant
TATA CONSULTANCY SERVICES, LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STEVEN HELDT, BRIAN BUCHANAN, and CHRISTOPHER SLAIGHT<br><br>Plaintiffs,<br><br>v.<br><br>TATA CONSULTANCY SERVICES, LTD.,<br><br>Defendant. | Case No.:  4:15-cv-01696-YGR<br><br>Hon. Yvonne Gonzalez Rogers<br><br>**TATA CONSULTANCY SERVICES, LTD.'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**<br><br>Date:        May 16, 2017<br>Time:       2:00 p.m.<br>Location:   Ctrm. 1, 4th Flr., Oakland<br><br>Complaint Filed:      April 14, 2015 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 2

     A.     Overview Of TCS' Business Model .................................................................. 2

     B.     TCS Is Committed To Equal Employment Opportunity ..................................... 3

     C.     TCS' Lawful Use Of The United States Visa System Is Undisputed .............. 4

     D.     Existing Employees Receive Priority For Open Assignments ......................... 5

     E.     New Employees Are Hired Only When An Open Assignment Cannot Be
            Filled By An Existing Employee ...................................................................... 6

     F.     Benching And Termination Practices ................................................................. 9

     G.     The Named Plaintiffs' Claims ......................................................................... 10

ARGUMENT .......................................................................................................................... 11

I.     Plaintiffs Bear A Heavy Burden in Seeking Class Certification, Which Is A Narrow
     Exception To The Usual Rule That Plaintiffs Should Litigate Their Own Claims. ............. 11

II.     Plaintiffs Cannot Satisfy The Required Elements Of Rule 23(a) .............................. 11

     A.     Plaintiffs Cannot Prove Numerosity Or The Existence Of An Ascertainable
            Class ............................................................................................................... 11

     B.     Plaintiffs Cannot Prove Commonality ............................................................ 14

            1.     The Statistical Evidence Does Not Support Commonality ............................. 14

            2.     The Anecdotal Evidence Does Not Support Commonality ........................... 18

            3.     The Alleged Common "Policies" Identified By Plaintiffs Do Not
                  Exist, And Nonetheless, Do Not Support Commonality Under A
                  Disparate Treatment Or Disparate Impact Theory ......................................... 19

     C.     Plaintiffs Cannot Prove Typicality .................................................................. 21

     D.     Plaintiffs Are Not Adequate Class Representatives ....................................... 21

III.     Plaintiffs Cannot Satisfy Their Burden Under Rule 23(b) or 23(c)(4) .................... 23

IV.     Plaintiffs' Belated Attempt To Conjure A Discovery Dispute And Shift To A
     Disparate Impact Model Fails ........................................................................................ 24

CONCLUSION ...................................................................................................................... 25

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................21, 23

5

*AT&T Mobility LLC v. Concepcion*,
6  563 U.S. 333 (2011) ...............................................................................................12

7
*Carter v. West Publ'g Co.*,
8  225 F.3d 1258 (1 th Cir. 2000) ...............................................................................22

9
*Cwiak v. Flint Ink Corp.*,
  186 F.R.D. 494 (N.D. Ill. 1999) .............................................................................12
10

*East Texas Motor Freight Sys. V. Rodriguez*,
11  431 U.S. 395 (1977) ...............................................................................................21

12
*Ellis v. Costco Wholesale Corp.*,
13  285 F.R.D 492 (N.D. Cal. 2012) ............................................................................24

14  *Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ..................................................................................11
15

*Everitt v. Marshall*,
16  703 F.2d 207 (5th Cir. 1983) ..................................................................................22

17
*Fleming v. Travenol Labs., Inc.*,
18  707 F.2d 829 (5th Cir. 1983) ..................................................................................22

19  *Frank v. United Airlines, Inc.*,
  216 F.3d 845 (9th Cir. 2000) ..................................................................................25
20

*Garrison v. Gambro, Inc.*,
21  428 F.3d 933 (10th Cir. 2005) ................................................................................25

22  *Gay v. Waiters' & Dairy Lunchmen's Union*,
  694 F.2d 531 (9th Cir. 1982) ..................................................................................16
23

24  *General Tel. Co. v. Falcon*,
  457 U.S. 147 (1982) ......................................................................................... *passim*
25

*Halliburton Co. v. Erica P. John Fund, Inc.*,
26  134 S. Ct. 2398 (2014) ............................................................................................11

27  *Harriston v. Chicago Tribune Co.*,
  992 F.2d 697 (7th Cir. 1993) ..................................................................................22
28

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

*Hazelwood School Dist. v. United States,*
    433 U.S. 299 (1977) ........................................................................................16

4

5

*Hines v. Widnall,*
    334 F.3d 1253 (11th Cir. 2003) ....................................................................22

6

*Keele v. Wexler,*
    149 F.3d 589 (7th Cir. 1998) ........................................................................14

7

8

*Klay v. Humana, Inc.,*
    382 F.3d 1241 (11th Cir. 2004) ....................................................................23

9

10

*Lewis v. Tobacco Workers' International Union,*
    577 F.2d 1135 (4th Cir. 1978) ......................................................................15

11

*Ortiz v. Hobby Lobby Stores, Inc.,*
    52 F.Supp.3d 1070, 1087-1088 (E.D. Cal. 2014) ........................................12

12

13

*Pacheco v. Mineta,*
    448 F.3d 783 (5th Cir. 2006) ........................................................................25

14

15

*Piva v. Xerox Corp.,*
    654 F.2d 591 (9th Cir. 1981) ........................................................................16

16

*Puffer v. Allstate Ins. Co.,*
    255 F.R.D. 450 (N.D. Ill. 2009) ...................................................................21

17

18

*Reid v. Lockheed Martin Aero. Co.,*
    205 F.R.D. 655 (N.D. Ga. 2001) ...........................................................18, 25

19

20

*Segar v. Smith,*
    738 F.2d 1249 (D.C. 1984) ...........................................................................15

21

*Senne v. Kan. City Royals Baseball Corp.,*
    315 F.R.D. 523 (N.D. Cal. 2016) .................................................................12

22

23

*Spaulding v. Univ. of Washington,*
    740 F.2d 686 (9th Cir. 1984) ........................................................................15

24

25

*Sprague v. Gen. Motors Corp.,*
    133 F.3d 388 (6th Cir. 1998) ........................................................................21

26

*Valentino v. Carter-Wallace, Inc.,*
    97 F.3d 1227 (9th Cir. 1996) ..................................................................23, 24

27

28

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional Corporations

iii

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
CASE NO. 4:15-cv-01696-YGR

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

*Vuyanich v. Republic Nat'l Bank*,
    723 F.2d 1195 (5th Cir. 1984) ................................................................22

4

5

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................... *passim*

6

*Webb v. Merck & Co.*,
    206 F.R.D. 399 (E.D. Pa. 2002) ................................................21

7

8

*Zenith Labs., Inc. v. Carter-Wallace, Inc.*,
    530 F.2d 508 (3d Cir. 1976) ................................................................21

9

10

**Statutes**

11

42 U.S.C. § 2000e-2(j) ................................................................15

12

42 U.S.C. §2000e-5(e)(1) ................................................................22

13

**Other Authorities**

14

F.R.C.P. 23 ................................................................1

15

F.R.C.P. 23(a) ................................................................11, 23, 24

16

F.R.C.P. 23(a)(1) ................................................................11

17

F.R.C.P. 23(a)(2) ................................................................14

18

F.R.C.P. 23(b) ................................................................11, 23

19

F.R.C.P. 23(b)(3) ................................................................23

20

F.R.C.P. 23(c)(4) ................................................................23, 24

21

22

23

24

25

26

27

28

1

## INTRODUCTION

Tata Consultancy Services, Ltd. ("TCS") is an information technology company headquartered in India—the world's largest source of technology industry employees. The vast majority of TCS' employees were hired in India, and are based in India. Under the visa program, TCS is authorized to utilize its India-based employees on projects in the United States. Plaintiffs do not dispute this; in fact, they concede that TCS' use of the visa program is lawful. However, plaintiffs argue that TCS' use of its existing employees pursuant to the visa program has produced a racially imbalanced workforce in the United States, and that such an imbalance is evidence of widespread discrimination.

