# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

STEVEN HELDT,
BRIAN BUCHANAN, and
CHRISTOPHER SLAIGHT,

Case No.: 4:15-cv-01696-YGR

Plaintiffs,

**DECLARATION OF DR. EDWARD P. LAZEAR IN SUPPORT OF DEFENDANT TATA CONSULTANCY SERVICES' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

v.

TATA CONSULTANCY SERVICES, LTD.,

Defendant.

I, Dr. Edward P. Lazear, hereby declare as follows:

1.     I have been retained as an expert by Defendant Tata Consultancy Services, LTD. ("Tata" or "Defendant") in the instant action. I have personal knowledge of the following facts and could and would testify competently if called to do so.

2.     Attached hereto as Exhibit 1 is a true and correct copy of my expert report in this matter.

3.     This report is accurate **to** the best of my knowledge, information, and belief, and represents my opinions in this matter to date. It also reflects my credentials and background.

1

I declare under pain and penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ___ day of March, 2017, at *j*, *41--Q* California.

Dr. Edwarerrazear

A notary public or other officer completing this cerebral° verifies only the identity of the individual who signed the document to which Ibis certificate is attached, and not the frOlhfulness, accuracy, or validity of that locurnonl.

STATE OF CALIFORNIA COUNTY OF                    A

SubVed, and svotkrn to ;or affirm d) before ,rnevin  this

___dayofN\          L'. 20    by. 4.                  K-

___Al-      'Q..

proved to me on the basis of satisfactory evidence to be the person(s) who appeare j before me.

_____ (Signature of

WILLIAM E. BUCY
COMM. #2073416
NOTARY PUBLIC - CALIFORNIA 0
SANTA CLARA COUNTY
My Comm. Expires July 30, 2018

2

*Heldt et al v. Tata Consultancy Services, LTD*

United States District Court for the Northern District of California
Oakland Division
Case No.: 4:15-cv-01696

Expert Report of Edward P. Lazear

March 20, 2017

**Table of Contents**

I.     Qualifications                                                                                     1

II.    Overview of Plaintiffs' Allegations                                                                2

III.   Assignment and Summary of Opinions                                                                 4

       A.    Assignment                                                                                   4

       B.    Summary of Opinions                                                                          4

IV.    Analytical Framework                                                                               5

       A.    Issues                                                                                       6

       B.    Data                                                                                         7

V.     Background: The Proposed Classes Encompass a Large Geographic Area, Multiple
       Hiring Channels, and Multiple Tata Decision Makers                                                 7

       A.    Staffing, Hiring, and Termination                                                            8

       B.    Multiple Tata Decision Makers, Hiring Channels, and Hiring Locations                         12

VI.    Analysis of Tata's Employment Practices                                                            15

       A.    Tata's Applicant Pool                                                                        15

       B.    Contrary to Plaintiffs' Assertion That Tata Had a Uniform Corporate Policy of
             Discrimination, The Hiring Pattern Shows Heterogeneity                                       1817

       C.    Tata's Hiring of Local Workers for Its Southern California Edison Project Was
             Not Racially Biased                                                                          2220

             1.    "Impacted" Former Southern California Edison Employees                                 2321

             2.    Other Local Hires for the Southern California Edison Project                           2624

       D.    Contrary to Plaintiffs' Assertion That Tata Had An Explicit Corporate Policy of
             Discrimination, The Firing Pattern Shows Heterogeneity                                       2927

       E.    The Economic Evidence Contradicts Plaintiff Christopher Slaight's Claim That
             Tata Discriminated Against Him on the Basis of Race With Respect to
             Termination                                                                                 3029

VII.   Conclusion                                                                                        3231

## I.      Qualifications

1.      My name is Edward Lazear. I am the Jack Steele Parker Professor of Human Resources Management and Economics at Stanford University's Graduate School of Business, and the Morris A. and Nona Jean Cox Senior Fellow at the Hoover Institution. I have also served as a professor at the University of Chicago, where I currently am a Visiting Distinguished Fellow. I received my Ph.D. in Economics from Harvard University and my A.B. and A.M. degrees from the University of California at Los Angeles.

2.      I served as Chairman of the President's Council of Economic Advisers from 2006 to 2009. In my position as the chief economic advisor to President George W. Bush, I helped formulate the government's economic policy, including briefing the President on issues relating to labor and unemployment, macroeconomic and fiscal policy, energy, health, environment, tax policy, economic issues in education and student loans, trade policy, telecommunications and the Internet, and antitrust and regulatory issues. I have testified before Congress on a number of occasions. I also served on the President's Advisory Panel on Federal Tax Reform in 2005. In addition, I have been an advisor to the governments of Czechoslovakia, Romania, Russia, Ukraine, and Georgia.

3.      My research applies economic principles and econometric techniques to a range of issues, including labor economics, personnel economics, discrimination, education, worker and executive compensation, pricing and marketing policies, the impact of new products on markets, the impact of government policies on a variety of social outcomes, and the effect of incentives on behavior.

4.      I have taught courses in many different areas of economics, including labor economics, the economics of discrimination, personnel economics, productivity, industrial organization, microeconomic theory, government economic policy and the macroeconomy, and econometrics and statistics.

5.      I am the founding editor of the *Journal of Labor Economics*, a role in which I served for nineteen years, and have also served as associate editor or as a member of the editorial boards of other journals.

6.      I have over 100 published articles, many of which have been published in top economics journals, including the American Economic Review, Journal of Political Economy, Quarterly Journal of Economics, Journal of Labor Economics, and Journal of Economic Perspectives. I have written or edited twelve books. I have received four honorary doctorates, as well as professional awards recognizing my leadership in economics. I have also received two teaching awards from Stanford University as well as the Davis award for distinguished career service. A copy of my curriculum vitae is included as **Attachment A**. A list of my litigation-related testimony in the past four years is attached as **Attachment B**.

7.      I am being compensated at my standard billing rate of $1,250 per hour. In addition, I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its aggregate billings on matters where the firm supports me. My compensation in this matter, including my compensation from Cornerstone Research, is in no way contingent or based on the content of my opinion or outcomes of this or any other matter.


## II.      Overview of Plaintiffs' Allegations

8.      Plaintiffs, two [1] Caucasian males, allege that Tata Consultancy Services, Ltd. ("Tata") engaged in a pattern and practice of discrimination on the basis of race and national origin in favor of workers of South Asian (primarily Indian) origin.

9.      According to Plaintiffs, Tata "provides consulting, IT, and outsourcing services to companies in the United States and throughout the world" and is "the third largest IT employer in the world" with about 14,000 employees in the United States. [2] Plaintiffs assert that whereas "South Asians made up 1-2% of the United States population" according to the 2010 census, "[a]pproximately 95% of Tata's United States-based workforce is South Asian (primarily from India)." [3] Plaintiffs further assert that "[t]his grossly disproportionate workforce is the result of Tata's intentional pattern and practice of employment discrimination against individuals who are

---

[1] My understanding is that one of the three named plaintiffs, Steven Heldt, has withdrawn from the class action.
[2] Third Amended Complaint, ¶ 20.
[3] Third Amended Complaint, ¶ 22.

not South Asian (or who are not of Indian national origin) or non-South Asians, including discrimination in hiring, placement, and termination decisions."[4] Plaintiffs claim that Tata engaged in discrimination in three ways:

> a.  "Tata employs in the United States a large number of South Asians (primarily Indian) visa workers" and "secures visas for these individuals."[5]
>
> b.  "Tata discriminates in 'local hiring,' *i.e.*, even when Tata hires non-visa dependent individuals who reside locally in the United States, such persons are still disproportionately South Asian."
>
> c.  "[F]or the comparatively few non-South Asians workers that Tata hires, it disfavors these individuals in its employment decisions, including, for example, in placement, promotion/demotion, and termination decisions."[7]

10.  Plaintiffs allege claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981").

11.  Plaintiffs propose to certify two classes defined as follows:

> A. Hiring Class: All individuals who are not of South Asian race or Indian national origin who sought a position with Tata in the United States and were not hired between April 14, 2011 and the date of class certification.
>
> B. Termination Class: All individuals who are not of South Asian race or Indian national origin who were employed by Tata in the United States, were placed in an unallocated status and were terminated between April 14, 2011 and the date of class certification.

12.  Plaintiffs' theory of economic harm is that putative class members "have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities

---

[4] Third Amended Complaint, ¶ 1 (internal reference omitted).
[5] Third Amended Complaint, ¶ 26.
[6] Third Amended Complaint, ¶ 27.
[7] Third Amended Complaint, ¶ 28.
[8] Plaintiffs' Notice of Motion and Motion for Class Certification, February 21, 2017, p. 13.

with regard to placement, compensation, and/or continued employment with Tata."[9] Plaintiffs are seeking compensatory damages, front- and back-pay, and punitive damages.[10]

## III.   Assignment and Summary of Opinions

### A.   Assignment

13.   Tata's counsel have asked me to consider two principal questions:

    a.   Has Tata discriminated in favor of South Asians in hiring decisions and against non-South Asians in termination decisions?

    b.   Are the individual hiring or termination outcomes experienced by proposed class members similar so that they could easily be represented by the named Plaintiffs or are outcomes idiosyncratic within the proposed classes?

### B.   Summary of Opinions

14.   A brief summary of my primary opinions is as follows:

- Tata did not discriminate in favor of South Asians with respect to hiring. I conclude this for two primary reasons. First, Tata's workforce doubled during the proposed class period but the number of South Asians did not. Second, there was too much heterogeneity across geographically dispersed hiring managers in the percent of South-Asians hired to support any conclusion of systematic company-wide discrimination. Specifically, hiring is done by different managers at different locations using different hiring channels. There is a large variation in the percent of South Asians hired across hiring managers and across locations. Additionally, many of Tata clients, rather than Tata itself, retain final approval authority for any hires. There is no common data nor common method that can explain the variations in hiring across locations, hiring managers or channels throughout the proposed classes. Similar heterogeneity exists with respect to the racial patterns of termination probabilities.

---

[9] Third Amended Complaint, ¶ 81.
[10] Third Amended Complaint, "Prayer for Relief."

- Tata did not discriminate in favor of South Asians when making the decision to terminate employees for whom Tata had not found recent project assignments. These termination decisions are not disproportionately concentrated among whites.

15.     For these reasons, I conclude that Tata did not discriminate in favor of South Asians to the detriment of individuals who are not South Asian (or who are not of Indian national origin).

16.     The rest of this report provides details of the analyses supporting the opinions summarized above. I have reviewed a variety of materials in forming my opinions in this case, including legal pleadings, depositions of the named Plaintiffs and Tata management representatives, and data and documents produced in discovery. **Attachment C** contains a list of materials I relied upon in forming my opinions. I reserve the right to update my opinions as additional discovery and/or additional data/information becomes available.

## IV.     Analytical Framework

17.     Tata Consultancy Services, Ltd. is a multinational "Information Technology (IT) services, consulting and business solutions company" headquartered in Mumbai, India.[11] As of 2015, the company had 319,656 employees worldwide, of which approximately 10.4% were non-Indian nationals—an increase from 7.3% in 2012.[12] Tata's North American operation, Tata Consultancy Services America ("TCS"), is headquartered in New York, New York.[13] As of October 2016, there were over 9,000 employees based in the United States.[14] This represents an increase of 300 percent in the size of the workforce between the start of the proposed class period through October 2016.

18.     Tata Consultancy Services America undertakes projects, or contract work, with firms located across the United States that pay TCS to improve the efficiency of or update the operations of their IT systems. Thus, these customers for TCS services seek to indirectly hire skilled IT specialists to perform professional services. As in other consulting firms, the IT

---

[11] Tata Consultancy Services Annual Report 2011–2012, p. 21.
[12] Tata Consultancy Services Annual Report 2011–2012, p. 27; Tata Consultancy Services Annual Report 2014–2015, pp. 60–61.
[13] http://www.tcs.com/worldwide/n_america/locations/usa/Pages/offices.aspx.
[14] TCSLTD003463399.

professionals hired by TCS will often be specialists who will locate to job sites. The process of hiring and assigning IT professionals to clients is described in detail below.

### A.  Issues

19.     The fundamental questions in this case are the following. First, what is the proportion of Indians or South Asians in the U.S. workforce of Tata? Second, if there are large numbers of Indians/South Asians, is this achieved through a widespread pattern, across hiring managers and locations, of consistently hiring large percentages of Indians/South Asians, suggesting evidence of discrimination? Third, do terminations favor keeping South Asians?

20.     Fourth, if some locations within Tata have a sizable percentage of South Asians among their workforce, does this suggest they are discriminating or is there an alternative benign explanation that is consistent with observing the same pattern? For example, it is quite possible that those of Indian origin in the United States are more likely to apply to Tata than those of non-Indian origin. Tata is a well-known Indian company, particularly among U.S.-based Indian technical workers. One possibility is that Indians choose to apply for jobs at Tata because the jobs provide working conditions and working environments that are familiar and are compatible with their own cultural experiences, and from their point of view, Tata provides a brand name on their resume. Non-Indians may avoid applying to Tata because Tata is less well known to them than U.S.-based technology and technology consulting companies. Either this explanation or the discrimination theory could generate patterns of predominantly Indian or South Asian employment at Tata, but the key question is whether the more sinister discrimination explanation or the more benign applicant-choice explanation is accurate. At the end of 2016, Tata employed 7,000 people in the United States, out of a U.S. IT skilled workforce of 2 million. Those skilled IT workers in the United States of non-Indian origin may not be familiar with the Tata brand, and perhaps as a result, would not recognize it as an option for gaining valuable experience, for networking with other IT workers to gain access to future IT jobs, or for indicating on their resume that they worked for a name-brand company.

21.     Another possibility is that applicants choose to apply or not to Tata based on their perceived expected productivity at Tata. There is no reason to assume that Indians (and other South Asians) have the same productivity-relevant experience as others. For example, if those in the United States who have immigrated from India are disproportionately IT professionals, the

likelihood of an Indian applying to Tata would be higher than that of a native-born Caucasian American. Once again, it is essential to distinguish between explanations of the data that are based on discrimination by Tata and those that are based on other, legitimate considerations.

### B.    Data

22.    Plaintiffs' expert is Dr. David Neumark. To ensure comparability, wherever possible I rely on the same data. There are two sources of data relevant to analyzing these issues: broad labor market data and data from Tata.

