Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
E-mail: dlow@kotchen.com;
E-mail: dkotchen@kotchen.com;
E-mail: mvk@kotchen.com

Attorneys for Buchanan, Slaight, Webber, Masoudi, and Mandili

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| STEVEN HELDT, BRIAN BUCHANAN, and CHRISTOPHER SLAIGHT<br><br>Plaintiffs,<br><br>v.<br><br>TATA CONSULTANCY SERVICES, LTD.,<br><br>Defendant. | Case No.: 4:15-cv-01696-YGR<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' SUPPLEMENTAL DISCOVERY BRIEF**<br><br>Complaint Filed: April 14, 2015 |

This case involves Tata's withholding from discovery voluminous data until directly before and after Plaintiffs' class certification deadline, and after the deadline to request to file a motion for partial summary judgment. On August 28, 2015, Plaintiffs issued discovery requests to Tata to which this data was responsive. In response, Tata produced to Plaintiffs simple lists of its active and inactive employees. Tata represented that more robust "allocation data" of employees' positions, promotions, performance ratings, terminations, job locations, assignments, *etc*. did not exist in an electronically-retrievable manner. Then, on a January 18, 2017 phone call – ***roughly 1.5 years after Plaintiffs' issued their discovery requests*** – Tata's expert witness informed Tata that he needed more robust data to "understand how [Tata] works" and to support his opinions, as follows:

> Q: And by January 18th, the reason you had the call was to ensure that you had data; is that right?
>
> A: No. The call was more general than that. It was, you know, we knew at that point that I was going to need to come to some conclusions with issues that I needed to have information on that I didn't yet feel I had enough on []. And we were trying to [] decide at that point whether such data existed. It had to exist.
>
> …
>
> Q: But you knew you needed that data to reach the conclusions you did in your report, correct?
>
> A: Well, I didn't know what the data was when I made the request. So the conclusions I came [to] are partly related to what was in that data, and I couldn't [have] known that at the time. But I did know I needed a better understanding other than just an employee list of how this company works.

Anderson Dep. Tr. 39:7-40:3 (Mar. 31, 2017) (Ex. 9).

Tata then promptly retrieved vast quantities of electronic data that it had told Plaintiffs did not exist, which were subsequently produced to Plaintiffs, including (but not limited to) the following:

- On February 2, 3, and 9, 2017, Tata produced 7,400 Manpower Reports, which contained over 60 data fields for approximately 37,000 employees (Tata's entire United States workforce). Some reports contained unique data fields that were missing from other reports.
- On February 3, 7, and 9, 2017, Tata produced almost 21,000 unallocated reports containing data relating to "benched" or unallocated employees (over 2.71 GB of data). Each spreadsheet contained over 45 data entries for thousands of unallocated employees.
- On February 3, 2017, Tata produced 853 spreadsheets containing visa ready reports, visa utilization reports and unallocated reports. Each spreadsheet contained entries for thousands of employees.
- On February 8, 2017, Tata produced visa 269 visa utilization reports (181 MB of data), each of which contained over 50 fields of data for hundreds of employees.

- On February 9, 2017, Tata produced employee allocation data containing hundreds of thousands of entries for each set of data relating to expats, and tens of thousands of entries for each set of data relating to local employees (millions of lines of data in total). Eight of the twelve spreadsheets included only employee numbers and omitted employee names.
- On this same date, Tata produced two sets of employee appraisal data that contained annual appraisal scores for over 61,400 employees.

Tata Data Exemplar at 11-34 (Ex. 10); Tata Data Production Log at 2-3 (Ex. 11).[1]

As a result of Tata's belated production of data, Plaintiffs were foreclosed from analyzing and moving for a promotions class, have been deprived of an opportunity to conduct follow-up discovery, and could not seek partial summary judgment. The prejudice to Plaintiffs is substantial.

**<u>Responses to Questions Posed by the Court</u>**

*1) Authority Regarding Plaintiffs' Data Questions*

At the outset of this case, the Court instructed the parties to be "collegial" and abide by the Court's discovery guidelines. Hr'g. Tr. 10:21-11:16 (Sept. 15, 2015) (Ex. 18). Among other things, those guidelines strongly encourage "cooperation" between counsel regarding the "collection, search, review, and production of ESI," and "an informal discussion about the discovery of ESI (rather than deposition)." ESI Guidelines at 1, 3 (Ex. 19). As discussed below, Plaintiffs sought to have Tata respond to questions only after Plaintiffs took a Rule 30(b)(6) deposition to understand data produced in January 2017. Plaintiffs respectfully submit that seeking answers to Plaintiffs' data questions was appropriate given: (i) that Tata produced vastly more comprehensive data in February and March 2017, after Plaintiffs' Rule 30(b)(6) data deposition; (ii) in light of the Court's discovery guidelines concerning informal discussions of ESI; and (iii) the timing of Tata's late production of data.

