Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
E-mail: dlow@kotchen.com;
E-mail: dkotchen@kotchen.com;
E-mail: mvk@kotchen.com

Attorneys for Buchanan, Slaight, Webber, Masoudi, and Mandili

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| STEVEN HELDT, BRIAN BUCHANAN, and CHRISTOPHER SLAIGHT<br><br>Plaintiffs,<br><br>v.<br><br>TATA CONSULTANCY SERVICES, LTD.,<br><br>Defendant. | Case No.: 4:15-cv-01696-YGR<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT TATA CONSULTANCY SERVICES, LTD.'S MOTION TO EXCLUDE THE EXPERT OPINION TESTIMONY OF DAVID NEUMARK**<br><br>Complaint Filed: April 14, 2015 |

## TABLE OF CONTENTS


TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 1

A. Dr. Neumark and His February 2017 Report. ........ 1

B. Tata's Discovery Misconduct. ........ 3

III. LEGAL STANDARD ........ 5

IV. ARGUMENT ........ 6

A. A *Daubert* Analysis of Dr. Neumark's Opinions Is Unnecessary at this Stage. ........ 6

B. Dr. Neumark Employed Standard Methodology That Is Admissible. ........ 7

1. Dr. Neumark's Testimony Is Relevant. ........ 8

2. Dr. Neumark's Testimony Is Reliable. ........ 14

3. Dr. Neumark's Hiring Analysis Relies on Relevant Comparisons. 19

C. Tata's Withholding of Data Renders Its *Daubert* Motion Futile. ........ 20

V. CONCLUSION ........ 21

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Ameritech Servs., Inc.*, 231 F.3d 414 (7th Cir. 2000) .......... passim

*Balderston v. Fairbanks Morse Engine Division of Coltec Indus.*, 328 F.3d 309 (7th Cir. 2003) 20

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .......... 17

*Butler v. Home Depot*, No. 94-cv-04335, 1997 U.S. Dist. LEXIS 16296 (N.D. Cal. Aug. 28, 1997) .......... 9

*Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380 (N.D. 1995) .......... 14

*Castaneda v. Partida*, 430 U.S. 482 (1977) .......... 7

*Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981) .......... 18

*Coates v. Johnson & Johnson*, 756 F.2d 524 (7th Cir. 1985) .......... 8

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000) .......... 13

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .......... 6

*Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356 (9th Cir. 1985) .......... 8, 9, 14

*Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183 (9th Cir. 2005) .......... 6

*Dothard v. Rawlinson*, 433 U.S. 321 (1977) .......... 18

*Durand v. Stonehouse Court Assocs., LLC*, 473 F. App'x 667 (9th Cir. 2012) .......... 5, 21

*E.E.O.C. v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575 (9th Cir. 1989) .......... 11, 12

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) .......... 6

*Flebotte v. Dow Jones & Co.*, No. 97-30117, 2000 U.S. Dist. LEXIS 19875 (D. Mass. Dec. 6, 2000) .......... 10

*Grodzitsky v. Am. Honda Motor Co.*, No. 2:12–cv–01142, 2014 U.S. Dist. LEXIS 24599 (C.D. Cal. Feb. 19, 2014) .......... 6

*Hazelwood Sch. Dist. v. United* States, 433 U.S. 299 (1977) .......... 7, 20

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) .......... 13

*In re Wells Fargo Residential Mortg. Lending Discrimination Litig.*, No. 08-md-01930, 2011 U.S. Dist. LEXIS 99830 (N.D. Cal. 2011) .......... 9

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .......... 1, 8

*Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir. 1998) .......... 6

*Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470 (9th Cir. 1995) .......... 8

*McMillan v. Mass. SPCA*, 140 F.3d 288 (1st Cir.1998)) ....10

*Mister v. Ill. Central Gulf R.R. Co.*, 832 F.2d 1427 (7th Cir. 1987).... passim

*Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475 (9th Cir. 1983) ....16, 18

*Moore*, 708 F.2d at 482-83 ....18

*Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005) ....8, 9, 10, 14

*Olaya v. Wal-Mart Stores, Inc.*, No. 11-cv-997, 2012 U.S. Dist. LEXIS 111079 (D. Nev. Aug. 7, 2012) ....5, 21

*Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541 (N.D. Cal. 2009) ....21

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528 (7th Cir. 1997)...13

*Prod. Tool Corp. v. Emp't & Training Admin.*, 688 F.2d 1161 (7th Cir. 1982)....17

*Rose v. Wells Fargo & Co.*, 902 F.2d 1417 (9th Cir. 1990) ....16

*Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir. 1997)....15

*Stepp v. Ford Motor Credit Co.*, 623 F. Supp. 583 (E.D. Wis. 1985) ....17

*United States v. Valencia*, 600 F.3d 389 (5th Cir. 2010) ....14

**<u>Other Authorities</u>**

20 C.F.R. § 655.700 ....16

20 C.F.R. § 655.731 ....13, 19

8 C.F.R. § 214.2 ....19

**<u>Rules</u>**

Fed. R. Civ. P. 26 ....5, 20

Fed. R. Civ. P. 37 ....5, 21

**PLAINTIFFS' OPPOSITION TO DEFENDANT TATA CONSULTANCY SERVICES, LTD.'S MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF DAVID NEUMARK**

## I. INTRODUCTION

Tata Consultancy Services, Ltd.'s ("Tata's") *Daubert* motion to strike Dr. David Neumark's testimony should be denied. Dr. Neumark is a highly-qualified professor who performed straightforward and reliable statistical analyses demonstrating gross statistical disparities in Tata's hiring and terminations of South Asians that could not have occurred by chance. These statistical findings are relevant to proving Plaintiffs' *prima facie* case under the *Teamsters* framework, especially when considered in combination with Tata's discriminatory policy and practice of favoring South Asian visa holders.[1] While Tata hypothesizes that there could be non-discriminatory factors causing the statistical disparities, Tata and its experts have not carried their burden to identify evidence that non-discriminatory factors caused the disparities.[2] Moreover, Tata's motion is improper considering that Tata withheld vast quantities of its employee data until just before Dr. Neumark's analysis was due, and Tata's own expert admits that Tata still has not produced data sufficient to identify any non-discriminatory variable that could explain the extreme disparity in Tata's U.S. workforce.

## II. BACKGROUND

### A. Dr. Neumark and His February 2017 Report.

Dr. Neumark is a labor economist who received his Ph.D. from Harvard University and is a Professor of Economics at the University of California at Irvine.[3] He has done extensive research on labor market discrimination, including methods for measuring and testing for discrimination that have been adopted by many other researchers. Neumark Report ¶ 1 (Ex. 1). He has been published

[1] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977).

[2] For the reasons discussed in the Joint Discovery Letter Brief (Dkt. #162), Tata's expert reports should be struck. *See also* Pls.' Supp. Discovery Brief (Dkt. #164) (discussing Tata's discovery misconduct, and its experts' heavy reliance on late-produced data). Because Tata's *Daubert* motion relies heavily on the report of G. Edward Anderson (Dkt. #125-1, Ex. D), the motion should be denied on this basis alone.

