MICHELLE M. LA MAR (SBN 163038)
mlamar@loeb.com
PATRICK N. DOWNES (SBN 186461)
pdownes@loeb.com
LAURA A. WYTSMA (SBN 189527)
lwytsma@loeb.com
ERIN M. SMITH (SBN 235039)
esmith@loeb.com
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: 310.282.2000
Facsimile: 310.282.2200

Attorneys for Defendant
TATA CONSULTANCY SERVICES, LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVEN HELDT, BRIAN BUCHANAN, and CHRISTOPHER SLAIGHT,<br><br>Plaintiffs,<br><br>v.<br><br>TATA CONSULTANCY SERVICES, LTD.,<br><br>Defendant. | Case No.: 4:15-cv-01696-YGR<br><br>Assigned to Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge Sallie Kim<br><br>**TATA CONSULTANCY SERVICES, LTD.'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL DISCOVERY BRIEF**<br><br>**Date: April 6, 2017**<br>**Time: 11:00 a.m.**<br>**Loc: Ctrm. A, 15th Floor**<br><br>Complaint Filed: April 14, 2015 |

# I. INTRODUCTION

Plaintiffs' latest attempt to create a discovery dispute fails. Fundamentally, Plaintiffs cannot identify a single document request regarding their claims of misconduct. Instead, plaintiffs argue that an interrogatory response given by Tata Consultancy Services, Ltd. ("TCS") on October 30, 2015 is deficient because it failed to identify records that were recently produced. However, that interrogatory did not seek the identification of records. Moreover, TCS responded and Plaintiffs never challenged the sufficiency of that response until now. (Ex. 1.)

Plaintiffs moved to certify two classes, a hiring class and a termination class. None of the data which Plaintiffs identify in their motion relates to the proposed hiring class. Moreover, given the parameters Plaintiffs provided to their own expert, none of the data could have changed their expert report, which only compares hiring, termination and "benching" between South Asians and Non-South Asians, which Plaintiffs' expert was able to calculate.

> So in some sense, I think -- understanding the hiring process, I think that's the phrase you used, might give me some hints about why it happens or probably still wouldn't tell me much -- much about intent. It would identify, perhaps, who's making the decisions, but that wouldn't material- -- I don't think materially affect <u>what I was asked to study and what I'm reporting here, which is the differences in outcomes</u>.

(Neumark Depo. at 42:11-20.)

Plaintiffs identify five document productions and suggest that TCS' interrogatory response was somehow false. As shown below, the vast majority of these documents were already known to Plaintiffs. The remainder of the documents were not maintained by TCS, but rather, were created by TCS solely to contend with this lawsuit. Indeed, Plaintiffs have been unable or unwilling to convert raw data into useful information throughout this case, and have instead demanded that TCS do that work for them. Now that TCS has done so (to avoid further unnecessary dispute), Plaintiffs complain that this information should have been provided earlier while ignoring the instances when that occurred. By way of example:

<u>Manpower Reports</u>: Plaintiffs assert that on February 2, 3, and 9, 2017, TCS produced 7,400 Manpower Reports for TCS' entire United States workforce for which data fields are inconsistent across reports. In truth, Manpower reports are distributed weekly and are current only

as of the date they are distributed. The Manpower reports produced by TCS were collected from attachments to emails. Their existence was known to Plaintiffs based on a manual that is the centerpiece of their Motion for Class Certification, the RMG Induction Manual ("RMG Manual"). (ECF # 115-8) (TCS007391 – TCS007452, at 7425.) Plaintiffs believe this manual, produced on June 13, 2016, reflects TCS' practice for the supposed discrimination that is the heart of their case. The RMG Manual discloses the Manpower reports, at TCS007430, (*See*, Ex. 2.) Moreover, TCS promptly produced the Manpower Reports to Plaintiffs after they were assembled, and before TCS' experts received the last Manpower Report on February 15, 2017. Finally, had Plaintiffs taken a deposition or served interrogatories to ask about Manpower Reports, they would have learned that the data fields are not "static." Some reports contain fields that others do not.

