Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
E-mail: dlow@kotchen.com;
E-mail: dkotchen@kotchen.com;
E-mail: mvk@kotchen.com;
E-mail: lgrunert@kotchen.com

Attorneys for Buchanan, Slaight,
Webber, Masoudi, and Mandili

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| STEVEN HELDT, BRIAN BUCHANAN, and CHRISTOPHER SLAIGHT<br><br>Plaintiffs,<br><br>v.<br><br>TATA CONSULTANCY SERVICES, LTD.,<br><br>Defendant. | Case No.: 4:15-cv-01696-YGR<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' SURREPLY TO TATA CONSULTANCY SERVICES, LTD.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint Filed: April 14, 2015 |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

PLAINTIFFS' SURREPLY TO TATA CONSULTANCY SERVICES, LTD.'S MOTION
FOR SUMMARY JUDGMENT .....................................................................................................1

    I.    FACT ISSUES PRECLUDE SUMMARY JUDGMENT .......................................1

        A.    Plaintiffs Have Presented Ample Evidence of Discrimination. ...................1

        B.    Late-Produced Documents Further Evidence Discrimination. .....................1

        C.    Dr. Neumark's Analysis Is Admissible Evidence That Gives Rise to
            an Inference of Discrimination. ....................................................................2

    II.    SUMMARY JUDGMENT ON PLAINTIFFS' INDIVIDUAL CLAIMS IS
          INAPPROPRIATE ..................................................................................................5

        A.    Plaintiffs Need Not Offer Individualized Evidence of
            Discrimination in Phase I of a Teamsters Class Action. ...............................5

        B.    Plaintiffs Have Presented Sufficient Evidence of Discrimination
            Against Plaintiff Buchanan. ..........................................................................5

        C.    Plaintiffs Have Presented Sufficient Evidence of Discrimination
            Against Plaintiff Slaight. ...............................................................................7

    III.    THE STATE OF DISCOVERY AND ITS IMPACT ON SUMMARY
           JUDGMENT ............................................................................................................9

    IV.    CONCLUSION ......................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Ameritech Servs., Inc.*, 231 F.3d 414 (7th Cir. 2000).......................................... 2, 3

*Barnes v. Hershey Co.*, No. 3:12-cv-01334, 2016 U.S. Dist. LEXIS 5485 (N.D. Cal. Jan. 15, 2016) ................................................................................................................... 5

*Castaneda v. Partida,* 430 U.S. 482 (1977)................................................................................ 2

*Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981) ................................................................. 3

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000) ............................................. 2, 5

*Domingo v. New England Fish Co.*, 727 F.2d 1429 (9th Cir. 1984) ........................................ 4

*Dothard v. Rawlinson*, 433 U.S. 321 (1977)............................................................................. 4

*EEOC v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575 (9th Cir. 1989).......................................... 3

*EEOC v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267 (D. Nev. 2009).................................... 5

*Finley v. Cnty. of Martin*, No. C-07-5922, 2009 U.S. Dist. LEXIS 119863 (N.D. Cal. Dec. 23, 2009) ................................................................................................................... 5

*Gen. Tel. Co. of NW, Inc.*, 885 F.2d at 581 (9th Cir. 1989)...................................................... 3

*Hazelwood Sch. Dist. v. United States*, 433 U.S., 299 (1977) ................................................. 2

*Hemmings v. Tidyman's Inc.*, 285 F. 3d 1174 (9th Cir. 2002).................................................. 3

*Hernandez v. City of Napa*, No. C-09-02782 EDL, 2010 U.S. Dist. LEXIS 109011 (N.D. Cal. Oct. 13, 2010)..................................................................................................... 9

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)................................................ 4

*Kennedy v. Allied Mut. Ins Co.*, 952 F.2d 262 (9th Cir. 1991) ................................................ 8

*Messick v. Horizon Indus.*, 62 F.3d 1227 (9th Cir. 1995)......................................................... 8

*Mister v. Ill. Cent. Gulf R.R. Co*, 832 F.2d 1427 (7th Cir. 1987) ........................................ 3, 4

*Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475 (9th Cir. 1983) .......................................... 4

