MICHELLE M. LA MAR (SBN 163038)
mlamar@loeb.com
LAURA A. WYTSMA (SBN 189527)
lwytsma@loeb.com
PATRICK N. DOWNES (SBN 186461)
pdownes@loeb.com
ERIN M. SMITH (SBN 235039)
esmith@loeb.com
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA  90067
Telephone: 310.282.2000
Facsimile: 310.282.2200

Attorneys for Defendant
TATA CONSULTANCY SERVICES, LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STEVEN HELDT, BRIAN BUCHANAN, and CHRISTOPHER SLAIGHT,<br><br>Plaintiffs,<br><br>v.<br><br>TATA CONSULTANCY SERVICES, LTD.,<br><br>Defendant. | Case No.: 4:15-cv-01696-YGR<br><br>Assigned to Hon. Yvonne Gonzalez Rogers<br><br>**TATA CONSULTANCY SERVICES, LTD.'S SURREPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:       August 22, 2017<br>Time:       2:00 p.m.<br>Location:  Courtroom 1, 4th Flr., Oakland<br><br>Complaint Filed:   April 14, 2015 |

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

TCS' SURREPLY IN OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
CASE NO.: 4:15-CV-01696-YGR

## I. INTRODUCTION

The Court has previously questioned how this action can be certified in the wake of *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("*Dukes*"). (*See* ECF 72, Hrg. Tr. pg. 12, ln. 15-21 "…it is not at all clear to me how this case is going to end up a class action…[*Dukes*] makes it very difficult to get these employment actions teed up in a class action way"). Yet plaintiffs ignore *Dukes*, flagrantly misrepresent the evidence, and argue that it makes no difference whether the named plaintiffs (or anyone else) have viable claims. Plaintiffs have not met their burden under Rule 23, and their "pattern-or-practice" allegations do not excuse them from doing so.

In *Dukes*, the Supreme Court reversed certification of a nationwide employment discrimination action due to the absence of any "glue" holding thousands of employment decisions together. *Dukes*, 564 U.S. at 357. Certification was deemed improper because no uniform policies provided a common answer to the question, *why was I disfavored*? *Id.* at 352. On the opposite end of the spectrum are the decisions cited by plaintiffs, such as *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012) ("*Ellis*"). In *Ellis*, a nationwide class was certified after the plaintiffs provided *significant proof* that a promotions policy, which was uniformly applied by the CEO and top-level management, resulted in the same injury against female employees (*i.e.* the failure to be considered for certain promotions). *Id.* at 530.

If *Dukes* and *Ellis* represent a factual continuum in which class certification is appropriate on one end (*Ellis*), and inappropriate on the other (*Dukes*), this case aligns with *Dukes*. Here, tens of thousands of hiring and termination decisions are at issue. They were made and otherwise influenced by 2,518 business managers, hundreds of customers, 90 outside recruiting firms, 17 internal recruiters, and of course, the applicants and employees themselves. (Chinnari Dec. (ECF 133) ¶4,9; Andrillo Dec. (ECF 140) ¶ 3). The decisions were further influenced by each applicant and employee's experience, geographic limitations, performance, and TCS' business needs, among other things. (Chinnari Dec. (ECF 133) ¶11). Fatally, plaintiffs make no assertion to the contrary. Although TCS maintains that plaintiffs have satisfied *none* of the factors required under Rule 23, due to space limitations, this brief will focus on the critical absence of commonality. The lack of typicality and adequacy is also evident from a review of commonality.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

1

TCS' SURREPLY IN OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
CASE NO.: 4:15-CV-01696-YGR

## II. COMMONALITY DOES NOT EXIST FOR A HIRING CLASS

Plaintiffs seek to certify a hiring class of all non-South Asian persons who applied for employment with TCS, but were not hired (even if they rejected an offer). As the "glue" allegedly tying all hiring decisions together, plaintiffs argue that TCS uses vendors to create an applicant pool that is disproportionately South Asian. Plaintiffs argue that the legality of this alleged practice is a "common question."

As *Dukes* and *Ellis* make clear, what matters to class certification is not the raising of common questions, even in droves, but the capacity of a class wide proceeding to generate common answers apt to drive the resolution of the litigation. *Ellis*, 285 F.R.D. at 506. In that regard, two important rules have emerged from decisional law. First, commonality requires plaintiffs to demonstrate that the class members have suffered the *same injury*, not merely that they have all suffered a violation of the same provision of law. *Id*. at 506; *Dukes*, 564 U.S. at 349-350. Second, if the common question for which certification is sought arises from an allegedly discriminatory policy, certification requires "significant proof" that the employer operated under that policy. *Ellis* at 507-508; *Dukes* at 354. Here, plaintiffs fail on both counts.

