1  MICHELLE M. LA MAR (SBN 163038)
   mlamar@loeb.com
2  LAURA A. WYTSMA (SBN 189527)
   lwytsma@loeb.com
3  PATRICK N. DOWNES (SBN 186461)
   pdownes@loeb.com
4  ERIN M. SMITH (SBN 235039)
   esmith@loeb.com
5  LOEB & LOEB LLP
   10100 Santa Monica Blvd., Suite 2200
6  Los Angeles, CA  90067
   Telephone: 310.282.2000
7  Facsimile: 310.282.2200

8  Attorneys for Defendant
   TATA CONSULTANCY SERVICES,
9  LTD.

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                         OAKLAND DIVISION

14  STEVEN HELDT, BRIAN BUCHANAN, and       Case No.:  4:15-cv-01696-YGR
    CHRISTOPHER SLAIGHT,
15                                          Hon. Yvonne Gonzalez Rogers
                   Plaintiffs,
16                                          **DECLARATION OF G. EDWARD
           v.                               ANDERSON, Ph.D. IN SUPPORT OF
17                                          TATA CONSULTANCY SERVICES,
    TATA CONSULTANCY SERVICES, LTD.,        LTD.'S SURREPLY IN OPPOSITION
18                                          TO PLAINTIFFS' MOTION FOR
                   Defendant.               CLASS CERTIFICATION**
19
20                                          Date:      August 22, 2017
                                            Time:      2:00 p.m.
21                                          Location:  Courtroom 1, 4th Flr., Oakland

22                                          Complaint Filed:    April 14, 2015

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

13582627.1
205625-10015

DECLARATION OF G. EDWARD ANDERSON, Ph.D.
CASE NO.: 4:15-CV-01696-YGR

**DECLARATION OF G. EDWARD ANDERSON, Ph.D.**

I, G. Edward Anderson, declare as follows:

1.      I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.  My qualifications and background information are unchanged from those provided in the Report I filed on March 20, 2017.

2.      I have reviewed Dr. David Neumark's Supplemental Report, filed June 22, 2017, and its associated tables and appendices.  I understand Dr. Neumark's Supplemental Report—which introduces modified analyses based on updated data files not available for his original Report—was partly intended to address criticisms that I made of his methodology and the conclusions he reached in that February 2017 Report.  Most importantly, Dr. Neumark's new Report re-asserts his belief that: "(i)<u>t is appropriate for deputees to be included in discrimination analyses</u>."[1]

3.      The question of whether it is appropriate to include Deputies in a class action matter alleging discrimination in local hiring and terminations must turn on whether this identifiable sub-group of U.S. Tata (hereafter, "TCS") employees is subject to the same hiring and termination policies and practices, throughout the purported liability period, as the group of non-South Asians who seek class treatment. I argued from both theoretical—but especially also on empirical—grounds,  that <u>only local South Asian TCS employees, and not Deputees, were appropriate for purported class comparisons with local non-South Asians</u>.  Nothing in Dr. Neumark's Supplemental brief changes that conclusion.

---

[1] Dr. David Neumark, Supplemental Brief, June 22, 2017, page 7.  I have removed the boldface type and added an underline to Dr. Neumark's statement.

1       4.      After a thorough review of his June 22, 2017 Supplemental Brief, I find

2  the updated analyses he presents cannot (and did not) generate reliable or accurate

3  evidence that local non-South Asians have been adversely affected in hiring or

4  terminations during the purported liability period.

5       5.      As I argued in my March 2017 report, such analyses in <u>hiring</u> would

6  require identifying the racial make-up of similarly-situated, local South Asian and non-

7  South Asian candidates interested, and available, for filling a specific job opening.

8  Such an opening in many instances involves recognition that the position is in a high-

9  tech consulting industry, must be filled at a specific point in time during the purported

10  liability period, and could be expected to involve frequent re-locations as short-term

11  U.S.-based assignments conclude.  Each of these factors can (and I believe does)

12  affect the potential makeup of local employment pools that TCS faces among its local

13  South Asian and non-South Asian candidates.

14       6.      Dr. Neumark's June 2017 Report ignores, rather than addresses, the

15  statistically significant racial differences I found arising from within TCS's local labor

16  market *candidate pools*:  these included significant race differences among applicants

17  by year, by job title, and/ or by source of applicants (i.e., among vendors,[2] college

18  recruiting, direct job board and social media applicants).  Similarly, Dr. Neumark has

19  yet to address significant differences I found among *selections* of South Asian and

20  non-South Asians—by year, by job title, and/or by source of applicants.

