Pages 1 - 57

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
STEVEN HELDT, et al.,          )
                               )
          Plaintiffs,          )
                               )   No. CV 15-1696 YGR
     vs.                       )
                               )
TATA CONSULTANCY SERVICES,     )
LTD.,                          )
                               )   Motion Hearing
          Defendant.           )
_____)
```

Oakland, California
Tuesday, October 3, 2017
3:22 p.m.

### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:            KOTCHEN & LOW LLP
                           1745 Kalorama Road, NW, Suite 101
                           Washington, DC 20009
                     BY:   **DANIEL A. KOTCHEN, ATTORNEY AT LAW**
                           **DANIEL L. LOW, ATTORNEY AT LAW**


For Defendant:             LOEB & LOEB LLP
                           10100 Santa Monica Blvd., Suite 2200
                           Los Angeles, California 90067
                     BY:   **MICHELLE M. LA MAR, ATTORNEY AT LAW**
                           **ERIN M. SMITH, ATTORNEY AT LAW**
                           **TERRY D. GARNETT, ATTORNEY AT LAW**
                           **PATRICK DOWNES, ATTORNEY AT LAW**

Reported by:  Sarah Goekler, CSR No. 13446, RMR, CRR, CCRR
              Official Reporter

*Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription*

<u>**Tuesday, October 3, 2017**</u>                                    <u>**3:22 p.m.**</u>

                              **P R O C E E D I N G S**

                              ---o0o---

        **THE CLERK:**  Calling Civil Action 15-1696, Heldt vs.
Tata Consultancy Service.

    Counsel, please come forward and state your appearances.

        **MR. KOTCHEN:**  Good afternoon, Your Honor.  Daniel
Kotchen and my colleague Daniel Low on behalf of the
plaintiffs.

        **THE COURT:**  Okay.  Good afternoon.

        **MS. LA MAR:**  Good afternoon, Your Honor.  Michelle
La Mar on behalf of Loeb & Loeb for the defendant, Tata
Consultancy Services.  And with me are Erin Smith, Patrick
Downes, and Terry Garnett.

        **THE COURT:**  When you turn your head, we can't hear
you.

        **MS. LA MAR:**  I'm sorry, Your Honor.

        **THE COURT:**  So I have Erin Smith.  Who's next to her?

        **MS. LA MAR:**  Patrick Downes and Terry Garnett.

        **THE COURT:**  Okay.  Thank you.

    All right.  Let's start with the motion to amend.  With
respect to that motion, I am tentatively inclined to deny as to
adding a cause of action but granting as to two of the three
named or suggested plaintiffs.

        We'll start with you, Mr. Kotchen.

1          MR. KOTCHEN:  Okay.  Is there a -- two of the three?

2    Do you know which two you were --

3          THE COURT:  Well, the one that doesn't have an

4    arbitration agreement -- or the one that does have an

5    arbitration agreement, seems to me, might be futile to allow

6    him.  I think that's Webber.  I could probably let it in

7    tentatively and you guys could litigate it, but that would be

8    the reason not to include it.

9          MR. KOTCHEN:  Your Honor, just on that issue, I would

10   direct you to *Morris vs. Ernst & Young*.  It's a Ninth Circuit

11   decision that held that class action waivers are not

12   enforceable.

13         THE COURT:  Well, they didn't say that *Morris* -- the

14   issue with *Morris*, it seemed to me, was about collective

15   action.  You can bring collective actions in arbitration.

16         MR. KOTCHEN:  The class -- the waiver here applied to

17   collective actions as well.  There's no collective action that

18   could be advanced on behalf of -- on behalf of the named

19   plaintiff.

20         THE COURT:  Response.

21         MR. GARNETT:  Well, Your Honor, Mr. Webber has signed

22   a valid arbitration agreement, and it -- whether it's a class

23   action or not, he's given up his claims to -- or given up his

24   right to pursue claims in this court.  So we suggest the

25   amendment on his claim would be futile, along with, you know,

1  the other proposed plaintiffs, having waited and delayed in

2  bringing --

3          **THE COURT:**  Well, there really isn't evidence of

4  prejudice with respect to the other two and, certainly, unlike

5  trying to bring in, you know, a new claim at this juncture

6  after two years.

7      So go ahead.

8          **MR. GARNETT:**  Well, we agree with Your Honor in terms

9  of the claim, for sure, especially where they've disavowed the

10  claim.  And we've proceeded bringing dispositive motions when

11  the plaintiffs, at least the lead plaintiffs, have

12  flip-flopped.

13      In their EEOC charges the original plaintiff, Mr. Heldt,

14  proposed bringing a disparate impact claim.  Tata then moved to

15  dismiss what we perceived to be a disparate impact claim.  And,

16  in opposition, plaintiffs were surprised what their language

17  was, that we're moving to dismiss such a motion -- or moving to

18  dismiss such a claim because they said they weren't bringing

19  one.

20      So they filed a new complaint.  Mr. Buchanan was now a

21  plaintiff, a month after his EEOC charge was filed where he

22  asserts disparate impact.  And in our motion papers, we point

23  out that they've claimed not to be bringing this.  The Court

24  ruled on the motion.  We've advanced; they amended again.

25  *Don't bring up disparate impact*.  And now here we are in 2017

1    where the very claim that they disavowed two years ago is the

2    one they want to bring in front of this Court.

3         So, on those facts, the Court's tentative is absolutely on

4    point.

5              **MR. KOTCHEN:**  Your Honor, we're just content on the

6    district treatment claim.  We'll happily oblige by Your Honor's

7    tentative ruling.

8              **THE COURT:**  All right.  I will go back and look at

9    his arbitration agreement, the actual language, and see if it's

10   as broad as I thought it was.

11        But I don't know if you want to be heard on that topic.

12             **MR. KOTCHEN:**  Your Honor, I can pull it up if it

13   would be of interest, the actual language.

14             **THE COURT:**  No.  I'm just asking if you want to be

15   heard.  I'll take a note.

16             **MR. KOTCHEN:**  I'll just defer to the actual exhibit.

17             **THE COURT:**  Okay.  All right.  Then let's go ahead

18   and move to the motion to exclude.

19        On this motion, I'm tentatively inclined to deny the

20   motion.

21        It seems to me what we have here is a, you know, classic

22   battle of the experts case.  You don't like the variables.

23   They claim they take issue with a number of the variables.

24   Well, that's what you get to argue about.

25             **MR. DOWNES:**  I think the problem here is the

methodology.  And the issue really centers on the inclusion of deputies in the analysis.  And I think it makes sense to go back and remember what this case is about.  The plaintiff needs to show that TCS engaged in a pattern and practice of discrimination.

THE COURT:  For that to show at this point is a prima facie case.

MR. DOWNES:  Prima facie case.  That's correct, Your Honor.

THE COURT:  And the burden for a prima facie case is quite low, at which point the burden shifts to you.

MR. DOWNES:  The case law is pretty clear that statistics alone showing a workforce with racial disparities is not enough to establish a prima facie case.

THE COURT:  Well, they have more than that.  I have to tell you, the leadership guidance -- perhaps the analysis is different depending on whether we're talking about the hiring class versus the termination class.  I'll let you know right now we're not there yet, but I have real concerns about this hiring class; fewer concerns with the termination class.  And, in part, because of the documentary evidence that they have to support the statistical evidence.

MR. DOWNES:  Well, I would take issue with that.  I think what they have are --

THE COURT:  I'm sure you do.  That's why we have

1  trials.

2       **MR. DOWNES:**  Yes, Your Honor.  But I think what they

3  have are a few emails.  I don't think that is a leadership

4  directive to prefer South Asians over non-South Asians.

5       **THE COURT:**  Because a lot of these folks are all over

6  the country.  And these days we write everything in letters

7  that we put in the U.S. Postal Service.

8     I mean, emails can be interpreted, depending on the

9  circumstances, as providing policy guidance.

10       **MR. DOWNES:**  Yes.  But there are hundreds of

11  thousands of emails produced in this case.  They have a few

12  emails suggesting that they prefer visa-ready in certain

13  circumstances over local employees or people in the

14  United States.  That does not make a policy.

15      And, in fact, that sets up what I was about to turn to,

16  which is, what we have here is a termination class and a hiring

17  class that they're trying to certify.  What they're pointing to

18  are statistics or emails that relate to staffing.  That's not

19  hiring.  That's not terminating.  That's staffing --

20       **THE COURT:**  Isn't the policy --

21       **MR. DOWNES:**  -- in the U.S.

22       **THE COURT:**  -- isn't there evidence in the record

23  that, if you are not hired, if you are not on a team for a

24  certain period of time, then you're on the list to be

25  terminated?

```
1        If you're not staffed, then, ultimately, you're
2   terminated.  You cannot disassociate those two things.  I mean,
3   you might if you're a lawyer.  But the reality is, is that if
4   you were never staffed, ultimately, you get terminated.
