UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRIAN BUCHANAN, et al.,

        Plaintiffs,

v.

TATA CONSULTANCY SERVICES, LTD,

        Defendant.

Case No.15-cv-01696-YGR

**ORDER GRANTING IN PART MOTION FOR LEAVE TO AMEND; DENYING MOTION TO EXCLUDE EXPERT OPINION; DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION**

Dkt. Nos. 104, 106, 115, 125, 194

Plaintiffs Brian Buchanan and Christopher Slaight[1] bring this putative class action against defendant Tata Consultancy Services, Ltd. ("TCS") for discrimination in employment practices. Plaintiffs bring causes of action for disparate treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq*., and the Civil Rights Act of 1866, 42 U.S.C. 1981.  (Dkt. No. 82, Third Amended Complaint ("TAC") ¶¶ 78-87.)  Plaintiffs Buchanan and Slaight allege that TCS discriminated against them in their hiring, employment, and/or termination practices based on race and national origin.  (TAC ¶¶ 1-5.)  Specifically, plaintiffs claim that TCS maintains a pattern and practice of intentional discrimination in its United States workforce whereby TCS treats persons who are South Asian[2] or of Indian national origin[3] more favorably than those who are not South Asian or of Indian national origin.  (*Id*.)

---

[1] On October 27, 2016, this Court granted the parties' stipulation that Steven Heldt be withdrawn as named plaintiff. (Dkt. No. 89.)  Accordingly, the Court notes that the caption of this case has been revised.

[2] Plaintiffs define "South Asian race" as referring to individuals who trace their ancestry to the Indian sub-continent. (TAC ¶ 1, fn. 1.)

[3] Plaintiffs define "Indian national origin" as referring to individuals born in India, or whose ancestors came from India.  (*Id*.)

1    Four substantive motions are now before the Court, namely plaintiffs' motions for (i) leave

2    to file a fourth amended complaint (Dkt. No. 104) and (ii) class certification (Dkt. No. 115);[4] and

3    TCS' motions (iii) to exclude the expert opinion of Dr. David Neumark (Dkt. No. 106) and (iv) for

4    summary judgment. (Dkt. No. 125.)[5]  Having carefully considered the pleadings and fully-briefed

5    motions, the hearing held on October 3, 2017, and for the reasons set forth below, the Court

6    **ORDERS** as follows:[6]

7        1.  Plaintiffs' motion for leave to file a fourth amended complaint is **GRANTED IN PART** as

8            to amending to add Seyed Amir Masoudi and Nobel Mandili as named plaintiffs;

9            **DENIED IN PART** as to adding Steven Webber.[7]

10       2.  Defendants' motion to exclude the expert opinion of Dr. Neumark is **DENIED**.

11       3.  Defendants' motion for summary judgment is **DENIED** as premature as to plaintiff

12           Christopher Slaight and **DENIED** as to plaintiff Brian Buchanan.

13       4.  Plaintiffs' motion for class certification is **GRANTED** as to the proposed termination

14           class and **DENIED** as to the proposed Hiring Class.

15       5.  The Court **APPOINTS** plaintiffs' counsel, Kotchen & Low, as class counsel.

16   _____

17       [4]  TCS makes various evidentiary objections to declarations filed by plaintiffs in support of
     the motion for class certification.  (Dkt. No. 126.) Local rule 7-3(a) requires "[a]ny evidentiary
18   and procedural objections . . . [to be] contained within the [opposition] brief or memorandum."
     (Dkt. No. 194.)  Because TCS failed to lodge its objections within TCS' opposition brief, the
19   Court finds the objections improper. Accordingly, the Court **OVERRULES** TCS' objections.

20       [5] In connection with its motion for summary judgment TCS has filed a request for judicial
     notice of: (i) an Equal Employment Opportunity Commission ("EEOC") enforcement guideline
21   and (ii) the administrative complaint filed in *Office of Federal Contract Compliance Programs,
     United States Department of Labor v. Palantir Techs., Inc*. (Dkt. No. 107, "RJN".)  Plaintiffs
22   object on the ground that these documents contain disputed facts. The Court finds that EEOC
     enforcement guidelines and publicly filed complaints "can be accurately and readily determined
23   from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The Court
     Grants TCS' request for judicial notice, but does not accept the truth of any matters asserted in the
24   documents. The Court gives such documents their proper evidentiary weight.

25       [6] In connection with their filings on these motions, the parties filed thirteen administration
     motions to seal documents. (*See* Dkt. No. 103, 105, 112, 113, 120, 143, 155, 163, 169, 195, 204,
26   213 and 219.)  The Court addresses each in separate orders.

27       [7] During the hearing held on October 3, 2017, plaintiffs' counsel agreed to withdraw the
     portion of plaintiffs' motion for leave to amend which sought to add a new claim for disparate
28   impact.  Accordingly, plaintiffs' motion for leave to amend to add a new claim for disparate
     impact is **DENIED** as moot.

# I.    BACKGROUND

## A.    TCS' Business and Workforce Composition

TCS is a foreign company headquartered in Mumbai, India, with approximately 29,900 employees in the United States.  (Dkt. No. 84, Answer to Third Amended Complaint ("Answer") ¶ 13; Dkt. No. 96-1 at 2 (active employee list).)  TCS contracts with clients to provide consulting, technology, and outsourcing services.  (Dkt. No. 141, Declaration of Umesh Kumar ("Kumar Decl.") ¶ 3.)  When TCS secures a consulting contract it allocates or hires individuals to serve the client onsite. (Dkt. No. 115-3, Ex. 3, Deposition of Balaji Ganapathy ("Ganapathy Dep.") at 29:3-6, 31:20-32:5; Ex. 4, Deposition of Umesh Kumar ("Kumar Dep.") at 38:7-39:14.) TCS staffs such client projects with a combination of (i) "visa-ready" individuals currently working for TCS overseas, (ii) individuals working for TCS in the United States which are not currently allocated to a client, and (iii) individuals not currently working for TCS in any capacity ("Local Hires"). (*See* Kumar Dep. at 38:7-39:14.)  During the class period,[8] foreign visa workers (referred to herein as "Deputees" or "Expats") represented between 75% and 89% of TCS's workforce in the United States. (Declaration of G. Edward Anderson ("Anderson Decl.") ¶ 14; Kumar Dep. at 82:17-83:4.) The vast majority of such Expats were South Asian. (*See* Anderson Decl. ¶ 14; Dkt. No. 115-3, Exs. 19, 20.)

TCS' business managers are responsible for determining the staffing needs for each TCS client.  (Kumar Decl. ¶ 5.) The staffing process begins when a business manager initiates a staffing request for an open position (the "Request") which identifies the job's location, start date, responsibilities, and skills and experience required.  (Kumar Decl. ¶ 10.) The Request is then transmitted to TCS' Resource Management Group ("RMG") which is responsible for helping business managers identify qualified internal candidates. (*Id.*)

If a business manager determines that no internal candidates in the United States or overseas match the Request, TCS seeks to fill the position with a Local Hire. (Dkt. No. 133, Declaration of Shyam Chinnari ("Chinnari Decl.") ¶ 4.)  TCS' Talent Acquisition Group ("TAG")

---

[8] Plaintiffs propose to define the class period as April 14, 2014, though the date of class certification.

assists business managers in identifying, recruiting, and onboarding Local Hires. (*Id.*) The TAG relies partly on third-party vendors (also known as "headhunters") who similarly work to target and attract qualified applicants. (*Id.* ¶¶ 5-7; Declaration of Brian Andrillo ("Andrillo Decl.") ¶ 3.)[9] After consulting with third-party vendors, the TAG screens and forwards qualifying resumes to business managers who have ultimate authority to hire non-technical employees. (Chinnari Decl ¶¶ 5-7.)  For positions that require technical skills, clients often are involved in the interview and selection process. (Chinnari Decl. ¶ 10.)

When a TCS employee is not assigned to a client that employee is placed on "unallocated" or "benched" status.  (Kumar Decl. ¶ 19; *see also* Dkt. No. 115, Ex. 7 (TCS044201-4203 at 4202); Ex. 9 (TCS044201-4203 at 4202).) The Resource Management Group ("RMG") assists benched employees in identifying open client projects for which they are qualified and to which they can apply. (Kumar Dep. at 27:13-28:21 (discussing TCS038103-8110 at 8105).) Employees receive their regular salary while benched, but those that remain benched for a prolonged period of time are proposed for termination.  (Kumar Dep. 15:3-15; Dkt. No. 115, Ex. 7 (TCS055851-5854 at 5853).)

Plaintiffs rely on internal documents in arguing that TCS maintains a pattern and practice of favoring visa-ready individuals and benched expats who are predominantly South Asian when assigning individuals to open client projects.  For example, plaintiffs point to documents showing that business managers are instructed to "map associates with unutilized visas and work permits for onsite opportunities" in the United States.  (Dkt. No. 115, Ex. 8 (TCS007391-452 at 425).) TCS documents also indicate that TCS issued and implemented a "[l]eadership directive [] to utilize every visa to the maximum extent." (*Id.,* Ex. 12 (TCS057815); *see also* Ex. 13 (TCS137485-7487 at 7485).)  Plaintiffs argue that such policies result in fewer work opportunities for non-South Asian employees and thus a greater number of involuntary terminations because employees who are unable to obtain onsite client opportunities remain unallocated and are

---

[9] During the class period TCS contracted with more than 60 headhunters to advertise open positions and collect resumes.  (Chinnari Decl. ¶ 6.)

ultimately terminated.  Plaintiffs further argue that TCS uses third-party recruiters to identify and attract South Asian Local Hires.

In addition to documentary evidence, plaintiffs also highlight the demographic composition and involuntary termination rates of TCS' workforce in the United States. Plaintiffs offer the expert opinion of Dr. David Neumark to show that defendant's U.S. workforce was between 72.32% and 78.91% South Asian during the class period, compared to 12.50% of the computer systems design and related services industry as a whole. (Dkt. No. 115, Ex. 1 (Expert Report of David Neumark ("Neumark Rpt.") ¶¶ 6, 9, 14; Tbl. 1).) Further, Dr. Neumark opines that the involuntary termination rate for benched non-South Asian employees is 10.6% as compared to less than 1% for benched South Asian employees. (Dkt. No. 196, Supplemental Expert Report of David Neumark ("Neumark Supp. Rpt."), Tbl. 2.)  According to Dr. Neumark, the likelihood of obtaining such skewed results by chance is less than 1 in 1 billion. (*Id.* ¶ 7; Neumark Rpt. ¶¶ 6, 9, 14; Tbl. 1.)

**B.     Plaintiff Buchanan**

With respect to plaintiff Buchanan, Southern California Edison ("SCE") employed him as an IT professional from 1986 until February 2015.  (TAC ¶ 31.)  SCE informed Buchanan in July 2014 that he and approximately 400 coworkers would be terminated and replaced by TCS employees.  (*Id.* ¶ 35.)  Buchanan agreed to remain in his position with SCE until early 2015 to train the incoming TCS employees.  (*Id.*)  Buchanan was discharged by SCE in February 2015 when TCS assumed primary responsibility for SCE's IT needs.  (*Id.* ¶ 42.)  In the interim, Buchanan attended a job fair organized by SCE for its employees awaiting termination, at which he met with a TCS Hiring Manager to express his interest in a position with TCS.  (*Id.* ¶ 39.) Plaintiffs allege that the TCS recruitment representatives acted in a dismissive manner which discouraged Buchanan from inquiring about other employment opportunities. TCS made no further contact with Buchanan regarding his application despite Buchanan's extensive qualifications and experience.  (*Id.*)  TCS hired only five of the twenty-eight members of plaintiff Buchanan's team at SCE, three of whom were South Asian.  (*Id.* ¶ 40.)  Plaintiff alleges that TCS replaced him and the remaining members of his team with South Asian workers who had inferior

5

experience and qualifications.  (*Id*. ¶¶ 40-41.)

