1   Daniel Low, SBN 218387
2   Daniel Kotchen (*pro hac vice*)
    Michael von Klemperer (*pro hac vice*)
3   Lindsey Grunert (*pro hac vice*)
    **KOTCHEN & LOW LLP**
4   1745 Kalorama Road NW, Suite 101
    Washington, DC 20009
5   Telephone: (202) 471-1995
    E-mail:  dlow@kotchen.com
6   E-mail:  dkotchen@kotchen.com
    E-mail:  mvk@kotchen.com
7   E-mail:  lgrunert@kotchen.com

8   Michael F. Brown (*pro hac vice*)
    **DVG LAW PARTNER LLC**
9   P.O. Box 645
    Neenah, WI 54957
10  920-238-6781
    920-273-6177 (fax)
11  mbrown@dvglawpartner.com

12  Attorneys for Buchanan, Slaight,
13  Webber, Masoudi, and Mandili

14
                    **UNITED STATES DISTRICT COURT**
15
                  **NORTHERN DISTRICT OF CALIFORNIA**
16
                          **OAKLAND DIVISION**
17

18  STEVEN HELDT, BRIAN BUCHANAN, and
    CHRISTOPHER SLAIGHT                         Case No.: 4:15-cv-01696-YGR
19
                                                **CLASS ACTION**
20                      Plaintiffs,
                                                **PLAINTIFFS' SUR-SURREPLY IN**
21          v.                                  **SUPPORT OF MOTION FOR CLASS**
                                                **CERTIFICATION**
22  TATA CONSULTANCY SERVICES, LTD.,
23                      Defendant.              Complaint Filed:  April 14, 2015

24

25

26

27

28

1    At the outset of this case, the Court recognized the importance of identifying a common

2 "policy or procedure" for class certification. Hr'g Tr. 12:15-19 (Sept. 15, 2015) (Dkt. #72). Discovery

3 has in this case revealed two such policies: (1) Tata's "leadership directive" to favor visa ready expats

4 in filling U.S. positions, and (2) Tata's practice of sourcing Indian job candidates from third-party

5 vendors. *See* Pls.' Reply at 1-5 (Dkt. #196). The common impact of these policies is reflected in

6 employment data. Hiring rates overwhelmingly favor expat and "local hire" Indians (primarily men).

7 *See, e.g.*, TCSLTD003552840-45 at 40-41 (Ex. 100) ("[T]he split of whom we choose to hire is about

8 90% Indian males and 10% All Others."). Termination rates overwhelmingly disfavor Tata's few non-

9 South Asian employees, as these individuals are benched and terminated as Indian expats become

10 available. *See* Pls.' Reply at 6. The evidence of Tata's policies and the impact of the policies on Tata's

11 hiring and termination rates satisfies Rule 23's commonality requirement.[1]

12    In its surreply, Tata advances six flawed arguments as to why commonality is not met here.

13 First, Tata argues that commonality cannot exist unless each class member suffered "the same injury,

14 not merely that they have all suffered a violation of the same provision of law." Tata's Surreply at 1-

15 2 (Dkt. #206).[2] But being subjected to the same general discriminatory policy is sufficient to establish

16 that class members suffered the same injury for purposes of commonality. *Ellis v. Costco Wholesale*

17 *Corp.*, 285 F.R.D. 492, 507-08 (N.D. Cal. 2012) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.

18 2541, 2553 (2011)) (finding sufficient allegations of "the same injury" where plaintiffs alleged a

19 "general policy of discrimination").[3] A plaintiff "need not prove absolute uniformity, but only a

20 'regular practice … [or] *pattern of* discriminatory decisionmaking.'" *Ellis*, 285 F.R.D. at 518 (quoting

21 *Cooper v. Fed. Res. Bank of Richmond*, 467 U.S. 867, 876 (1984)). Here, the hiring class is impacted

22 by both Tata's "leadership directive" and practice of sourcing Indians through third-party vendors.

23 Non-South Asian job applicants are denied employment in favor of visa-holding Indians (who also

24

[1] While Tata may dispute the existence of these policies, such questions of fact are left for the jury to
25 decide. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016).

