Daniel Low (Bar #218387)
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Fax: (202) 280-1128
E-mail:  dlow@kotchen.com;
E-mail:  dkotchen@kotchen.com;
E-mail:  mvk@kotchen.com;
E-mail:  lgrunert@kotchen.com

Attorneys for Class Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| BRIAN BUCHANAN, CHRISTOPHER SLAIGHT, SEYED AMIR MASOUDI, AND NOBEL MANDILI | Case No.: 4:15-cv-01696-YGR |
| | **FOURTH AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | FOR EMPLOYMENT DISCRIMINATION |
| v. | CLASS ACTION |
| TATA CONSULTANCY SERVICES, LTD., | DEMAND FOR JURY TRIAL |
| Defendant. | |

Plaintiffs Brian Buchanan,[1] Christopher Slaight, Seyed Amir Masoudi, and Nobel Mandili ("Plaintiffs")[2] bring this action on behalf of themselves and a class of

---

[1] Because the Court denied certification of the Hiring Class (Dkt. #244), Mr. Buchanan brings his claims on behalf of himself only.

[2] Plaintiff Heldt withdrew as a named plaintiff and is pursuing his claims on an individual basis. Dkt. #87. Thus, this class complaint does not address Plaintiff Heldt's

similarly situated individuals to remedy pervasive, ongoing race and national origin discrimination by Defendant Tata Consultancy Services, Ltd. ("Tata"), and allege as follows:

## NATURE OF THE ACTION

1.   Tata is an Indian company that employs approximately 29,900 employees in the United States. While roughly 1-2% of the United States population is South Asian, approximately 80% of Tata's United States-based workforce is South Asian (primarily from India). This grossly disproportionate workforce is the result of Tata's intentional pattern and practice of employment discrimination against individuals who are not South Asian (or who are not of Indian national origin), including discrimination in hiring, placement, and termination decisions.[3] For example, recruiters and sourcers within Tata's Resource Management Group have been explicitly instructed to focus primarily on filling U.S. positions with "visa ready" Indians.

2.   Indeed, Plaintiffs' experiences with Tata are representative of Tata's individual claims.

---

[3] As used herein, "South Asian race" refers to individuals who trace their ancestry to the Indian sub-continent. *See, e.g.*, *Fonseca v. Sysco Food Serv. of Az., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) ("Under 42 U.S.C. § 1981, discrimination based on ancestry or ethnic characteristics is prohibited" as discrimination based on race) (citation omitted). "Indian national origin" refers to individuals born in India, or whose ancestors came from India. *See Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*, 154 F.3d 1117, 1119 (9th Cir. 1998) (holding that "national origin" refers to both a person's place of birth, and the country from which his or her ancestors came).

discrimination against non-South Asians. For example, after Southern California Edison ("SCE") announced that it would transition much of its IT needs from in-house employees to Tata, Mr. Buchanan learned he would lose the SCE job he had held for many years. Mr. Buchanan applied for a job with Tata yet, despite being imminently qualified, Tata failed to hire him, choosing rather to staff its SCE project with South Asians.

3.   The comparatively few non-South Asians that Tata does hire likewise face discrimination. For example, Mr. Slaight started work with Tata in June 2012 as a software engineer. Over the following year, Tata assigned Mr. Slaight very little substantive work. He was ultimately terminated after being benched for several weeks.

4.   Mr. Masoudi and Mr. Mandili experienced similar, prolonged bench periods prior to their terminations. For instance, Mr. Masoudi was removed from his position servicing Tata client Apple in March 2016 and was replaced with an H-1B visa worker from India. After remaining on the bench for almost five months, and not being selected for a single position within Tata, Mr. Masoudi was terminated. Mr. Mandili worked as a Senior Project Manager in a position servicing Microsoft in Redmond, Washington. In or around March 2014, Tata asked Mr. Mandili to train a South Asian H-1B visa worker placed in an adjacent group. Two months later, Tata removed Mr. Mandili from the Microsoft project, and replaced him with the South Asian worker he had recently trained. Mr. Mandili remained on the bench for almost 8 months, despite actively searching for and applying to open positions within Tata. Tata terminated Mr.

Mandili's employment in February 2015.

5.   Tata's employment practices violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"). Plaintiffs seek, on their own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress Tata's pervasive pattern and practice of discrimination.

## PARTIES

6.   Plaintiff Brian Buchanan is a citizen of the United States of America, born in the United States, and of American national origin and ancestry. He is Caucasian. Mr. Buchanan has over 30 years of advanced training and job experience in IT services and project management.

7.   Mr. Buchanan has been employed in the IT field since 1982. Over the course of his career, Mr. Buchanan has filled many roles, including providing system availability, reliability, and data integrity for several IT and business unit projects, leading major and minor application implementation projects, and ensuring compliance with government processes, contracts, and regulations. In addition, Mr. Buchanan performed implementation, configuration, maintenance, and upgrades of enterprise server applications, network and management systems, and security systems, among other roles. In addition, Mr. Buchanan has served in supervisor and

manager roles at various times throughout his career.

