Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
E-mail: dlow@kotchen.com;
E-mail: dkotchen@kotchen.com;
E-mail: mvk@kotchen.com;
E-mail: lgrunert@kotchen.com

*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

BRIAN BUCHANAN, et al.,

Plaintiffs,

v.

TATA CONSULTANCY SERVICES, LTD.,

Defendant.

Case No. 4:15-cv-01696-YGR (SK)

**CLASS ACTION**

**PLAINTIFFS' OPPOSITION TO TCS'S MOTION TO DECERTIFY CLASS (DKT. #335)**

Hon. Yvonne Gonzalez Rogers

Date: July 17, 2018
Time: 2:00 p.m.
Location: Courtroom 1, 4th Flr., Oakland

Complaint Filed: April 14, 2015
Trial Date: November 5, 2018

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

PLAINTIFFS' OPPOSITION TO TCS'S MOTION TO DECERTIFY CLASS ..... 1

I. FACTS ..... 2

II. LEGAL STANDARD ..... 9

III. DISCUSSION ..... 11

A. TCS Has Not Established Good Cause for Revisiting Class Certification ..... 11

B. Plaintiffs Satisfy Rule 23's Commonality and Predominance Requirements. ..... 13

C. TCS's "New" Evidence Does Not (and Cannot) Rebut Plaintiffs' Evidence Demonstrating a "General Policy of Discrimination" to Favor South Asian Expats. ..... 16

*1. Dr. Lazear's Flawed Report Does Not Rebut Plaintiffs' Evidence of Commonality. ..... 17*

*2. TCS's Reliance on the Testimony of Three HR Personnel is Misplaced for Numerous Reasons, Including that None was a Member of RMG. ..... 18*

*3. TCS's Retention and Affirmative Action Efforts Do Not Rebut the Existence of Commonality. ..... 20*

*4. TCS Cannot Defeat Certification by Asserting That It Intends to Rely on Individualized Evidence During Phase I. ..... 21*

D. Plaintiffs Have Standing to Seek Injunctive Relief Because Mr. Mandili and Mr. Slaight Have Sought Reemployment With TCS ..... 23

E. TCS's Request to Rewrite the Class Definition to Excluded those Not Subject to Benching is Moot. 24

F. TCS's Arbitration Agreements are Unenforceable and/or Should Be Litigated in Phase II.24

G. TCS's Releases are Invalid and/or Should Be Litigated in Phase II. ..... 25

IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Cases**

*Aburto v. Verizon Cal., Inc.*, No. 11-CV-03683, 2014 WL 10381 (C.D. Cal. Jan. 3, 2012) ............ 11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013)……………...10, 11, 22

*Bates v. UPS*, 511 F.3d 974 (9th Cir. 2007) ........................................................................ 23

*Bayer v. Neiman Marcus Grp.*, 861 F.3d 853 (9th Cir. 2017)........................................................ 23

*Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384 (5th Cir. 1983)……………………………………22

*Brawner v. Bank of Am., N.A.*, No. C 14–02702 YGR (LB), 2014 U.S. Dist. LEXIS 168344 (N.D. Cal. Dec. 4, 2014)................................................................................................ 11

*Brown v. Wal-Mart Store, Inc.*, No. 09-cv-3339-EJD, 2018 U.S. Dist. LEXIS 71435 (N.D. Cal. April 27, 2018)..............................................................................................12, 13

*Campbell v. Facebook, Inc.*, 315 F.R.D. 250 (N.D. Cal. 2016)……………………………………11

*Canatella v. California*, 304 F.3d 843 (9th Cir. 2002) .................................................................. 23

*Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113 (S.D.N.Y. 2012)................................ 16

*Children's Alliance v. City of Bellevue*, 950 F. Supp. 1491 (W.D. Wash. 1997)............................. 15

*City of L.A. Dep't of Water v. Manhart*, 435 U.S. 702 (1978) ........................................................ 14

*Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12–cv–00824, 2015 U.S. Dist. LEXIS 35858 (D. Ariz. Mar. 23, 2015)................................................................................................ 10

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ...................................................................... 11

*Cooper v. Fed. Reserve Bank*, 467 U.S. 867 (1984)........................................................................ 15

*Dothard v. Rawlinson*, 433 U.S. 321 (1977) .................................................................................. 14

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)........................................................................ 11

*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012)........................................ *passim*

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ............................................ *passim*

*Everts v. Sushi Brokers LLC*, 247 F. Supp. 3d 1075 (D. Ariz. 2017) ............................................ 15

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012)......................................10, 19

*Fernandez v. Wynn Oil Co.*, 653 F.2d 1273 (9th Cir. 1981) .......................................................... 14

*Ferrill v. Parker Grp., Inc.*, 168 F.3d 468 (11th Cir. 1999) .......... 14

*Floyd v. City of N.Y.*, 283 F.R.D. 153 (S.D.N.Y. 2012) .......... 16

*Frank v. United Airlines, Inc.*, 216 F.3d 845 (9th Cir. 2000) .......... 9, 14, 15

*Freitag v. Ayers*, 463 F.3d 838 (9th Cir 2006) .......... 23, 24

*Gay v. Waiters' & Dairy & Lunchmen's Union*, 549 F.2d 1330 (9th Cir. 1977) .......... 9

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) .......... 12

*Gratz v. Bollinger*, 539 U.S. 244 (2003) .......... 24

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) .......... 18

*In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013) .......... 10

*In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115-WHO, 2018 U.S. Dist. 48606 (N.D. Cal. Mar. 23, 2018) .......... 12, 13

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .......... 17, 20, 22

*Int'l Union v. Johnson Controls*, 499 U.S. 187 (1991) .......... 14

*Labriola v. Bank of Am., N.A.*, No. C 12-79 CW, 2012 U.S. Dist. LEXIS 65853 (N.D. Cal. May 10, 2012) .......... 23, 24

*Lambert v. Nutraceutical Corp.*, 870 F.3d 1170 (9th Cir. 2017) .......... 11, 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... 24

*Marino v. CACafe, Inc.*, No. 16-cv-6291 YGR, 2017 U.S. Dist. LEXIS 64947 (N.D. Cal. Apr. 28, 2017) .......... 25

*Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012) .......... 10

*Nanty v. Barrows Co.*, 660 F.2d 1327 (9th Cir. 1981) .......... 23

*Parra v. Bashas', Inc.*, 291 F.R.D 360 (D. Ariz. 2013) .......... 10, 16

*Parra v. Bashas', Inc.*, 536 F.3d 975 (9th Cir. 2008) .......... 10

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) .......... 14

*Slayman v. FedEx Ground Package Sys.*, 765 F.3d 1033 (9th Cir. 2014) .......... 23

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) .......... 23

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014) .......... 10

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) .......... passim

*United States v. Hayes Int'l Corp.*, 456 F.2d 112 (5th Cir. 1972) .................................................. 23

*United Steel, Paper & Forestry, Rubber Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802 (9th Cir. 2010) ........................................................................................................................ 11

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................ *passim*

**Statutes**

42 U.S.C. § 2000e-2 ........................................................................................................ 14

**Rules**

Fed. R. Civ. P. 23 .................................................................................... *passim*

**Treatises**

2 W. Rubenstein, NEWBERG ON CLASS ACTIONS (5th ed. 2012) ............................................9

3 NEWBERG ON CLASS ACTIONS (5th ed. 2017) ..................................................................... 12

**PLAINTIFFS' OPPOSITION TO TCS'S MOTION TO DECERTIFY CLASS**

Defendant Tata Consultancy Services, Ltd. ("TCS") operates under a pervasive and explicit discriminatory policy to favor South Asian expats in staffing positions in the United States. In certifying the class, the Court found that Plaintiffs had presented "'significant proof'" that TCS "'operated under a general policy of discrimination,'" such that certification of the class was appropriate. Omnibus Order at 33 (Dec. 27, 2017) (Dkt. #244) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011)). That proof included internal TCS documents reflecting a "Leadership Directive" to use visa workers to the "maximum extent," a manual utilized by TCS's staffing department—the Resource Management Group ("RMG")—that promotes the "mapping" of visa workers to positions in the United States, and statistical evidence that demonstrated TCS's preference for South Asian expats, resulting in the benching and termination of locally hired non-South Asians at dramatically higher rates than their South Asian colleagues. *Id.* at 3-4, 33. TCS originally denied the existence of its "Leadership Directive." Def.'s Class Cert. Opp'n at 20 (Dkt. #127) ("such a directive does not exist").

After the Court's class certification decision, Plaintiffs' proof has only strengthened. Most significantly, TCS's President for North America, Surya Kant, and Senior Vice President in charge of North American Human Resources ("HR"), Narasimhan Srinivasan, have admitted to devising and implementing the "Leadership Directive" together, and Mr. Srinivasan has testified at length as to why TCS favors expats over locals.

