**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **BRIAN BUCHANAN, ET AL.,**<br><br>Plaintiffs**,**<br><br>vs.<br><br>**TATA CONSULTANCY SERVICES, LTD,**<br><br>Defendant**.** | CASE NO. 15-cv-01696-YGR<br><br>**ORDER GRANTING MOTION TO BIFURCATE PLAINTIFF CLAIMS AND PRECLUDE BUCHANAN FROM USING THE PATTERN AND PRACTICE METHOD OF PROOF; GRANTING MOTION TO COMPEL ARBITRATION; DENYING MOTION TO DECERTIFY CLASS**<br><br>Re: Dkt. Nos. 330, 331, 335, 368, 369 |

Plaintiffs Brian Buchanan, Christopher Slaight, Seyed Amir Masoudi, and Nobel Mandili[1] bring this class action against defendant Tata Consultancy Services, Ltd. ("TCS") for discrimination in employment practices. (Dkt. No. 246, Fourth Amended Complaint ("4AC").) Plaintiffs bring causes of action for disparate treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq*., and the Civil Rights Act of 1866, 42 U.S.C. 1981. (*Id.* ¶ 5.) Plaintiffs allege that TCS discriminated against them in their hiring, employment, and/or termination practices based on race and national origin. (*Id.* ¶¶ 1-5.) Specifically, plaintiffs claim that TCS maintains a pattern and practice of intentional discrimination in its United States workforce whereby TCS treats persons who are South Asian[2] or of Indian national origin[3] more favorably than those who are not South Asian or of Indian national origin. (*Id*.)

---

[1] On October 27, 2016, this Court granted the parties' stipulation that Steven Heldt be withdrawn as named plaintiff. (Dkt. No. 89.) Accordingly, the Court notes that the caption of this case has been revised.

[2] Plaintiffs define "South Asian race" as referring to individuals who trace their ancestry to the Indian sub-continent. (4AC ¶ 1, n. 3.)

[3] Plaintiffs define "Indian national origin" as referring to individuals born in India, or whose ancestors came from India. (*Id.*)

Now before the Court are TCS's motions for (i) bifurcation of plaintiff Buchanan's claims from those of the class (Dkt. No. 330); and (ii) compulsion of arbitration of certain class members' claims (Dkt. No. 331); and (iii) decertification of the class (Dkt. No. 335). Also before the Court are plaintiffs' motions for (i) approval of class notice and form (Dkt. No. 368); (ii) partial judgment on the pleadings regarding TCS's affirmative defenses (Dkt. No. 369)[4]; and (iii) invalidation of release agreements[5] (Dkt. No. 371). Having carefully reviewed the papers submitted and oral arguments at the hearing held on July 17, 2018, and for the reasons set forth more fully below, the Court **ORDERS** as follows:[6]

1. Defendant's motion to bifurcate the claims of plaintiff Buchanan from those of the other plaintiffs and the class is **GRANTED**.

2. Defendant's motion to compel arbitration of certain class members' claims is **GRANTED**.

3. Defendant's motion for decertification of the class is **DENIED** as framed, but the Court **MODIFIES AND LIMITS** the definition of the class as follows:

   All individuals who are not of South Asian race or Indian national origin who were employed by [TCS] in the United States, *were subject to a policy or practice of benching and allocation*, were placed in an unallocated status and were terminated between April 14, 2011 and [December 27, 2017].[7]

---

[4] As noted on the record during the July 17, 2018 hearing, plaintiffs have withdrawn this motion and the Court has so deemed it **WITHDRAWN**.

[5] As noted on the record during the July 17, 2018 hearing, the Court has requested additional information from defendants in support of their opposition to this motion to be filed no later than **Friday, July 27, 2018**. Accordingly, Court reserves resolution until a later date and **VACATES** the hearing scheduled for August 14, 2018.

[6] In connection with their filings on these motions, the parties filed fourteen administration motions to seal documents. (*See* Dkt. Nos. 332, 339, 340, 341, 363, 365, 367, 370, 383, 386, 391, 394, 405, 407.) The Court will address each in separate orders.