Claiming a pattern and practice of discrimination based upon both disparate treatment and disparate impact theories, plaintiffs now seek to certify both a "hiring" class and a "termination" class.[1] Plaintiffs rely upon three forms of evidence in support of their motion, none of which satisfies the strict requirements of Rule 23.

First, plaintiffs rely upon a purported statistical analysis that is so deeply flawed, it is not actually an *analysis* at all. Having failed to control for any variable aside from race, plaintiffs' statistical expert opines that the percentage of South Asian persons working for TCS in the United States is "strongly consistent" with discrimination. He renders this opinion notwithstanding the obvious non-discriminatory explanation— that being the vast majority of TCS' workforce is hired from the Indian labor market, and is in the United States lawfully.

Bona fide statistical analyses of local hiring and termination decisions reveal no evidence of systemic discrimination. Hiring rates closely align with the availability of South Asian and non-South Asian applicants in local hiring pools. Termination rates among locally hired employees are racially neutral. Even so, because hiring and termination rates of South Asian and non-South Asian persons vary between applicant pools, job positions, locations, years and managers, this case is unsuitable for class treatment. Further, the selection of individuals for hiring or termination depends critically on an

---

[1] The Court has not yet decided plaintiffs' motion for leave to amend the complaint—pursuant to which plaintiffs now seek to pursue a theory of disparate impact after twice advising TCS and the Court that such a theory was not being pursued. Nonetheless, as TCS shows, plaintiffs have failed to identify any facially neutral policy upon which a disparate impact theory may be predicated. Rather, plaintiffs argue that TCS and its headhunters were conscious of, and motivated by, the races and national origins of employees and applicants. On this record, a disparate impact theory is misplaced.

evaluation of individualized factors, such as the person's skills, experience, performance, interest in employment or continued employment, and ability to relocate to available assignments. These factors—some of which are highly subjective—make it impossible for any "common evidence" approach to reliably distinguish discriminatory from nondiscriminatory motives.

Second, plaintiffs rely on conclusory anecdotal evidence from nine individuals which collectively represent as little as .007% of the putative class in light of the nebulous class definitions. Yet when deposed, these individuals largely recanted the allegations in their declarations and offered no evidence of discrimination. A few of them even proffered alternative theories of gender discrimination, age discrimination, and preferential treatment of "East Asians."

Finally, plaintiffs argue that the "glue" tying tens of thousands of allegedly discriminatory employment decisions together is TCS' use of headhunters to create an applicant pool that is disproportionately South Asian. Yet plaintiffs offer no evidence of any such conspiracy between TCS and nearly 100 recruiting firms that it uses. Remarkably, the three resumes which plaintiffs have cited as evidence that headhunters racially "rigged" the applicant pool did not even come from headhunters. Plaintiffs also argue that TCS prefers "visa-ready" employees in staffing decisions, and that "visa-ready" is code for South Asian. Again, plaintiffs rely solely on assumptions and attenuated inferences—none of which should be accepted given that class certification based upon a common policy must be supported by "significant proof" of that policy. Certification should be denied.

## FACTUAL BACKGROUND

### A.     Overview Of TCS' Business Model

TCS provides information technology ("IT") services to customers worldwide. Declaration of Umesh Kumar ¶ 3. TCS customers are usually large businesses engaged in one of various industries (or "verticals"), including, for example, banking, healthcare, insurance, manufacturing, retail, hospitality, or transportation. Kumar Decl. ¶ 7. Employees are generally assigned to a single vertical, as well as a "horizontal." *Id.* "Horizontals" are the different services provided by TCS, such as IT infrastructure, business process services and other services. *Id.*

TCS is hired by customers to build or transform their IT systems. Kumar Decl. ¶ 3. Most of this work is performed at the customer's place of business or other customer-designated location. *Id.*

Sometimes the work is performed offshore in different countries. *Id.* Whether a customer chooses to retain all of its own staff, to reduce its staff, or to eliminate its staff entirely in connection with a project is the customer's exclusive choice. Id. TCS' involvement with the customer is project-based, varying in duration from months to years. *Id.*

From April 2011 to the present, TCS has provided services to more than 1,000 different customers globally, including at over 400 locations. Declaration of Balaji Ganapathy ¶ 2. Each site is staffed by TCS personnel, although the level of staffing varies depending upon the particular project. Kumar Decl. ¶ 4. Some sites have very few TCS employees; others have hundreds. *Id.*

Each customer and project have one or more TCS "Business Managers" who oversee the customer relationship and/or the specific project; Business Managers are also referred to as Hiring Managers and Program Managers. Kumar Decl. ¶ 5. The Business Managers are responsible for determining the staffing needs for the project, and with approval and/or input from the client, the Business Managers decide which TCS employees should be staffed on the customer's project. *Id.* Throughout the class period, each year there were between 1,500 and 2,694 Business Managers in the United States who made staffing and hiring decisions. *Id.*

**B.    TCS Is Committed To Equal Employment Opportunity**

At time of hire, all TCS employees are required to review and acknowledge the TCS Employee Handbook, which contains an Equal Employment Opportunity ("EEO") policy prohibiting discrimination against applicants and employees on the basis of race, color, national origin, citizenship, alienage and any other basis protected by law. Declaration of Jeevak Sharma, ¶ 5, Exs. 3 and 4. In addition, all employees are subject to the TATA Code of Conduct, which reiterates that TCS is an equal opportunity employer, and requires that all employment decisions "shall be administered in a manner that would ensure…equal opportunity is provided to those eligible and the decisions are merit-based." *Id.* at Ex. 2. New hires are required to participate in a Title VII training program and pass an examination on its contents. *Id.* at ¶ 6. Managers receive additional EEO training through periodic live presentations by TCS' outside labor counsel. *Id.*

TCS' policies prohibiting discrimination are strictly enforced; employees who do not adhere to them are disciplined. Kumar Decl. Ex. 1.

TCS requires the third-party vendors that it uses to recruit new hires, as well as the vendors who provide temporary contractors, to adhere to the TATA Code of Conduct and EEO policies. Declaration of Shyam Chinnari ¶ 6.  Likewise, care is taken to ensure that campus recruitment efforts are inclusive and open to all qualified students.  Declaration of Jennifer Alkiewicz, ¶ 9.  Further, in an effort to enlarge the pool of qualified candidates in the United States for careers in the fields of science, technology, engineering and math ("STEM" fields), TCS has participated in many initiatives to draw American students toward these fields.  Ganapathy Dec. ¶ 23; Alkiewicz Decl. ¶ 4.  TCS has publicly espoused its belief that workforce diversity enhances its business performance, and has worked collaboratively with multiple community groups, business partners and on-campus groups to enhance the diversity of its workforce and maintain a culture of inclusiveness through special events, mentorship programs and other initiatives.  Ganapathy Decl. ¶¶17-18.

## C.      TCS' Lawful Use Of The United States Visa System Is Undisputed

TCS has received authorization from the United States government to bring its India-based employees to the United States every year pursuant to visas in order to work on projects for TCS. Declaration of Amit Jindal ¶ 4.  TCS employees usually receive type "L" or "H-1B" visas from the United States for this purpose.[2]  *Id.* at 16.  "Visa-ready" employees are existing employees who were hired in another country (usually in India because that is where TCS is based) and for whom TCS has gone through the process of obtaining a type L or H-1B visa allowing the employee to work outside their home country.[3]  Kumar Decl. ¶ 8; Jindal Decl. ¶ 7.  "Expats" or "deputees" are existing employees who have been transferred (or "deputed") to the United States under an active visa.  *Id.* They are subject to Deputation Agreements with TCS, which, among other things, require them to relocate and accept projects as directed by TCS while in the United States.  Sharma Decl. ¶ 8.  From

---

[2] H-1B visas authorize highly educated persons in specialty occupations to work in the United States. L visas authorize foreign employees to be transferred to the employer's U.S. operations to work in managerial or executive positions, or positions requiring specialized knowledge.  Both visas expire after three years unless extended.  Jindal Decl. ¶ 6, 10-11; U.S. Dept. of State, and U.S. Citizenship and Immigration Services, http://travel.state.gov/content/visas/en/employment/temporary.html.