23.    Broad labor market data come from the American Community Survey. The American Community Survey is an annual survey conducted by the U.S. Census Bureau to provide yearly updates to demographic, social, and economic data reported in the Census Bureau's decennial census.[15]   In particular, the data allow analysis of labor force statistics by, among other things, occupation code, education, race, and local area (metropolitan statistical area).[16]

24.    The Tata data are the employees' records maintained by the company. These data include, but are not limited to, information regarding salary, immigration status, race, past projects, and reasons for separation of past employees.

### V.    Background: The Proposed Classes Encompass a Large Geographic Area, Multiple Hiring Channels, and Multiple Tata Decision Makers

25.    As discussed above, Plaintiffs propose two classes: a hiring class and a termination class over a six-year class period.

26.    The descriptions below of the business processes used by Tata to staff projects and hire and terminate workers are based on descriptive statistical analysis of Tata's personnel, hiring, and termination data as well as information on Tata's business organization. The analysis also relies on several qualitative sources, including the declarations of Amit Jindal, Balaji Ganapathy, Brian Andrillo, Jeevak Sharma, Shyam Sundar Chinnari, and Umesh Kumar.

---

[15] "What is the American Community Survey?," https://www.census.gov/programs-surveys/acs/about.html, last accessed on 1/13/17.
[16] For a list of many of the variables included in the American Community Survey, see "2015 Code Lists," https://www2.census.gov/programs-surveys/acs/tech_docs/code_lists/2015_ACS_Code_Lists.pdf.

### A.    Staffing, Hiring, and Termination

27.    Tata's objective is to help its customers achieve greater efficiency by enhancing customers' existing information technology systems or developing new ones.[17]  As Tata undertakes a consulting project at a customer's site, the customer may choose to retain some of its own IT staff, reduce its staff, or eliminate its staff relating to the project.[18]

28.    Tata assigns each customer one or more "Hiring Managers" (also known as "Business Managers") who oversee the customer relationship on a day-to-day basis and on the project level.[19]  Business managers are responsible for determining staffing needs for the project and, with input from the client, determining which existing employees should be staffed on the project.[20]  If it is necessary to hire a new employee, the Business Managers decide who should be hired from the local market, often subject to final client approval.[21]  Tata staffs its projects based on the skills required for the assignment.[22]  The Business Manager's selection process is governed by his or her own assessment of the skills needed for the project and the candidate's ability to meet those technical needs.[23]  To staff a project, the Business Managers choose initially from "existing" employees, which consists of a pool of Tata employees who are monitored by Tata's Resource Management Group.[24]  "Existing" Tata employees are current employees who have been hired from local labor markets ("local hires") and "expats" who have been temporarily transferred to the United States on a visa from Tata in India.[25]  Employees of Tata in India who are "visa ready" are used when job requirements or lack of availability in the United States requires Tata to activate visas for those Indian employees to travel to the United States.[26]  Recall that worldwide Tata has 319,656 employees, and thus can move employees from elsewhere in the world when needed for specialized projects, though it is not customary to do this.

---

[17] Declaration of Jeevak Sharma in Support of Defendant Tata Consultancy Services Ltd.'s Motion for Summary Judgment, January 31, 2017 ("Sharma Declaration I"), ¶ 2.
[18] Sharma Declaration I, ¶ 2.
[19] Declaration of Umesh Kumar, March 20, 2017 ("Kumar Declaration"), ¶ 5.
[20] Kumar Declaration, ¶ 5.
[21] Kumar Declaration, ¶ 5.
[22] Sharma Declaration I, ¶ 3.
[23] Kumar Declaration, ¶ 16.
[24] Sharma Declaration I, ¶ 3.
[25] Sharma Declaration I, ¶ 3.
[26] Sharma Declaration I, ¶ 3.

29.     Tata's Resource Management Group only draws employees for project placement from the existing Tata employees in the United States or from the Tata operations in India (or worldwide). They rarely sponsors H1-B visas for immigrants who were not employed by Tata in an international location.[27]

30.     If there are no existing employees available for an assignment and the project is short-term (typically less than one year), Tata will fill a vacancy with a temporary contract employee (termed a "Business Associate") employed by a third-party vendor.[28]  These temporary workers are not substitutes for a regular workforce and their compensation is paid by the third-party vendor.[29]  The employee data used below do not include these workers, who are not employees of Tata, and Tata infrequently hires its employees from this pool of temporary workers.

31.      If the project is long-term, Tata's recruiting department, the Talent Acquisition Group, will begin the process of recruiting a full-time local hire.[30]  Tata prefers to hire employees who will live near its customer's site (rather than sending employees home each weekend), thus Tata looks to hire local employees through a number of hiring channels.[31]  According to Tata, the majority of new hires are hired through vendors.[32]  Other hiring channels are direct social networking by TCS, employee referrals, campus recruitment, TCS's online career portal, rehiring of prior employees who resigned or were terminated due to being unallocated, and conversion of temporary independent contractors.[33]

32.     Tata's Talent Acquisition Group is divided into three subgroups for recruiting new permanent hires: (1) Technical Recruitment, which is responsible for hiring technology-related positions in the United States, such as engineers, programmers, and network analysts; (2) Campus Recruitment, which is Tata's program for college recruitment; and (3) Professional Recruitment, which hires for non-technical positions such as administration, sales, human resources, business consultants, finance, and legal.[34]

---

[27] Sharma Declaration I, ¶ 8.
[28] Sharma Declaration I, ¶ 4.
[29] Sharma Declaration I, ¶ 4.
[30] Sharma Declaration I, ¶ 8.
[31] Kumar Declaration, ¶ 12.
[32] Declaration of Shyam Chinnari, March 20, 2017 ("Chinnari Declaration"), ¶ 8.
[33] Chinnari Declaration, ¶ 8.
[34] Chinnari Declaration, ¶ 2.

33.     The Talent Acquisition Group usually works with headhunters, who are not affiliated with Tata, to help locate suitable applicants.[35]  Tata requires that all vendors, including headhunters, comply with Tata's policies prohibiting discrimination in employment.[36]  Tata does not direct vendors to preselect applicants with specific races or national origins, but rather requires that vendors are neutral with respect to race and national origin.[37]  Headhunters exercise their own discretion in determining which résumés to forward to Tata.[38]

34.     After the Talent Acquisition Group collects a set of resumes of possible new hires, the hiring manager makes the decision to hire. The policy of the Talent Acquisition Group is to forward all resumes received from all sources to the hiring manager who is assigned to do the hiring for a particular project.[39]  After consulting with the customer, the hiring manager will select which candidates to interview.[40]  Candidates are interviewed by the hiring manager, but the customer almost always interviews the candidate and all hiring decisions are subject to customer approval.[41]  Hiring managers are also free to recruit and hire candidates that they have located on their own.[42]

35.     In sum, employees are obtained for new consulting projects in two ways. They may come from the existing employees, a group which is monitored by the Resource Management Group. This group of employees may come from Tata India on a visa for special jobs. Or project managers and clients may be involved with hiring new employees from the United States labor market. These new employees will be sourced by the Talent Acquisition Group from eleven possible hiring channels and the final decision to hire is made by the local hiring manager in consultation with the client.

36.     When Tata completes a project or, more precisely, when an employee has completed his or her specific assignment on a project, the employee moves from an "allocated" to an

---

[35] Chinnari Declaration, ¶ 5.
[36] Chinnari Declaration, ¶ 6.
[37] Chinnari Declaration, ¶ 6.
[38] Chinnari Declaration, ¶ 7.
[39] Chinnari Declaration, ¶ 10.
[40] Chinnari Declaration, ¶ 10.
[41] Chinnari Declaration, ¶ 10.
[42] Chinnari Declaration, ¶ 10.

"unallocated" status within Tata.[43]   Employees can also become unallocated if they are removed from the project for lack of needed skills, problems with funding, client issues, or at the employee's own request.[44]   Unallocated employees are referred to as being "on the bench."[45]   The Resource Management Group manages all unallocated employees and seeks to assign them to new Tata projects or new roles in existing Tata projects.[46]   The process of reassigning an unallocated employee is based on the employee's skills, work history (including the industry or Tata "vertical" in which the employee has worked), as well as the employee's expressed agreement to change locations for a new assignment.[47]   Restrictions on location, lower technical skills, or less experience dictate how quickly an employee may be reassigned and removed from the bench.[48]   Unallocated employees are paid their regular salaries and receive all benefits while on the bench.[49]

37.     If the Resource Management Group is unable to allocate a benched employee after a reasonable period of time, the Group may then propose an employee for termination.[50]   Tata uses a three-tiered system of review before local employees are terminated.[51]   First, if an employee remains unallocated for a minimum of two weeks and the employee's skillsets and geographic requirements have not been aligned and are not forecasted to be aligned in the future, with available openings, the employee is referred to one of 30 "Talent Engagement Partners" within the Resource Management Group for possible reassignment.[52]   Second, the Talent Engagement Partner reviews the employee's employment history and decides whether to propose an employee for termination.[53]   If the Talent Engagement Partner decides to propose an employee for termination, the Partner must complete a "TCS Termination Form" that documents the reason for termination and the steps taken to attempt to place the employee. Third, the Termination Form

---

[43] Kumar Declaration, ¶ 19.
[44] Kumar Declaration, ¶ 19.
[45] Kumar Declaration, ¶ 20.
[46] Kumar Declaration, ¶ 20.
[47] Kumar Declaration, ¶¶ 11, 20.
[48] Kumar Declaration, ¶ 20.
[49] Kumar Declaration, ¶ 20.
[50] Kumar Declaration, ¶ 21.
[51] Declaration of Jeevak Sharma, March 20, 2017 ("Sharma Declaration II"), ¶ 9.
[52] Sharma Declaration II, ¶ 9.
[53] Sharma Declaration II, ¶ 9.

and documentation are sent to Tata's legal and human resource departments for review.[54] The final termination decision is made by the Deputy Head of Human Resources.[55]

38.     Tata's policy is to retain locally hired employees whenever it is economically sensible to do so.[56] Tata recognizes that it has made a substantial investment in recruiting, hiring, and training its local employees.[57] Even while an employee is being reviewed for possible termination, the Resource Management Group continues to look for suitable projects for the employee.[58] If an opening is found, the employee will be removed from the termination process and assigned to the project.[59]

### B.     Multiple Tata Decision Makers, Hiring Channels, and Hiring Locations

39.     Plaintiffs allege an explicit corporate policy that "favors South Asian Indian nationals in its U.S workforce hiring and termination actions...."[60] As described above, the key decision makers for hiring are the hiring managers who are dispersed geographically near new clients and the non-Tata-employed managers at Tata's clients' offices. Although an analysis of non-Tata-employed managers is not possible, analyses of Tata data show substantial turnover within hiring managers at Tata. Over the proposed class period, there was a total of 1,648 hiring managers, 72% of whom had a tenure of one year or less and 55% of whom had a tenure of less than three months.

40.     Tata U.S. employees are hired through eleven main channels,[61] although third-party vendors, employee referrals, direct applicants, and campus recruiting account for the majority of hires. Over half (57%) of Tata's hiring managers were associated with one hiring channel at Tata, but nearly a quarter (24%) were associated with two channels and 11% were associated with three channels.

---

[54] Sharma Declaration II, ¶ 9.
[55] Sharma Declaration II, ¶ 9.
[56] Sharma Declaration II, ¶ 10.
[57] Sharma Declaration II, ¶ 10.
[58] Sharma Declaration II, ¶ 11.
[59] Sharma Declaration II, ¶ 11.
[60] Motion for Class Certification, p. 1.
[61] These channels are third-party vendors, campus recruits, rehire, direct applicant, employee referral, job board, TCS job portal, social networking, BA ("business associate") conversion, career fair, and job postings.

41.     Further, there is substantial variation in the number and location of Tata employees across the United States. Some states, such as Alabama, had as few as six employees, while others, such as California, Illinois, Michigan, New Jersey, New York, Ohio, and Texas, had over 200 employees in each year of the proposed class period.

42.     As shown below, there are substantial differences in hiring outcomes across locations in the proposed classes. Given the variety of hiring channels, the many decision makers involved and the fact that the hiring managers change substantially over time, and given the dispersion of employees across the country, it is not surprising that hiring outcomes, as demonstrated below, differ significantly among hiring manager, locations, and hiring channels.

43.     The relevant group for determining whether Tata disproportionately favored South Asians in hiring decisions is the set of employees hired in the United States, not internal transfers from other worldwide operations or temporary workers from independent contractors. The analysis to determine the existence of discrimination focuses on "local" U.S. hires.

44.     When internationally sourced employees are hired by Tata in the United States, they only transfer from within worldwide Tata. Therefore, it has to be extremely likely that these employees will be of Indian origin because Tata is an Indian company. The search for evidence of discrimination must come only from the "local" U.S. hires, because those sourced internationally will be Indian the vast majority of the time, and thus Indian hires within this international group would not be evidence of discrimination against non-Indians. Because most of Tata's current worldwide employees are located in India, there is almost no way that international transfers could be anything other than disproportionately Indian.

45.      Further, the use of "expats" from India worldwide is not evidence of a camouflage for the desire to discriminate. It is rational, absent discrimination, to use transfers rather than new hires to fill open slots. There is a strong business rationale for favoring current employees over new ones to the extent that those employees can satisfy a job's requirements. Current workers already know the company and its procedures. They have revealed their effectiveness in the Tata environment through past performance. There is a large literature that discusses these productivity-based rationales for favoring insiders over outsiders. One reason is that they have

"firm-specific human capital,"[62] defined as skills that make the worker more valuable in his or her current company than elsewhere. The second reason is that the worker's quality has already been assessed through his employment with worldwide Tata.

46.     This practice is not unique to Tata. For example, a *Wall Street Journal* article written during the proposed class period gives the example of another consulting firm (Booz, Allen and Hamilton) that tried to hire outside, but then reverted to using its own people for productivity reasons:

> "We overlooked our own people. It was easier to go to the outside," said Lucy Sorrentini, a principal in people services at Booz. The company has since found it is more efficient to use insiders over new hires from the outside. "They know our firm and in some cases they already know the client," she said.