Plaintiffs first learned that Tata had been withholding substantial amounts of data in late December 2016, when, in advance of mediation, Tata disclosed it was collecting new employee data and then produced data for 47,098 individuals that contained many more fields than any prior data set. Tata maintained that this data could not be used in the case, nor shared with the Court. *See* Dkt. #96 at 2. Plaintiffs' promptly noticed a deposition to learn more about the data Tata maintained. *See* Rule 30(b)(6) Dep. Notice (Ex. 12). On January 17 and 19, 2017 – just 14 and 12 days until Plaintiffs'

[1] In addition, Tata waited until January and February 2017 to produce over 4 million pages of documents – almost all documents that Tata has produced in this case. *See* Dkt. #115 at 12.

deadline to move for class certification and after the deadline for Plaintiffs to seek leave to move for summary judgment – Tata produced voluminous new data on its active and separated employees that far exceeded its previous productions. This data included name, employee number, date of hire, nationality, visa status, and base country fields. This data was new to Plaintiffs, and Tata had repeatedly told Plaintiffs such data did not exist.[2] Plaintiffs then notified the Court of Tata's misconduct, and requested a hearing to address the matter. *See* Dkt. #96. Plaintiffs also amended their Rule 30(b)(6) notice to address and understand this new data (including the fields contained within the data), and to learn what other data Tata maintained. Ex. 1. That deposition was taken on January 25, 2017. Tata waited until after this deposition to produce to Plaintiffs the vast quantities of data discussed above (collected at the request of its expert) and has since refused to answer any questions about it. *See* Exs. 15-17.

*2) The Reasons Plaintiffs Are Seeking Discovery Relief Now*

Plaintiffs are seeking relief now because Tata only recently produced vast quantities of employee data, which its experts rely on extensively. Tata Data Production Log at 2-3 (Ex. 11). Plaintiffs have concerns regarding how this data was collected. For example, based on recent deposition testimony, it appears that Tata did not collect certain data for visa-holders, as Tata seeks to have these employees excluded from discrimination analyses (even though they comprise over 75% of Tata's U.S. workforce).[3] In addition, Plaintiffs do not understand the data, as the data has extensive fields that require explanation. *See, e.g.*, Neumark Decl. ¶ 4 (Mar. 31, 2017) (Ex. 22).

Moreover, the recently-produced data is vastly different than the data Tata produced in 2015 and 2016. Tata's 2015 and 2016 data was incomplete and unworkable. *See* Notice of Discovery Misconduct at 2 (Dkt. #96) (discussing incompleteness and unworkability of early produced data). In

[2] Email from D. Kotchen to M. La Mar, *et al.* (Jan. 18, 2017) ("We have been seeking data like this since the start of discovery, were told that such data is not available, and are now concerned about what other data exists that we do not have.") (Ex. 13); Email from D. Kotchen to M. La Mar, *et al.* (Jan. 20, 2017) ("We are shocked at this production of new data. We've never before seen data that Tata produced yesterday and have consistently been told the data is not available.") (Ex. 14).

[3] Plaintiffs also are concerned that Tata opted not to use its Ulimatix system to generate complete employee allocation data, despite the fact that Tata testified that Ultimatix can be queried to generate reports, which seems like a reliable methodology. Sharma (30(b)(6)) Dep. Tr. 5:9-22, 6:25-7:15, 17:7-20:2 (Jan. 25, 2017) (Ex. 20); Kumar (30(b)(6)) Dep. Tr. 25:2-17 (Jan. 25, 2017) (Ex. 21).

2016, in light of the unworkable data Tata had produced in discovery, Plaintiffs asked Tata about its ability to produce employee allocation data in response to Plaintiffs' discovery. *See* Email from M. von Klemperer to M. La Mar, *et al.* at Question 4 (Aug. 1, 2016) ("Interrogatory No. 2 of Plaintiffs' First Set of Interrogatories sought for each United States employee, 'each work location within the United States, each title and level, [and] each client the employee served (and dates of serving the clients)[.]' We assume TCS maintains this sort of allocation data, but we have been unable to locate it in any of the materials produced thus far. Please let us know how and where this information is maintained.") (Ex. 23). Tata told Plaintiffs that it does not have a database, or Human Resources system, from which Tata can pull allocation data by employee name, and that there was no way to print the requested information for the class period. Grunert Decl. ¶¶ 2-3 (Mar. 31, 2017) (Ex. 24). In addition, Tata stated that allocation data may be located in an employee's personnel file, but that the files are in India and are most likely hard copy, as opposed to electronic format. *Id.* These representations were untrue.[4]