[3] Expert Report of David Neumark ¶ 1 ("Neumark Report") (Ex. 1); Neumark Curriculum Vitae at 1-2, available at http://www.socsci.uci.edu/~dneumark/cv_107.pdf.

extensively, including a full-length book and dozens of peer-reviewed articles on discrimination. *Id.* ¶ 1, App. C. Tata does not challenge Dr. Neumark's extensive qualifications.

Dr. Neumark was retained in this case to evaluate the data produced by Tata in discovery to determine whether the data was consistent with discrimination by Tata in hiring and terminations. Based on Tata's data, Dr. Neumark found the following:

- *Hiring*: From 2011 through April 2015, approximately 75% of Tata's workforce in the United States was South Asian. *Id.* ¶ 14, Table 1. By contrast, only 12.5% of workers in the U.S. computer systems design and related services industry are South Asian. *Id.* In other words, the share of South Asians at Tata is approximately 200 standard deviations higher than in the relevant industry, and there is less than a one in a billion chance that the statistical disparity is due to chance. *Id.*
- *Terminations*: From 2011 through April 2015, less than 1% of South Asians at Tata were fired, compared to approximately 12% of non-South Asians, a standard deviation of over 47, and the statistical likelihood that this disparity was due to chance is less than 1 in 1 billion. *Id.* ¶ 17, Tables 3a-3e; Neumark Errata ¶ 17 (Ex. 2). Similarly, less than 1% of South Asians were terminated from the "bench," whereas over 7.5% of non-South Asians were terminated from the "bench," a standard deviation of over 38, with less than a 1 in 1 billion likelihood that the disparity is due to chance. Neumark Report ¶ 18, Tables 3a-3e; Neumark Errata ¶ 18 (Ex. 2).

While Tata and its experts have criticized Dr. Neumark for not performing multiple regression analyses to control for various factors that they claim could potentially provide a non-discriminatory basis for these vast disparities, Tata and its experts have failed to demonstrate that a non-discriminatory factor explains the disparity. In fact, Tata's own expert testified that Tata's production of data is insufficient even to perform such an analysis. Anderson Dep. Tr. 74:21-76:2 (Mar. 31, 2017) (Ex. 7) (testifying that he did not control for variables because "I don't believe that the data I have would allow me to do a reliable analysis like that").

**B. Tata's Discovery Misconduct.**

Tata has not provided timely discovery, and waited until January, February, and March 2017 – over 1.5 years after Plaintiffs issued their discovery requests – to produce the vast majority of its documents and critical employee data. *See* Pls.' Notice of Discovery Misconduct (Dkt. #96); Pls.' Reply in Support of Mot. to Amend Compl. at 6-8 (Dkt. #114); Pls.' Mot. for Class Cert. at 12-13 (Dkt. #115); Pls.' Admin. Mot. for Telephonic CMC at 2-3 (Dkt. #146).

Further, on January 17 and 19, 2017 – just 14 and 12 days until Plaintiffs' deadline to move for class certification and after the deadline for Plaintiffs to seek leave to move for summary judgment – Tata produced voluminous new data on its active and separated employees that far exceeded its previous productions. *See* Notice of Discovery Misconduct at 1-2 (Dkt. #96). Tata itself collected this data in September or October 2016, yet failed to produce it for months. Sharma (30(b)(6)) Dep. Tr. 25:8-27:7, 28:18-23 (Jan. 25, 2017) (Ex. 3). This data included name, employee number, date of hire, nationality, visa status, and base country fields. This data was new to Plaintiffs, and Tata had repeatedly told Plaintiffs such data did not exist. *Compare* Active and Separated Employee List Exemplars (Oct. 30, 2015) (containing only employee number, nationality, and EEO-1 data fields), *with* Active and Separated Employee List Exemplars (Jan. 17 & 19, 2017) (adding additional data fields for employee name, type (*i.e.* local or expat), base branch, location of hire, visa status, separation type, and reason for separation) (Ex. 4).[4] Plaintiffs took a deposition on January 25, 2017 to understand this data. *See* Am. Rule 30(b)(6) Dep. Notice (Dkt. #146-1).

Tata's expert found this data insufficient to "understand how [Tata] works," and to support his opinions; on a January 18, 2017 phone call, he thus requested that Tata provide him with more robust data:

---

[4] Email from D. Kotchen to M. La Mar, *et al.* (Jan. 18, 2017) ("We have been seeking data like this since the start of discovery, were told that such [data] is not available, and are now concerned about what other data exists that we do not have.") (Ex. 5); Email from D. Kotchen to M. La Mar, *et al.* (Jan. 20, 2017) ("We are shocked at this production of new data. We've never before seen data that Tata produced yesterday and have consistently been told the data is not available. Tata's withholding of data until the very eve of class certification is nothing short of discovery misconduct.") (Ex. 6).

> Q: And by January 18th, the reason you had the call was to ensure that you had data; is that right?
>
> A: No. The call was more general than that. It was, you know, we knew at that point that I was going to need to come to some conclusions with issues that I needed to have information on that I didn't yet feel I had enough on []. And we were trying to [] decide at that point whether such data existed. It had to exist.
>
> …
>
> Q: But you knew you needed that data to reach the conclusions you did in your report, correct?
>
> A: Well, I didn't know what the data was when I made the request. So the conclusions I came [to] are partly related to what was in that data, and I couldn't [have] known that at the time. But I did know I needed a better understanding other than just an employee list of how this company works.

Anderson Dep. Tr. 39:7-40:3 (Mar. 31, 2017) (Ex. 7).

Tata then promptly retrieved vast quantities of electronic data that it had told Plaintiffs did not exist, and subsequently produced it to Plaintiffs, including (but not limited to) the following:

- On February 2, 3, and 9, 2017, Tata produced 7,400 Manpower Reports, which contained over 60 data fields for approximately 37,000 employees (Tata's entire United States workforce). Some reports contained unique data fields that were missing from other reports.
- On February 3, 7, and 9, 2017, Tata produced almost 21,000 unallocated reports containing data relating to "benched" or unallocated employees (over 2.71 GB of data). Each spreadsheet contained over 45 data entries for thousands of unallocated employees.
- On February 3, 2017, Tata produced 853 spreadsheets containing visa ready reports, visa utilization reports and unallocated reports. Each spreadsheet contained entries for thousands of employees.
- On February 8, 2017, Tata produced visa 269 visa utilization reports (181 MB of data), each of which contained over 50 fields of data for hundreds of employees.
- On February 9, 2017, Tata produced employee allocation data containing hundreds of thousands of entries for each set of data relating to expats, and tens of thousands of entries for each set of data relating to local employees (millions of lines of data in total). Eight of the twelve spreadsheets included only employee numbers and omitted employee names.
- On this same date, Tata produced two sets of employee appraisal data that contained annual appraisal scores for over 61,400 employees.