Unallocated Reports: Plaintiffs assert that on February 3, 7, and 9, 2017, TCS produced almost 21,000 unallocated reports containing data relating to "benched" or unallocated employees. However, Plaintiffs already knew about unallocated reports—which are also described in the RMG Manual. See, TCS007411, TCS007419 to TCS007422 ("Unallocated associates are required to be monitored very closely on a daily basis through a report which is generated and published on a daily basis"). In addition, TCS produced unallocated reports to Plaintiffs on November 28, 2016.[1] The unallocated reports were produced to Plaintiffs before they were produced to TCS' experts, who did not receive the last of these reports until February 11, 2017, and did *not* rely upon them in reaching their conclusions. If Plaintiffs' current motion were a legitimate discovery issue, Plaintiffs clearly would have requested additional unallocated reports before now. Finally, the reports were collected from attachments to TCS' emails.[2] Plaintiffs received these reports as soon as they had been assembled by TCS.

---

[1] *See*, TCS042037, TCS042864, TCS042865, TCS042866, TCS048999, TCS060497, TCS060498, TCS087476, TCS141521, TCS141522, TCS144111, TCS158463, TCS158755, TCS173020 and TCS174966.

[2] Plaintiffs began their current discovery dispute by pointing to TCS' email productions that occurred in November and December 2016. (*See*, ECF No. 96.) TCS responded by demonstrating Plaintiffs were at fault for any delay. (*See*, ECF Nos. 98, 139.) Plaintiffs then abandoned their email argument and raised the current one for the first time. However, TCS' explanation of the email production is important to the Manpower and Unallocated reports, as these productions were obtained from the email collections.

<u>Visa Ready and Visa Utilization Reports</u>: Plaintiffs complain that these items were produced in early-February 2017. However, TCS produced its entire visa information system—a database reflecting more detailed information regarding TCS visa holders, in July 2016. Moreover, these reports were *not* relied upon by TCS' experts, who received these documents on February 4, 2017; after production to Plaintiffs. These documents were also extracted from TCS' emails. Umesh Kumar, one of TCS' Rule 30(b)(6) deponents, also testified about visa ready reports on January 27, 2016. (1/27/16 Kumar Dep., 39:5-14.)

<u>Allocation Data</u>: Plaintiffs assert that on February 9, 2017, TCS produced employee allocation data for expats and local hires. However, Plaintiffs already had this information for local hires in the form of the Offer Extended Report, which was produced on September 16, 2016. Moreover, the allocation data Plaintiffs received is not ordinarily maintained in the course of business, but was assembled by TCS after a unique "script" was created to extract data from a portal (known as Ultimatix) containing nearly 100 different applications relating to TCS' overall operations.[3] TCS' experts received this information on February 10, 2017. As TCS witnesses have testified, reports showing each employee's "allocation" over time can usually only be generated on a per employee basis. In fact, such reports were produced for the named Plaintiffs on May 6, 2016 (TCS007307-7322), and disclosed in the RMG Manual at TCS007436. However, only recently did TCS discover a method to produce this information for the entire workforce.

Plaintiffs also complain that the allocation history includes only employee numbers and not names. TCS generally maintains employee data in this manner. Adequate class counsel can easily reconcile the employee numbers with the class list to identify the employee names.

<u>Global Speed</u>: Finally, Plaintiffs argue that TCS delayed in producing appraisal scores for over 61,400 employees from TCS' Global Speed system. However, appraisal data was disclosed to Plaintiffs in the Global Speed Manual on October 27, 2015. See, e.g. TCS000346 ("Relative

---

[3] Plaintiffs state in footnote 3 that they are concerned why TCS opted not to use Ultimatix to obtain employee allocation data. However, the data was in fact extracted from the Ultimatix system by a 10-person team based in India who worked for 20 days to create, review and test queries to obtain the data. TCS offered to duplicate the entire Ultimatix system at Plaintiffs' expense in 2016. Plaintiffs never accepted that offer.

Evaluation of employees in logical units. All Employees to receive ranks from A-E, with A being the highest."; "Year End rank is shared with the appraisee. The appraisee has the option to agree/disagree with same. . . ."); TCS000361 ("Ranking Process"); TCS000362("Difference Between Rating & Performance Bands"); TCS000343 ("Performance Management Life Cycle in TCS."); TCS00188-197, and at 191 ("Through Rationalisation, an employee's performance is ranked on relative basis vis-à-vis the performance of all other employees within the Unit, to arrive at the Performance Band."). Moreover, Global Speed [Performance] Data related to named plaintiff Slaight was produced on September 12, 2016 (TCS021913). Jeevak Sharma, one of TCS' Rule 30(b)(6) deponents, also testified about the Global Speed performance management database and reports generated from Global Speed on January 28, 2016 (1/28/2016 Sharma Dep., 17:1-21:25). TCS' experts did not consider Global Speed data, and did not receive these files until February 10, 2017. Moreover, TCS offered to produce documents from Global Speed if Plaintiffs identified search terms, which they never did. (Ex. 3.)