*Palmer v. Shultz*, 815 F.2d 84 (D.C. Cir. 1987)........................................................................ 3

*United States v. City & Cnty. of Denver*, 943 F. Supp. 1304 (D. Colo. 1996) ....................... 5

*United States v. City of Warren*, 138 F.3d 1083 (6th Cir. 1998) ............................................. 4

*United States v. Morvant*, 843 F. Supp. 1092 (E.D. La. 1994) .................................................. 5

*Van Asdale v. Int'l Game Tech.*, 577 F.3d 989 (9th Cir. 2009) ........................................... 8, 9

*Walker v. Robbins Hose Co.*, 465 F. Supp. 1023 (D. Conn. 1979) ........................................... 4

**<u>Regulations</u>**

20 C.F.R. § 655.731(a) ............................................................................................................... 4

**PLAINTIFFS' SURREPLY TO TATA CONSULTANCY SERVICES, LTD.'S MOTION FOR SUMMARY JUDGMENT**

The arguments presented in Tata's Reply in Support of Summary Judgment are flawed because: (1) ample evidence creates fact issues precluding summary judgment, including late-produced evidence, and expert analysis; (2) summary judgment based on individualized evidence is inappropriate under the *Teamsters* framework and based on the evidence here; and (3) denial of summary judgment is appropriate based on Tata's discovery misconduct.

## I.   FACT ISSUES PRECLUDE SUMMARY JUDGMENT

**A.   Plaintiffs Have Presented Ample Evidence of Discrimination.**

Plaintiffs have produced ample evidence that precludes summary judgment, as detailed in Plaintiffs' opposition brief. SJ Opp'n at 9-12 (Dkt. #121); Pls.' Statement of Additional Facts ("SOF") ¶¶ 1-8, 12-15, 20-25 (Dkt. #122). For example, Tata's own documents reflect that Tata has an explicit policy of discriminatorily favoring South Asian visa holders.[1] Tata's own documents also reflect instructions from business units to the Talent Acquisition Unit ("TAU") and from TAU to vendors to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[2] Moreover, Tata's workforce is overwhelmingly South Asian, and non-South Asians are terminated at a disproportionate rate. Pls.' Supp. SOF ¶ 10.

**B.   Late-Produced Documents Further Evidence Discrimination.**

Late-produced documents offer further evidence of Tata's corporate policy of favoring South Asian visa workers in staffing U.S. positions and its preference for hiring Indians. *Id.*; Pls.' SOF ¶¶ 1-5 (Dkt. #122). This new evidence also shows Tata's explicit instructions to vendors ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, resulting in an overwhelmingly South Asian workforce that far exceeds the number of South Asians in the relevant labor market. Pls.' Supp. SOF ¶ 10. The data recently supplied by Tata also reflects dramatically higher termination rates for non-South Asians, particularly from the bench. *Id.* ¶¶ 3, 10 (citing Neumark Supp. Rpt. Tbl. 2 (finding 62.01 standard deviation distinction

---

[1] *See, e.g.*, Pls.' SOF ¶ 1 (quoting TCS057813-18 at 15 ("Leadership directive is to utilize every visa to the maximum extent")); Pls. Supplemental Statement of Additional Facts ("Supp. SOF") ¶ 10.

[2] *See* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, English Oxford Living Dictionaries (2017), available at https://en.oxforddictionaries.com/definition/▓▓▓ Pls.' SOF ¶ 8; Pls.' Supp. SOF ¶ 10.

1
PLAINTIFFS' SUMMARY JUDGMENT SURREPLY - Case No. 4:15-cv-01696-YGR

between South Asian and non-South Asian terminations, and 55.05 standard deviation distinction between South Asian and non-South Asian terminations from the bench)). In light of this evidence, and the other ample evidence of discrimination cited by Plaintiffs, summary judgment is inappropriate.