No evidence exists that the putative class members suffered the same injury from the alleged vendor "sourcing" policy. Vendors are one of eight recruiting channels, and provide approximately 50% of local hires. (Anderson Dec. (ECF 129) ¶¶ 20, 33)). Plaintiffs can only identify two members of their hiring class: Brian Buchanan and Steven Bradley. The other named and proposed plaintiffs were hired by TCS. Neither Buchanan nor Bradley sought employment with TCS through vendors; rather, they attended a job fair. (Buchanan Dep. at 70:25-71:1 (ECF 139-1); Bradley Dep. at 54:2-3 (ECF 139-3). Importantly, the putative class members who actually used headhunters testified without equivocation that the headhunters did *not* discriminate against them. (*See* concurrently filed La Mar Dec., Ex. E, 25:10-26:22; 28:10-29:22; 38:2-38:10; and 41:3-41:8 and Ex. G 23:23-24:8; 25:18-26:24; and 52:12-52:22.) Thus, there can be no claim that the class members suffered the same harm as a result of the same alleged practice.

Further, a common scheme of racial profiling by vendors is not supported by "significant proof." Having abandoned their allegation that TCS requires vendors to disclose photographs and

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

2

TCS' SURREPLY IN OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
CASE NO.: 4:15-CV-01696-YGR

national origins of recruits, plaintiffs now argue that approximately eight emails (out of millions produced) prove that TCS instructs vendors to racially shape the applicant pool. As TCS has previously explained (ECF 203, pg. 1), these emails cover only one recruiter (Brian Galicki) and six positions out of more than 16,000 offers extended during the class period. At worst, the emails reflect isolated instances of one person's neglect of company policy, and not a companywide scheme. *See e.g. Dukes* at 356 ("…demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's"). Moreover, the hiring statistics pertinent to Galicki reflect an unbiased selection rate between South Asian and non-South Asian candidates. Supp. Anderson Dec. ¶¶ 12-14. In fact, former named plaintiff Steven Heldt was actually recruited to TCS by Galicki through the very same headhunting firm identified in some of the emails cited by plaintiffs. Declaration of Jeevak Sharma, ¶ 8. The uncontested TCS and headhunter declarations establish that headhunters are subject to TCS' equal employment policies, use mainstream, publicly available recruiting channels, and do not discriminate. (Friberg Dec. (ECF 131) ¶¶3,7,9; Varma Dec. (ECF 134) ¶¶3,9,10; Garg Dec. (ECF 135) ¶¶3,7,8,10; Gandhi Dec. (ECF 136) ¶¶3,7,8,10; Vajjala Dec. (ECF 137) ¶¶3,6,7,8).

In summary, the use of vendors is insufficient to establish commonality or typicality for a hiring class. And as shown above, there are no adequate representatives for this claim. The question "why was I not hired" cannot be answered in each case by plaintiffs' vendor theory.

### III. COMMONALITY IS ABSENT FOR A "TERMINATION CLASS"

Plaintiffs also seek to certify a termination class of all non-South Asian employees who were benched and then terminated, regardless of circumstance. Although the policy that is claimed to establish commonality for the termination class is not entirely clear, plaintiffs argue that "leadership directives" to utilize visa holders evince discrimination against non-South Asians in assignments. Plaintiffs argue that this contributes to the lack of assignments for non-South Asian persons, and that such persons are benched and terminated at higher rates.

The "termination class" is not supported by evidence that the same general policy affected all class members in the same way. Employees lose assignments for many reasons, including their own requests (*e.g.* Nahshal), performance concerns (*e.g.* Slaight, Giovanni, Mousoudi, Webber),

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

3

TCS' SURREPLY IN OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
CASE NO.: 4:15-CV-01696-YGR

1  and refusal to relocate.  Sharma Dec. (ECF 151) Ex. 7, 9, 11, 12, 14.  Termination decisions are
2  reached after any combination of customers, managers, talent engagement partners, human
3  resources staff, and in-house counsel have determined that a person is not suitable for continued
4  employment. [1]  *Id*. at ¶¶ 9-11.  Plaintiffs have established no common connection between these
5  decisions and an alleged "leadership directive" to use visa holders on projects.