21       7.      Even at the most aggregated level, Dr. Neumark's Supplemental Report

22  fails to address the finding of my original report on hiring: that when aggregate hiring

23  of non-South Asians is compared with aggregate measures of non-South Asian

---

[2] In fact, Dr. Neumark did address one of my findings on candidate pool racial differences, as concerned the variability in percentage of South Asians reported by different vendor organizations.  As I show below, Dr. Neumark apparently did not recognize that the percentages shown in my Table 8 were for only the ten largest vendor-supplied pools from 340 different vendors used by TCS in the purported liability period.  The variability among all of these vendors greatly exceeded that from only the ten largest, as I show below.

1   availability, no obvious shortfall in hires of non-South Asian hiring was observed.[3]

2   Below, I present additional findings that confirm that even the *on-board*

3   *representation of non-South Asians itself* (regardless of selection rates from

4   appropriate candidate pools) is not consistent with discrimination in hiring under Dr.

5   Neumark's logic.

6       8.   Regarding terminations within the purported class period, Dr. Neumark

7   appears to again ignore the highly individual nature of termination decisions (and in

8   particular, the factors which lead to dramatically lower termination rates of U.S.

9   Deputee South Asian employees even when compared to local South Asians only)

10  and instead points to the relatively large proportion of TCS employees who are

11  South Asian and working within the U.S. as evidence that such a high relative

12  percentage of South Asian employees (critically, including Deputees as

13  indistinguishable from local South Asians) is "consistent" with discrimination in

14  terminations.  My first Report detailed several of the factors that partially account for

15  statistically significant observed differences between *local* South Asian and *local*

16  non-South Asian termination rates—none of which were addressed in Dr. Neumark's

17  June 2017 Supplemental Brief.  Instead, Dr. Neumark produces additional results—

18  based on newly produced data on termination of Deputees—that led him to once

19  again analyze aggregate termination rates of all South Asian employees compared

20  with local non-South Asian employees.

21      9.   Based on the data and testimony I have reviewed, I find that a randomly

22  selected Deputee within the purported class period (who is sent to and from the

23  United States, and/or other countries world-wide, with the understanding that TCS will

24  assign and re-assign the Deputee anywhere, and at any time, that his or her skill set

25  can be best used at a client site) is likely to terminate involuntarily at dramatically

---

[3] See March 2017 Report of G. Edward Anderson, Tables 2 and 8, where I showed aggregate vendor availability was 42.9% South Asian and selections from vendor sources were 43.3% South Asian (about the same).

1   lower rates than either local employees.  I believe this low termination rate is related

2   to the fact that a typical local TCS employee (who may be either South Asian or non-

3   South Asian) is likely to possess less relative experience with TCS, is likely to

4   possess less specific experience working with a U.S. client at the time re-assignment

5   decisions are required and that critically, local U.S. employees have the option of

6   accepting, or declining, re-assignments offered by TCS without the same contractual

7   consequences faced by Deputees.  Thus, unallocated Deputees and local TCS

8   employees are rarely similarly-situated from the employee side of the labor market.

9       10.     Deputees, as TCS employees transferred to the United States can, at

10  TCS's choice, be re-assigned to the home country or any other location world-wide

11  that TCS operates, should re-assignments not be available in the U.S.  Local South

12  Asian and non-South Asian TCS employees typically do not possess a visa that

13  would allow world-wide re-assignment, allowing these employees many fewer

14  potential re-assignments when compared with Deputees (and resulting in an almost

15  zero percent rate of involuntary terminations from the bench).  From the employer

16  side of the market, therefore, local South Asian and local non-South Asian TCS

17  employees are not similarly-situated with Deputees.

18      11.     Including Deputees in a common class action analysis, contrary to Dr.

19  Neumark's assertion, is not justified on either logically or empirically based

20  termination common evidence.  Below, I briefly and separately address the flaws in

21  Dr. Neumark's hiring and termination results as modified by his Supplemental Report.

22  Before this, however, I present separate findings on two Plaintiff claims that are

23  related to hiring practices.

24

25

26

1    *Claim:  E-Mails from Brian Galicki establish "shaping" of vendor pools and point*
2    *to discrimination in hiring.*
3
4    12.    Plaintiff's Class Certification Reply cites e-mails from a TAG Lead
5    named Brian Galicki as evidence that:
6
7    "… third party vendors forward to Tata a disproportionately
8    high percentage of South Asian applicants, which leads to
9    a disproportionate number of South Asian local hires."[4]
10
11    13.    I showed in my March 2017 Report that hires ("joins") of local South
12    Asians, as a group, represented a smaller percentage of hires (38.5%, in Table 2)
13    compared with measured Vendor availability (42.9%).  In response to Plaintiff's
14    specific claims about these e-mails, I re-investigated the offers and hires made
15    specifically by Brian Galicki in his role as a TAG Lead from candidates supplied by
16    IT Trailblazers, the vendor identified in Mr. Galicki's e-mails, from among the same
17    data sources analyzed in March 2017.
18    14.  **Table 1** displays the result of this analysis.  I found that of 5,851
19    candidates from IT Trailblazers, 41.7% were identified as South Asian.  By contrast,
20    the 466 candidates receiving offers of employment from Mr. Galicki (from any
21    source) were measured as being 38.3% South Asian.  Candidates accepting offers
22    from Mr. Galicki were measured as being 37.8% South Asian.  This table
23    demonstrates that IT Trailblazers, as a source of candidates, does not appear to
24    have provided an unusually high percentage of local South Asians to TCS, nor, from
25    among all of Mr. Galicki's sources of candidates, were the offers he made