5            MR. DOWNES:  Okay.  If you were looking at
6   terminations, yes.  If you're benched for a significant amount
7   of time and --
8            THE COURT:  Right.
9            MR. DOWNES:  -- there's no work for you, you will be
10  terminated.  But there's nothing to suggest that those
11  terminations disfavor non-South Asians.
12      I don't think -- I don't think those emails go to that
13  point.  What those emails suggest is that TCS is a
14  project-based business.  They staff projects.  They don't hire
15  people to staff projects unless they need to.
16      By including in his analysis -- Dr. Neumark, by including
17  in his analysis, staffing decisions, he's ignoring the fact
18  that there's no hiring going on when you staff --
19            THE COURT:  The questions I address at this stage are
20  twofold.  I mean, we're talking about the motion to exclude.
21      But, at class certification, I am looking about -- I am
22  looking to whether or not I can -- whether the plaintiff can
23  try it.  I don't -- I don't ultimately decide who wins.
24      The question is, is there common evidence?  And, given the
25  nature of the documentary evidence combined with the
```

1  statistical evidence, they have evidence that they could

2  present to a jury.  Now, whether or not it's ultimately

3  persuasive, I'm not here to decide.

4          MR. DOWNES:  I understand Your Honor's point very

5  clearly.

6      I guess what I'm trying to say is the evidence that they

7  presented does not go to terminations or to hiring.  The

8  evidence that they presented goes to staffing.

9      TCS is a project-based business.  So when they decide

10  there's a new --

11          THE COURT:  You just conceded that, if you're not

12  ultimately staffed, then, as the evidence has been postured,

13  you could be terminated.

14          MR. DOWNES:  Yes.  But the issue is whether those

15  terminations are based on race or national origin.  And there's

16  no evidence of that.  The evidence --

17          THE COURT:  There's never going to be direct evidence

18  in these kinds of cases.  These kinds of cases are always built

19  on circumstantial evidence.

20          MR. DOWNES:  The circumstantial evidence that they're

21  presenting relates to staffing decisions, not to hiring, not to

22  terminations.

23          THE COURT:  Then I'm not -- then I'm not

24  understanding you, because you seem to be making a distinction

25  where I'm saying that there's a plausible causation link based

1   upon circumstantial evidence.

2       So am I missing your argument or you just don't want

3   to ...

4           **MR. DOWNES:**  I think maybe we are talking like two

5   ships passing in the night.  What I'm trying to point out is

6   that evidence about preferring visa-ready in certain

7   circumstances, that relates to staffing decisions that TCS

8   makes when they want to staff a project in the United States.

9       So TCS is a project-based business.  When they get a new

10  project in the United States, their preference is to use people

11  in the United States to staff that project.  If there are no

12  people in the United States to staff the project or they don't

13  have the requisite skills, they may then look to others

14  internally within TCS to staff the project.

15      And some of those folks may be visa-ready individuals who

16  have a visa and are allowed to work in the United States.  We

17  still don't have any hiring; we still don't have any

18  terminations.

19      Those are internal decisions about staffing a project.

20  That's what -- that's the evidence they're pointing to.  That's

21  not evidence of discrimination in hiring or in terminations.

22  That's just simply evidence about how TCS staffs.

23          **THE COURT:**  If a person is not staffed, will they be

24  terminated?

25          **MR. DOWNES:**  It depends on how long they're not

1    staffed.

2         **THE COURT:**  Isn't there some metric that if people

3    are not getting staffed, they are ultimately terminated?

4         **MR. DOWNES:**  Yes.  There's going to be --

5         **THE COURT:**  Okay.  Then that's the argument.

6       That -- do you not see that or you just don't want to

7    concede it on the record?  I want to understand if you even see

8    what I'm saying.

9         **MR. DOWNES:**  I see what you're saying, but I don't

10   see any evidence that those terminations are based on

11   discrimination in any way.  I don't see how they have linked --

12        **THE COURT:**  All right.  A response.

13        **MR. DOWNES:**  -- the evidence that they're pointing

14   to, to discrimination.

15        **MR. KOTCHEN:**  Your Honor --

16        **THE COURT:**  A response to that point.

17        **MR. KOTCHEN:**  They are -- all you need to do, on the

18   issue of terminations, is look at the data.  And, when you see

19   data, like what's on Slide 13 on the screen, where the

20   percentage of folks who are terminated are so in favor of

21   non-South Asian, particularly for folks who are terminated from

22   the bench, there's something amiss.

23      And I think Your Honor's exactly right that there's a --

24   the record is replete with examples of -- that their resourcing

25   model is favoring visa holders to the maximum extent.

1       When you look at this in connection with expats -- this is

2  Exhibit 73, Your Honor.  If you see -- this is involuntary

3  terminations for 2015 to 2016.  And, if you see towards the

4  bottom half of the slide, there's involuntary terminations

5  broken out by expats and broken out by locals.

6       And involuntary terminations for expats were six, three of

7  which were done by death.  So three folks had, unfortunately,

8  passed away.

9       When you look at the local involuntary terminations,

10  there's 2,272.  I'm sorry.  There's 508 involuntary

11  terminations, 390 of which were because they were unallocated.

12       Now, when you think that -- about their business model and

13  upwards of 89 percent of their U.S. workforce are comprised of

14  expats, these numbers are highly, highly unusual.  And, when

15  you couple that with the evidence about staffing and mapping

16  individuals to open positions and giving preference to certain

17  individuals, we think is a clear claim of intentional

18  discrimination.

19       And I think Your Honor's right.  Tata is -- seems to be

20  disputing the facts.  Ultimately, the jury will decide who's

21  right on this issue.

22            **MR. DOWNES:**  May I respond, Your Honor?

23            **THE COURT:**  You may.

24            **MR. DOWNES:**  Let me bring this back to Dr. Neumark.

25       Dr. -- and look at these statistics, if you'd put that

 1  back up there --

 2          **MR. KOTCHEN:**  Sure.

 3          **MR. DOWNES:**  -- when he says "local," that has

 4  nothing to do with -- that doesn't suggest that those -- some

 5  of those locals, quote/unquote, locals who were terminated were

 6  not South Asian.  And I don't think Dr. Neumark even makes that

 7  argument.

 8      What they have -- what Dr. Neumark has failed to do and

 9  what he -- he hasn't even attempted to do is to tie this and --

10          **THE COURT:**  Once again, we're at a prima facie case.

11  We're not here on summary judgment, and I'm not trying this

12  case yet.  All we're -- we're just at class cert, and that's --

13  and so the standard is different.

14          **MR. DOWNES:**  I understand, Your Honor.  I understand.

15          **THE COURT:**  So, you know, is this -- is this enough

16  to get over that hurdle so that we go to the next phase?  At

17  least for the termination class, I think it is.

18          **MR. DOWNES:**  I think that's probably better argued by

19  my colleague who's going to argue class certification.

20      But, bringing this back to Dr. Neumark, we take issue with

21  his report because Dr. Neumark -- he doesn't reference any of

22  this anecdotal evidence.  All he has is a bold statistic about

23  racial disparities at TCS.  That's his entire report.

24      And, to get there, he has to include deputees, people from

25  TCS who are staffed on projects.  They're not hired; they're

1  not terminated.  In fact, he doesn't even include deputees in
2  his termination -- he doesn't include deputees as being
3  terminated when they leave the United States; although, he does
4  claim they were hired the day they step off the plane in the
5  United States.  So his own statistics are internally
6  inconsistent with respect to hiring and with respect to
7  terminations.

8      Dr. Neumark does not even address the anecdotal evidence
9  that they're trying to present to the Court now.  Dr. Neumark
10 simply says, *Oh, I observe racial disparities at TCS.*  But he
11 refused -- steadfastly refused to opine that the cause of that
12 racial disparity was discrimination.

13        THE COURT:  He doesn't have to in terms of cause; a
14 jury can do that.

15        MR. DOWNES:  But we're on a motion to exclude here.
16 I don't believe that the statistics are enough to make
17 Dr. Neumark's opinion or analysis --

18        THE COURT:  Which opinion are you talking about in
19 specific?  What paragraph numbers?

20        MR. DOWNES:  On Dr. Neumark?

21        THE COURT:  Correct.

22        MR. DOWNES:  Basically his entire report.  His entire
23 report is based on his observation of racial disparities and
24 that's it.  Nothing more, nothing less.

25        THE COURT:  All right.  One response to that.

1            **MR. KOTCHEN:**  Your Honor, the case law is absolutely

2    clear.  When you look at *Teamsters*, *Adams, Obrey*, *Diaz*, *Mister*,

3    *Mozee*, the cases that have been cited by both sides support the

4    proposition that we can make a prima facie case using

5    statistics such as that advanced by Dr. Neumark.