**C.  Plaintiff Slaight**

With respect to plaintiff Slaight, TCS hired Slaight as a software engineer in April 2012.  (*Id*. ¶ 62.)  His first project was an assignment at TCS client AXA beginning in October 2012. (*Id*. ¶¶ 63-64.)  Slaight alleges that TCS failed to assign him substantive work while his South Asian colleagues regularly received such work.  (*Id*. ¶ 64.)  TCS placed Slaight on the bench beginning in March 2013.  (*Id*. ¶ 65.)  Slaight claims that he actively pursued open positions at TCS while he was benched but was only given the opportunity to interview with one client.  He was terminated less than one month after being benched, in April 2013.  (*Id*. ¶¶ 65-66.)  Slaight claims that TCS knowingly and intentionally favored persons of South Asian race and national origin in its employment decisions with respect to himself throughout his employment, and all others similarly situated.  (*Id*. ¶ 85.)  According to defendant, Slaight was terminated due to poor performance and his own geographical restrictions.

## II.  LEGAL FRAMEWORK

### A.  Leave to Amend

Under Federal Rule of Civil Procedure 15(a)(2), courts are to grant leave to amend "when justice so requires."  The rule is "to be applied with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir. 2001); *see also Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).  Generally, a court should determine whether to grant leave indulging "all inferences in favor of granting the motion." *Griggs v. Pace Am. Grp., Inc.,* 170 F.3d 877, 880 (9th Cir. 1999). That said, "leave to amend is not to be granted automatically." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990).

The Court weighs the following factors in ruling on a motion for leave to amend: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of the amendment; and (5) whether the movant has previously amended its pleadings.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004). Of these factors, "the consideration of prejudice to the opposing party [ ] carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003). "Courts may decline to grant

leave to amend only if there is strong evidence of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party  by virtue of allowance of the amendment, [or] futility of amendment, etc." *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.,* 708 F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman v. Davis,* 371 U.S. at 182).

### B.    *Daubert* Standard for Expert Opinions

Federal Rule of Evidence 702 permits opinion testimony by an expert as long as the witness is qualified and their opinion is relevant and reliable.  An expert witness may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702.  Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments).  An expert should be permitted to testify if the proponent demonstrates that:  (i) the expert is qualified; (ii) the evidence is relevant to the suit; and (iii) the evidence is reliable.  *See Thompson v. Whirlpool Corp.*, 2008 WL 2063549, at *3 (W.D. Wash. 2008) (citing *Daubert*, 509 U.S. at 589–90).

### C.    Summary Judgment

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact as to the basis for the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

Where the moving party has the burden of proof at trial, it "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. *Anderson*, 477 U.S. at 250; *Soremekun*, 509 F.3d at 984; *see* Fed. R. Civ. P. 56(c), (e). The opposing party's evidence must be more than "merely colorable" and must be "significantly probative." *Anderson*, 477 U.S. at 249–50.  Further, the opposing party may not rest upon mere

1    allegations or denials of the adverse party's evidence, but instead must produce admissible

2    evidence showing a genuine dispute of material fact exists. *See Nissan Fire & Marine Ins. Co.,*

3    *Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). "Disputes over irrelevant or

4    unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac.*

5    *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

6         Nevertheless, when deciding a summary judgment motion, a court must view the evidence

7    in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

8    *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). A

9    district court may only base a ruling on a motion for summary judgment upon facts that would be

10   admissible in evidence at trial. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010);

11   Fed. R. Civ. P. 56(c).

12         **D.     Class Certification**

13         Under Federal Rule of Civil Procedure 23(a), a court may certify a class only where "(1)

14   the class is so numerous that joinder of all members is impracticable; (2) there are questions of law

15   or fact common to the class; (3) the claims or defenses of the representative parties are typical of

16   the claims or defenses of the class; and (4) the representative parties will fairly and adequately

17   protect the interests of the class." Fed. R. Civ. P. 23(a). Courts refer to these four requirements as

18   "numerosity, commonality, typicality[,] and adequacy of representation." *Mazza v. Am. Honda*

19   *Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

20         Once the threshold requirements of Rule 23(a) are met, plaintiffs must then show "through

21   evidentiary proof" that a class is appropriate for certification under one of the provisions in Rule

22   23(b). *Comcast Corp. v. Behrend*, 599 U.S. 27, 33 (2013). Here, plaintiffs seek certification under

23   Rule 23(b)(3), which requires plaintiffs to establish "that the questions of law or fact common to

24   class members predominate over any questions affecting only individual members, and that a class

25   action is superior to other available methods for fairly and efficiently adjudicating the

26   controversy." Fed. R. Civ. P. 23(b)(3).[10] The predominance inquiry focuses on "whether

27

28         [10] In the alternative, plaintiffs seek to certify a class with respect to particular issues under
     Rule 23(c)(4), namely whether (i) defendant maintained a pattern or practice of discrimination, (ii)

proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Dukes*, 564 U.S. at 351); *see also Mazza*, 666 F.3d at 588. The Court considers the merits to the extent they overlap with the Rule 23 requirements. *Ellis*, 657 F.3d at 983. The Court must resolve factual disputes as "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*." *Id.* (emphasis in original). "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.'" *Aburto v. Verizon Cal., Inc.*, No. 11-CV-03683, 2012 WL 10381, at *2 (C.D. Cal. Jan. 3, 2012) (quoting *Ellis*, 657 F.3d at 982), *abrogated on other grounds as recognized by Shiferaw v. Sunrise Sen. Living Mgmt., Inc.*, No. 13-CV-2171, 2014 WL 12585796, at * 24n. 16 (C.D. Cal. June 11, 2014). "A party seeking class certification must affirmatively demonstrate [its] compliance with the Rule." *Dukes*, 564 U.S. at 350. Ultimately, the Court exercises its discretion to determine whether a class should be certified. *Califano v. Yamasaki*, 442 U.S. 682, 703 (1979).

## III.   DISCUSSION

### A.   Motion for Leave to Amend

Plaintiffs seek leave to amend to file a fourth amended complaint for the sole purpose of adding three additional named plaintiffs: Steven Webber, Seyed Amir Masoudi, and Nobel Mandili. Defendant opposes the motion on grounds of undue delay with regard to all three, and futility with regard to Webber only.

//

//

//

punitive damages are appropriate, and (iii) injunctive relief is appropriate. Under Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues."

### 1.    Prejudice to TCS

The Court begins by considering whether granting leave to amend would prejudice TCS because "prejudice to the opposing party carries the 'greatest weight' in the leave to amend inquiry." *Dupree v. Apple, Inc.*, 2017 U.S. Dist. LEXIS 7765 at *12 (quoting *Eminence,* 316 F.3d at 1048, 1052.  Prejudice to the defendant occurs where "amendment would increase the burden of necessary future discovery," *Jackson v. Bank of Haw.,* 902 F.2d 1385, 1387-88 (9th Cir. 1990), or "require[] that the defendant develop entirely different defenses." *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1292 (9th Cir. 2000).

TCS does not argue that adding Webber, Masoudi, and Mandili (the "proposed additional plaintiffs") as named plaintiffs will result in prejudice and the Court so finds. With regard to the burden of future discovery, additional discovery will necessarily be limited to documents and depositions involving proposed additional plaintiffs and thus will not increase TCS's burden significantly.[11]  Finally, amendment would not require TCS to "develop entirely different defenses," *Coleman*, 232 F.3d at 1292, because the claims asserted by the proposed additional plaintiffs are identical to those asserted by Buchanan and Slaight.  Finally, granting leave to amend will not prejudice TCS because TCS would face claims by the proposed additional plaintiffs regardless of whether the Court grants leave to amend.  For example, were this Court to deny leave to amend, the proposed additional plaintiffs could file individual lawsuits alleging claims similar to those asserted here.

### 2.    Undue Delay

After prejudice, "[u]ndue delay is the next factor a court considers in deciding whether to grant leave to amend." *Dupree*, 2017 U.S. Dist. LEXIS 7765 at *14 (citing Foman*, 371 U.S. at 182*).  "[L]ate amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action." *Allen v. City of Beverly Hills,* 911 F.2d 367, 374 (9th Cir. 1990).  However, "'[u]ndue

---

[11] When propounding discovery, plaintiffs are cautioned to adhere to their representation that "discovery can be taken while Plaintiffs complete their discovery of Tata" and "[a]dding these three individuals will do little to increase Tata's burden."  (Dkt. No. 104 at 9.)

delay cannot alone justify the denial of a motion to amend.'" *Square 1 Bank v. Lo*, 2014 WL 1154031, at *1 (N.D. Cal. 2014) (citing *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712-13 (9th Cir. 2001)).

Defendant argues that plaintiffs cannot explain their "significant delay" in moving for leave to amend nearly two years after this lawsuit was filed. (Dkt. No. 111 at 6.) Specifically, defendant contends that plaintiffs' counsel was aware that Massoudi had a potential discrimination claim against TCS because six months prior to moving for leave to amend counsel attempted to negotiate an individualized agreement on Massoudi's behalf. Defendant further asserts that plaintiffs delayed in seeking leave to add Webber because Webber "threatened to join the lawsuit five months [prior to plaintiffs' seeking leave to amend], but never did." (*Id*.)

Defendant does not persuade. With regard to Massoudi, the mere fact that plaintiffs' counsel attempted to negotiate an individual settlement on behalf of Massoudi several months before seeking leave to add him as a named plaintiff does not establish undue delay. Defendant cites no authority for the proposition that named plaintiffs must be added within a certain date of attempting to negotiate an individual settlement. With regard to Webber, plaintiffs represent that Webber retained counsel just one day before plaintiffs moved for leave to amend. This is sufficient. Finally, and in any event, "'[u]ndue delay cannot alone justify the denial of a motion to amend.'" *Square 1 Bank*, 2014 WL 1154031, at * (citing *Owens*, 244 F.3d at 712-13).

### 3. Futility

Here, TCS focuses its attack on Webber. Defendant does not argue that the proposed amendment is futile with regard to Massoudi or Mandili. Specifically, defendant argues that Webber signed an arbitration agreement and class action waiver which bars Webber from bringing claims in federal court. *See AT&T Mobility v. Concepcion*, 563 U.S. 333, 344 (2011). The "Mutual Agreement To Arbitrate Claims" which Webber signed provides that TCS and Webber "mutually consent to the resolution by arbitration of all claims or controversies ("claims"), past, present, and future." (Dkt. No. 111, Declaration of Michelle M. Marr ("Marr Decl.") ¶ 4, Ex. 5.) Webber's arbitration agreement further states "[a]rbitrable claims include . . . claims for discrimination [] including, but not limited to race . . . [and] national origin." (*Id*.) This punitive

1    class action plainly falls under the purview of the arbitration agreement.  The issue is whether the

2    agreement is enforceable.