26 [2] Tata argues that "plaintiffs ignore *Dukes*." *Id.* at 1. But Plaintiffs discuss *Dukes* at length in their
opening brief, and demonstrate that, unlike in *Dukes*, Plaintiffs here challenge corporate-wide policies
27 created and enforced by upper management. *See* Pls.' Mem. at 18 (Dkt. #115).

28 [3] *See also Rollins v. Traylor Bros.*, C14-1414, 2016 U.S. Dist. LEXIS 7294, at *19 (W.D. Wash. Jan.
21, 2016); *Parra v. Bashas', Inc.*, 291 F.R.D. 360, 375 (D. Ariz. 2013).

1

must apply and interview for jobs in the U.S.) and locally-sourced Indians. Pls. Mem. at 5-11; Pls.'
Reply at 1-5; TCSLTD003552840-45 at 40-41 (Ex. 100). In addition, the termination class is impacted
by Tata's "leadership directive." The comparatively few non-South Asians hired by Tata are routinely
benched and then terminated, as visa holding Indians become available to fill jobs. Pls. Mem. at 7, 10-
11; Pls.' Reply at 6.

Second, Tata argues that commonality cannot exist if employment decisions were "influenced
by each applicant and employee's experience, . . . performance," etc. Tata's Surreply at 1. Tata is
incorrect. "'Where the circumstances of each particular class member vary but retain a common core
of factual or legal issues with the rest of the class, commonality exists.'"[4] To the extent Tata wishes
to raise defenses concerning any individual termination or failure to hire, it may do so during Phase
II. *See* Pls.' Mem. at 2-3, 20; Pls.' Reply at 17.

Third, Tata argues that Plaintiffs fail to present significant proof of the existence of a
leadership directive to favor visa workers for U.S. positions. Tata's Surreply at 4. Contemporaneous
records and witness testimony, however, confirm the existence of the policy. *See* Pls.' Mem. at 6-8
(quoting policy manuals and emails discussing and implementing directive); Pls.' Reply at 1-3
(quoting corporate representative's admission that directive exists, citing records that make clear that
expats are "mapped" to U.S. positions pursuant to directive, and quoting from requisitions earmarked
for "expats" and "visa ready" individuals); RGS Excerpts (Ex. 101).

Tata downplays the significance of Plaintiffs' evidence of the requisitions (*i.e.*, open
positions) reserved for "expats only" or "expats preferred." Tata's Surreply at 4 (discussing Plaintiffs'
Compilation Exhibit B (Dkt. #196-3)). But Compilation Exhibit B provides only *exemplary* and *unique*
quotes from a single human resources database spreadsheet and exemplary emails. Countless
additional examples exist (though many use identical language). *See* RGS Excerpts (Ex. 101)
(compiling thousands of requisitions with instructions such as, "VISA Candidates are enough. No need
of US Citizens"). Tata argues that a request for "expats only" may be "due to the lack of a local

---

[4] *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quoting *Evon v. Law Offices of Sidney Mickell*,
688 F.3d 1015, 1029 (9th Cir. 2012)); accord *Parra v. Bashas', Inc.*, 536 F.3d 975, 979 (9th Cir. 2008);
*Ellis*, 285 F.R.D. at 815 (plaintiffs "need not prove absolute uniformity, but only a 'regular' practice
… [or] *pattern of* discriminatory decisionmaking") (citation omitted).

1    employee with the skills or experience needed" and not discriminatory. Tata's Surreply at 4. But the

2    preference for expats quoted by Plaintiffs are included *in the requisitions themselves* – not after some

3    preliminary determination has been made about the availability of local resources. *See* Comp. Ex. B;

4    RGS Excerpts (Ex. 101).

5          Furthermore, the fact that a small number of requisitions are restricted to local hires does not

6    suggest a lack of discrimination. For example, a small number of positions are restricted to U.S.

7    citizens and permanent residents by law because of the sensitive nature of the work, as Tata's own

8    exhibit indicates. *See, e.g.*, Sharma Decl. Ex. 1 at 4 (Dkt. #211-1) ("This is for the CA Top Secret

9    Infrastructure requirement in US. This requirement to be locally hired"). Moreover, the number of

10   visas available each year is capped, meaning Tata cannot fill every U.S. position with a visa worker.