8.   Plaintiff Christopher Slaight is a citizen of the United States, born in the United States, and of American national origin and ancestry. He is Caucasian. Mr. Slaight has a Bachelor of Science degree in Computer Information Systems and Database Management from DeVry University. Mr. Slaight specializes in software engineering.

9.   Plaintiff Seyed Amir Masoudi is a green card holder and permanent resident of the United States of America. He was born in Iran and is of Iranian national origin and ancestry. Mr. Masoudi holds a bachelor's degree in Biochemistry from the University of Washington, as well as a bachelor's degree in Computer Engineering from Washington State University. He is also an SAP HANA Certified Application Associate with broad knowledge and skills in SAP technologies. Mr. Masoudi has been employed in the information technology field since 2008 and specializes in software development and testing.

10. Plaintiff Nobel Mandili is a citizen of the United States of America, born in Syria, and of Syrian national origin and ancestry. Mr. Mandili holds a Master of Science in Electrical Engineering degree from the Polytechnic Institute of Wroclaw, Poland, and has taken postgraduate courses at UC Irvine in Information and Computer Science. He has also completed numerous workshops in Oracle User Group, e-commerce, and Network IETF/ITU/ISO. Mr. Mandili is Cisco CCNA certified, Oracle PL/SQL certified, and SQL Server TSQL certified. He has been employed in the information technology field for over 23 years and specializes in product management,

33

1   technical project management, and consulting.

2   11. Plaintiffs are all members of a protected class, as recognized by Title VII of the

3

4   Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000e, *et seq.*) and the Civil Rights

5   Act of 1866, as amended, (42 U.S.C. § 1981). Further, Mr. Buchanan, Mr. Masoudi,

6

7   and Mr. Mandili have exhausted their administrative remedies and complied with the

8   statutory prerequisites of filing a Title VII complaint by filing charges of against Tata

9   with the U.S. Equal Employment Opportunity Commission ("EEOC"), and receiving

10

11   notices of their right to sue from the agency.

12   12. Defendant Tata is a business that provides consulting, technology, and

13   outsourcing services. Tata, headquartered in Mumbai, India, operates approximately

14

15   19 offices in the United States, including in Santa Clara, California. Tata employs at

16   least 29,900 persons in the United States.

17   ## <u>JURISDICTION</u>

18

19   13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331; 42

20   U.S.C. § 2000e-5(f), *et seq.*, and 42 U.S.C. § 1981(a).

21   14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as

22

23   the matter in controversy exceeds the sum or value of $75,000, exclusive of interest

24   and costs, and is between a citizen of a state and a foreign corporation.

25   15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as

26

27   this matter is a class action with an amount in controversy of greater than $5 million,

28   exclusive of interest and costs, and involves at least one class member who is a citizen

of a state and is brought against a foreign corporation.

16. This Court has personal jurisdiction over Tata because it engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State, including the operation of several offices here. Additionally, Plaintiffs' claims arise, in part, out of Tata's activities in California.

## VENUE AND INTRADISTRICT ASSIGNMENT

17. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because Tata resides in this District, conducts business in this District and engaged in discriminatory conduct in this District. Assignment in this Division is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events giving rise to this matter's claims occurred in this Division. Additionally, Tata engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of an office in Santa Clara, California. Further, and as discussed below, Mr. Masoudi interviewed and was hired for a position servicing Tata client Apple in Sunnyvale, California in July 2015.  He relocated to Mountain View, California for the position. In addition, during periods of non-productive, benched time, Mr. Masoudi interviewed – and was not hired – for positions in Northern California, including a Test Lead position in Walnut Creek, California.

## STATEMENT OF FACTS

18. Tata has engaged in a systematic, company-wide, pattern and practice of

33

discriminating in favor of South Asians and against individuals who are not South Asians in hiring, job placement, and termination.

*Tata's Grossly Disproportionate Workforce*

19. Tata provides consulting, IT, and outsourcing services to companies in the United States and throughout the world.

20. Tata is the third largest IT employer in the world and has about 29,900 employees in the United States. Tata made over $15 billion in revenue in the past fiscal year. Tata derives over 50% of its revenue from North America, the vast majority of which is derived from the United States.

21. Tata's employment demographics stand in stark contrast with the population of the United States. During the 2010 census, all Asian subgroups combined made up 4.8 percent of the United States population. South Asians made up 1-2% of the United States population.[4] Approximately 80% of Tata's United States-based workforce is South Asian (primarily from India). This grossly disproportionate workforce demonstrates an intentional pattern and practice of discrimination, and cannot be explained by coincidence or business necessity.

---

[4] Available data also suggest that South Asians make up a very small portion of the IT professionals in the United States. The Association of Information Technology Professionals ("AITP") – an IT professional organization – conducted a demographic study of its members in 2007 and found that only 2% of the membership was of Asian ethnic origin.