In its motion, TCS entirely ignores these admissions, and attempts to relitigate issues already decided by this Court. For example, TCS raises arguments identical to those already considered and rejected by the Court. TCS also relies on irrelevant and mischaracterized evidence and information to dispute the existence of its discriminatory scheme. Evidence that creates a factual dispute may be presented to the jury at trial, not to challenge certification. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016). TCS's evidence does not rebut Plaintiffs' significant proof, and its motion should be denied.

## I. FACTS

TCS provides IT outsourcing services to clients throughout the United States, including companies like Southern California Edison, Bank of America, American Express, and Toyota. 4th Am. Compl. ¶¶ 2, 12, 35, 48 (Dkt. #246); TCS061566-67 at 66 (Ex. 1); Ganapathy Decl. ¶ 2 (Dkt. #142); Omnibus Order at 3 (Dkt. #244).

TCS currently employs approximately 32,500 employees in the United States. Srinivasan Dep. Tr. 68:5-11 (May 11, 2018) (Ex. 2). To staff a client project, TCS either matches existing employees to the project, or conducts external hiring within the U.S. *See* Kumar Decl. ¶¶ 2, 5-6 (Dkt. #141). When an employee's project comes to an end, he or she must locate another project.[1] TCS's RMG is responsible for identifying new positions for the individual and facilitating the individual's placement in a new job.[2] RMG closely tracks when positions are scheduled to end, and individuals—mostly expats—are often placed directly into a new position.[3] Individuals who are not immediately hired for a new position are placed in a non-productive status, referred to as being "benched" or "unallocated."[4] TCS closely monitors the status of benched employees.[5] If an individual is benched for too long, he or she will be terminated.[6]

The vast majority—up to 89%—of TCS's workforce in the U.S. consists of expats from India,

---

[1] Kumar (30(b)(6)) Dep. Tr. 27:13-28:21 (Jan. 25, 2017) (Ex. 3).

[2] *Id.*; Kumar Decl. ¶ 2, 6 (RMG "facilitates the placement of existing full-time employees into available positions in the United States") (Dkt. #141); TCS038103-10 at 05 ("once your release [from a project] is approved, RMG will start exploring options for you. They will try to finalize your profile for one of the available open positions within TCS, if you get selected after internal/client interviews.") (Ex. 4).

[3] Kumar (30(b)(6)) Dep. Tr. 26:16-28:8 (Ex. 3); TCS007391-452 at 407-09 (noting that RMG [redacted] ) (Ex. 5).

[4] TCS044201-03 at 02 ("I explained the bench policy to you wherein you will be unallocated once you're released from [the client project] and you will need to work actively with RMG … to find your next assignment") (Ex. 6); TCS038103-10 at 05 (Ex. 4).

[5] Kumar (30(b)(6)) Dep. Tr. 17:10-12 (unallocated reports "generated on a daily basis.") (Ex. 3); Excerpt from TCSLTD0055447590 (unallocated report listing the name of each unallocated employee and his or her "number of days unallocated" and "no. of weeks [unallocated]") (Ex. 7).

[6] TCS's Mot. at 6 (Dkt. #335); Kumar (30(b)(6)) Dep. Tr. 15:3-15 (Ex. 3); TCS055851-54 at 53 (noting "[t]here are 136 Local Hires currently unallocated. Out of that 100+ associates are more than one month unallocated. Request your help to take necessary action from HR to place these associates into project or release them.") (Ex. 8).

and almost every TCS project in the U.S. is staffed with over 90% South Asian expats.[7] The remainder consists of individuals hired within the U.S. TCS has publicly touted its goal of increasing its U.S. workforce to consist of 50% of local hires (as opposed to roughly 10%). TCSLTD005647628-33 at 30 (Ex. 51).[8] Privately, however, TCS believes that expats are more capable than local hires and, as a result, has continued to prioritize the placement of expats in U.S. positions at the expense of non-South Asian local hires, including benched local hires who face termination.

In recent depositions, TCS executives (President Surya Kant and Vice President and Head of HR Narasimhan Srinivasan) testified that, compared to local hires employed by TCS, expats are better able to execute TCS's Global Network Delivery Model. Srinivasan Dep. Tr. 71:12-15, 74:23-75:13 (Q: "So are there certain positions that are better filled by ex-pats?" A: "If there is a global delivery model involved, then yes.") (Ex. 2); Kant Dep. Tr. 123:24-124:10 (Apr. 30, 2018) (testifying that a team in U.S. would be requesting only visa-ready candidates for positions because project involved "global network delivery model") (Ex. 13).[9] TCS uses its Global Network Delivery Model on essentially every U.S. project.[10] Under this model, [redacted].[11] TCS executives testified to three frivolous, discriminatory stereotypes in an effort to explain why South Asian expats should be prioritized over local hires in the placement of U.S. jobs.

First, TCS claims to prioritize expats over local hires for U.S. jobs because the expats have

---

[7] *See, e.g.*, Def.'s Class Cert. Opp'n at 4-5 (Dkt. #127); Anderson Decl. ¶ 14 (Dkt. #129); Kumar Decl. ¶ 9 (stating that over 99% of expats are from India) (Dkt. #141); Srinivasan Dep. Tr. 68:5-11 (Ex. 2); TCSLTD003474918-31 at 22 (further indicating that 78% of projects were staffed *exclusively* with expats) (Ex. 9); Neumark Supp. Rpt. Tbls. A5, A6, A7, A8 (Ex. 10).

[8] This goal was not implemented as part of a good faith commitment to diversity, but out of a concern for pending immigration reforms by the U.S. government. TCS157878-83 at 82 (Ex. 11); TCSLTD006874858-64 at 60 (Ex. 12). Moreover, given TCS's discriminatory preference, it has consistently failed to make any progress towards this goal. TCS's Class Cert. Opp'n at 4-5 (Dkt. #127) (admitting to a U.S. workforce of "between 76.3% and 89% expats" during the class period).

[9] *See also* Kant Dep. Tr. 149:1-19 (testifying that staffing email stating "'My first preference is to go for expats,'" "means people who know how to do it in, you know, [a] global way") (Ex. 13).

[10] Srinivasan Dep. Tr. 71:12-22; 79:4-12 ("very few [U.S. projects] will be only on-site") (Ex. 2); Kant Dep. Tr. 13:16-17 (TCS "pioneered the global network delivery model") (Ex. 13); Kumar (30(b)(6)) Dep. Tr. 87:23-88:14 (Ex. 3).

[11] TCSLTD003567690-706 at 690 ([redacted]") (Ex. 14).

experience working from India and thus have "familiarity with TCS processes [and] familiarity with methodologies." Kant Dep. Tr. 141:11-16 (Ex. 13); *id.* 127:18-128:7, 129:8-14 ("we have delivery centers in India … naturally those people would be preferred for these [U.S.] positions"); Srinivasan Dep. Tr. 72:2-12, 73:2-22 (Ex. 2). But anyone, local hires and expats alike, can obtain the same familiarity. Kant Dep. Tr. 141:23-142:3, 149:22-25 (Q: "Would local hires that work for TCS be familiar with TCS's processes?" A: "Once they join TCS and they have worked with TCS for some time, certainly they would be aware of TCS processes and the methodologies.") (Ex. 13).

Second, TCS claims to prioritize expats over local hires for U.S. jobs because expats are "used to working with different time zones." Srinivasan Dep. Tr. 72:12-13, 73:23-74:6 (Ex. 2). But no reason exists why local hires would be unable to get used to working with different time zones. *Id.* 74:2-6 (Q: "[T]hat's something that local hires wouldn't be able to get used to?" A: "[T]hey may not have experience.").

Third, TCS claims to prioritize expats over local hires for U.S. jobs because expats are "used to" moving back and forth between the U.S. and India. *Id.* 72:15-21, 74:8-22; Kant Dep. Tr. 123:20-124-10 (Ex. 13). But India offers visas for business travelers from the U.S., and no reason exists why local hires could not travel there.[12] In fact, Mr. Slaight (and several U.S. colleagues) traveled to India for two months on visas to "meet[] with the team that worked in India on projects in the U.S." Slaight Dep. Tr. 38:16-22, 66:4-73:1, 81:16-82:7 (Sept. 17, 2016) (Ex. 15).

As Mr. Srinivasan explained, the vast majority of TCS's U.S. workforce consists of South Asian expats because of TCS management's discriminatory belief that it is "critical" to place expats in U.S. positions given these three justifications. Srinivasan Dep. Tr. 71:12-15, 72:18-21; 74:23-75:13 (Ex. 2). Pursuant to this discriminatory preference for South Asian expats, TCS's "Leadership Team," consisting of Surya Kant, TCS's President for North American, and his direct report, Mr. Srinivasan devised a "Leadership Directive," that every expat should be utilized "to the maximum extent." *Id.*

---

[12] *See Employment Visa (E)*, INDIA BUREAU OF IMMIGRATION, https://boi.gov.in/content/employment-visa-e (last visited June 14, 2018) (listing various categories of individuals eligible for visas to India, including "Foreign nationals deputed for providing technical support").