[7] Plaintiffs' motion for approval of class notice and form (Dkt. No. 368) is **GRANTED IN PART**. In general, the Court approves plaintiffs' plan of notice, including use of email for those class members for whom email addresses are available. Additionally, the Court instructs plaintiffs to include in their plan of notice a web-based opt-out opportunity. Now that the Court has modified the class definition, the Court instructs the parties to submit a joint revised form of notice no later than **Friday, July 27, 2018**. Accordingly, the Court **VACATES** the hearing scheduled for Tuesday, July 31, 2018.

## I. BACKGROUND

### A. TCS's Business and Workforce Composition

TCS is a foreign company headquartered in Mumbai, India, with approximately 29,900 employees in the United States. (Dkt. No. 252, Answer to Fourth Amended Complaint ("Answer") ¶ 12.) TCS contracts with clients to provide consulting, technology, and outsourcing services. (Dkt. No. 141, Declaration of Umesh Kumar ("Kumar Decl.") ¶ 3.) When TCS secures a consulting contract it allocates or hires individuals to serve the client onsite. (Dkt. No. 115-3, Ex. 3, Deposition of Balaji Ganapathy ("Ganapathy Dep.") at 29:3-6, 31:20-32:5; Ex. 4, Deposition of Umesh Kumar ("Kumar Dep.") at 38:7-39:14.) TCS staffs such client projects with a combination of (i) "visa-ready" individuals currently working for TCS overseas, (ii) individuals working for TCS in the United States which are not currently allocated to a client, and (iii) individuals not currently working for TCS in any capacity ("Local Hires"). (*See* Kumar Dep. at 38:7-39:14.) During the class period,[8] foreign visa workers (referred to herein as "Deputees" or "Expats") represented between 75% and 89% of TCS's workforce in the United States. (Declaration of G. Edward Anderson ("Anderson Decl.") ¶ 14; Kumar Dep. at 82:17-83:4.) The vast majority of such Expats were South Asian. (*See* Anderson Decl. ¶ 14; Dkt. No. 115-3, Exs. 19, 20.)

TCS's business managers are responsible for determining the staffing needs for each TCS client. (Kumar Decl. ¶ 5.) The staffing process begins when a business manager initiates a staffing request for an open position (the "Request") which identifies the job's location, start date, responsibilities, and skills and experience required. (Kumar Decl. ¶ 10.) The Request is then transmitted to TCS's Resource Management Group ("RMG") which is responsible for helping business managers identify qualified internal candidates. (*Id.*)

If a business manager determines that no internal candidates in the United States or overseas match the Request, TCS seeks to fill the position with a Local Hire. (Dkt. No. 133, Declaration of Shyam Chinnari ("Chinnari Decl.") ¶ 4.) TCS's Talent Acquisition Group

---

[8] The class period is defined as April 14, 2011 through December 27, 2017. (*See* Dkt. No. 244, Class Certification Order ("Cert. Order").)

3

("TAG") assists business managers in identifying, recruiting, and onboarding Local Hires. (*Id.*) The TAG relies partly on third-party vendors (also known as "headhunters") who similarly work to target and attract qualified applicants. (*Id.* ¶¶ 5-7; Declaration of Brian Andrillo ("Andrillo Decl.") ¶ 3.)[9] After consulting with third-party vendors, the TAG screens and forwards qualifying resumes to business managers who have ultimate authority to hire non-technical employees. (Chinnari Decl. ¶¶ 5-7.) For positions that require technical skills, clients often are involved in the interview and selection process. (Chinnari Decl. ¶ 10.)

When a TCS employee is not assigned to a client that employee is placed on "unallocated" or "benched" status. (Kumar Decl. ¶ 19; *see also* Dkt. No. 115, Ex. 7 (TCS044201-4203 at 4202); Ex. 9 (TCS044201-4203 at 4202).) The Resource Management Group ("RMG") assists benched employees in identifying open client projects for which they are qualified and to which they can apply. (Kumar Dep. at 27:13-28:21 (discussing TCS038103-8110 at 8105).) Employees receive their regular salary while benched, but those that remain benched for a prolonged period of time are proposed for termination. (Kumar Dep. 15:3-15; Dkt. No. 115, Ex. 7 (TCS055851-5854 at 5853).)