[3] TCS also obtains type "B" visas to permit its foreign employees (typically higher ranking executives) to attend business meetings in the United States.  Jindal Dec. ¶ 5.  These employees do not work in the United States; employment in the United States is not allowed under a B visa.  *Id.*

April, 2011 through December 31, 2016, TCS' workforce in the United States has consisted of between 76.3% and 89% expats.  Declaration of G. Edward Anderson, Ph.D. ¶ 14.  The percentage of expats in the United States has decreased each year.  *Id.*

Visa-ready employees are not newly-hired for the purpose of working in the United States as plaintiffs suggest; generally, employees are employed with TCS at least two years before TCS obtains a visa on their behalf, meaning that "visa ready" employees are, by definition, *existing* TCS employees who are skilled and experienced professionals.[4]  Kumar Decl. ¶ 8; Jindal Decl. ¶¶ 7-8.  Further, visas are only available to employees who possess certain skills and experience and have received specialized training, including in TCS' Globally Networked Delivery Model, to carry out multi-national processes across various time zones.  Kumar Decl. ¶ 6; Jindal Decl. ¶ 8.  Obtaining visas is an extensive process; TCS cannot quickly obtain a visa for an employee based in India to fill an immediate employment need that exists in another country.  Jindal Decl. ¶¶ 11-15.

TCS has never been found to have violated the visa program despite multiple routine investigations.  Jindal Decl. ¶ 10.  Plaintiffs have expressly stated that they do not challenge TCS' use of the visa program as unlawful.  ECF No. 59, p. 5-6.  Plaintiffs' expert agrees that the assignment of expats to projects in the United States is not discrimination *per se*.  Declaration of Patrick Downes, Ex. A at 16:9-25.

**D.    Existing Employees Receive Priority For Open Assignments**

Project staffing decisions follow a multi-step process.  First, the Business Manager of the project initiates a request through an electronic "Requirement Gathering System" ("RGS").  Kumar Decl. ¶ 10.  The request  (also referred to as a "requirement") identifies the position, location, start date and responsibilities, as well as the skills and experience needed.  *Id.*  Then, one of the 23 employees in TCS' Resource Management Group ("RMG")—the department responsible for facilitating the placement of TCS employees into projects—will search internally for existing employees who match the requirements.  *Id.* at ¶ 10.  That entails a search within the applicable vertical and horizontal for employees possessing the requisite qualifications, a review of the daily "Unallocated Report" to see

---

[4] In fact, to qualify for an L visa, the United States requires that an employee must have been continuously employed by the same employer abroad for at least one year within the preceding three years.  Jindal Decl. ¶ 12.

who is available for assignment in the area, email and phone communications with unallocated employees and Business Managers, and a "Best Fit" analysis in the RGS system that matches employee competencies to those required for the position.  *Id*. at 11.

In locating staff for an assignment, every effort is made to use existing employees rather than hire from the outside.  Kumar Decl. ¶¶ 12-13.  The first group of employees that are considered are those who already work for the client, or who are already at the site in need of staffing.  *Id*. at ¶ 12.  If no match is made from that pool, RMG broadens its search to employees who possess the needed skills in the geographic area (or who are willing to relocate to the area).  *Id*. at ¶ 13.  "Visa-ready" employees are sometimes (but not always) considered for assignment  when RMG cannot find an existing employee in the United States with the suitable skill set for the location needed.  *Id*.  The use of a "visa-ready" associate is generally preferred over the hiring of a new employee altogether.  Kumar Decl. ¶¶  13-14.  Visa-ready employees are uniquely skilled, and TCS has already invested the time and capital necessary to make them valuable to the company.  *Id*.

Ultimately, staffing decisions are within the discretion of the thousands of Business Managers and TCS customers; customers commonly review resumes, interview and approve the TCS employees being proposed for the project.  Kumar Decl. ¶¶ 14-16.  The Business Managers and customers also remain free to select a person outside of the profiles collected and supplied by RMG.  *Id*.  Staffing decisions are influenced by the employee's resume, interview performance, performance in prior assignments, skills, and ability to work at the location in need.  Kumar Decl. ¶ 16.  When no employees—whether local, expat, or visa ready—are available matching the skill set and location, or when the Business Manager chooses not to consider a visa-ready employee, TCS then begins the process of recruiting a new hire locally for the position.  Chinnari Decl. ¶ 4.

### E.    New Employees Are Hired Only When An Open Assignment Cannot Be Filled By An Existing Employee

The Talent Acquisition Group is the arm of TCS that facilitates the recruitment and hiring of new employees in the United States by assisting the Hiring Managers in locating applicants.  Chinnari Decl. ¶ 4.   It has 17 employees and independent contractors in its three subdivisions who focus on the recruitment of (1) technical employees, (2) professional employees (such as employees for sales,

consulting, administrative, legal and human resources positions), and (3) entry-level technical trainees located through on-campus recruitment.  Chinnari Decl. ¶ 4; Alkiewicz Decl. ¶ 2; Declaration of Brian Andrillo, ¶¶ 2-3.   The Talent Acquisition Group usually recruits exclusively from the United States labor market.  Chinnari Decl. ¶ 4.

When Business Managers identify the need for a new employee, they will report the position's requirements to the Talent Acquisition Group.  Chinnari Decl. ¶ 4; Andrillo Decl. ¶ 3.  Most of the time, the Talent Acquisition Group will share the position's requirements with a third-party vendor (*i.e.*, headhunter).  Chinnari Decl. ¶¶ 5-7; Andrillo Decl. ¶ 3.  During the class period, TCS contracted with more than 60 different headhunting firms to assist in the location of applicants.  Chinnari Decl. ¶ 6. Either the headhunters or TCS will advertise for the job and collect resumes for likely candidates. Chinnari Decl. ¶ 5; Varma Decl. ¶¶ 3, 9; Garg Decl. ¶¶ 3, 10; Gandhi Decl. ¶¶ 3, 8.  This is generally done through common online job boards such as LinkedIn.com, CareerBuilder.com, Dice.com and Monster.com.  *Id*; Chinnari Decl. ¶ 5; Andrillo Decl. ¶ 3.

After the resumes are screened by the vendor or Talent Acquisition Group to ensure that the candidate's resume meets the requirements of the position, the resumes are forwarded to the Business Manager.  Chinnari Decl. ¶¶ 6, 10.  Usually around 10 resumes per open position are provided. Chinnari Decl. ¶ 7.  For technical recruits, the Business Manager will then discuss the candidates with the customer, and work collaboratively with the customer to decide which candidates to interview and hire.  Chinnari Decl. ¶ 10.  Customers often are involved in the interview and selection process itself. *Id*.  In the case of non-technical employees, the choice of who to hire is made by the Business Manager alone.  Andrillo Decl. ¶ 5.  Otherwise, once a Business Manager and customer decide who they want to hire, the Talent Acquisition Group will work directly with the candidate, the headhunter (where applicable), and the TCS Human Resources Department to finalize the offer terms.  *Id*.

Finally, through on-campus recruiting, TCS seeks entry-level trainees who can be groomed to become experienced technical employees.  *See generally* Alkiewicz Decl.  The recruiters are usually TCS employees within the Talent Acquisition Group, but often, are TCS employees who graduated from the school in question (such as named plaintiff Christopher Slaight).  Alkiewicz Decl. ¶ 9.  After passing an initial screening interview and technical interview (for which there are 235 different

interviewers), the applicants' resumes are provided to Business Managers with entry-level openings, who then decide, in consultation with the customer, whether to interview and offer employment to the candidates. *Id*. at ¶¶ 7- 8. Once hired, campus recruits enter into a fully compensated training program for approximately two months, during which time they are extensively trained in TCS' proprietary tools and methods. *Id*. at ¶¶ 3 and 8. At the conclusion of their paid training they report to their assigned client and are considered part of the Initial Learning Program (or "ILP"). *Id*.

Other than adherence to TCS' nondiscrimination policies, the third-party vendors, Talent Acquisition Group, and Business Managers are free to exercise their own discretion in the manner and means of recruiting and hiring new employees. Chinnari Decl. ¶ 11. Hiring decisions are influenced by an applicant's resume, his or her performance in multiple interviews, clearance of background and reference checks, interest in TCS, skills and experience, geographic restraints, ability to start on a project within the required time period, and customer input and/or approval. Chinnari Decl. ¶ 11.