47.     Tata's practice mirrors that of other well-known project-oriented businesses in the United States.[64]

48.     Additionally, data on the composition of temporary contract workers hired through third-party vendors cannot speak to Tata's alleged discriminatory practices. The pool of applicants for these jobs is determined by the contractor, not by Tata. Furthermore, these workers are not hired as substitutes for Tata's permanent employees. Tata always prefers to use local hires to third-party contractors when it is economically feasible.[65]   Although it might be alleged that Tata intentionally picks vendors that have predominantly Indian workers, there is no evidence that this is the case. In fact, Tata claims that it requires all of its vendors to sign an Equal Employment Opportunity Policy Program which includes language such as "[d]iscrimination against employees and applicants due to race, color, religion, sex (including sexual harassment),

---

[62] See Becker, Gary S., "Investment in Human Capital: A Theoretical Analysis," *Journal of Political Economy*, Vol. 70, No. 5, Part 2: Investment in Human Beings (Oct., 1962), pp. 9–49.
[63] Silverman, Rachel, and Lauren Webber, "An Inside Job: More Companies Opt to Recruit from Within," *Wall Street Journal*, 5/29/2012.
[64] Other companies mentioned in the above article that have developed innovative ways to recruit internally include Cisco, Shaw Group, Inc., and Google.
[65] Deposition of Umesh Kumar ("Kumar Deposition"), January 27, 2016, at 56:14–22.

national origin, disability, age (40 years or older), military and veteran status is prohibited. Violations of this policy will be subject to discipline, up to and including termination."[66]

49.     It is for these reasons that I have analyzed only the set of U.S. local hires to determine whether Tata disproportionately favored South Asians. This is the group over which Tata has control. Omitted from the empirical analysis are the temporary workers hired by outside vendors who are not employees, and the international transfers from worldwide Tata who would almost have to be Indian since Tata is an Indian firm.

## VI.     Analysis of Tata's Employment Practices

### A.     Tata's Applicant Pool

50.     Tata's primary source of job candidates, as discussed earlier, is from its vendors (also called third-party recruiters) from whom Tata obtains more than 50 percent of its new hires. Three declarations provide details on Tata's hiring practices. All state that they have never been asked to discriminate nor would they be willing to discriminate on the basis of race. Altus, for example cites the following racial makeup for its applicants: Asian Indian: 55%, Chinese: 3%, Filipino: 1%, White: 30%, Canadian: 4%; Black or African American: 3%, Hispanic or Latino: 4%, American Indian and Alaska Native: 0%, .[67]  DextPro cites similar numbers: 50% for Southern Asians, 4% for other Asians, 43% for whites, 2.6% for blacks, and 0.4% for Hispanic.[68] These numbers are consistent with the distribution of Tata's local hires. In 2015, the makeup of Tata's workforce was 50.2% for South Asian, 3.7% for other Asian, 33.8% for white, 6.3% for black, 3.5% for Hispanic, 1.6% for other, and 5.6% with no race indicated.

51.     Taken together, these figures suggest that South Asians comprise a high percentage of the applicant pool for Tata local jobs; that other Asians, such as Chinese, tend not to apply for jobs at Tata; and that when other Asians do apply for jobs at Tata, the company does not discriminate

---

[66] Plaintiffs' Exhibit 38, TAH000685332. See also TAH000685335, TAH000685342.
[67] Motion for Class Certification, Exhibit 36.
[68] Motion for Class Certification, Exhibits 36 and 38.

against them in hiring because representation among hires reflects representation in the applicant pool.

52.     A difficulty arises in generating a table of breakouts by race because about 4 percent of all Tata employees do not self- report a race. Further, the split between South Asian and Asian is also problematic because it requires information about nationality, which is often missing . We define a person as South Asian if they are defined as employees with a nationality of India, employees with a race of Asian and nationality of Pakistan, Nepal, Bangladesh, Sri Lanka, or United States, or employees with a race of Asian, missing nationality, and last name that matches the name of an employee categorized as South Asian under the two previously mentioned criteria. Non-South Asians are defined as employees not categorized as South Asian and whose race is Asian and nationality is not missing or employees whose race is Asian, nationality is missing, and last name matches the name of an employee categorized as non-South Asian under the previously mentioned criteria.

## Figure 1: Racial Composition of Tata Workforce [1]
### By Race and Year [2]

| Race | 2011 [3] | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|
| **Count** | | | | | |
| South Asian [4] | 2,222 | 2,380 | 2,677 | 2,866 | 3,153 |
| Non-South Asian [5] | 10 | 10 | 10 | 20 | 19 |
| Undetermined Asian [6] | 49 | 83 | 166 | 304 | 633 |
| White | 906 | 1,133 | 1,449 | 1,662 | 2,183 |
| Black | 79 | 136 | 224 | 277 | 406 |
| Hispanic | 78 | 75 | 114 | 123 | 229 |
| Other [7] | 15 | 34 | 49 | 71 | 106 |
| No Race [8] | 154 | 130 | 224 | 209 | 362 |
| **Total** | **3,513** | **3,981** | **4,913** | **5,532** | **7,091** |

| Race | 2011 [3] | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|
| **Percentage** [4] | | | | | |
| South Asian [4] | 63.3% | 59.8% | 54.5% | 51.8% | 44.5% |
| Non-South Asian [5] | 0.3% | 0.3% | 0.2% | 0.4% | 0.3% |
| Undetermined Asian [6] | 1.4% | 2.1% | 3.4% | 5.5% | 8.9% |
| White | 25.8% | 28.5% | 29.5% | 30.0% | 30.8% |
| Black | 2.2% | 3.4% | 4.6% | 5.0% | 5.7% |
| Hispanic | 2.2% | 1.9% | 2.3% | 2.2% | 3.2% |
| Other [7] | 0.4% | 0.9% | 1.0% | 1.3% | 1.5% |
| No Race [8] | 4.4% | 3.3% | 4.6% | 3.8% | 5.1% |
| **Total** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Source: TCSLTD003463394; TCSLTD003463395; TCSPROD000000150; TCSPROD000000151; TCSLTD003463399; TCSLTD003463400

Note:

[1]  Includes only local employees.

[2]  An employee is included as having been part of Tata's workforce as of the snapshot date if he or she was hired on or before the date of the snapshot and was not separated from Tata as of the snapshot date. Unless otherwise specified, the date of the snapshot is as of January 1st of that year.

[3]  For 2011 the snapshot date is as of April 13, 2011, the day prior to the proposed class period start.

[4]  South Asians are defined as employees with a nationality of India, employees with a race of Asian and nationality of Pakistan, Nepal, Bangladesh, Sri Lanka, or United States, or employees with a race of Asian, missing nationality, and last name that matches the name of an employee categorized as South Asian under the two previously mentioned criteria.

[5]  Non-South Asians are defined as employees not categorized as South Asian and whose race is Asian and nationality is not missing or employees whose race is Asian, nationality is missing, and last name matches the name of an employee categorized as non-South Asian under the previously mentioned criteria.

[6]  Employees with a race of Asian not defined as South Asian or non-South Asian.

[7]  Includes employees whose EEO form details specified their race as either "American Indian" or "Two or more races."

[8]  Includes employees whose race was unavailable.

**B.      Contrary to Plaintiffs' Assertion That Tata Had a Uniform Corporate Policy of Discrimination, The Hiring Pattern Shows Heterogeneity**

53.      As discussed above, Plaintiffs assert that the impact is common because of an allegedly uniform corporate policy of discrimination against non-South Asians. Plaintiffs' argument implies that hiring and terminating managers did not have sufficient discretion to deviate from company-wide policy and, as such, could not be the appropriate units for the determination of discrimination.

54.      There is a standard statistical test that economists and statisticians use to determine whether there are significant differences within the sample that require analyzing data at a finer level of aggregation than initially hypothesized. In this case, Plaintiffs' hypothesis is that the United States is the appropriate level on which to base the analysis. If that hypothesis is rejected because locations differ sufficiently to require analysis at the location level, then what occurred within the larger region (in this case, the entire country) cannot be deemed to be common, and Plaintiffs' hypothesis that discrimination was determined and implemented at the national level cannot be accepted. Instead, analysis at the location or manager level is required to determine the possible impact on any given class member in each proposed class.

55.      The following statistical analyses show evidence consistent with my opinion that Plaintiffs' hypothesis that discrimination was determined and implemented at the national, company-wide level should be rejected. These analyses were performed to test hiring and termination of local Tata employees during the proposed class period.

56.      For hiring outcomes, the proportions of South Asians among new hires during the proposed class period were compared across subgroups along several dimensions. These dimensions include hiring locations, hiring managers, and hiring channels. These dimensions were chosen because different decision makers may be involved in the hiring process across different locations and hiring channels. In other words, if the alleged discrimination is a company-wide national policy, as Plaintiffs allege, then finding statistically significant heterogeneity in hiring patters in the percentage of new hires who are South Asian across different locations and hiring channels and hiring managers demonstrates that Plaintiffs'

hypothesis of a company-wide discrimination policy should be rejected. There was statistically significant heterogeneity across all three dimensions.[69] Other factors at the location level, hiring manager level, and hiring channel level are clearly operating to affect outcomes. But those factors are neither common nor capable of being modeled with the common data. **Figure 2**A, 2B, and 2C below illustrates the heterogeneity across hiring managers, location and hiring channel.

57.      2A shows how the likelihood of hiring a non-Asian varies by channel. The observed variation is tested for significance. The F-test was 15.77 (with 12 and 5936 degrees of freedom) for the regression that was testing whether there were insignificant differences in the proportion of South Asians among new hires across hiring channels, as shown in Figure 2A. It rejects that there were insignificant differences across hiring channels.

58.      2B shows how the likelihood of hiring a non-Asian varies by state. The observed variation is tested for significance. The F-test was 15.03 (with 45 and 6866 degrees of freedom) for the regression that was testing whether there were insignificant differences in the proportion of South Asians among new hires across states, as shown in Figure 2B. It rejects that there were insignificant differences across states.

59.      2C shows how the likelihood of hiring a non-Asian varies by hiring manager. The observed variation is tested for significance. The F-test was 2.55 (with 1416 and 4697 degrees of freedom) for the regression that was testing whether there were insignificant differences in the proportion of South Asians among new hires across hiring managers, as shown in Figure 2C. It rejects that there were insignificant differences across hiring managers.

---

[69] The standard test for homogeneity is called an "F-test." The hypothesis for this test is that there is homogeneity (or commonality) within the larger, pooled population (in this case, local Tata employees in the United States). The test determines whether this hypothesis can be rejected in favor of one that concludes that smaller subgroups (in this case, for example, different locations) are different. The F-Test for 2A is 15.77. The F-test for 2B regression with state is 2.553, and the F-test for 2C is 15.03.



Figure 2A: Proportion of Local South Asian[1] Hires[2]
By Channel of Hire[3]
During Proposed Class Period[4]

Source: TCSLTD003463394; TCSLTD003463395; TCSPROD000000150; TCSPROD000000151; TCSLTD003463399;
TCSLTD003463400; TCSPROD000001969
Note:
[1]  South Asians are defined as employees with a nationality of India, employees with a race of Asian and nationality of Pakistan,
Nepal, Bangladesh, Sri Lanka, or United States or employees with a race of Asian, missing nationality, and last name that matches the
name of an employee categorized as South Asian under the two previously mentioned criteria.
[2]  Individuals with missing race or missing channel are excluded.
[3]  Channel is defined as the "Application Source" or "Source of Hire" in the Active and Separated 2016 data.
[4]  Includes local hires beginning on 04/13/2011. Data is available through 04/28/2015.

**Figure 2B: Proportion of Local South Asian [1] Hires [2]**
By State of Hire [3]
During Proposed Class Period [4]



Source: TCSLTD003463394; TCSLTD003463395; TCSPROD000000150; TCSPROD000000151; TCSLTD003463399;
TCSLTD003463400; TCSPROD000001969
Note:
[1]  South Asians are defined as employees with a nationality of India, employees with a race of Asian and nationality of Pakistan,
Nepal, Bangladesh, Sri Lanka, or United States, or employees with a race of Asian, missing nationality, and last name that matches the
name of an employee categorized as South Asian under the two previously mentioned criteria.
[2]  Individuals with missing race or missing state are excluded.
[3]  State is defined as the state of the offer location in the offer data.
[4]  Includes local hires beginning on 04/13/2011. Data is available through 04/28/2015.



**Figure 2C: Proportion of Local South Asian [1] Hires [2]**
By Hiring Manager [3]
During Proposed Class Period [4]

Source: TCSLTD003463394; TCSLTD003463395; TCSPROD000000150; TCSPROD000000151; TCSLTD003463399; TCSLTD003463400; TCSPROD000001969
Note:
[1]  South Asians are defined as employees with a nationality of India, employees with a race of Asian and nationality of Pakistan, Nepal, Bangladesh, Sri Lanka, or United States, or employees with a race of Asian, missing nationality, and last name that matches the name of an employee categorized as South Asian under the two previously mentioned criteria.
[2]  Individuals with missing race or hiring manager are excluded.
[3]  Hiring manager is defined as the hiring manager in the offer data. Due to the number of hiring managers included in the above analysis, the hiring manager numbers have been omitted from the x-axis.
[4]  Includes local hires beginning on 04/13/2011. Data is available through 04/28/2015.

60.     Figure 2C shows that among 1,487 hiring managers, 492 of them did not hire any South Asians during the entire proposed class period. Similarly, 2B shows that four states and 2A one channel did not hire any South Asians during the entire proposed class period. These results demonstrate the difficulties in defining a common practice of discrimination in favor of South Asians. Instead, hiring managers or hiring managers grouped by hiring channels or location seem able and willing to make hiring decisions independent of race.

### C.     Tata's Hiring of Local Workers for Its Southern California Edison Project Was Not Racially Biased

61.     Tata's local hires for the Southern California Edison project to restructure its information technology department comprise two groups: (1) "impacted" former Southern California Edison employees, and (2) other individuals hired permanently for the project. This section discusses

Tata's hiring with respect to each group and concludes that there is no economic evidence of racial bias.

### 1. "Impacted" Former Southern California Edison Employees

62. Following Southern California Edison's decision to engage Tata, Tata held a special meeting to allow former Southern California Edison employees, referred to as "impacted" employees, to apply for positions in the project. In particular, as part of the transition process, Tata invited around 600 "impacted" employees to a town hall meeting to discuss potential openings in the project.[70] These employees were invited to apply for 43 positions that were reserved specifically for these "impacted" employees.

63. Available data were examined to assess Tata's hiring process as applied to the set of "impacted" former Southern California Edison employees. The results of this analysis were then compared to assertions of Mr. Buchanan, a named plaintiff, regarding the Southern California Edison project as well as to an analysis of data from the American Community Survey, a dataset that labor economists often use for analysis. As discussed below, the results of this analysis contradict Mr. Buchanan's claims regarding the hiring process and show that Tata did not disproportionately favor Asians over non-Asians relative to the applicant pool or when compared to an analysis of the racial composition of software and information technology workers in the Los Angeles area.