*3) Authority Regarding Third Party Collection of Data*

Tata's conduct in this case closely mirrors its conduct in the *Epic Systems Corporation v. Tata Consultancy Services* case, in which the court sanctioned Tata multiple times for obstructive, evasive, and untimely discovery practices that the Court described as "horrific." Ex. 5 at 4; *id.* at 5 ("TCS's failures in producing timely records and apparent suppressions of 'the truth' are disturbing to the court, as they should be to defendants"); Ex. 6 at 2 (discussing Tata's "disappointingly incomplete [and] at times obstructive, approach to written discovery and 30(b)(6) depositions"). Among other things, the court in *Epic* ordered the appointment of a third party to determine what discoverable data Tata maintained. Ex. 6 at 11 ("Plaintiff is to designate an outside expert with no affiliation with Epic to discuss with TCS's Chief Security Officer, Ajit Menon, how best to accomplish electronic

[4] Around the same time that Tata told Plaintiffs that it did not have retrievable allocation data, it gave its expert a sample of allocation data for 50 employees that he had requested. Anderson Dep. Tr. 33:21-34:7 (Mar. 31, 2017) (discussing sample data provided in summer or fall 2016) (Ex. 9).

searching of TCS's data").[5] Other courts have awarded similar relief.[6] As can be discussed at the upcoming hearing, Plaintiffs have serious concerns about the collection of Tata's data and believe that a third party is necessary to ensure complete and accurate data collection.

*4) Sources of Discovery Requests Underlying Motion*

The data discussed above contains employee allocation, appraisal, position, visa, and other information that is responsive to Plaintiffs' Interrogatory 2, which sought employee:

> [N]ame, race, national origin … annual compensation … each work location within the United States, each title and level, each client the employee served (and dates of serving the client), each employee review rating … start and end dates with Tata, visa type, visa dates….

Rog. 2, Pls.' 1st Set of Rogs. (Ex. 27). The data is also responsive to numerous document requests relating to the demographics of Tata's workforce and staffing. *See* RFP 4, 6, 8, 16, Pls.' 1st Set of RFP (Ex. 28). Moreover, having relied extensively on the data in opposing class certification, Tata was also required to timely identify it on their initial disclosures, but failed to do so. Def.'s Init. Discs. (Ex. 29); Fed. R. Civ. P. 26(a)(1)(A)(ii) (requiring disclosure of "all documents [and] electronically stored information … that the disclosing party … may use to support its claims or defenses[.]"); Fed. R. Civ. P. 26(e) (requiring timely supplementation). A party who fails to disclosure information, as required by Rule 26(a) and (e), "is not allowed to use that information … on a motion, at a hearing, or at trial[.]" Fed. R. Civ. P. 37(c)(1). This exclusion is mandatory. *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 544 (N.D. Cal. 2009); *see Durand v. Stonehouse Court Assocs., LLC*, 473 F. App'x 667, 668 (9th Cir. 2012) (affirming striking of witness not disclosed on initial disclosures); *Olaya v. Wal-Mart Stores, Inc.*, No. 11-cv-997, 2012 U.S. Dist. LEXIS 111079, at *8-15 (D. Nev. Aug. 7, 2012) (striking expert report where party failed to disclose damages data on initial disclosures and produced it only "eight days prior to the expert disclosure deadline").

---

[5] That case ultimately resulted in a $940 million jury verdict against Tata for client data theft. Ex. 25.

[6] Order at 7, *In re Delta / AirTran Baggage Fee Antitrust Litig.*, MDL 2089 (N.D. Ga. Nov. 19, 2012) (ordering defendant to make available to a discovery expert retained by plaintiffs at defendant's expense to collect ESI responsive to discovery requests) (Ex. 26); *Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 406 (W.D. Tenn. 2011) (ordering defendant to bear costs of third party forensic analysis because of its "deficient preservation and collection efforts"); *Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, 267 F.R.D. 443, 448 (D. Conn. 2010) ("[I]t is the Defendants' apparent deceit, obstreperousness and destruction of relevant information, that the Defendants were required to maintain and preserve, that necessitates the retention of a … computer expert").

Dated: March 31, 2017

Respectfully submitted,

By: /s/Daniel Kotchen
Daniel Kotchen (*pro hac vice*)
Daniel Low, SBN 218387
Michael von Klemperer (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Email: dkotchen@kotchen.com;
dlow@kotchen.com;
mvk@kotchen.com

*Attorneys for Plaintiffs Buchanan, Slaight, Webber, Masoudi, and Mandili*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system.

Dated: March 31, 2017

/s/Daniel Kotchen
Daniel Kotchen