Tata Data Exemplar at 11-34 (Ex. 8); Tata Data Production Log at 2-3 (Ex. 9).[5] Despite waiting to

---

[5] In addition, Tata waited until January and February 2017 to produce over 4 million pages of documents – almost all documents that Tata has produced in this case. *See* Pls.' Mot. for Class Cert. at 12 (Dkt. #115).

produce this data until after Plaintiffs' January 25 deposition taken to understand Tata's data to produce these vast quantities of data, Tata has refused to answer any questions about its recently-produced data.[6]

Tata's experts rely heavily on this recently-produced data and incorporate the data into over 30 separate analyses (the vast majority of their analyses) and throughout their reports *See* Tata Data Production Log at 2-3 (Ex. 9); Anderson Decl. Tables 1-9, 11-23, 25, App. Tables 1-3, 4.1-4.2 (Dkt. 125-1, Ex. D); Lazear Decl. Figs. 1, 2A-2C, 3, 5-7 (Dkt. #128).

As discussed in Plaintiffs Supplemental Discovery Brief and Joint Discovery Letter Brief, Tata's belated production of documents and data has caused Plaintiffs substantial prejudice, including denying Plaintiffs the time necessary to fully review, and understand, and analyze the data. Pls.' Supp. Discovery Brief at 2, 5 (Dkt. 164); Joint Discovery Letter Brief at 1-2 (Dkt. #162) For example, Tata's decision to produce vast quantities of complicated, undefined data, that Tata's expert deemed necessary to "understand how [Tata] works," after Plaintiffs' data deposition and only days before Plaintiffs' class certification filing deadline effectively precluded Plaintiffs and Dr. Neumark from relying on the data in support of class certification, or in rebuttal to the dozens of analyses Tata's experts performed with the data.[7]

## III. LEGAL STANDARD

Expert reports and testimony may be admissible so long as "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to

---

[6] *See* Email from L. Tremaine to L. Wytsma, *et al.* (Mar. 2, 2017) (Ex. 10); Email from D. Kotchen to L. Wytsma, *et al.* (Mar. 17, 2017) (Ex. 11); Email from M. von Klemperer to M. La Mar, *et al.* (Mar. 22, 2017) (Ex. 12).

[7] As discussed in the Joint Discovery Letter Brief, the Court should strike Tata's expert analyses, for, among other things, relying extensively on data not disclosed in Tata's initial disclosures. Joint Discovery Letter Brief at 1-2 (Dkt. #162); Fed. R. Civ. P. 26(a)(1)(A)(ii); Fed. R. Civ. P. 26(e); Fed. R. Civ. P. 37(c)(1) (requiring exclusion of undisclosed information); *Durand v. Stonehouse Court Assocs., LLC*, 473 F. App'x 667, 668 (9th Cir. 2012) (affirming striking of witness not disclosed on initial disclosures); *Olaya v. Wal-Mart Stores, Inc.*, No. 11-cv-997, 2012 U.S. Dist. LEXIS 111079, at *8-15 (D. Nev. Aug. 7, 2012) (striking expert report where party failed to disclose damages data on initial disclosures and produced it only "eight days prior to the expert disclosure deadline").

determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Under this rule, the Court must ensure that that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). The *Daubert* opinion sets forth a "liberal standard of admissibility[,]" as the accuracy of evidence is to be tested before the jury through "'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005) (quoting *Daubert*, 509 U.S. at 596).

## IV. ARGUMENT

The Court should deny Tata's *Daubert* motion because: (A) the Court can grant class certification and deny Tata's summary judgment motion based on Tata's common discriminatory policy of favoring foreign visa holders and the underlying statistical disparity without addressing the admissibility of Dr. Neumark's testimony; (B) Dr. Neumark's testimony is admissible because it is both relevant and reliable; and (C) having elected to withhold vast quantities of employee data, Tata cannot strike expert testimony on the basis that it fails to address this data. As discussed below, Dr. Neumark's testimony is relevant under the *Teamsters* framework because it shows that the statistical discrepancy in hiring and terminations could not have occurred by chance. In addition, Dr. Neumark's testimony is reliable because it is based on a widely-accepted and reliable statistical analysis.

### A. A *Daubert* Analysis of Dr. Neumark's Opinions Is Unnecessary at this Stage.

A full *Daubert* analysis is necessary before ruling on class certification or summary judgment only "[i]f the expert testimony is critical to class certification" or summary judgment.[8] Here, class

[8] *Grodzitsky v. Am. Honda Motor Co.*, No. 2:12–cv–01142, 2014 U.S. Dist. LEXIS 24599, at *21 (C.D. Cal. Feb. 19, 2014) (emphasis added) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-83 (9th Cir. 2011)).

certification can be granted and Tata's summary judgment motion can be denied based on Tata's common discriminatory policy of favoring foreign visa holders in hiring and terminations, and based on Tata's undisputed data that demonstrates a gross disparity in the race and national origin of those hired or terminated. *See* Pls.' Mot. for Class Cert. at 6-11 (Dkt. #115); Neumark Report ¶¶ 6-9, 14, 17-18, Table 1, Tables 3a-3e (Ex. 1); Neumark Errata ¶¶ 7-8, 17-18 (Ex. 2).[9]

### B. Dr. Neumark Employed Standard Methodology That Is Admissible.

Dr. Neumark's methodology is the same methodology "typically" used in employment discrimination cases:

> Studies in employment discrimination cases typically begin by defining the relevant labor market, and then ask what the results would be for the salient variable (race [or] age [for example]) if there were no discrimination. That is called the "null hypothesis." If the relevant market is 40% African-American, for instance, one would expect 40% of hires to be African-American under the null hypothesis. If the observed percentage of African-American hires is only 20%, then the statistician will compute the "standard deviation" from the expected norm and indicate how likely it is that race played no part in the decisionmaking. Two standard deviations is normally enough to show that it is extremely unlikely (that is, there is less than a 5% probability) that the disparity is due to chance, giving rise to a reasonable inference that the hiring was not race-neutral; the more standard deviations away, the less likely the factor in question played no role in the decisionmaking process.

*Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000) (citing *Hazelwood Sch. Dist. v. United* States, 433 U.S. 299, 308 n.14 (1977); *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977)).