## II. AUTHORITY REGARDING PLAINTIFFS' DATA QUESTIONS

TCS is unaware of any authority requiring counsel to provide substantive responses to emails. TCS has provided responses to some emails when possible as a professional courtesy. However, TCS' attorneys have made clear that these email exchanges do not substitute for formal discovery responses. *See e.g.* Ex. 4, email from M. La Mar to D. Kotchen dated November 20, 2015, stating: "Again, I am providing my understanding of this information so that we can streamline the searches you have requested. It is not meant to be a verified discovery response. I do, however, believe it to be accurate." Plaintiffs should not be surprised that, as their bogus claims of discovery misconduct erupted, the parties on the receiving end of such accusations elected not to respond to questions better posed through formal discovery. At no time were Plaintiffs prevented from serving additional interrogatories or deposition notices.

## III. THE REASON PLAINTIFFS SEEK RELIEF NOW

Plaintiffs claim they do not understand the data. While that is a legitimate reason to serve additional deposition notices, that is not a reason to *exclude* evidence or depose counsel. Exclusion of evidence is not appropriate where nondisclosure is substantially justified or harmless.

*Kempf v. Barrett Business Servs., Inc.*, 336 Fed. Appx. 658 (9th Cir. 2009). Here, disclosure occurred and justification exists regarding the timing of production as described above.

## IV. AUTHORITY REGARDING THIRD-PARTY COLLECTION OF DATA

Plaintiffs lack any Ninth Circuit authority, and TCS is aware of none, ordering the involvement of a third-party in an analogous situation.[4] By contrast, Plaintiffs' request is based on the existence of "serious concerns" which Plaintiffs cannot articulate. Rather than focus on the discovery here, Plaintiffs repeat statements from an unrelated patent dispute which is currently on appeal. Plaintiffs previously asserted, falsely, that TCS' counsel here was also counsel in that matter. After TCS provided the publicly available docket to Plaintiffs, Plaintiffs now abandon that assertion. Third-party intervention is unwarranted here.

## V. SOURCES OF DISCOVERY UNDERLYING MOTION

Plaintiffs suggest that TCS should have produced the recently-produced items with its Rule 26 Initial Disclosures. However, initial disclosures do not require a party to produce any actual documents. *See* Rule 26(a)(1)(A)(ii); *see also Brock v. County of Napa*, 2012 U.S. Dist. Lexis 98579, *13 (N.D. Cal. 2012). Plaintiffs agree. When TCS asked Plaintiffs for all documents identified in their Initial Disclosures, Plaintiffs answered: "Plaintiff will produce at the appropriate time responsive documents identified on Plaintiff's pre-trial exhibit list(s)." (Ex. 5.) In contrast, TCS has produced more than 6.5 million documents, in addition to the seven databases previously identified to the District Court. (ECF Nos. 80, 91.)[5]

---

[4] In *Delta*, defendant failed to search several hard drives and look for backup tapes containing 60,000 responsive documents. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1350-1351 (N.D. Ga. 2012). In *Nacco Materials*, the court ordered the defendant failed to produce a knowledgeable 30(b)(6) witness in response to a court order, took no steps to prevent data from being overwritten or deleted, failed to preserve backup tapes, and failed to effectively collect ESI. *See Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 404 (W.D. Tenn. 2011). In *Genworth*, defendants selectively imaged only computers that were not used during the alleged misappropriation, and threw another computer in the trash. *See Genworth Fin. Wealth Mgmt. v. McMullan*, 267 F.R.D. 443, 448 (D. Conn. 2010).

[5] Plaintiffs argue that the documents are responsive to RFP Nos. 4, 6, 8 and 16. However, TCS objected and did not agree to produce anything due to the overbreadth of RFP No. 6 (seeking all documents and ESI relating to the staffing of all projects in the United States). TCS produced documents in response to RFP No. 8 (seeking organizational charts), RFP No. 16 (seeking visa information), and RFP No. 4 (seeking workforce demographics and EEO-1 reports). (*See*, Ex. 6).

Dated: April 4, 2017

LOEB & LOEB LLP

By: /s/ Michelle M. La Mar
Michelle M. La Mar
Attorneys for Defendant
TATA CONSULTANCY SERVICES, LTD.