### C.  Dr. Neumark's Analysis Is Admissible Evidence That Gives Rise to an Inference of Discrimination.

Among the evidence precluding summary judgment is the expert analysis performed by Dr. Neumark, who found the dramatic statistical disparities between Tata's hiring and terminations of South Asians compared to non-South Asians. Tata repeats three attacks on Dr. Neumark's analyses that Tata made in its *Daubert* motion, Tata's Reply at 7-11 (Dkt. #150), but those arguments are flawed for the reasons set forth in Plaintiffs' *Daubert* Opposition. *See generally* Pls.' *Daubert* Opp'n (Dkt. #170) (rebutting similar attacks on Dr. Neumark's methodology and analysis). First, Dr. Neumark's analyses show that there was a less than one in a billion possibility that the disparities were the result of chance. Pls.' Supp. SOF ¶ 3; Pls.' RSS ¶ 15 (Dkt. #122). Even without demonstrating causation, Dr. Neumark's analysis "g[ave] rise to [the] reasonable inference that the hiring was not race-neutral[,]" as they eliminate the possibility that Tata's workforce demographic occurred by chance. *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000) (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S., 299, 308 n.14 (1977); *Castaneda v. Partida,* 430 U.S. 482, 496 n.17 (1977)); Pls.' *Daubert* Opp'n at 8-11 (Dkt. #170). These statistics, when considered in combination with evidence of Tata's corporate policies to favor South Asian visa holders for open U.S. positions and to instruct its vendors ███████████████████, Pls.' SOF ¶ 1 (Dkt. #122); Pls.' Supp. SOF ¶ 10, is sufficient to create a triable issue of fact.[3]

Second, Tata – not Plaintiffs or their expert – carries the burden to demonstrate a non-discriminatory explanation for its disproportionate workforce. *See* Pls.' *Daubert* Opp'n at 11-14 (Dkt.

---

[3] In its argument, Tata relies on *Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000), which was an individual case with a different legal standard than that applicable in a *Teamsters* Phase I case.

#170) (collecting cases).[4] While Tata identifies six factors that it speculates could help explain the discrepancy in Tata's hiring and terminations, Tata's Reply at 9, Tata and its expert fail to carry their burden to offer a regression or other analysis demonstrating the relevance of those factors.[5] And Tata's expert testified that he lacked the data for a regression analysis controlling for those factors.[6]

Third, Tata argues that Dr. Neumark should have relied on Tata's flawed applicant data rather than ACS survey data for the relevant labor market. Tata's Reply at 9-10. *But see* Pls.' *Daubert* Opp'n at 19-20 (Dkt. #170). Tata, however, does not maintain an applicant tracking system, and the applicant data provided by Tata was unreliable and incomplete.[7] Moreover, Tata's applicant pool – which it contends is 40% South Asian[8] – is so grossly disproportionate with that of the relevant IT labor market (approximately 15.8% South Asian), that this disparity alone is evidence of discrimination. *Castaneda v. Pickard*, 648 F.2d 989, 1003 (5th Cir. 1981); Pls.' Supp. SOF ¶ 3. This undoubtedly is due to Tata's explicit instructions to vendors ▮. Pls.' Supp. SOF ¶ 10. And applicant pools that themselves are a product of discrimination "cannot be taken at face

---

[4] *Adams*, 231 F.3d at 424 (rejecting attack on plaintiff's statistical analysis for failure to account for explanatory variables, and explaining that "importantly, it was [the defendant] that had the responsibility of offering alternative explanations. The only one it actually advanced ... was singularly unpersuasive"); *Hemmings v. Tidyman's Inc.*, 285 F. 3d 1174, 1188-89 (9th Cir. 2002) ("the defendant must 'produce credible evidence that curing the alleged flaws would also cure the statistical disparity'") (citation omitted); *EEOC v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575, 580-81 (9th Cir. 1989) ("the defendant cannot rebut an inference of discrimination by merely pointing to flaws in the plaintiff's statistics[,]" rather, the defendant must identify "'the missing factor'" and introduce "'evidence to support the contention that the missing factor can explain the disparities as a product of a legitimate, nondiscriminatory'" process.) (quoting *Palmer v. Shultz*, 815 F.2d 84, 101 (D.C. Cir. 1987)).