6        Second, substantial proof of a common and discriminatory preference for visa holders is
7  lacking.[2]  Plaintiffs cite a handful of emails and other documents containing generic statements
8  about using visas for the maximum period possible, and then leap to the unsupported conclusion
9  that these statements prove racial bias.  (*See* Compilation Ex. A.)  However, plaintiffs must
10  improvise and interpose additional text to argue that the utilization of visa holders is a subterfuge
11  for discrimination.  For instance, plaintiffs cite a TCS manual to argue that company policy is to
12  "map" visa ready individuals to opportunities "irrespective of qualifications."  (Reply at 2:4-5.)
13  However, the exact quote from the manual is, "RMG should *try* and map associates," and this
14  guidance must be read consistently with the balance of the manual, which extensively discusses
15  how to internally screen profiles to determine candidate suitability and competency.  (*See*
16  concurrently filed La Mar Dec., Ex. H., TCS00398, 414, 425, 437, 439.)

17        Plaintiffs continue to misrepresent the evidence by arguing that "countless" jobs are
18  expressly reserved for visa holders.  Plaintiffs partially quote from 226 entries in the Requirement
19  Gathering System ("RGS") which include "visa ready" or similar terms. (Plaintiffs' Compilation
20  Ex. B).  However, plaintiffs fail to inform the Court that there are over 600 occurrences of a stated
21  preference for a local hire, and over 174,000 entries with *no* stated preference.  Sharma Dec. ¶ 5.
22  An individualized assessment is required to determine whether, in any of the rare instances cited
23  by plaintiffs, the preference for a visa holder was discriminatory, or rather, due to the lack of a
24  local employee with the skills or experience needed.

---

[1] In fact, the statistical evidence shows that deallocations and terminations are driven by individualized factors.  (*See* Anderson Dec. (ECF 129), ¶¶ 11, 82-84, 91-92).

[2] TCS prioritizes placing *existing* employees in available assignments rather than hiring anew, starting with local employees, then expanding to employees located abroad.  Kumar Dec. (ECF 141) ¶¶12-14.  Deputees are often selected for transfer into the United States because they have already worked overseas for the same customer.  Declaration of Yogesh Thakoor, ¶¶ 6-8.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

4

TCS' SURREPLY IN OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
CASE NO.: 4:15-CV-01696-YGR

Lastly, plaintiffs argue that TCS managers are inherently biased, but supply no common evidence. For instance, plaintiffs' Compilation Exhibit C contains a summary of negative commentary provided to TCS through a voluntary, anonymous survey. Supplemental Declaration of Balaji Ganapathy, ¶ 5,9. A relatively equal number of positive comments were provided by employees in connection with that same survey. *Id*. at ¶10. Plaintiffs also argue that the results of a 2012 internal review revealed "inherent bias" among TCS managers. However, the study also found "ethnicity [was] not the primary cause for inherent bias; as local hires of both Indian and non-Indian origin were ranked lower than expats." Ganapathy Dec. ¶ 16.

In summary, the termination class is unsupported by a common policy that affected class members in the same way. Fundamentally, no common evidence exists that answers whether South Asian visa holders were unlawfully preferred in any single instance.

## IV. DR. NEUMARK'S ANALYSES DO NOT SUPPORT CERTIFICATION.

Armed with the database created by TCS' expert regarding TCS' workforce and applicants, Dr. Neumark is unable to identify any pocket where TCS' hiring (or terminations) differs materially from TCS' actual labor pool. Instead, Neumark attempts to explain why including Deputies is appropriate, and plaintiffs tacitly concede that if Deputies are excluded, plaintiffs lack statistical evidence supporting their discrimination claim. While modern case law supports looking at the employer's actual labor pool, as opposed to generic data like the ACS survey relied on by Neumark, no authority supports using a foreign labor pool to demonstrate a statistical imbalance in hiring that occurs in the United States.

Dr. Neumark's supplemental report is also factually deficient. Basic labor economic literature has long recognized that an employee's experience with a client is significant and a recognized business advantage despite Dr. Neumark's suggestion to the contrary. *See* Rebuttal Declaration of Edward P. Lazear, ¶ 5. Deputies possess such experience in comparison to putative class members, and TCS' use of Deputies does not tell the fact finder anything with respect to discrimination against local non South Asians. Certification should be denied.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

5

TCS' SURREPLY IN OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
CASE NO.: 4:15-CV-01696-YGR

Dated: July 11, 2017

LOEB & LOEB LLP
MICHELLE M. LA MAR
LAURA A. WYTSMA
PATRICK N. DOWNES
ERIN M. SMITH

By: /s/ Michelle M. La Mar
   Michelle M. La Mar
   Attorneys for Defendant
   TATA CONSULTANCY SERVICES, LTD.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

6

TCS' SURREPLY IN OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
CASE NO.: 4:15-CV-01696-YGR

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system on July 11, 2017.

Dated: July 11, 2017             /s/Michelle M. La Mar
                                 Michelle M. La Mar

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

7

TCS' SURREPLY IN OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
CASE NO.: 4:15-CV-01696-YGR