---

[4] Plaintiffs' Class Certification Reply, page 4.

significantly higher in favor of South Asians (compared with measured availability)—in fact, his offers were lower, although not significantly statistically lower, than a perfectly unbiased selection rate would predict.[5]

*Claim: TCS's On-Board Employee Representation Is "Consistent with Discrimination":*

15.  Dr. Neumark asserts that the large difference he measures between the percentage of U.S. TCS employees who are South Asian (76.4% by his measure) and his preferred measure of South Asian availability (15.8% in the Supplemental Brief, up from 12.8% in his February 2017 Report) constitutes "strongly statistically significant evidence consistent with TCS discriminating in favor of South Asians in hiring."[6]  Two important contradictions to this claim are provided by the data.

16.  First, the measured percentage of South Asians in TCS's workforce is highly influenced by the large presence of Deputees (sometimes referred to as "Expats").  These are experienced TCS employees who are transferred to (and from) the United States to work under temporary visas, often doing the same work, for the same client, as was being done in the home country.[7]  It should surprise no one to learn that as individuals, the measured race of Deputees is almost always South Asian, as these employees were hired from labor markets overseas that themselves were overwhelmingly likely to be populated by South Asians.[8]  Removing the effect on aggregate measured race attributable to Deputees causes TCS's U.S.

---

[5]  Statistical testing confirms that although Brian Galicki's selection rate of South Asians was lower than availability pools would have predicted, the differences were below two standard deviations.  This result is consistent with the statement that Mr. Galicki's selections of candidates from the TCS data were not consistent with an adverse selection rate of non-South Asians.

[6]  Dr. David Neumark, Supplemental Brief, page 2.

[7]  See Table 2 below, where 71.9% of Deputees are transferred from the home country to work in their first U.S. assignment for the same client.

[8]  Of all 43,392 Deputees in the Employee List data, 42,177 are South Asian (or 97.2%).

1    composition of local, American employees to fall, according to my estimates, from

2    81.7% South Asian, to about half of this, at 43.9% South Asian.[9]

3         17.  Second, Dr. Neumark's ACS-based availability estimate for South

4    Asians—increased in his Supplemental Report from 12.5% to 15.8%--is nowhere

5    near the percentage of South Asians found in the TCS data who approached TCS

6    via job boards and/or came from social media sites, as I documented in my March

7    2017 Report.  This group of candidates, which was shown to be 49.7% South

8    Asian,[10] provides a reliable measure of the racial makeup of candidates who are

9    interested in being considered for hire in TCS's positions; critically, these applicants

10   offer a non-"shaped" applicant pool, since each person self-selected to approach

11   TCS.

12        18.  What is likely to account for the strikingly higher percentage of South

13   Asian applicants for TCS positions versus Dr. Neumark's ACS measure of

14   availability (15.8%)?  I believe the answer lies in recognizing that actual applicants to

15   TCS understand the positions they are applying for will involve a consulting

16   environment in high tech positions that may require frequent re-location and are

17   likely to involve workplaces where at least three of out every four co-workers are

18   South Asian (using Dr. Neumark's estimate of 76.4%).  Regardless of the reasons,

19   candidates who self-select via job boards and through social media are 49.7% South

20   Asian—and not 15.8%, as Dr. Neumark might expect based on his ACS measure of

21   availability.  Discrimination should play no role in the percentage of South Asians

22   who have self-selected to become TCS job candidates.

---

[9] These percentages come from employees found in Employee List TCSPROD000000159, which is more recently updated list than Dr. Neumark relied upon.  The 43.9% South Asian measure includes permanent resident visa holders who are considered "local" but are shown below to be more than 98% South Asian.

[10] See March 2017 Report of G. Edward Anderson, Table 11. The percentage of 49.7% is calculated using a weighted average of the race of Job Board and Social Networking candidates.

1    19.  I do not suggest that comparing TCS's on-board employee counts with

2    appropriately defined applicant pools[11] constitutes a reliable measure of

3    discriminatory impacts, but it is striking how much different TCS's racial comparisons

4    look when only on-board, local South Asians (approximately 43.9%, above) are

5    compared with self-selected applicants through job boards and social media

6    (approximately 49.7%, above).  Without Deputees, the percentage of South Asians

7    employed by TCS appears entirely consistent with self-reported percentages of

8    available candidates for TCS positions.