6        In addition, we have this other evidence that Your Honor

7    has mentioned.  I think that they're not right on the case law.

8    I think that the facts they're trying to argue are to be

9    presented to a jury under *Tyson*, and I don't think it's an

10   appropriate motion to advance for them.

11           **MR. DOWNES:**  I would disagree.

12       I think the Supreme Court in *Woods Cove Packing vs. Atonio*

13   clearly said that of all statistics that don't go to the issue

14   of causation may end up with a liability finding against an

15   employer who's acting in a nondiscriminatory manner, and,

16   therefore, they shouldn't be allowed.  That's what we're

17   arguing on the motion.

18           **MR. KOTCHEN:**  Your Honor, if they take issue with our

19   statistics, their job is to rebut them with their own

20   statistics, and they haven't done that.  All they're doing is

21   characterizing the analysis that we set forth, arguing that the

22   anecdotal evidence that we have is just essentially a one-off

23   and irrelevant.  Those are issues to be made to the jury.

24           **MR. DOWNES:**  That's absolutely untrue.  The *Teamsters*

25   case -- in the *Teamsters* case, there was 40 -- there were

1   40 declarations of employees who claim they were discriminated

2   against.  Here, we have none of that.  There's no anecdotal

3   evidence.  All we have is --

4           **THE COURT:**  Statistics.

5           **MR. DOWNES:**  -- statistics, so the burden has not

6   shifted to us under *Teamsters*.

7           **THE COURT:**  Well, I'm not sure about that.  As I

8   said, it's a relatively low burden.

9       And the other concern that I had as I was working through

10  this is that, as I understand it, you know, defendants didn't

11  produce enough data to allow the experts to control for many of

12  the variables that you now complain that he didn't control for.

13          **MR. KOTCHEN:**  Yes.

14          **MR. DOWNES:**  I think that they had adequate time.  We

15  produced a lot of additional data.  They claim towards the end

16  of the briefing period -- this hearing has been continued many

17  times.  They've got many opportunities to submit supplemental

18  reports and they just didn't do it.  So that -- the evidence is

19  there.  They, for whatever reason, chose not to use it to

20  control for those variables.

21          **MR. KOTCHEN:**  Your Honor, their own expert said they

22  didn't have the data to control for variables, and --

23          **THE COURT:**  That's what I thought the record showed.

24          **MR. KOTCHEN:**  Yes.

25          **THE COURT:**  All right.  Summary judgment.

1          **MR. DOWNES:**  Thank you, Your Honor.

2          **THE COURT:**  Thank you.

3          **MS. SMITH:**  Good afternoon, Your Honor.

4          **THE COURT:**  Good afternoon.

5     All right.  Go ahead.

6          **MS. SMITH:**  I'm sorry?

7          **THE COURT:**  I said go ahead.

8          **MS. SMITH:**  Oh.

9     Well, Your Honor, with respect to Mr. Buchanan, the fatal

10   issue with respect to his claims is that, to this very day,

11   he's not identified a job that he believes he was eligible for,

12   that he wanted or that he applied for.

13     Mr. Buchanan testified that his whole claim in this action

14   is based on the fact that he believes he was not allowed to

15   apply for his position.  And we have proven -- and it is

16   undisputed that his position was eliminated by

17   Southern California Edison and it was never reinstated by TCS.

18     Mr. Buchanan has generated no evidence that that position

19   came back to life after SCE eliminated it.  Rather, he's

20   testified point blank that he has no idea whether the position

21   was reinstated.  He's also testified that he looked for

22   openings on the TCS website and saw nothing matching his skill

23   set.

24     He further testified that there was no one-to-one

25   replacement of the staff in his department.  Rather, TCS took

1    over all the functions.  He trained three people on only one of

2    his 25 job responsibilities.  And he's speculated that as many

3    as 25 different people could have assumed his role.

4         So he hasn't created anything at all, hasn't established a

5    triable issue of fact as to the --

6              **THE COURT:**  Let me ask you this --

7              **MS. SMITH:**  -- existence of a position.

8              **THE COURT:**  -- what if I find that you have failed to

9    rebut the prima facie case?

10             **MS. SMITH:**  Under the *Teamsters* --

11             **THE COURT:**  Yes.

12             **MS. SMITH:**  Then Mr. Buchanan would receive the

13   benefit of a presumption of discrimination in his favor, which,

14   I believe, is still overcome by the fact that there was no

15   position for him.  We cannot have discriminated against a

16   person by not offering a position that doesn't exist.

17             **THE COURT:**  All right.  A response.

18             **MR. KOTCHEN:**  Your Honor, Mr. Buchanan gave Tata his

19   résumé and said he wanted to apply for a general support

20   applications position.  He knew those positions existed because

21   he was training folks.  Tata was taking over the work that he

22   had done.

23        The issue is, they don't keep -- they don't have an

24   application database that they track where they track

25   applications.  So they're saying, *We have no record of*

1    *Mr. Buchanan giving us his résumé.*  And they certainly have not

2    submitted anything in the record about the folks that he talked

3    to at the job fair.  There's no reason to have a job fair

4    unless you're looking for potential employees.

5        I think Your Honor's exactly right that there's a

6    prima facie case, that we think we've met that burden.  There's

7    a presumption that they have to rebut now that they didn't hire

8    Mr. Buchanan for valid reasons.  And so they have to look -- I

9    think that presumption in and of itself is sufficient to defeat

10   their summary judgment motion here.  But I also --

11            **THE COURT:**  We all agree that the -- that the

12   defendant's burden under this scenario is clear and convincing

13   evidence; correct?

14            **MR. KOTCHEN:**  Yes.

15            **THE COURT:**  Is that correct?

16            **MS. SMITH:**  That's correct.

17            **THE COURT:**  All right.  So what is the best evidence

18   that you have, or is it the lack of evidence upon which you

19   rely?

20            **MS. SMITH:**  The best evidence that we have is the

21   declaration of Balaji Ganapthy, in which he testifies that the

22   position that Mr. Buchanan had with SCE is -- no longer exists.

23   And, further, Mr. Buchanan's own testimony with respect to that

24   subject matter.

25            **THE COURT:**  Anything else?

1          MS. SMITH:  Nothing further with respect to Buchanan.

2          THE COURT:  So those two pieces of evidence satisfy

3     the clear and convincing standard required by the law?

4          MS. SMITH:  I don't believe there's any evidence

5     creating a triable issue of material fact as to the existence

6     of a position for Mr. Buchanan, and I believe that is fatal to

7     his claim.

8          THE COURT:  Any response?

9          MR. KOTCHEN:  Your Honor, we respectfully disagree.

10        Mr. Buchanan testified that he submitted his résumé in

11    applying for a position, a general support applications

12    position, and we think the record is clear on that.  We don't

13    think that their vague evidence is -- comes close to meeting

14    the clear and convincing standard.

15         MS. SMITH:  May I address that, Your Honor, because I

16    don't think that quite responds to the question.

17        Mr. Kotchen has said a couple times now that Mr. Buchanan

18    submitted his résumé.  He applied.  He applied.  But there is

19    still no evidence that's been proffered of the existence of a

20    position for him.

21         MR. KOTCHEN:  Your Honor, he trained the people who

22    took his job.  You don't train people to take your job unless

23    there's a position for which they're going to work.

24         MS. SMITH:  He trained them on one application.  He

25    was responsible for 25 applications.  He testified he trained

```
 1  three individuals to take over 1/25th of his role.
 2           THE COURT:  Okay.  Anything else?
 3           MR. KOTCHEN:  Nothing else, Your Honor.
 4       MS. SMITH:  Nothing further with respect to
 5  Mr. Buchanan.
 6           THE COURT:  Okay.  Thank you.
 7       Motion for class cert.
 8       MS. SMITH:  Oh, I'm sorry, Your Honor.  Were we going
 9  to address Mr. Slaight?
10           THE COURT:  Go ahead.  Sorry.
11       MS. SMITH:  Thank you.  Sure.
12       It is our view that Mr. Slaight's deposition testimony is
13  dispositive with respect to his discrimination claims.  Again,
14  even if he were to receive the benefit of a presumption, he
15  testified very clearly that he was not discriminated against in
16  his hiring, in his training.  He engaged in recruitment efforts
17  on behalf of TCS and felt no pressure to select Indian
18  candidates.
19       Mr. Slaight does not dispute -- he conveniently cannot
20  remember, but he does not dispute, and certainly does not
21  dispute by way of admissible evidence, that he was counseled
22  for having an unprofessional attitude with clients, for
23  profanity, punctuality, for working from home too much, for
24  showing up late, for poor performance, for being disruptive,
25  for having a slovenly appearance, for failing to take
```

1  initiative to learn technology, and, ironically, for a lack of

2  sensitivity to cultural differences.