3            In arguing that the arbitration agreement is not enforceable, plaintiffs rely primarily on

4    *Morris*, a Fair Labor Standards Act case in which the Ninth Circuit held unenforceable a waiver

5    "precluding [plaintiffs] from bringing, in any forum, a concerted legal claim" because it violated

6    the National Labor Relations Act ("NLRA").  *Morris v. Ernst & Young, LLP,* 834 F.3d 975, 979

7    (9th Cir. 2016), *cert. granted*, 137 S. Ct. 809 (2017).  Plaintiff does not persuade, as *Morris* is

8    distinguishable. In holding the waiver in *Morris* unenforceable, the Ninth Circuit reasoned that the

9    "NLRA establishes a core right to concerted activity. Irrespective of the forum in which disputes

10   are resolved, employees must be able to act in the forum *together.*" *Id.* at 989–990 (emphasis in

11   original).  By contrast, the arbitration agreement which Webber signed contains no language

12   preventing Webber from bringing claims in an arbitration forum together with other employees.

13   Rather, the waiver simply bars Webber from "initiat[ing] or prosecut[ing] any lawsuit or

14   administrative action" either individually or together with other employees outside of the

15   arbitration procedures set forth therein. (Marr  Decl. ¶ 4, Ex. 5).  Accordingly, the arbitration

16   agreement is enforceable and the Court finds that adding Webber as a named plaintiff would be

17   futile.

18                   **4.     Conclusion**

19           For the reasons discussed above, the motion for leave to file a fourth amended complaint is

20   **GRANTED IN PART**.  Leave is granted for the sole purpose of adding plaintiffs Massoudi and

21   Mandili.  Leave is **DENIED** as to Webber.

22           **B.     Motion to Exclude Expert Opinion of Dr. Neumark**

23           The Court next turns to the motion to exclude the expert opinion of Dr. Neumark, as

24   defendants' arguments on the summary judgment and class certification motions stem, in part,

25   from this challenge.

26           Plaintiffs offer Dr. Neumark, a professor of labor economics at the University of

27   California, Irvine, to opine that various statistical disparities in the data produced by TCS are

28   "strongly consistent" with discrimination in hiring and terminations on the basis of race and

national origin.  (Neumark Rpt. ¶ 6.) Dr. Neumark's findings focus on statistical disparities regarding TCS' workforce during the class period, namely the proportion of (i) Southeast Asians working at TCS compared to the computer design and related services industry as a whole, and (ii) the proportion of Southeast Asians which TCS involuntarily terminated from the bench compared to non-Southeast Asians.  For each of these statistical disparities, Dr. Neumark opines that the results are statistically significant and there exists less than .00000001% probability that the disparity is due to chance. (*Id.* ¶¶ 6, 8.) Defendant does not challenge Neumark's qualifications. Rather, defendant contends that Dr. Neumark's calculations (i) are unhelpful to the trier of fact because he fails to opine that discrimination was the cause of the statistical disparities, and unreliable because he (ii) fails to consider non-discriminatory factors which could explain these statistical disparities, (iii) fails to consider the appropriate labor market by including expats from his calculations, (iv) employs a novel methodology which is inconsistent with his prior published work, and (v) ignores the fact that TCS' actual applicant pool is 40% South Asian.  The Court addresses each criticism.

### 1.    Lack of Opinion on Causation

Defendant argues that Dr. Neumark's analysis is unhelpful to the trier of fact because he does not opine that discrimination was the cause of the statistical disparities which he identified. Dr. Neumark's conclusion is limited to an opinion that the statistical disparities are "strongly consistent" with discrimination.  Defendant relies primarily on *Coleman*, an employment discrimination class action in which the Ninth Circuit found that plaintiffs' expert's opinion that there was a "3 in 100 billion" probability that a statistical disparity occurred due to chance, but which did not address causation, insufficient to survive a motion for summary judgment. *Coleman,* 232 F.3d at 1283.

Defendant does not persuade. As an initial matter, defendant ignores the fact that the *Coleman* Court actually admitted and fully considered plaintiffs' expert's statistical evidence. *See Coleman,* 232 F.3d at 1283-84.  There, the Court found plaintiffs' statistical evidence admissible despite methodological criticisms undermining the weight of such evidence.  232 F.3d at 1285.

Further, expert analysis need not purport to prove discrimination to be helpful to the trier

of fact. "A statistical study may fall short of proving the plaintiff's case, but still remain relevant to the issues in dispute." *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005). In *Obrey*, the Ninth Circuit considered the admissibility of an expert analysis "based entirely on statistical disparities." *Id.* at 696. There, defendant argued that plaintiff's expert's statistical analysis was not relevant because the expert did not purport to identify discrimination. In finding the expert analysis helpful to the trier of fact and therefore admissible, the Court noted that defendant's objection went to "weight and sufficiency rather than admissibility." *Id.* at 695. Here, Dr. Neumark need not opine that the observed statistical disparities were caused by discrimination for his testimony to be relevant and helpful to the trier of fact. As in *Obrey* and *Coleman*, Dr. Neumark's analysis shows statistical disparities between South Asians and non-South Asians in TCS' workforce composition and involuntary termination outcomes. The Court notes that determining causation is the providence of the jury, not an economic expert.

### 2. Non-discriminatory Factors

Defendant's second basis for excluding Dr. Neumark's opinion is that he did not take into account non-discriminatory factors which could explain the statistical disparities he observed. Specifically, TCS asserts that Dr. Neumark failed to control for differences between South Asian and non-South Asian employees and applicants with regard to (i) compensation demands; (ii) willingness to relocate; (iii) familiarity with TCS clients; (iv) skills and training; and (v) performance ratings. TCS relies primarily on *Bazemore* in arguing that Dr. Neumark's statistical analysis is "so incomplete as to be inadmissible as irrelevant." *Bazemore v. Friday,* 478 U.S. 385, 401 n.10 (1985).[12]

---

[12] TCS also cites *Coleman, Sheehan, Rose* in arguing that Dr. Neumark's analysis is so incomplete as to be inadmissible. Defendant does not persuade. As noted the *Coleman* Court actually admitted plaintiff's expert's testimony despite a failure to control for "obvious variables." *Coleman*, 232 F.3d at 1283.
Similarly, in *Rose*, the Ninth Circuit admitted and considered plaintiff's expert's statistical evidence of age discrimination even though the analysis failed to take into account the fact that "older persons tend to occupy [the type of] key management positions" which were eliminated pursuant to a workforce consolidation of duplicative job positions following a corporate merger. *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1423 (9th Cir. 1990).
Defendant's reliance on *Sheehan* is puzzling. There, the Court excluded expert testimony based on an improper equation of a "simple statistical correlation to a causal relation. *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 942 (7th Cir. 1997). Here, as discussed above, defendant

As an initial matter, the portion of *Bazemore* on which TCS relies is dicta which appears in a footnote following the Court's articulation of the general rule that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Id*. at 401. As discussed above, "objections to a study's completeness generally go to 'the weight, not the admissibility of the statistical evidence.'" *Obrey,* 400 F.3d at 695 (quoting *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th Cir. 1995)).

Further, TCS cannot simply identify non-discriminatory variables and assert that controlling for such variables would cure the observed statistical disparities. Rather, defendant must "produce credible evidence that curing the alleged flaws must also cure the statistical disparity." *E.E.O.C. v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575, 583 (9th Cir. 1989). Here, TCS's own economic expert, Dr. Anderson, conceded that the data which TCS produced in this case was insufficient to control for most of these variables through a reliable multi-variable regression.[13] (Dkt. No. 170, Ex. 7, Deposition G. Edward Anderson ("Anderson Dep.") at 74:21–76:2 (testifying that he did not control for certain variables because "I don't believe that the data I have would allow me to do a reliable analysis like that).) Thus, the Court finds that defendant has failed to demonstrate how controlling for non-discriminatory variables explain the statistical disparities identified by Dr. Neumark.

### 3. Relevant Labor Market

With regard to TCS' third challenge to Dr. Neumark's opinion which is failure to identify the appropriate relevant labor market, defendant focuses its attack on Dr. Neumark's inclusion in his hiring analysis of South Asians expats hired in India and transferred to the United States

---

moves to exclude Dr. Neumark's opinion specifically because he did not equate statistical correlation with causation. *See Section III.B.1, supra*. As TCS repeatedly points out, Dr. Neumark opines that the statistical disparities are "consistent" with a pattern of discrimination and does not claim a causal relationship.

[13] The Court notes that Dr. Anderson did analyze two non-discriminatory variables, namely (i) tenure at TCS and (ii) performance ratings. (Anderson Rpt. ¶¶ 17, 69, Tbl. 14.) However, as discussed below triable factual issues exist as to whether these variables are themselves a product of discrimination. *See Section III.C.2, infra*. In any event, Dr. Anderson's analysis of these two variables merely suggests a simple correlation between (i) tenure, (ii) performance ratings, and (iii) termination rates. Such analysis does constitute the type of multi-variable analysis which TCS contends Dr. Neumark should have conducted.

United States District Court
Northern District of California

1  pursuant to work visas.  Specifically, TCS takes issue with the fact that Dr. Neumark deems an

2  expat's first project in the United States as his date of hire.  TCS' criticism may have substantial

3  implications for this case given that South Asian expats accounted for greater than 75% of TCS'

4  United States workforce during the class period. (Anderson Decl. ¶ 14.)  Whether an expat

5  transferred to the United States constitutes a "hire" for the purposes of an employment

6  discrimination analysis presents an issue of first impression.  This Court is unaware of any case

7  which specifically analyzed whether expats transferred to the United States pursuant to work visas

8  are properly deemed "hires" for the purposes of defining a relevant labor market, nor have the

9  parties offered any such cases.

10      According to TCS, expats are already TCS employees when they arrive in the United

11  States and thus should not be deemed "hires" in Dr. Neumark's analysis.[14]  Defendant further

12  highlights that it has received authorization from the United States government to bring such

13  India-based employees to the United States pursuant to work visa. (Dkt. No. 130, Declaration of

14  Amit Jindal ¶ 4.)  Plaintiffs argue that expats must apply and interview for positions in the United

15  States which are otherwise filled by local hires. (Kumar Dep. at 27:13-29:1, 43:22-44:5.)  Further,

16  plaintiffs point to TCS documents which suggest that defendant views expats and Local Hires as

17  substitutes. (Dkt. No. 195, Exs. 76-79 (listing open available for "LOCAL HIRE/EXPAT.)

18      TCS' criticism presents a close issue. On the one hand, expats must compete against Local

19  Hires for positions supporting TCS clients in the United States.  (Dkt. No. 195, Exs. 76-79.) Like

20

21      [14] Defendant also attacks Dr. Neumark's failure to include expats transferred back to India
before the expiration of the expat's visa in his termination analysis.  The Court finds TCS'
22  criticism valid, but notes that Dr. Neumark adjusted his calculations to address this issue in his
supplemental report.  (Neumark Supp. Rpt. ¶ 7, Tbl. 2.)  The impact of this adjustment on Dr.
23  Neumark calculations is *de minimis* and does not impact the statistical significance of his findings.
(*Id.*)

24      Defendant further argues that the involuntary termination rate for expats is nearly 100%
because almost all expats eventually return to their home county.  Defendant does not persuade, as
25  adopting this logic would essentially shield all employers which discriminate in favor of expats
and against United States employees from liability under Title VII for discrimination based on
26  national origin. The fact that expats work in the United States pursuant to visas which contain
specific time limitations means that most expats must necessarily return to their home country on a
27  predetermined date. It does not follow that such expats were involuntary terminated, as the
conclusion of their employment in the United States is not a discretionary employment decision
28  but the result of an employer's compliance with United States visa and immigration laws.