11   Pls.' Reply at 3. The fact that some requisitions do not explicitly state that they are reserved for expats

12   is irrelevant. There is no need for an explicit reference in *every* requisition to favor expats because

13   Tata employees, per the "leadership directive," must favor visa workers and "map" them to positions

14   in the United States. Pls' Mem. at 6; Pls.' Reply at 1-3. Employee data reveals the common effect of

15   Tata's leadership directive: during the class period, visa holding South Asian expats have comprised

16   between ***76.3% and 89%*** of Tata's U.S. workforce, with almost every worksite staffed with over 90%

17   South Asian expats, and 78% of projects are staffed *exclusively* with expats. Pls.' Reply at 5 & n.14;

18   Kumar Decl. ¶ 9 (Dkt. #141) (over 99% of expats are Indian).

19         Fourth, Tata casts its "leadership directive" as impacting only the terminations class, and not

20   affecting the hiring class because, according to Tata, it simply gives preference to "existing

21   employees" over external applicants. Tata's Surreply at 3, 4 n.2 (discussing leadership directive in

22   context of terminations class only). But Tata's "leadership directive," does not favor "existing

23   employees." It only favors visa-holding Indians who must apply and interview for U.S. positions, just

24   like external applicants. Pls.' Mem. at 4; Pls.' Reply at 10 & n.25.[5] There is no plausible argument that

25   such a preference may constitute a defensible "seniority system."[6] Even Tata itself admits that a

26   _____

27   [5] *See also* Notice of Citation Correction (noting correction to Kumar deposition transcript citation).

[6] *Martinez v. Oakland Scavenger Co.*, 680 F. Supp. 1377, 1391-92 (N.D. Cal. 1987) (explaining that

28   a seniority "system is not a defense if it is not bona fide, or if it is the result of intent to discriminate,"

3

directive to favor visa holders is discriminatory. Ganapathy (30(b)(6)) Dep. Tr. 42:25-43:10 (Jan. 25, 2017) (Ex. 29); Tata's Opp'n at 20:23-25 (Dkt. #127).

If Tata is unable to locate a visa-ready Indian for a U.S. position, it then seeks "local hire" candidates of Indian origin. Tata relies on the same database – RGS – to post open requisitions to be filled by either visa workers or local hires, and entries reflect that, while preference is given to visa workers, locals will be hired if a visa worker is not found. *See generally* RGS Excerpts (Ex. 101) ("Please see if we have visa ready candidates, if not we'll need to recruit as the position is immediate;" "Expats preferred, if not then Locals;" "Please give visa ready candidates. If not, please go for recruitment;" "Expats preferred. Open to US Local Hiring;" "We prefer expats first and then look for local hires"). Preference is then given to candidates of Indian origin. Pls.' Reply at 3-5.

This process results in the hiring of a strikingly disproportionate U.S. workforce. As Sarajane MacKenzie, Tata's North American head of human resources, observed in 2012, "the split of whom we choose to hire [for North American technical positions] is about 90% Indian males and 10% All Others." TCSLTD003552840-45 at 40-41 (Ex. 100). Ms. MacKenzie recognized that Tata was not "supposed to be hiring" such a disproportionate share of Indian men and, to mitigate this imbalance, proposed a 30% management position quota of other hiring categories (including Indian women) with the hope that more diversity would ensue over time. *Id.*[7]

> We should discuss whether having 30% of all the management/supervisory positions …
> in an ISU in the USA … filled with non Indian males should be a set goal for the USA
> …. That 30% can be made up of all the categories that we are ***suppose[d] to be hiring***:
> white males, white females, African American males, African American females,
> Hispanic males, Hispanic females[,] Indian females …. ***That still would leave 70% of
> the management positions to be filled by Expat and Local Indian males,*** which would
> still make them the significant majority.

*Id.* at 41 (emphasis added). Ms. MacKenzie recognized that Tata's leadership needed to approve such

and finding job bidding system not be bona fide, where it was subject to many exceptions that favored a particular race); *see also* 42 U.S.C. § 2000e-2(h) (stating that seniority system must be bona fide, and "not the result of an intention to discriminate"); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 346 n.28 (1977) (a "seniority system … cannot be bona fide if an intent to discriminate entered into its very adoption"); Pls.' Reply at 11 (compiling cases).