*Tata's Senior Management Discriminates*

22. On information and belief, all or most of Tata's United States-based business units are headed by individuals of South Asian race and Indian national origin. Among these senior managers, there is a culture of hostility towards, and non-acceptance of American workers. These senior managers have resisted efforts to increase racial and/or national origin diversity among Tata's workforce. Because of anti-American and pro-South Asian sentiment by senior management, Tata's United States-based workforce has been, and remains, highly disproportionate, with approximately 80% South Asian workers (primarily from India) in the United States.

*Methods by Which Tata Achieves its Discriminatory Goals*

23. Tata has a strong corporate preference for employing South Asian employees in the United States, as reflected in its 80% South Asian U.S. workforce. This discriminatory preference adversely affects two categories of individuals: non-South Asian job applicants seeking employment with the company, and the relatively few non-South Asian individuals Tata employs in the United States, who are routinely placed on nonproductive status (referred to as being benched), not promoted, and then terminated at dramatically higher rates than their South Asian colleagues. Tata's discriminatory scheme consists of two mutually reinforcing prongs.

24. First, Tata has an explicit corporate directive to favor its South Asian visa workers in staffing positions in the United States. At least 70% of Tata's employees working in the U.S. are visa-dependent. All, or substantially all, of these individuals

33

are South Asian. The United States' H-1B visa system is intended to be used to bring specialized foreign workers to the United States when there are insufficient United States workers to perform the jobs at issue, however, Tata is consistently one of the top three H-1B sponsors in the United States. In fiscal years 2013, 2014, and 2015, for example, Tata filed 5,954, 9,262, and 14,000 H-1B petitions, respectively. Similarly, L-1 visas are intended to be used to bring management level employees to the United States for temporary assignments. Between 2002 and 2011, Tata sponsored 25,908 L-1 visas. All, or the "vast majority," of these visas are for South Asian workers located in India. And Tata's dependence on visa workers continues despite a corporate mandate "to reduce [Tata's] overall H1B needs by [approximately] 50%" in fiscal year 2016."

25. Tata's Resource Management Group ("RMG"), which is responsible for allocating Tata employees to client projects and filling open positions in the United States, implements the corporate directive to utilize Tata's visa workers to the "maximum extent." Thus, Tata's South Asian visa-dependent workforce is given preference to fill U.S. positions over qualified non-South Asians, as RMG is explicitly instructed to "map" individuals in India with "unutilized visa" to "onsite opportunities" in the U.S.:

> The visa utilization report is published every fortnight by Chennai Data Support. It gives a view of the number of associates in the branch who have valid visas and work permits, and [are] currently at offshore. It also gives a split of how many associates have utilized their visas and work permits. You can split the data branch wise and visa type wise. RMG should try and map associates with unutilized visas and work permits for onsite opportunities.

26. Thus, Tata's South Asian visa workers in the U.S. and visa ready employees abroad (who are meticulously tracked) are prioritized over non-South Asian workers for open positions. This explicit preference to fill positions with visa-ready South Asians disadvantages: (1) qualified non-South Asian applicants; and (2) the comparatively few non-South Asian individuals Tata employs, who are routinely place in unallocated status (*i.e.* benched), seek and are rejected for new positions within Tata in favor of visa-ready South Asians, are not promoted, and are terminated at grossly disproportionate rates.

27. Second, Tata discriminates in "local hiring," *i.e.*, even when Tata hires non-visa dependent individuals who reside locally in the United States, such persons are still disproportionately South Asian.

28. Tata's Talent Acquisition Group ("TAG"), which is responsible for recruiting and hiring local talent for technical, professional, and recent graduate positions, favors South Asian candidates in the United States. Thus, Tata consistently hires substantially more South Asians in the United States than those in the relevant labor market.

29. TAG and RMG also utilize third party vendors and headhunters to locate available talent in the United States. These third-party recruiters account for approximately 50% of Tata's United States-based hiring. A number of these entities track the nationality and visa status of sourced candidates and forward this information to Tata as part of the candidate's information and qualifications. This tracking allows Tata to perpetrate its discriminatory hiring practices, which favor South Asian

applicants. Because of Tata's preference for South Asian candidates, third-party vendors and headhunters submit a disproportionately high number of South Asian candidates for potential employment with Tata. The result of these practices is an applicant pool considered by Tata that is substantially more South Asian than the relevant labor market and hiring figures that strongly disfavor non-South Asian candidates.

30. The end result of Tata's discriminatory scheme is a workforce that is approximately 80% South Asian, with South Asians significantly more likely to be hired, and the relatively few non-South Asians who are hired are less likely to be promoted and significantly more likely to be fired.

31. Tata's discrimination is intentional and done with malice and reckless indifference to Plaintiffs' federally protected rights. As a proximate result of Tata's willful and unlawful discrimination, Plaintiffs and other non-South Asians, have lost jobs, job opportunities (through Tata's failure to hire these non-South Asians), wages, benefits, and other financial and non-financial injuries, and have suffered emotional distress. Further, Tata's practices discussed above have disparately impacted non-South Asians. Plaintiffs' experiences demonstrate the human toll of Tata's pattern and practice of intentional discrimination.