38:24-39:19 (Q: "[W]ho are the members of the leadership team[?]" A: "[I]t is me and Surya [Kant]"); Kant Dep. Tr. 120:20-121:5, 122:13-16 ("I was involved in giving the directive[.] . . . I gave the goal"), 122:21-24 (Q: "And that [goal] turned into a leadership directive to utilize visas to the maximum extent?" A: "[Y]es") (Ex. 13);[13] *see, e.g.*, TCS057813-18 at 15 ("Leadership directive is to utilize every visa to the maximum extent – L1 B: 5 Yrs, H1 B: 6 Yrs & L1 A: 7 Yrs.") (Ex. 16); TCS137485-87 at 85 ("Leadership Team has advised to utilize visa ready Associates at on site") (Ex. 17).[14] The directive was issued to RMG, whose head, Umesh Kumar, reported directly to Mr. Srinivasan and who was present during the meeting where the directive was devised. Srinivasan Dep. Tr. 42:24-43:10, 44:15-17 (Ex. 2).[15] The directive applies "US-wide," not just to a specific business unit or division. Srinivasan Dep. Tr. 44:21-45:1 (Ex. 2).[16]

Management's preference for the placement of expats in U.S. positions is reflected in the company's practices. TCS regularly applies for well over 10,000 visas annually.[17] As a result, TCS is consistently the top recipient of L-1 visas and one of the top three recipients of H-1B visas.[18]

---

[13] *See also* Kant Dep. Tr. 36:20-21 ("my goals … are translated into policies and then actions") (Ex. 13).

[14] TCS151793-94 at 93 (same) (Ex. 18); TCS153136-38 at 37 (same) (Ex. 19); Kumar (30(b)(6)) Dep. Tr. 80:23-81:5 (testifying, through 30(b)(6) witness, that "[TCS] should use a person's visa to the maximum approval limit") (Ex. 3); TCS148025-27 at 25 ("Leadership Team has advised not to send any visa ready associate back [to India] unnecessarily and utilize him/her here") (Ex. 20); Compilation Exhibit A (containing exemplary statements from documents reflecting Tata's corporate policy to use visas to the "maximum extent.").

[15] *See also* Kumar (30(b)(6)) Dep. Tr. 80:23-81:5 (Q: "Are you familiar with th[e leadership directive to utilize every visa to the maximum extent]?" A: "I am familiar that we should use a person's visa to the maximum approval limit.") (Ex. 3).

[16] Significantly, TCS maintains a "flat" leadership hierarchy, with few levels of management. *See* Devenny Dep. Tr. 188:18-189:7 (Apr. 2, 2018) (Ex.21). The Head of HR reports directly to the company's President, and the Head of RMG reports directly to the Head of HR. *See* Srinivasan Dep. Tr. 7:3-7, 11:11-15, 12:20-23 (Ex. 2).

[17] *See, e.g.*, TCS's Resp. to Pls.' 5th Set of INTs at Resp. No. 1 (Ex. 22); TCS's Supp. Resp. to Pls.' Am. Notice of Rule 30(b)(6) Dep. at 4 & Ex. A (Ex. 23).

[18] *See, e.g.*, Excerpt from U.S. Citizenship & Immigration Servs., Approved H-1B Petitions by Employer for Fiscal Year 2015, 2016, and 2017 (Ex. 24); U.S. Citizenship & Immigration Servs., Excerpt from Approved L-1 Petitions by Employer for Fiscal Year 2015, 2016, and 2017 (Ex. 25). The full lists are available on the agency's website. *See Buy American, Hire American*, U.S. CITIZENSHIP & IMMIGRATION SERVS. (May 15, 2018), https://www.uscis.gov/legal-resources/buy-american-hire-american-putting-american-workers-first (containing links to the annualized lists).

After securing visas, TCS closely tracks the visa status of its employees.[19] Likewise, TCS tracks the allocation status of these individuals.[20] RMG then endeavors to place expats in open positions—RMG's Manual (which is uniform nationwide) directs RMG to "map associates with unutilized visas and work permits for onsite opportunities." TCS007391-425 at 425 (Ex. 5). This "mapping is in line[] with leadership guidance about optimizing VISA utilisation [sic] of VISA ready folks." TCSLTD003968335- 41 at 37 (Ex. 26).[21]

Countless requisitions in RMG's Resource Gathering System ("RGS") are explicitly restricted to "expats only." *See* Compilation Ex. B. Countless others state that expats are "preferred." *Id.* And while not *every* requisition in RGS contains an explicit preference for expats, the Leadership Directive was widely distributed, understood, and implemented. As one TCS employee stated when seeking to fill an open position, "[w]e have a mandate from Narsi [Srinivasan] to look for visa option first." TCSLTD005494331-34 at 31 (Ex. 29).[22] As Mr. Srinivasan (the Head of HR) explained, being an expat is "a preferred attribute," and failing to maximize the use of visa workers is tantamount to a "criminal offense."[23]

---

[19] Kumar (30(b)(6)) Dep. Tr. 54:13-19, 88:15-23 (testifying, through 30(b)(6) witness, to TCS's "weekly reports" of visa ready workers) (Ex. 3); *see, e.g.*, TCS007391-752 at 407-09 (noting RMG [redacted] (Ex. 5).

[20] Kumar (30(b)(6)) Dep. Tr. 17:10-12 (noting, through 30(b)(6) witness, that the unallocated reports "are generated on a daily basis.") (Ex. 3).

[21] TCSLTD002879934-37 at 35 ("in order to increase the requirements fulfillment for North America onsite … RMG will try to map these associates against the RGS requirement") (Ex. 27); TCS069046-47 at 46 (requesting RMG review the list of unallocated expats and "map each associate to two accounts and mark[] the priority 1 & 2. . . . Prioritized accounts will quickly evaluate and absorb associates into immediate billable roles.") (Ex. 28).

[22] TCS's emails are rife with comparable sentiments. *See, e.g.*, Compilation Ex. B at B12 ("We need only Expat[s] for these positions"); *id.* at B5 ("We will prefer a TCS expat associate with a long term visa."); *id.* at B16 ("At present we are looking only [for] TCS expat and Visa Ready from offshore"); *id.* at B20 ("I have 3-4 positions open. Preferably visa ready, but can wait for visa processing if person is in India"); TCS177617-18, at 17 (RMG Lead Ambika G: "Can we look at Visa ready or visa eligible cvs please[?]" Alok Bhalla: "Visa Ready will be a preference.") (Ex. 30); TCS148654-55 at 54 ("For this position, we are looking for Expats only.") (Ex. 31).

[23] Srinivasan Dep. Tr. 75:20-76:4 (testifying further that an explicit preference for expats does not raise any concerns for him) (Ex. 2); TCSLTD001820670-73 at 70, 72, 73 (In response to email noting that "there are 1063 associates holding valid H1B unallocated at offshore," Mr. Srinivasan responded that "It is a criminal offense to waste the visas likes this. . . . I want to see how many of them can be mapped against current open requirements.") (Ex. 32).

TCS previously argued that the Leadership Directive did not exist. Def.'s Class Cert. Opp'n at 20 (Dkt. #127) ("such a directive does not exist"). As TCS's head of diversity recognized while testifying as a corporate representative, such a directive would be discriminatory:

> Q: As the head of diversity at TCS, would you be concerned if there was a leadership directive for positions to be filled with visa-ready individuals?
> A: Yes.
> Q: Why would you be concerned about that?
> A: Because as I said, citizenship or nationality should not be the basis for determining a person is fit against a particular position.

Ganapathy (30(b)(6)) Dep. Tr. 42:25-43:10 (Jan. 25, 2017) (Ex. 33); *see also* Def.'s Class Cert Opp'n at 20 (preference to fill positions with individuals of certain race or national origin would be "a source of concern"). TCS has now acknowledged that the Leadership Directive exists—as overwhelming evidence demonstrates—but asserts that it was not issued and implemented "at the expense of any other population in the company." Kant Dep. Tr. 32:8-15 (Ex. 13); TCS's Mot. at 11 (arguing that efforts to increase "fulfillment and curb attrition apply to expats and locals equally").

The statistical and documentary evidence belies this assertion. As a result of TCS's preference for staffing positions with South Asian expats, these individuals are either not placed on the bench at all or are rapidly moved off the bench to fill open positions.[24] At the same time, TCS's comparatively few non-South Asian employees languish on the bench and are then terminated at dramatically higher rates than their South Asian colleagues.[25] As the Court previously recognized, "the involuntary termination rate for benched non-South Asian employees is 10.6% as compared to less than 1% for benched South Asian employees." Omnibus Order at 5 (Dkt. #244) (citing Neumark Supp. Rpt. Tbl. 2 (Ex. 10)). The likelihood of such a disparity occurring by chance is less than 1 in 1 billion. *Id.* (citing Neumark Supp. Rpt. ¶ 7 (Ex. 10); Neumark Rpt. ¶¶ 6, 9, 14, Tbl. 1 (Ex. 34)).