Plaintiffs rely on internal documents in arguing that TCS maintains a pattern and practice of favoring visa-ready individuals and benched expats who are predominantly South Asian when assigning individuals to open client projects. For example, plaintiffs point to documents showing that business managers are instructed to "map associates with unutilized visas and work permits for onsite opportunities" in the United States. (Dkt. No. 115, Ex. 8 (TCS007391-452 at 425).) TCS documents also indicate that TCS issued and implemented a "[l]eadership directive [] to utilize every visa to the maximum extent." (*Id.,* Ex. 12 (TCS057815); *see also* Ex. 13 (TCS137485-7487 at 7485).) Plaintiffs argue that such policies result in fewer work opportunities for non-South Asian employees and thus a greater number of involuntary terminations because employees who are unable to obtain onsite client opportunities remain unallocated and are

---

[9] During the class period TCS contracted with more than 60 headhunters to advertise open positions and collect resumes. (Chinnari Decl. ¶ 6.)

4

ultimately terminated. Plaintiffs further argue that TCS uses third-party recruiters to identify and attract South Asian Local Hires.

In addition to documentary evidence, plaintiffs also highlight the demographic composition and involuntary termination rates of TCS's workforce in the United States. Plaintiffs offer the expert opinion of Dr. David Neumark to show that defendant's U.S. workforce was between 72.32% and 78.91% South Asian during the class period, compared to 12.50% of the computer systems design and related services industry as a whole. (Dkt. No. 115, Ex. 1 (Expert Report of David Neumark ("Neumark Rpt.") ¶¶ 6, 9, 14; Tbl. 1).) Further, Dr. Neumark opines that the involuntary termination rate for benched non-South Asian employees is 10.6% as compared to less than 1% for benched South Asian employees. (Dkt. No. 196, Supplemental Expert Report of David Neumark ("Neumark Supp. Rpt."), Tbl. 2.) According to Dr. Neumark, the likelihood of obtaining such skewed results by chance is less than 1 in 1 billion. (*Id.* ¶ 7; Neumark Rpt. ¶¶ 6, 9, 14; Tbl. 1.)

### B. Plaintiff Buchanan

With respect to plaintiff Buchanan, Southern California Edison ("SCE") employed him as an IT professional from 1986 until February 2015. (4AC ¶¶ 32, 38.) SCE informed Buchanan in July 2014 that he and approximately 400 coworkers would be terminated and replaced by TCS employees. (*Id.* ¶ 36.) Buchanan agreed to remain in his position with SCE until early 2015 to train the incoming TCS employees. (*Id.*) Buchanan was discharged by SCE in February 2015 when TCS assumed primary responsibility for SCE's IT needs. (*Id.* ¶ 43.) In the interim, Buchanan attended a job fair organized by SCE for its employees awaiting termination, at which he met with a TCS hiring manager to express his interest in a position with TCS. (*Id.* ¶ 40.) Plaintiffs allege that the TCS recruitment representatives acted in a dismissive manner which discouraged Buchanan from inquiring about other employment opportunities, and TCS made no further contact with Buchanan regarding his application despite Buchanan's extensive qualifications and experience. (*Id.*) TCS hired only five of the twenty-eight members of plaintiff Buchanan's team at SCE, three of whom were South Asian. (*Id.* ¶ 41.) Plaintiff alleges that TCS replaced him and the remaining members of his team with South Asian workers who had inferior

experience and qualifications. (*Id.* ¶¶ 41-42.)

**C. Class Allegations**

Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for TCS's alleged "systematic pattern and practice of discrimination against non-South Asian and non-Indian individuals in the United States." (*Id.* ¶ 74.) Plaintiffs bring this action on behalf of the following class:

> All individuals who are not of South Asian race or Indian national origin who were employed by [TCS] in the United States, were placed in an unallocated status and were terminated between April 14, 2011 and [December 27, 2017].[10]

(*Id.* ¶ 74; *see also* Cert. Order at 30.)

**D. Arbitration Agreements**

Beginning July 2015, TCS asked all new employees hired in the United States to sign mutual arbitration agreements. (Dkt. No. 331-1, Declaration of Jeevak Sharma ¶ 3.) These arbitration agreements took two forms during the class period: one nationwide form ("Nationwide Agreement") and one form for employees hired in California ("California Agreement"). (Dkt. Nos. 331-2; 331-3.) The nationwide form provides, in relevant part:

> The Company and I mutually consent to the resolution by arbitration of all claims or controversies ("claims"), past, present or future, whether or not arising out of my employment (or its termination) that the Company may have against me or that I may have against any of the following (1) the Company . . . . Arbitrable claims include, but are not limited to . . . claims for discrimination including, but not limited to, race, . . . , national origin . . . ) . . . and claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance . . . . To the maximum extent permitted by law, I hereby waive any right to bring on behalf of persons other than myself, or to otherwise participate with other persons in, any purported class, collective, or representative action . . . .