During the putative class period, TCS made almost 17,000 employment offers in the United States for technical positions alone. Chinnari Decl. ¶ 9. These offers covered services at over 1,200 client sites. *Id*. Over the class period, approximately 2,518 different Business Managers were responsible for these hiring decisions. *Id*. Ultimately, 13,649 individuals accepted such offers from TCS. Chinnari Decl. ¶ 9; Anderson Decl. ¶ 20. These hires came to TCS through multiple applicant pools, including (1) vendors (49.9%); (2) social networking by TCS (11.7% of local hires); (3) employee referrals (11.5%); (4) campus recruitment (9.6%); (4) TCS online portal (8.4%); (5) conversion of independent contractors to employees (2.2%); (6) India-based Talent Acquisition Group referral (1.4%); and "other"/unknown (3.3%). Anderson Decl. Table 2. The percentage of South Asian and non-South Asian applicants varies substantially from one pool to the next. *Id*. And even within the same pool, the percentage of South Asian and non-South Asian applicants varies sharply depending upon the vendor being utilized, the position being filled, and the year. *Id*. ¶¶ at 34-39 and Tables 3-10. Nonetheless, TCS' hiring rates for South Asian and non-South Asian applicants in the United States generally correlate to the percentage of South Asian and non-South Asian applicants in the relevant applicant pool. Anderson Decl. ¶ 54; Expert Report of Edward P. Lazear, Ph.D. ¶ 51.

**F.     Benching And Termination Practices**

When an existing employee's project ends or they are removed from a project for lack of skill sets, performance issues, budget constraints, client concerns or even at an employee's request, an employee becomes "unallocated." Kumar Decl. ¶ 19. RMG follows the same process described above to help the employee find a new position. *Id.* at ¶ 20. Restrictions on location, lower technical skills, and experience similarly dictate how quickly someone will be reallocated or removed from the "bench." *Id.* Being unallocated or benched is not the same as being terminated; unallocated/benched employees continue to receive their usual wages and benefits while unallocated. *Id.*

Local hires who remain on the bench for an extended time, and whose individual skills, experience or location preferences prevent them from being reallocated in a reasonable time, are proposed for termination by RMG. Kumar Decl. ¶ 21. Termination decisions are also influenced by past performance, rejection of assignments, and cooperation with the Resource Management Group in locating new assignments. *Id.* Termination proposals are reviewed both by Human Resources and employment counsel. Sharma Decl. ¶¶ 9-10. Locals who are terminated due to lack of allocation are eligible for rehire and in fact have been rehired when openings become available for their skill set. Kumar Decl. ¶ 21.

Visa holders (expats or deputees) who are in the United States and are not reallocated in a reasonable time are returned to the country of their home base. Kumar Decl. ¶ 21; Jindal Decl. ¶ 14. The RMG unit in the employee's home base will then determine the employee's further allocation (or termination). *Id.* United States immigration laws prohibit an unallocated employee from remaining in the United States for a lengthy period, and from being terminated while in the United States; the Deputation Agreements between TCS and deputees also preclude termination in the United States. Jindal Decl. ¶ 14; Sharma Decl. ¶ 8.[5]

A direct comparison of benching and termination rates between South Asian and non-South Asian employees in the United States from 2011 to the present reveals there is no significant difference between the two groups. Anderson Decl. ¶¶ 90-99; Lazear Rpt. ¶¶ 72-76. Such comparison also shows

---

[5] During the class period, 39,721 employees from India, and 346 employees from other countries, travelled to the United States under visas to work on projects here. Kumar Decl. ¶ 9. During the same period, 29,344 employees returned to India, and 209 returned to other countries. *Id.*

1  that termination rates vary by job, year, manager, and number of previous unallocated periods.  *Id.*

2  ### G.    The Named Plaintiffs' Claims

3      The putative class is presently represented by Brian Buchanan and Christopher Slaight;

4  Buchanan appears to represent the "hiring" class; and Slaight the "termination class."

5      As briefed in TCS' motion for summary judgment, Buchanan, who is of white race and

6  American national origin, worked for Southern California Edison ("SCE") as an IT specialist before

7  SCE outsourced its IT functions to TCS and other vendors in 2014.  Ganapathy Decl. ¶¶ 11-12.  TCS

8  reserved 44 positions at SCE for former SCE employees who wished to apply for employment with

9  TCS.  *Id.* at ¶ 14.  TCS invited SCE employees to attend one of seven town hall meetings at which the

10  positions and application process were discussed.  *Id.*  Buchanan rejected the town hall meeting

11  invitation.  *Id.*  Buchanan admittedly never submitted an actual application to TCS, and to this day, has

12  never identified an available job with TCS that he wanted.  La Mar Decl. Ex. 1 at 71:6-12; 86:16-87:4.

13  Buchanan nonetheless contends that he was "not allowed" to apply to TCS based on his experience at

14  a job fair conducted by TCS and 30 other employers in October, 2014, which he attended.  *Id.* at

15  60:22-61:24.  According to Buchanan, the TCS booth was staffed by three or four TCS employees

16  speaking to each other in Hindi who seemed dismissive of Buchanan for reasons he does not know.

17  *Id.* at 89:17-22.  Buchanan did nothing to follow up with TCS following the job fair.  *Id.* at 86:13-15.[6]

18      Christopher Slaight, who is also white, was hired by TCS through on-campus recruitment.  After

19  being assigned, Slaight was counseled by TCS regarding unprofessional behavior, profanity, poor

20  punctuality, poor attendance, unprofessional personal appearance, lack of sensitivity to cultural

21  differences, and failure to take initiative in learning technology.  La Mar Decl. Ex. 2 at 120:19-125:5;

22  Sharma Decl. Ex. 7.  Slaight does not believe the criticism he received was because he is white.  La

23  Mar Decl. Ex. 2 at 144:19-24.  On February 27, 2013, TCS' client asked that Slaight be removed from

24  the project.  *Id.* at 129:20-21, 142:5-14; Sharma Decl. Ex. 7.  Because Slaight refused to work outside

25  of New York or New Jersey, TCS was unable to locate another assignment for him.  La Mar Decl.

26  Ex. 2 at 144:25-151:18; Sharma Decl. Ex. 7.

27  _____

28  [6] The statistics for TCS' hiring decisions at SCE do not support Buchanan's discrimination claims, and if anything, show that non-South Asian applicants were more likely to be hired.  Lazear Rpt. ¶¶ 59-71.

Loeb & Loeb
A Limited Liability Partnership
Including Professional Corporations

Slaight testified that his hiring, training, performance counseling and termination were all nondiscriminatory.  La Mar Decl. Ex. 2 at 26:11-28:6; 33:14-20; 65:22-66:3; 144:19-24; 161:15-18. The *one and only* thing Slaight identified as being unfair is that while at his assigned project in New Jersey, he allegedly did not receive "substantial" work.  La Mar Decl. Ex. 2 at 106:6-15.  However, Slaight knows of no facts indicating that he was treated differently because of his race or national origin.  *Id*. at 130:7-131:4.

## ARGUMENT

### I.  Plaintiffs Bear A Heavy Burden in Seeking Class Certification, Which Is A Narrow Exception To The Usual Rule That Plaintiffs Should Litigate Their Own Claims.

Class actions represent "an exception to the usual rule that litigation is conducted by and on behalf the of individual named parties only."  *General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982). A class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Id.* at 161.  That rigorous analysis "must consider the merits if they overlap with the Rule 23(a) requirements."  *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir. 2011).  Indeed, this Court has already acknowledged that the merits of this action are intertwined with questions related to class certification.  ECF No. 72 at 12-13 ("these days we have to look at it all in order to evaluate whether or not you are going to have or can sustain a class action.").  To obtain class certification, plaintiffs must not simply plead, but prove, all Rule 23(a) factors—numerosity, commonality, typicality, and adequacy of representation—and at least one Rule 23(b) factor.  *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2412 (2014).  As described below, the hiring and termination decisions affecting the putative class members involve circumstances which so vastly differ that no class can be certified.  In fact, all that the named plaintiffs and potential class members have in common is that they cannot prove actionable discrimination.