64. There were three issues that arose in preparing the data for analysis. First, because individuals were not assigned a Tata employee number until they were hired, assembling and comparing data for job applicants, interviewees, those offered jobs, and those who accepted offers was largely based on a process of name matching. Second, as discussed earlier, race information for some employees may be missing and a potential bias is of concern, then we developed a process for assessing whether a person is Asian based on an individual's name. To do this, we relied on Census data on race (by EEOC categories of Asian, white, black, and other) associated with last names and verifying the likely outcome with pictures on social media. This

---

[70] Deposition of Balaji Ganapathy, **date** ("Ganapathy Deposition") at 36:9–37:12; TATA001133040. For a list of the 597 impacted employees, see TATA001129883.

process does not distinguish between categories of Asians nor is it reliable for last names that common among more than one ethnic group.

65.     When analyzing data from Southern California Edison, data on race was only maintained by the categories required by EEOC guidelines and did not provide any additional detail, meaning that South Asians could not be differentiated from other Asians.

**66.**     **Figure 3** tabulates the number and race of the individuals comprising the four phases of Tata's hiring related to the "impacted" former Southern California Edison employees: (1) those identified as "impacted" employees, (2) job applicants, (3) persons offered a job, and (4) individuals who accepted an offer. This table shows that there were 597 former Southern California Edison employees identified as "impacted." Of those 597 individuals, 173 applied for a position, 47 received offers, and 43 accepted offers of employment.

**67.**     **Figure 3** also provides a count of impacted individuals by race and calculates the percentage of Asians and non-Asians for each group. Thus, about 42% of the impacted employees were Asian, and 35% of impacted employees were white.

**Figure 3: Southern California Edison Project
Tata Did Not Discriminate Against Non-Asian "Impacted" Former Southern
California Edison Employees Who Applied for Positions in Tata**

| Race [1] | Number of "Impacted" Employees | Number of Applicants [2] | Number of Offers | Number Joined |
|---|---|---|---|---|
| **Count** | | | | |
| Asian | 249 | 81 | 24 | 23 |
| White/Not Hispanic Origin | 209 | 45 | 11 | 9 |
| Black/Not Hispanic Origin | 27 | 5 | 1 | 0 |
| Hispanic | 100 | 39 | 10 | 10 |
| Other [3] | 12 | 3 | 1 | 1 |
| **Total Count** | 597 | 173 | 47 | 43 |

| | Percent of "Impacted" Employees | Percent of Applicants [4] | Probability of an Offer Given an Application [4] | Probability of Acceptance Given an Offer [4] |
|---|---|---|---|---|
| **Percentage/Probability** | | | | |
| Asian | 41.7% | 32.5% | 0.30 | 0.96 |
| White/Not Hispanic Origin | 35.0% | 21.5% | 0.24 | 0.82 |
| Black/Not Hispanic Origin | 4.5% | 18.5% | 0.20 | 0.00 |
| Hispanic | 16.8% | 39.0% | 0.26 | 1.00 |
| Other [3] | 2.0% | 25.0% | 0.33 | 1.00 |
| **Total Percentage/Probability** | 100.0% | 29.0% | 0.27 | 0.91 |

Source: TATA001129883; TATA001138313; TATA001133781; TCSLTD000625276; TCSPROD000001057; TATA001135987; TATA001135032

Note:
[1] Self-reported race. If race information is not reported or is unavailable, surname information was matched with the most common race using the U.S. Census Bureau's study of frequently occurring surnames. If race information was still unavailable, topical research was performed to determine the ethnic origin of the first and last name.
[2] The number of applicants is derived from both the applicant pool and the interview pool.
[3] "Other" includes "Two or More Races."
[4] Percentages or probability for each race are computed as follows: %Applicants = #Applicants/#Impacted Employees, %Offers = #Offers/#Applicants, and %Joined = #Joined/#Offers.
[5] There were 71 "Impacted" Employees that did not declare a race. It was estimated using the previously discussed methodology that 41 of those were white, 21 were Asian, and 9 were Hispanic. There were 14 applicants who did not declare a race. It was estimated that, of these, seven were white, five were Asian, and two were Hispanic.

68.     Two statistics are important for the purposes of assessing discrimination. First and foremost is the likelihood of being offered a job, conditional on applying. According to the above table, 81 of the 173 applicants were Asian and 45 were white. Of the 81 Asian applicants, Tata made offers to 24 with an offer rate of 0.30. The offer rate to whites was 0.24 or 11 out of 45. Although the offer rate was somewhat higher to Asians than to whites, the difference is not statistically significant. The usual standard in research and litigation for statistical significance is that there is less than a 5% probability that the observed pattern could be produced by mere chance. That standard is not close to being met here. Put differently, the difference between the

proportion of jobs offered to Asian applicants and white applicants is close, indeed too close to conclude that it was caused by the challenged conduct rather than chance.[71]

69.     Further, the conclusion is unchanged if the comparison is between Asians and non-Asians. There are 23 non-Asians who received offers. Once again, the offer rate is slightly higher to Asians than to non-Asians taken as a group, but the difference is not statistically significant.

70.     A second possibility is that whites or non-Asians in general do not apply because they know that they will be turned down. But this possibility is not valid for, as just shown, there is no statistically significant difference in the probability that a non-Asian applicant is offered a job relative to an Asian applicant. So the premise that whites or non-Asians decline to apply because they know they will be turned down is an incorrect one.

### 2.     Other Local Hires for the Southern California Edison Project

71.     The previous section presented an analysis of Tata's hiring process for "impacted" former Southern California Edison employees. This section considers Tata's hiring of additional local workers for the Southern California Edison project for slots not reserved for "impacted" employees and concludes that the data do not support a claim that the staffing was disproportionate or racially biased.

72.     Tata's hiring of these additional local hires would be drawn from the Los Angeles market. **Figure 4**, below, shows the racial composition of software and information technology workers in Los Angeles averaged over the years 2011 to 2014. About 37% of the workers are Asian, and about 45% are white.

---

[71] The conclusion is the same if those employees who did not declare a race were removed. In this case, there would be 24 of 81 Asians who received offers, and 11 out of 38 whites who received offers. This does not come close to meeting standards required for statistical significance. The statistical test used is the 2-tailed t-test, which is the standard test used for this kind of analysis.

**Figure 4: Racial Composition [1] of Workers [2] in the Computer Systems Design and Related Services Industry [3] with Software-Related Occupations [4] in Los Angeles [5]**
**2011–2014**

| Race | Percent |
|------|---------|
| Asian | 36.8% |
| White/Non Hispanic Origin | 44.8% |
| Black/Not Hispanic Origin | 4.1% |
| Hispanic | 10.7% |
| Other | 3.5% |

Source: Steven Ruggles, Katie Genadek, Ronald Goeken, Josiah Grover, and Matthew Sobek. Integrated Public Use Microdata Series: Version 6.0 [Machine-readable database]. Minneapolis: University of Minnesota, 2015.
Note:
[1]  Individual observations are weighted with "perwt" variable, indicating how many individuals in the United States population are represented by a given person in the sample. The total number of observations in the analysis is 2,592.
[2]  The labor market is restricted to all employed persons within the last year between the ages of 18 and 65.
[3]  Defined as ACS industry code 7380.
[4]  Individuals with occupation codes of "Computer and Information Systems Managers," "Computer Scientists and Systems Analysts/Network Systems Analysts/Web Developers," "Computer Programmers," "Software Developers, Applications and Systems Software," "Computer Support Specialists," "Database Administrators," and "Network and Computer Systems Administrators" (occupation codes 110, 1000, 1010, 1020, 1050, 1060, 1100, respectively).
[5]  Defined as the Los Angeles-Long Beach-Anaheim, CA metropolitan statistical area (31080).
[6]  Defined as all individuals with a self-reported race as Asian, including South Asians. This includes individuals who reported their race as "Chinese," "Japanese," and "Other Asian or Pacific Islander."
[7]  Defined as individuals of any single race who also identified themselves as having a Hispanic origin.
[8]  Includes "American Indian or Alaska Native," "Other race, nec" and two or more races.

73.     **Figure 5** shows the ethnicity of Tata's local hires in addition to the impacted former Southern California Edison employees. The table shows that Tata hired 58 long-term employees for the project in addition to the 43 impacted former Southern California Edison hires, and that 28% of these employees were Asian as compared to 55% who were white. The actual hiring pattern by Tata, shown in **Figure 5**, over-represents whites among local hires and under-represents Asians among local hires relative to their weights in the Los Angeles labor pool displayed on Figure 4.

**Figure 5: Southern California Edison Project
Tata Did Not Hire a Disproportionate Number of Asian Employees**

| Race [1] | Tata Hires | | |
|---|---|---|---|
| | Impacted [2] Employees | Other Local [3] Hires | Total Hires |
| **Count** | | | |
| Asian | 23 | 16 | 39 |
| White/Not Hispanic Origin | 9 | 32 | 41 |
| Black/Not Hispanic Origin | 0 | 3 | 3 |
| Hispanic | 10 | 6 | 16 |
| Other [4] | 1 | 1 | 2 |
| **Total Count** | 43 | 58 | 101 |
| | | | |
| **Percentage** | | | |
| Asian | 53% | 28% | 39% |
| White/Not Hispanic Origin | 21% | 55% | 41% |
| Black/Not Hispanic Origin | 0% | 5% | 3% |
| Hispanic | 23% | 10% | 16% |
| Other [4] | 2% | 2% | 2% |
| **Total Percentage** | 100% | 100% | 100% |

Source: TCSPROD000000161; U.S. Census Bureau, 2010 Census; TCSLTD000625276.XLSB; TATA001129883; TATA001138313; TATA001133781; TCSLTD000625276; TCSPROD000001057; TATA001135985; TATA001135032

Note:
[1] Self-reported race. If race information is not reported or is unavailable, surname information was matched with the most common race using the United States Census Bureau's study of frequently occurring surnames. If race information was still unavailable, topical research was performed to determine the ethnic origin of the first and last name.
[2] Former Southern California Edison employees whose jobs were being replaced and who were hired by Tata Consultancy Services, Ltd. If discrepancies existed between self-reported race in the Tata data and the Southern California Edison data, the race declared in the Southern California Edison data was used.
[3] Individuals that were hired to by Tata Consultancy Services to work on the Southern California Edison project.
[4] "Other" includes "Two or more races."
[5] A few of the former Southern California Edison impacted employees declared different races at Southern California Edison and at Tata.
[6] There were 18 local hires did not have race information of whom it was estimated that 12 were white, 4 were Asian, 1 was Black, and 1 was Latino.

74.     Accordingly, this analysis shows that the economic data are inconsistent with Plaintiffs'

assertion, "Mr. Buchanan applied for a job with Tata yet, despite being imminently qualified,

Tata failed to hire him, choosing rather to staff its SCE project with an almost 100% South Asian workforce."[72]

> **D.      Contrary to Plaintiffs' Assertion That Tata Had An Explicit Corporate Policy of Discrimination, The Firing Pattern Shows Heterogeneity**

75.      In an analysis similar to that used to examine hiring patterns, involuntary separations were examined. The results are demonstrated in **Figures 6,** As was true for hiring, significant heterogeneity by location in termination patterns was found. Location was significant in explaining the differences in percentages of non-South Asians fired.[73]   The existence of heterogeneity contradicts the theory that there was a uniform directive at the corporate level to fire more non-Asians.

---

[72] Third Amended Complaint, ¶ 2.
[73] The F-test 2.37 (with 24 and 566 degrees of freedom) . Four states and 492 hiring managers hired only South Asians.

**Figure 6: Proportion of Local South Asian[1] Employees Fired Due to Unallocation[2]**
**By State of Hire[3]**
**During Proposed Class Period[4]**



Source: TCSLTD003463394; TCSLTD003463395; TCSPROD000000150; TCSPROD000000151; TCSLTD003463399;
TCSLTD003463400; TCSPROD000001969
Note:
[1]  South Asians are defined as employees with a nationality of India, employees with a race of Asian and nationality of Pakistan,
Nepal, Bangladesh, Sri Lanka, or United States, or employees with a race of Asian, missing nationality, and last name that matches
the name of an employee categorized as South Asian under the two previously mentioned criteria.
[2]  Employees are defined as fired if they have a separation category of "Involuntary," and have a separation category of
"Unallocated." Individuals with missing race or missing state are excluded.
[3]  State is defined as the state of the offer location in the offer data.
[4]  Includes local employees who are terminated beginning 04/14/2011. Data is available through 04/28/2015.

**E.      The Economic Evidence Contradicts Plaintiff Christopher Slaight's Claim That Tata Discriminated Against Him on the Basis of Race With Respect to Termination**

76.      Plaintiffs assert that Christopher Slaight graduated with a degree in computer information systems and database management in June 2012, was hired by Tata in early July 2012, and underwent training in Ohio and India over the next two months. According to Plaintiffs, Mr. Slaight was assigned to a project in October 2012, but was never assigned any meaningful work. Six months later, on March 29, 2013, Mr. Slaight was removed from the project and placed on the bench of unallocated employees. Tata terminated Mr. Slaight's employment on April 19, 2013. Plaintiffs allege that Mr. Slaight's experience at Tata was the result of an "intentional pattern and practice of employment discrimination against individuals who are not South Asian (or who are not of Indian national origin), including discrimination in hiring, placement, and

termination decisions."[74] In particular, Plaintiffs claim that Mr. Slaight was fired because he was white. As discussed below, the economic evidence is inconsistent with, and contradicts, this claim.

77.     If Mr. Slaight's claims were correct, one would expect to see a pattern of discrimination across other similarly situated employees—that is, across others hired at the same time by Tata. To test whether Mr. Slaight 's hypothesis is correct that he was fired because he was white, new hires in 2011, 2012 and 2013 were grouped into 3 cohorts according to the calendar year of hire. In other words, anyone hired during the same calendar year was considered to be in the same cohort. Next, the number of people involuntarily separated within a year of their employment at Tata were counted. Figure 7 summarizes hires and terminations for these three cohorts by race. As shown in the figure, total of 1916 Asians were hired in 2011, 2012, and 2013. Of these 1916 Asians were hired in these 3 years, 66 were fired within one year of being hired. Thus, 3.5 percent of the Asians hired in 2011, 2012, and 2013 were fired within one year, as was Mr. Slaight.

78.     If Mr. Slaight's hypothesis is correct, then a higher percentage of the whites in these 3 same cohorts would have been fired. For whites, 1775 were hired in the same three cohorts for 2011, 2012, and 2013 However, only 50 out of 1775, or 2.8 percent were fired. Thus Mr. Slaight's hypothesis is not supported by the data.

---

[74] Third Amended Complaint, ¶ 1.