As is "typical," Dr. Neumark "beg[a]n by defining the relevant labor market." *Id.* For his hiring analysis, he defined the relevant labor market as "the market for United States' computing workforce." Neumark Report ¶ 11 (Ex. 1). For his termination analysis, he defined the relevant labor market as Tata's own workforce. *Id.* ¶ 16. He then asked what the results would be for hiring and

---

[9] *See also* TCS057813-7818 at 7815 ("Leadership directive is to utilize every visa to the maximum extent – L1 B: 5 Yrs, H1 B: 6 Yrs & L1 A: 7 Yrs.") (Ex. 13); TCS137485-7487 at 7485 ("Leadership Team has advised to utilize visa ready Associates at on site") (Ex. 14); TCS148025-8027 at 8025 ("Leadership Team has advised not to send any visa ready associate back [to India] unnecessarily and utilize him/her here") (Ex. 15); Kumar (30(b)(6)) Dep. Tr. 80:23-81:5 (Jan. 25, 2017) (testifying, through 30(b)(6) witness, "we should use a person's visa to the maximum approval limit") (Ex. 23); TCS177617-7618, at 7617 (RMG Lead Ambika G: "Can we look at Visa ready or visa eligible cvs please[?]" Alok Bhalla: "Visa Ready will be a preference.") (Ex. 13).

terminations of non-South Asians or non-Indians absent discrimination. *Id.* ¶¶ 14, 17. After finding significant disparities, he calculated the standard deviation and the likelihood of the disparities occurring by chance – in each case, over one in one billion, *id.* ¶¶ 6-8, 14, 17-18 – thereby "giving rise to a reasonable inference that the hiring was not race-neutral." *Adams*, 231 F.3d at 424.

Thus, Dr. Neumark's testimony is: (1) relevant; and (2) reliable.

**1. Dr. Neumark's Testimony Is Relevant.**

"Statistical evidence is unquestionably relevant in a Title VII disparate treatment case[,]" in part because it is "helpful in establishing a *prima facie* case[.]" *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1362 (9th Cir. 1985). In a pattern or practice case brought under *Teamsters*, "[t]he plaintiffs' prima facie case will … usually consist of statistical evidence demonstrating substantial disparities in the application of employment actions as to minorities and the unprotected group, buttressed by evidence of general policies or specific instances of discrimination[.]" *Coates v. Johnson & Johnson*, 756 F.2d 524, 532 (7th Cir. 1985). "'Statistics showing racial or ethnic imbalance are probative…because such imbalance is often a telltale sign of purposeful discrimination.'" *Diaz*, 752 F.2d at 1363 (quoting *Teamsters*, 431 U.S. at 340 n.20). "A statistical study may fall short of proving the plaintiff's case, but still remain relevant to the issues in dispute." *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005). "[O]bjections to a study's completeness generally go to 'the weight, not the admissibility of the statistical evidence.'" *Id.* (quoting *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th Cir. 1995)).

Tata argues that Dr. Neumark's opinion is irrelevant because: (a) he only offered the opinion that the statistical disparity could not have occurred by chance; and (b) he did not conduct a multiple regression analysis controlling for factors that Tata hypothesizes might provide a non-discriminatory explanation for the disparity.

a. <u>Expert Testimony Need Not Prove Discrimination to Be Relevant and Admissible.</u>

Dr. Neumark analyzed Tata's data and found dramatic disparities in Tata's hiring and terminations of South Asians. He determined that there was less than a one in a billion likelihood that the disparities could have occurred by chance. Neumark Report ¶¶ 6-8, 14, 17-18, Table 1, Tables

3a-3e (Ex. 1); Neumark Errata ¶¶ 7-8, 17-18 (Ex. 2). Tata argues that his analyses are not relevant because he "simply attempt[s] to show disparities exist," and does not offer an opinion on "whether discrimination caused the disparities that he identified." Tata's Mot. to Exclude Expert Opinion Testimony of David Neumark at 10, 12 ("Tata's Mem") (Dkt. #125). But his opinion that the dramatic disparity cannot be attributed to chance is relevant and admissible because it is helpful to establishing Plaintiffs' *prima facie* case. *Obrey*, 400 F.3d at 697; *Diaz*, 752 F.2d at 1363; *Butler v. Home Depot*, No. 94-cv-04335, 1997 U.S. Dist. LEXIS 16296, at *21 (N.D. Cal. Aug. 28, 1997).

The Ninth Circuit and other courts have routinely admitted expert opinions regarding the existence of a statistical disparity. *Obrey*, 400 F.3d at 697; *Butler*, 1997 U.S. Dist. LEXIS 16296, at *21. In *Obrey*, the Ninth Circuit found that the expert's analysis was "based entirely on statistical disparities[,]" and "by itself, . . . cannot constitute proof that the [defendant] discriminated[.]" 400 F.3d at 696-97. But the Ninth Circuit reversed the lower court's exclusion of the expert, finding that his analysis "should have been admitted for whatever probative value it had[,]" and that "defendant's objections . . . went to weight and sufficiency rather than admissibility[.]" *Id.* at 697. Similarly, in *Butler*, this court admitted an expert opinion that statistical "disparities cannot be attributed to chance alone," and observed that if "[d]efendant's criticisms of plaintiffs' statistical evidence [is] valid," this would go to "weight" and "is an issue that is properly reserved for the factfinder at trial." 1997 U.S. Dist. LEXIS 16296, at *23.

Tata also argues that Dr. Neumark's opinion is inadmissible for class certification because statistics showing a racial disparity can be insufficient to demonstrate commonality for class certification. Tata's Mem. at 9-10 (citing *In re Wells Fargo Residential Mortg. Lending Discrimination Litig.*, No. 08-md-01930, 2011 U.S. Dist. LEXIS 99830 (N.D. Cal. 2011)). Tata relies entirely, however, on *Wells Fargo*, in which the court *denied* Wells Fargo's Daubert motions. 2011 U.S. Dist. LEXIS 99830, at *19. That court found a lack of commonality only because plaintiffs conceded that there was a "policy of *discretion*." *Id.* at *13-14 (emphasis added). Here, by contrast, Plaintiffs have identified a common discriminatory policy of favoring South Asian visa holders. *See e.g.,* TCS057813-7818 at 7815 (Ex. 13); TCS137485-7487 at 7485 (Ex. 14). This policy and Dr.

Neumark's statistics support a finding of commonality.

b. A Multiple Regression Analysis Was Not Required.

In conducting a *Daubert* analysis, courts examine what the expert "did, rather than hypothetical tests that he or another expert might have done." *Adams*, 231 F.3d at 425. Expert testimony about a statistical disparity in employment decisions is relevant even if the expert did not "run a multiple-regression analysis that would have isolated the relevance of [e.g., race] as a factor in the companies' decisions." *Id.* Courts have consistently found that expert testimony regarding a statistical disparity is relevant even if the expert's analysis did not include a multiple regression analysis accounting for factors other than race. *See, e.g.*, *Teamsters*, 431 U.S. at 339 n.20 (rejecting the defendant's argument that "statistics . . . comparing the racial composition of an employer's work force to the composition of the population at large[] should never be given decisive weight in a Title VII case"); *Obrey*, 400 F.3d at 696-97; *Adams*, 231 F.3d at 427-28 (reversing exclusion of statistical evidence of correlation between age and termination despite failure to control for other variables); *Mister v. Ill. Central Gulf R.R. Co.*, 832 F.2d 1427, 1431 (7th Cir. 1987) (finding that plaintiffs had made out their *prima facie* case of racial discrimination where expert showed a statistical disparity even though he "used no independent variables other than race"); *Flebotte v. Dow Jones & Co.*, No. 97-30117, 2000 U.S. Dist. LEXIS 19875, at *12 (D. Mass. Dec. 6, 2000) ("[T]he failure to account for the defendant's nondiscriminatory explanation for the terminations does not affect the admissibility of the proposed statistical evidence.") (citing *McMillan v. Mass. SPCA*, 140 F.3d 288, 303 (1st Cir.1998)).