[5] *Mister v. Ill. Cent. Gulf R.R. Co*, 832 F.2d 1427, 1434-35 (7th Cir. 1987) ("When the defendant pronounces a reason . . . followed by silence on the plaintiff's [characteristics or qualifications], it has not adequately articulated a neutral reason[.]"); *Gen. Tel. Co. of NW, Inc.*, 885 F.2d at 581, 583 (9th Cir. 1989) (noting that the employer must "produce credible evidence that curing the alleged flaws [in plaintiff's statistics] would also cure the statistical disparity").

[6] Anderson Dep. Tr. 74:21-76:2 (Mar. 31, 2017) ("I don't believe that the data I have would allow me to do a reliable analysis like that") (Dkt. #170-7).

[7] Chinnari Decl. ¶ 8 ("TCS did not maintain a general applicant tracker database during the class period") (Dkt. #133).

[8] Tata's Reply at 9.

value" and used as an objective measure in which to assess discrimination. *Castaneda*, 648 F.2d at 1003.[9] Dr. Neumark therefore correctly defined the relevant labor market as "the Computer Systems Design and Related Services industry." Pls.' RSS ¶ 18 (citing Neumark Report ¶¶ 11, 14) (Dkt. #122). This is the market in which the labor is conducted and thus appropriate for Dr. Neumark's hiring analysis. *See, e.g.*, *Mister*, 832 F.2d at 1434-35; *Moore*, 708 F.2d at 482-83 (the relevant labor market "must be that of the local labor force possessing the requisite skills").

Tata also faults Dr. Neumark for including "deputees" in his hiring and terminations analysis. Tata's Reply at 10-11. But deputees' status as existing employees does not preclude their consideration in a hiring analysis, as both expats and local hire candidates undergo the same application and interview process for U.S. positions, must be paid the same and are considered for the same openings and perform the same work. Pls.' Supp. SOF ¶ 2; 20 C.F.R. § 655.731(a). An employer cannot follow a staffing policy, where, as here, its intention or effect are discriminatory.[10] To this end, federal enforcement agencies recognize that an employer may not discriminate in favor of visa workers over others "in hiring, firing and recruiting." Pls.' Supp. SOF ¶ 1 (quoting DOJ Press Release (Apr. 3, 2017)). This is exactly the policy Tata is pursuing – giving preference to South Asian

---

[9] *See also Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) ("There is no requirement ... that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants. . . . The application process might itself not adequately reflect the actual potential applicant pool"); *Mister*, 832 F.2d at 1436 ("An applicant pool analysis is biased against finding discrimination, if potential applicants know or suspect that the employer is discriminating"); *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 482-83 (9th Cir. 1983) (where applicant pool is compromised, "the proxy pool must be that of the local labor force possessing the requisite skills").

[10] *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 353 (1977) (holding that seniority system may not be applied with "an intention to discriminate because of race … or national origin."); *United States v. City of Warren*, 138 F.3d 1083, 1094 (6th Cir. 1998) (defendant's "limitation of its applicant pool to residents of the overwhelmingly white city, combined with refusal to publicize jobs outside the racially homogenous county" was discriminatory); *Craig v. Ala. State Univ.*, 804 F.2d 682, 690 (11th Cir. 1986) (finding policy to favor existing employees for positions over external applicants discriminatory); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1435-36 (9th Cir. 1984) (finding discrimination in hiring and promotion where employer used separate recruiting channels for different jobs, and relied on word-of-mouth recruiting and nepotism that resulted in supervisor positions being filled with nearly all whites); *Walker v. Robbins Hose Co.*, 465 F. Supp. 1023, 1045-48 (D. Conn. 1979) (finding intent to discriminate where defendant's recruiting practices perpetuated all-white workforce).

visa workers over all others. Further, Dr. Neumark recently supplemented his analysis with new data provided by Tata in May 2017 to account for terminations that Tata identifies as occurring outside the United States. Incorporating this new data, the termination rate for South Asians is disproportionately lower than non-South Asians by 13.2 percentage points, or 62 standard deviations, and the statistical likelihood that this disparity is due to chance is less than 1 in 1 billion.[11]

## II.  SUMMARY JUDGMENT ON PLAINTIFFS' INDIVIDUAL CLAIMS IS INAPPROPRIATE

Summary judgment on the individual claims of named Plaintiffs Buchanan and Slaight is inappropriate: (a) procedurally; and (b) under the evidence presented.