9

10    **Hiring:**

11

12    20.     Although he presents no direct hiring analysis of South Asian and non-

13    South Asian TCS employees, Dr. Neumark asserts that Deputees should be included

14    in hiring analyses because the data demonstrates:

15

16         "... that deputees and local hires fill the same types of

17         positions, that deputees work in the United States for many

18         years (and are thus not temporary), and that both deputees

19         and local hires are subject to the same allocation and

20         unallocation processes...."[12]

21

22

23    21.  The statement above overlooks at least three critical facts the data

24    clearly makes:  (1) Deputees are, by definition, hired in South Asian labor markets,

---

[11] Several of the applicant pool percentages I estimated in my March 2017 Report were similar to the self-selected applicant measure.  See Table 11 in the Report of G. Edward Anderson, March 2017.
[12] Supplemental Report of Dr. David Neumark, paragraph 9 boldface, and page 7.

1    typically work for several years in the home country prior to being transferred to the

2    U.S., and (2) often transfer into a first U.S. assignment to work at an existing

3    client's workplace.[13]  (3) The data continue to reveal, consistent with my March

4    2017 Report, that significant differences in race were seen among applicants and

5    subsequent hires by job, over time, and by source.

6         22.     Although it seems obvious, including Deputee and non-Deputee

7    South Asian employees in a common hiring analysis versus non-South Asians

8    (without differentiating which South Asians are actual local hires and which are

9    Deputees) leads to greatly exaggerated empirical differences in hiring outcomes in

10   favor of South Asians, since Deputees were virtually all selected from labor

11   markets that were, in reality, almost entirely populated by South Asian

12   candidates.[14]  Any measured excess of South Asians selection rates (including

13   Deputees), at least when compared to an U.S.-based applicant pool, provides no

14   information at all when adjudicating whether discrimination played a role in local

15   hiring outcomes for local South Asian and non-South Asian candidates.

16        23.     Dr. Neumark's Supplemental Report took issue with one of the

17   analysis results from my March 2017 Report, wherein I found that significant

18   variability existed between the percentage of South Asian candidates, among

19   vendors.[15]  Noting that "9 out of the 11 percentages are between 41.7 and 45.4%,"

20   Dr. Neumark stated "my professional assessment is that any reasonable labor

21   economist would view the percentage of South Asians in Table 8 as substantively

22   similar…."[16]

---

[13] See Table 2, below, for additional detail.

[14] On-board U.S.-based Deputees are approximately 97% South Asian.  It is reasonable to assume the labor markets from which they were hired were populated almost entirely by South Asian candidates.  My March 2017 Report found local labor market availability for TCS positions to be far lower at approximately 40% South Asian.

[15] See Table 8 in the Report of G. Edward Anderson, March 2017.

[16] Supplemental Report of Dr. David Neumark, page 10.

24.     I apparently failed to make clear that the ten vendor percentages shown in Table 8 of my March 2017 Report were merely the ten *largest* vendors among the three hundred and forty (340) vendors identified in the data.  Had I used even the 100 hundred largest vendors, for example, variation like that shown in **Figure 1** would have been clear.

25.     In Figure 1, the percentages of South Asian candidates, by vendor, range from 11.6% to 65.0%.[17] The vendors in my Report's Table 8 are shown in red highlighted bars (the height of which is the percentage South Asian for the individual vendor) and the Figure indicates the overall weighted mean South Asian job board and social networking pool was 49.7% South Asian—a percentage larger than any of the 10 vendors I showed in Table 8.  If I inadvertently gave the impression that TCS used only a small number of vendors or that there was not significant variability in the representation of South Asian and non-South Asian candidates on a vendor-by-vendor basis—especially when all vendors in the data were examined—the oversight was not intentional.

26.     Dr. Neumark's belief that Deputees should be included in analyses of discrimination among local employees ignores a fundamental distinction that separates Deputees from non-Deputees:  namely, that as experienced employees transferred to and from the United States, Deputees are not only highly familiar with TCS employment, but they are highly likely to have previously worked for the same client in the home country as when transferred to an initial U.S. assignment.

27.     See **Table 2**, where I display the results of analyzing how frequently Deputees are initially assigned to work with a client for whom the Deputee has prior work experience.  In the Table looking at 6,161 Deputees' first

---

[17] I restrict the analysis above to the 100 most frequent vendor names to ensure the percentage of South Asian candidates is based on individual samples of at least 30 persons.  The 11.6% comes from 39 Impact Personnel candidates, and the 65.0% comes from 391 SVAM International candidates.