3      Mr. Slaight does not dispute that TCS's client, who is

4  non-Indian, asked him to be released from the project.  He does

5  not dispute that he limited TCS in its search for other

6  assignments to the New York/New Jersey area.  Mr. Slaight

7  testified unequivocally that he possessed entry-level skills;

8  he didn't have expertise.  He was part of a training program.

9  And he was terminated, consistent with TCS policy for

10  termination, after attempts to place him were not successful.

11      He testified in his deposition that he knows of no facts

12  indicating that his termination was discriminatory.  He was

13  asked -- and I'll quote directly:

14      "Q.  Do you have any facts that would establish that your

15      termination was based on the fact you are white?

16      "A.  From what I recall, I don't.

17      "Q.  Based on the fact that you're a non-Indian?

18      "A.  From what I recall, I don't."

19  He was further asked in plain English:

20      "Q.  Do you believe you were treated unfairly because of

21      your race?

22      "A.  I'm not really sure.

23      "Q.  Do you have any facts that would support a contention

24      that you were treated unfairly because of your race?

25      "A.  Not to my knowledge."

1    These admissions dispose of Mr. Slaight's discrimination

2  claims.

3         **MR. KOTCHEN:**  Your Honor, Mr. Slaight -- Tata never

4  informed individuals of its corporate policy to favor

5  visa-holding expats in placing positions.

6    They say that Mr. Slaight had a preference for staying in

7  the New York/New Jersey area, and that's the reason why he

8  deserves to be dismissed from this case.  He did have that

9  preference.  But, as reflected in Exhibit 53, expats have those

10  preferences as well, but they're not terminated.

11    They say that he showed up late or had a slovenly

12  appearance.  Mr. Slaight was not given a single thing to do for

13  six months.  He went to -- he had just graduated from college.

14  He literally went to a cubicle and sat and did nothing.  He saw

15  his South Asian colleagues getting lots of responsibility.  He

16  tried to get some type of work.  He was told to go ask the end

17  client for work, which he did.

18    Their own termination notice -- internal termination

19  notice says that he wasn't terminated for cause; he was

20  terminated because his position was eliminated.  And so I think

21  that what they're doing now is they are trying to gin up a

22  record of an employee who was not fit for work when their

23  South Asian employees were given work, were treated fairly, and

24  were able to advance.

25    As to his deposition testimony, he did testify to those

issues.  He submitted an affidavit, which they attack, saying,
*Now that I know about this* -- he didn't know about the policy.
They hadn't produced documents on the policy.  He hadn't known
about the policy to favor South Asian expats in placing
positions.  That knowledge gives him a basis for
discrimination.

On page 15 of the defendant's brief, their summary brief,
the question is whether or not the company did, in fact,
discriminate, not whether or not the employee did, in fact,
believe the company had discriminated.  That's their own
statements.

So, if they're not going to share their policy that their
own head of diversity is discriminatory, if it's proven to be
true, then if they're not sharing that with individuals and
individuals don't know about it, you can't expect individuals
to testify about it in deposition.

So we think that Mr. -- the record for Mr. Slaight is
identical to what other individuals who are not of South Asian
race went through at Tata, and we think this claim is
legitimate and should stand.

**MS. SMITH:**  May I respond?  Thank you.

Your Honor, that contention is, in my view, wholly
disingenuous.

Mr. Slaight, in his deposition, was shown interrogatory
responses that he himself verified.  He was shown a first

amended complaint, which I presume he reviewed before it was
filed.

     And, even if he didn't, he had it in his hand physically
in the deposition, spent the time reading through it and was
asked about each of his paragraphs, was asked about
interrogatory responses, which allege many of the things that
have been alleged in connection with this class certification
briefing.  They allege a preference for the utilization of visa
holders in making assignments.

     Mr. Slaight still testified that he had no information, no
basis to believe that he himself was discriminated against, and
with good reason, in light of his performance history with the
company, in light of the fact that he was part of a training
program.

     With respect to the claim that Mr. Slaight didn't receive
substantive work, it is true that he identified that as being a
single concern that he had with respect to his employment.  He
also testified that his white colleagues were fully occupied
and completely engaged.

          **THE COURT:**  Let me ask you a question.

          **MS. SMITH:**  Sure.

          **THE COURT:**  Hypothetical.  Let's say the president of
the company sent a memo to the head of human resources and
said -- basically, a memo that outlined the plaintiffs' claim: *You know, white men just can't cut it.  They don't work as*

1 *hard.  They don't give it the extra effort.  They're too*

2 *privileged.  I want you, so that we're not sued sometime, to*

3 *keep someone on -- to keep someone on our payroll for two weeks*

4 *and then the third week, fire them because I prefer to have*

5 *South Asians.*  Let's say that existed, hypothetically.

6     And so people were very nice to individuals, treated them

7 well, gave them their cubicle.  And every three weeks someone

8 would get fired.  And, ultimately, a lawsuit is brought.  And

9 the individual who is fired said, *Now, did you have any reason*

10 *to know -- did you have any reason to think that you were fired*

11 *because someone was discriminating against you?*  And the

12 truthful answer to that question was no, because they never saw

13 that memo.

14     Are you saying that I would have to grant summary

15 judgment?

16         **MS. SMITH:**  Of course not, Your Honor.  If there were

17 such a silver bullet, if there were such a memo --

18         **THE COURT:**  But isn't that really the analysis here?

19 Don't I have to look at whatever the circumstantial evidence is

20 in context?

21     The argument you just made suggests that hidden motives

22 have to be ignored if the plaintiff doesn't know about them.

23         **MS. SMITH:**  I don't intend to suggest that.  It is

24 simply that, in the case of Mr. Slaight, there is undisputed

25 evidence of poor performance, setting aside his --

1        THE COURT:  Okay.

2        MS. SMITH:  -- testimony that he wasn't -- he didn't

3   feel he was discriminated against, even if we table that.

4        THE COURT:  So the question I have, then, is do you

5   have sufficient evidence under a clear and convincing standard

6   if I disregard his deposition?

7        MS. SMITH:  I believe we do.  I believe we have a

8   very clear record of poor performance that he does not contest,

9   nor could he.

10      We have a record of somebody who was participating in a

11  training program, somebody who refused to relocate.  That's

12  also noted on his termination form, that one opportunity fell

13  through due to an unwillingness to relocate.  I believe that

14  all of that amounts to clear and convincing evidence of a

15  legitimate business reason, a nondiscriminatory reason to

16  terminate Mr. Slaight's employment.

17       THE COURT:  Do I have the timing wrong?  I thought he

18  was terminated after only three weeks on the bench.  Is that

19  wrong?

20       MS. SMITH:  That's correct.

21       MR. KOTCHEN:  Your Honor --

22       THE COURT:  Seems like a pretty quick release.

23       MR. KOTCHEN:  If he was terminated for --

24       THE COURT:  I wasn't asking you.

25       MR. KOTCHEN:  Oh, I'm sorry.  I'm sorry.

1          **MS. SMITH:**  There is no set time frame relative to
2    the declarants that gave declarations in support of the class
3    cert motion.  I see time periods ranging from about a month to
4    in excess of one year, and it's largely dependent on what are
5    the person's qualifications?  What's the probability that we'll
6    be able to reinstate them into an assignment?

7        Given all of Mr. Slaight's shortcomings, his geographic
8    restrictions, and the fact that he was an entry-level employee
9    with no refined skill set to speak of, I, again, maintain that
10   we have clear and convincing evidence of a legitimate,
11   nondiscriminatory termination.

12          **THE COURT:**  All right.  Now you may respond.

13          **MR. KOTCHEN:**  Excuse me, Your Honor.  I'm sorry about
14   that.

15       If poor performance was the reason for his termination,
16   the termination notice, which was internal, never shared with
17   Mr. Slaight, would have said poor performance was the reason
18   for his termination.

19          **THE COURT:**  And what exhibit number, again, is that?

20          **MR. KOTCHEN:**  That is Exhibit 84, Your Honor.

21          **THE COURT:**  All right.

22       All right.  Class cert.

23       As I indicated throughout these proceedings, I think the
24   case for a hiring class is much stronger than the case for a
25   termination class.

1      We will begin with you, Mr. Kotchen.

2           MR. KOTCHEN:  Yes, Your Honor.

3      So you said that the case for a hiring class is a case --

4           THE COURT:  I'm sorry.  The termination.  Right.

5  Vice versa.

6           MR. KOTCHEN:  Well, let's look at -- can I just

7  review some facts with you, Your Honor?

8      So there are two corporate policies at issue.  One is the

9  leadership directive that we've talked about.  Now, Tata's U.S.

10  workforce ranges, in the class period, from 76.3 percent to

11  89 percent South Asian.  They also source local candidates from

12  third-party vendors.  So let's talk about both of those.