Local Hires, expats must apply, interview, and be selected for jobs in the United States. Accordingly, there exists a reasonable basis to view expats and Local Hires as labor market substitutes. Further, an expat's first project in the United States represents a new role for the expat. Working onsite with a client in the United States is fundamentally different than supporting a client remotely from India. On the other hand, expats were hired and employed by TCS in India prior to transferring to the United States. Further, plaintiffs do not dispute that expats enter the United States pursuant to work visas specifically authorized by the United States government.

To resolve this issue the Court looks to the underlying purposes of United States visa laws. Federal courts have found that the purpose of visa laws is to enable foreign workers to "enter[] the labor market" in the United States, *Prod. Tool Corp. v. Emp't & Training Admin.*, 688 F.2d 1161, 1168 (7th Cir. 1982), while protecting the domestic economy from adverse working standards as workers "enter[] the labor market." *Vemuri v. Napolitano*, 845 F. Supp. 2d 125, 131 (D.D.C. 2012). Such cases support the proposition that expats "enter" the United States labor market when expats commence work in the United States pursuant to work visas. Effective on that date, the expat's work visa begins to run and the expat is considered a United States employee for the purposes of tax and labor laws.

Therefore, the Court finds that it was reasonable for Dr. Neumark to deem an expat's first project in the United States as the expat's date of hire. *See Prod. Tool Corp.*, 688 F.2d at 1168; *Vemuri*, 845 F. Supp. 2d at 131. However, the Court takes no position as to whether foreign workers transferred to the United States pursuant to work visa in fact constitute hires for the purposes of an employment discrimination analysis. Rather, the Court's finding is limited to the reasonability of Dr. Neumark's assumption, not its ultimate validity. Accordingly, the Court finds that defendants' criticism of Dr. Neumark's inclusion of expats in his hiring analysis goes to the weight of Dr. Neumark's opinion and does not warrant exclusion.

### 4.        Consistency with Prior Work

Defendant's fourth ground for exclusion of Dr. Neumark's opinion is that his methodology is novel, untested, and inconsistent with his prior published work. Defendant does not persuade, as Dr. Neumark's methodology is consistent with the methodology used by experts in employment

discrimination cases.  *See Hazelwood Scho. Dist. v. United States*, 433 U.S. 299, 308, n.14 (1977); *see also Adams v. Ameritech Servs., Inc.,* 231 F.3d 414, 424 (7th Cir. 2000). Here, Dr. Neumark (i) defines the relevant labor market, (ii) determines the expected employment results absent discrimination ("Null Hypothesis"), (iii) compares the actual statistical results against the Null Hypothesis, (iv) calculates the standard deviation between the actual statistical results and the Null Hypothesis, and (v) computes the likelihood that these statistical disparities occurred by chance. *See id*.  There exists nothing novel or untested about such a methodology.

Citing Dr. Neumark's prior work published in the National Bureau of Economic Research (the "NBER Publication"), defendant attempts to frame Dr. Neumark's failure to control for certain non-discriminatory variables as inconsistent with his previous position on employment discrimination regression analyses. However, TCS misinterprets the NBER Publication. There, Dr. Neumark merely cautioned against studies which rely on an "artificial pool of job applicants" rather than "trying to control for variables that might be associated with productivity." (Dkt. No. 125, Declaration of Patrick Downes ("Downes Decl.") ¶ 4, *Detecting Discrimination in Audit and Correspondence Studies,* NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper 16448 (October 2010) at 3.) The NBER Publication does not stand for the proposition that studies which fail to control for such variables are inherently flawed or unreliable. Rather, the NBER Publication simply encourages researcher to *try* to control for such variables when sufficient data is available. Here, Dr.  Neumark and TCS' economic expert Dr. Anderson apparently agree that TCS did not produce sufficient data to conduct a reliable multi-variable analysis which controls for many of the variables potentially associated with productivity.  (Anderson Dep. 74:21–76:2.)

Defendant also points to Dr. Neumark's deposition testimony to argue that his methodology is unreliable because he was unable to name any studies which employ the methodology he used in this case. Defendant's argument fails, as TCS misconstrues the deposition testimony.  During his deposition, Dr. Neumark did not testify that his methodology was "unorthodox" or "untested."  Rather, Dr. Neumark testified that his use of company-level data is uncommon because researchers rarely have access to such granular data. (Downes Decl. ¶ 2, Deposition of David Neumark, Ph. D. ("Neumark Dep.") at 110:5-23 (stating that "there aren't

1    many published papers with company databases . . . Occasionally, a consultant gets hold of data

2    and is able to do this kind of thing").)  The dearth of published material employing the mythology

3    used by Dr. Neumark here thus does not reflect a novel or untested mythology, but rare access to

4    granular company-level data.

### 5.    TCS' Actual Applicant Pool

6         Finally, TCS argues that Dr. Neumark's opinion should be excluded because he failed to

7    consider that 40% of TCS' actual applicant pool is comprised of South Asian candidates.

8    Defendant's argument fails in light of the Supreme Court's holding in *Dothard*. There, the Court

9    held that a "statistical showing" of discrimination need not be "based on analysis of the

10   characteristics of actual applicants" because the "the application process might itself not

11   adequately reflect the actual potential applicant pool." *Dothard v. Rawlinson*, 433 U.S. 321, 330

12   (1977).  Further, where "there is an allegation that the employer's discriminatory practices infect

13   recruiting . . . applicant flow data cannot be taken at face value." *Castaneda v. Pickard*, 648 F.2d

14   989, 1003 (5th Cir. 1981).

15        Here, plaintiffs allege that TCS engages in a pattern and practice of discrimination which

16   extends to its use of third-party recruiters to identify, target, attract, and hire South Asian

17   applicants.  (TAC ¶ 1 ("recruiters within Tata's United States recruiting unit have been explicitly

18   instructed to focus primarily on hiring Indians for positions in the United States").)[15]  Therefore,

19   Dr. Neumark's use of American Community Service ("ACS") employment data instead of TCS'

20   actual applicant pool was reasonable and TCS' criticisms go to weight, not admissibility.

### 6.    Conclusion

22        For the reasons discussed above, TCS' motion to exclude the expert opinion of Dr.

23   Neumark is **DENIED**.

24   //

25

---

26   [15] In addition, the Seventh Circuit has recognized that "[a]n applicant pool analysis is
     biased against finding discrimination, if potential applicants know or suspect that the employer is
     discriminating. *Mister v. Illinois Cent. Gulf R. Co.,* 832 F.2d 1427, 1436 (7th Cir. 1987). Here,
27   TCS applicants may "know or suspect that the employer is discriminating," *Mister,* 832 F.2d at
     1436, and thus any analysis based on the applicant pool will be biased against finding
28   discrimination.

United States District Court
Northern District of California

### C.      Motion for Summary Judgment

#### 1.      Legal Standard

In a disparate treatment case, plaintiffs must show that intentional discrimination was the determinative factor in an adverse employment action. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610 (1993). Class action plaintiffs may bring a claim for disparate treatment by alleging that the employer's conduct was part of a "pattern or practice" of discriminatory treatment toward members of a protected class. *International Broth. of Teamsters v. United States*, 431 U.S. 324, 325 (1977). "As the Supreme Court reaffirmed in *Dukes*, pattern-or-practice cases alleging disparate treatment under Title VII typically follow a bifurcated, burden-shifting structure laid out by *Int'l Broth. of Teamsters*." *Ellis v. Costco*, 285 F.R.D. 492 at 505 (N.D. Cal. 2012). Under the Supreme Court's *Teamsters* framework, pattern or practice claims are evaluated in two phases, namely the "liability stage" ("Phase One") and the "remedial stage" ("Phase Two"). *Teamsters*, 431 U.S. at 360.

##### a.  Phase One: Plaintiffs' Prime Facie Case

During the initial liability stage, plaintiffs bear the burden of establishing a *prima facie* case that "unlawful discrimination has been a regular procedure or policy followed by an employer." *Id*. Plaintiffs must show that intentional discrimination was the defendant's "standard operating procedure" as opposed to an "unusual practice." *Id*. at 336. To carry their burden, plaintiffs must produce evidence giving rise to a sufficient "inference that employment decisions were based on an unlawful discriminatory criterion." *Segar v. Smith*, 738 F. 2d 1249, 1267 (D.C. Cir. 1984.) Plaintiffs can establish this inference through circumstantial evidence such as statistical disparities, documents, and testimony from protected class members. *Teamsters,* 431 U.S. at 336; *American Federation of State, County & Mun. Employees, AFL-CIO (AFSCME) v. State of Wash.* 770 F. 2d 1401, 1407 (9th Cir. 1985).

"The burden of establishing a *prime facie* case is not designed to be 'onerous.'" *Diaz v. American Telephone & Telegraph*, 752 F. 2d 1356 (9th Cir. 1985). To establish a *prima facie* case, "the plaintiff need only provide evidence that *suggests* that the 'employment decision was based on a discriminatory criterion.'" *Diaz*, 752 F.2d at 1361 (quoting *Teamsters*, 431 U.S. at 358)

(emphasis in original). "[G]ross statistical disparities" in the treatment of members of a protected class "alone may in a proper case constitute *prima facie* proof of a pattern or practice of discrimination." *Hazelwood*, 433 U.S. at 308 (citing *Teamsters*, 431 U.S. at 339); *see also Diaz*, 752 F.2d at 1363 (9th Cir. 1985) ("In some cases, statistical evidence alone may be sufficient to establish a *prima facie* case."); *O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864, 866 (9th Cir. 1982) ("Statistical data is one way to establish a *prima facie* case"); *EEOC v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994) ("Statistical evidence can . . . be sufficient to establish a pattern and practice of discrimination"). In the context of summary judgment, the proof necessary to establish a *prima facie* case of employment discrimination is "minimal." *Coleman*, 232 F.3d 1271 (quoting *Wallis v. J.R Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

### b. Phase One: Defendant's Rebuttal

If plaintiffs carry their initial burden of making a *prima facie* showing, the burden then shifts to the defendant to rebut plaintiffs' *prima facie* case by demonstrating that plaintiffs' proof is inaccurate or statistically insignificant, or by proffering a persuasive nondiscriminatory explanation for the statistical discrepancy. *See Teamsters*, 341 U.S. at 360; *Segar v. Smith*, 738 F. 2d at 1268; *United States v. City of New York* 717 F. 3d 72, 85-86 (2nd Cir. 2013). In order to rebut "the inference of discrimination raised by the statistical evidence," a defendant must "do more than simply point out possible flaws in the proponent's statistical analysis." *General Telephone Co.*, 885 F.2d at 575; *see also Palmer v. Schultz*, 815 F.2d 84, 101 (D.C. Cir. 1987) (holding that "defendant cannot rebut statistical evidence . . . without introducing evidence to support the conclusion that the missing factor can explain the disparities as the product of a legitimate, nondiscriminatory selection criterion"). Thus, a defendant must "produce credible evidence that curing the alleged flaws [in plaintiff's statistical analysis] would also cure the statistical disparity." *Id*.