[7] Hiring quotas are inappropriate under Title VII, *see* 42 U.S.C. § 2000e-2(j), and even hiring 70% Indian men for management positions would be discriminatory given the demographic make-up of the relevant labor market. *See* Neumark Supp. Rpt. Tbl. 1 (Ex. 60).

4

1   an effort to increase the diversity of its U.S. workforce. *Id.* That did not happen, as Tata has continued

2   to source new hires primarily through its "leadership directive," and also through the use of third-party

3   vendors that locate Indians.

4   　　　Fifth, Tata argues that visa workers are favored because of their experience with the same

5   client while working in India, Tata's Surreply at 4 n.2, but this argument is unsupported by

6   contemporaneous documents and the experience of witnesses. *See* Pls.' Reply at 6 & n.18, 12 & n.28

7   (discussing Tata's refusal to hire Plaintiff Buchanan for position on SCE account despite his many

8   years of experience with SCE, the training required of new visa workers, and Tata's refusal to rehire

9   non-South Asians terminated from the bench, despite their experience). Tata has even shown an

10  inclination to rehire a client's former employees whose positions were eliminated for a brief period of

11  time for appearance's sake only, knowing they will be terminated in favor of expats. Pls.' Reply at 6

12  & n.18; TCSLTD005059003-07 at 03, 05-06 (Ex. 96). These individuals, by definition, have

13  substantial client experience, which did not factor into Tata's employment decision.

14  　　　Sixth, Tata argues that evidence of explicitly discriminatory recruiting instructions should be

15  ignored as an anomaly from a single recruiter – Brian Galicki. Tata's Surreply at 3. But Mr. Galicki,

16  both received instructions to favor "desi" or "Indian" candidates from business units, and issued

17  instructions to vendors to favor such candidates, indicating that many more individuals were involved.

18  Tata collected ESI from only 5 custodians involved in recruiting, Email from M. von Klemperer to M.

19  La Mar, *et al.* (Aug. 29, 2016) (Ex. 102), making such comments in the files of one of them highly

20  significant. Moreover, Tata fails to address other contemporaneous documents reflecting a common

21  preference among hiring managers for Indians. *See* Pls.' Reply at 4 & n.10 (quoting, *e.g.*, Ex. 55

22  ("Hiring trends … indicate Hiring Managers within ISUs have higher affinity towards selecting local

23  hire candidates who are of Indian-origin")); TCSLTD003552840-45 at 40-41 (Ex. 100) ("hiring

24  managers … choose to hire about 90% Indian males and 10% All Others … based on 'comfort and

25  familiarity,'" *i.e.*, discriminatory preference). Tata's hiring data demonstrate that Tata's vendors

26  understood and consistently carried out Tata's discriminatory preference for South Asians candidates,

27  recruiting a much higher percentage of South Asian candidates than exist in the relevant labor market

28  (or that applied voluntarily through Tata's on-campus recruiting program). *See* Pls.' Reply at 4-5.

PLAINTIFFS' CLASS CERT. SUR-SURREPLY - CASE NO. 4:15-CV-01696-YGR

Dated:  July 24, 2017                          Respectfully submitted,

                                               By:  /s/ Daniel Kotchen
                                                    Daniel Low (SBN 218387)
                                                    Daniel Kotchen (*pro hac vice*)
                                                    Michael von Klemperer (*pro hac vice*)
                                                    Lindsey Grunert (*pro hac vice*)
                                                    KOTCHEN & LOW LLP

                                                    Michael F. Brown (*pro hac vice*)
                                                    DVG LAW PARTNER LLC

                                                    Attorneys for Plaintiffs Buchanan, Slaight,
                                                    Webber, Masoudi, and Mandili


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system.

Dated: July 24, 2017                           By: /s/Daniel Kotchen
                                                   Daniel Kotchen

PLAINTIFFS' CLASS CERT. SUR-SURREPLY - CASE NO. 4:15-CV-01696-YGR