*Plaintiff Buchanan's Experiences*

32.  Mr. Buchanan began working for Southern California Edison ("SCE")[5] in 1986 as a networking specialist. In or around 2003, SCE promoted Mr. Buchanan to IT Specialist 4 – a senior IT position.

33.  In that role, Mr. Buchanan served on SCE's Infrastructure General Application Support Team ("Mr. Buchanan's Team" or "the Team"), personally supporting approximately 25 different applications necessary for SCE's day-to-day business. These applications included, for example, an enterprise document management application, a records management application, a GIS mapping application, a building management system, an HR call recording application, IT Help Desk Apropos, and a SVY Vovici survey application.

34.  Mr. Buchanan consistently received positive performance reviews from SCE and was never subject to disciplinary measures regarding performance or otherwise.

35.  In or around May 2012, SCE decided to restructure its IT department. SCE decided it would drastically reduce the number of workers it directly employed and, in large part, contract-out its IT needs. By early 2014, SCE decided it would retain Tata to perform the bulk of its IT needs.

36.  On July 21, 2014, SCE announced that Mr. Buchanan and about 400 others

---

[5] SCE is the primary electricity supplier for southern California and employs about 14,000 people. It is a subsidiary of Edison International.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

would be terminated. However, SCE asked Mr. Buchanan and many other employees if they would remain with the company for several more months to help perform a "knowledge transfer" – *i.e.*, training their replacements from Tata. Mr. Buchanan agreed to remain with SCE through January 9, 2015.[6] Under the terms of the SCE-Tata contract, Tata was scheduled to take primary responsibility for most of SCE's IT needs by December 2014.

37.  As part of that transition, Mr. Buchanan was told that his Team, consisting of around 28 individuals, was to be terminated and all of the positions filled by Tata employees.

38.  By late summer or early fall 2014, it became apparent that Tata would not be able to meet the December 2014 deadline of assuming the SCE work. Accordingly, the December 2014 deadline was pushed back. On or about November 3, 2014, SCE asked Mr. Buchanan to extend his contract until February 6, 2015. Though Mr. Buchanan asked for a longer extension, SCE refused to extend his contract beyond February 6, 2015.

39.  By January 2015, Tata had assigned only two workers to Mr. Buchanan's Team in California. Both of these Tata employees were South Asian from India and in the United States on visas. Mr. Buchanan was tasked with training these employees, who

---

[6] This employment end date was later extended into February 2015, after Tata was unable to meet its deadlines for taking primary responsibility of SCE's IT needs.

would eventually take over some of his responsibilities. These employees had very little or no relevant experience, and performing the "knowledge transfer" was a challenge. For example, when an SCE server stopped working, Mr. Buchanan had to supervise these individuals' repair efforts. During this process, Mr. Buchanan had to repeatedly instruct them where and how to look for issues on the server, including the very basic steps of checking application log files, web log files, and the event viewer. log.

40. In late October 2014, Mr. Buchanan attended a job fair in Arcadia, California, which SCE had organized for its soon-to-be terminated employees. Tata also attended the job fair, manning a booth at which it met with and sought potential employees. The Tata booth was staffed with several individuals, all of whom were South Asian. Mr. Buchanan attended the fair and spoke with an individual at the Tata booth who identified himself as a Tata regional manager. This Tata representative informed Mr. Buchanan that Tata was hiring for positions servicing SCE, as well as for other positions in the Greater Los Angeles area unrelated to SCE. Mr. Buchanan gave the manager a copy of his resume and told him he was interested in positions with Tata servicing SCE, and in other positions with Tata. The manager said that Tata would contact him if Tata was interested in hiring him. Mr. Buchanan observed that the manager was dismissive and spent little time speaking with him. In comparison, Mr. Buchanan observed that the Tata employees spent considerably more time speaking with South Asian applicants and spoke to them in Hindi (an Indian language) about

33

available positions. Tata did not hire Mr. Buchanan and did not contact him after the job fair, despite his excellent qualifications and considerable experience.

41.   Tata had numerous openings for positions on Mr. Buchanan's Team, as well as for other positions servicing SCE. Tata also had openings for other positions in the United States that did not involve SCE. Of the twenty-eight individuals originally working for SCE on Mr. Buchanan's Team, Tata hired only five of them. Three of these individuals Tata hired were South Asian, all from India. The other two were Korean and Vietnamese. Tata replaced the other twenty-three original Team members with South Asians. Likewise, beyond Mr. Buchanan's Team, Tata replaced the vast majority of displaced SCE IT workers with South Asians.

42. Given his considerable experience and skill, Mr. Buchanan personally supported approximately 25 software applications for SCE. Despite his vast experience performing these tasks, Tata did not hire Mr. Buchanan. Rather, Tata hired less experienced South Asian employees to perform those tasks.  Each was assigned to support approximately one application. Accordingly, on information and belief, Tata assigned numerous individuals, up to potentially 25, to fulfill the role Mr. Buchanan was performing single-handedly.