---

[24] Neumark Supp. Rpt. Tbls. A3, A4 (demonstrating that locals remain on bench substantially longer than expats) (Ex. 10); TCS069046-47 at 46 (requesting RMG review the list of unallocated expats and "map each associate to two accounts and mark[] the priority 1 & 2. . . . Prioritized accounts will quickly evaluate and absorb associates into immediate billable roles.") (Ex. 28); Kumar (30(b)(6)) Dep. Tr. 60:6-19 (Q. "Is there a process for releasing expats from positions?" A. "[I]f the … project is getting over, there might be people on that project, right? What this e-mail suggests is to reassign [expats] for other projects." Q: "Is this to avoid these individuals being unallocated?" A: "Yes.") (Ex. 3).

[25] Neumark Rpt. ¶¶ 7-8, 17-18, Tbls. 3.a-3.e (Ex. 34); Neumark Supp. Rpt. Tbl. A3 (Ex. 10).

TCS's attrition reports reflect this gross disparity. The reports indicate that attrition for local hires has remained dramatically higher than expat attrition throughout the class period.[26] And this disparity remains consistently disproportionate across client projects of all sizes throughout the country.[27] The vast majority of involuntary terminations are a result of being unallocated.[28] TCS's 2016 attrition report, for example, indicates that while 390 local hires were terminated for being unallocated, zero expats were.[29] TCS's management has expressed no concern over these disparities.[30]

TCS has argued that these gross disparities can be explained because the U.S. terminations data does not include expat terminations. But the data belies this argument. Dr. Neumark found that including data concerning terminations outside of the United States did not materially alter the disparity in terminations—the rates comparing terminations of South Asians versus non-South Asians remain staggeringly disproportionate. *See* Neumark Supp. Rpt. ¶¶ 7-8, Tbl. 2(Ex. 10). TCS has also argued that the gross disparities reflected in the data and in its attrition reports are irrelevant because, unlike locals, when expats remain on the bench for too long, they are sent back to India and

---

[26] *See, e.g.*, TCSLTD003481641-60 at 48 (2012 local hire attrition: 28.9%, expat attrition: 5.3%) (Ex. 35); TCSLTD001448569-80 at 70 (2012-15 local hire attrition: between 20-25%, expat attrition: between 5.74-10.69%) (Ex. 36); TCSLTD001421577-89 at 78 (2016 local hire attrition: 23.52%, expat attrition: 11.78%) (Ex. 37).

[27] TCSLTD001416821-37 at 33-35 (comparing attrition at large, mid-sized, and small accounts) (Ex. 38).

[28] TCSLTD001421555-74 at 59 (Ex. 39); TCSLTD001448569-80 at 77 (Ex. 36); TCSLTD001421577-89 at 79 (Ex. 37); *see also* Srinivasan Decl. Ex. C at TCSLTD00818584 ("The other major reason for Local Hire attrition is after release the associate remains unallocated for a long time and finally quits or is terminated") (Dkt. #337-3).

[29] TCSLTD001421577-89 at 87 (Ex. 37). Mr. Srinivasan instructed that the attrition reports "should have expatriate, Local split of voluntary and involuntary." TCSLTD001450869-72 at 70 (Ex. 40); Srinivasan Dep. Tr. 94:18-24 (Ex. 2).

[30] *See* Kant Dep. Tr. 36:11-15 (Q. "Have you seen disparities in terms of involuntary terminations comparing expats to local hires that cause you concern?" A. "[N]ot recently.") (Ex. 13); Srinivasan Dep. Tr. 83:25-84:16 (Q. "[H]ave you seen terminations that are unfair?" A. "I have not come across [any]. . . . No.") (Ex. 2).

reassigned.[31] In contrast, local hires are fired.[32] Moreover, unallocated expats *in India* who have unutilized visas are given placement priority for U.S. jobs, as TCS views not maximizing expat visas as tantamount to a "criminal offense." TCSLTD001820670-73 at 70, 72 (Ex. 32). As a consequence, local hire attrition and termination rates remain high. *See, e.g.*, *supra* note 26.

The experiences of the Named Plaintiffs are representative of TCS's treatment of non-South Asians. Each Named Plaintiff was removed from a project, placed on the bench, passed over for positions, and then terminated. *See, e.g.* 4th Am. Compl. ¶¶ 3-4, 48-49, 64-67, 69-73 (Dkt. #246). Numerous class members have come forward to share similar stories. *See, e.g.*, Pls.' Mot. for Class Cert. at 10-11 (Dkt. #115).

## II. LEGAL STANDARD

"Employment discrimination based on race [] or national origin is by definition class discrimination[, and because] the purpose of Title VII is to eliminate such class based discrimination, class actions are favored in Title VII actions for salutary policy reasons." *Gay v. Waiters' & Dairy & Lunchmen's Union*, 549 F.2d 1330, 1333 (9th Cir. 1977) (noting further that "class actions are consistent with the broad remedial purpose of Title VII"). The Court has already found that Plaintiffs satisfy the requirements of Rule 23(a), 23(b)(2), and 23(b)(3). Omnibus Order at 39-40 (Dkt. #244) (certifying class under Rules 23(b)(2) and 23(b)(3)). TCS seeks reconsideration of only the Court's finding that the Class satisfies Rule 23(a)(2)'s commonality and 23(b)(3)'s predominance requirements.[33]

To satisfy Rule 23(a)(2)'s commonality requirement, Plaintiffs must present one or more common questions of law or fact. Fed. R. Civ. P. 23(a)(2). "[A] common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 136 S. Ct. at 1045 (quoting 2 W.

---

[31] Srinivasan Dep. Tr. 84:23-85:20 (explaining that expats "go back to their base country, and they have their employment in the base country," while locals are just terminated outright) (Ex. 2); Srinivasan Decl. ¶ 14 (Dkt. #337); TCS's Mot. at 6. This difference in treatment is itself discriminatory. *See, e.g.*, *Frank v. United Airlines, Inc.*, 216 F.3d 845, 853, 855 (9th Cir. 2000) ("An employer's policy amounts to disparate treatment if it treats men and women differently on its face").

[32] Srinivasan Dep. Tr. 85:6-20 (Ex. 2).

[33] As the Court has already found, the class satisfies Rule 23's numerosity, typicality, adequacy, superiority, and ascertainability requirements, *id.* at 35-39, and TCS does not contend otherwise.

Rubenstein, NEWBERG ON CLASS ACTIONS § 4:50, pp. 196-97 (5th ed. 2012)); *Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12–cv–00824, 2015 U.S. Dist. LEXIS 35858, at *39-40 (D. Ariz. Mar. 23, 2015) ("where 'the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members,' there is a common question" (quoting *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 756 (7th Cir. 2014)). A single company-wide discriminatory policy or practice can satisfy the commonality requirement. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) ("commonality only requires a single significant question of law or fact"). Commonality does not require uniformity among class members – "'[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.'" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (quoting *Parra v. Bashas', Inc.*, 536 F.3d 975, 978-79 (9th Cir. 2008)). Courts have found that "whether Defendant has engaged in a pattern or practice of discrimination such that all class members are entitled to a presumption of discrimination under the *Teamsters* method of proof is a common issue subject to classwide resolution." *Ellis*, 285 F.R.D. at 538; *accord Parra v. Bashas', Inc.*, 291 F.R.D 360, 375 (D. Ariz. 2013).

Rule 23(b)(3)'s "predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common aggregation-defeating, individual issues." *Tyson Foods*, 136 S. Ct. at 1045 (internal quotation omitted); *see also In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1187 (N.D. Cal. 2013) ("Plaintiffs are not required to show that each element of the underlying cause of action is susceptible to classwide proof … only … that common questions will predominate with respect to their case as a whole"). Courts have found that whether a defendant has engaged in a pattern or practice of discrimination "predominates because it has a direct impact on every class member's effort to establish liability and on every class member's entitlement to … monetary relief." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 538 (N.D. Cal. 2012) (citation omitted).

Plaintiffs need not prove their case at the certification stage. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013). Rather, they need only show that their *prima facie* case "is '*capable of proof at trial* through evidence … common to the class rather than individual to its

members.'" *Campbell v. Facebook, Inc.*, 315 F.R.D. 250, 264 (N.D. Cal. 2016) (emphasis added) (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430 (2013)). When facts are disputed on a motion for decertification, resolving the factual dispute "is the near-exclusive province of the jury," and the court can deny class certification on the basis of a disputed factual issue "only if it concluded that no reasonable juror could have believed [in the persuasiveness of plaintiffs' admissible evidence]." *Tyson Foods*, 136 S. Ct. at 1049; *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1184 (9th Cir. 2017) (reversing class decertification and holding that questions of fact "should be decided at trial," not on motion for decertification); *see also United Steel, Paper & Forestry, Rubber Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808-09 (9th Cir. 2010) (reversing denial of certification where district court found that "it was not *assured* that plaintiffs would prevail on their primary legal theory," and explaining "'nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.'" (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974))) (emphasis in original).[34] "'Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Brawner v. Bank of Am., N.A.*, No. C 14–02702 YGR (LB), 2014 U.S. Dist. LEXIS 168344, at *6 (N.D. Cal. Dec. 4, 2014) (quoting *Amgen*, 568 U.S. at 467).