(Dkt. No. 331-2 at 1-2.) The California form provides, in relevant part:

> . . . both the Company and you voluntarily agree that any claim, dispute, or controversy arising out of or relating to your employment with the Company or the separation of that employment shall be submitted to final and binding arbitration . . . . Examples of claims, disputes or controversies

---

[10] By an order dated December 27, 2017, the Court defined the class to include those individuals who "were placed in an unallocated status and were terminated between April 14, 2011 and the date of class certification." (Cert. Order. at 30.)

that must be resolved through the process set forth in this agreement rather than in court, include, but are not limited to claims for alleged . . . wrongful termination . . . ; discrimination and harassment claims, including, without limitation, those brought under Title VII of the Civil Rights Act . . . and any other employment related claims of any type . . . .

(Dkt. No. 331-3.)

## II. MOTION TO BIFURCATE

### A. Standard

Pursuant to Rule 42(b), a district court may "order a separate trial of one or more separate . . . claims" for "convenience, to avoid prejudice, or to expedite and economize . . . ." Fed. R. Civ. P. 42(b); *see also Hangarter v. Provided Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (noting that Rule 42(b) allows a trial court to bifurcate case in furtherance of convenience, to avoid prejudice, or to defer costly and possibly unnecessary proceedings) (internal quotations omitted). "Factors to be considered when determining whether to bifurcate include: avoiding prejudice, separability of the issues, convenience, judicial economy, and reducing risk of confusion." *Bates v. United Parcel Service*, 204 F.R.D. 440, 448 (N.D. Cal. 2001). The party seeking bifurcation "has the burden of proving that bifurcation is justified given the facts [of the] case . . . that the bifurcation will promote judicial economy and avoid inconvenience or prejudice to the parties." *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992).

### B. Proper Use of Pattern and Practice Framework

As a threshold issue, the Court addresses TCS's motion to preclude Buchanan from availing himself of the pattern and practice framework for establishing claims of employment discrimination under *Teamsters v. United States*, 431 U.S. 324 (1977), as it is relevant to the parties' arguments on the motion to bifurcate.

The Ninth Circuit has not yet explicitly determined whether an individual private plaintiff may bring a claim for discrimination using the *Teamsters* framework.[11] However, a majority of

---

[11] The Court finds unpersuasive plaintiffs' assertion that the Ninth Circuit "permitted [an] individual plaintiff[] to proceed under a pattern or practice theory of liability" in *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005). *Obrey* involved an employer's objection to the admissibility of statistical evidence and did not directly address the plaintiff's use of the pattern

7

the circuits that have considered the issue have held that the pattern and practice method of proof is not available to private plaintiffs because such an extension would allow "nonclass private plaintiffs who have shown a pattern or practice of discrimination (but have not made out a disparate impact claim) to shift the burden to employers to prove that they did not discriminate against a particular individual." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 149 (2d Cir. 2012) (collecting cases).[12] To allow this expansion of *Teamsters* would "conflict with the Supreme Court's oft-repeated holding in the context of disparate treatment, private nonclass litigation that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."" *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

### C. Bifurcation of Buchanan's Individual Claims

Buchanan asserts an individual claim of discrimination based on a failure to hire. The Court did not certify a "failure to hire" class. To determine whether bifurcation of Buchanan's claims will promote judicial economy, reduce the risk of confusion, and avoid prejudice to the parties, the Court must assess and compare the facts and evidence Buchanan intends to present at trial to be presented by the class.

Plaintiffs assert in their opposition that Buchanan's claims "involve the same corpus of facts" as those of the class. (Dkt. No. 363 ("Bifurcation Opposition") at 5.) In support of that statement, plaintiffs acknowledge that Buchanan's claims and those of the class both arise under the same statutory framework, namely Title VII and rely on "TCS's leadership directive to favor South Asian visa holders, mapping of visa ready workers in India to U.S. positions irrespective of

---

and practice method of proof. *Id*. at 693.