### II.  Plaintiffs Cannot Satisfy The Required Elements Of Rule 23(a)

#### A.  Plaintiffs Cannot Prove Numerosity Or The Existence Of An Ascertainable Class

To be certified, a proposed class must be so numerous that joinder of all members individually is "impracticable."  F.R.C.P. 23(a)(1).  Here, plaintiffs have made no meaningful attempt to prove numerosity.  Rather, they simply argue that a class may be formed by as few as 40 individuals, and invite the court to make "common sense assumptions" with respect to the number of putative class

members.  Considering that plaintiffs themselves only managed to find nine individuals to join them in support of their motion, the Court should not feel compelled to engage in such speculation.  *See Cwiak v. Flint Ink Corp.*, 186 F.R.D. 494, 497 (N.D. Ill. 1999) (denying certification where plaintiff's estimated number of class members was purely speculative; plaintiff presented no discernable method to predict how many individuals were in the putative class).[7]

Equally important is that plaintiffs have not, and cannot, provide a methodology for identifying members of the proposed classes.  "A threshold inquiry in determining whether a proposed class is appropriately certified is whether the class is sufficiently definite so as to render it 'administratively feasible to determine if a given individual is a member of the class.'"  *Senne v. Kan. City Royals Baseball Corp.*, 315 F.R.D. 523 (N.D. Cal. 2016).  Ascertainability considers three issues: (1) whether the class can be ascertained by reference to objective criteria; (2) whether the class includes members who are not entitled to recovery; and (3) whether the named plaintiffs can show that they will be able to locate absent class members once the action is certified.  *Id.*

The classes proposed by plaintiffs are not ascertainable for several reasons.  Consider that Buchanan and Steven Bradley believe they are "applicants" because they gave their resumes to TCS.  TCS has no record of such resumes.  Ganapathy Decl. Ex. 3.  Neither plaintiffs nor their expert have suggested the means of identifying "applicants" who did not actually submit applications.  Adding to this uncertainty is the fact that headhunters may forward resumes without first consulting with an individual to determine his or her interest in employment with TCS.  Anyone who was not interested in employment with TCS should not be part of this action, but there is no way to identify such persons from the information available.

Assuming actual applicants could be identified, simply applying for a job does not make one eligible for employment.  A massive data gathering effort would be necessary to determine each

---

[7] Two other facts significantly diminish numerosity.  As of July, 2015, all TCS employees in the United States were required to sign arbitration agreements containing class action waivers.  Sharma Decl. ¶ 20, Ex. 15.  The employees who signed cannot be counted as class members in this case; they would need to pursue their claims on an individual basis, if at all.  *See Ortiz v. Hobby Lobby Stores, Inc.*, 52 F.Supp.3d 1070, 1087-1088 (E.D. Cal. 2014); *see generally AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).  Also, because Buchanan's EEOC Charge was filed on May 14, 2015, the class period for plaintiffs' Title VII claims must begin on November 14, 2014 (180 days before the date of the Charge), and not as of April, 2011 as plaintiffs have suggested.  This further reduces the number of people in the class.

applicant's relevant skills, experience, education, degree of interest in working for TCS (which involves short-term, project-based work often necessitating relocation), salary requirements, geographic restrictions, resume quality, interview performance, background and reference check results, *and* the impact this constellation of factors had on each decision maker, in order to know why a person was not hired.  Ascertaining the class must also entail an analysis of open positions.  For example, Mr. Buchanan to this very day has not identified an open position at TCS for which he was qualified and sought.  La Mar Decl. Ex. 1 at 71:6-12; 86:16-87:4. Mr. Bradley also affirmatively testified that he was not qualified for the positions he knew of.  *Id*. at Ex. 3 at 58:14-23.  It makes no difference how many hundreds of thousands of resumes or applications were dropped off at job fairs or forwarded by vendors if there were no job openings matching a candidate's skills and interests.

Similar issues preclude the identification of the termination class.  Although TCS records will, at minimum, disclose who was terminated after being unallocated, extensive research will be required to determine whether the lack of an allocation was due to discrimination or some other reason.  For instance, Christopher Slaight was removed from his assignment at the client's request due to his disruptive behavior and poor performance.  Declarant Amir Masoudi's position ended as scheduled, but he was not considered for another position with the same client because the client thought he was too combative.  Sharma Decl. Ex. 11.  Declarant Nasser Nahshal *asked to be released* from his project because he wanted to look into other opportunities.  Nahshal Decl. ¶ 2.

In addition, a comparison of each terminated employee's skills against open assignments would also be needed, as would an evaluation of the person's geographic restrictions.  For instance, Christopher Slaight refused to work outside of New York or New Jersey; declarant Amir Masoudi refused to work outside of Northern California unless he could work from home part of the week. Sharma Dec. Ex. 11.  It would also have to be determined whether positions were offered but rejected, or whether the employee unilaterally disqualified himself or herself (as declarant Nobel Mandili did) based upon their own perception of their skill sets.  Sharma Decl. Ex. 10.  The degree to which the employee cooperated with RMG in securing new assignments is also an indispensable component of this analysis.  For instance, Mr. Mandili was admonished multiple times over his failure to timely respond when RMG contacted him about open assignments.  *Id*.

Plaintiffs undoubtedly will attempt to rebut these arguments by reiterating they only seek certification for a liability phase, and that damages can be decided later in individualized proceedings. But as the considerations set forth above prove, liability cannot be adjudicated in one fell swoop. Because even the most basic question of who belongs in the class generates more inquiries than can be managed effectively in a class setting, certification should be denied.

### B.      Plaintiffs Cannot Prove Commonality

Rule 23(a)(2) requires a plaintiff seeking class certification to show there are "questions of law or fact common to the class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998).  A common question, however, is not enough.  *See Falcon*, 457 U.S. at 157.  The common question must be of such a nature that "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

As in *Dukes*, plaintiffs here rely chiefly upon statistical evidence regarding TCS' use of South Asian workers in the United States, as well as anecdotal allegations from a fraction of a percent of the putative class members, to prove commonality.  *See id.* at 356.  And just as in *Dukes*, this proffer fails.

### 1.      The Statistical Evidence Does Not Support Commonality

Plaintiffs' statistical expert, Dr. David Neumark, has issued a report stating that the statistical evidence is strongly consistent with discrimination by TCS against non-South Asian applicants and employees. Dr. Neumark's methodology is flawed, unscientific and unreliable.  *See generally* TCS' concurrently filed *Daubert* motion.

To maintain his conclusion that the percentage of South Asians employed by TCS in the United States is too high to have occurred by chance, Dr. Neumark takes the position that a deputee's arrival in the United States constitutes a "local hire."  Plaintiffs then argue that TCS' practice of "expat hiring" results in a United States workforce that is disproportionately (*i.e.* between 72.3% and 78.91%) South Asian.  However, "expat hiring" and "Expat U.S. Hires"—terms coined by plaintiffs—are fictitious concepts.  "Expats" are *existing* employees who are based in other countries and temporarily transferred to the United States to work on projects.  Kumar Decl. ¶ 8.  To argue they constitute new hires is illogical, since expats, by definition, arrive in the United States only because they are *already* employees of TCS and *already* possess the skills and experience which makes them demonstrably qualified to hold

positions.  Despite Dr. Neumark's "1 in 1 billion" propaganda, the fact that TCS' workforce is predominantly comprised of employees hired in *India*—temporarily in the United States on visas—explains the volume of South Asian TCS employees in the United States.  Thus, any statistical analysis as to whether TCS engages in discriminatory hiring in the United States must exclude these individuals and focus on actual hiring in the United States.[8]  Lazear Rpt. ¶¶ 44-46; Anderson Decl. ¶¶ 14-18.

Further, Dr. Neumark's analysis fails to control for any variable other than race.  Dr. Neumark testified that he was asked by plaintiffs' counsel to determine the racial breakdown of TCS' workforce, inclusive of deputies; he did exactly and only that.  Downes Decl. Ex. A at 68:12-69:5.  Yet the value of statistical evidence depends upon "the absence of variables which would undermine the reasonable-ness of the inference of discrimination."  *Spaulding v. Univ. of Washington*, 740 F.2d 686, 703 (9th Cir. 1984); *see also Segar v. Smith*, 738 F.2d 1249, 1274 (D.C. 1984) (for statistics to show disparity in treatment, they must be assembled using a methodology that eliminates nondiscriminatory reasons for any disparities).  Here, such unaccounted-for variables render Dr. Neumark's opinion meaningless.