## Figure 7: Total Hires and Terminations for Local Employees
### 2011-2013 [1]

| Race | Total Hires | Total Unallocated Terminations [2] |
|---|---|---|
| **Count** | | |
| Asian [3] | 1,916 | 66 |
| White | 1,775 | 50 |
| Black | 370 | 27 |
| Hispanic | 125 | 6 |
| Other [4] | 89 | 3 |
| No Race [5] | 349 | 20 |
| **Total** | 4,624 | 172 |

Source: TCSLTD003463394; TCSLTD003463395; TCSPROD000000150; TCSPROD000000151; TCSLTD003463399; TCSLTD003463400

Note:
[1]  Employee separation data begins April 14, 2011, the start of the class period. As a result, not all of 2011 separations are included in the table above.
[2]  Defined as having a separation status of "Involuntary" and a reason for separation of "Unallocated," within one year of hire.
[3]  Includes South Asians, non-South Asians, and undetermined Asians. South Asians are defined as employees with a nationality of India, employees with a race of Asian and nationality of Pakistan, Nepal, Bangladesh, Sri Lanka, or United States, or employees with a race of Asian, missing nationality, and last name that matches the name of an employee categorized as South Asian under the two previously mentioned criteria. Non-South Asians are defined as employees not categorized as South Asian and whose race is Asian and nationality is not missing or employees whose race is Asian, nationality is missing, and last name matches the name of an employee categorized as non-South Asian under the previously mentioned criteria. Undetermined Asians are employees with a race of Asian not defined as South Asian or non-South Asian.
[4]  Includes employees whose EEO form details specified their race as either "American Indian" or "Two or more races."
[5]  Includes employees whose race data was unavailable.

## VII. Conclusion

79.      In sum, it is my opinion that there is no evidence suggesting that Tata discriminated in favor of South Asians over non-South Asians in hiring or termination decisions. Furthermore, the enormous heterogeneity that exists among hiring managers, locations and hiring channels implies that no common method nor common model can be used to analyzed the proposed classes in their entireties. Coupled with the diversity of experience in termination rates across races, the only possible conclusion is that too much unexplained heterogeneity exists to treat either the hiring class or the termination class as a singular group for the purposes of determining the existence of discrimination.

s/ Edward Lazear

Attachment A

# EDWARD PAUL LAZEAR

CURRICULUM VITAE
March, 2017

**Business addresses:**
Hoover Institution
Stanford University
Stanford, CA 94305-6010
Phone: 650/723-4724 Fax: 650/723-0498
and
Graduate School of Business
Stanford University
Stanford, CA 94305-5015
Phone: 650/723-9136 Fax: 650/725-7979

**PRIMARY POSITIONS:**  Morris Arnold Cox and Nona Jean Cox Senior Fellow, Hoover Institution (2002- )
and
Jack Steele Parker Professor of Human Resources Management and Economics, Graduate School of Business, Stanford University (1995- )

**PREVIOUS POSITIONS**:  Chairman, President's Council of Economic Advisers, The White House (2006-09)
Senior Fellow, Hoover Institution (1985-2002)
Professor of Human Resource Management and Economics, Graduate School of Business (1992-95)
Stanford University
Coordinator of Domestic Studies (1987-1990), Hoover Institution
Assistant Professor of Economics (1974-1978);
Associate Professor of Industrial Relations (1978-1981);
Professor of Industrial Relations (1981-1985);
Isidore Brown and Gladys J. Brown Professor of Urban and Labor Economics, Graduate School of Business (1985-1992)
University of Chicago

**OTHER AFFILIATIONS:**      Advisor to Federal Reserve System, Minneapolis (2017-)
Research Fellow, IZA (2002- 6, 2009-) Research Fellow,
Center for Corporate Performance,
Denmark (2004-6, 2009-)
Member, Global Economic Symposium Advisory Board
(2009-
Member, George W. Bush Institute Board (2009-
Research Fellow, SIEPR (2004-6, 2009-)
Member, Advisory Council, Hong Kong Institute of
Economics and Business Strategy, University of Hong
Kong (2000-6 )
Chairman, Academic Research Committee, Research
Advisory Board of the American Compensation
Association (1999-2002)
Founder of the Society of Labor Economists, 1996
Research Advisory Board, American Compensation
Association (1996-99)
Steering Committee, SIEPR, Stanford University (1996-2006)
Research Associate, National Bureau of Economic Research
(1974-)

**EDITORIAL AFFILIATIONS:**      Founding editor, *Journal of Labor Economics*
(University of Chicago Press) (1982- 2001)
Associate Editor, *Journal of Economic Perspectives* (American
Economic Association) (1986-1989)
Member, Editorial Board, *LABOUR/Review of Labour
Economics and Industrial Relations* (1992-2006)
Member, Editorial Board, *Managerial and Decision Economics*
(1994- )
Co-Editor, *Journal of Labor Abstracts* (1996-2006)
Associate Editor, *German Economic Review* (2000-2004)
Columnist, *The Economist's Voice* (2005-2006)
Member, Editorial Board,
*Journal of Labor Economics,* (2009-)
Member, Board of Distinguished Advisers DIW-DC (2009-)
Member, Editorial Advisory Board, *Research in Labor
Economics,* (2011-)
Member, Editorial Board, *International Human Resources
Issues* (2011-)

| | |
|---|---|
| **ACADEMIC DEGREES**: | A.B., UCLA (Economics) 1971 |
| | A.M., UCLA (Economics) 1971 |
| | Ph.D., Harvard University (Economics) 1974 |
| | Legum Doctor (Honorary), Albertson College of Idaho, 1997 |
| | Doctor Mercaturae Honoris Causa (Honorary), Aarhus School of Business 2006 |
| | Doktor, Honoris Causa (Honorary), University of Zurich, 2010 |
| | Doctor Honoris Causa (Honorary), Copenhagen Business School, 2013 |
| | |
| **TEACHING EXPERIENCE:** | Microeconomic Theory; Labor Economics; Industrial Relations; Personnel; Econometrics; Mathematics for Economists; and Discrimination in the Labor Market |

**HONORS AND FELLOWSHIPS:**

Robert Davis Award for Lifetime Achievement, Stanford University, 2016.
Labor and Employment Relations Association (LERA) Fellow, 2015-
Coulter Faculty Fellowship 2014-2015
Honorary Doctorate Mercaturae Honoris Causa, Copenhagen Business School, 2013
American Association for the Advancement of Sciences, Fellow, 2012-
Winnick Family Faculty Fellowship, 2010-2011
Honorary Doctorate, University of Zurich, 2010
Spence Faculty Fellow, 2009-2010
Jacob Mincer Prize for Lifetime Achievement. Society of Labor Economists, 2006
Honorary Doctor Mercaturae Honoris Causa, Aarhus School of Business, 2006
IZA Prize in Labor Economics, 2004
Society of Labor Economists, Fellow, 2003-
National Academy of Sciences, BOTA, member, 2001-2005
Michael and Monica Spence Faculty Fellow, 2000-01
Distinguished Service Award, Ph.D. Faculty, Stanford University, 2000
American Academy of Arts and Sciences, Fellow, 2000-
Leo Melamed Biennial Prize for Outstanding Research, 1998
President, Society of Labor Economists, 1997-98
First Vice-President, Society of Labor Economists, 1996-97
Honorary Doctor of Laws degree, Albertson College of Idaho, awarded June, 1997
Stanford Graduate School of Business Research Fellowship, 1996-97
*Personnel Economics* selected as MIT Press Outstanding Book, 1996
*Personnel Economics* selected as one of ten most important books in Labor Economics Princeton, 1996
Distinguished Teaching Award, Graduate School of Business, Stanford University, May 1994
Econometric Society, Fellow, 1988-
Member, Conference on Research in Income and Wealth, 1988-

Grant by Government of Spain to study U.S./Spanish unemployment, 1987-88
Binational Fellowship, United States/Israel Binational Science Foundation, 1985
Elected Fellow, Center for Advanced Study in the Behavioral Sciences, June 1981
National Science Foundation Grant Recipient, 1979-81, 1981-83, 1984-86, 1987-90, 1991-95,
    1995-96, 1996-97, 1997-2001
Graduate Fellow, National Science Foundation, 1971-74


**HONORARY LECTURES:**
COPE (associated with European Association for Personnel Economics) Keynote Address,
    February, 2017.
Asian Bureau of Finance and Economic Research (ABFER) 2016 Annual Conference Keynote
    Address, Singapore, May 2016.
Inaugural Morley Gunderson Lecture in Labour Economics and Industrial Relations, University of
    Toronto, November 2015.
Rodolfo DeBenedetti Annual Lecture, Bocconi University, Milan, October, 2015.
Keynote Address, Colloquium on Personnel Economics (COPE) Vienna, March 2015.
Wade Fenzer Public Policy Lecture, University of Wisconsin, November 2014.
Yoram Ben-Porath Memorial Lecture, Jerusalem, September 2014.
Keynote Address at Global Aspects of Personnel Economics Conference, Sandbjerg Manor,
Denmark, August 2014.
Keynote Address, International Symposium: The Science of Japanese Personnel Management
 -Rethinking Employment Systems in the Era of Globalization, July, 2013
Keynote Address, Celebration in Honor of Lim Chong Yah, Singapore, August, 2012.
Keynote Address, Singapore Economic Society, August 2011.
Keynote Address, European Personnel Economics Annual Meeting, February 2010.
Honorary Doctorate Lecture, University of Zurich, April, 2010.
Trevor Swan Lecture, Australian National University, September, 2009.
Keynote Address, Australian Conference of Economists, 2009.
Keynote Address, Southern Economics Association Meetings, Charleston, S.C. 2006.
Keynote Address, ITPF-Brookings Institution Conference, Washington, D.C., 2005
Keynote Address, Canadian Annual Conference on Economics, Montreal, Canada, 2005
Keynote Address, International Workshop on Human Resources Management, Seville, Spain, 2005
Keynote Address, Fifth International Symposium on Multinational Business Management, Nanjing,
    China, 2005
Bogen Lecture, Hebrew University of Jerusalem, 2005
Keynote Address, Personnel Economics and New Data, Bonn, Germany, November, 2004.
Adam Smith Lecture, European Association of Labor Economists, Seville, Spain, 2003
Commencement Address, UCLA, June 2002
Presidential Address, American Economic Association, for Sherwin Rosen, January 2002
Bertha Leigh Memorial Lecture, University of Washington, 2002.
Fishelson Memorial Lecture, Tel Aviv University, January 2002
Keynote Address, CAEP Conference on New Data in Personnel Economics, Aarhus, Denmark,
    October 2001

Keynote Address, CEP Conference on Education Policy in the UK, September 2001
Keynote Address, Ministry of Labor, Ottawa, Canada, May 2000
McMyler Annual Lecture, Case Western Reserve University, March 2000
University of Cincinnati Annual Lecture, February 1999
Astra-Erikkson Lectures in Economics, Stockholm, Sweden, September 1998
Presidential Address to Society of Labor Economists, May 1998
Frank Paish Lecture to the Royal Economic Society, April 1998
University of Dundee, Scotland, EMRU Conference Keynote Speaker, July 1995
Centre for Labour Market & Social Research, Aarhus, Denmark, Inaugural Lecture, March 1994
Wicksell Lectures, Stockholm, Sweden, March 1993
University of Warwick/European Assn. of Labour Economists Keynote Speaker, September 1992
Western Michigan University Public Lecture Series, September 1989
Harding Visiting Lecturer, University of Toronto, October 1988
Towers/Cresap Annual Lecture, University of Chicago, October 1988
Washington University, October 1987
University of Kansas, April 1985
Louisiana State University, November 1985
Goldwater Lectureship, Arizona State University, 1982


**VISITING APPOINTMENTS:**
University of Zurich 2010-
University of Chicago Becker Friedman Institute 2009-2015
London School of Economics, June 1999
NAKE (Netherlands Network of Economics), Tilburg, Netherlands, June 1999
University of Oregon, March 1999
Finnish Postgraduate Program in Economics, Helsinki, August 1998
Aarhus University, Denmark, September 1996
Institut d'Etudes Politiques/MBA Program, Paris, September 1995
University of Saarlandes/Center for the Study of New Institutional Economics, Saarbrucken,
    Germany, August 1992
Institut d'Etudes Politiques, Paris, May 1987
Institute for Advanced Studies, Vienna, 1983-84 (in residence January 1984)
National Productivity Board, Singapore, June 1985 & July 1982
Fellow of the Institute for Advanced Study, Hebrew University of Jerusalem, 1977-78
    (in residence June-July 1978)

**OTHER PUBLIC POLICY APPOINTMENTS AND SERVICE:**
Council of Economic Advisors, Governor Arnold Schwarzenegger, State of California, 2005-2006
Commissioner, White House Panel on Tax Reform, President George W. Bush, January, 2005-
November, 2005.
Testimony before Board of Governors of the Federal Reserve System, October 1997
Economic Advisor to President Shevardnadze of Republic of Georgia, October 1994
National Science Foundation Economics Review Panel, August 1993-95

5

Supreme Economic Council of Russian Republic, December 1991 - August 1993
Advisor to Prime Minister of Ukraine, Kiev, April 1993
Advisor to Supreme Economic Council, Supreme Soviet, Russian Republic, Moscow,
    March 1991, May 1991, January 1992; By Decree of Supreme Soviet, Foreign Member of
    Supreme Economic Council of Russian Republic, December 1991 - August 1993
Advisor to Prime Minister of Romania, January 1992
Advisor to Vice Prime Minister of Romania, Bucharest, February 1991
Advisor to Ministry of Privatization of Czechoslovakia, Prague, February 1991
Advisor to Government of Romania, Bucharest, October 1990
Advisor to Minimum Wage Study Comm. (an Ad Hoc Committee of the U.S. Congress), 1979-81

**BOOKS:**

*Allocation of Income Within the Household*, with Robert T. Michael. Chicago: University of Chicago Press, 1988.

*Issues in Contemporary Retirement*, edited with Rita Ricardo-Campbell. Stanford, CA: Hoover Press, 1988.

*Microeconomic Theory*, 6th edition, with John P. Gould, Jr. Homewood, IL: Richard D.Irwin, 1989.

*Searching for Alternatives: Drug-Control Policy in the United States*, edited with Melvyn B.Krauss. Stanford, CA: Hoover Institution Press, 1991. Paperback edition, 1992.

*Economic Transition in Eastern Europe and Russia: Realities of Reform*, ed. Edward P. Lazear. Stanford, CA: Hoover Institution Press, 1995.