In *Obrey*, the defendant challenged an expert's statistical comparison because it was "based entirely on statistical disparities" and failed to control for other factors, *e.g.*, it "failed to account for the relative qualifications of the applicant pool." 400 F.3d at 695-96. The defendant argued that it was "so incomplete that it was inadmissible as irrelevant, unfairly prejudicial, and unreliable[,]" and the trial court excluded the analysis. *Id.* at 694. The Ninth Circuit reversed, finding that the expert's statistical analysis should have been admitted because it "was relevant for what it purported to analyze: the race of managers selected . . . compared to the race of those who applied[.]" *Id.* at 696-

98.

Here, Dr. Neumark determined that there was a dramatic statistical disparity between Tata's hiring and terminations of South Asians compared to non-South Asians in the relevant labor pool, and that there was a less than one in a billion possibility that the disparities were the result of chance. Neumark Report ¶¶ 6-8 (Ex. 1); Neumark Errata ¶¶ 7-8; 17-18 (Ex. 2). He concluded that the data were "strongly consistent with Tata discriminating in favor of South Asians." Neumark Report ¶ 6 (Ex. 1). Such statistical findings are relevant because they can "create an inference of discriminatory intent[.]" *Diaz*, 752 F.2d at 1363. And combined with other evidence, they satisfy Plaintiffs' burden to prove a *prima facie* case under *Teamsters*. *Id.*

Tata argues that Plaintiffs "provided [Dr. Neumark] with limited data," while "[o]ther data was available." Tata's Mem. at 11 n.4. But as discussed above, Tata produced vast quantities of complex, undefined data in early February – mere weeks before Plaintiffs' class certification deadline – and then refused to answer questions about it. Tata Data Exemplar at 11-34 (Ex. 8); Tata Data Production Log at 2-3 (Ex. 9) (including, for example, 7,400 separate Manpower reports and almost 21,000 unallocated reports). This last-minute data dump prevented Plaintiffs from taking follow-up discovery regarding the data, and there was no plausible way for Dr. Neumark to analyze it and incorporate it into his reports. Neumark Decl. ¶¶ 2, 4 (Apr. 2, 2017) (Ex. 26). Even the data Tata produced in January was incomplete. For example, while Tata's 2015 employee lists contained nationality data, it inexplicably omitted nationality data from its 2016 employee list production. *Id.* ¶ 2. Moreover, Tata's own expert testified that Tata's production of data is insufficient even to perform a regression analysis. Anderson Dep. Tr. 74:21-76:2 (Mar. 31, 2017) (Ex. 7) (testifying that he did not control for variables because "I don't believe that the data I have would allow me to do a reliable analysis like that").

c. <u>To Rebut the Statistical Disparity, Tata Has the Burden of Demonstrating a Non-Discriminatory Explanation.</u>

After a plaintiff demonstrates a statistically significant disparity in employment decisions, "the defendant cannot rebut an inference of discrimination by merely pointing to flaws in the

plaintiff's statistics." *E.E.O.C. v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575, 581 (9th Cir. 1989). To carry its burden, the employer must "produce credible evidence that curing the alleged flaws would also cure the statistical disparity[.]" *Id.* at 583.[10] "When the defendant pronounces a reason unrelated to the plaintiff ('a midget can't do the job', followed by silence on the plaintiff's height), it has not adequately articulated a neutral reason[.]" *Mister*, 832 F.2d at 1434. In *Mister*, the only purportedly non-discriminatory explanation advanced by the employer was that it did not hire applicants who lived further away from the job site, and the Seventh Circuit found that the employer "had at least to produce evidence that black and white applicants lived different distances from work." *Id.* at 1435.

Here, Dr. Neumark performed a statistical analysis showing that the disparity in hiring and terminations could not have occurred by chance. Dr. Neumark was not required to perform regression analyses to exclude the hypothetical possibility that unknown non-discriminatory factors caused the disparity. *Gen. Tel. Co. of NW.*, 885 F.2d at 583; *Adams*, 231 F.3d at 427; *Mister*, 832 F.2d at 1431.

In response, Tata argues that non-discriminatory factors might account for the disparity if, for example, South Asian or Indians had higher "skill levels," "willingness" to work, or "familiarity with a TCS client." Tata's Mem. at 11-12. But Dr. Neumark's opinion is relevant in helping to establish Plaintiffs' *prima facie* case, and in response, Tata "had at least to produce evidence that [South Asian] and [non-South Asian] applicants" had different skill levels, willingness to work, or familiarity with clients. *Mister*, 832 F.2d at 1435. "When the defendant pronounces a reason . . . followed by silence on the plaintiff's [characteristics or qualifications], it has not adequately articulated a neutral reason[.]" *Id.* at 1434. Tata and its experts failed to articulate a neutral reason by for example, conducting a multiple regression analysis accounting for such factors. Presumably, Tata did not disclose that it had conducted these analyses because they would have shown that non-South Asians were equally or more skilled, willing to work, and familiar with the client.[11]

[10] "A plaintiff in a Title VII suit need not prove discrimination with scientific certainty." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986).

[11] For example, when Southern California Edison ("SCE") outsourced its IT jobs to Tata, former SCE employees like named plaintiff Brian Buchannan were the most familiar with SCE and had the most relevant skills for the job, but were passed over in favor of South Asian visa workers who they had

And whether Tata is able to introduce evidence that tends to rebut Plaintiffs' *prima facie* case is irrelevant to whether Dr. Neumark's opinion tends to support a *prima facie* case and is admissible under *Daubert*. *See Teamsters*, 431 U.S. at 361 (establishing burden shifting framework in pattern and practice cases).

Moreover, Tata has not produced data that could be used to perform many of the regression analyses that Tata suggests. As Tata's expert admitted, Tata did not provide him with data to conduct "a reliable analysis like that." Anderson Dep. Tr. 74:21-76:2 (Mar. 31, 2017) (noting further, "[a]t the level that the data is now, I can't know any of that") (Ex. 7). Dr. Neumark "'used the best available data, which [came] from the [defendant] itself." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (quoting *Adams*, 231 F.3d at 424). "If the defendant believed information about the employees' educational background, for example, would have explained the differences in promotions and compensation between male and female upper level employees, [defendant] should have provided information about educational level to the plaintiffs, or at a minimum, introduced testimony that education was a central factor in promotions." *Id.* at 1188-89; *see also Mister*, 832 F.2d at 1431 ("We are not about to discount the plaintiffs' statistical work on grounds that the employer, with the best access to data, chose not to raise.").