### A. Plaintiffs Need Not Offer Individualized Evidence of Discrimination in Phase I of a *Teamsters* Class Action.

Tata argues that it is procedurally appropriate to consider on summary judgment during Phase I whether specific individuals were the victims of discrimination in pattern or practice cases. But Tata is unable to cite any cases in which summary judgment was granted against individual plaintiffs in Phase I of a *Teamsters* class action. Tata Reply at 2-3. Instead, Tata relies on inapposite pattern-or-practice cases involving, *e.g.*, individual plaintiffs rather than class actions.[12]

Courts that have addressed Phase I *Teamsters* class actions have found that, on summary judgment, "at the liability stage of a pattern-or-practice lawsuit" under the *Teamsters* framework, plaintiffs "need not offer evidence that each individual for whom it will ultimately seek relief was a victim of the policy." *United States v. City & Cnty. of Denver*, 943 F. Supp. 1304, 1309 (D. Colo. 1996) (granting summary judgment for plaintiff at liability stage) (citing *United States v. Morvant*, 843 F. Supp. 1092, 1095 (E.D. La. 1994)); *accord* Pls.' SJ Opp'n at 9-12 (collecting cases).

### B. Plaintiffs Have Presented Sufficient Evidence of Discrimination Against Plaintiff Buchanan.

---

[11] Pls.' Supp. SOF ¶ 3 (citing Neumark Supp. Rpt. ¶ 7, Tbl. 2).

[12] *See, e.g.*, *Coleman*, 232 F.3d 1271 (involving age discrimination claims of ten individual plaintiffs that had been severed, and *Teamsters* did not apply); *Barnes v. Hershey Co.*, No. 3:12-cv-01334, 2016 U.S. Dist. LEXIS 5485, at *24 n.8 (N.D. Cal. Jan. 15, 2016) (recognizing that the Supreme Court has never extended *Teamsters* to non-class cases); *Finley v. Cnty. of Martin*, No. C-07-5922, 2009 U.S. Dist. LEXIS 119863 (N.D. Cal. Dec. 23, 2009) (single plaintiff case unrelated to *Teamsters*); *see also EEOC v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267, 1319 (D. Nev. 2009) (deciding class-wide rather than individualized liability in connection with pattern or practice claim).

Even if it were appropriate to address individual claims before Phase II, to show that Tata is entitled to judgment as a matter of law, Tata would need to demonstrate that – even after applying a Phase I presumption in Plaintiffs' favor – there is no triable issue of fact. Here, the evidence provides ample support for each Plaintiff's claim.

Specifically, Buchanan was a top performer at Southern California Edison ("SCE") and had over 25 years of experience with the company, making him an ideal candidate for Tata. Pls.' Supp. SOF ¶ 4; Pls.' SOF ¶ 11 (Dkt. #122). Yet Tata was dismissive of Buchanan at the SCE job fair, showed little interest in accepting his resume, never contacted him regarding his application, and chose to instead staff the project with a disproportionately high number of Indian expats. Pls.' RSS ¶¶ 24, 27; Pls.' SOF ¶¶ 14, 15 (Dkt. #122); Pls. Supp. SOF ¶ 6 (citing TCSLTD004034425-27 at 27 (indicating that as of ███████ ████████████████████████████)). Tata relies on the declaration of just one employee (and limited documents) to argue that it has "established" that Tata does not favor South Asians. Tata's Reply at 11 (citing Kumar Decl. ¶¶ 13-14, 18 (Dkt. #152)). But overwhelming documentary evidence confirms Tata's corporate policy of favoring South Asians for open positions and its leadership directive to utilize visas "to the maximum extent." Pls.' SOF ¶ 1 (Dkt. #122); Pls.' Supp. SOF ¶ 10. While Tata argues that it simply prefers to place existing visa-dependent employees in U.S. positions, Tata's own documents reflect its discriminatory preference to employ expats from India rather than local hires.[13] Tata's discriminatory policy and practices have had an adverse impact on non-South Asians applicants, including Mr. Buchanan. *Id.* ¶¶ 3, 10; Pls.' Mot. for Class Cert. at 6-11 (Dkt. #115).[14]

---

[13] Pls.' Supp. SOF ¶ 10 (quoting TCSLTD005059003-07 at 05-06 (██████ ████████████████████████████ TCSLTD003189623-31 at 31 ████████ ████████████████████████████████████████████████ ████████████████████████████████ TCSLTD004623398-413 at 398 ███ ████████████████████████████████████████████████ ████████████████████).