1    assignments from combined Manpower and Allocation files[18], fully 71.9% involved

2    an experienced employee whose assignment at his/her first U.S. client appears to

3    have constituted continuing work for the same client as the Deputee had worked

4    with remotely in the home country.   The percentage of same-client relationships

5    holds across 99.1% of Deputees analyzed.  Across jobs, 69.5% of Deputees in

6    Consultant positions, 71.5% of Deputees in IT/System Analyst, and 73.8% of

7    Deputees initially assigned as System Engineers worked for the same client

8    before, and during, the initial assignment.  Table 2 also makes clear that a typical

9    Deputee has more than 3.11 years of experience and has completed, on average,

10   more than five (5.1) projects in the home country before his/her assignment to the

11   U.S.[19]

12        28.        Dr. Neumark's stated opinions (above), suggesting that specific

13   TCS and client experience can be reasonably substituted by hiring a local

14   employee, is entirely inconsistent with testimony of Umesh Kumar:

15

16            "You see, TCS, when they win any projects from the

17            customer, the customer has given the project to TCS

18            to execute based on its capability of delivering the

19            projects with their methodology, their experience, what

20            they are getting with people who are involved with

21            TCS, so primarily they are looking for people who are

22            involved in TCS who have TCS experience in their

23            projects".[20]

---

[18] Manpower Reports (TCSLTD003718949 - TCSLTD003725887, TCSPROD000000001–38, TCSLTD003463539 - TCSLTD003463998), Allocation History (TCSPROD000000143, 144, 145, 148).

[19] I document below how frequently these client/Deputee relationships continue to show re-assignments after the initial assignment in the U.S., leading to very different allocation and unallocation effects between Deputees and local employees.

[20] Deposition of Umesh Kumar, January 25, 2017, page 84.

1

2          Contrary to Dr. Neumark's opinion, Mr. Kumar makes abundantly clear that

3   not only is prior TCS experience important to TCS's clients, it may be *the most*

4   *important* asset a Deputee possesses (and one which a new hire from a local

5   market is extremely unlikely to possess).  When a Deputee is initially assigned to a

6   project with the same client in the U.S. that he or she has already worked for

7   overseas, the assignment offers clients an opportunity to work side-by-side with

8   knowledgeable consultants and to do so in the U.S. location, rather than continuing

9   to work with TCS consultants overseas.  With this recognition, it must be clear that

10  in the case of many Deputees, the decision by TCS to effectively transfer an

11  experienced employee to a U.S. location is a starkly different action than attempting

12  to hire and subsequently train, a local employee.  Said another way, Deputees in

13  this situation are not similarly-situated to local job candidates that will not possess

14  direct TCS or client experience on projects that are likely to be on-going.

15          29.     In sum, Deputees have no place in analyses that assert discrimination

16  in the hiring decision made about <u>local</u> South Asian and <u>local</u> non-South Asian

17  applicants.  Deputees as a group are not similarly-situated to either local South Asian

18  or local non-South Asians in being initially assigned to their first position in the U.S.

19  Including Deputees as if they are "local new hires" could only act to inflate any

20  measure of South Asian hiring far above representation in a local labor market.

21

22  **Terminations:**

23

24          30.     I argued in my March 2017 Report that an analysis of discrimination in

25  terminations of U.S. TCS employees should exclude Deputees.  In his Supplemental

26  Report, Dr. Neumark presents the results of analyzing a newly-produced data file on

1    Deputee terminations that occurred both inside, and outside, the United States. [21]

2    On the basis of these newly-analyzed terminations of Deputees, he asserts that :

3

4              "… adding in deputee terminations classified as occurring

5              outside the United States does not materially affect the

6              conclusions of the analysis of terminations.  Non-South

7              Asian TCS employees are still significantly more likely to be

8              terminated than their South Asian counterparts, consistent

9              with discrimination against non-South Asians in

10             terminations."[22]

11

12    *31.*    Dr. Neumark appears to be making the same logical error in

13    terminations that he makes in his conclusions about hiring discrimination.

14    Specifically, by failing to recognize that the employment role played by a Deputee is

15    that of a <u>transferred employee,</u> and not an employee hired and terminated only within

16    the United States, it is folly to expect that Deputees and local South Asians together,

17    as a group—could present the proper comparison for local non-South Asians.[23]

18    32.    <u>Deputees demonstrate group characteristics that are clearly</u>

19    <u>distinguishable.</u>  A typical Deputee is an employee who has agreed to move to the

20    United States and then re-locate within the U.S. whenever, and wherever, the

21    company believes it can best use that employee's skills.  If no suitable U.S. position

22    can be found for an unallocated Deputee, re-assignment to an open position world-

23    wide is possible (and likely), especially if a re-assignment is available in the home

---

[21] As noted, the most current data shows only two (2) involuntary terminations of Deputees in the U.S. during the purported liability period.  This comes from Separation File TCSPROD000001971.

[22] See Supplemental Report of David Neumark, June 2017, page 4.