13      So, Your Honor, with respect to the leadership directive,

14  the resourcing model -- the example is replete in our

15  compilation Exhibit A to our class certification reply brief.

16  The resourcing model is built on retention on-site for longer

17  period than maximizing fees to period.  As per corporate

18  directive, we have to utilize the visa-ready associates at

19  on-site.

20      When there's a position that opens up, there are people

21  that -- expats, for example, in India who are already

22  visa-ready.  They're working in other positions in India.  They

23  have to apply for -- they have to interview for the jobs that

24  open up in the U.S., just like anyone else, just like the local

25  hires.  There's an explicit process that they have to go

1   through to get the work.

2       And so, when there's a leadership directive to map these

3   folks to open positions, these folks are still -- it's not as

4   if they're just transferred on a short-term basis, which I know

5   is their argument.  They're there for, on average, three years.

6   These are new positions.  These positions, they have to submit

7   visa applications for identifying the new position.

8       And so the hiring process is just as if they're -- Tata

9   would go through to hire a local candidate:  Apply for it,

10  interview, and it will evaluate the candidate.

11      And our contention is everyone should be able to compete

12  for those positions.  To favor one group, such as visa-holding

13  expats, is not some sort of bona fide seniority system.

14      I know that their argument, Your Honor, is, *Well, they're*

15  *existing employees that are transferred*, but that's -- *and our*

16  *policy is to favor existing employees*.  That's not what they're

17  doing.  They are favoring one type of person who has to apply

18  for a new job.  Only a visa-holding expat.  That's why for very

19  few locals -- non-South Asian locals they do hire, they're

20  benched and terminated at such higher rates, because these

21  visa-holding expats are preferred for open positions.

22      And so that policy not only affects folks who are hired

23  and benched, it affects local people who -- local candidates

24  who want to apply for the position.

25      The one thing you will not find in any of their briefing

1    on this issue is a single case citation or a single citation to

2    a statute.  Title 7 has, in the statute itself, a reference to,

3    if a seniority system has merit, it can be a justification for

4    a practice -- an employment practice giving preference to, for

5    example, existing employees.

6        But it has to be bona fide.  It can't be done with a

7    discriminatory intent.  And you see that reflected in

8    *Teamsters*.  You see that reflected in the *Martinez* case that we

9    cite.  You see those principles reflected in the *Warren* case

10   that we cite.  You see them in the *Domingo*.  I mean, we have a

11   whole host of cases that we cite in our class certification

12   reply brief and in our sur-surreply.

13       They don't cite a single case that would support the

14   proposition that, just because these are existing employees,

15   they are treated differently for discriminatory -- under

16   discrimination laws because they're existing employees when our

17   policy is just to favor them.  I understand their arguments on

18   the merits.  I understand them.  I think they're jury

19   questions.

20       If their argument is, don't worry.  We just prefer to hire

21   and place existing employees in our open positions in the U.S.

22   If that's their argument, which it is, that's fine.  But that's

23   not what's happening.  We get a chance to show the jury, *Well,*

24   *they're not hiring existing employees; they're only hiring*

25   *expats.  They're only placing the expats in the positions.*

1          **THE COURT:**  All right.  A response on that topic.

2          **MS. LA MAR:**  Sure, Your Honor.

3      I think we have to go back and take a look at basically

4  the setup for Tata because Mr. Kotchen's explanation is really

5  not consistent with the facts.

6      Tata hires the deputies in India.  We're an India-based

7  company.  We then make visa applications to the

8  U.S. Government.  Those visa applications are granted for our

9  Indian personnel to come to U.S. and fill some positions.  We

10  also have local individuals that we hire here.  Some are

11  Indian; some aren't.

12      When the Indian visa holders get to the U.S., plaintiffs'

13  argument is that they are immediately included in the

14  workforce.  And this is despite the fact that they were hired

15  in a completely different labor market.

16      And I think *Teamsters* is clear that when you're looking at

17  whether something is discriminatory, you have to look at the

18  labor market in which the individuals were hired in, because

19  otherwise, Your Honor, plaintiffs' argument is attacking the

20  effect, the natural and direct effect of the visa program.

21      If they're coming over on visas and the U.S. Government

22  says you're here, and then we immediately include them in the

23  labor force, and then we then compare that labor force with a

24  labor force that has been brought over from India and we say,

25  *That's inconsistent with U.S. labor market,* which is their

argument, well, there is of course now an imbalance that's not
discriminatory, but it's based on the fact that these
individuals were brought over under a different labor market.

So right at the onset, Your Honor, their case of, we're
only -- that the statistics -- or that we're only placing visa
individuals into positions here is incorrect.  There are
existing employees.

But what speaks to the fallacy of this argument is when
these visa holders are brought to the U.S. and they are placed
in positions, plaintiffs' counsel says, *Well, they're part of
the workforce, and we have to analyze those folks against the
workforce that is in the U.S. market,* even though they came
from a different labor market.

But, when they leave, Your Honor -- because they are
temporary workers here.  When they leave, the plaintiffs'
counsel isn't counting that as a termination.  They certainly
had become unallocated.  They certainly have now left the
country.  Right.  But the same provision that they use to
include them in the labor market is not the provision that they
use to remove them from TCS's labor force.

And so, therefore, there's a disconnect with respect to
the statutes.  Their case basically challenges the direct and
natural result of being granted a visa.  It's not
discriminatory.

            **THE COURT:**  All right.  Next.

1          MR. KOTCHEN:  Your Honor, if you look at -- in our

2     class reply and our surreply briefs, the relevant labor market

3     here is labor market for the U.S.  And these folks are entering

4     it, the labor market, to assume a position that they apply for

5     and they interviewed for.  They don't dispute that.

6          And so, here, in this case, there's a lot -- there's a lot

7     written about their defense is that these folks are not hires.

8     They should be counted under discrimination laws.

9          If you look at Exhibit 100 to -- which is cited in our

10    class surreply, this is an email from the head of HR for North

11    America.  And she is concerned that what Tata is doing is

12    hiring 90 percent Indian males for positions.  She is lumping

13    together expats and she is lumping together local hires and

14    say, *We are supposed to be hiring folks like white males, white*

15    *females, African-American males, African-American females,*

16    *Hispanic males, Hispanic females, Indian females.*

17         And she's trying to propose a plan to increase the hiring

18    of these individuals.  These are expats and local.  That's

19    exactly how you're supposed to look at the analysis.

20         If -- for some reason, if 89 percent of their workforce in

21    the U.S. are comprised of expats, which during the class period

22    they were at times, between 76 and 89 percent, to exclude those

23    folks from hiring analysis, it would be the easiest way to

24    avoid discrimination laws in the U.S.  It is contrary -- again,

25    you won't find a single case cite.  You won't find a single

cite to statute that supports their theory because these folks are placed and hired in new positions in the U.S.

If their argument -- if I'm taking their position, it is -- what they're advancing is a seniority system.  They're saying, *Don't worry, Your Honor.  We have a bona fide seniority system that gives us the right to just prefer our own employees.*  But Title 7 itself says a seniority system cannot be discriminatory.  It's no defense if it's not bona fide. They're not favoring their own employees; they're only favoring expats with visas.

And that's why I think it's a critically important issue as to what constitutes the hiring class here and what constitutes a hire.  And, if there's any doubt about it, I would trust the head of their North American HR, who is writing a document contemporaneous, not prepared for litigation, expressing her real thoughts about how they can increase more legitimate hiring practices in the U.S.

**THE COURT:**  Any response?

**MS. LA MAR:**  Yes, Your Honor.  I'd like to respond to both assertions.

First of all, plaintiffs go -- are insistent that these are not our existing employees and that they are applying for positions.  They are our existing employees.  They stay on our payroll.  They were paid in India; they're paid here.  Just like the local hires, for example, Steven Heldt, he was placed

1    on the bench and replaced five times.

2         Yes, the process is that you interview with 2,500

3    different business managers for multiple positions.  Yes,

4    that's the process.  But you're paid.  You don't put up a new

5    application, so to speak.  You don't execute new forms to be

6    hired.  You're on our payroll.  You get healthcare.  You are

7    still our employee.  The model is, you move from job site to

8    job site, but you remain a TCS employee.

9         So there's no new hire here, Your Honor, which I think is

10   the fallacy of their argument.  And what they're saying, again,

11   is when the deputies get here, they're hired.  That's not the

12   case.  They are already our existing employees.

13        Now, if we move to the email -- and we call it the Sarah

14   Jane email -- and I've got to tell you, this is something that

15   I find, as an employment attorney, to be somewhat hard to deal

16   with.  And it's hard for me to deal with because this is an

17   email that is in exchange with the diversity and inclusion

18   counsel to start efforts to create more diversity, more

19   inclusion, more retention in 2012 at TCS.