If defendant cannot produce such evidence, this "will support a rebuttable inference that all class members were victims of the discriminatory practice." *Ellis,* 285 F.R.D. at 505 (quoting *Teamsters*, 431 U.S. at 361). The analysis then proceeds to Phase Two.

//

### c. *Phase Two: Remedial Stage*

If an employer "fails to rebut the inference that arises from the [] *prima facie* case," the analysis proceeds to the Remedial Phase where plaintiffs are entitled an "inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Teamsters* 341 U.S. at 361; *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095 at 1106-07, fn.7 (10th Cir. 2001) (indicating that plaintiffs at this stage are "entitled to a presumption that the employer had discriminated against them"). When plaintiffs seek individual relief such as monetary damages, "a district court must usually conduct additional proceedings . . . to determine the scope of individual relief." *Id.*

During Phase Two, the burden shifts to the defendant "but it will have the right to raise any individual defenses it may have," and to "demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." *Teamsters* at 362 (citing *Franks*, 424 U.S. at 747, 772 (1976) (employer has the burden "to prove that individuals . . . were not in fact victims of previous hiring [or termination] discrimination"). A defendant must offer "clear and convincing evidence" that adverse employment action would have occurred "even absent the proven discrimination." *Muntin v. State of Ca. Parks Dept.*, 738 F.2d 1054, 1056 (9th Cir. 1984); *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 n.22 (11th Cir. 2000); *see also Segar*, 738 F.2d at 1269-70.

## 2. Discussion

### a. *Phase One: Plaintiffs' Prime Facie Case*

Plaintiffs rely primarily on three types of evidence to establish their *prima facie*, namely (i) statistical disparities between South Asian and non-South Asian employees with regard to both workforce composition and involuntary terminations from the bench; and TCS documents which suggest that defendant (ii) prefers expats which are predominantly South Asian over Local Hires when mapping benched employees to onsite client opportunities and (iii) instructs third-party vendors to identify, target, and recruit South Asian in local hiring.

With regard to the first category which is plaintiffs' statistical evidence, Dr. Neumark opined that TCS involuntarily terminated 10.6% of its non-South Asian workers compared to less

1    than 1% of South Asian workers during the class period. (Neumark Supp. Rpt., Tbl. 2)  According

2    to Dr. Neumark, these results are statistically significant and the likelihood of obtaining such

3    skewed results by chance is less than 1 in 1 billion. (*Id.*)  Dr. Neumark also opined that TCS'

4    workforce was between 72.32% and 78.91% South Asian during the class period, compared to

5    12.50% of the computer systems design and related services industry as a whole. (Neumark Rpt.

6    ¶¶ 6, 14; Tbl. 1).) [16]  These results are also statistically significant, and the likelihood of obtaining

7    these results by chance is less than 1-in-1-billion.  Such "gross statistical disparities" in the

8    treatment of non-South Asian employees "alone may in a proper case constitute *prima facie* proof

9    of a pattern or practice of discrimination." *Hazelwood*, 433 U.S. at 308 (citing *Teamsters*, 431

10   U.S. at 339).[17] However, plaintiffs here do not rely merely on statistical evidence alone but offer

11   additional documentary evidence of discrimination.

12       The second category of evidence is TCS documents which suggest a pattern and practice of

13   favoring benched South Asian expats over Local Hires in allocating employees to onsite client

14   projects. Such work allocations are significant given TCS' business and termination model

15   discussed above.  As noted benched TCS employees receive their regular paychecks but are

16   generally terminated if they remain unallocated for an extended period of time.  (Kumar Dep. at

17   15:3-15; Dkt. No. 115, Ex. 7 (TCS055851-5854 at 5853).)

18       Plaintiffs offer internal TCS documents which describe a TCS "[l]eadership directive [] to

19

20       [16] At this juncture the Court takes no position as to whether foreign workers transferred to
     the United States pursuant to work visas are properly deemed "hires."  *See* Section III.B.3, *supra*.
21   As noted Dr. Neumark's inclusion of expats in his hiring analysis was reasonable, and any
     criticisms of such inclusion go to the weight of his opinion. However, in an abundance of caution,
22   the Court affords minimal weight to plaintiffs' statistical evidence of hiring disparities.

23       [17] Defendant argues in passing that plaintiffs fail to make out a *prima facie* case because
     plaintiffs rely "almost exclusively" on statistical evidence and "[l]iability may not be based solely
24   on racial imbalance among employees." *Lewis v. Tobacco Workers' International Union*, 577 F.2d
     1135, 1141 (4th Cir. 1978). However, defendant misconstrue plaintiffs' initial burden to establish
25   a *prima facie* case.  At the *prima facie* stage plaintiffs need not establish TCS' ultimate liability,
     but must merely proffer evidence which "*suggests*" that TCS' employment decisions were the
26   "based on a discriminatory criterion." *Diaz*, 752 F.2d at 1361 (quoting *Teamsters*, 431 U.S. at 358)
     (emphasis in original).  As noted the Ninth Circuit has found that "gross statistical disparities . . .
27   alone" may be sufficient. *Hazelwood*, 433 U.S. at 308 (citing *Teamsters*, 431 U.S. at 339); *Diaz*,
     752 F.2d at 1363.  Finally, and in any event, defendant's assertion that plaintiffs rely almost
28   exclusively on statistical evidence does not persuade in light of the copious documentary evidence
     which plaintiffs offer in additional to the statistical evidence.

United States District Court
Northern District of California

utilize every visa to the maximum extent." (Dkt. No. 115, Ex. 2 (TCS057813-18 at 15).)  These

documents further reflect instructions that the "RMG should try and map associated with

unutilized visas and work permits for onsite opportunities."  (Dkt. No. 115, Ex. 8 (TCS007391-

7452 at 7425).)   Other such documents describe instructions for the RMG to review a list of

unallocated expats and map "each associate to two accounts and mark[] the priority 1 & 2"

because "[p]rioritized accounts will quickly evaluate and absorb associates into immediate billable

roles." (*Id.*, Ex. 27 (TCS069046-9047).)  Further, plaintiffs offer evidence that this corporate

directive was implemented across a range of business managers.  (*Id.*, Ex. 90

(TCSLTD004016550-53 at 50) ("As per Corporate directive we have to utilize the visa ready

associates at onsite"); Ex. 91(TCSLTD004040304-06 at 304) (referencing "direction from our

leadership team on leveraging visa ready expat associates"); Ex. 93 (TCSLTD003236913) ("As

per recent Management decision, we have been advised to . . . re deploy [expats] at onsite if they

are getting released.").)

        Third, plaintiffs offer TCS documents which describe apparent instructions to identify,

target, and attract South Asian Local Hires (also referred to as "Desi" applicants).  For example,

one such document reflects a request from TCS' "Offshore Lead" to a Senior Talent Acquisition

Manager to "get a Local Hire preferably Indian . . . . We need only Indians for this requirement."

(Dkt. No. 197, Ex. 60 (TCSLTD005353314-17 at 14-16).)  In response, the Talent Acquisition

Manager notes that "finding a Desi should not be an issue and [I] will only look for this but

obviously we cannot release this sort of info to the outside world [smiley face]." (*Id.*)  Similar

documents indicate that TCS' "[h]iring trends in FY12 indicate Hiring Managers within ISUs have

higher affinity towards selecting local hire candidates who are of Indian-origin." (*Id.*, Ex. 55

(TCSLTD003481371-77 at 76); *see also* Ex. 62 (TCSLTD005349892-93 at 92) (informing

recruiter "I need more candidates for this but they[]must be Desi"); Ex. 63 (TCSLTD005204587-

91 at 87, 88) (Project Manager: "I don't know how to ask this subtly . . . do u think we can get

someone 'desi' for this[?]  Senior Talent Acquisition Specialist: "No problem I'll let [the recruiter]

know[.]").)

The Court finds that plaintiffs' statistical and documentary evidence easily satisfies their burden to make a *prima facie* showing. In the context of summary judgment the proof necessary to establish a *prima facie* case of employment discrimination is "minimal." *Coleman*, 232 F.3d 1271 (quoting *Wallis*, 26 F.3d at 889); *see also Diaz*, 752 F. 2d at 1356 (burden is not designed to be "onerous"). Plaintiffs' showing is sufficient, as they have provided ample "evidence that *suggests* that [TCS'] 'employment decision[s] [were] based on a discriminatory criterion." *Diaz*, 752 F.2d at 1361 (quoting *Teamsters*, 431 U.S. at 358) (emphasis in original).

### b. Phase One: Defendant's Rebuttal

Having found plaintiffs' *prima facie* showing sufficient, the burden now shifts to defendant to rebut plaintiffs' *prima facie* case by demonstrating that plaintiffs' proof is inaccurate or statistically insignificant, or by proffering a persuasive nondiscriminatory explanation for the statistical discrepancy. *See Teamsters*, 341 U.S. at 360; *Segar v. Smith*, 738 F. 2d at 1268. TCS challenges plaintiffs' *prima facie* case on five grounds: First, TCS argues that plaintiffs' statistical evidence is undermined by Dr. Neumark's failure to eliminate non-discriminatory factors. Second, plaintiffs' inclusion of expats in plaintiffs' hiring analysis is improper. Third, the statistical evidence fails to focus on the geographic regions where applicants and employees actually seek to work. Fourth, plaintiffs fail to consider the fact that TCS' applicant pool is 40% South Asian. Fifth, the percentage of South Asians employed at TCS decreased during the class period.

With regard to Dr. Neumark's failure to control for non-discriminatory variables, defendant largely rehashes the same arguments raised in TCS' motion to exclude the expert opinion of Dr. Neumark. *See* Section III.B, *supra*. However, in order to rebut "the inference of discrimination raised by the statistical evidence [TCS must] . . . . do more than simply point out possible flaws in [plaintiffs'] statistical analysis." *General Telephone Co.*, 885 F.2d at 575 (1989); *Palmer*, 815 F.2d at 101. Here, TCS fails to "produce credible evidence that curing the alleged flaws [in plaintiff's statistical analysis] would also cure the statistical disparity." *Id.* at 583. Defendant makes no showing that controlling for allegedly non-discriminatory variables eliminates the statistical significance of Dr. Neumark's statistical findings. TCS merely identifies certain variables which *could* explain the statistical disparities, but fails to establish that these

variables "explain the disparities as the product of a legitimate, nondiscriminatory selection criterion." *Palmer,* 815 F.2d at 101. For example, TCS offers no evidence that compensation demands actually differ between South Asian and non-South Asians, or that South Asian applicants and employees have superior technical skills, are more willing to relocate, or provide higher quality work.

Defendant's reliance on *Coleman* is misplaced. There, plaintiffs made out a *prima facie* case of age discrimination primarily through statistical evidence. Defendant rebutted the *prima facie* case by showing that plaintiffs' statistical evidence was not statistically significant after controlling for age, skill level, and education. By contrast, defendant here has not shown that Dr. Neumark's evidence lacks statistical significance after controlling for non-discriminatory variables because TCS did not conduct its own analysis controlling for such variables. As noted TCS' own economic expert testified that a reliable multi-variable regression analysis could not be performed with the data which TCS provided. (Anderson Dep. at 74:21-76:2.)