43.  Despite the availability of qualified non-South Asian workers, Tata was not able to meet its deadline to take primary responsibility for SCE's IT needs by February 2015 because Tata was unable to secure a sufficient number of its preferred South Asian employees. Additionally, many of the South Asian employees it did secure were

unprepared to take over responsibilities from out-going SCE employees. Because of these delays, SCE asked Mr. Buchanan to extend his contract for another month in early 2015. Mr. Buchanan asked that his contract be extended until June, but SCE refused. On February 6, 2015, Mr. Buchanan's employment with SCE ended. As of February 6, 2015, Tata remained unable to take over primary responsibility for SCE's IT needs.

44. Between July 2014 and February 2015, Mr. Buchanan observed that the vast majority of Tata's employees were South Asian, including those located in the United States.

*Plaintiff Slaight's Experiences*

45. Mr. Slaight graduated in June 2012 from DeVry University with a Bachelor of Science degree in Computer Information Systems and Database Management. Mr. Slaight interviewed with a Tata Manager of College Recruiting & Relations in April 2012 and was hired as a software engineer shortly thereafter. Mr. Slaight attended orientation in May 2012, and started full time on July 9, 2012. Over the following two months, Mr. Slaight underwent training in Cincinnati, Ohio and Chennai, India.

46. Upon returning from India, Mr. Slaight was assigned to a client project in Jersey City, New Jersey servicing client AXA.

47. Mr. Slaight's assignment at AXA started October 1, 2012. He reported to work and was assigned to the AXA GIP COE Deployment Team, which was responsible for the deployment and maintenance of applications on the AXA server. Alok Bhalla, a

33

South Asian of Indian national origin, was Tata's local Business Relationship Manager. Vignesh Ramanan, a South Asian of Indian national origin, was Tata's Senior Engagement Manager and Mr. Slaight's direct Tata supervisor. Mr. Slaight was eager to begin working as a software engineer and looked forward to gaining real-world experience. However, over the next six months, Tata failed to assign Mr. Slaight any substantive work. Nor did Tata provide him with any training relating to his day-to-day responsibilities. Each day, Mr. Slaight reported to work, only to sit at his desk waiting for an assignment. Approximately every week to two weeks, Mr. Slaight approached Mr. Bhalla and/or Mr. Ramanan to request work. Yet neither Mr. Bhalla nor Mr. Ramanan ever assigned Mr. Slaight any substantive work. On the other hand, Mr. Slaight observed that his South Asian colleagues were regularly assigned substantive work.

48.  On March 29, 2013, after six months without substantive work, Mr. Slaight was removed from the client project and placed on the "bench" – *i.e.* he was still employed by Tata but not allocated to a client. Mr. Slaight reached out to Tata's internal recruiters and the HR department seeking a new placement. On April 17, 2013, Mr. Slaight interviewed with several local Tata managers servicing Bank of America in Pennington, New Jersey. Each of these managers was South Asian and, upon information and belief, of Indian national origin. Despite performing well during these interviews, Tata did not select Mr. Slaight for the position.

49.  On April 19, 2013, HR representative Debojyoti Sen informed Mr. Slaight that

his employment with Tata had been terminated. Throughout his entire employment with Tata, Mr. Slaight was never assigned any substantive work.

*Plaintiff Masoudi's Experiences*

50.  Mr. Masoudi graduated from Washington State University in the spring of 2014 with a Bachelor of Science degree in Computer Engineering. In July 2014, Mr. Masoudi was contacted by Tata recruiter Kristine Nunez who asked whether Mr. Masoudi would be interested in participating in Tata's Initial Learning Program ("ILP") for recent graduates. She explained that he would be required to travel to Cincinnati, Ohio for two months of training, but that he would be placed on a client project in California soon after his training was completed. Mr. Masoudi then underwent a telephone interview in early August and was hired as a software engineer shortly thereafter.

51.  On September 2, 2014, Mr. Masoudi relocated to Cincinnati, Ohio for training and was placed on the SAP Enterprise Solution Team. Mr. Masoudi worked under the supervision of Tata Manager Vikram Shankar. Along with the majority of Tata's management staff in Cincinnati, Mr. Shankar is of South Asian race and Indian national origin.

52.  Mr. Masoudi performed well throughout his training period. He was consistently a top performer and scored high on all tests and evaluations. However, when a specialized SAP training program was offered by Tata in California, for which Mr. Masoudi expressed interest, Mr. Masoudi's manager instead sent Raghuveer

33

Musty, Mr. Masoudi's South Asian colleague, to the training.

53. Mr. Masoudi was not selected for a client project in November or December 2014, as promised by Tata recruiter Kristine Nunez. Instead, Mr. Masoudi's manager, Mr. Shankar, returned to India during this time, without informing his team members, and assigned Mr. Masoudi little to no work. Mr. Masoudi remained on the bench in Cincinnati.