## III. DISCUSSION

### A. <u>TCS Has Not Established Good Cause for Revisiting Class Certification.</u>

TCS's motion for decertification improperly raises arguments that it raised or could have raised in TCS's unsuccessful opposition to Plaintiffs' motion for class certification. While courts may reconsider the propriety of class certification under Rule 23, reconsideration must be based on a "'subsequent development[] in the litigation,'" such as the emergence of new evidence or a change in the law. *In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115-WHO, 2018 U.S. Dist. 48606, at

[34] In its class certification order, the Court held that it "must resolve factual disputes," and "consider 'the persuasiveness of the evidence presented.'" Omnibus Order at 9 (Dkt. #244) (quoting *Aburto v. Verizon Cal., Inc.*, No. 11-CV-03683, 2014 WL 10381, at *2 (C.D. Cal. Jan. 3, 2012)) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-83 (9th Cir. 2011)). However, *Ellis* predated the Supreme Court's 2016 holding in *Tyson Foods*, in which it held that a summary judgment standard—no reasonable juror—applied to the consideration of evidence on motions for class certification. *See Tyson Foods*, 136 S. Ct. at 1049.

*12-13 (N.D. Cal. Mar. 23, 2018) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); citing 3 NEWBERG ON CLASS ACTIONS § 7:37 (5th ed. 2017)). "The burden of showing why [the court] should consider decertification falls squarely on the shoulders of defendants." *Id.* at 13 (citing 3 NEWBERG ON CLASS ACTIONS § 7:39 (5th ed. 2017)); *Brown v. Wal-Mart Store, Inc.*, No. 09-cv-3339-EJD, 2018 U.S. Dist. LEXIS 71435, at *5-6 (N.D. Cal. April 27, 2018) ("the proper question is whether Wal-Mart has identified a subsequent development in the law or the evidence to justify revisiting class certification on its merits"); 3 NEWBERG ON CLASS ACTIONS § 7:39 (5th ed. 2017) ("[A] defendant seeking decertification or modification ought to be required to make some showing of changed circumstances or law, which would then trigger a plaintiffs' obligation to defend certification."). Where a defendant fails to identify sufficient "subsequent developments in the evidence or the law," the court need not "revisit[] class certification on its merits." *In re Korean Ramen Antitrust Litig.*, 2018 U.S. Dist. 48606, at *16; *Brown*¸ 2018 U.S. Dist. LEXIS 71435, at *7 (denying decertification where defendant "simply rehashes arguments already addressed by this Court").

TCS identifies no change in relevant law. Nor could it. Rather, it primarily rehashes an argument already addressed extensively by this Court—whether Plaintiffs have presented "significant proof" of a general policy of discrimination. *See, e.g.*, TCS's Mot. at 9. TCS's other arguments could have been raised previously but were not, *e.g.*, standing of the named plaintiffs, arbitration, and releases. *See id*. at 19-21.

Nor does TCS identify any substantial new evidence that would warrant reopening the Court's certification decision. For example, *every* paragraph in the "Facts" section of TCS's brief is purportedly supported, in part, by the declaration of the Head of HR, Mr. Srinivasan, an employee who has worked at TCS for 29 years. *See id.* at 2-6; Srinivasan Decl. ¶ 2 ("I have been employed by TCS since 1991") (Dkt. #337). Plainly, Mr. Srinivasan's knowledge was available to TCS before the last round of briefing. For the same reason, TCS's reliance on testimony from its former HR employees regarding TCS's practices is misplaced, as this was information that was already within TCS's knowledge. Any suggestion that the company only just learned of its own HR policies, practices, and employees' knowledge is implausible. Similarly, Dr. Lazear's supplemental expert

report relies entirely on TCS data that had already been produced at the time of Dr. Lazear's first expert report in March 2017, which was filed in opposition to Plaintiffs' certification motion. *See* Lazear Supp. Rpt. at 4 (Dkt. #336-8).

Because TCS's Motion rehashes prior arguments, and fails to present good cause for omitting the evidence on which it now relies during the first round of certification briefing, the Court need not "revisit[] class certification on its merits." *In re Korean Ramen Antitrust Litig.*, 2018 U.S. Dist. 48606, at *16. The "motion is an exercise in futility, as [TCS] has identified no change in law or fact that would justify upsetting the prior certification decision." *Brown*, 2018 U.S. Dist. LEXIS 71435, at *2. It should, therefore, be denied.

**B. <u>Plaintiffs Satisfy Rule 23's Commonality and Predominance Requirements.</u>**

When certifying the class, the Court found three common questions that predominate: "(i) whether TCS engaged in a pattern and practice of discrimination against non-South Asians, whether (ii) plaintiffs and the proposed classes are entitled to injunctive relief and (iii) the availability of punitive damages." Omnibus Order at 32 (Dkt. #244). "The existence of these three common issues is undisputed." *Id.* at 33. Rather, the Court's analysis focused on whether Plaintiffs had offered "'significant proof' that TCS 'operated under a general policy of discrimination.'" *Id.* (quoting *Dukes*, 564 U.S. at 352). The Court found that Plaintiffs had presented such proof in the form of "statistically significant disparities in involuntary [termination] rates between benched South Asian and non-South Asian employees," and "TCS documents which describe a general corporate policy of favoring expats and visa-ready individuals who are predominately South Asian in allocating benched employees to open client projects." *Id.* In addition, Plaintiffs "proffer[ed] substantial evidence regarding the implementation of said policy." *Id.*

As discussed above, Plaintiffs' proof has only grown stronger post-certification. While TCS initially denied the very existence of its "Leadership Directive," TCS's President, Mr. Kant, and Head of HR, Mr. Srinivasan, recently testified that they devised the Leadership Directive in a meeting with the Head of RMG as a way of maximizing the utilization of TCS's South Asian expats.[35] As both Mr.

---

[35] TCS argues that the directive was not issued "at the expense of any other population in the company." Kant Dep. Tr. 32:8-15 (Ex. 13); TCS's Mot. at 10-11 (arguing that efforts to increase

Kant and Mr. Srinivasan testified, TCS prefers staffing projects in the U.S. with South Asian expats, believing them to be "critical." *See supra* p. 4. This preference is based on TCS's purported belief in South Asians employees' superiority over (non-South Asian) local hires. TCS's belief in this supposed superiority is based on three stereotypical generalizations about the relative capabilities of South Asian and non-South Asian employees, rather than individualized assessments of each employees' capabilities. *See supra* pp. 3-4. Not only is reliance on these types of stereotypical beliefs prohibited under Title VII and § 1981,[36] TCS's discriminatory, false, and pretextual justifications are also compelling evidence of discriminatory intent.[37]

Given TCS's discriminatory preference, the Leadership Directive was issued to RMG "US-wide," and vigorously implemented (as countless requisitions, emails, and TCS's employment data demonstrate). *See* Compilation Ex. B; Srinivasan Dep. Tr. 44:21-45:1 (Ex. 2). As a result, South

---

"fulfillment and curb attrition apply to expats and locals equally"). As discussed above, the statistical and documentary evidence belies this assertion. *See supra* pp. 7-8 and notes 24-29. Moreover, whether the Leadership directive *in fact* resulted in discrimination is a question of fact for resolution by the jury. *See, e.g.*, *Ellis*, 285 F.R.D. at 509-510 ("'the district court was not required to resolve factual disputes regarding … whether women were in fact discriminated against'" pursuant to challenged practices) (quoting *Ellis*, 657 F.3d at 983); Omnibus Order at 14 ("causation is the providence of the jury") (Dkt. #244).

[36] *See, e.g.*, *City of L.A. Dep't of Water v. Manhart*, 435 U.S. 702, 707 (1978) (noting in sex discrimination case that "[i]t is now well recognized that employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females"); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276 (9th Cir. 1981) ("stereotypic impressions of male and female roles do not qualify gender as a BFOQ."). TCS cannot argue that its preference for South Asian expats is justified as a business necessity, because Plaintiffs assert intentional discrimination claims. *See* 42 U.S.C. § 2000e-2(k)(2) ("A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination"). Nor can TCS raise a "bona fide occupational qualification" defense to a claim of race discrimination. *See* 42 U.S.C. § 2000e-2(e) (limiting BFOQ defense to "religion, sex, or national origin"); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473-74 (11th Cir. 1999) ("BFOQ defense does not apply to racial discrimination, the BFOQ defense is never available to the § 1981 defendant"). Although TCS may argue that national origin is a BFOQ at trial, this "'extremely narrow exception'" requires evidence (not stereotypes) that preferring Indians is "'reasonably necessary' to the 'normal operation' of its 'particular business,'" *Frank*, 216 F.3d at 855 (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 344 (1977); *Int'l Union v. Johnson Controls*, 499 U.S. 187, 187 (1991); 42 U.S.C. § 2000e-(2)(e)(1)), a proposition unsupported by any evidence in the record.