[12] *See Semsroth v. City of Wichita*, 304 Fed.Appx. 707, 715 (10th Cir. 2008); *Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 967–69 (11th Cir. 2008); *Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 575 (6th Cir. 2004); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355–56 (5th Cir. 2001); *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *see also Schuler v. PricewaterhouseCoopers, LLP*, 739 F.Supp.2d 1, 6 n. 2 (D.D.C.2010) ("Courts in every other Circuit that have touched on this issue have indicated that an individual plaintiff cannot maintain a pattern and practice claim.") (collecting cases).

qualifications, earmarking U.S. jobs only for visa holders or expats, maintaining an overwhelmingly South Asian workforce, training less-qualified visa holders, etc." (*Id.*) First, the fact that the claims of Buchanan and the class arise under the same statute does not support plaintiffs' assertion that the claims will rely on the same corpus of facts.

Second, the "leadership directive" to which plaintiffs refer is, by plaintiffs' own admission, a directive to favor South Asian visa holders when mapping *existing employees* to open assignments. (4AC at ¶ 24 ("Tata has an explicit corporate directive to favor *its South Asian visa workers in staffing* positions in the United States.") (emphasis supplied).[13] As the Court previously noted, "plaintiffs offer no evidence of a leadership directive, corporate directive, or management decision with regard to hiring." (Cert. Order at 34 (internal citations omitted).) Similarly, allegations that TCS engaged in "mapping of visa ready *workers in India* to U.S. positions . . . , earmarking U.S. jobs for only visa holders or expats[14], *maintaining* an overwhelmingly South Asian workforce, and *training* [of] less-qualified visa holders" all address TCS's conduct with respect to current employees and therefore would apply only to the termination-based claims of the class. To allow plaintiffs to present evidence at a trial of Buchanan's claims would result in confusion and could lead to prejudice against TCS by allowing Buchanan to benefit from factual allegations about TCS's internal staffing process that are otherwise not relevant to his failure-to-hire claims.

Further, plaintiffs also aver that at trial, Buchanan will "rely on the same statistical, documentary, and testimonial evidence of TCS's discriminatory policies and their effect on non-South Asian and non-Indian individuals." (*Id.* at 6.) However, plaintiffs do not present any examples of such evidence. Plaintiffs' trial plan fails to provide additional "common evidence" beyond that discussed here and suggests that the center of plaintiffs' common evidence is a pattern and practice method of proof. (*See* Dkt. No. 403-1 at 4-5.)

---

[13] S*ee also* Dkt. No. 218, Sur-Surreply in Support of Motion for Class Certification at 1:3–4; Dkt. No. 268, Discovery Joint Letter Brief at 7:25–8:2.

[14] Plaintiffs have previously defined "visa holders" as visa ready individuals in India who are working for TCS in other positions. (Dkt. No. 115 at 4.)

9

Because Buchanan, as an individual private plaintiff, is subject to a different burden-shifting framework than will govern the claims of the class and the overlap in the factual basis of Buchanan's claims relative to those of the class is minimal, bifurcation would avoid confusion and prejudice and would not substantially impact judicial economy or efficiency at trial. Furthermore, allowing Buchanan's trial to proceed as a single determination, both as to liability and damages, supports judicial economy and convenience. For these reasons, the Court **GRANTS** TCS's motion to bifurcate Buchanan's claims and to preclude Buchanan from using the pattern and practice method of proof in support of his private claim.

### III. MOTION TO COMPEL ARBITRATION

#### A. Standard

The Federal Arbitration Act ("FAA") allows a party to request that a district court compel arbitration and stay judicial proceedings. 9 U.S.C. §§ 3, 4. Typically, the court's role is limited to determining whether: (i) an agreement exists between the parties to arbitrate; (ii) the claims at issue fall within the scope of the agreement; and (iii) the agreement is valid and enforceable. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).

However, the strong presumption in favor of arbitration "does not confer a right to compel arbitration of any dispute at any time." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 474 (1989). The FAA provides that arbitration agreements are unenforceable where there are "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability may be applied to invalidate arbitration agreements without contravening federal law." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 574, 582 (1960). Thus, when evaluating the enforceability of arbitration agreements, courts should generally refer to the applicable state law principles governing for formation of contracts. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Ingle v. Circuit City Stores*, 328 F.3d 1165, 1170 (9th Cir. 2003).