For instance, with respect to the hiring class, Dr. Neumark ignores the races and national origins of the individuals who *actually applied* at TCS, and instead, uses the American Community Survey ("ACS") as a base measure of applicant availability to argue that TCS' United States workforce should not exceed 12.5% South Asian.  However, the ACS data is *industry* specific, not *job* specific; it includes demographic information for janitors, secretaries, CEOs and other roles in the technology industry as a whole.  Anderson Decl. ¶ 96.  If a nationwide, industrywide data point is to be utilized, at minimum, it must be distilled to positions in the technology industry that are (1) technical, (2) project-based, and (3) require relocation between work assignments. Such positions are held by approximately 40% South Asians, which generally correlates with TCS' local hiring.  *Id.*

---

[8] Dr. Neumark's opinion is, in essence, that an imbalance alone is evidence of discrimination. However, "[l]iability may not be based solely on the existence of a racial imbalance among employees."  *See Lewis v. Tobacco Workers' International Union*, 577 F.2d 1135, 1141 (4th Cir. 1978).  TCS has no legal obligation to hire new employees rather than use existing (and already trained) ones; nor is there any obligation to hire employees belonging to certain groups in order to correct statistical imbalances which may exist.  42 U.S.C. § 2000e-2(j) ("Preferential treatment not to be granted on account of existing number or percentage imbalance").  Accepting Dr. Neumark's theories, TCS could hire *zero* South Asians for the next several years and still be in violation of Title VII due to the large presence of South Asians among existing employees.

From there, a reasoned analysis must concentrate on the pools from which TCS draws applicants—*e.g.*, vendors, job boards, on-campus recruiting, etc.  Otherwise, it is impossible to know whether hiring practices are askew.[9]  Anderson Decl. ¶ 24.  In fact, the applicant pool provided by TCS' vendors is approximately 40% South Asian.  *Id.* at Table 8.  The pool from job boards utilized by TCS is approximately 30% South Asian.  *Id.* at Table 11.  But even within each pool, there is vast disparity in the number of South Asian and non-South Asian applicants depending upon the specific vendor, hiring manager, and geographic location, thus underscoring that common evidence cannot be utilized to determine whether any single recruitment path (such as the use of vendors) was discriminatory.  *See e.g.* Anderson Decl. Tables  8-13; Lazear Figure 2B.

A statistical analysis alleging discriminatory hiring practices must also control for employee qualifications and the availability of positions matching those qualifications.  Anderson Decl. ¶ 25.  Dr. Neumark made no attempt to do that.  To accept Dr. Neumark's analysis, one must assume that every applicant was equally qualified for every position, and that there were as many open positions as there were interested persons.  Moreover, Dr. Neumark fails to consider the role of applicant interest in working for TCS—a critical consideration given that an applicant's willingness to move from one project to the next (and possibly relocate) is essential.  *Id.*  TCS is a well-known Indian company, particularly among Indian technical workers.  Lazear Rpt. ¶ 20.  Employment with TCS provides working conditions that are familiar and compatible with their own cultural experiences.  *Id.*  In that regard, Dr. Neumark fails to consider that TCS extends many more offers to non-South Asian candidates than are ultimately accepted by them.  Chinnari Decl. ¶ 9; Garg Decl. ¶ 12; Varma Decl. ¶ 12; Vajalla Decl. ¶ 12.  Finally, Dr. Neumark's hiring analysis fails to consider the significant influence that customers have in hiring decisions, and the highly decentralized recruitment and hiring process.  Chinnari Decl. ¶ 10.  In summary, Dr. Neumark offers no "common evidence" for ensuring that, in regard to thousands of job openings, *discrimination* was the reason for the selection of a South Asian candidate rather than the applicant's experience, interest, or other legitimate reasons for non-selection.[10]

---

[9] Any baseline measure must take the relevant applicant pool into account.  *See Hazelwood School Dist. v. United States*, 433 U.S. 299, 308 (1977); *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 550 (9th Cir. 1982); *Piva v. Xerox Corp.*, 654 F.2d 591, 596-97 (9th Cir. 1981).

[10] Plaintiffs' argument that TCS surpassed its affirmative action goals for Asians is a red herring.

Loeb & Loeb
A Limited Liability Partnership
Including Professional  Corporations

With respect to the termination class, Dr. Neumark's analysis likewise evokes more questions than it answers. Most importantly, Dr. Neumark again erroneously includes expats in his benching and termination analysis when, as a matter of immigration law and private contract (*i.e.* Deputation Agreement), these employees (1) are not benched or terminated while in the United States—but rather, are returned to their home country, and (2) lack the freedom to reject a project or relocation. A proper analysis must focus on benching and termination decisions affecting local hires. Anderson Decl. ¶¶ 62-65.

Further, Dr. Neumark's analysis fails to account for the fact that often, an employee's unallocated status reflects the employee's refusal to relocate to available assignments, an employee's voluntary decision to leave a project (as in the case of declarant Nasser Nahshal), or an employee's rejection of projects that are offered. Sharma Decl. Ex. 12. It also fails to consider that employees may be unallocated due to performance or behavioral concerns, or in response to a client's request (as was the case with Slaight and several of the declarants). Consider again that Slaight became unallocated after TCS' customer asked that he be removed. Moreover, Dr. Neumark has not considered the qualifications and skills necessary for open requirements, and whether employees who were terminated after being unallocated possessed the requisite qualifications for those positions. Employees with more years of job experience, greater skills and willingness to relocate are easiest to allocate. Anderson Decl. ¶¶ 58-59. Expats fall into this category by default. Given all of the individualized considerations that factor into allocation decisions, Dr. Neumark has not and cannot identify any common evidence that termination decisions favor South Asians.

As Dr. Anderson and Dr. Lazear explain, the statistics relating to TCS' hiring and termination practices are *inconsistent* with companywide discrimination. Anderson Decl. ¶¶ 6-11, 78; Lazear Rpt. ¶¶ 14-16. Hiring and termination rates differ drastically by applicant pool, job position, year, decision maker and region. *Id.* Overall, however, hiring rates generally match the applicant pools, and termination rates did not differ significantly between South Asians and non-South Asians. *Id.* If anything, the percentage of South Asians in TCS' United States workforce has markedly *decreased* over the class period.

---

Affirmative action goals are not quotas to be achieved through race-based preferences, but rather, a tool to aid in breaking down barriers to equal employment for women, racial minorities and veterans. (Source, Office of Federal Contract Compliance Programs; https://www.dol.gov/ofccp/regs/compliance/ directives/dir207.pdf). Such goals set neither minimums nor maximums.

Anderson Decl. Appendix Table 1.  Because Dr. Neumark's unscientific, broad averages mask details that contradict his conclusions, his report does not establish the existence of common questions.

<div align="center">

**2.      The Anecdotal Evidence Does Not Support Commonality**

</div>

As in *Dukes*, plaintiffs' anecdotal evidence is "too weak to raise any inference that all individual, discretionary personnel decisions [at TCS] are discriminatory." *Dukes,* 564 U.S. at 358.

Eight of the nine declarants attest in a conclusory fashion that they were benched while South Asian employees received priority in assignments.  However, there is no uniformity in the length of time spent on the bench; the declarants were unallocated *with full pay* between four months and 1.5 years each before being terminated.  Further, when deposed, not one of the declarants could provide any detail concerning the South Asian employees who allegedly received positions instead of them, or the qualifications of any such persons.

Moreover, each of the declarants has had unique performance and employment histories with TCS that simply do not lend themselves to class treatment.  For instance, Mr. Giovanni and Mr. Mousodi were released from their last assignments for performance reasons.  Sharma Decl. Exs. 9 and 11.  Mr. Masoudi then refused to accept projects outside of Northern California or even attend meetings more than 45-miles from his home.  *Id*. at Ex. 11.  Mr. Webber was released from his last assignment due to unprofessional communications with the client.  *Id*. at Ex. 14.  Mr. Nahshal was released at his own request because he wanted to move to New York; TCS was unable to place him in a position there.  *Id*. at Ex. 12.  Ms. Wilson is actively employed by TCS.  Wilson Decl. ¶ 2.  The ninth declarant, Mr. Bradley, worked for SCE.  He allegedly gave TCS his resume at a job fair and never heard back.  La Mar Decl. Ex. 3 at 54:19-22; 55:4-15.  TCS has no record of his resume, but clearly engaged in substantial non-discriminatory hiring at SCE.  Lazear Rpt. ¶¶ 59-71.  Mr. Bradley did not believe he was qualified for any of the positions he could have applied for at TCS.  La Mar Decl. Ex. 3 at 58:14-23.