*Personnel Economics* [The 1993 Wicksell Lectures]. Eleven-chapter book on which lectures were based. Cambridge: The MIT Press, 1995.

*Personnel Economics for Managers*, Edward P. Lazear. New York: John Wiley & Sons, 1998. (Also in Japanese, 1998; in German (with Birgitta Wolf and Uschi Backes-Gellner); in Chinese and Korean.

*Education in the 21st Century,* ed. and introduction by Edward P. Lazear, Stanford, CA: Hoover Institution Press, 2002.

*Personnel Economics, Collected Works,* ed. with Robert McNabb, Edward Elgar Publisher, 2004.

*The Structure of Wages: An International Comparison*, ed. with Kathryn L. Shaw. University of Chicago Press, National Bureau of Economic Research, 2008.

*Personnel Economics in Practice, with Michael Gibbs*, *in Third Edition* . John Wiley and Sons, 2008.

6

*Inside the Firm: Contributions to Personnel Economics.* Oxford University Press. 2011.

**Booklet:**
*Observations on the Financial Crisis* with Keith B. Hennessey. Stanford, Ca: Hoover Institution
   Press, 2013.

## PUBLISHED PAPERS:

"Age, Experience, and Wage Growth," *American Economic Review* 66:4 (September 1976): 548-58.

"Schooling as a Wage Depressant," *Journal of Human Resources* 12:2 (Spring 1977): 164-76.

"Education: Consumption or Production?" *Journal of Political Economy* 85:3 (June 1977): 569-97.

"The Narrowing of Black-White Wage Differentials Is Illusory," *American Economic Review*
69:4 (September 1979): 553-64.

"Why Is There Mandatory Retirement?" Orig. *Journal of Political Economy* 87:6 (December 1979):
   1261-84. Reprinted in  *Labor Economics/The International Library of Critical Writings in
   Economics*   47, Vol. II, eds. Orley C. Ashenfelter and Kevin F. Hallock (Aldershot, England:
   Edward Elgar Publishing Ltd., 1995): 381-404; also reprinted in *The Economics of Aging/The
   International Library of Critical Writings in Economics* 51, ed. John Creedy (Aldershot, England:
   Edward Elgar Publishing Ltd., 1995): 90-113. Reprinted in  *Worth Series of Outstanding
   Contributions in Economics: Labor Economics.* Orley Ashenfelter, Series Editor and Volume Editor:
   Worth Publishers, Inc., University of Chicago Press, 1999.

"Male-Female Wage Differentials: Has the Government Had Any Effect?" In *Women in the
   Labor Market*, edited by Cynthia B. Lloyd, Emily S. Andrews, and Curtis L. Gilroy. New York:
   Columbia University Press, 1979.

"The Economics of Compensation of Government Officials," with Sherwin Rosen. In *The Rewards
   of Public Service: Compensating Top Federal Officials*, ed. Robert W. Hartman and
   Arnold R. Weber. Washington, DC: Brookings Institution, c.1980.

"Family Background and Optimal Schooling Decisions," *Review of Economics and Statistics* 62:1
   (February 1980): 42-51.

"Family Size and the Distribution of Real Per Capita Income, with Robert Michael, *American
   Economic Review* 70:1 (March 1980): 91-107.

"Real Income Equivalence Among One-Earner and Two-Earner Families," with Robert Michael,
   *American Economic Review P&P* 70:2 (May 1980): 203-8.

"Minimum Wages vs. Minimum Compensation," a report to the Minimum Wage Study

Commission, with Frederick H. Miller, December 1980.

"Forced Exit," *The Wharton Magazine* 4:2 (Winter 1980): 30-33.

"Agency, Earnings Profiles, Productivity, and Hours Restrictions," *American Economic Review* 71:4 (September 1981): 606-20. Reprinted in *The Economic Value of Education: Studies in the Economics of Education/The International Library of Critical Writings in Economics* 17, ed. Mark Blaug (Aldershot, England: Edward Elgar Publishing Limited, 1992): 226-240; also reprinted in *Labor Economics/The International Library of Critical Writings in Economics* 47, Vol. II, eds. Orley C. Ashenfelter and Kevin F. Hallock (Aldershot, England: Edward Elgar Publishing Ltd.,1995): 111-125.

"Rank-Order Tournaments as Optimum Labor Contracts," with Sherwin Rosen, *Journal of Political Economy* 89:5 (October 1981): 841-64. Reprinted in M. Kleiner, ed., *Industrial Relations: Institutions and Organizational Performance,* Dartmouth Publishing, 1994 and in *Labor Economics/The International Library of Critical Writings in Economics* 47, Vol. II, eds. Orley Ashenfelter and Kevin F. Hallock (Aldershot, England: Edward Elgar Publishing Ltd., 1995): 422-45 and in Kevin F. Hallock and Kevin J. Murphy, *The Economics of Executive Compensation,* 1999.

"An Analysis of Federal Worker Compensation," Washington, DC: American Enterprise Institute, 1982.

"Severance Pay, Pensions, and Efficient Mobility," NBER Working Paper No. 854, February 1982.

"Intergenerational Externalities," *Canadian Journal of Economics* 16:2 (May 1983): 212-28.

"A Competitive Theory of Monopoly Unionism," *American Economic Review* 73:4 (September 1983): 631-43.

"A Microeconomic Theory of Labor Unions," *Research in Labor Economics*, Supplement 2: New Approaches to Labor Unions, ed. Joseph Reid (Greenwich, CT: JAI Press, 1983): 53-97.

"Pensions as Severance Pay." In *Financial Aspects of the United States Pension System*, eds. Zvi Bodie and John B. Shoven. Chicago: University of Chicago Press for the NBER, 1983.

"A Comparison of Federal and Private Pension Plans," with Beth Asch, Washington, DC: American Enterprise Institute, 1984.

"The Excess Sensitivity of Layoffs and Quits to Demand," with Robert Hall, *Journal of Labor Economics* 2:2, Essays in Honor of Melvin W. Reder. (April 1984): 233-57. Reprinted in *Labor Economics/The International Library of Critical Writings in Economics* 47, Vol. III, eds. Orley C. Ashenfelter and Kevin F. Hallock (Aldershot, England: Edward Elgar Publishing Ltd., 1995):155-79.

"Incentives, Productivity, and Labor Contracts," with Robert L. Moore, *Quarterly Journal of Economics* 99:2 (May 1984): 275-96; also in *Efficiency Wage Models of the Labor Market*, eds. George Akerlof and Janet Yellen (Cambridge: Cambridge University Press, 1986): 135-56.

"Incentives and Wage Rigidity," *American Economic Review P&P* 74:2 (May 1984): 339-44.

"Incentive Effects of Pensions." In *Pensions, Labor, and Individual Choice*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1985): 253-82.

"Social Security and Pensions." In *Research in Labor Economics*, Vol. 7, ed. Ronald G. Ehrenberg (Greenwich, CT: JAI Press, 1985): 1-30.

"The Role of Wages in the Allocation Process," *Wirtschaftspolitische Blatter* (June 1985): 547-54.

"Retirement from the Labor Force." In *Handbook of Labor Economics*, Vol. 1, eds. Orley Ashenfelter and Richard Layard (London: Elsevier, 1986): 305-55.

"Raids and Offer Matching." In *Research in Labor Economics*, Vol. 8, Part A, ed. Ronald G. Ehrenberg (Greenwich, CT: JAI Press, 1986): 141-65.

"Retail Pricing and Clearance Sales," *American Economic Review* 76:1 (March 1986): 14-32.

"Salaries and Piece Rates," *Journal of Business* 59:3 (July 1986): 405-31.

"Estimating the Personal Distribution of Income with Adjustment for Within-Family Variation," with Robert Michael, *Journal of Labor Economics* 4:3 (July 1986): S216- S239.

"Comparable Worth and Discrimination in the Labor Market," with Daniel Fischel, *Chicago Law Review* 53 (Summer 1986): 891-918.

"Incentive Contracts," *The New Palgrave: A Dictionary of Economics*, Vol. 2 (E-J), eds. John Eatwell, Murray Milgate and Peter Newman (London: The Macmillan Press Limited, 1987): 744-48.

"Pension Inequality," with Sherwin Rosen, *Issues in Pension Economics*, eds. Zvi Bodie, John B. Shoven and David A. Wise (Chicago: University of Chicago Press for the NBER, 1987): 341-359.

"Lump-Sum Payments," *Hoover Institution Working Paper in Economics* No. E-87-8 (February 1987); A Report Prepared for the Bureau of Labor Statistics, United States Department of Labor (March 1987).

"Pensions and Turnover," with Robert Moore, *Pensions in the U.S. Economy*, eds. Zvi Bodie, John Shoven, and David Wise (Chicago: University of Chicago Press for the NBER, 1988): 163-88.

"The Labor Market and International Competitiveness," *Thinking About America: The United States in the 1990s*, eds. Annelise Anderson and Dennis Bark (Stanford, CA: Hoover Institution Press, 1988): 367-81.

"Employment-at-Will, Job Security, and Work Incentives." In *Employment, Unemployment, and Labor Utilization*, ed. Robert A. Hart (Boston: Unwin Hyman, 1988): 39-61.

"Introduction," with Rita Ricardo-Campbell. In *Issues in Contemporary Retirement,* eds. Rita Ricardo-Campbell and Edward P. Lazear (Stanford, CA: Hoover Institution Press, 1988): xvii-xxiii; also available as separate reprint, "Introduction to *Issues in Contemporary Retirement*," Hoover Institution Press, 1988.

"Enhancing Productivity through Compensation: The 1988 Towers/Cresap Lecture," University of Chicago, Graduate School of Business, Selected Paper No. 68, 1988.

"Pay Equality and Industrial Politics," *Journal of Political Economy* 97:3 (June 1989): 561-80.

"Adjusting to an Aging Labor Force." In *Issues in the Economics of Aging*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1990): 287-312.

"Job Security and Unemployment." In *Advances in the Theory and Measurement of Unemployment*, eds. Yoram Weiss and Gideon Fishelson (London: Macmillan, 1990): 245-67.

"Male-Female Wage Differentials in Job Ladders," with Sherwin Rosen, *Journal of Labor Economics* 8:1, Part 2: Essays in Honor of Albert Rees. (January 1990): S106-S123.

"The Introduction of New Products," with Debra J. Aron, *American Economic Review P&P* 80:2 (May 1990): 421-6.

"Pensions and Deferred Benefits as Strategic Compensation," *Industrial Relations* 28:2 (Spring 1990): 263-80; also in *The Economics of Human Resource Management*, eds. Daniel J. B. Mitchell and Mahmood A. Zaidi (Oxford, England and Cambridge, MA: Basil Blackwell, 1990): 109-26.

"Job Security Provisions and Employment," *Quarterly Journal of Economics* 105:3 (August 1990): 699-726.

"The Timing of Raises and Other Payments," *Carnegie-Rochester Conference Series on Public Policy,* Vol. 33 [Studies in Labor Economics in Honor of Walter Y. Oi], eds. Allan H. Meltzer and Charles I. Plosser. (Amsterdam: Elsevier Science Publishers, Autumn 1990): 13-48.

"The Resurgence of Regulation," Stanford University draft (November 1990).

"Labor Economics and the Psychology of Organizations," *Journal of Economic Perspectives* 5:2 (Spring 1991): 89-110; also forthcoming in Italian from Bollati Boringhieri Editore, Turin, Italy.

"Introduction," with Melvyn B. Kraus. In *Searching for Alternatives: Drug-Control Policy in the United States,* eds. Melvyn B. Krauss and Edward P. Lazear (Stanford, CA: Hoover Institution Press, 1991): xxi-xxxvii.

"Stock, Options, and Deferred Compensation," with Matthew O. Jackson, *Research in Labor Economics,* Vol. 12, ed. Ronald G. Ehrenberg (Greenwich, CT: JAI Press, Inc., 1991):41-62.

"Discrimination in Labor Markets," *Essays on the Economics of Discrimination*, ed. Emily P. Hoffman (Kalamazoo: W. E. Upjohn Institute for Employment Research, 1991): 9-24.

"Prices and Wages in Transition Economies." In *Search of a Transition to a Free Society*, (Prague: Mont Pelerin Society Regional Meeting, November 3-6, 1991): 226-262; revision in *Hoover Institution Essays in Public Policy* series, No. 29 (June 1992).

"The Job as a Concept." In *Performance Measurement, Evaluation, and Incentives*, ed. William J. Bruns, Jr. (Boston: Harvard Business School Press, 1992): 183-215.

"Peer Pressure and Partnerships," with Eugene Kandel, *Journal of Political Economy* 100:4 (August 1992): 801-17.

"Incentive Contracts in Labour Markets," *The New Palgrave Dictionary of Money and Finance*, Vol. 2 (F-M), eds. Peter Newman, Murray Milgate and John Eatwell (New York: The Stockton Press; London: The Macmillan Press Ltd., 1992): 335-341.

"Compensation, Productivity and the New Economics of Personnel," *Research Frontiers in Industrial Relations and Human Resources*, eds. David Lewin, Olivia Mitchell and Peter Sherer (Madison: Industrial Relations Research Association, 1992): 341-380.

"The New Economics of Personnel," *LABOUR/Review of Labour Economics and Industrial Relations* 7:1 (Spring 1993): 3-23.

"The Interaction Between Political and Economic Freedom," Chapter Six, *Transition to Democracy in Poland*, ed. Richard F. Staar (New York: St. Martin's Press, 1993): 111-122.

"Some Thoughts on Savings," *Studies in the Economics of Aging*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1994): 143-169.

"Economic Reform: Appropriate Steps and Actual Policies" [introduction]. In *Economic Transition in Eastern Europe and Russia: Realities of Reform*, ed. Edward P. Lazear (Stanford, CA: Hoover Institution Press, 1995): 3-61.

"Publicly Provided Goods and Services In a Transition Economy," with Sherwin Rosen. In *Economic Transition in Eastern Europe and Russia: Realities of Reform*, ed. Edward P.Lazear

(Stanford, CA: Hoover Institution Press, 1995): 322-339.

"A Jobs-Based Analysis of Labor Markets," *American Economic Review P&P* 85:2 (May 1995): 260-265.

"Corporate Culture and the Diffusion of Values." In *Trends in Business Organization: Do Participation and Cooperation Increase Competitiveness?* [International Workshop/The Kiel Institute of World Economics], ed. Horst Siebert (Tubingen: J.C.B. Mohr/Paul Siebeck, 1995): 89-133.

"Bait and Switch," *Journal of Political Economy* 103:4 (August 1995): 813-30.