The cases relied on by Tata do not suggest a contrary conclusion under the facts here. For example, Tata cites cases involving summary judgment rather than a *Daubert* motion. Tata's Mem. at 12 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000); *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537-38 (7th Cir. 1997)). In *Coleman*, the court found that the statistical evidence was relevant to demonstrating plaintiff's *prima facie* case. 232 F.3d at 1282. In *People Who Care*, the expert opinion was objectionable because, unlike here, the expert did not compare the test group with a relevant control group. 111 F.3d at 537.[12]

---

to train. Tata also speculates that compensation expectations may account for the disparity, Tata's Mem. at 11, but Tata certifies in its H-1B visa applications that its visa workers are being paid the prevailing wage. 20 C.F.R. § 655.731.

[12] Rather, he compared test scores of "poor" black students versus "poor" white students and assumed that the disparity in test scores was entirely attributable to intentional discrimination by the school

Tata also relies on *Casey v. Ohio Medical Products*, in which a medical expert improperly relied on a study of halothane-related liver disease that "simply described reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group." 877 F. Supp. 1380, 1385 (N.D. Cal. 1995). By contrast, Dr. Neumark properly compared hired or terminated Tata employees with the relevant labor market. Neumark Report ¶¶ 11, 16 (Ex. 1).

**2. Dr. Neumark's Testimony Is Reliable.**

Tata argues that Dr. Neumark's testimony must be excluded as unreliable because: (a) he does not control for other variables; (b) he identifies the relevant labor market as the market for United States' computing workforce; and (c) his hiring analysis does not compare similarly situated employees. Tata's Mem. at 12-17.

a. Dr. Neumark Does Not Offer an Unreliable Opinion on Causation.

"[R]egression analysis is not a mandatory feature in all applications of economics or statistics." *See United States v. Valencia*, 600 F.3d 389, 427 (5th Cir. 2010) (citing *Adams*, 231 F.3d at 425). Courts regularly admit expert opinions on statistical disparities, as discussed above. *Obrey*, 400 F.3d at 695; *Adams*, 231 F.3d at 424; *Mister*, 832 F.2d at 1431; *Diaz*, 752 F.2d at 1363.

Tata argues that Dr. Neumark offers a "scientifically unreliable" opinion when he purportedly "test[s] for discrimination." Tata's Mem. at 12-13. But Dr. Neumark does not offer an opinion on whether the vast racial and national origin disparity was caused by discrimination. Tata recognizes this elsewhere in its brief, where Tata points out that "Dr. Neumark describes his opinions as

---

district, failing to compare the disparity to "the gap between white and minority students in school districts that have not been found to have discriminated[.]" *Id.* at 537. The expert also ignored "well-documented" factors that "explain differences in scholastic achievement" that are not evenly distributed across racial groups, and failed to determine whether the black students included in the study were poorer than the white students. *Id.* Here, Plaintiffs have properly compared the demographics of Tata' workforce with the relevant control group, *i.e.*, those in a similar IT position in the United States. And Tata has not documented any factors that explain the statistical disparities. *See Mister*, 832 F.2d at 1432 ("The [employer] had a straightforward way to establish its claim [that a non-discriminatory factor explained the statistical disparity]. . . . But the [employer] did not conduct this inquiry.").

'consistent with discrimination,'" and that he "is not opining that TCS discriminates[.]" *Id.* at 4. Because he has not offered an opinion on causation, Dr. Neumark does not need to follow the methodology relevant to offering such an opinion.

Dr. Neumark's opinions are that the share of South Asian workers in Tata's U.S. workforce is over 200 standard deviations higher than the relevant labor market, that the termination rates for non-South Asians are over 47 standard deviations higher, and that the statistical likelihood of Tata achieving it rates of hiring and terminations favoring South Asians by chance was less than 1 in 1 billion – findings strongly consistent with discrimination. *Id.* at 4-5; Neumark Report ¶¶ 6-8 Table 1, Tables 3a-3e (Ex. 1); Neumark Errata ¶¶ 7-8, 17-18 (Ex. 2); *Adams*, 231 F.3d at 424 ("Two standard deviations is normally enough to show that it is extremely unlikely … that the disparity is due to chance, giving rise to a reasonable inference that the hiring was not race-neutral; the more standard deviations away, the less likely the factor in question played no role in the decisionmaking process").

Tata does not – and cannot – argue that Dr. Neumark used flawed or unreliable methodology in calculating standard deviations or the likelihood that random chance could account for the gross statistical disparities in Tata's hiring and terminations. Neumark Report ¶¶ 6-8, 14, 17-18 (Ex. 1). These opinions are based on standard and reliable statistical analyses. *Adams*, 231 F.3d at 424 (collecting cases regarding this type of "typical[]" statistical analysis in employment discrimination cases).

In arguing that Dr. Neumark's opinion is impermissibly unreliable, Tata relies, for example, on *Sheehan v. Daily Racing Form, Inc.*, in which an expert improperly "equat[ed] a simple statistical correlation to a causal relation[.]" 104 F.3d 940, 942 (7th Cir. 1997). Unlike the expert in *Sheehan*, however, Dr. Neumark does not offer an opinion on causation.[13]

[13] In *Sheehan*, the expert examined the statistical likelihood that more older employees were terminated based on chance from a list of 17 employees, but he improperly omitted two employees from consideration, and improperly offered the opinion that people on the list were terminated *because of age* without eliminating alternative explanations. *Id.* at 942 (finding a "failure to exercise the degree of care that a statistician would use in his scientific work"). By contrast, Dr. Neumark offers an opinion only on the statistical disparity, not causation.

Tata also cites *Rose v. Wells Fargo & Co.*, in which an expert's opinion was admitted to show that "persons over fifty . . . were terminated at a higher rate[.]" 902 F.2d 1417, 1425 (9th Cir. 1990). Unremarkably, the court found that, standing alone, these statistics did not prove causation. *Id.*

b. Dr. Neumark Accounts for the Proper Labor Market.

Tata disputes that Dr. Neumark accounted for the proper labor market with respect to hiring, which he defined as "the Computer Systems Design and Related Services industry." Neumark Report ¶ 11 (Ex. 1). This is the market in which the labor is conducted and is thus the appropriate market to assess. *See, e.g.*, *Mister*, 832 F.2d at 1434; *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 482-83 (9th Cir. 1983) (the relevant labor market "must be that of the local labor force possessing the requisite skills").

According to Tata, deputees are not part of the relevant labor market at Tata and should be excluded from Dr. Neumark's analysis of Tata's workforce, or, alternatively, the relevant labor market should consist of both the United States and India. Tata's Mem. at 14-16. But the fact that visa workers from India enter the U.S. labor market to fill positions does not broaden the geographic scope of the labor market, nor does it make sense to exclude deputees from an analysis of Tata's U.S. workforce.