[14] Tata again argues that Dr. Neumark's statistical evidence does not raise a triable issue of fact, Tata's Reply at 11, but as discussed above, overwhelming statistical and documentary evidence of Tata's discriminatory practices favoring South Asians is sufficient to create a triable issue of fact. *See supra* at 1-2.

Tata argues that Buchanan failed to identify a position for which he was qualified but he, in fact, has identified such positions. Pls.' RSS ¶ 37 (noting that Buchanan applied for a general applications support position at the SCE job fair) (Dkt. #122). Moreover, Buchanan's position was not eliminated, it was divided between multiple expats he trained to take over his role. *Id.* ¶ 23. And even if Buchanan's specific job title was "eradicated" as Tata claims, Tata's Reply at 12, Buchanan was still imminently qualified for a number of job openings on the SCE project given his over 25 years of professional experience. Pls.' Supp. SOF ¶ 4.

While Tata argues that it had no input in SCE's decision to terminate Buchanan, Tata's Reply at 12, Tata was directly responsible for rejecting Buchanan's application for employment and failing to hire him. Pls.' SOF ¶ 14 (Dkt. #122). And Tata's claim that it "engaged in substantial, nondiscriminatory recruiting and hiring at SCE" is unsubstantiated. Tata's Reply at 12.[15] In fact, while Tata reserved just 44 rehire positions for the approximately 600 displaced SCE employees,[16] over █████████████████████████████████████████. Pls.' Supp. SOF ¶ 6.

### C. Plaintiffs Have Presented Sufficient Evidence of Discrimination Against Plaintiff Slaight.

Tata argues incorrectly that Slaight fails to identify an open position "he believes should have been offered to him." Tata's Reply at 13. While on the bench, Slaight interviewed for a performance testing position with Tata client Bank of America in Pennington, New Jersey, and was awaiting feedback from his interview at the time of his termination. Pls.' RSS ¶ 61 (Dkt. #122); Pls.' SOF ¶ 22. Slaight believed that he performed well in the interview, and in an email a few days after the interview, stated that he felt he could meet the requirements of the position. Pls.' RSS ¶ 61 (Dkt. #122). Further, while Tata generally allows unallocated employees to remain on the bench for 30

---

[15] Both Buchanan and another former SCE employee, Stephen Bradley, complained that Tata's conduct at the SCE job fair was discriminatory. Pls.' Supp. SOF ¶ 5.

[16] Ganapathy Decl. ¶ 14 (indicating approximately 600 SCE employees were displaced and that Tata "specifically reserved 44 positions on the SCE project for former SCE employees") (Dkt. #153).

days while looking for subsequent work, Pls.' SOF ¶ 23, Slaight was afforded just three weeks – foreclosing him from other opportunities which may have arisen while he was on the bench.[17]

Slaight was removed from the AXA Equitable ("AXA") client project on March 27, 2013, as AXA had been expecting to receive one contractor from Tata instead of two, and did not have sufficient work for Slaight. *Id.* ¶ 21; Tata's SOF ¶ 58 (Dkt. #108). Tata makes the unfounded assertion that Plaintiffs are "adding facts" and "trying to contribute to the false narrative that multiple visa holders come into United States job sites and replace local hires." Tata's Reply at 13. But Tata's own records confirm that Slaight was removed from the AXA client project and later terminated because his position was eliminated. Pls.' Supp. SOF ¶ 7 (quoting TCS029653-55 at 53 (Involuntary Termination Form noting Slaight's "Reason for Termination: . . . INVOLUNTARY – Position Eliminated Altogether & No Other Suitable Position Found"). Further, while Tata suggests that it attempts to release expats first and retain local workers, its own documents indicate otherwise.[18]