[23] This should not be taken as an opinion that discrimination in terminations can be decided in this matter on the basis of common data; I continue to believe, as stated in my March 2017, that only a narrow analysis of potentially individual terminations can answer what role if any discrimination played in specific terminations.

country.  The U.S. *local* employee, by contrast, has made no agreement to move at the choice of TCS and in any event, is likely to face a smaller market for his/her skills in the United States.  Recognition of these differences in re-assignment options makes a sworn statement by Umesh Kumar, when commenting on why we very rarely see involuntary terminations of Deputies in the United States, obvious:

> "The expat, if we are not able to find a project for them, they are asked to go back to the base branches.  The local hire, every attempt will be taken and a sincere attempt to find them and help them find an active assignment."[24]

33.     The empirical findings in Dr. Neumark's Supplemental Report Table 2 compares termination rates of <u>all </u>South Asians to non-South Asians and he finds that the termination rate for South Asians is lower by 13.20 percentage points, or 62 standard deviations  compared with non-South Asians—virtually all of whom are local employees. [25]  This difference in measured termination rates is unsurprising, since it is driven by Dr. Neumark's inclusion, without distinction, of Deputies among local South Asians as the comparison group for non-South Asians.

34.     The data made available to Dr. Neumark and me show several characteristics of Deputies that distinguish them not only from non-South Asians, but also from local South Asians.  I believe these differences make Dr. Neumark's inclusion of Deputies in analyses like his Table 2 entirely misleading:

---

[24] Deposition of Umesh Kumar, January 25, 2017, page 76.
[25] Neumark Supplemental Report, page 4.

1       •     As noted above, Dr. Neumark apparently believes that including

2     "almost 40 ex-pats who were involuntarily terminated"[26] out of a pool of more

3     than 41,000 Deputees working in the U.S. during the liability period—an

4     amazingly low termination rate of Deputees, of approximately .01%--supports a

5     conclusion that "non-South Asian TCS employees are still significantly more

6     likely to be terminated than their South Asian counterparts, consistent with

7     discrimination against non-South Asians in terminations."[27]

8     While Deputees constituted an enormous share of non-terminations (*i.e.,*

9     more than 43,000 of these South Asians never involuntarily terminate in the

10     data), no similar sub-group of non-South Asians are present.[28]  To illustrate this

11     point, consider that if 43,392 Deputees—almost all of whom are South Asian—

12     involuntarily terminate from the bench in the United States at a rate of 0.00%

13     and in the same period 6,068 local South Asians involuntarily terminate at a

14     rate of 7.8% (as I showed in Table 19 of my March 2017 Report[29]), the

15     difference in these rates (of 7.8%) corresponds to a difference of 58.46

16     standard deviations.  A difference of this magnitude—like the difference Dr.

17     Neumark cites when comparing South Asian to non-South Asian termination

18     rates—"cannot be due to chance."  At the same time, it cannot be due to

19     discrimination on the basis of race (because Deputees are almost entirely

20     South Asian).  Instead, this difference in termination rates occur because

[26] Dr. Neumark relies on an earlier version of Separation information; as shown in Appendix Table A, of the 37 involuntary terminations of "Ex-pats", 33 were actually voluntary and 2 were separated outside of the USA, according to the most recent data source.

[27] Supplemental Report of Dr. Neumark, page 4.  Note that Dr. Neumark appears to say that that regardless of their TCS experience or skill sets, that all local South Asian and non-South Asian employees are "counterparts" to Deputees.

[28] That is, the tiny fraction of Deputees who are Non-South Asian cannot counterbalance the effect of the overwhelmingly large effects on termination of South Asian Deputees.

[29] See Report of G. Edward Anderson, March 2017, Table 19.  In fact, that table only analyzed terminations from the bench; neither of the two involuntary terminations of Deputees appears to have been while they were benched.

15

1    Deputees and local employees are not subject to the same termination policies

2    and practices, differ on average time working with TCS and more importantly,

3    do not have the same alternatives or incentives for re-assignment after

4    becoming unallocated

5    •    Dr. Neumark recognizes in his Supplemental Report that Deputees

6    "are unallocated less often, for shorter periods and are fired less often."[30]   The

7    measures of these differences in his Appendix Table A3—specifically, that

8    Deputees are shown as unallocated for 16.39 days, versus 29.47 days for

9    local South Asian and non-South Asian employees, on average—is entirely

10   consistent with the notion that Deputees are facing a world-wide market for re-

11   assignment (that local employees do not) and that Deputees are far less likely

12   to decline re-assignment compared with local employees, who are free to do.  I

13   believe Deputee's client and location assignments help to explain why

14   Deputees, as a group, typically show shorter unallocation spells than local

15   employees.

16   Consider **Table 3,** which compares the likelihood that *re-assignments*

17   are made not only within the same geographical area, but when re-

18   assignments are also made to the same client.  According to the full

19   Manpower data (described in my Original Report[31]), Deputees are far more

20   likely than local employees to be re-assigned to the same location and same

21   client as before the unallocation spell began.  As shown in the Table, 74.9% of

22   reassignments of Deputees are made to the same location and client, versus

23   only 60.2% of such re-assignments being made for local employees who are

24   unallocated in the purported liability period.