20        And at the time this person was the head of diversity

21   inclusion -- I'm sorry.  She was the head of North American.

22        But, if you look at her email, what she says is, *Hey,*

23   *look, there's this problem that I perceive.  Let's do a quota*

24   *system.*  Okay.  And so, first of all, it does cover North

25   America.  So it's Canada and the U.S., so the numbers may be a

1   little bit skewed.

2       But what they do then is they institute a diversity and

3   inclusion program where they train the individual managers on a

4   local level, because those individual managers are the ones

5   that are in charge of selecting the people for staffing and in

6   hiring situations are also deciding who gets hired.

7       So they go through -- and I think plaintiffs' documents

8   illustrate several of these programs where TCS has gone in and

9   has tried to make an effort to bring cultures together and to

10  facilitate U.S. growth.

11      And, for them to now attack it and say, *Hey, you're*

12  *looking at it and it's a problem,* I find as a labor attorney

13  that any diversity efforts and any efforts towards moving

14  toward diversity, I believe establish a company policy of

15  inclusiveness and diversity.  Sure, there may be people that

16  don't abide by it, but it doesn't make it company policy.

17      So, when I look at this, you know, 2012 process, and then

18  I look at our expert's declaration where -- 128, page 21 at 67,

19  he basically notes that between 2000 -- April 2011 and

20  January 1st, 2015, our locally hired workforce has gone from --

21  has changed to 44.5 percent South Asian, actually decreasing

22  10 percent from April 2011.  So what that says is, our numbers

23  of locally hired South Asians have actually gone down.

24      Now, Your Honor, I think another point that plaintiffs

25  keep raising, which I also find to be interesting, is, we're

not addressing the breadth of the termination process or the breadth of the hiring class problems.  This case really is like *Dukes* with respect to commonality, Your Honor.

If we look at just the backdrop of the hiring class, we're talking about all job positions, all locations for all non-South Asians who applied to TCS and were not hired for the class period.  That includes the discretionary decision-making process of three separate divisions of TCS's talent acquisition group.  It includes the discretionary decision-making of 2,983 local business managers and ILP personnel.

Which is the Internal Learning Program, another diversity initiative where we started going to campus hirings; hundreds of clients and their personnel, because they are involved in the hiring decisions; 90 different headhunter firms and their personnel, and these are independent headhunter firms; 23 internal recruiters; 70 schools and portions of their staff, for approximately 18,288 jobs that span anywhere from the legal counsel to somebody who is working a technical desk at a client site.

The applications for the hiring class are submitted through 11 hiring channels, and the headhunter submissions alone, that headhunter channel, is 125,000 submissions.

If we look at the termination class, which is a different process because, as we just talked about, Your Honor, it's a staffing process, it's not a hiring process, it's even broader,

because we have to tie in the allocation, i.e., why was this person benched.  And then, after that person was benched, why did the allocation efforts fail?

So the termination process, again -- I'm sorry, the termination class, again, includes all jobs, all locations for all non-South Asians who were benched and then terminated.

And, again, we're looking at the discretionary decision-making of 10,716 local business managers; 23 vertical RMG leads, hundreds of clients and their personnel; 76 talent engagement partners; 40,873 different jobs, most of which are different job positions; 3,887 locations, for approximately 1,000 terminations.

And, again, the termination class, as I said before, plaintiffs are not countering the fact that the deputees were unallocated and left the country.  And the magnitude of that, Your Honor, is large because Mr. Umesh Kumar, in his declaration, says that 39,000 deputees came in and 29,000 left.  So, by not including that, they're skewing the statistics.

Your Honor, I really think this case basically stacks the deck inappropriately because they are placing people that are hired outside of the labor market, which, again, *Teamsters* says you look at the labor market from which the people are hired from as the comparing market.  It's very clear in Footnote 20.  That's the comparing market, where the people are hired.

THE COURT:  All right.  Response.

1        **MR. KOTCHEN:**  Your Honor, just a couple points.

2        The head of HR North America talks about the people that

3   they're supposed to be hiring.  When she's comparing who

4   they're supposed to be hiring against, she's looking at expats

5   and local hires who are filling jobs in the U.S.

6        If there's a question of fact as to whether or not these

7   folks are hiring -- or this constitutes hiring, I'd

8   respectfully submit that's a question that should be resolved

9   by the jury.

10       In terms of the law, they don't cite any law that would

11  support their proposition that they can favor expats in filling

12  new positions in the U.S.  In fact, the U.S. Government takes a

13  position that you can't.  The INA prohibits national origin

14  discrimination, just like Title 7, and the Government says:

15            "The antidiscrimination provision of the INA

16       generally prohibits employers from discriminating

17       against U.S. workers because of their citizenship or

18       national origin in hiring, firing, and recruiting.

19       Employers violate the INA if they have a

20       discriminatory hiring preference that favors H-1B visa

21       holders over U.S. workers."

22       That's exactly what's happening here.

23       With respect to *Dukes* and the issue of commonality.  When

24  you look at *Dukes*, Your Honor, *Dukes* -- the Supreme Court in

25  *Dukes* said there are two ways to show commonality.  It cites

1    *Falcon* for this proposition.  The first is evidence of a

2    company-wide procedure that can be charged with bias.  There is

3    no question that we satisfy this here.

4         Tata's head of diversity testified that, A, any preference

5    favoring visa holders, in his view, would be problematic.  It

6    would be discriminatory.  We have that.

7         The second way that you can satisfy commonality under

8    *Dukes*, if there's significant proof that an employer operates

9    under a general policy of discrimination.

10        Your Honor, we think the record evidence is replete with

11   general discrimination at Tata that easily satisfies the *Dukes*

12   standard.  You have the statistics.  You have -- the local

13   hires are 55.4 percent Asian, something I want to touch on in

14   just a bit.

15        You have the skewed applicant pool that they keep,

16   basically their Excel spreadsheets with respect to certain

17   emails, that show that South Asians are heavily skewed in terms

18   of who's applying.  You have the recruiters going out looking

19   for specific folks of Indian origin to fill positions.  You

20   have the head of HR's statement that they're choosing to hire

21   about 90 percent Indian males for their positions.  You have

22   the corporate directive to utilize visa-ready associates on

23   sites and their job requisitions.

24        There are many instances in which they're preferring or

25   exclusively requesting only expats.  You have RMG mapping to

open positions, folks with visas, without any degree of

computation from non-visa holders.

You have a document that reflects an HR document.  Hiring

trends in Fiscal Year '12 indicate higher affinity towards

selecting local hire candidates who are of Indian origin.  You

have an analysis that reveals an inherent bias in ranking

employees, expats versus locals.

You have the termination rates.  This, in our view,

Your Honor, is clear evidence that meets the commonality, the

significant proof commonality requirement under *Dukes*, the

second prong, of commonality.

With respect to --

**MS. LA MAR:**  Your Honor, may I respond to that?

**THE COURT:**  Go ahead.

**MS. LA MAR:**  Let's look at the policies, because he

keeps referencing the policies like they're not in dispute, and

of course they are in dispute.

If we look at the leadership directive, or as we call it

the visa max policy, plaintiffs' evidence of that policy that

there is a leadership directive comes from an email regarding a

wedding, which I understand nowadays emails are oftentimes

places where we see things.  But this leadership directive

basically says to utilize every visa to the maximum extent.

L-1B, five years; H-1B, six years; and L-1A, seven years.  And

that's at Exhibit 7, Your Honor.  And that's a direct quote.

1      Now, plaintiffs use this and other emails to jump to the

2  conclusion that we have a preference in staffing for visa

3  holders.

4      Okay.  One, I'm still sort of troubled by the fact that we

5  have South Asian locals that are hired here that are local

6  hires, as well as non-South Asian locals.  So what he's saying

7  is we prefer visa workers, and if that's the case, under the

8  INA, it's citizenship, Your Honor.  It's not race or national

9  origin.  But let's leave that aside for a moment.  I don't want

10 to get off track.  I'm talking about the policies here.

11      Now, again, the statement comes from an email, and if you

12 look at the deposition of Umesh Kumar, which plaintiffs quote

13 for the fact that we acknowledge this policy.  What he says is,

14 basically, this is a policy for personal reasons.  Visa holders

15 have -- sometimes they want to go back to India before their

16 original visa is over, for their marriage, you know, for some

17 personal tragedy or something like that.  And Mr. Kumar says

18 that's what this policy is for.

19      And, in the language just after the portion quoted by

20 plaintiffs -- and it's at page 82 -- Mr. Kotchen asked, again,

21 Mr. Kumar, with respect to, you know, this policy.  And he

22 says, visas -- "Positions are not filled by visa status."  And

23 that's in direct response to this directive.