However, the Court notes that Dr. Anderson was able to use the data which TCS provided to conduct a limited statistical analysis of two allegedly non-discriminatory variables, namely tenure and performance ratings. With regard to tenure, TCS contends that plaintiffs' statistical evidence is undermined by the fact that expats have on average nearly three years of experience with TCS prior to arriving in the United States. Dr. Anderson opines that employees with longer tenure are involuntarily terminated at lower rates. (Anderson Rpt. ¶ 17, 69; Tbl. 14.) Defendant does not persuade, as Dr. Anderson's calculations reveal no difference in involuntary termination rates between employees with less than one year of tenure at TCS and those with 2-3 years of experience which is the average tenure of expats when they arrive in the United States. (*Id.*) Dr. Anderson further asserts that plaintiffs' statistical evidence is insignificant because expats receive higher performance rankings and employees with higher performance rankings are involuntarily terminated at lower rates. (Anderson Rpt. ¶ 17, 69; Tbl. 14.) The Court declines to afford this opinion significant weight because the record suggests that TCS' performance rankings may themselves reflect discrimination. For example, an internal TCS presentation specifically identifies "inherent bias among managers while ranking Local hires . . . . Local hires ranking is

26

1    skewed consistently towards lower ranks . . . . Over 20% of local hires ranked as D or E, as

2    opposed to 5% amongst expats." (Dkt. No. 197, Ex. 55 (TCSLTD003481371-77 at 73).)

3    Therefore, TCS' first criticism fails.

4        TCS' second attack on plaintiffs' *prima facie* showing recycles same arguments raised in

5    defendant's motion to exclude Dr. Neumark based on the inclusion of expats in his hiring

6    analysis.[18]  As discussed above, whether expats are properly included in plaintiffs' hiring analysis

7    is a close call and at minimum a triable issue.  In light of plaintiffs' statistical evidence of

8    discrepancies in involuntary terminations from the bench between South Asian and non-South

9    Asian employees, and the unrebutted documentary evidence of discrimination, the Court finds that

10   plaintiffs need not rely on Dr. Neumark's hiring analysis to make a *prima facie* showing.

11       Third, TCS argues that Dr. Neumark fails to focus on the geographic regions where

12   applicants and employees actually seek to work. Defendant points out that plaintiffs offer no

13   evidence on the demographics of qualified applicants in the applicants' respective local labor

14   pools.  TCS offers evidence that 43% of software and IT workers in Los Angeles and 70% of

15   applicants for software engineering positions at a Palo Alto employer were Asian. (*See* RJN, Ex.

16   2.) With regard to the anecdotal and unverified statistics describing the racial composition of

17   software and IT workers in Los Angeles and Palo Alto, the Court finds that such figures fail to

18   address (i) the percentage of such workers who are *South* Asian; (ii) whether these figure may

19   themselves reflect discrimination; or (iii) the proportion of TCS employees in Los Angeles and

20   Palo Alto.

21       Defendant further argues that plaintiffs' nationwide labor market runs afoul of *Hazelwood*,

22   *Gay,* and *Piva.*  The Court disagrees.  Here, plaintiffs are proceeding under a nationwide theory of

23

24       [18] In its motion for summary judgment, TCS raises an additional argument that the General
25   Agreement on Trade in Services ("GATS") specifically authorizes TCS' visa practices.  This
     argument fails in light of the fact that GATS does not apply to the "movement of all categories of
26   natural persons supplying services under the Agreement." (*See* GATS: General Agreement on
     Trade in Services, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade
27   Organization, Annex on Movement of Natural Persons ¶¶ 1-4.)

28

discrimination. *Hazelwood* and *Gay,* by contrast, involved allegations of discrimination in local labor markets. *See Hazelwood,* 433 U.S. at 308 (St. Louis county); *Gay v. Waiters' and Dairy Lunchmen's Union*, 549 F.2d 1330, 1331 (9th Cir. 1977) (San Francisco). Given the geographic mobility necessarily involved in the onsite consulting services which TCS offers and the geographic dispersion of TCS' workforce across virtually the entire United States, the Court finds that a national labor market and nationwide theory of harm are appropriate.

In addition, *Piva* is distinguishable. There, plaintiff attempted to establish a *prima facie* based on statistical disparities between defendant's workforce and the general population. *Piva v. Xerox Corp.,* 654 F.2d 591, 596 (9th Cir. 1981.) The Ninth Circuit rejected this approach, reasoning that when "special qualifications are required to fill particular jobs, comparisons to the general population . . . may have little probative value." *Id*. at 596 (quoting *Hazelwood*, 433 U.S. at 308 n.13). By contrast, plaintiffs here do not compare TCS' workforce to the general population. Instead, Dr. Neumark benchmarks TCS' workforce demographics against the computer systems design and related services industry which is a reasonable proxy for a labor pool of individuals with the "special qualifications" required of TCS applicants and employees. *Id*.

TCS' fourth attack on plaintiffs' *prima facie* case is that plaintiffs fail to consider the fact that TCS' applicant pool is 40% South Asian. Once again, defendant reiterates the same arguments proffered in its attempt to exclude Dr. Neumark's expert opinion. *See* Section III.B, *supra*. As discussed above, Dr. Neumark's decision to benchmark TCS' actual employment results against the computer systems design and related services industry is reasonable given the allegations and evidence in the record that TCS' applicant pool may itself be the product of discrimination. *See id*.

Finally, TCS argues that the percentage of South Asians employed at TCS decreased during the class period. (*See* Dkt. 128, Declaration of Dr. Edward P. Lazear ("Lazear Decl.") ¶ 52, Figure 1.) However, TCS' calculations include only Local Hires and are thus limited to a sample size which represents between 10% and 25% of TCS' United States workforce. (*See id*.; Answer ¶ 13; Dkt. No. 96-1 at 2 (active employee list).) Further, TCS offers no evidence as to whether the statistical discrepancy between the percentage of South Asians and non-South

involuntarily terminated from the bench decreased during the class period. The Court thus finds the evidence of declining South Asian workforce composition insufficient in itself to rebut plaintiffs' *prima facie* case.[19]

For the reasons discussed above, the Court finds that TCS has failed to rebut plaintiffs' *prima facie* case.

### c. *Phase Two: Remedial Stage*

Defendant argues that it is entitled to summary judgment as to (i) Buchanan because Buchanan cannot identify an available position for which he was qualified and to which he applied, and (ii) Slaight because Slaight was terminated for poor performance. The Court finds that a ruling on the individual claims of Buchanan and Slaight is premature.

"[C]ourts have routinely adopted the approach advocated by plaintiffs in which the first phase of the proceedings focuses exclusively on classwide claims, while individual compensatory damages would be resolved in the second phase." *Rollins v. Traylor Bros.*, 2016 U.S. Dist. LEXIS 7294, *56 (W.D. Wash. 2016) (quoting *Ellis*, 285 F.R.D. at 543-44.) Such "bifurcation promotes judicial economy and reduces juror confusion. If Plaintiffs do not prevail in Stage One, there will be no need to conduct Stage Two Damage hearings." *Id.* (citing *Bates v. UPS*, 204 F.R.D. 440, 449) (N.D. Cal. 2001).

"During the first stage of a pattern-or-practice case . . . a summary judgment motion (whether filed by plaintiffs or defendants) must focus solely on whether there is sufficient evidence demonstrating that defendants had in place a pattern or practice of discrimination during the limitations period." *Thiessen*, 267 F.3d at 1109 (citing *Teamsters*, 431 U.S. at 357-61). "In this

---

[19] TCS also argues that plaintiffs' claims fail because TCS is committed to a formal policy of diversity and inclusion. Defendant offers a TCS "Employee Handbook" which describes a policy prohibiting discrimination on the basis of race and national origin. (Sharma Decl. ¶ 5, Exs. 3, 4.) Further, all TCS new hires must participate in Title VII compliance training program and managers receive additional training from outside labor counsel. (*Id.* ¶ 6.) TCS avers that its policies prohibiting discrimination are strictly enforced and employees that fail to adhere to such policies are disciplined. (Kumar Decl., Ex. 1.) Defendant does not persuade in light of TCS' failure to cite any authority for the proposition that an employer is immune from Title VII liability by virtue of having in place a formal diversity policy.

United States District Court
Northern District of California

case, plaintiffs' motion for class certification of their claims is pending before this court. An individual assessment of each plaintiff's intentional national origin discrimination claim under *McDonnell Douglas* is premature." *Colindres v. Quietflex Mfg.*, 2004 WL 3690215, at *6 (S.D. Tex. 2004).

### d. Conclusion

For the reasons discussed above, defendant's motion for summary judgment as to Phase One liability is **DENIED**. TCS' motion for summary judgment as to Phase Two is **DENIED** as premature to the extent class certification is granted as to Phase One.

### D. Motion for Class Certification

Plaintiffs seek to represent two damages classes pursuant to Rule 23(b)(3).[20] Specifically, plaintiffs define the classes as follows:

(1) **Hiring Class**: All individuals who are not of South Asian race or Indian national origin who sought a position with Tata in the United States and were not hired between April 14, 2011 and the date of class certification.

(2) **Termination Class**: All individuals who are not of South Asian race or Indian national origin who were employed by Tata in the United States, were placed in an unallocated status and were terminated between April 14, 2011 and the date of class certification.

In the alternative, plaintiffs seek to certify a class pursuant to Rule 23(c)(4) for the purpose of resolving three particular issues, namely, (i) whether TCS engages in a pattern and practice of discrimination and the availability of (ii) punitive damages and (iii) injunctive relief. Plaintiffs further move for an order appointing plaintiffs as representatives of the classes defined above, and appointing plaintiffs' counsel as counsel for the class.[21]

---

[20] Excluded from the proposed classes are the defendants, any entity in which defendants have a controlling interest or that has a controlling interest in defendants, and defendants' legal representatives, assignees, and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

[21] At the hearing held on October 3, 2017, defense counsel raised for the first time an argument that plaintiffs lack standing because the named plaintiffs are former employees and plaintiffs are only seeking certification of Phase One issues where the available remedy is "an award of prospective relief," such as "an injunctive order against the continuation of the

Plaintiffs contend that they have established all requirements for certification of a damages class under Rule 23(b)(3).  TCS challenges all elements.

In light of the issues presented, the Court will first address commonality under Rule 23(a) together with predominance under Rule 23(b)(3).  *See, e.g.*, *Collins v. ITT Educ. Servs., Inc.*, No. 12-CV-1395, 2013 WL 6925827, at *3 (S.D. Cal. 2013) (addressing commonality and predominance together) (citing *Amchem Prods.*, 521 U.S. at 609 ("Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.")); *Steven Ades & Hart Woolery v. Omni Hotels Mgmt. Corp.*, No. 13-CV-2468, 2014 WL 4627271, at *8 (C.D. Cal. 2014).  The Court will then address numerosity under Rule 23(b)(3) together with ascertainability.  Next, the Court will turn to the remaining factors under Rules 23(a) and 23(b)(3) —typicality, adequacy, and superiority.