54. Shortly thereafter, a software development position opened up in Boston, Massachusetts, which Mr. Masoudi learned of from Mr. Shankar. Mr. Masoudi confirmed that he was interested in the position, and informed Mr. Shankar that he had the relevant experience in Linux development systems and databases. However, Mr. Shankar did not forward Mr. Masoudi's resume to the Resource Management Group ("RMG") for an interview, and instead recommended two of Mr. Masoudi's South Asian colleagues that were not qualified for the position. Mr. Shankar then asked Mr. Masoudi to help train and prepare his two colleagues for the interview, which Mr. Masoudi did.

55. The following month, Mr. Masoudi and his colleague, Abdul Quraishi, interviewed for a position in California servicing Tata client Juniper Networks. Abdul Quraishi is of South Asian race and is originally from Bangladesh. Mr. Masoudi was well qualified for the position, as he was one of the top two performers in his group for software development and testing. Mr. Masoudi's colleague, on the other hand, lacked programming knowledge and SAP expertise. Both Mr. Masoudi and Mr.

Quraishi participated in the telephone interview in the same room. Mr. Masoudi was interviewed first and was able to competently answer all of the interviewer's questions. The interviewer was a Tata employee of South Asian descent. While Mr. Quraishi was not able to answer a number of the interviewer's questions, he was still chosen for the position over Mr. Masoudi.

56. On March 16, 2015, Mr. Masoudi raised his concern of not being placed on a client project with Pankaj Kumar, the Enterprise Solution Resource Management Group Lead. However, Mr. Masoudi still did not received any client interviews for many weeks. He was also assigned little work by his manager, Mr. Shankar, and was told to "look busy" when clients visited the Cincinnati facility.

57. When Mr. Masoudi asked his manager why he had not been placed in a new position, Mr. Shankar replied that Mr. Masoudi did not have enough skills as a recent graduate and encouraged him to lie about his work experience and skill sets on his resume. Mr. Masoudi refused to do so.

58. Mr. Shankar also encouraged Mr. Masoudi to obtain SAP Hana Certification and stated that Mr. Masoudi would be placed in an open position in Southern California once he completed this certification program. Mr. Masoudi complied and obtained the SAP Hana Certification. However, he was never assigned to a position in Southern California and remained on the bench in Cincinnati.

59. In July 2015, Mr. Masoudi interviewed and was selected for a position servicing Tata client Apple as an SAP Performance Engineer. Mr. Masoudi started

33

work on the Apple project in Sunnyvale, California on August 24, 2015, almost one year after his initial start date with the Tata.

60. In his position, Mr. Masoudi worked in a group of approximately 30 employees, the majority of whom were on H-1B visas. The majority of Mr. Masoudi's colleagues, including his manager, Mr. Pimple, were of South Asian race and Indian national origin. Mr. Masoudi observed that that majority of his group members lacked the SAP performance experience and skills that were required for the position.

61. Despite performing well in his position as an SAP Performance Engineer, Mr. Masoudi was treated poorly by his South Asian colleagues who created a hostile work environment. Within his first few weeks servicing Apple, one of Mr. Masoudi's coworkers, Diwakar IB, threatened to report Mr. Masoudi to the Apple manager stating "I can make your life miserable here. You don't want to mess with me." Mr. IB is of South Asian race and Indian national origin. Mr. Masoudi was also required to shadow Mr. IB, but Mr. IB repeatedly ignored Mr. Masoudi, refused to train him, and mocked his questions. Mr. Masoudi's other South Asian colleagues also provided him with incorrect answers when he asked them for assistance. Further, Mr. Masoudi's colleagues repeatedly asked about inappropriate work subjects, such as Mr. Masoudi's nationality, religion, immigration status, how he became a green card holder, and his health conditions.

62. Mr. Masoudi learned that Mr. IB and other Tata team members reported him to the client, falsely stating that he was unprofessional and repeatedly absent from

33

work. When Mr. Masoudi asked his team member Amruta Kale why he was being targeted, she informed Mr. Masoudi that his coworkers did not like him as he was "not one of them" because he was "not Indian."

63. Mr. Masoudi was also repeatedly excluded by his South Asian group members. He was not invited to team lunches, and on a few occasions, Mr. Masoudi's name was intentionally left off of meeting minutes even though he was in attendance. Further, Mr. Masoudi's colleagues spoke Hindi in the office when discussing the client project, and Mr. Masoudi was therefore excluded from these conversations. When Mr. Masoudi asked his team members for help on the project, his South Asian colleagues would provide him with incorrect answers, or would mock his questions. During meetings, his comments and suggestions were often ignored and his manager, Mr. Pimple, would direct questions regarding Mr. Masoudi's projects to other team members during the meetings.