[37] *See, e.g.*, *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147-48 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive").

Asian expats are consistently favored for open positions, while non-South Asians remain on the bench. Neumark Supp. Rpt. Tbls. A3, A4 (demonstrating that locals remain on bench substantially longer than expats) (Ex. 10). Pursuant to TCS policy, individuals who remain on the bench for too long are then terminated. As the data and TCS's internal documents demonstrate, non-South Asians are terminated at dramatically higher rates than their South Asian colleagues. *See supra* pp. 7-8 and notes 25-29. In defense, TCS has argued that, unlike local hires, expats are not subject to termination for remaining on the bench—they are relocated to India and reassigned work there, a policy that is itself discriminatory. Srinivasan Dep. Tr. 84:23-85:20 (Ex. 2).[38] Moreover, unallocated expats *in India* who have unutilized visas are given placement priority for U.S. jobs, as TCS views not maximizing expat visas as tantamount to a "criminal offense." TCSLTD001820670-73 at 70, 72 (Ex. 32).

A nationwide corporate policy issued by company executives for discriminatory purposes, and that results in discriminatory effects, is the quintessential example of a "general policy of discrimination." *See, e.g.*, *Ellis*, 285 F.R.D. at 511, 514, 518-19 (finding commonality and predominance satisfied where plaintiffs "produced 'significant proof'" of a "common, companywide promotion system," with significant involvement from "[t]op management," including the company's CEO who "personally instructs his staff as to the criteria they should employ in making promotion decisions," resulting in "classwide effects purportedly caused by said policies and practices"); Omnibus Order at 23-24 (Dkt. #244) (holding that Plaintiffs established their *prima facie* case, relying in part on evidence of TCS's "[l]eadership directive" which was "implemented across a range of business managers").[39] In contrast, in *Dukes*, the plaintiffs challenged a corporate policy to give low-level decision makers full discretion in making employment decisions, which the Court described as

[38] *See Frank*, 216 F.3d at 853, 855 ("An employer's policy amounts to disparate treatment if it treats men and women differently on its face"); *Everts v. Sushi Brokers LLC*, 247 F. Supp. 3d 1075, 1079 (D. Ariz. 2017) (policy "which on its face applies less favorably to a protected group" constitutes direct evidence of discrimination); *Children's Alliance v. City of Bellevue*, 950 F. Supp. 1491, 1495 (W.D. Wash. 1997) ("Differential treatment on the face of an ordinance demonstrates an intent to discriminate; additional evidence of discriminatory animus is not required").

[39] A plaintiff "need not prove absolute uniformity, but only a 'regular' practice … [or] '*pattern of* discriminatory decisionmaking.'" *Ellis*, 285 F.R.D. at 518 (quoting *Cooper v. Fed. Reserve Bank*, 467 U.S. 867, 876 (1984)).

"a policy *against having* uniform employment practices." *Compare Dukes,* 564 U.S. at 355 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is . . . a policy *against having* uniform employment practices"), *with Ellis*, 285 F.R.D. at 518-19 ("Unlike in *Dukes* … here the criteria Plaintiffs allege to be subjective and unvalidated derive from top management's own *instructions*, and senior management oversees" implementation) (emphasis added), *and Parra*, 291 F.R.D. at 375 (holding that defendant's "written, non-discretionary, centralized wage scale … is precisely what was missing in *Dukes*"); *see also Floyd v. City of N.Y.*, 283 F.R.D. 153, 173-74 (S.D.N.Y. 2012) (defendant's "centralized policy" that was "generate[d] from a centralized source," and employed "hierarchical supervisory structure to effect and reinforce its department-wide policies" supported commonality).[40]

There is no reasonable argument that Plaintiffs have failed to proffer "'significant proof'" of a "'general policy of discrimination,'" given the testimonial and documentary evidence discussed above. Accordingly, as the Court has previously held, Plaintiffs satisfy the requirements of Rule 23(a)(2) and (b)(3), and class status should be maintained. *See* Omnibus Order at 33, 38-39 (Dkt. #244).

**C. <u>TCS's "New" Evidence Does Not (and Cannot) Rebut Plaintiffs' Evidence Demonstrating a "General Policy of Discrimination" to Favor South Asian Expats.</u>**

Both TCS's President, Mr. Kant, and Head of HR, Mr. Srinivasan have admitted that they devised the "Leadership directive" to maximize the use of South Asian expats in the United States, which was then issued "US-wide" to the company's RMG department. Kant Dep. Tr. 120:20-121:5, 122:13-16 (Ex. 13); Srinivasan Dep. Tr. 43:24-44:13, 44:15-17, 44:21-45:1 (Ex 2). Documentary evidence demonstrates the issuance and implementation of the directive, and TCS's internal documents and employment data confirm the discriminatory impact on non-South Asian local hires throughout the U.S. *See, e.g.*, Compilation Ex. B; *see supra* pp. 7-8 and notes 25-29. Because Plaintiffs have satisfied the "significant proof" standard, no further inquiry is necessary.

In seeking decertification, TCS relies on a flawed expert report and irrelevant and mischaracterized testimony from a few former employees that were neither company executives, nor

[40] *See also Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 118 (S.D.N.Y. 2012).

members of RMG—the department responsible for carrying out the directive. To the extent such evidence is relevant at all, it is appropriate for presentation to the jury at trial, not in seeking decertification of the class. *See Tyson Foods*, 136 S. Ct. at 1049 (resolving factual disputes "is the near-exclusive province of the jury," and the court can deny class certification on the basis of a disputed factual issue "only if it concluded that no reasonable juror could have believed [in the persuasiveness of plaintiffs' admissible evidence]"); *Lambert*, 870 F.3d at 1184 (reversing class decertification and holding that questions of fact "should be decided at trial," not on motion for decertification); *Ellis*, 285 F.R.D. at 509-510. Accordingly, TCS's reliance on such evidence is misplaced, and TCS's arguments in favor of decertification should be rejected.

*1. Dr. Lazear's Flawed Report Does Not Rebut Plaintiffs' Evidence of Commonality.*

Relying on the expert report of Edward Lazear, TCS argues that it did not involuntarily terminate enough non-South Asians for these terminations to support commonality. TCS' Mot. at 8-9. In other words, in TCS's view, it did not discriminate *enough* for a class to be certified.[41] TCS cites no caselaw for this bizarre assertion, which should be rejected on its face. TCS also asserts that "the overwhelming majority of class members do not experience involuntary termination." *Id.* at 8. But, the class is limited to individuals "placed in an unallocated status and . . . terminated," meaning one-hundred percent of class members experienced involuntary termination. Omnibus Order at 30 (Dkt. #244).

Moreover, commonality is satisfied where a plaintiff presents "significant proof" that a defendant "has engaged in a pattern or practice of discrimination." *Ellis*, 285 F.R.D. at 538. As addressed above, Plaintiffs have done so here, and Dr. Lazear's report does not rebut any of Plaintiffs' considerable evidence (including, *e.g.*, admissions from TCS management, voluminous internal documents, and data demonstrating the heavily disproportionate benching and termination of non-South Asians). Plaintiffs need only demonstrate "a pattern of discriminatory decisionmaking" not "absolute uniformity," *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360 n.46 (1977); *Ellis*, 285 F.R.D. at 518, and the fact that TCS did not discriminate against even more people is irrelevant to the question of commonality or predominance.

[41] Notably, TCS does not challenge numerosity.

Finally, Dr. Lazear's comparison of the termination rates of non-South Asian workers at TCS to the termination rates in the work force at large is also misplaced. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977) (holding that the "comparison of Hazelwood's teacher work force to its student population fundamentally misconceived the role of statistics in employment discrimination cases. . . . [A] proper comparison was between the racial composition of [the] teaching staff and the … qualified public school teacher population in the relevant labor market."). The proper comparison here is between the terminations rates of South Asians *at TCS* versus the termination rates of non-South Asians *at TCS. See, e.g.*, Neumark Rpt. ¶¶ 16-17 ("The relevant labor market is Tata's workforce … because terminations can only occur among Tata employees") (Ex. 34); Omnibus Order at 14 (Dkt. #244) (noting that "[a]s in *Obrey* and *Coleman*, Dr. Neumark's analysis shows statistical disparities between South Asians and non-South Asians in TCS' workforce composition and involuntary termination outcomes," and is therefore "relevant and helpful to the trier of fact"). Based on this proper comparison, the terminations rates for non-South Asians in the U.S. are highly disproportionate. *See supra* p. 7 and note 25.