10

**B. Analysis**

As a preliminary matter, the parties do not dispute either the existence or applicability of the arbitration agreements. Rather, plaintiffs contend that the agreements are unenforceable because TCS has waived its right to demand arbitration and the Nationwide Agreement contains impermissible waiver and unconscionable provisions. (Dkt. No. 372 ("Arbitration Opposition") at 1.) The Court addresses each.

The Court first considers whether TCS has waived its right to demand arbitration. A party seeking to prove waiver of a right to arbitration must demonstrate: "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 758 (9th Cir. 1988) (internal quotations omitted).

In evaluating these factors, the Court considers primarily whether TCS's apparent delay in filing the instant motion resulted in prejudice to the plaintiffs. Although TCS waited until plaintiffs filed their Fourth Amended Complaint to assert its right to arbitration, TCS notified plaintiffs of the existence of the arbitration agreements and defendant's intent to enforce them as soon as plaintiffs' implicated a potential plaintiff to whom the agreements applied. (Dkt. No. 111 at 10 (averring that the claims of proposed plaintiff Steven Webber are barred because "TCS implemented arbitration agreements and class action waivers with its employees on or about July, 2015" and "Webber signed such a provision").) Therefore plaintiffs were on notice regarding the existence of the arbitration agreements and TCS's intent to enforce them, where applicable, prior to plaintiffs' motion for class certification (Dkt. No. 115) and their opposition to TCS's motion for summary judgment (Dkt. No. 121). Additionally, TCS notified plaintiffs of its position that employees who signed the arbitration agreements cannot be counted among the class its opposition to plaintiffs' motion for class certification. (Dkt. No. 127 at 12 n.7.)

While in some circumstances, defendants' delay may constitute cause to deny the motion, granting the motion here would merely reduce the size of the class, not derail the litigation in its

11

entirety.[15] Plaintiffs have not suggested that granting TCS's motion will affect their ability to prosecute the instant class action. Although parties dispute the precise size of the class, and as discussed at the hearing, the Court notes that even assuming numbers least favorable to the plaintiffs (lowest class size and highest number of class members bound by arbitration) well over 100 class members would remain. (*See* Arbitration Opposition at 3; Cert. Order at 35.) Such reduction in class size would have no impact on plaintiffs' ability to maintain numerosity under Fed. R. Civ. Proc. 23(a)(1). *See Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 608 (N.D. Cal. 2004) (finding that a common sense approach to numerosity is reasonable); *see also Californians for Disability Rights, Inc. v. Cal Dep't of Transp.*, 249 F.R.D. 334, 347 (N.D. Cal. 2008). Further, in this context, all the parties' litigation actions would have had to occur in any event—plaintiffs knew of the arbitration agreements in drafting their motion for class certification and opposition to TCS's motion for summary judgment. Therefore, the granting of TCS's motion would not prejudice plaintiffs. Accordingly, the Court finds that TCS has not waived its right to arbitrated claims brought by class members bound by the arbitration agreements.

Having not found a waiver, the Court now turns to whether the arbitration agreements contain impermissible prospective waiver of an employee's federal antidiscrimination rights. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 265, 274 (2009) ("federal antidiscrimination rights may not be prospectively waived"). Plaintiffs' argument in support of a finding of impermissible waiver rest on the assertion that the Ninth Circuit recognizes a "distinct cause of action" manifesting in a right to pursuance individual pattern and practice claims. (Arbitration Opposition at 13.) Plaintiffs rely on the Ninth Circuit's decision in *Obrey* to support their claim. 400 F.3d at 694. As the Court discussed herein, *Obrey* involved an employer's objection to the admissability of statistical evidence and did not directly address the plaintiff's use of the pattern and practice method of proof. *Id*. at 693. (*See supra* III.A.1). Additionally, the Court does not find persuasive

---

[15] Delay could cause prejudice to the opposing party, if a defendant strategically postured the filing to serve as an alternative tactic to derail an action only after an adverse court ruling on class certification. A motion to compel arbitration can be raised prior to class certification. *See*, *e.g.*, *Congdon v. Uber Techs.*, 16-cv-02499-YGR, Dkt. Nos. 50, 65; *Morvant et al v. P.F. Chang's China Bistro, Inc. et al.*, 11-cv-05405-YGR, Dkt. Nos. 40, 64.