Anecdotal evidence does not support class certification where it simply lodges complaints without any evidence of discrimination.  *See Reid v. Lockheed Martin Aero. Co.*, 205 F.R.D. 655, 674 (N.D. Ga. 2001).  Where, as here, plaintiffs are challenging tens of thousands of employment decisions by hundreds of individual managers, commonality is absent.  *See e.g. Dukes*, 564 U.S. at 358.

1

2

### 3. The Alleged Common "Policies" Identified By Plaintiffs Do Not Exist, And Nonetheless, Do Not Support Commonality Under A Disparate Treatment Or Disparate Impact Theory

3

Plaintiffs argue that two alleged TCS policies give rise to common questions. First, plaintiffs argue

4

that TCS uses recruiters to ensure that a "substantial percentage" of candidates for employment are South

5

Asian. Mot. at 8:9-14. Second, plaintiffs argue that an alleged "leadership directive" favoring the use of

6

visa holders over locally hired employees results in non-South Asian employees being benched and then

7

terminated at higher rates. *Id.* at 7:1-6. A plaintiff seeking class treatment for an alleged general policy of

8

discrimination must offer "significant proof" that the employer operated under that general policy, and that

9

the alleged policy manifested itself in the "same general fashion" as to all putative class members. *Falcon*,

10

457 U.S. at 159, n. 15; *Dukes*, 564 U.S. at 353. Plaintiffs have not met that standard.

11

Plaintiffs offer no cohesive argument—let alone evidence—that the 90 vendors used by TCS

12

over the class period created a racially pre-screened applicant pool. In seeking candidates, the vendors

13

searched common websites and did not use processes calibrated to net a disproportionately high

14

number of South Asian applicants. Varma Decl. ¶¶ 3, 9; Garg Decl. ¶¶ 3, 10; Gandhi Decl. ¶¶ 3, 8.

15

Moreover, the allegation of any express or implied directive requiring vendors to racially screen

16

applicants is disproven by the facts that: (1) there is little consistency in the rates of South Asian

17

applicants referred by each different vendor, and (2) for all vendors, the majority of applicants were

18

*not* South Asian. Anderson Decl., Table 8. If anything, TCS' use of vendors to locate and prescreen

19

applicants only further decentralized a recruitment process which was otherwise left to the discretion

20

of *thousands* of TCS clients and Business Managers.

21

In addition, TCS does not request, require or expect that applicant photos or races be disclosed

22

on either resumes or standardized forms. Chinnari Decl. ¶ 7. The three resumes cited by plaintiffs for

23

this spurious argument were not even submitted by vendors, but by the applicants themselves, and in

24

one instance, by the applicant's husband. Andrillo Decl. ¶¶ 7-10. The emails to which the resumes

25

were attached readily establish this, but plaintiffs chose to conceal those emails from the Court—

26

which is precisely why the Court should not adopt plaintiffs' assumptions or indulge their failed

27

inferences. *Id.* Further, the only reason that an applicant's "nationality" or "citizenship" would be

28

disclosed is for employment eligibility purposes; TCS uses these terms interchangeably for I-9

purpose.  Chinnari Decl. ¶ 7.  Plaintiffs have cited three resumes in which Indian national origin was disclosed, and invite the Court to infer that these applicants had a competitive advantage because they were from India.  The irony is that none of these three individuals were hired by TCS, and that TCS does not recruit new hires outside of the country for positions that are based in the United States. Chinnari Decl. ¶ 7; Varma Decl. Ex. B; La Mar Decl. ¶ 6.

Equally unsubstantiated is the alleged preference for "visa-ready" associates in assignment decisions.  Preference for a visa-ready associate means that TCS would prefer using an existing employee on a visa who has the requisite skills  rather than hiring a *new* employee.  Kumar Decl. ¶¶ 6, 10, 12-13.  While plaintiffs have attached a number of emails to their motion stating "visa-ready preferred" in support of their argument that priority is given to visa-ready employees, such emails are greatly outnumbered by the volume of requests stating "local hire preferred."  Kumar Decl. Exs. 1-2. There is also a significant volume of emails directing that expats be released in favor of preserving the allocations of local hires.  *Id.* at Exs. 5-9.  Thus, the scant emails cited by plaintiffs do not prove a policy.

Plaintiffs also invite the Court to misconstrue the RMG Induction Manual as codifying a preference for visa-ready employees.  Nothing in the Manual supports that. Rather, the Manual states that visa holders should be utilized where their skills and competencies match open requirements as opposed to hiring anew.  Kumar Decl. ¶ 18.

Finally, plaintiffs' repeatedly argue that TCS' head diversity officer—Balaji Ganapathy— testified that TCS' business practices are discriminatory.  Of all of the factual misrepresentations in plaintiffs' motion, this is the most acute.  The question Mr. Ganapathy answered was, *if there was* a leadership directive for positions to be filled with visa-ready individuals, would that be a source of concern?  Ganapathy Decl. ¶ 19.  The question was a hypothetical one; such a directive does not exist, but as Mr. Ganapathy testified, citizenship or nationality should not determine fitness for duty.  *Id.*  A better question would have been whether a directive to fill positions with persons of a certain race or national origin would be a source of concern.  Obviously it would be.  *Id.* at ¶ 22.

Without significant proof of a policy that provides the "common glue" tying thousands of employment decisions together, certification should be denied.

Loeb & Loeb
A Limited Liability Partnership
Including Professional  Corporations

**C.     Plaintiffs Cannot Prove Typicality**

"The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998). To satisfy this requirement, the representatives must have the same interests and have suffered the same injury as members of the proposed class. *See East Texas Motor Freight Sys. V. Rodriguez*, 431 U.S. 395, 403 (1977).

Here, typicality among the plaintiffs does not and cannot exist. Anderson Decl. ¶ 97-102. Buchanan, who was never employed at TCS, alleges discrimination based on a seemingly unfriendly greeting at a job fair. He never applied for employment with TCS despite multiple opportunities, and has never identified an open position which he would have accepted. Slaight, who was hired and extensively trained at TCS' expense, alleges discrimination because he did not receive "substantial" work at a client site, and after being released per client request, refused to relocate for a new assignment. Neither could cite any evidence that their grievances were the result of race or national origin discrimination. *See generally* ECF No. 108. Because the named plaintiffs and their expert cannot explain with "reasonable specificity" how proving the elements of their individual claims also will prove the class members' claims, they have not established typicality. *See Falcon*, 457 U.S. at 161.[11]

**D.     Plaintiffs Are Not Adequate Class Representatives**

"Adequacy" requires that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-626 (1997). "From a practical standpoint, [the adequacy] requirement also tends to merge with the commonality and typicality requirements." *See Webb v. Merck & Co.*, 206 F.R.D. 399, 408 (E.D. Pa. 2002).

Here, for the same reasons that Plaintiffs lack standing and cannot show typicality, they also

---

[11] Plaintiffs' individual claims are also subject to unique defenses, such as nondiscriminatory business reasons supporting the challenged employment decisions, and lack of standing (addressed below). This further highlights the absence of typicality. *See Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 469 (N.D. Ill. 2009); *Zenith Labs., Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976) (affirming denial of certification where unique defenses as to representative could become the focus of the litigation and disadvantage the class).

cannot show they are adequate class representatives.  Buchanan failed to apply to TCS despite multiple

opportunities, nor has he identified an available job for which he was qualified.  Against that backdrop,

Mr. Buchanan cannot possibly represent the interests of those individuals who actually applied for

available positions for which they were qualified, but were not selected.  As for Mr. Slaight, he freely

admits that he was not discriminated against.  Typicality clearly is lacking.  *See Harriston v. Chicago

Tribune Co.*, 992 F.2d 697, 703-704 (7th Cir. 1993); *see also Everitt v. Marshall*, 703 F.2d 207, 210-

11 (5th Cir. 1983) (because the plaintiff herself had not even arguably been subjected to discrimina-

tion, she was "simply not eligible to represent a class of persons who did allegedly suffer [such]

injury"); *Fleming v. Travenol Labs., Inc.*, 707 F.2d 829, 833 (5th Cir. 1983) (denying class certifica-

tion because, even if true, the allegations of discrimination were not applicable to the plaintiff).

Further, a named plaintiff who lacks standing to assert a particular claim is precluded from

asserting that claim on behalf of a class.  *See e.g. Harriston* 992 F.2d at 704 (affirming denial of class

certification where plaintiff was not properly a member of the class she described).  Here, neither

Slaight nor Buchanan may represent a class under Title VII.