"An Economic Analysis of Works Councils," with Richard B. Freeman. In *Works Councils: Consultation, Representation, and Cooperation in Industrial Relations* [NBER conference volume], eds. Joel Rogers and Wolfgang Streeck, Chicago: University of Chicago Press for the NBER, November 1995.

"Relational Investing: The Worker's Perspective," with Richard B. Freeman, NBER Working Paper No. 5436 (January 1996); also forthcoming in *Meaningful Relationships: Institutional Investors, Relational Investing and the Future of Corporate Governance*, eds. Ronald Gilson, John C. Coffee and Louis Lowenstein (New York: Oxford University Press), expected 1998.

"Hiring Risky Workers." In *Internal Labour Markets, Incentives, and Employment*, eds. Isao Ohashi and Toshiaki Tachibanaki (New York: St. Martins Press, 1998). Also NBER Working Paper No. 5334 (November 1995).

"Culture Wars in America," *Hoover Institution Essay in Public Policy*, July 1996.

"Incentives in Basic Research," *Journal of Labor Economics* 15:1, Part 2: Essays in Honor of Yoram Ben-Porath (January 1997):S167-S197.

"Labor in a Global Economy," with Sherwin Rosen. In *Agenda for Economic Reform in Korea: International Perspective*, eds. Kenneth Judd and Young-Ki Lee, Stanford, CA: Hoover Institution Press, 1998.

"Intellectual Property: Issues and Answers." In Hoover Conference Volume, *Capital for Our Time: The Economic, Management and Legal Challenge of Intellectual Property,* ed. N. Imparato, Stanford, CA: Hoover Institution Press, October 1998.

"Globalisation and the Market for Team-mates," Frank Paish Lecture to the Royal Economic Society, April, 1998. *Economic Journal* 109:454 (1999):15-40.

"Personnel Economics: Past Lessons and Future Directions," Presidential Address to the Society of Labor Economists, San Francisco, May 1, 1998. *Journal of Labor Economics* 17:2 (April 1999): 199-

236.

"The Economist as an Expert in Discrimination Cases: The Elegance of Microeconomic Theory." In *The Role of the Academic Economist in Litigation Support*, ed. Daniel J. Slottje (Amsterdam: North-Holland - Elsevier, 1999):137-45.

"Culture and Language," *Journal of Political Economy* 107:6 (December 1999):S95-S126.

"Diversity and Immigration." In NBER Conference Volume: *Issues in the Economics of Immigration,* ed. George Borjas. Chicago: University of Chicago Press, 2000.

"Economic Imperialism," Essay for Millennium Issue,   *Quarterly Journal of Economics* 115:1 (February 2000): 99-146.

"The Power of Incentives," *American Economic Review P&P* 90:2 (May 2000): 410-414.

"Personnel Economics and Economic Approaches to Incentives," *HKCER Letters* 61 (Sept/ Oct 2000): 1-8.

"The Future of Personnel Economics," *Economic Journal* 110:467 (November 2000): F611-39.

"Performance Pay and Productivity," *American Economic Review* 90:5 (December 2000): 1346-1361.

"Personnel Economics". *The New Palgrave Dictionary of Economics. Second Edition*. Eds. Steven N. Durlauf and Lawrence E. Blume. Palgrave Macmillan, 2008. The New Palgrave Dictionary of Economics Online. Palgrave Macmillan.

"Educational Production," *Quarterly Journal of Economics* 116:3 (August 2001): 777-803.

"Teacher Incentives," *Swedish Economic Policy Review* 10:2 (2003): 179-214.

"The Dominance of Retail Stores," with Alexandre Ziegler, NBER Working Paper No. w9795, June 2003.

"The Peter Principle: A Theory of Decline," *Journal of Political Economy* 112:1, pt. 2 (2004): S141-S163.

"Internal and External Labor Markets," with Paul Oyer, 2003 EALE Adam Smith Lecture,  *Labour Economics,* 2004.

"Balanced Skills and Entrepreneurship," *American Economic Review P&P,* May 2004.

"The Structure of Wages and Internal Mobility," with Paul Oyer, *American Economic Review P&P,* May 2004.

13

"Salaire à la performance: incitation ou sélection?" *Economie et Prévision*, numéro spécial *Journées de l'AFSE* « Economie des ressources humaines » 2004, pp. 17-25.

"Output-Based Pay: Incentives or Sorting?" *Research in Labor Economics*, *Volume 23, Accounting For Worker Well-Being*, (ed. by Solomon W. Polachek), 2005, pp. 1-25.

"Speeding, Terrorism, and Teaching to the Test," *Quarterly Journal of Economics,* August 2006, Vol. 121, No. 3, Pages 1029-1061: 1029-1061.

"Mexican Assimilation in the United States," in *Mexican Immigration to the United States,* edited by George Borjas, pp. 107-22, NBER-University of Chicago Press, 2007.

"Entrepreneurship," *Journal of Labor Economics*, 23:4 (October 2005): 649-80.

"Personnel Economics: The Economist's View of Human Resources," with Kathryn Shaw. *Journal of Economic Perspectives*, 21 (4), (Fall 2007): 91-114.

"Tenure and Output," with Kathryn Shaw *Labour Economics*, 15 (2008): 710-724.

"Personnel Economics". *The New Palgrave Dictionary of Economics. Second Edition*. Eds. Steven N. Durlauf and Lawrence E. Blume. Palgrave Macmillan, 2008. The New Palgrave Dictionary of Economics Online. Palgrave Macmillan.

"Wage Structure, Wages, and Mobility," with Kathryn Shaw in  *The Structure of Wages: An International Perspective*, Editor Edward Lazear and Kathryn Shaw, University of Chicago, National Bureau of Economic Research, 2009.

"Firm-Specific Human Capital: A Skill-Weights Approach," Journal of Political Economy, 2009, vol. 117, no. 5, October, pp 914-40.

"Policies Affecting Work Patterns and Labor Income for Women," with Ann-Sofie Kolm, in *Reforming the Welfare State,* ed. Richard Freeman, Birgitta Swedenborg, and Robert H. Topel, University of Chicago for NBER, Chicago and London, 2010, pp. 57-81

"Wages, Productivity and Retirement," *International Tax and Public Finance,* 18, 1, (2011), pp. 17-35.

"A Personnel Economics Approach to Productivity Enhancement," with Kathryn L. Shaw. , *Nordic Economic Policy Review,* 2 (2011).

"Sorting, Prices and Social Preferences," with Ulrike Malmendier and Roberto Weber. *American Economic Journal, Applied Economics,* January, 2012.
"Leadership: A Personnel Economics Approach," *Labour Economics.* Volume 19, Issue 1, January 2012, Pages 92-101

14

"The US Fiscal Situation: Causes and Remedies," *The Economists' Voice*, March, 2012.

"Why Do Inventories Rise When Demand Falls in Housing and Other Markets?," *The Singapore Economic Review*, Vol. 57, No. 2 (2012) 1250007 (32 pages), DOI: 10.1142/S0217590812500075

"Hiring, Churn and the Business Cycle," with James Spletzer. *American Economic Review P&P*, May, 2012.

"The US Labor Market: Status Quo or a New Normal?" with James Spletzer. *Annual Proceedings of the Jackson Hole Federal Reserve Conference, August, 2012.*

"Personnel Economics" with Paul Oyer, in *Handbook of Organizational Economics*, Robert Gibbons and John Roberts, ed. Princeton, N.J: Princeton University Press, 2013, pp 479-519.

"Observations on the Financial Crisis," with Keith Hennessey. *Hoover Essays,* August, 2013.

"Structural or Cyclic? The Labor Market in Recessions," in *IZA World of Labor,* August, 2014.

"The Future of Inflation," prepared for presentation at Mont Pelerin Society Meetings, Hong Kong, September, 2014.

"The Impatient Salesperson and the Delegation of Pricing Authority," *Research in Economics,* 69,1, March 2015, pp. 63-74.

"Gary Becker's Legacy for Economics and Policy," *American Economic Review P&P,* May, 2015.

"The Value of Bosses," with Kathryn L. Shaw and Christopher Stanton, *Journal of Labor Economics*, Volume 33, 4, October 2015, pp. 823-61.

"Making Do with Less: Why Productivity Rises During Recessions," with Kathryn L. Shaw and Christopher Stanton, *Journal of Labor Economics.*Volume 34, Number S1, Part 2, January 2016, pp. S333-60.

"Overconfidence and Occupational Choice," NBER Working Paper w21921, Jan, 2016.

"Demographics and Entrepreneurship," with James Liang and Hui (Jackie) Wang. NBER Working Paper, originally, September 2014. Forthcoming, *Journal of Political Economy* (2017).

"Personel Economics: A Research Field Comes of Age," with Christian Grund, Alex Bryson, Robert Dur, Christine Harbring, and Alexander K. Koch, *German Journal of Human Resource Management,* special issue "Advances in Personnel Economics," introduction, forthcoming.

"Who Gets Hired? The Importance of Finding an Open Slot," with Kathryn Shaw and Christopher Stanton, forthcoming, *Journal of Labor Economics.*

"Hiring and Separations in Equilibrium" with Kristin McCue. NBER Working Paper, Jan. 2017.

## COMMENTS AND OTHER PAPERS:

"On the Shadow Price of Children," with Robert Michael, presented at the December 1971 Meeting of the Econometric Society.

"The Timing of Technical Change: An Analysis of Cyclical Variations in Technology Production," Edward P. Lazear, Ph.D. Dissertation, Harvard University, 1974.

"Human Wealth and Human Capital," NBER Working Paper No. 97, July 1975. Stanford, CA: Center for Economic Analysis of Human Behavior and Social Institutions.

"An Economic Theory of Learning," by McKenzie and Staff, Review, *Journal of Political Economy* 84:1 (February 1976): 192-4.

"Academic Achievement and Job Performance: Note," *American Economic Review* 67:2 (March 1977): 252-254; reprinted in *The Economic Value of Education: Studies in the Economics of Education* [The International Library of Critical Writings in Economics #17], ed. Mark Blaug (Aldershot, England: Edward Elgar Publishing Limited, 1992) 223-225.

"Reply to Killingsworth" [comment on Lazear's "Male-Female Wage Differentials: Has the Government Had Any Effect?"]. In *Women in the Labor Market*, eds. Cynthia B. Lloyd, Emily S. Andrews, and Curtis L. Gilroy (New York: Columbia University Press, 1979): 376-377.

"Comment on 'New Measures of the Cost of a Worker: Implications for Demand Elasticities and Nominal Wage Growth,' by Daniel S. Hamermesh," *Studies in Income and Wealth*, Vol. 48, *The Measurement of Labor Cost* (Chicago: University of Chicago Press, 1983): 306-8.

"Some Reflections on Melvin W. Reder," *Journal of Labor Economics* 2:2, Essays in Honor of Melvin W. Reder (April 1984): 145-50.

"Illusory Wage Differentials: Reply," *American Economic Review* 74:5 (December 1984): 1128.

"An Analysis of the Marketability of a CPI Future," with Debra J. Aron, Chicago Mercantile Exchange, February 1985.

"Comment on Bernanke and Powell, 'The Cyclical Behavior of Industrial Labor Markets: A Comparison of the Pre-War and Post-War Eras,'" *The American Business Cycle: Continuity and Change,* ed. Robert J. Gordon (Chicago: University of Chicago Press for the NBER, 1986): 626-32.

"Comment on Frant and Leonard, 'Promise Them Anything: The Incentive Structures of Local Public Pension Plans,'" *Public Sector Payrolls*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1986): 237-42.

"Comparable Worth: A Rejoinder," with Daniel Fischel, *Chicago Law Review* 53 (Summer 1986): 950-52.

"Comment on Hausman and Paquette, 'Involuntary Early Retirement and Consumption,'" *Work, Health, and Income among the Elderly*, ed. Gary Burtless (Washington, DC: The Brookings Institution, 1987): 175-81.

"Comment on Katz, Kochan, and Keefe, 'Industrial Relations and Productivity in the U.S. Automobile Industry,'" *Brookings Papers on Economic Activity* 3 (1987): Special Issue on Microeconomics, eds. Martin Neil Baily and Clifford Winston (Washington, DC: The Brookings Institution, 1988): 716-20.

"Discussion of Laurence J. Kotlikoff's 'The Relationship of Productivity to Age,'" *Issues in Contemporary Retirement*, eds. Rita Ricardo-Campbell and Edward P. Lazear (Stanford, CA: Hoover Press, 1988): 126-9.

"Symposium on Public and Private Unionization," *Journal of Economic Perspectives* 2:2 (Spring 1988): 59-62.

"Comment on Bernheim's 'The Timing of Retirement: A Comparison of Expectations and Realizations,'" *The Economics of Aging*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1989): 356-8.

"Symposium on Women in the Labor Market," *Journal of Economic Perspectives* 3:1 (Winter 1989): 3-7.

"Comment on James H. Stock and David A. Wise, 'The Pension Inducement to Retire: An Option Value Analysis,'" *Issues in the Economics of Aging*, ed. David Wise (Chicago: University of Chicago Press for the NBER, 1990): 224-9.

"Comment on Hatta and Oguchi, 'Changing the Japanese Social Security System from Pay as You Go to Actuarially Fair,'" *Topics in the Economics of Aging*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1992): 245-8.

"Discussion: The Economics of Professional Etiquette," *American Economic Review* 83:2 (May 1993): 44.

"Discussion of Heckman, James J. and Peter Klenow, 'Is There Underinvestment in Human Capital?'" Hoover Conference on Capital Formation and Economic Growth, October 1997.

"Discussion of Olivier Blanchard, 'The Perverse Effects of Partial Labor Market Reform: Fixed Duration Contracts in France," Banco de Portugal Conference on Labor Market Institutions and Economic Outcomes, June 3, 2001.

"Sherwin Rosen, 1938–2001," *Annals of the National Academy of Sciences, Biographical Memoir*, Vol. 83, 2003.

"Lazear Responds to "Why the Annuity of Social Security is Valuable and Why Despite the Annuity Feature African-Americans Do Not Fare Badly," by Jack Needleman" in *The Economists' Voice*, January, 2005.

"Spence, A. Michael (born 1943)." *The New Palgrave Dictionary of Economics. Second Edition*. Eds. Steven N. Durlauf and Lawrence E. Blume. Palgrave Macmillan, 2008. The New Palgrave Dictionary of Economics Online. Palgrave Macmillan.

"Preface to 'Raids and Offer Matching', " forthcoming, *Research in Labor Economics.*

"A Gifted Economist and the Ultimate Social Scientist," *Journal of Labor Economics,* 32, 3 (July 2014), 401-403.