Deputees make up over 76% of Tata's U.S. workforce. Anderson Decl. ¶ 14 (Dkt. #125-1, Ex. D).[14] Deputees must apply and interview for positions in the U.S. that are otherwise filled by local hires.[15] Moreover, a potential deputee, before entering the U.S. labor force, must go through a time consuming and expensive process to apply for and receive a work visa. Tata's Opp'n to Pls.' Mot. for Class Cert. at 5 (Dkt. #127). A strict cap exists to limit the number of foreign workers that can fill U.S. positions, and the government uses a lottery system to award visas against the cap. 20 CFR § 655.700; *USCIS Completes the H-1B Cap Random Selection Process for FY 2017*, USCIS (Apr. 12, 2016), *available at* https://www.uscis.gov/news/alerts/uscis-completes-h-1b-cap-random-selection-process-fy-2017. These barriers to entry were imposed by Congress explicitly "to protect

[14] In 2011, 89% of Tata's U.S. workforce consisted of deputees. *Id.*

[15] Kumar (30(b)(6)) Dep. Tr. 27:13-29:1, 43:22-44:5 (Jan. 25, 2017) (Ex. 23).

the domestic labor force from job competition and adverse working conditions as a result of foreign workers entering the labor market." *Prod. Tool Corp. v. Emp't & Training Admin.*, 688 F.2d 1161, 1168 (7th Cir. 1982) (noting further that the Secretary of Labor is required to make "labor market findings" regarding the labor market in the United States before permitting immigration). The barriers to entry ensure that potential employees in other countries are not readily substitutable for potential employees in the United States, rendering foreign labor markets separate and distinct from a U.S. labor market.[16] To suggest that Tata's conduct somehow broadens the U.S. labor market to encompass India is to ignore the economic and regulatory barriers in place to ensure foreign workers cannot simply travel to the U.S. to fill a job. Thus, the U.S. labor market is separate and distinct from foreign markets, and, having entered the U.S. labor market, deputees are appropriately included in U.S. workforce analyses.

Moreover, to further its discriminatory objective of filling U.S. positions with its preferred race of employees, Tata has elected to confront Congressionally-mandated labor market entry barriers by investing in and creating a waiting list of visa holders who can fill positions in the U.S. on a moment's notice.[17] Tata then instructs RMG to use its best efforts map these individuals to open positions.[18] In turn, RMG gives preference to expats for open positions.[19]

---

[16] *See, e.g.*, *Stepp v. Ford Motor Credit Co.*, 623 F. Supp. 583, 590 (E.D. Wis. 1985) ("The controlling concept for market definition in this case is that of cross-elasticity or reasonable substitutability. . . . Cross-elasticity varies according to many factors including … barriers to entry" (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962))).

[17] TCSLTD005646947 (2013 list of 9,248 "Visa Ready" workers, all of whom are residing at a "Base Branch" in India) (Ex. 17); TCSLTD005646989 (2012 list of 10,290 "Visa Ready" workers, all of whom are residing at a "Base Branch" in India except for 60 who reside at a "Base Branch" in Singapore) (Ex. 25).

[18] TCS007391-7452 at 7425 ("RMG should try and map associates with unutilized visas and work permits for onsite opportunities.") (Ex. 18); TCS069046-9047 (requesting RMG review the list of unallocated expats and "map each associate to two accounts and mark[] the priority 1 & 2. . . . Prioritized accounts will quickly evaluate and absorb associates into immediate billable roles.") (Ex. 19).

[19] TCS177617-7618, at 7617 (RMG Lead Ambika G: "Can we look at Visa ready or visa eligible cvs please[?]" Alok Bhalla: "Visa Ready will be a preference.") (Ex. 16); TCS150731-732 at 731 ("We have got [a] couple of Mainframe requirements[.] . . . Could you please share if any visa ready TCS expats [are] available?") (Ex. 20); TCS038825-8832 at 8826 ("For we have 13 open positions @ onsite

Tata also argues that Dr. Neumark was wrong to rely on ACS data regarding the demographic makeup of the IT industry as an external benchmark, rather than Tata's actual applicant pool. Tata's Mem. at 14. But applicant pools that themselves are a product of discrimination "cannot be taken at face value" and used as an objective measure in which to assess discrimination:

> [I]n cases such as this one where there is an allegation that the employer's discriminatory practices infect recruiting, the process by which applications are solicited, … applicant flow data cannot be taken at face value and assumed to constitute an accurate picture of the relevant labor market. Discriminatory recruiting practice may skew the ethnic composition of the applicant pool.

*Castaneda v. Pickard*, 648 F.2d 989, 1003 (5th Cir. 1981); *see also id.* ("[a] statistically significant disparity between the racial composition of the applicant pool and that of the relevant labor market may create a prima facie case of discrimination in recruiting."); *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) ("There is no requirement … that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants. . . . The application process might itself not adequately reflect the actual potential applicant pool"); *Mister*, 832 F.2d at 1436 ("An applicant pool analysis is biased against finding discrimination, if potential applicants know or suspect that the employer is discriminating"); *Moore,* 708 F.2d at 482-83 (where applicant pool is compromised, "the proxy pool must be that of the local labor force possessing the requisite skills").

Here, Tata's applicant pool – which it contends is 40% South Asian[20] – is so grossly disproportionate with that of the relevant IT labor market (approximately 12.5% South Asian), that it alone is evidence of discrimination. *Castaneda*, 648 F.2d at 1003; Neumark Report Table 1 (Ex. 1). Accordingly, a "proxy pool" is necessary, *Moore*, 708 F.2d at 482-83, which Dr. Neumark appropriately determined was the Computer Systems Design and Related Services industry. Neumark

---

… for which we need VISA ready profiles[.] . . . Request you share the profiles ASAP") (Ex. 21); TCS151441-1443 at 1442 (listing positions to be closed by RMG, including a "Performance Tester" position with "Comments … Prefer expat") (Ex. 22); TCS148654-8655 at 8654 ("For this position, we are looking for Expats only.") (Ex. 24).

[20] Tata inappropriately excludes deputees from its analysis, despite the fact that they must apply and interview for positions in the U.S. Kumar (30(b)(6)) Dep. Tr. 27:13-29:1, 43:22-44:5 (Jan. 25, 2017) (Ex. 23).