Finally, Tata invokes the "sham affidavit" rule, which prevents a party from "'creat[ing] an issue of fact by an affidavit contradicting his prior deposition testimony.'" *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins Co.*, 952 F.2d 262, 266 (9th Cir. 1991)). This rule, which "'should be applied with caution[,]'" applies only when: (1) "the district court . . . make[s] a factual determination that the contradiction was actually a 'sham'"; and (2) the contradiction is "clear and unambiguous." *Id.* at 998-99 (quoting *Kennedy*, 952 F.2d at 267). "'[M]inor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.'" *Id.* at 999 (quoting *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995)). Here, the sham affidavit rule does not apply because Slaight does not seek to "'create an issue of fact by an affidavit[,]'" *id.* at 998 (citation

---

[17] Slaight had been on the bench for just 10 days when Tata completed an involuntary termination form for his release, listing the reason for his termination as "INVOLUNTARY – Position Eliminated Altogether & No Other Suitable Position Found." Pls.' Supp. SOF ¶ 7. The fact that this form was completed after just 10 days of unallocation suggests that Tata was not genuinely committed to finding Slaight a new position within the company. *Id.*

[18] *See supra* at n.13 (discussing Tata's practice of ███████████ ███████████).

omitted), but instead has created an issue of fact based on the various other evidence of Tata's discriminatory policy and scheme. Moreover, Slaight's declaration is not a "sham," but honestly corrects the record based on newly learned information.[19]

### III. THE STATE OF DISCOVERY AND ITS IMPACT ON SUMMARY JUDGMENT

As discussed in Plaintiffs' summary judgment opposition, Tata waited until January and February 2017 to produce over 4 million pages of documents, thereby precluding Plaintiffs from reviewing and incorporating these materials into their class certification and summary judgment opposition briefs. SJ Opp'n at 7. Tata now attempts to shift the blame for its discovery misconduct to Plaintiffs by arguing that they are somehow at fault for Tata's repeated discovery delays. Tata's Reply at 4-7. Tata disingenuously argues, for instance, that Plaintiffs took *seven* Rule 30(b)(6) depositions in early 2016 to better understand Tata's "documents and procedures[,]" Tata's Reply at 4-5, but Plaintiffs noticed and took just one Rule 30(b)(6) deposition on these topics (Tata chose to designate seven witnesses for the deposition).[20] Tata also blames its delays on disagreements over search terms. Tata's Reply at 6. However, Plaintiffs' initial search terms were provided to Tata on March 7, 2016, yet Tata made no attempt to test the keywords until July 2016, and failed to produce custodian email boxes until late November, months after the close of the initial email production period agreed to by the parties.[21] The chart depicting Tata's belated document production clearly demonstrates the prejudicial nature of Tata's discovery misconduct.[22]

---

[19] *Id.* at 999 (reversing district court's application of sham affidavit rule where there was no unambiguous contradiction); *Hernandez v. City of Napa*, No. C-09-02782 EDL, 2010 U.S. Dist. LEXIS 109011, at *25 (N.D. Cal. Oct. 13, 2010) (finding "somewhat contradictory" declaration about what plaintiff "only later remembered" was not a sham); Slaight Decl. ¶ 3 (Mar. 5, 2017) ("I was not aware that Tata had a corporate policy favoring visa holding Indian nationals. . . . I believe Tata's corporate policy and practices to be discriminatory") (Dkt. #122-52).

[20] Renewed Joint Mot. to Extend Scheduling Order Deadlines at 2 ("On November 24, 2015, Plaintiffs issued a Rule 30(b)(6) deposition notice with respect to various topics[.] . . . TCS ultimately designated seven witnesses to address the noticed topics. To accommodate the schedules of the witnesses, the depositions took place in January, February and March 2016") (Dkt. #80).

[21] *See id.* ("Between May 20, 2016 and the beginning of August, the Parties will work in good faith to produce documents responsive to initial search terms"); Pls.' Supp. SOF ¶ 8.