---

[30] Supplemental Report of David Neumark, page 7.
[31] Manpower Reports (TCSLTD003718949 - TCSLTD003725887, TCSPROD000000001–38, and TCSLTD003463539 - TCSLTD003463998).

1

2       **Conclusions**

3

4       35.     The presence of Deputees in both his hiring and termination

5   studies distorts measured differences of South Asian and non-South Asian

6   outcomes.   In addition, any analysis (of hiring, or terminations) must account

7   for all relevant factors that ensure 1) candidates for hire, 2) selected candidates

8   offered positions, and 3) U.S. based employees facing potential termination,

9   are similarly-situated.   This will generally require individual inquiry as to the

10  relevant skills and experience needed for open positions (hiring) and the

11  specific circumstances contributing to each employee's termination.

12

13      I declare under penalty of perjury under the laws of the United

14  States of America that the foregoing is true and correct.

15

16      Executed July 11, 2017 at Los Angeles, California.

17

18

19      _____

20      G. Edward (Ted) Anderson, Ph.D.

17

**Table 1**

***Candidates Recruited by Brian Galicki: Percent South Asian***

| | Count | % South Asian | % Non-South Asian |
|---|---|---|---|
| All Vendor Candidates | 252,113 | 42.9% | 57.1% |
| Candidates Recruited by IT Trailblazers | 5,851 | 41.7% | 58.3% |
| Offers | 466 | 38.3% | 61.7% |
| Joiners | 367 | 37.8% | 62.2% |

| *Two-sample Test of Proportions* | Standard Deviations |
|---|---|
| IT Trailblazers candidates vs. offers | 1.42 |
| IT Trailblazers candidates vs. joiners | 1.46 |

Notes:

* Percent South Asian is determined using the name-matching algorithm described in Appendix 4 of the March 21, 2017 declaration of G. Edward Anderson.

* "Recuiter" field is used to determine offers associated with Brian Galicki.

* "Offer Status" field is used to determine joiners associated with Brian Galicki.

**Sources**:   Offers Extended (TCS021915, TCSLTD000625561, and TCSLTD000623535), 012 Candidate Tracker (TCSLTD000618191 - TCSLTD000625711), and Consolidated Vendor Candidate Data (TCSLTD003463396 - 97).

**Table 2**
**Deputees Atttributes at First U.S. Project**

| Job | Count | Job Percentage | Existing TCS Attributes (Average) at First U.S. Project | | |
| --- | --- | --- | --- | --- | --- |
| | | | Years of TCS Experience | Number of Completed Projects | Worked for same employer |
| *Consultant* | 1,000 | 16.2% | 2.96 | 5.5 | 69.5% |
| *IT/Systems Analyst* | 2,682 | 43.5% | 3.06 | 5.2 | 71.5% |
| *Systems Engineer* | 2,421 | 39.3% | 3.23 | 5.0 | 73.8% |
| *Total* | 6,161 | 99.1% | 3.11 | 5.1 | 71.9% |

NOTES
* Deputees were removed from Employee counts if they were not found in the data.
* Deputees were removed from Employee counts if they did not join in between 4/14/2011 and 12/31/2016.
* Deputees were removed if they did not have any employement history outside of the USA, if they are seen in the US before working abroad, or if their first US project is missing a customer name.

**Sources:** Employee List received on 2/10/17 (TCSPROD000000159),  Manpower Reports (TCSLTD003718949 - TCSLTD003725887, TCSPROD000000001–38, TCSLTD003463539 - TCSLTD003463998), and Allocation History (TCSPROD000000143, 144, 145, 148).

**Table 3**
**Average Unallocation Experiences, Successful Re-Assignments**

| Employee Type | Total Count [1] | Different Location, Different Client | | | Same Location, Same Client | | |
|---|---|---|---|---|---|---|---|
| | | Count | % | Avg. Unallocation Length (in weeks) | Count | % | Avg. Unallocation Length (in weeks) |
| Deputees | 89,443 | 12,003 | 13.4% | 2.83 | 66,998 | 74.9% | 1.67 |
| Locals | 40,482 | 12,579 | 31.1% | 3.51 | 24,380 | 60.2% | 1.84 |

Notes:

[1] The total count of unallocation spells includes two more types of spells ("Different Location, Same Client" and "Same Location, Different Client")

* Counts exclude employees listed as "Business Associates" and employees who terminated before 4/14/11.
* Observations were removed from analysis if the project did not take place in the United States.
* "Different Location, Different Client":  Both the location and the client of the project that precedes the unallocation spell are different than the location and client of the project that directly follows.
* "Same Location, Same Client":  Both the location and the client of the project that precedes the unallocation spell are the same as the location and client of the project that directly follows.