24      And, more importantly, Your Honor, plaintiffs' expert, as

25 I heard Mr. Kotchen say earlier today, says the average use of

```
 1   the visa, the average time is not five years, six years or
 2   seven years.  It's three years, 2.96.  So, if this is a
 3   company-wide policy, it's not being adhered to.  And that is,
 4   Your Honor, at 196-12, paragraph 20.
 5       Also, Your Honor, I think the policy is also clearly
 6   identified in another exhibit that -- the personal aspect of
 7   this policy in another exhibit that plaintiffs have attached.
 8   And that's in Exhibit 13 where it, again, shows that we need
 9   you to use the visa that you came here on, but -- unless you
10   have some HR personal issue.  And I think it's very clearly
11   stated there.
12       Now, I think what we would expect to see, Your Honor, is
13   that if there was this policy to keep people here and utilize
14   them for the max, you know, the maximum amount of their visa,
15   we would see the number of expats increase, and we would see
16   the number of locals go down.  And locals, again, are
17   South Asian and non-South Asian.
18       But, actually, Your Honor, if you look at the chart that
19   is in Document 115, which is in plaintiffs' motion, it actually
20   shows that the number of expats has gone down and the number of
21   locals has gone up.
22       And so when we're talking about using a policy, and just
23   talking about a prima facie case, Your Honor, I think with all
24   respects, *Dukes* says on commonality the Court should really do
25   a rigorous analysis of whether or not these are common
```

1  questions or not and whether or not there is a common policy

2  that is discriminatory.

3          **THE COURT:**  Well, certainly the leadership directive

4  was not targeted towards one person.  I mean, this is not a

5  case where, in a standard employment case, where there are --

6  well, I will strike that.

7     Go ahead.

8          **MS. LA MAR:**  Well, and, Your Honor, along those

9  lines, that's obviously a very good question because I think

10  what plaintiffs are missing is exactly what was asked about

11  *Dukes* and the stereotyping evidence that they tried to put in.

12     And that was how much does this policy, this use of visas,

13  what's the percentage.  There's no evidence of that whatsoever,

14  just -- again, we go back to the general statistics where the

15  deck is stacked because we're bringing people over who have

16  worked for us for two years, and oftentimes much longer than

17  that, in a variety of different countries, and that's what we

18  keep going back to.

19     But there's no evidence here that, for example, Mr. --

20          **THE COURT:**  Look, you aren't going to agree,

21  obviously, with their approach.  That's not the question in

22  front of me.

23          **MS. LA MAR:**  Sure.

24          **THE COURT:**  The question in front of me is whether a

25  jury can resolve a critical issue and the critical issue is

whether or not there is a policy with respect to, in my view,
because I'm still not convinced, on the hiring.

I think there are numerous issues with that class -- for
termination, and they're either going to say yes or no, because
they don't have specific evidence.  There is a set of evidence
that is globally applied.  Short trial.  A week, ten days
whatever.  This isn't a huge issue.

**MS. LA MAR:**  It's a Phase 1 issue, obviously,
Your Honor.

**THE COURT:**  Right.  And then -- and then you go from
there.

But you seem to want me to just agree with your theory,
and there's another side to the same coin.

**MS. LA MAR:**  I understand, Your Honor.  And you're up
there and I'm here, so I wouldn't expect that you would agree
always with my theory.  Sometimes maybe you would and sometimes
maybe you wouldn't.

**THE COURT:**  Maybe after I heard the evidence.  But I
haven't heard the evidence.

My question is, is there enough there?  And, frequently,
in these kinds of cases, there isn't.

**MS. LA MAR:**  Well, let me just address the other
evidence that he talked about, if I may, Your Honor, because
they do seem to take things out of context.  They cite this RMG
Manual where they think it establishes that we map visa

 1  employees.

 2       If you look at Exhibit H, which is the rest of the manual,

 3  you see that we map everybody.  Specifically, if you look at

 4  Exhibit H, 7414.  It's TCS 7414, ECF.  I believe it's 207,

 5  Your Honor.

 6       You look at the third page, it says we look at -- you

 7  know, we look at the right fit, the right resources.  If you

 8  look down at people that are being released in that, it says we

 9  map.  So mapping is a practice that's done by RGS.  And RGS --

10  I'm sorry, RGM, the Resource Management Group.  They are the

11  ones that deal with internal staffing.

12       So right now I'm talking about internal staffing.  These

13  are existing employees.  For example, Your Honor, if you

14  transferred to the District Court in Los Angeles, we'd welcome

15  you there, Your Honor.  But that would be a transfer for you;

16  you would be going to a different job.  Right?  But that's not

17  a rehire.  Okay?  So that's the staffing that we're talking

18  about; we're not rehiring these people.

19       If we look at the different sources that they have, for

20  example, the releases or the Compilation B, all these type of

21  things, it's -- the evidence doesn't show a company-wide

22  practice.  It shows perhaps certain instances of things that

23  are, you know, something that, you know, obviously TCS needs to

24  explain.  But I really think under *Dukes*, it's a company-wide

25  practice, significant proof that we're discriminating.

```
 1          After all, what they're looking for is a Phase 1
 2   proceeding in which a presumption would attach.  And there has
 3   to be, at least under Dukes, significant evidence of that.
 4   It's not just some evidence.  And I think that the Ninth
 5   Circuit in Ellis II actually spoke to that.  It really does
 6   need to be significant evidence that we look at to carry the
 7   burden of persuasion.
 8              THE COURT:  All right.  Let's get wrapped up here.
 9          MR. KOTCHEN:  Your Honor, can I just respond to a
10   couple things?
11      Michelle started by saying that --
12              THE COURT:  Excuse me?
13          MS. LA MAR:  We know each other very well.
14              THE COURT:  Well, I don't care if you know each other
15   or not.  It's inappropriate.
16          MR. KOTCHEN:  I'm sorry.  Ms. La Mar started by
17   saying that there are facts in dispute.  We think that it would
18   be a -- that is a jury question if there are facts in dispute.
19          The leadership directive, Your Honor, we do -- we agree
20   with you.  This is an unusual case where you have high-level
21   decision-making and policy analysis to favor a certain type of
22   employee.  And we think that that certainly satisfies the
23   commonality requirement here.
24          I'd like to address your concerns about the hiring class,
25   Your Honor, and with respect to the relevant labor market, if
```

1  there are issues with that, I would direct you to pages 16 and

2  17 of our *Daubert* opposition brief.

3     If there are concerns about the law on seniority systems,

4  I would direct you to pages 11 of our class cert reply brief

5  and pages 3 to 4 of our class cert surreply brief.  Again, we

6  cite law cases, policy statements and so forth that we think

7  that hiring folks for positions in the U.S., visa holders is --

8  would constitute a form of discrimination if there's a specific

9  preference for them.

10     We've not spoken at all about the local hiring and the

11  instructions to find folks, what I refer to as Desis, find

12  folks of Indian decent.  The evidence is obviously there if you

13  look at our class cert reply brief.

14     If you look at Slide 10 of my PowerPoint presentation, the

15  applicant pool of folks who are sourced through vendors is

16  highly skewed toward South Asians, and we don't think that is

17  by accident.  We think folks go out and specifically say, *We*

18  *need to find South Asians for this requirement.*  And that is

19  clearly a form of discrimination in hiring that we think is

20  actionable under the discrimination laws.

21     So, Your Honor, with respect to -- I hear what you're

22  saying.  The termination class, I agree with you, in terms of

23  the leadership directive.  We think the leadership directive

24  applies equally to the hiring class.  And we don't think that

25  it is -- that it would be appropriate to give that amount

1 saying, because these folks are existing employees, even though
2 they're hired into new positions, there's no dispute that they
3 interview and apply for new positions.
4     We don't think it is sufficient to give them an out,
5 saying this doesn't constitute an act of firing.  If there's
6 any question as a matter of fact, we think that issue should be
7 left to the jury.
8            THE COURT:  Any response?
9            MS. LA MAR:  Yeah.  Your Honor, when we're talking
10 about -- we call it the vendor conspiracy policy.  He calls it
11 a vendor policy.  You know, what we're looking at there is
12 third-party independent headhunters where plaintiffs contend
13 that we cause them to go out to Monster and LinkedIn and get
14 résumés from only local Indians, and then give them to us, with
15 this sort of conspiracy process that we -- that we then beef up
16 our local hiring.
17     The problem with that, Your Honor, is of course we
18 submitted declarations from several of these vendors, and these
19 are reputable independent vendors who have many other clients,
20 and those vendors basically say they don't do that.
21     The only evidence they have of this vendor conspiracy
22 policy is one errant recruiter who, for a total of six
23 positions out of the countless positions I discussed earlier,
24 joked about wanting Desis.  And, in some instances, Your Honor,
25 those emails show that the business managers who are

1  responsible for hiring at the local levels, some of those in

2  those six emails were asking for them.

3      But to take that and make it a company policy that we have

4  this vendor conspiracy theory is just not supported by the

5  evidence, that the vendors do give us statistics that are

6  higher than what would be in the local workforce.

7           THE COURT:  Well, the other problem is that the only

8  evidence you have is from the vendors.  And the vendors, in

9  terms of the local hire numbers, you know, are only a fraction,

10  about half of all the local hires you have.  And you have no

11  evidence for any of the other sources.  It's really just

12  relying on that vendor evidence, which is thin.

13           MS. LA MAR:  Your Honor, there is actually one more

14  piece of evidence, and that's our campus recruiting evidence.

15  And that plaintiffs hold out as being equal with or very close

16  to equal with the national average.  That's where we hire

17  directly from schools.

18           THE COURT:  All right.  Final statements.

19           MR. KOTCHEN:  Your Honor, if there's -- if there are

20  other concerns that you have about the hiring class, I can

21  address it.  I'd be happy to address them here.

22           THE COURT:  I'm finishing up here.

23           MR. KOTCHEN:  Okay.  Okay.  Your Honor, thank you for

24  your time.

25      We think that this is a scheme, a discriminatory scheme

1    that applies to terminations and hiring.  And we think it meets

2    the commonality criteria.  And we respectfully believe that the

3    facts the law reflects, that visa holders who come into U.S.

4    for new positions in the U.S., apply for and interview them

5    for, that constitutes hiring that are actionable under

6    discrimination laws.

7         **MS. LA MAR:**  Your Honor, I know we're drawing to the

8    end and I had hoped to make a presentation in a little bit of a

9    different order, but we also have a standing problem for the

10   two named plaintiffs.

11        Neither one of them are existing employees.  Neither one

12   of them are current applicants.  And, under *Ellis* and *Luhan*

13   (phonetic), I believe neither one of them have standing and

14   therefore do not constitute adequate reps for this class.

15        **THE COURT:**  There's plenty of Ninth Circuit law that

16   says when you have an issue, effectively, and the likelihood of

17   the harm continues, that that's sufficient to grant standing.

18   So I don't think that that's going to hold us up.

19        **MS. LA MAR:**  Your Honor, I would ask the Court to --

20   and I know the Court knows the law.  But, if you do look at

21   *Ellis*, the Ninth Circuit opinion, and you do look at *Luhan*, I

22   do believe that both of those indicate that you do, if you are

23   a former employee and you are seeking injunctive relief, which

24   is all that's sought, because they're not asking to satisfy

25   Phase 2; they're only asking to satisfy Phase 1, which Phase 1

1    is liability for injunctive relief.  That's all they're asking

2    for.

3          And so, if we have two individuals, neither of whom can

4    seek injunctive relief because they are not current employees

5    and they are not subject to impending harm, so to speak, they

6    do not have standing to --

7                THE COURT:  Response on that.

8                MR. KOTCHEN:  Your Honor, we are seeking to satisfy a

9    class for punitive damages for the prima facie case of

10   liability and for injunctive relief.  We're not -- it's not

11   satisfying just for injunctive relief.  And these folks were

12   clearly harmed and can recover, in our view, for the harm that

13   was caused by the discriminatory policy.

14         The issues that they're addressing in terms of what the

15   amount of the compensation is, that will be left to Phase 2,

16   but this is not just an injunctive relief class.

17               MS. LA MAR:  Your Honor, Phase 1 is an injunctive

18   relief class.  Phase 2 is where individual inquiries are made

19   into monetary damages, and we are able to raise individualized

20   defenses to those claims.  Plaintiffs' papers are very clear.

21   They're only seeking liability -- they're only seeking

22   certification for Phase 1.

23         Under Phase 1, liability is for injunctive relief.

24   There's a presumption.  But, if you're not going to grant

25   injunctive relief because they don't have standing, I don't

1   know how they're going to get in a word of punitive damages or

2   establish a prima facie case for liability for each of these

3   individuals.  I think the cases are quite clear.

4          MR. KOTCHEN:  Your Honor, on Slide 15, the liability

5   phase would include whether Tata is engaged in a pattern and

6   practice of discrimination, punitive damages and injunctive

7   relief.  That's what we're seeking class certification for.

8      The one last thing I'd leave Your Honor with is, again, on

9   this issue of hiring and the visa holders, you will not find a

10  single citation in the defendant's briefing that would

11  support -- legal support for the proposition that these folks

12  do not constitute hires in the U.S.

13         MS. LA MAR:  Your Honor, I believe plaintiffs just

14  made my argument.  They're seeking injunctive relief.  They are

15  seeking the presumption, and they don't have standing for that.

16         THE COURT:  Have any of you cited cases where there's

17  a Phase 1 with punitive to me or not?

18         MR. KOTCHEN:  Your Honor, in Ellis, the Court held

19  in -- during Phase 1 the appropriateness of punitive damages.

20  The actual amount was going to be left to Phase 2.

21         MS. LA MAR:  Right.  So --

22         THE COURT:  So do you have any support for the basic

23  proposition that you've articulated where you'd have -- or do

24  you concede that there's no standing as to Phase 2?

25         MR. KOTCHEN:  To Phase 2?  No, I don't agree with it

1    at all because, in Phase 1, we are talking about setting up

2    whether or not there's a pattern and practice such that the

3    presumption applies during Phase 2.

4         **THE COURT:**  Counsel just made an argument that your

5    clients don't have standing because they are not current

6    employees.

7         **MR. KOTCHEN:**  Right.

8         **THE COURT:**  So, irrespective of the punitive damages,

9    address that topic.

10        **MR. KOTCHEN:**  So --

11        **THE COURT:**  Do they have standing as nonemployees and

12   what's your authority?

13        **MR. KOTCHEN:**  They have standing as nonemployees

14   because they are seeking relief with punitive damages and

15   compensatory damages.  And the *Teamsters* approach is to do this

16   in two phases.

17        *Ellis* went through this very same issue, that not all the

18   employees at *Ellis* were existing employees.  You have a phase

19   process where the first phase is, is there a pattern and

20   practice of discrimination?  Let's assume that there is.  Then

21   you go to Phase 2, where there's a presumption that applies.

22   They can present evidence, defenses, and the issue of

23   compensatory damages is addressed.

24        In the first Phase 2, we would like to address the issue

25   of whether punitive damages are appropriate here.  That's what

the Court did in *Ellis*.   Punitive damages are not awarded only

to folks who are existing employees.   If there's an act of

discrimination, if an applicant applies and was discriminated

against and turned down and it's intentional discrimination,

punitive damages could apply.   The same is true of someone who

is terminated from Tata.

        So at the end of Phase 1, there's no actual delivery of

dollars; that's left for Phase 2.   But you don't get to Phase 2

without first going through Phase 1.

        **MS. LA MAR:**   Your Honor, I think it's very clear, and

I just want to make sure the record is clear here.   Phase 1 is

injunctive relief.   And, if you get injunctive relief, then

you're eligible to -- and I'll admit it -- for whether or not

you get punitive damages at Phase 1.   You also are entitled to

a presumption that you talked about in conjunction with the

motion for class cert, but it doesn't establish liability; it

just establishes a presumption.

        So, if you do not have standing in Phase 1 for injunctive

relief, there is no mechanism to award punitive damages.   And

the Ninth Circuit in *Ellis* talked about it in detail.   Now,

they did find one person in the putative class who did have

standing, but in this case that's not the case.

        And, in fact, if you look at -- and I'm just talking about

standing for Phase 1 because that's all they're seeking to

certify.   Their papers are replete with that.   They're not

1  seeking to certify Phase 2.  They haven't given this Court a

2  trial plan for Phase 2 in any way, shape, or form.

3       Phase 1 is very clearly injunctive relief.  Phase 2 is

4  damages.

5            MR. KOTCHEN:  Your Honor, this would term -- the

6  *Teamsters* approach -- *Teamsters* did not stand for the

7  proposition that folks go through Phase 1 and you deliver

8  relief at Phase 1.  *Teamsters* stands for the proposition that

9  you have a pattern and practice where a prima facie case is

10 established during Phase 1.  Once you get past that phase, then

11 you go to Phase 2.

12           THE COURT:  All right.  Thank you.

13           MS. LA MAR:  All right.  Your Honor, thank you so

14 much.

15           MR. KOTCHEN:  Thank you, Your Honor.

16               (Proceedings adjourned at 4:48 p.m.)

17                      ---oOo---

18 I certify that the foregoing is a correct transcript from the

19 record of proceedings in the above-entitled matter.

20

21 Dated:  October 16, 2017

22

23 _____

24      Sarah L. Goekler, CSR 13446, RMR, CRR, CCRR

25                  U.S. Court Reporter