### 1.      Predominance and Commonality

#### *a.  Legal Standard*

Rule 23(a)(2) requires that the party seeking certification show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, a common question "must be of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  The existence of common questions itself will not satisfy the commonality requirement, and instead, "[w]hat matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* at 350 (citation omitted) (emphasis in original).  The predominance inquiry under Rule 23(b)(3) is "far more demanding."  *See Amchem Prods.*, 521

---

discriminatory practice." *Teamsters*, 431 U.S. at 361.  However, defendant ignores the fact that Phase One issues also include a determination on the availability of punitive damages which provides an independent basis for plaintiffs' standing in this case. *Rollins*, 2016 U.S. Dist. LEXIS 7294, *54; *Ellis*, 285 F.R.D. at 542-43 (stating that "the availability of punitive damages should be adjudicated in Stage One of the trial"); *E.E.O.C. v. Outback Steak House of Florida, Inc*., 576 F.Supp.2d 1202, 1205–07 (D. Colo. 2008).

U.S. at 623–24.

The Supreme Court explained in *Dukes* that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 349-50. (internal citations and quotation marks omitted). Rather, plaintiffs' "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

In the context of a putative employment discrimination class action under Title VII, plaintiffs seeking to sue about a large number of "employment decisions at once" must establish "some glue holding the alleged *reasons* for all those decisions together." *Id.* at 352. Otherwise, it will be "impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* The *Dukes* Court described the "glue" that gives rise to sufficient commonality as "significant proof" that an employer "operated under a general policy of discrimination." *Id.* at 355 (quoting *Falcon,* 457 U.S. at 159 n.15 (1982)).

### b. Discussion

With regard to the two proposed classes, plaintiffs' claims hinge on several common questions, namely (i) whether TCS engaged in a pattern and practice of discrimination against non-South Asians, whether (ii) plaintiffs and the proposed classes are entitled to injunctive relief and (iii) the availability of punitive damages. Each question is capable of proof with evidence common to the class.[22] As discussed above, during Phase One plaintiffs will attempt to show that TCS engages in a pattern and practice of discrimination using common statistical and documentary evidence. During this stage TCS may present common defenses by attacking plaintiffs' statistics, presenting its own statistical analysis, and offering documentary evidence

---

[22] Several courts have held that "'pattern and practice question[s] predominate[] because [they] ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to . . . monetary relief.'" *Ellis*, 285 F.R.D. at 538 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)).

32

which rebuts plaintiffs' evidence of pattern and practice discrimination. The existence of these three common issues is undisputed. The question before this Court is whether plaintiffs have proffered "significant proof" that TCS "operated under a general policy of discrimination" which constitutes sufficient "glue holding the alleged reasons for [TCS' challenged employment] decisions together" with regard to each proposed class. *Dukes*, 564 U.S. at 352 (citing *Falcon,* 457 U.S. at 159 n.15). Because plaintiffs present distinct evidence with regard to the two proposed classes, the Court addresses each class separately.

*i. Termination Class*

With regard to the proposed Termination Class, the Court finds that based on the standard articulated in *Dukes*, plaintiffs offer sufficient proof that TCS "operated under a general policy of discrimination." *Dukes*, 564 U.S. at 352. As discussed above, plaintiffs' proof comes in two general categories, namely (i) statistically significant disparities in involuntary rates between benched South Asian and non-South Asian employees, and (ii) TCS documents which describe a general corporate policy of favoring expats and visa-ready individuals who are predominantly South Asian in allocating benched employees to open client projects. Such evidence was discussed previously in the context of defendant's motion of summary judgment. *See* Section C.2.A, *supra*. Rather than repeat itself here, the Court instead highlights three aspects of the evidence offered by plaintiffs in support of the proposed Termination Class: First, Dr. Neumark's statistical findings regarding disparities in involuntary termination rates are unaffected by the criticism which undermines the weight of his hiring analysis (*i.e.* deeming an expat who previously worked for TCS in India as a new hire on the date of the expat's first project in the United States). Second, plaintiffs offer TCS internal documents which suggest that defendant's policy of prioritizing benched expats in staffing Projects represents a "general policy of discrimination." *Dukes*, 564 U.S. at 352. For example, TCS business manager describe the policy as a "[l]eadership directive," "[c]orporate directive," and "[m]anagement decision." (*See* Dkt. No. 115, Exs. 2, 91, 93.) Third, plaintiffs proffer substantial evidence regarding implementation of said policy. (*Id.*)

//

*ii.  Hiring Class*

By contrast, plaintiffs fail to offer sufficient proof that TCS "operated under a general policy of discrimination" with regard to the proposed Hiring Class. *Dukes*, 564 U.S. at 352. First, the potential size of the proposed Hiring Class dwarfs that of the Termination Class. According to plaintiffs, third-party vendors alone submitted 126,000 candidate resumes to TCS during the class period.  Because third-party vendors account for approximately half of TCS applications, the size of the proposed class could easily exceed 250,000. "The Supreme Court suggested (when not explicitly stating) that the sheer size of the [*Dukes*] class . . .  was key to the commonality decision.  This makes a great deal of sense when the purpose of the commonality inquiry is to identify 'some glue holding the alleged reasons for all of [the challenged] employment decisions together.'" *Chen–Oster v. Goldman, Sachs & Co.,* 877 F.Supp.2d 113, 119 (S.D.N.Y. 2012) (quoting *Dukes*, 564 U.S. at 350); *see also Ross v. RBS Citizens, N.A.,* 667 F.3d 900, 909 (7th Cir. 2012).  Similarly, the "sheer size" of the proposed Hiring Class here requires substantial "glue holding the alleged reasons for all of [the challenged] employment decisions together."  The Court finds that plaintiffs fail to proffer such glue.

Second, as noted plaintiffs' hiring analysis is vulnerable to criticism regarding Dr. Neumark's inclusion of expats and the Court thus affords this portion of plaintiffs' statistical analysis minimal weight.  With regard to the documentary evidence offered in support of the proposed Hiring Class, such evidence is anecdotal and fails to establish a "general policy of discrimination" even if persuasive as to individual incidents.  *Dukes*, 564 U.S. at 352.

Third, unlike the evidence of a general policy of discrimination in client project allocations, plaintiffs offer no evidence of a "[l]eadership directive," "[c]orporate directive," or "[m]anagement decision" with regard to hiring. (*See* Dkt. No. 115, Exs. 2, 91, 93.)  Fourth, plaintiffs fail to address the fact that TCS' clients are apparently involved in the hiring process for positions that require technical skills which presents individual inquires. (Chinnari Decl. ¶ 10.)

Finally, plaintiffs' evidence is limited to potential discrimination by third-party recruiters which represent approximately 56% of TCS hires during the class period. (Anderson Decl. ¶ 35, Tbl. 3.)  Plaintiffs make no showing of discrimination as to TCS' other primary hiring channels,

namely employee referrals, social networking, job boards, and campus recruitment. (*See id*.) The data shows significant variation in the percentage of South Asian hires across these five channels, ranging from 43.7% for employee referrals to 27.7% for social networking. Based on the foregoing, the motion to certify the proposed Hiring Class is **DENIED**. Accordingly, the remaining analysis in this section applies only to the Termination Class.

### 2. Numerosity

Rule 23(a) requires that each proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs need not state an exact number to meet the threshold requirements of Rule 23. Rather, the rule "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. Inc. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980); *see also Gold v. Midland Credit Mgmt., Inc.*, 306 F.R.D. 623, 630 (N.D. Cal. 2014); *see, e.g.*, *Patrick v. Marshall*, 460 F. Supp. 23, 29 (N.D. Cal. 1978) (certifying class with at least thirty-nine potential members). A class or subclass with more than 40 members "raises a presumption of impracticability [of joinder] based on numbers alone." *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 152–53 (N.D. Cal. 2015).

The Court finds that plaintiffs' showing of numerosity is sufficient as to the Termination Class. Plaintiffs offer expert testimony that TCS involuntarily terminated between 896 and 1,116 benched non-South Asian employees during the class period. (Neumark Rpt. ¶ 15, Tbls. 3.a-e.) Defendants do not challenge plaintiffs' calculations, but instead argue that plaintiffs cannot provide a methodology for identifying members of the proposed class.[23]

Defendant does not persuade in light of the Ninth Circuit's holding in *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017). There, the Court held that "Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification," and courts should "hew[] closely to the text of Rule 23." *Briseno*, 844 F.3d at 1126. Accordingly, TCS' reliance on the ascertainability criteria cited in *Senne v. K.C. Royals Baseball Corp.*, 315 F.R.D. 523 (N.D. Cal.

_____

[23] Fundamentally, this argument is more aptly addressed as one of ascertainability, not numerosity. However, as defendants comingle their arguments regarding numerosity and ascertainability the Court will address ascertainability in this section.

United States District Court
Northern District of California

2016), is misplaced because *Senne* was decided prior to the Ninth Circuit's ruling in *Briseno*.

With regard to the Termination Class, plaintiffs define the class based on three objective criteria, namely (i) race, (ii), national origin, and (iii) whether TCS terminated that employee from the bench during the class period. Defendant's argument that the class is not ascertainable because proof of class membership requires self-identification of race and/or national origin fails because Rule 23 can be satisfied even where ascertaining class membership requires self-identification. *See Briseno*, 844 F.3d at 1132.

### 3. Typicality

As to the Termination Class, the Court finds that plaintiffs have made a sufficient showing of typicality. To satisfy typicality, plaintiffs must establish that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Defendant does not dispute that (i) Termination Class representative Slaight is not of South Asian race or Indian national origin, or that he was (ii) employed by TCS in the United States, (iii) placed in an unallocated status, and (iv) terminated during the class period. Instead, TCS argues that Slaight cannot "cite any evidence that their grievances were the result of race or national origin discrimination." (Dkt. No. 127 at 21.)

Defendant ignores the substantial evidence of TCS' pattern and practice of favoring benched expats who are predominantly South Asian in mapping such employees to open client projects. TCS also overlooks the fact that employees which remain on the bench for a prolonged period of time are proposed for termination. The fact that TCS has articulated non-discriminatory reasons for terminating Slaight does defeat typicality because such justifications "are merely alternative explanations for the alleged discrimination, and it is 'always the defendant's contention in class action discrimination claims[] that the plaintiffs suffered no discrimination, or at least that any discrimination that occurred was isolated rather than systematic.'" *Ellis, 285* F.R.D. 492, 535 (quoting *Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 268 (S.D.N.Y. 2007)).

//

//

//

### 4.      Adequacy

Rule 23(a)'s adequacy requirement considers "(1) [whether] the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) [if] the representative plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Staton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003). With regard to the Termination Class, defendant does not argue that Slaight has a conflict of interest with other class members or that he will not prosecute the action vigorously. Instead, TCS argues that Slaight is not an adequate class representative because he "freely admits that he was not discriminated against." (Dkt. No. 127 at 22.) The Court finds that TCS' characterization of Slaight's testimony is not quite accurate. During his deposition, Slaight was unable to identify "any facts that would establish that [his] termination was based on the fact that [he was] white." (Dkt. No. 105-7, Deposition of Christopher Slaight ("Slight Dep.") at 161:15-18.) Slaight's inability to identify facts supporting his claim is different than "freely admit[ting]" that his claim fails. Further, at the time of Slaight's deposition TCS had not produced many of the documents which describe TCS' apparent corporate directive to favor visa-ready individuals and expats. *See* Section III.C.2, *supra*. Accordingly, Slaight's inability to identify "facts that would establish" that Slaight was terminated due to his race or national original during a deposition which occurred before the conclusion of fact discovery does not render Slaight an inadequate representative for the Termination Class.[24]

---

[24] TCS further argues that Slaight cannot represent the Termination Class because he did not file a timely Charge of Discrimination with the EEOC. To proceed under Title VII, a Charge of Discrimination must be filed with the EEOC no more than 180 days from the allegedly unlawful act. 42 U.S.C. §2000e-5(e)(1). Fundamentally, this argument is more aptly addressed as one of standing, not adequacy.

In any event, defendant's argument fails because plaintiffs are entitled to rely on the timely EEOC filing of Heldt, the original named plaintiff in the action. *Dukes v. Wal-Mart Stores Inc.*, 2002 U.S. Dist. LEXIS 28984, at *35 (permitting plaintiffs to piggyback on EEOC charge of former named plaintiff); *see also Parra v. Bashas', Inc.*, 291 F.R.D. 360, 383-84 (D. Ariz. 2013) (finding adequacy satisfied despite named plaintiff's failure to exhaust administrative remedies because named plaintiff was entitled to "piggy-back onto the EEOC charge" of other plaintiffs). Heldt's Charge of Discrimination with the EEOC addressed both hiring and terminations. (*See* DKt. No. 25-1 ¶ 4). Further, defendant's standing argument will be muted once plaintiffs file an amended complaint which adds Mandili because plaintiffs offer unrebutted evidence that Mandili's EEOC filing was timely. (Dkt. No. 191, Notice of EEOC Action, Ex. A.)

Additionally, plaintiffs' counsel, Kotchen & Low LLP, have experience litigating class action claims in both federal and state courts, and appear to have been prosecuting this action vigorously. Defendant raises no arguments to the contrary. Therefore, the Court finds that Slaight and his counsel have satisfied the adequacy requirement under Rule 23(a)(4).

### 5.    Superiority

Lastly, Rule 23(b)(3) requires a finding that a class action is superior to individual suits. To make this determination, the Court considers the following four non-exhaustive factors: (1) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D). "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1235 (9th Cir. 1996).

The Court finds that a liability determination during Phase One will resolve for the Termination Class as a whole the question of whether TCS engages in a pattern and practice of discrimination, thus obviating the need for further litigation on this issue, saving judicial and class member resources, and avoiding the possibility of inconsistent judgments. *See Bell v. PNC Bank, Nat'l Assoc.*, 800 F.3d 360, 379-80 (7th Cir. 2015) (noting that if the class prevails in establishing that defendant had an illegal policy, individual class member trials may follow, but "[a]t least it will not be necessary in each of those trials to determine whether [the defendant] had an illegal policy" affecting the class). In addition, while the potential recovery for putative class members is not trivial, potential class members may not be able to afford the substantial upfront costs of litigating a complex discrimination case against a multi-national corporate defendant. Individual expenses could nullify any potential recovery. Under these circumstances, "few potential class members could afford to undertake individual litigation . . . [and] few class members would have any meaningful redress against [TCS] as a practical matter." *Chamberlan v. Ford Motor Co.*, 223

F.R.D. 524, 527 (N.D. Cal. 2004).[25]

TCS' main argument here hinges on its assertion that superiority is "diminished by the sheer volume of individualized inquiries necessary to . . . establish individual recovery." Defendant does not persuade. Although individualized inquires will necessarily remain after Phase One, the remaining questions will be greatly narrowed because the threshold question of whether TCS maintained a pattern and practice of discriminating against non-South Asian employees will have been be resolved on a classwide basis. By trying Phase One a classwide basis, the Court and the parties will achieve significant efficiencies by eliminating the need to litigate the overarching pattern or practice issue for each individual plaintiff.

Accordingly, the Court **GRANTS** plaintiffs' motion for class certification of the Termination Class and **DENIES** the motion as to the Hiring Class. In light of the Court's ruling, the motion to certify a class under Rule 23(c)(4) is **DENIED** as moot.

### 6.    Injunctive Relief Class

Rule 23(b)(2) allows a Court to certify a class when the requirements of Rule 23(a) are satisfied and the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting that class as a whole." Fed. R. Civ. P. 23(b)(2). District courts may certify both a 23(b)(2) class for the portion of the case concerning injunctive and declaratory relief and a 23(b)(3) class for the portion of the case requesting monetary damages. *See* Newberg on Class Actions § 4:38 (5th ed. 2017); *see, e.g.*, *Barrett v. Wesley Fin. Grp., LLC*, No. No. 13-CV-554-LAB, 2015 WL 12910740, at *6–7 (S.D. Cal. Mar. 30, 2015) (certifying both classes in the context of the TCPA); *Kavu*, 246 F.R.D. at 649 (same). However, "[c]lass certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (citation omitted).

---

[25] TCS argues that given the amounts which have been demanded in individual settlement negotiations it is clear that each putative class member has a strong interest in controlling her own action. However, settlement demands do not necessarily reflect the value of each plaintiff's case. Further, settlement discussions are privileged and do not constitute evidence which this Court may consider.

"Although the Ninth Circuit previously held that, in Rule 23(b)(2) cases, monetary damage requests were generally allowable if they were incidental to the litigation, the Supreme Court has called this standard into doubt." *Barrett*, 2015 WL 12910740, at *6 (citing *Wal-Mart*, 131 S. Ct. at 2560).

Here, the large amount of potential liability undermines the proposition that declaratory or injunctive relief is primary to plaintiffs' action. However, in cases "where a plaintiff seeks both declaratory and monetary relief, [courts] may certify a damages-seeking class under Rule 23(b)(3), and an injunction-seeking class under Rule 23(b)(2)." *Barrett*, 2015 WL 12910740, at *7 (citing *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)). The Court finds that certifying the classes here as both damages-seeking classes under Rule 23(b)(3) and injunctive relief only classes under Rule 23(b)(2) is appropriate and promotes judicial efficiency. In the event that plaintiffs are able to demonstrate liability, but ultimately fail to establish classwide damages, the Court may still enter an injunction against defendant.

Accordingly, the Court finds that plaintiffs have satisfied the requirements for certification under Rule 23(b)(2).

### E. Motion for Summary Judgment as to Plaintiff Brian Buchanan

Having granted plaintiffs' motion for class certification as to the Termination Class, defendant's motion for summary judgment as to plaintiff Slaight is "premature." *Colindres*, 2004 WL 3690215, at *6. However, in light of the denial of class certification regarding the Hiring Class, the Court proceeds to analyze defendant's motion for summary judgment as to plaintiff Buchanan.

Defendant argues that TCS is entitled to summary judgment with regard to Buchanan because Buchanan cannot show that "he applied and was qualified for a job for which [TCS] was seeking applicants." *Chavez v. Tempe Union High Sch. Dist. No. 213*, 565 F.2d 1087, 1091 (9th Cir. 1977) (quoting *McDonnell Douglas*, 411 U.S. at 793). Specifically, defendant highlights that Buchanan (i) failed to attend TCS town hall meetings; (ii) admitted that his only application was dropping off his resume at a TCS job fair, and (iii) cannot identify a single available job at TCS for which he was qualified.

As an initial matter, the Court notes that because TCS has failed to rebut plaintiffs' *prima facie* case of pattern and practice discrimination, Buchanan is entitled to an "inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Teamsters* 341 U.S. at 361. Drawing all reasonable inferences in favor of the non-moving party, the Court finds that plaintiffs raise triable issues as to Buchanan's claims. First, the record reflects that Buchanan was a highly qualified system integrator with 25 years of relevant experience in the field. (*See* Dkt. No. 199, Ex. 79 at SCE000150 (SCE employee performance appraisal commending Buchanan for continuing to "look[] for ways to improve his technical ability and stay on top of the latest tech trends" even after 25 years of service with the company). Further, Buchanan was a strong performer in his previous role at SCE. (*See id.*, Ex. 77 at SCE000125; Ex. 78 at SCE000134-45.) Second, Buchanan testified that he attended a TCS job fair in pursuit of a job. (Dkt. No. 120-5, Ex. 34, Deposition of Brian Buchanan ("Buchanan Dep.) at 60:22-61:24.) According to Buchanan, SCE arranged the job and informed Buchanan that dozens of employers including systems integration firms such as TCS and Infosys would be attending and "may even be doing . . . on the spot interviews, so be prepared." (Buchanan Dep. at 60:25-61:8.) Buchanan recalled participating in an informal interview with at least one employer at the job fair. (*Id.* at 68:4-16.) Third, Buchanan testified that the two TCS representatives rebuffed him at the job fair by speaking Hindi as they ignored him. Specifically, plaintiffs introduce unrebutted testimony that TCS' representatives were "dismissive," showed little interest in accepting Buchanan's resume, and never contacted Buchanan regarding his application. (*Id.* at 60:22-61:24, 70:19-71:5.) The Court finds plaintiffs' showing sufficient to establish a triable issue as to whether Buchanan "applied and was qualified for a job for which TCS was seeking applicants." *Chavez*, 565 F.2d at 1091

In any event, even if Buchanan did not actually apply for a job at TCS he could still be entitled to relief if he was deterred from applying due to TCS' discriminatory practices and policies. *See Teamsters*, 431 U.S. at 368. Here, evidence in the record suggests the conduct of TCS' representatives at the job fair may have deterred Buchanan from (i) inquiring further with regard to open positions for which he was qualified and (ii) applying to such positions.

1    (Buchanan Dep. at 60:22-61:24, 70:19-71:5.)

2          Therefore, defendant's motion for summary judgment as to Buchanan is **DENIED**.

3    **IV.    CONCLUSION**

4          For the reasons discussed above, the Court **ORDERS** as follows:

5          1.   Plaintiffs' motion for leave to file a fourth amended complaint is **GRANTED IN PART** as

6                to amending to add Seyed Amir Masoudi and Nobel Mandili as named plaintiffs;

7                **DENIED IN PART** as to adding Steven Webber.  Plaintiffs shall file a fourth amended

8                complaint by **Monday, January 8, 2018**.  Defendant shall respond by **Monday,**

9                **January 22, 2018**.

10         2.   Defendants' motion to exclude the expert opinion of Dr. Neumark is **DENIED**.

11         3.   Defendants' motion for summary judgment is **DENIED** as premature as to plaintiff

12               Christopher Slaight and **DENIED** as to plaintiff Brian Buchanan.

13         4.   Plaintiffs' motion for class certification is **GRANTED** as to the proposed Termination

14               Class and **DENIED** as to the proposed Hiring Class.

15         5.   The Court **APPOINTS** plaintiffs' counsel, Kotchen & Low, as class counsel.

16         A case management conference is hereby scheduled for **January 29, 2018 at 2:00 p.m.** in

17   the United States Federal Courthouse in Oakland, Courtroom One.

18         This terminates Dkt. Nos. 104, 106, 107, 115, 125, 126, 194

19         **IT IS SO ORDERED.**

20   Dated:        December 27, 2017

21

22

23                                        **YVONNE GONZALEZ ROGERS**
                                          **UNITED STATES DISTRICT JUDGE**

24

25

26

27

28