64. On March 2, 2016, Tata employee Subodh Shetty informed Mr. Masoudi that his contract on the Apple client project was not being renewed, and that Tata was placing him on the bench. Mr. Shetty is of South Asian race and Indian national origin and is visa-dependent. While Mr. Shetty stated that the reason for Mr. Masoudi's release was due to budget cuts, Mr. Masoudi later learned in a team meeting that Tata had hired an additional contractor from India to join his team on a H-1B visa and to work in the same role as Mr. Masoudi. Mr. Masoudi informed Mr. Shetty that he believed he was being treated unfairly, and that he planned to report Tata's

discriminatory conduct to the Department of Labor ("DOL"). Mr. Shetty then threatened Mr. Masoudi by stating that he would ensure that Mr. Masoudi received negative performance feedback on the Apple project if he reported any discrimination. Mr. Masoudi informed Tata's Human Resources Department of this threat of retaliation, yet no action was taken.

65. Mr. Masoudi remained on the bench for the next five months. During this time, he repeatedly sought employment by sharing his resume with Ms. Dasgupta, and RMG employee, forwarding several openings to her which matched his qualifications, and searching for positions on Tata's internal portal. However, Mr. Masoudi's emails and telephone calls to Ms. Dasgupta regarding open positions often went unanswered. While Mr. Masoudi remained on the bench, one of his South Asian colleagues who was also released from the Apple project around the same time was quickly placed in a new role at Tata within one week.

66. In April 2016, Mr. Masoudi underwent a telephone interview for a Test Lead position in Walnut Creek, California. The interviewer, who was of South Asian descent, asked Mr. Masoudi where he was from and whether he spoke Hindi, which Mr. Masoudi found strange as Tata conducted business activities in English. Despite being well qualified for the role and performing well in the interview, Mr. Masoudi was not selected for the position.

67. Tata terminated Mr. Masoudi's employment on August 1, 2016. Mr. Masoudi was informed that his termination was due to his prolonged period of on the bench.

33

Mr. Masoudi was never promoted.

*Plaintiff Mandili's Experiences*

68. In March 2012, Mr. Mandili started work with Tata as a Senior Project Manager servicing Microsoft in Redmond, Washington. Mr. Mandili performed well in this role and was responsible for creating and managing the Azure/Cloud services Applications for Microsoft customers.

69. In or around March 2014, Tata transferred an H-1B visa employee, Suman Bhattacharjee, into an adjacent group on the Microsoft client project and asked Mr. Mandili to train this individual. Mr. Bhattacharjee is of South Asian race and Indian national origin. Mr. Mandili complied, and trained Mr. Bhattacharjee for the next two months on the various technologies.

70. In May 2014, Tata informed Mr. Mandili that he was being removed from his position servicing Microsoft, and that he would be placed on the bench. Mr. Bhattacharjee assumed Mr. Mandili's role as Senior Project Manager.

71. Mr. Mandili remained on the bench for the next eight months. During this time, he repeatedly sought employment by applying to numerous positions on Tata's internal portal and forwarding his resume to the RMG lead in Edison, New Jersey for consideration. Mr. Mandili also visited Tata's Bellevue, Washington office on a weekly basis to speak with Human Resources and RMG. Despite repeatedly following-up with Tata in-person and via email, he received little feedback regarding open positions and remained on the bench. Mr. Mandili's Indian colleagues who

serviced Microsoft on H-1B visas, however, were readily transferred into new positions when their current roles ended, and were not placed on the bench.

72. Mr. Mandili participated in approximately six telephone interviews for various positions within Tata, and despite being well qualified, he was not selected for a single role. On one occasion, Mr. Mandili was told that he had been selected for a position servicing Southern California Edison in Los Angeles, however, Tata reneged on its offer two days before Mr. Mandili's start date.

73. Tata terminated Mr. Mandili's employment on February 2, 2015. Mr. Mandili was never promoted.

## CLASS ACTION ALLEGATIONS

74. Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for Tata's systematic pattern and practice of discrimination against non-South Asian and non-Indian individuals in the United States. This action is brought on behalf of the following class:

> All individuals who are not of South Asian race or Indian national origin who were employed by Tata in the United States, were placed in an unallocated status and were terminated between April 14, 2011 and the date of class certification.

75. The class excludes all individuals who are either of South Asian race or Indian national origin (as defined in footnote 2). Thus, the class would exclude a person of South Asian race irrespective of that person's national origin, visa status, or citizenship.

Likewise, the class would exclude a person of Indian national origin irrespective of that person's race.

76. Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed to be in the thousands. Furthermore, class members are readily identifiable from information and records in Tata's possession.

77. There are numerous questions of law and fact common to members of the class. Among the common questions of law or fact are: (a) whether Tata has intentionally discriminated against individuals who are not of South Asian race or Indian national origin in making employment decisions; (b) whether Tata has intentionally favored South Asians (and individuals of Indian national origin) in hiring, placement, promotion/demotion, and retention decisions and/or whether Tata has intentionally disfavored non-South Asians (or individuals not of Indian national origin) in hiring, placement, promotion/demotion, and termination decisions; (c) whether Tata's policy and practice of relying on South Asian visa and local workers (primarily from India) is intentionally discriminatory; (d) whether Tata has violated Title VII; (e) whether Tata has violated § 1981; (f) whether equitable and injunctive relief is warranted for the class and (g) whether compensatory and/or punitive damages are warranted for the class.

78. Plaintiffs' claims are typical of the class. Members of the class were damaged by the same discriminatory policies and practices employed by Tata.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

79. Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class litigation to represent them and the class.

80. Plaintiffs and the class they seek to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of Tata's actions.

81. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Tata has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the class as a whole. Members of the class are entitled to declaratory and injunctive relief to end Tata's systematic, common, uniform, unfair, and discriminatory policies and practices.

82. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the class is whether Tata has discriminated on the basis of race and national origin in their employment practices. These questions are central to the case and predominates over individual issues among the members of the proposed class. Tata has engaged in a common course of discriminatory conduct in a

manner that has harmed all of the class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

83. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Tata's discrimination.  Certification under this rule is also appropriate to decide whether Tata has adopted a systemic pattern and practice of national origin and racial discrimination in hiring and employment decisions. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## <u>COUNT I</u>
**(Disparate Treatment on the Basis of Race and National Origin)**
**(Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)**
**(On behalf of Plaintiffs Buchanan, Masoudi, and Mandili and the Class)**

84. Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

85. This claim is brought by Plaintiffs Buchanan, Masoudi, and Mandili on behalf of themselves and the class.

86. Throughout the class liability period, Tata has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race and Indian

national origin by: (a) knowingly and intentionally favoring individuals of South Asian race and Indian national origin in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (b) knowingly and intentionally disfavoring individuals who are not of South Asian race and Indian national origin (including Plaintiffs Buchanan, Masoudi, and Mandili) in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 80% or more South Asian employees (primarily from India).

87. As a direct and proximate result of Tata's intentional discrimination, Plaintiffs and class members have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to placement, compensation, and/or continued employment with Tata.

88. Tata's actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq.*

**COUNT II**
**(Disparate Treatment on the Basis of Race)**
**(Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**
**(On behalf of all Class Plaintiffs and the Class)**

89. Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

90. This claim is brought by all Plaintiffs on behalf of themselves and the class.

91. Throughout the class liability period, Tata has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race by: (a) knowingly

33

and intentionally favoring South Asian individuals in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (b) knowingly and intentionally disfavoring non-South Asian individuals (including Plaintiffs) in employment decisions, including hiring, placement, promotion/demotion, and termination decisions, (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 80% or more South Asian employees.

92.  As a direct and proximate result of Tata's intentional discrimination, Plaintiffs and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to placement, compensation, and/or continued employment with Tata.

93. Tata's actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the class pray for relief as follows:

a.  Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b.  Designation of Plaintiffs as representatives of the class;

c.  Designation of Plaintiffs' counsel as counsel for the class;

d.  A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.;

e.  A declaratory judgment that the practices complained of herein are unlawful and violate the Civil Rights Act of 1866, 42 U.S.C. § 1981;

f.  A permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

g.  Order Defendant to adopt a valid, non-discriminatory method for hiring, placement, termination, and other employment decisions;

h.  Order Defendant to post notices concerning its duty to refrain from discriminating against employees on the basis of race or national origin;

i.  Award Plaintiffs and the Class compensatory damages for the harm they suffered as a result of Defendant's violations of Title VII and § 1981;

j.  Award Plaintiffs and the Class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendant's discriminating against them in violation of Title VII and § 1981;

k.  Award Plaintiffs and the Class front- and back-pay, and such other equitable relief as the Court deems just and appropriate;

l.  Award Plaintiffs and the Class exemplary and punitive damages;

m.  Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

n.  Award Plaintiffs and the Class such other relief as this Court deems just and appropriate.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs and the Class respectfully demand a trial by jury on all issues properly triable by a jury in this action.

DATED:    January 8, 2018                     Respectfully submitted,

                                              By: /s/Daniel Kotchen

                                              Daniel Kotchen (*pro hac vice*)
                                              Daniel Low, SBN 218387
                                              Michael von Klemperer (*pro hac vice*)
                                              Lindsey Grunert (*pro hac vice*)

33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Email: dkotchen@kotchen.com
dlow@kotchen.com;
mvk@kotchen.com;
lgrunert@kotchen.com

Michael F. Brown
**DVG LAW PARTNER LLC**
P.O. Box 645
Neenah, WI 54957
920-238-6781
920-273-6177 (fax)
mbrown@dvglawpartner.com

Vonda K. Vandaveer
**V.K. Vandaveer, P.L.L.C.**
P.O. Box 27317
Washington, DC 20038-7317
202-340-1215
202-521-0599 (fax)
atty@vkvlaw.com

Steven Tidrick, SBN 224760
Joel Young, SBN 236662
**The Tidrick Law Firm**
2039 Shattuck Avenue #308
Berkeley, CA 94704
Telephone: (510) 788-5100
Facsimile: (510) 291-3226
E-mail: sgt@tidricklaw.com
E-mail: jby@tidricklaw.com

*Attorneys for Class Plaintiffs*

FOURTH AMENDED COMPLAINT - CASE NO. 4:15-CV-01696-YGR