2. *TCS's Reliance on the Testimony of Three HR Personnel is Misplaced for Numerous Reasons, Including that None was a Member of RMG.*

TCS bases several arguments on the testimony of Donna Gomez, Lekisha Bailey, and Hannah Russo, former TCS HR employees. TCS's arguments are misplaced.

First, TCS finds it "critical[]" that these HR employees were unaware of TCS's leadership directive. TCS's Mot. at 11. But the existence of the directive is not subject to reasonable dispute – TCS's executives have admitted to its existence. In addition, ample documentation and data reflects the directive and its discriminatory impact on non-South Asians. Moreover, none of these former employees were members of TCS's Resource Management Group ("RMG") – the group responsible for carrying out the leadership directive and mapping expats to open U.S. positions. *See* Srinivasan Dep. Tr. 44:14-17 (testifying that directive was issued to RMG) (Ex. 2); Kumar (30(b)(6)) Dep. Tr. 26:23-28:8 (testifying that it was RMG, not HR, responsible for staffing open U.S. positions) (Ex. 3). The fact that employees in *other* departments were unaware of the directive is immaterial.[42] It makes

[42] However, Ms. Gomez did observe the effects of TCS's discrimination, testifying that RMG did

sense that this discriminatory directive would not be publicized to TCS's non-South Asian employees, especially human resources personnel. *See* Ganapathy (30(b)(6)) Dep. Tr. 42:25-43:10 (acknowledging TCS's awareness that a directive to prefer visa-ready individuals would be discriminatory) (Ex. 33).

Second, TCS argues that "common evidence is absent" because Ms. Bailey and Ms. Gomez testified that some individualized factors played into the decision to remove employees from projects and place them on the bench "[b]efore an employee was referred to RMG." TCS's Mot. at 14-16. But it was RMG that was responsible for carrying out the directive and allocating benched employees—not HR personnel like Ms. Bailey or Ms. Gomez. Kumar (30(b)(6)) Dep. Tr. 326:23-28:8 (Ex. 3).

Third, TCS argues that commonality is lacking because Ms. Gomez and Ms. Bailey did not personally discriminate or observe discrimination when approving terminations. TCS's Mot. at 16-18. To begin, this is inaccurate—Ms. Gomez found that discrimination at TCS was "pervasive," "a pattern" and the "standard operating procedure," and did observe discrimination in terminations.[43] But more fundamentally, TCS's argument misunderstands how TCS's discriminatory preference manifests itself. As addressed above, RMG prioritizes South Asian expats in staffing positions in the U.S. pursuant to the Leadership Directive issued by Mr. Kant and Mr. Srinivasan. An individual's termination paperwork, which describes the efforts to allocate that individual and not efforts to prioritize staffing others (*i.e.*, South Asian expats), would not reflect this preference. The priority given to South Asian expats leads to locals languishing on the bench, and their ultimate termination at staggeringly disproportionate rates pursuant to TCS's policy of terminating those who have remained on the bench for too long.

These specific, centralized employment practices satisfy commonality, even if "the circumstances of each particular class member vary." *Evon*, 688 F.3d at 1029 (citation omitted);

---

not "mak[e] efforts help place the local displaced" employees and instead "ma[de] more efforts to place expatriates." Gomez Dep. Tr. 112:10-18 (Apr. 13, 2018) (Ex. 41).

[43] Gomez Dep. Tr. 117:10-15, 127:2-5; 129:25-130:5, 133:12-20, 137:25-138:2, 143:7-22, 192:5-22, 216:11-217:13, 265:24-266:2 (Q: "Did you ever think any of those terminations that you reviewed, in your opinion, were discriminatory?" A: "Yes. . . .) (Ex. 41).

*accord Ellis*, 285 F.R.D. at 538; *Tyson Foods*, 136 S. Ct. at 1045. If TCS has individualized defenses for some employment decisions, those may be raised during Phase II. Omnibus Order at 22; *accord Teamsters*, 431 U.S. at 342 n.24; *Ellis*, 285 F.R.D. at 539 (collecting cases). For example, TCS suggests that some local hires had location restrictions, which impacted their ability to be reallocated. TCS's Mot. at 14-15. But this is an individualized merits issue, not relevant to class certification—TCS has offered no class-wide proof (such as statistical evidence) in support, and the evidence reflects that expats themselves had locations restrictions (but this did not affect their reallocation in their preferred locations).[44] Moreover, Title VII and § 1981 prohibit an employer from basing its employment policies on stereotypical views on the perceived strengths or weaknesses of particular groups based on their race or national origin. *See supra* p. 14 and note 36

*3. TCS's Retention and Affirmative Action Efforts Do Not Rebut the Existence of Commonality.*

TCS argues that its retention and affirmative action efforts "render implausible" Plaintiffs' theory of companywide discrimination. TCS's Mot. at 12-13. On its face, this is a merits argument, inappropriate for resolution on a motion to decertify. *See, e.g.*, *Ellis*, 657 F.3d at 983 ("the district court [i]s not required to resolve factual disputes regarding . . . whether women were in fact discriminated against"); Omnibus Order at 14 (Dkt. #244) ("causation is the providence of the jury"). These measures do not rebut the existence of commonality or predominance. In fact, to the extent TCS's initiatives are relevant at all, they actually support a finding of commonality, as TCS's "*companywide* changes" demonstrate "companywide control" over staffing. *Ellis*, 285 F.R.D. at 529-30 (emphasis in original).

Moreover, the Court has already rejected TCS's effort to avoid liability by relying on its diversity efforts, Omnibus Order at 29 n.19 (Dkt. #244), and at trial, TCS's reliance on these efforts will fail again on the merits. TCS offers no evidence that its efforts were actually successful or

---

[44] *See, e.g.*, TCSLTD003599309-18 at 15-16 (listing expats' location preferences) (Ex. 42); TCSLTD004490593-604 at 595, 599 (same) (Ex. 43). Moreover, Ms. Bailey testified that throughout the 300 client accounts in her region (Southern California), the vast majority of positions were filled with South Asian expats. Bailey Dep. Tr. 87:7-88:5 (May 15, 2018) (Ex. 44). Accordingly, it is unsurprising that local hires in that area found it difficult to find positions there.

implemented in furtherance of a good faith desire for diversity. On the contrary, evidence suggests that TCS's recent focus on local hiring and retention was motivated by anticipated changes to U.S. visa laws.[45] Nor have these initiatives curbed TCS's disproportionate termination of non-South Asian local hires. *See supra* p. 7-8 and note 25-29. And the probative value of "post-lawsuit" affirmative action efforts should be discounted, as a company may simply be attempting "to avoid liability or large damages in their pending discrimination case." *Ellis*, 285 F.R.D. at 529-30 (citation omitted). For instance, while TCS now touts its companywide goal of a 50/50 local-to-expat ratio, from 2013-2015, its companywide goal was to employ only between 12-20% locals. *See* TCSLTD005647628-33 at 30 (Ex. 51).

#### 4. *TCS Cannot Defeat Certification by Asserting That It Intends to Rely on Individualized Evidence During Phase I.*

TCS argues that the class should be decertified because its employee data contains inaccurate termination codes and, at trial, it will rebut Plaintiffs' *prima facie* case with "individualized termination reports." TCS's Mot. at 18-19 & n.12. To begin, the premise of TCS's argument, that its "unallocated" data code is used as a "catchall," is incorrect and is contradicted by the evidence.[46] Moreover, permitting a defendant to defeat certification by relying on limitations with its own employee data would be improper and would create a perverse incentive, discouraging employers from maintaining accurate records.[47]

Nor may TCS defeat certification by asserting that it intends to rely on individualized evidence during Phase I. During Phase I, the focus will be "on a pattern of discriminatory decisionmaking."

---

[45] *See* TCS157878-83 at 82 ("we need to reach 85% offshoring and 50/50 Locals to Expatriates at onsite in FY15 to meet the Immigration Reform and other challenges in USA.") (Ex. 11); TCSLTD006874858-64 at 60 ("[Green card] processing should not be looked at addressing the visa issue but for meeting the requirements of Immigration reforms. We have to hit 50:50 ratio for Locals and Expatriates and GC is one of the strategy for the same.") (Ex. 12).

[46] The data separately codes terminations due to death, joining the customer, job abandonment, or disciplinary issues. *See* Excerpt from TCSPROD000001985 (listing separation reasons) (Ex. 45). And TCS instructs its employees to accurately code this data. *See* TCSLTD003506707-09 at 07-08 (Ex. 52).

[47] *Cf. Tyson Foods*, 136 S. Ct. at 1047 (rejecting challenge to class certification based on representative evidence necessary as a result of the employer's failure "to keep proper records"); Omnibus Order at 15 (Dkt. #244) (rejecting challenge to expert analysis limited as a result of TCS's failure to produce sufficient data).

*Teamsters*, 431 U.S. at 360 n.46. "The employer's defense must … be designed to meet the prima facie case of the [Plaintiffs]." *Id.*; *see also* Omnibus Order at 21 (Dkt. #244) (discussing TCS's burden to rebut Plaintiffs' prima face case during Phase I). "[I]ndividual proof concerning each class member's specific injury [i]s appropriately left to proceedings to determine individual relief." *Teamsters*, 431 U.S. at 342 n.24; *accord Ellis*, 285 F.R.D. at 539 (compiling cases); *see also Tyson Foods*, 136 S. Ct. at 1045 ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or *some affirmative defenses peculiar to some individual class members*") (emphasis added) (citation omitted).

Moreover, TCS argues that its individualized evidence will rebut the existence of "a companywide policy to favor expatriates in placement decisions." TCS's Mot. at 19 n.12. But where a defendant challenges "a fatal similarity – [an alleged] failure of proof as to an element of the plaintiffs' cause of action – courts should engage that question as a matter of summary judgment, not class certification." *Tyson Foods*, 136 S. Ct. at 1047 (citation omitted) (rejecting challenge to class certification where defendant's "primary defense" was argument that plaintiffs' proof was "unrepresentative or inaccurate" – a defense that was "itself common to the claims made by all class members"). In other words, TCS's argument that its evidence will rebut the existence of a pattern or practice of discrimination actually supports a finding of commonality. *Ellis*, 285 F.R.D. at 530 ("Defendant's argument is once again premised on a common contention regarding the class as a whole, and therefore actually supports the finding of commonality").

Whether TCS will actually rebut Plaintiffs' case is a question for trial, not class certification. *Amgen*, 133 S. Ct. at 1191; *Ellis*, 285 F.R.D. at 509-510. However, at trial, TCS's argument will fail on its merits. The existence of TCS's "companywide policy to favor expatriates in placement decisions," TCS's Mot. at 19 n.12, is not a matter open to reasonable dispute—TCS's President and Head of HR have already admitted to its existence, and documentary and statistical evidence demonstrate its existence, implementation and effects. *See supra* pp. 4-8 and notes 13-29. Likewise, TCS has admitted that employees who remain unallocated are terminated. TCS's Mot. at 6. While TCS may attempt to rebut Plaintiffs' *prima facie* case with "evidence contained in individual

termination records," *Id.* at 18, such an effort will be "doomed to failure because a prima facie case of class-wide discrimination 'is not met by [defendant's] attempts to parry specific allegations of … discrimination.'" *Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384, 1393 (5th Cir. 1983) (quoting *United States v. Hayes Int'l Corp.*, 456 F.2d 112, 120 (5th Cir. 1972)).

**D. <u>Plaintiffs Have Standing to Seek Injunctive Relief Because Mr. Mandili and Mr. Slaight Have Sought Reemployment With TCS.</u>**

Both Mr. Mandili and Mr. Slaight have standing to seek injunctive relief, as each has sought reemployment with TCS. Ninth Circuit case law allows injunctive relief on behalf of former employees who may face the same discriminatory practices again in the future. "In the particular context of injunctive and declaratory relief, a plaintiff must show that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Canatella v. California*, 304 F.3d 843, 852 (9th Cir. 2002) (citations omitted). A former employee has standing to seek injunctive and declaratory relief from a former employer's discriminatory practices if there is "a prospect that he may . . . be subjected to the challenged policy again." *Labriola v. Bank of Am., N.A.*, No. C 12-79 CW, 2012 U.S. Dist. LEXIS 65853, at *18-19 (N.D. Cal. May 10, 2012); *see also Freitag v. Ayers*, 463 F.3d 838, 857 (9th Cir 2006); *Nanty v. Barrows Co.*, 660 F.2d 1327, 1333 (9th Cir. 1981).[48] "'In a class action, standing is satisfied if at least one named plaintiff meets the requirements.'" *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011) (quoting *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007)); *accord Ellis*, 657 F.3d at 979.

Here, Mr. Mandili has testified that "I have still today as we speak at least five applications for a job with TCS," and TCS recruiters have repeatedly contacted him. Mandili Dep. Tr. 94:9-25 (Mar. 8, 2017) (Ex. 46); Mandili Decl. ¶ 2 (June 5, 2018) (Ex. 47); Mandili 0000758 (discussing potential position with TCS in 2015) (Ex. 48); Mandili 0000058-59 (same for 2016) (Ex. 49). Similarly, after his termination, Mr. Slaight sought reemployment with TCS. *See* Plaintiffs 0000470-

[48] The cases cited by TCS—*Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 865 (9th Cir. 2017) and *Slayman v. FedEx Ground Package Sys.*, 765 F.3d 1033, 1047-48 (9th Cir. 2014), do not hold otherwise. TCS's Mot. at 20. For example, in *Bayer*, the Ninth Circuit noted that the plaintiff "is no longer employed with Neiman Marcus and *has produced no evidence to suggest he plans to seek employment with Neiman Marcus again*." 861 F.3d at 865 (emphasis added).

71 at 71 (contacting TCS to explore "options for re-employment or [whether] positions are available") (Ex. 50). Accordingly, Plaintiffs have standing—not only are Mr. Mandili and Mr. Slaight "able and ready" to re-apply to TCS, *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003), they have done so. The law requires nothing more. *Id.*; *Freitag*, 463 F.3d at 857; *Labriola*, 2012 U.S. Dist. LEXIS 65853, at *18-19.

Moreover, because TCS engages in a companywide pattern and practice of discrimination, *see, e.g.*, Omnibus Order at 23 (Dkt. #244), it is especially likely that, if rehired, Mr. Mandili, Mr. Slaight, the other Plaintiffs, and the members of the class would be subjected to the same discriminatory treatment because "'[p]ast wrongs . . . are evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Ellis*, 657 F.3d at 979 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

**E. <u>TCS's Request to Rewrite the Class Definition to Excluded those Not Subject to Benching is Moot.</u>**

The class is defined to include individuals who were benched and then terminated. Omnibus Order at 30 (Dkt. #244). TCS argues that employees not subject to benching should be excluded from the class. TCS's Mot. at 20. On its face, TCS's argument is moot and the class definition should not be altered.

**F. <u>TCS's Arbitration Agreements are Unenforceable and/or Should Be Litigated in Phase II.</u>**

As addressed more fully in Plaintiffs' opposition to TCS's motion to compel arbitration, TCS's arbitration agreements (Dkt. #331-5) are unenforceable because (a) TCS waived its right to demand arbitration, rendering both arbitration agreements unenforceable in this proceeding; (b) Arbitration Agreement B is void because it works as a waiver of employees' Title VII and § 1981 pattern-and-practice rights; and (c) no agreements were ever formed because both agreements are unconscionable. In the alternative, the Court should defer resolution of these issues until Phase II because compelling individuals into arbitration requires individualized determinations improper at this stage in the proceeding. *See* Omnibus Order at 22 (Dkt. #244); *Tyson Foods*, 136 S. Ct. at 1045; *Ellis*, 285 F.R.D. at 539. This is particularly appropriate given that (a) many of the agreements are illegible or incomplete and (b) many of the signatories do not appear to be class members because

they are either South Asian or they were not involuntarily terminated from the bench. These issues must be resolved on an individual basis. *Cf.* Omnibus Order at 36 (Dkt. #244) (noting that class membership may involve some "self-identification"). The Court lacks jurisdiction over non-class members and therefore cannot compel them into arbitration.

### G. TCS's Releases are Invalid and/or Should Be Litigated in Phase II.

TCS argues that individuals who signed releases should be excluded from the class definition. TCS's Mot. at 20-21. But, as addressed in Plaintiffs' concurrently filed motion to invalidate the releases, the releases omitted critical information, by failing to disclose *any* information related to the lawsuit, including: the existence of this lawsuit, the name and case number, a copy of the complaint, a description of the claims, the status of the case, or contact information for Plaintiffs' counsel. *See generally* Sharma Decl. Ex. A.2 (Dkt. #338-2). Courts regularly invalidate releases obtained in such circumstances. *See, e.g.*, *Marino v. CACafe, Inc.*, No. 16-cv-6291 YGR, 2017 U.S. Dist. LEXIS 64947, at *7 (N.D. Cal. Apr. 28, 2017). To the extent the releases are not invalidated, a release is an individualized affirmative defense, appropriate for resolution during Phase II. *See* Omnibus Order at 22 (Dkt. #244); *Tyson Foods*, 136 S. Ct. at 1045; *Ellis*, 285 F.R.D. at 539.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny TCS's motion to decertify the class.

Dated: June 19, 2018

By: /s/Daniel Kotchen
Daniel Kotchen

**KOTCHEN & LOW LLP**
Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*)
Michael von Klemperer (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
dlow@kotchen.com;
dkotchen@kotchen.com;
mvk@kotchen.com;
lgrunert@kotchen.com

*Attorneys for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system.

Dated: June 19, 2018

By: /s/Daniel Kotchen
Daniel Kotchen