12

plaintiffs' argument that *Teamsters* pattern and practice burden-shifting framework is a substantive right.[16]

Plaintiffs also argue that the Nationwide Agreement violates the effective vindication doctrine because it "preclude[s] introduction of any pattern-or-practice evidence whatsoever, in violation of the rights Plaintiffs and class members enjoy in this forum." (Arbitration Opposition at 14–15 (citing *Obrey*, 400 F.3d at 694).) Once again the Court disagrees with plaintiffs' characterization of the holding in *Obrey*. Furthermore, plaintiffs fail to point to any language in the Nationwide Agreement in support of their argument. Plaintiffs do note that the agreement imposes the Federal Rules of Evidence, which suggests that any evidence admissible in this forum would be admissible in the proposed arbitration forum. (*Id.* at 15.)

Finally the Court addresses plaintiffs' claim that the Nationwide Agreement is unconscionable and recognizes that unconscionability is determined by reference to applicable state law. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *AT&T Mobility LLC v. Conception*, 563 U.S. 333, 339 (2011). Here, by its terms, enforcement and interpretation of the Nationwide Agreement is controlled by the state in which an employee was terminated. (Dkt. No. 331-1, Exh. 1.) Plaintiffs apply California law. (Arbitration Opposition at 16.) While the Court has certified a nationwide class, even if California law did govern the unconscionability determination for each of agreements at issue, plaintiffs have not shown that the Nationwide Agreement is both procedurally and substantively unconscionable. *See Baltazar v. Forever 21, Inc.*, 62 Cal.4th 1237, 1242 (2016) (noting that unconscionability under California law requires

---

[16] In support of this argument, plaintiffs rely on *Rodriguez de Quijas v. Shearson/American Exp., Inc.*, for the proposition that "[t]he Supreme Court has held that a burden of proof constitutes a substantive, rather than procedural, right that cannot be prospectively waived in an arbitration agreement. 490 U.S. 477, 481 (1989). The Court notes that this citation does not stand for this proposition. In *Rodriguez*, the Court explained that certain rights enshrined in the Securities Act, including the right to select a judicial forum, were "not such essential features" of the Act that they could be "construed to bar any waiver" of those provisions. *Id.* In so explaining, the Court *noted* that the Securities Act contains "two different kinds of provisions" and that "[s]ome are substantive, such as the provision placing on the seller the burden of proving lack of scienter when a buyer alleges fraud. Others are procedural." *Id.* In fact, the citation to which plaintiffs point provides additional support for TCS's motion to compel arbitration. *See id.* ("[S]uspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants, . . . has fallen far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.")

13

both procedural and substantive unconscionability). Plaintiffs rest their argument for substantive unconscionability on the agreement's "selective[] overlay [of] a pro-Defendant subset of the Federal Rules of Civil Procedure," namely that it allows TCS to file a motion to dismiss, while denying the employee the opportunity to file a motion to strike or motion for judgment on the pleadings. (Arbitration Opposition at 19.) However, plaintiffs do not substantively elaborate on the unconscionability of that procedural limitation. First, the procedural and evidentiary rules apply equally to both sides equally.(Dkt. No. 331-1, Exh. 1 at ¶ 3.) Second, the noted limitation does not appear to rise to the level of unconscionability. A defendant may use a motion to dismiss to test the adequacy of allegations but a plaintiff unilaterally files a complaint. Motions to strike are disfavored and at times address concerns of allegations in a public filing, and thus not relevant in private arbitrations. Motions for judgment on the pleadings are easily recast in terms of motions for summary judgment. Further, neither of those motions are particularly relevant (nor were they used) in this context. In short, plaintiffs have failed to make a persuasive argument with respect to unconscionability.[17]

For these reasons, the Court **GRANTS** TCS's motion to compel arbitration of the claims belonging to class members who signed the arbitration agreements described herein.

**IV. MOTION TO DECERTIFY THE CLASS**

**A. Standard**

Fed. R. Civ. Pro. 23(c)(1)(C) permits a court to "alter[] or amend[]" an order granting class certification "before final judgment." The Ninth Circuit has similarly stated that district courts may modify a class definition as a result of developments during the course of litigation. *See Armstrong v. Davis*, 275 F.3d 849, 871 n. 28 (9th Cir. 2001) (recognizing that Rule 23 "provides

---

[17] For the same reasons, the Court does not find persuasive plaintiffs' argument that the facially neutral summary judgment provision favors defendants in the arbitration context. Plaintiffs merely cite filing data from federal courts to demonstrate the non-controversial position that defendants use this motion more often that plaintiffs. (See Arbitration Opposition at 19 (citing Fed. Judicial Ctr., Report on Summary Judgment Practices Across Districts with variations in Local Rules (Aug. 13, 2008)).) Similarly, the Court finds unpersuasive plaintiffs' argument that the application of the Federal Rules of Evidence, in their entirety, render the agreement substantively unconscionable. Plaintiffs do not provide any citations to support this proposition other than *Williams v. Illinois*, 567 U.S. 60, 69-70 (2012) which merely indicates that evidentiary rules are unnecessary in a bench trial.

14

1   district courts with broad discretion to determine whether a class should be certified, and to revisit
2   that certification" and that "the district court may redefine the class") (citing *Penk v. Oregon State
3   Bd. of Higher Educ.,* 816 F.2d 458, 467 (9th Cir.1987)).

District courts have a responsibility to review continually "the appropriateness of a certified class in light of developments subsequent to class certification." *Schilling v. TransCor Am., LLC*, 2012 WL 4859020, at *1 (N.D. Cal. 2012); *see also Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("Under Rule 23 the district court is charged with the duty of monitoring its class decisions in light of the evidentiary development of the case. The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts.")

**B. Analysis**

Much of TCS's motion to decertify the class relies on arguments as to the strength and validity of plaintiffs' evidence of discrimination, which, defendant avers, undermine commonality and predominance. Specifically, TCS argues that (i) involuntary terminations are "too rare" at TCS to constitute evidence of intentional discrimination; (ii) plaintiffs' own witnesses' testimony undermines their assertion of a companywide policy of discrimination; and (iii) TCS's use of the term "unallocated" does not comport with plaintiffs' allegations as to individuals in the "unallocated" group. (*See* Dkt. No. 335 ("Decertification Motion").) Additionally, TCS argues in its reply that the evidence defendant plans to present at trial will address individualized issues and will therefore undermine predominance. (*See* Dkt. No. 385 ("Decertification Reply") at 3.)

The Court is not persuaded that any of the factual deficiencies to which TCS points change its analysis as to commonality and predominance. The three common issues upon which the Court found predominance for purposes class certification were whether (i) TCS engaged in a pattern and practice of discrimination against non-South Asians, (ii) plaintiffs and the proposed classes are entitled to injunctive relief, and (iii) the availability of punitive damages. All remain. TCS's arguments as to the strength of plaintiffs' evidence does not warrant decertification. (Cert. Order at 32.); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011).

Although TCS fails to raise issues with predominance or commonality sufficient to warrant decertification of the class, the Court is persuaded by TCS's argument that the class definition should be further refined. In light of the Court's grant of TCS's motion to compel arbitration, those individuals who executed the arbitration agreements described herein should be excluded from the class. Additionally, as noted above, plaintiffs' evidence in support of TCS's general policy of discrimination focuses on TCS's alleged discrimination in allocating, and de-allocating, benched employees to open client projects. (*See* Cert. Order at 32.) Therefore the Court finds that the class definition should be refined to make more explicit these findings.

For these reasons, the Court **DENIES** TCS's motion decertify the class as framed and **REFINES** the definition of the class in accordance with this Order as set forth below.

## V. CONCLUSION

For the reasons discussed above, the Court **ORDERS** as follows:

1. Defendant's motion to bifurcate the claims of plaintiff Buchanan from those of the other plaintiffs and the class is **GRANTED**.

2. Defendant's motion to compel arbitration of claims class members with whom it has arbitration agreements is **GRANTED**.

3. Defendant's motion for decertification of the class is **DENIED** as framed, but the Court **REFINES** the definition of the class as follows:

All individuals who are not of South Asian race or Indian national origin who were employed by [TCS] in the United States, *were subject to a policy or practice of benching and allocation*, were placed in an unallocated status and were terminated between April 14, 2011 and [December 27, 2017] *and who are not bound by an arbitration agreement with TCS*.

This terminates Dkt. Nos. 330, 331, 335, 368, and 369.

**IT IS SO ORDERED.**

Dated: July 23, 2018

									_____
									**YVONNE GONZALEZ ROGERS**
									**UNITED STATES DISTRICT COURT JUDGE**