To proceed under Title VII, a Charge of Discrimination must be filed with the EEOC no more

than 180 days from the allegedly unlawful act.  42 U.S.C. §2000e-5(e)(1).  Buchanan is the only

representative plaintiff who filed a Charge.  However, his Charge was untimely because it was filed on

May 14, 2015—more than 180 days after the discriminatory act that he complains of (*i.e.* the October

2014 job fair).  Because Buchanan's Title VII claim is time-barred, he cannot represent the putative

class under Title VII.  *See Carter v. West Publ'g Co.*, 225 F.3d 1258, 1263 (1 th Cir. 2000).

Even if Buchanan's Charge had been timely filed, it would only support a "hiring" class;

Buchanan lacks standing to represent and assert claims on behalf of the "termination class" under Title

VII, because he was not terminated by TCS.  *See Vuyanich v. Republic Nat'l Bank*, 723 F.2d 1195,

1199-1201 (5th Cir. 1984) (holding that extension of the litigation to claims the named plaintiffs could

not raise "violates rudimentary principles of typicality, commonality, and standing…"); *see also Falcon,*

457 U.S. at 159 fn. 15 (rejecting across the board attack on employment practices);  *Hines v. Widnall*, 334

F.3d 1253, 1257-58 (11th Cir. 2003) (denying certification where named plaintiffs, who lacked

discriminatory hiring or transfer claims, sought to challenge too broad a spectrum of employer practices).

1  Because Buchanan and Slaight are not adequate class representatives, certification should be denied.

2  **III.   Plaintiffs Cannot Satisfy Their Burden Under Rule 23(b) or 23(c)(4)**

3        Even if plaintiffs had met their burden under Rule 23(a), which they have not, they still must

4  establish grounds for pursuing a class action under Rule 23(b).  *See Amchen*, 521 U.S. at 614.

5  Plaintiffs have chosen to proceed under Rule 23(b)(3), under which plaintiffs must demonstrate that

6  "questions of law or fact common to class members predominate over any questions affecting only

7  individual members, *and* that a class action is superior to other available methods for fairly and

8  efficiently adjudicating the controversy." *Dukes*,564 U.S. at 361 (quoting Fed. R. Civ. P. 23(b)(3)).

9  Alternatively, they proceed under Rule 23(c)(4), for certification of discrete questions.

10       The predominance requirement of Rule 23(b)(3) "is far more demanding" than the commonality

11  inquiry under Rule 23(a).  *Amchem*, 521 U.S.at 623-24.  "Where, after adjudication of the classwide

12  issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of

13  individualized legal points to establish most or all of the elements of their individual claims, such

14  claims are not suitable for class certification under Rule 23(b)(3)."  *Klay v. Humana, Inc*., 382 F.3d

15  1241, 1255 (11th Cir. 2004).

16       Here, individualized evidence is required for both liability and damage determinations, even

17  under the phased approach suggested by plaintiffs.  The individualized considerations that predominate

18  include the skills, experience, preferences and choices of the applicants and employees, the

19  composition and sources of the applicant pools, the decisions of Business Managers and customers, the

20  availability of positions, the qualifications required, and so on.  It is abundantly clear from the

21  depositions of the named plaintiffs and the affiants that the decisions which affected them did not

22  emanate from a common policy or source.

23       Moreover, plaintiffs have failed to establish that a class action is "superior" to individual suits.

24  Superiority is diminished by the sheer volume of individualized inquiries necessary to determine who

25  belongs in the class, let alone to establish individual recovery.  Moreover, given the amounts which have

26  been demanded in settlement, it is clear that each putative class member has a strong interest in controlling

27  his or her own action.  *See e.g. Valentino v. Carter-Wallace, Inc*., 97 F.3d 1227, 1231-1232 (9th Cir. 1996).

28  In fact, declarants Dwight Giovanni and Amir Masoudi have confirmed that they intend to bring individual

claims. La Mar Decl. Ex. 4 at 174:11-175:8. It would make little sense to certify a class when two of nine putative class members identified to date are planning to opt out in favor of individual litigation.

Finally, plaintiffs offer no evidence of how either of the "phases" which they envision will be efficiently managed by this Court. In fact, plaintiffs appear to suggest that each class member will come forward to undergo an individual trial presided over by a different fact-finder in order to be afforded monetary relief. In essence, plaintiffs have directly proposed thousands of trials, which is what the class action process is engineered to avoid.

Plaintiffs fare no better under Rule 23(c)(4). Plaintiffs have argued that the court may certify the questions of whether TCS engaged in a pattern and practice of discrimination in hiring, promotions, and terminations, whether unspecified practices of TCS resulted in an adverse impact on the class, whether punitive damages are appropriate, and whether injunctive relief is appropriate. Plaintiffs offer no support for their proposition that the Court can simply dispense with the requirements of Rule 23(a) and (b) and then certify a class based on these "issues." Plaintiffs cite *Valentino v. Carter-Wallace, Inc*., 97 F.3d 1227, 1234 (9th Cir. 1995) in support of such argument, but *Valentino* held that the district court abused its discretion by not adequately considering the predominance requirements before certifying individual issues under Rule 23(c)(4). *Id*. The other case cited by plaintiffs, *Ellis v. Costco Wholesale Corp*., 285 F.R.D 492, 544 (N.D. Cal. 2012) found there were common questions applicable to whether injunctive relief and punitive damages were available to the class as a whole. *Id*. at 545. As shown above, no common questions are evident here. Because there is no single issue for which sufficient common questions exist, plaintiffs' attempt to certify "issues" is inappropriate.[12]

## IV. Plaintiffs' Belated Attempt To Conjure A Discovery Dispute And Shift To A Disparate Impact Model Fails

As shown by the fact that plaintiffs have *never* moved to compel, there is no legitimate discovery dispute in this case. *See generally* La Mar Decl. It is apparently plaintiffs' *modus operandi* to allege such a dispute when the facts and law are at odds with their complaint. *See e.g. Koehler et al v. Infosys Technologies Limited Inc.,* US Dist. Ct., Wisconsin Eastern Dist., Case 2:13-cv-00885-PP-

[12] "What matters to class certification…is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes,* 564 U.S. at 350.

DEJ, Document 129.  Plaintiffs' accusations regarding TCS' conduct in discovery are inaccurate and misleading, and should be disregarded.

Further, the disparate impact theory that plaintiffs belatedly seek to weave into this action alters nothing in the analysis above. Mot. at 16:16.  The cornerstone of a disparate impact theory is a *facially neutral* policy that had a discriminatory effect on a protected class.  *See Frank v. United Airlines, Inc*., 216 F.3d 845, 853 (9th Cir. 2000).  Where, as here, the challenged rule or policy is expressly based on a protected characteristic, or is adopted as a sham for intentional discrimination, the claim is one for disparate treatment.[13]  *See id*. at 853-854; *see also Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006).  Further, disparate impact cases require actual proof of disparate impact.  For the reasons addressed above, Dr. Neumark's analysis does not carry that burden.  Nor do the declarations of the putative class members.  *See e.g. Garrison v. Gambro, Inc*., 428 F.3d 933, 938-939 (10th Cir. 2005) (granting summary judgment where only evidence of disparate impact was that plaintiffs' replacements were mostly young men).

## CONCLUSION

At the September 2015 case management conference, this Court questioned whether there was sufficient glue tying tens of thousands of employment decisions together to make class certification appropriate in this case.  ECF No. 74 at p. 12:15-21 ("…it is not at all clear to me how this case is going to end up a class action…unless you find some policy or procedure or something…").  After two years of litigation, it is clear that there is no such glue.

Because plaintiffs failed to meet their substantial burden to show that class certification is appropriate, their motion should be denied.

Dated:  March 20, 2017                              Respectfully submitted,

                                                    LOEB & LOEB LLP

                                                    By: /s/ Michelle M. La Mar
                                                        Michelle M. La Mar
                                                        Attorneys for Defendant
                                                        TATA CONSULTANCY SERVICES, LTD.

---

[13] Further, Section 1981 can only be violated only by *intentional* discrimination.  *Reid*, 205 F.R.D. at 667.  Given that plaintiffs' Title VII claims are precluded for the reasons set forth above, they cannot avail themselves of a disparate impact theory at all in this action.