## POSITION PAPERS:

"Privatization of Large Scale Enterprises in Romania" (February 1991) "Economic Reform in Eastern Europe, with Application to Czechoslovakia and Romania" (March 1991).

"Russian Economic Transition: Privatization, Labor Issues, & Pricing Policies" (March 1991).

"Rapid Sequential Reform: A Proposal for the Economic Transition in the Russian Republic," with Annelise Anderson, Mikhail Bernstam & Charles McLure (May 1991).

"The Renaissance: A Set of Specific Economic Reforms for Russia" [prepared for the Supreme Economic Council of the Russian Republic] (September 1991).

"Restructuring the Coal Industry in the Kuznetzk Basin" (August 1991; revised September 1992).

"Economic Reform in Ukraine," with Michael Bernstam, John Cochrane, Charles McLure and Sherwin Rosen (April 1993).

"Reflections on the October 1994 Trip to Tbilisi, Georgia" (October 1994).

Jonathan Marshall, "Minimum Wage Increase Finds More Support," *San Francisco Chronicle* (1/25/95).

"Cover Charge," *Hoover Digest* 2:2 (1996).

"Whose Boom Is It, Anyway?" *Hoover Digest* 2:2 (1999)

"The Plight of Mexicans in the United States" *Hoover Essays* (2004)

## WORK IN PROGRESS:

"Microfoundations of Entrepreneurship," with Simon Janssen, James Liang, Niels Westergard-Nielsen, Jackie Wang.

"Eliminating Adverse Selection in Labor Markets," with Katherine Casey

"Optimal Intergenerational Inequality"

"Let Me Think About It - The time pattern of decision making"

"Eliminating Poverty by Raising Wages"

## COLUMNS, OP-EDS AND POPULAR PRESS:

"Job Security Rules Cut Employment in Much of Europe," *Wall Street Journal* (10/14/87).

"Plant Closure Notice Means Lost Jobs," *Christian Science Monitor* (10/14/87).

"U.S. Will Cripple Business If It Repeats Europe's Follies," *The American* (9/21/88).

"Which Minimum Wage Bill," *The Washington Times* (4/10/89).

"Some Thoughts on Economies in Transition, with Special Application to the Soviet Union," *Pravda* (Moscow), 1990.

"Water for the People." *Los Angeles Times* (2/5/91).

"Politics Thwarts Reform/Central European planners trying to introduce market practices contend with leaders eager to hold power and masses eager to hold down prices," *Christian Science Monitor* (4/16/91).

"Moving to a Free Market in Eastern Europe and the Lessons for Japan and the United States," *Japan Research Review* 1:10 (October 1991): 48-53.

"Russia's Economic Reform As Seen From the Inside," *San Francisco Chronicle* (2/3/92); reprinted as "Russia: Misunderstanding Market Economics," *Newport Daily Independent* (Arkansas) (8/7/92).

"The Shifting World of Work," *Los Angeles Times* (2/7/94).

"Fixing the Immigration Problem," *San Francisco Chronicle* (8/2/95).

"Clinton rides the prosperity wave," *Washington Times* (1/20/99).

"Smaller Class Size Isn't a Magic Bullet," *Los Angeles Times* (9/2/99).

"Education in California: Teachers for the New Century," *San Francisco Chronicle* (12/23/02).

"How are managers to be compensated? Amazing insights from the field of Personnel Economics," *Neue Zürcher Zeitung* (6/10/03).

"The Double Benefit of Tax Cuts," with Gary S. Becker and Kevin M. Murphy, *Wall Street Journal* (10/7/03).

"Private Accounts for Social Security," *Economist's Voice,* (2005).

"A Golden Opportunity," with James M. Poterba, *Wall Street Journal,* (11/1/05)

""Reforming Taxes to Promote Economic Growth" *Economist's Voice* (2005), reprinted in Hoover Digest, 2005.

"American at Work," with Katherine Baicker *Wall Street Journal* (May 2, 2006), p. A-18

"Coming of Wage," with Allan B. Hubbard *Wall Street Journal* (Oct 2, 2006), p. A-10.

"Lead Weight or Gold Mine: What Are the True Costs of Immigration?" with Karl Zinsmeister. *Realclearpolitics.com*, June 25, 2007.

"Let the Market Set Gas Prices," *Politico,* June 21, 2007.

"The Republicans' no-bang mortgage plan," with Gary S. Becker. *Financial Times*, February 10, 2009.

"High Five with Edward P. Lazear," *Forbes,com*, April 15, 2009.

"Do We Need a Second Stimulus?" *Wall Street Journal,* July 9, 2009.

"Stimulus and the Jobless Recovery" *Wall Street Journal,* November 2, 2009.

"The Spending "Freeze" that Isn't" *Wall Street Journal,* January 28, 2010.

"How to Grow Out of the Deficit" *Wall Street Journal,* September 27, 2010.

"Unsustainable Budget Threatens the Nation" (with nine other CEA chairs), *Politico,* March 24, 2011

"Why the Job Market Feels So Dismal," *Wall Street Journal,* May 16, 2010.

"How Big Government Hurts the Average Joe ", *Wall Street Journal,* August 5, 2011.

"The Euro Crisis: Doubting the 'Domino' Effect," *Wall Street Journal,* October 31, 2011.

"The Jobs Picture Is Still Far From Rosy,"  *Wall Street Journal,* January 20, 2012.

"The Worst Economic Recovery in History," *Wall Street Journal,* April 3, 2012.

"Three Views of the 'Fiscal Cliff'" *Wall Street Journal,* May 18, 2012.

"Whose Fault is Today's Bad Economy?" *Wall Street Journal,* June 13, 2012.

"Slow Recovery or Failed Agenda?" *Wall Street Journal,* July 30, 2012.

"There is No 'Structural' Unemployment Problem" *Wall Street Journal*, September 4, 2012.

"Middle class will share with the rich the burden of spending" *Orlando Sentinel*, October 23, 2012.

"Election could determine future course of the economy," *The Daily Caller,* November 5, 2012.

"Chinese 'Currency Manipulation' Is Not the Problem," *Wall Street Journal,* January 8, 2013

"A Market Solution to Immigration Reform," with Gary S. Becker. *Wall Street Journal,* March 2, 2013

"Beware the Monthly Jobs-Report Chatter," *Wall Street Journal,* April 5, 2013.

"The Hidden Jobless Disaster," *Wall Street Journal,* June 6, 2013.

"An Upgrade for the Senate Immigration Bill,"  *Wall Street Journal,* July 17, 2013.

"The Stock Market Beats GDP as an Economic Bellwether," *Wall Street Journal,* July 31, 2013.

"High Unemployment Makes Productivity a Job Destroyer," *Investor's Business Daily* September 19, 2013.

"Who Really Fixed the Financial Crisis?" with Keith Hennessey, *Politico,* September 13, 2013.

"Bush ended financial crisis before Obama took office -- three important truths about 2008," with Keith Hennessey, *Foxnews.com*, September 16, 2013.

"No Tapering Soon if the Fed Looks at Labor," *Wall Street Journal,* October 1, 2013.

"How 'Debt Ceilings' Increase Debt" with Gary Becker. *Wall Street Journal* October 24, 2013

"President Obama, Is a 'substandard' health plans really substandard?". *Foxnews.com,* November 8, 2013.

"The Young, the Restless, and Economic Growth," *Wall Street Journal,* December 23, 2013.

"Bushcare," *Politico*, February 18, 2014.

"The Hidden Rot in the Jobs Numbers," *Wall Street Journal,* March 17, 2014.

"How to Energize a Lackluster Recovery," *Wall Street Journal,* April 21, 2014.

"A Gifted Economist and the Ultimate Social Scientist," *Wall Street Journal,* May 6, 2014.

"Job Turnover Data Show Lots of Churning, Little Job Creation"  *Investors Business Daily* (Brain Trust Series), August 20, 2014.

"The Climate Change Agenda Needs to Adapt to Reality" *Wall Street Journal* September 3, 2014.

"Government Forecasters Might As Well Use a Ouija Board," *Wall Street Journal*, October 17, 2014.

"An Immigration Game Plan for the New Congress," *Wall Street Journal,* December 5, 2014.

" 'Scoring' Legislation for Growth"  *Wall Street Journal,* January 7, 2015.

"Solving the Puzzle of Stagnant Wages" *Wall Street Journal,* January 26, 2014.

"Want to Reduce Inequality? Consult China, Vietnam and India" *Wall Street Journal*, April 1, 2015.

"Why the Economy Still Limps Along," *Wall Street Journal,* June 23, 2015.

"How Not to Prevent the Next Financial Meltdown" *Wall Street Journal,* Oct 3, 2015.

"This is the Real Unemployment Rate," *Washington Post*, November 6, 2015.

"If Only Hillary and Bernie Would Recall JFK" *Wall Street Journal,* January 29, 2016.

"America's Coming Tax Increase," *Wall Street Journal,* April 28, 2016.

"The Fed Missed It's Chance. Now What?" *Wall Street Journal,* July 22, 2016.

"Germany Offers a Promising Jobs Model" *Wall Street Journal,* September 9, 2016 (with Simon Janssen).

"Holiday Cheer from the Dismal Science" *Wall Street Journal,* December 29, 2016.

"How Trump Can Hit 3% Growth - Maybe" *Wall Street Journal,* February 28, 2017.

Attachment B

# Professor Edward P. Lazear's Prior Testimony

The following is a description of the major cases in which Professor Edward P. Lazear has consulted and testified as of March, 2017:

*Martin Jenkins et al. v. NCAA.*  Retained by Jeffrey Kessler of Winston Strawn on behalf of Jenkins. Class certification and antitrust liability issues. Expert report and deposition. 2014-2015.

*Jose Andino v. Kaiser Foundation Hospitals.*  Retained by Joshua Rodine of Seyfarth Shaw. Class certification and analysis of overtime policies on behalf of Kaiser Foundation Hospitals. Expert report. 2015

*Dukes et al. v. Wal-Mart Stores, Inc.*  Retained by Karl Nelson of Gibson, Dunn & Crutcher. Class certification and gender discrimination analysis on behalf of Wal-Mart Stores, Inc. Expert report and deposition. 2013.

*In Re Toyota Unintended Acceleration Product Liability Litigation.*  Retained by Darren McCarty of Alston & Bird and Michael Scudder of Skadden, Arps, Slate, Meagher & Flom. Class certification and damages analysis on behalf of Toyota. Expert reports and deposition. 2011-2012.

Attachment C

# Documents Relied Upon by Edward P. Lazear

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Legal Pleadings** | |
| Third Amended Complaint | April 20, 2016 |
| Defendant Tata Consultancy Services, Ltd.'s Motion for Summary Judgment; Memorandum and Authorities in Support Thereof, with related declarations and exhibits. | January 31, 2017 |
| Plaintiffs' Notice of Motion and Motion for Class Certification, with Exhibits 1-52 | February 21, 2017 |
| | |
| **Depositions** | |
| Deposition of Umesh Kumar, with Exhibits 1-5 | January 27, 2016 |
| Deposition of Shyam Sundar Chinnari | January 28, 2016 |
| Deposition of Amit Jindal | February 26, 2016 |
| Deposition of Jennifer Alkiewicz | March 16, 2016 |
| Deposition of Brian Andrillo | March 16, 2016 |
| Deposition of Balaji Ganapathy | March 17, 2016 |
| Deposition of Christopher J. Slaight, with Exhibits 1-29 | September 17, 2016 |
| Deposition of David Neumark | March 15, 2017 |
| | |
| **Expert Reports** | |
| Expert Report of David Neumark, with Appendices A-D | February 21, 2017 |
| | |
| **Declarations** | |
| Declaration of Jeevak Sharma in Support of Defendant Tata Consultancy Services LTD.'s Motion for Summary Judgment | January 31, 2017 |
| Declarations of Jennifer Alkiewicz, Brian Andrillo, Shyam Sundar Chinnari, Balaji Ganapathy, Amit Jindal, Umesh Kumar, and Jeevak Sharma in Support of Tata Consultancy Services, Ltd's Opposition to Motion for Class Certification | March 20, 2017 |
| | |
| **Annual Reports** | |
| Tata Consultancy Services 2011-2012 Annual Report | May 26, 2012 |
| Tata Consultancy Services 2014-2015 Annual Report | May 21, 2015 |
| | |
| **Academic Literature & Public Press** | |
| Becker, Gary S., "Investment in Human Capital: A Theoretical Analysis," Journal of Political Economy, Vol. 70 Issue 5, Part 2: Investment in Human Beings, October 1962, pp. 9-49 | |
| Silverman, Rachel Emma and Lauren Webber, "An Inside Job: More Firms Opt to Recruit from Within," *Wall Street Journal* | May 29, 2012 |

**Document Title, Bates Numbers**                                    **Document Date**

**Websites**

Tata Consultancy Services Office Locations, available at:
http://www.tcs.com/worldwide/n_america/locations/usa/Pages/offices.aspx

"About TCS," Tata Consultancy Services, available at: http://www.tcs.com/about/Pages/default.aspx, accessed on 1/12/17

"Industries," Tata Consultancy Services, available at: http://www.tcs.com/industries/Pages/default.aspx

"High Tech," Tata Consultancy Services, available at:
http://www.tcs.com/industries/high_tech/Pages/default.aspx

A New Way Forward - Tata Consultancy Services Corporate Brochure, available at:
http://www.tcs.com/SiteCollectionDocuments/Brochures/TCS-Capabilities-CORPORATE-BROCHURE-11102014-web.pdf, accessed on 1/13/17

American Community Survey and Puerto Rico Community Survey - 2015 Code Lists, available at:
https://www2.census.gov/programs-surveys/acs/tech_docs/code_lists/2015_ACS_Code_Lists.pdf

"What is the American Community Survey?," available at: https://www.census.gov/programs-surveys/acs/about.html, last accessed on 1/13/17

**Case Materials**

*TAH000685332*

*TAH000685335*

*TAH000685342*

*TATA001129883*

*TATA001133040*

*TATA001133781*

*TATA001135032*

*TATA001135987*

*TATA001138313*

*TCS029653-7*

*TCSLTD000618073*

*TCSLTD000625276*

*TCSLTD003463394-5*

*TCSLTD003463399-400*

*TCSPROD000000143-5*

*TCSPROD000000148*

*TCSPROD000000150-1*

*TCSPROD000000161-1057*

*TCSPROD000001969*

**Data**

American Community Survey Data; Integrated Public Use Microdata Series

**Document Title, Bates Numbers**          **Document Date**

Names_2010Census.xlsx


**All other materials cited in this report.**