Report ¶ 11 (Ex. 1) This industry corresponds closely with the positions held by Tata's U.S. workforce.[21]

Tata also argues that Dr. Neumark inappropriately includes deputee terminations in his analysis because "[d]eputees are never terminated in the United States." Tata's Mem. at 15. Without providing any citation, Tata relies on its expert for the proposition that a deputee "termination will not take place, by law, in the U.S." Anderson Decl. ¶ 62-63 (Dkt. #125-1, Ex. D); Tata's Mem. at 15. But no law supports this contention – deputees can be fired at any time. Visa regulations specifically provide for this possibility and require the employer "to notify the DHS that the employment relationship has been terminated so that the [H-1B] petition is canceled." 20 C.F.R. § 655.731(c)(7)(ii); 8 C.F.R. § 214.2(h)(11)(iii)(A)(1) (providing for revocation of H-1B visa where "the beneficiary is no longer employed by the petitioner"). In fact, "[t]he employer will be liable for the reasonable costs of return transportation of the alien abroad if the alien is dismissed from employment by the employer before the end of the period of authorized admission." 8 C.F.R. § 214.2(h)(4)(iii)(E). Moreover, Tata's separation data contains deputees terminated in the U.S. Sharma (30(b)(6)) Dep. Tr. at 34:12-16, 45:16-23 (Jan. 25, 2017) (Q: "If an expat is terminated involuntarily, that would be reflected in the separated employees list, right?" A: "Yes, if he is terminated while he's in the U.S.") (Ex. 3). The fact that exceedingly few deputees are in fact terminated is consistent with – and evidence of – discrimination. *See* Neumark Report Tables 3.a-3.e (Ex. 1).

**3. Dr. Neumark's Hiring Analysis Relies on Relevant Comparisons.**

Tata argues that Dr. Neumark's hiring analysis is flawed because he fails to compare similarly situated individuals. Tata's Mem. at 16-17. In Tata's view, Dr. Neumark was required to consider each applicant's "qualifications, experience, or skill." *Id.* at 17. But Plaintiffs allege a classwide discriminatory policy, making the entire applicant pool the appropriate comparison.[22] Moreover, as

---

[21] Tata has previously admitted that "the demographics of qualified IT professional in the United States" would be an appropriate pool for comparison. *See* Tata's Mot. For Summ. J. at 11 (Dkt. #106).

[22] TCS057813-7818 at 7815 ("Leadership directive is to utilize every visa to the maximum extent – L1 B: 5 Yrs, H1 B: 6 Yrs & L1 A: 7 Yrs.") (Ex. 13); TCS137485-7487 at 7485 ("Leadership Team has advised to utilize visa ready Associates at on site") (Ex. 14); TCS148025-8027 at 8025

discussed above, it is Tata's burden to identify a non-discriminatory explanation for the gross statistical disparities that Dr. Neumark demonstrates in Tata's hiring practices. *See supra* Section 1(c) (citing, *e.g.*, *Adams*, 231 F.3d at 424-25), *supra*. Tata has not attempted to demonstrate that non-Indian applicants are less qualified than its Indian applicants (likely because they are not).[23] Dr. Neumark's analysis eliminated the possibility that Tata's hiring and workforce demographics arose by chance – "an important step in the plaintiffs' proof," *Adams*, 231 F.3d at 427, and he was not required to look at each individual applicant's qualifications. Tata's reliance on *Balderston v. Fairbanks Morse Engine Division of Coltec Industries*, is misplaced, as that was an individual action, warranting a narrower statistical focus. Tata's Mem. at 17 (citing 328 F.3d 309, 320 (7th Cir. 2003)). As the Supreme Court found in *Hazelwood*, the appropriate comparison is between the demographic makeup of an employer's workforce, and the demographic makeup of the qualified workers in the relevant labor market. *Hazelwood*, 433 U.S. at 308; *see also Adams*, 231 F.3d at 424 ("If the relevant [labor] market is 40% African-American, for instance, one would expect 40% of hires to be African-America"). This is precisely what Dr. Neumark did. Neumark Report ¶¶ 6-9, 14, 17-18 (Ex. 1).

### C. Tata's Withholding of Data Renders Its *Daubert* Motion Futile.

In moving to strike Dr. Neumark's testimony, Tata relies extensively on the fact that Dr. Neumark did not incorporate in his report data that Tata withheld from discovery until just before the deadline for Plaintiffs' to submit their Motion for Class Certification and Dr. Neumark's report. *See* Tata's Mem. at 5-6, 11-12. Likewise, Tata cites extensively to the expert report of G. Edward Anderson, who relies heavily on this late produced data. *Id.* at 1, 3, 6-7, 11-12, 14-17; Anderson Decl. Tables 1-9, 11-23, 25, App. Tables 1-3, 4.1-4.2 (Dkt. #125-1, Ex. D). Not only was this data responsive to Plaintiffs' discovery requests, but Tata was also required to timely disclose the data in its initial disclosures, which it failed to do. Fed. R. Civ. P. 26(a)(1)(A)(ii) (requiring disclosure of "all documents [and] electronically stored information … that the party … may use to support its claims

---

("Leadership Team has advised not to send any visa ready associate back [to India] unnecessarily and utilize him/her here") (Ex. 15).

[23] During Phase II of the class proceedings, Tata will be free to challenge the qualifications of any individual class member. *Ellis.*, 285 F.R.D. at 539.

or defenses[.]"); Fed. R. Civ. P. 26(e) (requiring timely supplementation). A party who fails to disclosure information, as required by Rule 26(a) and (e), "is not allowed to use that information … on a motion, at a hearing, or at trial[.]" Fed. R. Civ. P. 37(c)(1); *see* Pls.' Supp. Discovery Brief at 5 (Dkt. #164). ***This exclusion is mandatory.*** *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 544 (N.D. Cal. 2009); *see Durand,* 473 F. App'x at 668 (affirming striking of witness not disclosed on initial disclosures); *Olaya,* 2012 U.S. Dist. LEXIS 111079, at *8-15 (striking expert report where party failed to disclose damages data on initial disclosures and produced it only "eight days prior to the expert disclosure deadline"). Accordingly, Tata is foreclosed from relying on this data as a basis to exclude Dr. Neumark's testimony and its motion thus must be denied.

## V. CONCLUSION

For the foregoing reasons, Tata's motion should be denied.

Dated: April 3, 2017

Respectfully submitted,

By: /s/Daniel Kotchen
Daniel Kotchen (*pro hac vice*)
Daniel Low, SBN 218387
Michael von Klemperer (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Email: dkotchen@kotchen.com;
dlow@kotchen.com;
mvk@kotchen.com

Michael F. Brown (*pro hac vice*)
**DVG LAW PARTNER LLC**
P.O. Box 645
Neenah, WI 54957
920-238-6781
920-273-6177 (fax)
mbrown@dvglawpartner.com

Steven Tidrick, SBN 224760
Joel Young, SBN 236662
**The Tidrick Law Firm**
2039 Shattuck Avenue #308
Berkeley, CA 94704
Telephone: (510) 788-5100
Facsimile: (510) 291-3226
E-mail: sgt@tidricklaw.com
E-mail: jby@tidricklaw.com

*Attorneys for all Plaintiffs Buchanan, Slaight, Webber, Masoudi, and Mandili*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system on April 3, 2017.

Dated: April 3, 2017

/s/Daniel Kotchen
Daniel Kotchen