[22] SJ Opp'n at 7; Pls.' SOF ¶ 24. A production log was produced alongside the document production chart that contains both the volume of each production in megabytes or gigabytes and the number of

Tata also argues that Plaintiffs improperly failed to engage in formal discovery, but this is misleading and inaccurate. Tata's Reply at 4. Plaintiffs abided by the Court's instructions at the outset of this case that the parties be "collegial" and abide by the Court's discovery guidelines that strongly encourage "cooperation" between counsel regarding the "collection, search, review, and production of ESI," and "an informal discussion about the discovery of ESI (rather than deposition)." Hr'g. Tr. 10:21-11:16 (Sept. 15, 2015) (Dkt. #164-18); ESI Guidelines at 1, 3 (Dkt. #164-19). Moreover, the materials requested informally by Plaintiffs were responsive to Plaintiffs' formal discovery requests issued in August 2015, documents and data that Tata failed to produce and at times even denied existed. SJ Opp'n at 7-8.[23] And Tata's claimed attempts to "accommodate" Plaintiffs have been lacking, at best. Pls.' Supp. SOF ¶ 9.

Contrary to Tata's assertions, Plaintiffs detailed the specific discovery requests Tata failed to respond to in Plaintiffs' Supplemental Discovery Brief. *See* Pls.' Supp. Discovery Brief at 5 (discussing specific discovery requests from August 2015 the late produced materials were responsive to) (Dkt. #164). And the prejudice to Plaintiffs from the discovery misconduct is clear: Tata's production of critical documents and data in early 2017 not only precluded Plaintiffs reviewing and incorporating this tremendous volume of materials into its prior briefing, but it also prevented Plaintiffs from affirmatively moving for partial summary judgment prior to the Court's deadline or seek certification of a promotions class. *Id.* at 2; SJ Opp'n at 7-8.

## IV.   CONCLUSION

For the foregoing reasons, and for the reasons reflected in Plaintiffs' opposition brief, the Court should deny Tata's motion for summary judgment.

---

pages of each production, and it is not "misleading," as Tata asserts. Pls.' SOF ¶ 24 (citing Tata Document Production Log (Dkt. #122-66)); SJ Opp'n at 7.

[23] Tata argues that Plaintiffs identified the materials they wanted produced in response to their first set of document requests, and that "plaintiffs now maintain that additional, unrequested items should have been produced." Tata's Reply at 5 n.2. However, it is Tata's duty to determine what documents and data exist that are responsive to Plaintiffs' discovery requests and to produce any non-privileged materials. Further, Tata withheld its allocation data from production and repeatedly told Plaintiffs that such data did not exist. SJ Opp'n at 7-8. There is no possible way Plaintiffs could have requested the production of this data, given these assurances.

| | |
|---|---|
| Dated: June 22, 2017 | Respectfully submitted, |
| | By: /s/Daniel Kotchen |
| | Daniel Kotchen (*pro hac vice*) |
| | Daniel Low, SBN 218387 |
| | Michael von Klemperer (*pro hac vice*) |
| | Lindsey Grunert (*pro hac vice*) |
| | **KOTCHEN & LOW LLP** |
| | 1745 Kalorama Road NW, Suite 101 |
| | Washington, DC 20009 |
| | Telephone: (202) 471-1995 |
| | Email: dkotchen@kotchen.com; |
| | dlow@kotchen.com; |
| | mvk@kotchen.com; |
| | lgrunert@kotchen.com |
| | |
| | Michael F. Brown (*pro hac vice*) |
| | **DVG LAW PARTNER LLC** |
| | P.O. Box 645 |
| | Neenah, WI 54957 |
| | 920-238-6781 |
| | 920-273-6177 (fax) |
| | mbrown@dvglawpartner.com |
| | |
| | Steven Tidrick, SBN 224760 |
| | Joel Young, SBN 236662 |
| | **The Tidrick Law Firm** |
| | 2039 Shattuck Avenue #308 |
| | Berkeley, CA 94704 |
| | Telephone: (510) 788-5100 |
| | Facsimile: (510) 291-3226 |
| | E-mail: sgt@tidricklaw.com |
| | E-mail: jby@tidricklaw.com |
| | |
| | *Attorneys for all Plaintiffs Buchanan, Slaight, Webber, Masoudi, and Mandili* |

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system.

Dated: June 22, 2017                              /s/Daniel Kotchen
                                                  Daniel Kotchen