**Sources**: Employee List received on 2/10/17 (TCSPROD000000159), Separation Details (TCSPROD000001971, TCSPROD000001979, TCSPROD000001985), and Manpower Reports (TCSLTD003718949 - TCSLTD003725887, TCSPROD000000001–38, TCSLTD003463539 - TCSLTD003463998).

**Appendix Table A**

**Deputees who Neumark claims to be Involuntarily Terminated**

*Note: TCSPROD000001971 is the updated US Separation Details File for Expats, received on 5/26/17 (relied upon by Dr. Anderson).*

*Note: TCSLTD003463400 is the Separated Employee List received on 1/24/17 (relied upon by Dr. Neumark).*

| Employee Number | Employee Type | Separated in USA? TCSPROD000001971 | Separation Category TCSPROD000001971 | Separation Category TCSLTD003463400 | Reason for Separation TCSPROD000001971 | Reason for Separation TCSLTD003463400 |
|---|---|---|---|---|---|---|
| 131114 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Redundant Skills |
| 153509 | Expat | Separated in USA | Voluntary | Involuntary | Job Abandonment | Reasons Not Known |
| 156850 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Poor Performance |
| 165466 | Expat | Separated outside USA | Involuntary | Involuntary | Disciplinary Action | Other Reasons |
| 174073 | Expat | Separated in USA | Voluntary | Involuntary | Job Abandonment | Reasons Not Known |
| 190295 | Expat | Separated in USA | Voluntary | Involuntary | Job Abandonment | Reasons Not Known |
| 190490 | Expat | | | Involuntary | | Poor Performance |
| 195912 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Poor Performance |
| 197381 | Expat | Separated in USA | Involuntary | Involuntary | Disciplinary Action | Other Reasons |
| 199361 | Expat | Separated in USA | Voluntary | Involuntary | Job Abandonment | Reasons Not Known |
| 205567 | Expat | Separated in USA | Voluntary | Involuntary | Job Abandonment | Reasons Not Known |
| 209038 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Poor Performance |
| 221423 | Expat | Separated in USA | Voluntary | Involuntary | Job Abandonment | Reasons Not Known |
| 224602 | Expat | Separated in USA | Voluntary | Involuntary | Poor Performance | Poor Performance |
| 228513 | Expat | Separated in USA | Involuntary | Involuntary | Poor Performance | Poor performance |
| 236763 | Expat | Separated in USA | Voluntary | Involuntary | Poor Performance | Poor Performance |
| 249482 | Expat | Separated in USA | Voluntary | Involuntary | Disciplinary Issue | Disciplinary Issue |
| 325820 | Expat | | | Involuntary | | Poor Performance |
| 332215 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Poor Performance |
| 339650 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Redundant Skills |
| 349778 | Expat | Separated in USA | Voluntary | Involuntary | Poor Performance | Poor Performance |
| 351547 | Expat | Separated in USA | Voluntary | Involuntary | Poor Performance | Poor Performance |
| 352271 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Disciplinary Issue |
| 358932 | Expat | Separated in USA | Voluntary | Involuntary | Job Abandonment | Disciplinary Issue |
| 370138 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Disciplinary Issue |
| 389698 | Expat | Separated in USA | Voluntary | Involuntary | Job Abandonment | Reasons Not Known/ Other Reason |
| 391418 | Expat | Separated outside USA | Involuntary | Involuntary | Disciplinary Action | Sexual Harassment |
| 474815 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Poor Performance |
| 479668 | Expat | | | Involuntary | | Reasons Not Known/ Other Reason |
| 482533 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Other Reasons |
| 485280 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Poor Performance |
| 662117 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Disciplinary Issue |
| 709809 | Expat | Separated in USA | Voluntary | Involuntary | Better Career Opportunities | Inter-Tata Transfer |
| 720703 | Expat | Separated in USA | Voluntary | Involuntary | Dissatisfaction With Job / Company/Supervisor | Dissatisfied with Company |
| 819088 | Expat | Separated in USA | Voluntary | Involuntary | Other Reasons/Not Disclosed | Reasons Not Known |
| 821268 | Expat | | | Involuntary | | Poor performance |
| 826197 | Expat | Separated in USA | Voluntary | Involuntary | Job Abandonment | Other Reasons |



Figure 1: Percent South Asian of Candidates
By Vendor Agency

(Compared to the 49.7% South Asian of Job Board/Social Networking Candidates)

Vendors not in Table 8 of March 2017 Report
Vendors in Table 8 of March 2017 Report

** Note: Vendor Agencies with under 30 candidates are excluded from analysis.

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system on July 11, 2017.


Dated: July 11, 2017          /s/Michelle M. La Mar
                              Michelle M. La Mar

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations