DANIEL LOW, SBN 218387
dlow@kotchen.com
DANIEL KOTCHEN (*pro hac vice*)
dkotchen@kotchen.com
MICHAEL von KLEMPERER (*pro hac vice*)
mvk@kotchen.com
LINDSEY GRUNERT (*pro hac vice*)
lgrunert@kotchen.com
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995

*Attorneys for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER SLAIGHT, et al.<br><br>Plaintifs,<br><br>v.<br><br>TATA CONSULTANCY SERVICES, LIMITED,<br><br>Defendant. | Case No.: 4:15-cv-01696-YGR (SK)<br><br>CLASS ACTION<br><br>PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PERMIT CONTEMPORANEOUS TESTIMONY FROM A REMOTE LOCATION UNDER RULE 43(A)<br><br>Date: October 12, 2018<br>Time: 9:00am<br>Location: Courtroom 1, 4th Flr., Oakland<br><br>Complaint Filed:  April 14, 2015<br>Trial Date: November 5, 2018 |

1

### NOTICE OF MOTION AND MOTION TO PERMIT CONTEMPORANEOUS TESTIMONY FROM A REMOTE LOCATION UNDER RULE 43(A)

2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**: Please take notice that at 9:00 am. on

3

October 12, 2018,* in Courtroom 1, 4th Floor of the above-titled court, located at 1301 Clay Street,

4

Oakland, California 94612, Plaintiffs Christopher Slaight, Seyed Amir Masoudi, Nobel Mandili, and

5

the class will, and hereby do, move this court for an order under Fed. R. Civ. P. 43(a) permitting live

6

videoconference testimony by six TCS executives during the trial beginning November 5, 2018.

7

8

Date: September 10, 2018
/s/Daniel Kotchen
Daniel Kotchen

9

Daniel Low (SBN 218387)
Michael von Klemperer (*pro hac vice*)

10

Lindsey Grunert (*pro hac vice*)
KOTCHEN & LOW LLP

11

12

*Attorneys for Plaintiffs and the Class*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

* Plaintiffs have noticed this Motion for the existing pre-trial conference date and time.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. II

STATEMENT OF THE ISSUES TO BE DECIDED ............................................................ IV

MEMORANDUM IN SUPPORT OF MOTION TO PERMIT CONTEMPORANEOUS TESTIMONY FROM A
REMOTE LOCATION UNDER RULE 43(A) ........................................................................ 1

I.    **Background** ................................................................................................. 2

    A.   TCS's Changing Theories of the Case ............................................. 2

    B.   TCS's Untimely Document Production ............................................. 3

    C.   The Trial Witnesses that TCS Refuses to Produce ......................... 5

II.   **Legal Standard** ....................................................................................... 8

III.  **Argument** ................................................................................................. 8

    A.   The Federal Rules Authorize Compelling Live Videoconference Testimony Under
Rules 45 and 43(a) .......................................................................... 9

    B.   Good Cause and Appropriate Safeguards Exist Under Rule 43(a) ...................... 12

       1.   *Plaintiffs Satisfy the Good Cause Standard* ................................... 12

       2.   *Plaintiffs' Proposal Ensures Appropriate Safeguards* ................................. 16

    C.   Deposition Testimony Is Not an Adequate Substitute for Live Testimony in This
Case ................................................................................................ 17

IV.  **Conclusion** ............................................................................................. 18

**TABLE OF AUTHORITIES**

**Cases**

*Adam v. Carvalho*, 138 F. App'x 7 (9th Cir. 2005) ............................................................... 17

*Air Turbine Tech. v. Atlas Copco AB*, 410 F.3d 701 (Fed. Cir. 2005) .................................... 8

*All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12-0146 2013 U.S. Dist. LEXIS 64587 (S.D. Cal. May 3, 2013) ......................................................................................................................... 17

*Allen v. Takeda* (*In re Actos® (Pioglitazone) Prods. Liab. Litig.*), No. 6:11-md-2299, 2014 U.S. Dist. LEXIS 2231 (W.D. La. Jan. 8, 2014) ........................................................................... passim

*Burnley v. City of San Antonio*, 470 F.3d 189 (5th Cir. 2006) ............................................. 11

*Chapman v. Tristar Prods.*, No. 1:16-cv-1114, 2017 U.S. Dist. LEXIS 104344 (N.D. Ohio July 6, 2017) ............................................................................................................ 11, 12, 13, 15

*City of L.A. Dep't of Water v. Manhart*, 435 U.S. 702 (1978) ............................................... 3

*City of L.A. Dep't of Water v. Manhart*, 435 U.S. 702 (1978). .............................................. 3

*Class v. United States*, 138 S. Ct. 798 (2018) ..................................................................... 10

*Draper v. Rosario*, 836 F.3d 1072 (9th Cir. 2016) ............................................................. 14

*Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005) ................................................................ 18

*Epic Sys. Corp. v. Tata Consultancy Servs.*, No. 14-cv-748, 2015 U.S. Dist. LEXIS 166438 (W.D. Wis. Dec. 10, 2015) .................................................................................................................. 9

*Epic Sys. Corp. v. Tata Consultancy Servs.*, No. 14-cv-748, 2015 U.S. Dist. LEXIS 173927 (W.D. Wis. Dec. 31, 2015) .................................................................................................................. 9

*Epic Sys. Corp. v. Tata Consultancy Servs.*, No. 14-cv-748, 2016 U.S. Dist. LEXIS 38018 (W.D. Wis. Mar. 23, 2016) .................................................................................................................. 9

*FTC v. Swedish Match N. Am.*, 197 F.R.D. 1 (D.D.C. 2000) .............................................. 17

*Gonzalez Ambrioso v. Ledesma*, No. 2:16-cv-2091, 2016 U.S. Dist. LEXIS 147513 (D. Nev. Oct. 24, 2016) ......................................................................................................................... 17

*Hormel v. Helvering*, 312 U.S. 552 (1941) ......................................................................... 14

*In re Henson*, 302 B.R. 884 (Bankr. N.D. Cal. 2003) .......................................................... 18

*In re San Juan Dupont Plaza Hotel Fire Litig.*, 129 F.R.D. 424 (D.P.R. 1989) ................... 11, 12

*In re Vioxx Prods. Liab. Litig.*, 439 F. Supp. 2d 640 (E.D. La. 2006) ........................... 11, 12, 14

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 1988 U.S. Dist. LEXIS 19630 (W.D. Wash. Aug. 9, 1988) ................................................................................................................... 11, 12

*In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, No. 2592, 2017 U.S. Dist. LEXIS 81047 (E.D. La. May 25, 2017) ..................................................................................................................... passim

*Johnson v. Bay Area Rapid Transit Dist.*, No. 09-0901-EMC, 2014 U.S. Dist. LEXIS 77411 (N.D. Cal. June 4, 2014) ................................................................................................................ 11

*King v. Deathriage*, No. 1:14-cv-00111, 2017 U.S. Dist. LEXIS 89972 (E.D. Cal. June 12, 2017) . 17

*Lopez v. NTI, LLC*, 748 F. Supp. 2d 471 (D. Md. 2010) .............................................. 15, 18

ii

*McKnight v. Neven*, 366 F. App'x 841 (9th Cir. 2010) ............................................................. 10

*Miller v. Lemhi Cty.*, No. 4:15-cv-00156, 2018 U.S. Dist. LEXIS 34835 (D. Idaho Mar. 2, 2018) .. 11

*Mullins v. Ethicon, Inc.* (*Mullins I*), No. 2:12-cv-02952, 2015 U.S. Dist. LEXIS 163522 (S.D. W.
     Va. Dec. 7, 2015) ........................................................................................ 12, 14, 16, 17

*Mullins v. Ethicon, Inc.* (*Mullins II*), No. 2:12-cv-02952, 2017 U.S. Dist. LEXIS 17555 (S.D.W. Va.
     Feb. 8, 2017) ................................................................................................... 12, 13, 16

*NML Capital LTD. v. Republic of Arg.*, No. 2:14-cv-492, 2014 U.S. Dist. LEXIS 110625 (D. Nev.
     Aug. 11, 2014) ............................................................................................................ 11

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ............................................................... 11

*Ransom v. Herrera*, No. 1:11-cv-01709, 2018 U.S. Dist. LEXIS 13261 (E.D. Cal. Jan. 25, 2018) .. 18

*Scott Timber, Inc. v. United States*, 93 Fed. Cl. 498 (Fed. Cl. 2010) ................................... 8

*T.B. v. San Diego Unified Sch. Dist.*, No. 12-56060, 2015 U.S. App. LEXIS 13365 (9th Cir. July 31,
     2015) ........................................................................................................................ 10

*United States v. $ 4,224, 958.57*, 392 F.3d 1002 (9th Cir. 2004) ....................................... 10

*United States v. Mejia*, 69 F.3d 309 (9th Cir. 1995) .......................................................... 18

*United States v. Sierra Pac. Indus.*, No. 2:09-cv-2445, 2011 U.S. Dist. LEXIS 60372 (E.D. Cal. May
     26, 2011) .................................................................................................................... 11

*United States v. Vonn*, 535 U.S. 55 (2002) ...................................................................... 10

**Other Authorities**

Hon. David G. Campbell, Advisory Comm. on Fed. R. Civ. P., *Report of the Civil Rules Advisory
     Committee* 3 (May 8, 2012) ........................................................................................ 10

Minutes, Civil Rules Advisory Committee Meeting (March 22-23, 2012) ....................................... 11

*Video Conferencing Services*, N.D. CAL.,
     http://www.cand.uscourts.gov/filelibrary/837/VCrequest.pdf .................................................. 1

## <u>STATEMENT OF THE ISSUES TO BE DECIDED</u>

Whether good cause and appropriate safeguards exist to permit live videoconference testimony at trial, pursuant to Fed. R. Civ. P. 43(a), where TCS produced over a million pages of documents after the close of discovery, and where Plaintiffs have not had an opportunity to question TCS's witnesses about justifications TCS asserted after its last-minute correction of its inaccurate denials of the existence of a leadership directive.

1

### Memorandum in Support of Motion to Permit Contemporaneous Testimony from a Remote Location Under Rule 43(a)

2

3

Plaintiffs seek to call six Tata Consultancy Services, Ltd. ("TCS") executives at trial, who

4

TCS refuses to voluntarily produce either in person or remotely. As a result, Plaintiffs are seeking an

5

order under Fed. R. Civ. P. 43(a) permitting live videoconference testimony by the six witnesses

6

during the upcoming trial. If the Court authorizes remote testimony, Plaintiffs will issue subpoenas

7

commanding each witness to appear and testify at a federal courthouse within twenty miles of his

8

workplace, in accordance with Rule 45(c)(1).

9

The Oakland federal courthouse has videoconferencing equipment available and a

10

videoconferencing protocol in place.[1] Of the six remote witnesses, Mr. Kant, Mr. Srinivasan, Mr.

11

Ganapathy, Mr. Seetharaman, and Mr. Rangasamy would appear to testify at the District of New

12

Jersey's Newark federal courthouse, sixteen miles from TCS's Edison, New Jersey offices.[2] Mr.

13

Jindal would appear and testify at the District of Maryland's Greenbelt federal courthouse, seventeen

14

miles from TCS's Rockville, Maryland offices.

15

There are multiple advantages of live videoconference testimony over presenting deposition

16

excerpts, including more coherent, less stale testimony that better permits a jury to ascertain witness

17

credibility. Especially compelling circumstances for allowing video testimony exist here for two main

18

reasons. First, TCS initially made false statements denying the existence of its leadership directive,

19

and about Surya Kant's knowledge of it, but Mr. Kant and Narasimhan Srinivasan later admitted its

20

existence and made new assertions justifying its existence. This last-minute nature of TCS's reversal

21

prevented Plaintiffs from asking other witnesses about these justifications or taking other related

22

discovery.  Second, TCS produced over 1.4 million pages of documents after the close of discovery,

23

and Plaintiffs have not yet had an opportunity to question any witnesses about these late-produced

24

[1] The instructions to request the Court's videoconferencing equipment are available online. *Video Conferencing Services*, N.D. CAL., http://www.cand.uscourts.gov/filelibrary/837/VCrequest.pdf.

25

26

[2] Plaintiffs note that the District of New Jersey IT staff has experience arranging for such live testimony via video link. *See, e.g.*, *Allen v. Takeda* (*In re Actos® (Pioglitazone) Prods. Liab. Litig.*), No. 6:11-md-2299, 2014 U.S. Dist. LEXIS 2231, at *51-52 (W.D. La. Jan. 8, 2014) (holding that New Jersey executives must testify via video link from the Newark Federal Courthouse); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, No. 2592, 2017 U.S. Dist. LEXIS 81047, at *10 (E.D. La. May 25, 2017) (same).

27

28

1

1   documents. Plaintiffs would be prejudiced if they were unable to question key TCS executives about

2   the documents.

3                                  **I.      BACKGROUND**

4   **A.     TCS's Changing Theories of the Case**

5          Throughout this litigation, Plaintiffs have taken the position that TCS maintains a "leadership

6   directive" to use visa workers to the "maximum extent" when staffing client projects within the U.S.

7   Omnibus Order at 3-4, 33 (Dkt. #244); Pls.' Class Cert. Reply (Dkt. #196); Pls.' Class Cert. Mot.

8   (Dkt. #113-3). From the outset, TCS fastidiously denied the existence of a leadership directive that

9   favored expat employees over locally hired employees, including during a Rule 30(b)(6) deposition.

10  *See, e.g.,* Def.'s Class Cert. Opp'n at 20 (Dkt. #127) ("such a directive does not exist"); 2017

11  Ganapathy 30(b)(6) Dep. 42:25-43:10 (Ex.1). Throughout this time, TCS took the position that such

12  a directive would be concerning and discriminatory "[b]ecause . . . citizenship or nationality should

13  not be the basis for determining a person is fit against a particular position." 2017 Ganapathy 30(b)(6)

14  Dep. 42:25-43:10 (Ex. 1);[3] *see also* Def.'s Class Cert Opp'n at 20 (Dkt. #127) (preference to fill

15  positions with individuals of certain race or national origin would be "a source of concern").

16         In April 2018, Plaintiffs sought to depose Surya Kant, President of TCS North America. *See*

17  Joint Letter Br. (Dkt. #282). TCS adamantly opposed the request, arguing that other witnesses had

18  already addressed the Leadership Directive when testifying that they did not know about it. *Id.* at 2

19  ("Plaintiffs complaint that these witnesses failed to 'adequately address the "leadership directive,"'

20  is just another way to say that plaintiffs disagree with the witnesses answers on the subject."). The

21  company asserted that "Mr. Kant [lacks] any unique information about TCS' 'leadership directive'

22  or alleged 'preference' for 'visa-ready' associates," and "has no unique knowledge related to this

23  litigation." *Id.* at 2, 4. Once Magistrate Judge Kim denied TCS's request for a protective order, Dkt.

24  #285, TCS's representations to the Court proved untrue.

25         During his April 30 deposition—two weeks before the close of discovery—Surya Kant

26

27  ───────────────

   [3] "Q: As the head of diversity at TCS, would you be concerned if there was a leadership directive

28  for positions to be filled with visa-ready individuals? A: Yes. Q: Why would you be concerned about
   that? A: Because as I said, citizenship or nationality should not be the basis for determining a person
   is fit against a particular position." *Id.*

unexpectedly admitted that he helped devise the Leadership Directive and stated that expats are preferred for positions because they are better at certain jobs than locally hired employees. Kant Dep. 120:20-121:21, 125:10-25 (Ex. 2). Then, on May 11—four days before the close of discovery— Narasimhan Srinivasan, TCS's Senior Vice President in charge of North American Human Resources, admitted that he helped devise the leadership directive with Mr. Kant and that he issued it to Umesh Kumar, the Head of RMG, for implementation "US-wide." Srinivasan Dep. 44:21-45:1 (Ex. 3). Mr. Srinivasan provided, for the first time, three pretextual (and false) justifications for TCS's newly admitted facially discriminatory policy, which all rest on stereotypical beliefs about non-South Asian employees.[4]

        After the close of discovery, TCS re-wrote its theory of the case to conform to these eleventh-hour admissions. In its reply in support of its motion to decertify the class, TCS admitted that the leadership directive existed, but sought to justify it as an "efficiency measure." *Compare* Def.'s Decert. Reply at 14 (Dkt. #385) (discussing purpose of directive), *with* Def.'s Class Cert. Opp'n at 20 (Dkt. #127) ("such a directive does not exist"). It also abruptly took the position that being of Indian national origin is a *bona fide* occupational qualification to work for TCS, based on Mr. Srinivasan's three pretextual justifications for preferentially staffing expats. *See* July 17, 2018 Hearing Tr. 54:12-56:9 (Dkt. #419) (remarks of T. Garnett, counsel for TCS). Even the Court expressed surprise, stating "[w]ell, that's interesting because it certainly is – it's now news to me. That's not – that's not the kind of defense that I've heard in the past." *Id.* 56:10-12.

**B.    TCS's Untimely Document Production**

        In addition to changing its theory of the case in the closing days of discovery, TCS produced over 86,000 pages of documents on May 15, the last day of discovery, and 1.4 million pages of documents since that date. MvK Decl. ¶ 2. Between May 16 and June 11, TCS produced 446,000

---

[4] First, TCS claims to prioritize expats over local hires for U.S. jobs because the expats have experience working from India and thus have "familiarity with TCS processes [and] familiarity with methodologies." Srinivasan Dep. 72:2-12, 73:2-22 (Ex. 3). Second, TCS claims to prioritize expats over local hires for U.S. jobs because expats are "used to working with different time zones." *Id.* 72:12-13, 73:23-74:6. Third, TCS claims to prioritize expats over local hires for U.S. jobs because expats are "used to" moving back and forth between the U.S. and India. *Id.* 72:15-21, 74:8-22. These pretextual justifications are themselves discriminatory. *See City of L.A. Dep't of Water v. Manhart*, 435 U.S. 702, 707 (1978).

3

1    pages of documents (Bates Nos. TCSLTD007784580-TCSLTD008230939). *Id.* ¶ 2. At the time, TCS

2    represented that these documents were largely released privilege documents. *See* Ex. 4 (emails

3    corresponding to documents produced in May and June). In July and August TCS produced an

4    additional 984,000 pages of documents (Bates Nos. TCSLTD008230940-TCSLTD009149330). *See*

5    Pls.' Admin. Mot at 1-3 (Dkt. #486). Of those, 200,000 pages were documents responsive to

6    Plaintiffs' August 2015 document requests, purportedly produced as the result of a "quality control"

7    process, which TCS claimed to be "largely of marginal interest." *Id.* at 1-2. The remainder were

8    documents produced in response to Plaintiffs' challenges to TCS's dubious privilege assertions. *Id.*

9            Despite TCS's benign explanations for these post-May-15 documents, of the 1,545 items on

10   TCS's preliminary exhibit list, over half (796) were produced *after* the May 15 close of discovery.

11   MvK Decl. ¶ 3. This includes 688 entries from the May-June bates ranges and 108 from the July-

12   August bates ranges. *Id.* ¶ 4. The number of TCS's preliminary exhibit list entries that fall within

13   these bates ranges suggests that the stated reasons were mere pretext for the untimely release of

14   documents that TCS belatedly decided that it wanted to introduce at trial. TCS's conduct prevented

15   Plaintiffs from inquiring into any of these documents during discovery.

16           In addition, TCS produced key documents on or after the last day of discovery, which

17   prevented Plaintiffs from questioning executives about the documents or issuing follow up

18   discovery.[5] While Plaintiffs' review of documents is ongoing, documents produced on and after May

19   15 include: ████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████████████████

23

24           [5] As a practical matter, there is no way Plaintiffs will be able to review all of these documents as

25   thoroughly as they would like.

26           [6] TCSLTD008330906-21 at 08 (Ex. 5) ██████████████████████████
     ████████████████TCSLTD008148629-31 at 29 (Ex. 6)███████████████████

27           [7]   TCSLTD008028157-59   (Ex.   7)   ████████████████████████████████
     TCSLTD008028160-258 at 182, 199 (Ex. 8)████████████████████████████

28

[11] and (g) the release agreements, which TCS produced on the last day of the discovery, disguising the breadth of the program.[12]

**C.    <u>The Trial Witnesses that TCS Refuses to Produce</u>**

At trial, Plaintiffs would like to call the following executives to testify via live videoconference:[13]

<u>Surya Kant</u>: Mr. Kant is TCS's President of TCS North America and works in TCS's Edison, New Jersey office. MvK Decl. ¶ 5; Kant Dep. 5:21-24 (Ex. 2). He is responsible for many of TCS's day-to-day operations, including setting TCS's affirmative action goals, staffing goals, issuing leadership directives, and other responsibilities reflecting TCS's flat leadership structure. *See* Kant Dep. 8:15-9:5, 10:12-11:25, 126:2-18 (Ex. 2) (discussing setting goals); *id.* 16:12-17:10 (discussing affirmative action duties); *id.* 120:20-121:5 (discussing leadership directive); *see also* Order at 1-2

---

[8] TCSLTD007823210-212 (Ex. 9).

[9] TCSLTD009165546-48 at 46 (Ex. 10) (

[10] TCSLTD008381300-02 at 00 (Ex. 11).

[11] TCSLTD007905187-99 at 89-90 (Ex. 12) ;
TCSLTD008350232-35 at 33 (Ex. 13) ( ).

[12] *See* Releases (Dkt. #388-2).

[13] To facilitate the efficient and early scheduling of witnesses at trial, Plaintiffs emailed TCS on August 22 to confirm that its employees would be available for testimony during Plaintiffs' case-in-chief. Email from M. von Klemperer to TCS Counsel (Aug. 22, 2018) ((Ex. 14). TCS responded the following week that TCS would not make them available to testify in person and later rejected Plaintiffs' suggestion that they voluntarily appear remotely. Email from T. Garnett to Pls.' Counsel (Aug. 27, 2018) (Ex. 14).

(Dkt. #285) (discussing TCS's "flat" leadership structure). Plaintiffs would like to question Mr. Kant about TCS's affirmative action policies, the leadership directive that he issued, and Mr. Srinivasan's three justifications for TCS's expat preference. In addition, Plaintiffs would like to question Mr. Kant regarding documents that TCS produced on or after the last day of discovery, including the 2015 PricewaterhouseCoopers report (finding that TCS lacked adequate anti-discrimination policies), the scope of and Mr. Kant's personal involvement in TCS's release program, and emails from Mr. Kant's subordinates concerning TCS's preference for expats and mapping of expats to accounts.

Narasimhan Srinivasan: Mr. Srinivasan is TCS's Head of Human Resources for North America and works in TCS's Edison, New Jersey office. *See* Srinivasan Decl. ¶ 1 (Dkt. #337). He oversees all HR operations in the U.S., including benching policies, employee terminations, and the Resource Management Group ("RMG"), which is responsible for staffing client projects. *Id.* ¶ 1. Plaintiffs would like to question Mr. Srinivasan about TCS's HR policies, his three justifications for preferring expats, and the leadership directive which helped devise and issue to RMG. In addition, Plaintiffs would like to question Mr. Srinivasan regarding documents that TCS produced on or after the last day of discovery, including his emails concerning TCS's preference for expats and mapping of expats to accounts, the Price Waterhouse Coopers audit (finding TCS lacked adequate anti-discrimination policies), the Ernst & Young audit (which he personally received and was asked to comment on), and the scope and Mr. Srinivasan's personal involvement in TCS's release program.

Balaji Ganapathy: Mr. Ganapathy is TCS's Head of Workforce Effectiveness for North America and works in TCS's Edison, New Jersey offices. Ganapathy Decl. ¶¶ 1-2 (Dkt. #210). Mr. Ganapathy not only leads TCS's diversity efforts, but was TCS's key witness supporting the company's initial theory of the case—that the leadership directive "does not exist," and would be concerning because "citizenship or nationality should not be the basis for determining a person is fit against a particular position." Ganapathy 30(b)(6) Dep. 42:25-43:10 (Ex. 1); Ganapathy Decl. ¶ 19, 22 (Dkt. #142); Def.'s Class Cert. Opp'n at 20 (Dkt. #127). Plaintiffs would like to question Mr. Ganapathy regarding TCS's diversity efforts and the inconsistencies between his prior testimony and the testimony given by other executives. In addition, Plaintiffs would like to question Mr. Ganapathy about documents TCS produced on or after the last day of discovery, including the

6

PricewaterhouseCoopers report and the Ernst & Young audit (which he personally received and was asked to comment on).

Amit Jindal: Mr. Jindal is TCS's Head of Immigration and works in TCS's Rockville, Maryland offices. *See* Jindal Decl. ¶ 1 (Dkt. #130). TCS filed a declaration from Mr. Jindal, and selected him to testify on behalf of the company as a 30(b)(6) deponent. *Id.*; Jindal 30(b)(6) Dep. (Ex. 17). Mr. Jindal has worked in HR for TCS since 1999 and currently oversees TCS's immigration team, ensuring TCS's supply of visa-ready workers who are preferentially staffed at the expense of locally hired non-South Asian employees. *See* Jindal Decl. ¶ 3 (Dkt. #130). Plaintiffs would like to question Mr. Jindal regarding the number of expats that travel each year to the U.S. to staff positions and associated filings/plans needed to enable these expats to work in the U.S. In addition, Plaintiffs would like to question Mr. Jindal about documents TCS produced on or after the last day of discovery, including the PricewaterhouseCoopers audit (which he personally received) and the Ernst & Young audit (which he personally received and was asked to comment on).

Ashok Seetharaman: Mr. Seetharaman is TCS's Deputy Head of HR and works in TCS's Edison, New Jersey offices. MvK Decl. ¶ 6. He has not been deposed in this matter, as Plaintiffs only learned of his relevance when his subordinate, Jeevak Sharma, testified that he is deeply involved in employee termination decisions and the employee release program at issue in this lawsuit. *See* Sharma Dep. 18:17-19:4, 22:23-23-1, 38:21-39:1, 56:3-57:23, 59:17-60:1 (Ex. 18). He would testify during the punitive damages phase to TCS's use of the employee release and arbitration programs to insulate TCS from future liability for systematic discrimination, which is relevant to reprehensibility and the amount of damages required to deter future misconduct.

Vignesh Rangasamy: Mr. Rangasamy, who works in the Edison, New Jersey offices, recently replaced Umesh Kumar (who returned to India) as head of TCS's RMG, which is responsible for staffing client projects, mapping unallocated employees, and implementing the leadership directive.[14]

---

[14] Mr. Kumar, a key figure in this litigation, left TCS and returned to Bangalore, India. *See* Email from M. La Mar (Mar. 23, 2018) (Ex. 15). Subsequently, Mr. Sirinivasan testified that Mr. Kumar was present at the leadership directive's creation and implemented the directive. Srinivasan Dep. 42:24-43:10, 44:15-17 (TCSLTD0083502323). Plaintiffs cannot subpoena Mr. Kumar without resort to the Hague Convention, which is impractical. As Mr. Kumar's successor, Mr. Rangasamy is an appropriate substitute.

7

*See, e.g.,* Kumar Decl. ¶ 2 (Dkt. #141) (describing RMG head's responsibilities); Srinivasan Dep. 12:2-6 (stating Vignesh is the current head of RMG); Vignesh Rangasamy, LINKEDIN, https://www.linkedin.com/in/vignesh-rangasamy-19b2946/ (last visited Sept. 7, 2018) (placing Mr. Rangasamy in TCS's Edison, NJ offices). Plaintiffs would like to question Mr. Rangasamy regarding staffing client projects, mapping employees, implementing the leadership directive, and a number of RMG requisitions that reflect a preference for expats.

## II.    LEGAL STANDARD

Under Rule 43(a), "the court may permit testimony in open court by contemporaneous transmission from a different location" for "[1] good cause in compelling circumstances and [2] with appropriate safeguards." In allowing remote video testimony under Rule 43(a), courts reflect a "consistent sensitivity to the utility of evolving technologies that may facilitate more efficient, convenient, and comfortable litigation practices." 9A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2414 (3d ed.). "The use of such contemporaneous transmission in lieu of live testimony is 'expressly reserved to the sound discretion of the trial court.'" *Scott Timber, Inc. v. United States*, 93 Fed. Cl. 498, 500 (Fed. Cl. 2010) (quoting *Air Turbine Tech. v. Atlas Copco AB*, 410 F.3d 701, 714 (Fed. Cir. 2005)); *accord Beltran-Tirado v. INS*,  213 F.3d 1179, 1185-86 (9th Cir. 2000) (permitting the use of telephonic testimony where witness not present in the jurisdiction and witness was subject to cross-examination).

## III.    ARGUMENT

Where a court permits remote testimony under Rule 43(a), a party may subpoena the witness to testify within the geographic limits of Rule 45(c)(1). *See* Fed. R. Civ. P. 45, Advisory Committee's Note to 2013 amendment ("When an order under Rule 43(a) authorizes testimony from a remote location, the witness can be commanded to testify from any place described in Rule 45(c)(1)"). In this case, good cause exists to permit live videoconference testimony under Rule 43(a), and Plaintiffs would be prejudiced if they were not allowed the opportunity to question TCS witnesses about newly produced documents and TCS's purported justifications for its leadership directive, and TCS's previous denials that the directive actually existed.

When assessing good cause for live videoconference testimony under Rule 43(a), courts often weigh five factors, which all favor permitting the testimony in this case, courts often confider five factors. First, TCS has "control . . . over the witness[es]," who are current TCS executives.  Second, this is a "complex, multi-party, multi-state" litigation, as it is a class action, with over 1,000 class members nationwide, concerning systematic discrimination. Third, TCS is seeking a "tactical advantage" at trial by not producing the witnesses. TCS changed its story at the end of discovery and waited until the close of discovery to produce over 1.5 million pages of documents, including key documents that would have altered the course of discovery and to which executives have never testified. By not producing its executives for trial, TCS seeks a tactical advantage by shielding these witnesses from testifying to (a) TCS's leadership directive denials and subsequent admissions, (b) contemporaneous documents demonstrating the falsity of the purported justifications for the leadership directive, and (c) harmful documents produced upon the close of discovery.[15] Fourth, TCS will not suffer "true prejudice" if its executives testify, because each would travel less than twenty miles to testify. Fifth, live video testimony affords the Court with "the flexibility needed to manage" the litigation by providing a means of securing critical trial testimony that will aid the jury.

In addition, technological developments make video testimony an attractive option for securing live trial testimony, and courts have extolled the benefits to juries' understanding of cases through the use of live video testimony, as opposed to inherently less coherent deposition clips.

## A.      The Federal Rules Authorize Compelling Live Videoconference Testimony Under Rules 45 and 43(a)

---

[15] In 2016, TCS was sanctioned by a federal court for engaging in discovery practices strikingly similar to those it pursued in this case. The court found that "TCS's "appreciation of its obligations to respond to discovery" was "horrific" and noted that "TCS's failures in producing timely records and apparent suppressions of 'the truth' are disturbing to the court, as they should be to defendants." *Epic Sys. Corp. v. Tata Consultancy Servs.*, No. 14-cv-748, 2016 U.S. Dist. LEXIS 38018, at *6 (W.D. Wis. Mar. 23, 2016). The court faulted TCS for, among other things, spurious privilege assertions, untimely document production, designating 30(b)(6) witnesses with insufficient knowledge, concealing information, and overall obstructive conduct. *Epic Sys. Corp. v. Tata Consultancy Servs.*, No. 14-cv-748, 2015 U.S. Dist. LEXIS 166438, at *1 (W.D. Wis. Dec. 10, 2015); *Epic Sys. Corp. v. Tata Consultancy Servs.*, No. 14-cv-748, 2015 U.S. Dist. LEXIS 173927, at *1-2 (W.D. Wis. Dec. 31, 2015).

9

The Federal Rules of Civil Procedure authorize both contemporaneous transmission of live witness testimony by court order, under Rule 43(a), and the issuance of a Rule 45 subpoena to compel a witness's appearance. The Advisory Committee's Note to the 2013 amendment of Rule 45 explains that "[w]hen an order under Rule 43(a) authorizes testimony from a remote location, the witness can be *commanded* to testify from any place described in Rule 45(c)(1)." Fed. R. Civ. P. 45, Advisory Committee's Note to 2013 amendment (emphasis added).[16] This Note "confirms that, when the issuing court has made an order for remote testimony under Rule 43(a), a subpoena may be used to command the distant witness to attend and testify within the geographical limits of Rule 45(c)." Hon. David G. Campbell, Advisory Comm. on Fed. R. Civ. P., *Report of the Civil Rules Advisory Committee* 3 (May 8, 2012).[17]

When drafting the Note, the Advisory Committee envisioned the exact scenario presented here, explaining that "[t]o the extent testimony of such party [officer or employee] witnesses is important there are alternatives to attending trial. *See, e.g.*, . . . 43(a) (permitting the court to order testimony by contemporaneous transmission)." *Id.* at 5. Other Advisory Committee materials further confirm this reading of the 2013 note:

> One of the comments, from a lawyer in Hawaii, observed that difficulty had been encountered in persuading courts on the mainland to enforce subpoenas to testify at trials in Hawaii by means of contemporaneous transmission under Rule 43(a). The Subcommittee agrees that a Rule 45 subpoena is properly used for this purpose — a witness outside the reach of a subpoena from the court where the action is pending can be compelled to testify from a place within the limits imposed by Rule 45. *The Committee agreed that the Committee Note should be revised to confirm this plain reading of the revised Rule 45 text.*

---

[16] The Civil Rules Advisory Committee drafts the Federal Rules of Civil Procedure. Its notes are frequently afforded great weight in interpreting the rules. *See, e.g.*, *Class v. United States*, 138 S. Ct. 798, 808 (2018) ("Advisory Committee's Notes on a federal rule of procedure 'provide a reliable source of insight into the meaning of a rule, especially when, as here, the rule was enacted precisely as the Advisory Committee proposed.'") (quoting *United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002)).

[17] Federal courts often consider the Civil Rules Advisory Committee reports, which exhaustively set forth the reasoning for each amendment, when interpreting the Federal Rules. *See, e.g.*, *T.B. v. San Diego Unified Sch. Dist.*, No. 12-56060, 2015 U.S. App. LEXIS 13365, at *56 n.11 (9th Cir. July 31, 2015); *McKnight v. Neven*, 366 F. App'x 841, 842 n.1 (9th Cir. 2010); *United States v. $ 4,224, 958.57*, 392 F.3d 1002, 1005 (9th Cir. 2004).

Minutes, Civil Rules Advisory Committee Meeting (March 22-23, 2012), p.14 (emphasis added).[18]

This use of the rules is not contrary to the limits imposed by Rule 45. In 2013, Rule 45 was amended to remove the geographic limits on federal district courts' subpoena power.[19] *See Johnson v. Bay Area Rapid Transit Dist.*, No. 09-0901-EMC, 2014 U.S. Dist. LEXIS 77411, at *4-6 n.2 (N.D. Cal. June 4, 2014).[20] To prevent undue burden, however, a federal subpoena cannot require a person to travel a distance greater than that specified in Rule 45(c)(1), titled "Place of Compliance," which provides that a subpoena may command a person to attend a trial, hearing, or deposition only within 100 miles of where the person resides, is employed, or regularly transacts business in person. This is a travel-based restriction, not a jurisdictional one—federal subpoenas are valid nationwide, so long as the place of compliance comports with Rule 45(c)(1). *NML Capital LTD. v. Republic of Arg.*, No. 2:14-cv-492, 2014 U.S. Dist. LEXIS 110625, at *29-30 (D. Nev. Aug. 11, 2014) ("The territorial scope of the court's subpoena power is only limited by Rule 45(c), which governs the place of compliance.").

Courts have repeatedly used Rules 43 and 45 together. *See, e.g.*, *Miller v. Lemhi Cty.*, No. 4:15-cv-00156, 2018 U.S. Dist. LEXIS 34835, at *21 (D. Idaho Mar. 2, 2018); *Chapman v. Tristar Prods.*, No. 1:16-cv-1114, 2017 U.S. Dist. LEXIS 104344, at *4 (N.D. Ohio July 6, 2017); *In re Xarelto*, 2017 U.S. Dist. LEXIS 81047, at *9-10; *Allen v. Takeda*, 2014 U.S. Dist. LEXIS 2231, at *51-52, *55; *Scott Timber*, 93 Fed. Cl. at 500 &n.2; *In re Vioxx Prods. Liab. Litig.*, 439 F. Supp. 2d 640, 641, 644 (E.D. La. 2006) (citing *In re San Juan Dupont Plaza Hotel Fire Litig.*, 129 F.R.D. 424, 426 (D.P.R. 1989); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 1988 U.S. Dist. LEXIS 19630, at *1, 4-6 (W.D. Wash. Aug. 9, 1988)); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 12.334 n.344 (noting the option).

---

[18] Federal courts often consider the Civil Rules Advisory Committee meeting minutes when interpreting the Federal Rules. *See, e.g.*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 843 (1999); *Burnley v. City of San Antonio*, 470 F.3d 189, 199 n.8 (5th Cir. 2006); *United States v. Sierra Pac. Indus.*, No. 2:09-cv-2445, 2011 U.S. Dist. LEXIS 60372, at *20-21 (E.D. Cal. May 26, 2011).

[19] Prior to 2013, Rule 45 contained geographic limits on federal district courts' subpoena jurisdiction—the reach of their compulsory process was limited.

[20] "[Defendant] asserts that he is outside the subpoena power of the Court because he is 'outside of California . . . .' This statement is overbroad insofar as . . . the 2013 amendment to Rule 45 authorizes nationwide service of Rule 45 subpoenas." *Id.* (citation omitted).

**B.**    **Good Cause and Appropriate Safeguards Exist Under Rule 43(a)**

Plaintiffs' request is supported by good cause and their proposal assures adequate safeguards,

satisfying the requirements of Rule 43(a).

**1.**    **Plaintiffs Satisfy the Good Cause Standard**

Courts weigh five factors when considering whether good cause exists to permit live

videoconference testimony:

> (1) the control exerted over the witness by the defendant; (2) the complex, multiparty,
> multi-state nature of the litigation; (3) the apparent tactical advantage, as opposed to
> any real inconvenience to the witness, that the defendant is seeking by not producing
> the witness voluntarily; (4) the lack of any true prejudice to the defendant; and (5)
> the flexibility needed to manage a complex multi-district litigation.

9A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2414; *see, e.g.*, *Chapman v*, 2017 U.S.

Dist. LEXIS 104344, at *2-3; *In re Xarelto*, 2017 U.S. Dist. LEXIS 81047, at *8; *Mullins v. Ethicon,

Inc.* (*Mullins II*), No. 2:12-cv-02952, 2017 U.S. Dist. LEXIS 17555, at *41 (S.D.W. Va. Feb. 8, 2017);

*Mullins v. Ethicon, Inc.* (*Mullins I*), No. 2:12-cv-02952, 2015 U.S. Dist. LEXIS 163522, at *11 (S.D.

W. Va. Dec. 7, 2015); *Allen v. Takeda*, 2014 U.S. Dist. LEXIS 2231, at *35, 54-56; *In re Vioxx*, 439

F. Supp. 2d at 643; *In re San Juan Dupont Plaza Hotel Fire Litig.*, 129 F.R.D. at 426; *In re Wash.

Pub. Power*, 1988 U.S. Dist. LEXIS 19630, at *4-6. These factors weigh in favor of requiring TCS's

employees to testify via videoconference.

(1) <u>Defendant's Control over Witnesses</u>: TCS has control over each of the executives

Plaintiffs seek to testify as they are current TCS employees. *See, e.g.*, *Chapman*, 2017 U.S. Dist.

LEXIS 104344, at *3 (holding that defendant's current employees are under its control); *Mullins I*,

2015 U.S. Dist. LEXIS 163522, at *10-11 (same); *In re Vioxx*, 439 F. Supp. 2d at 643 (same).

(2) <u>The Complex, Multiparty, Multi-State Nature of the Case</u>: This case features a nationwide

class pursuing pattern and practice claims against a multinational corporation that operates in forty-

five states, rendering the evidence and witnesses diffuse. *See* MvK Decl. ¶ 7. A jury will soon

determine whether TCS has a pattern or practice of discrimination, resolving over 1,000 class

members' eligibility for relief. If the jury finds in the affirmative, the Court will then need to fashion

an injunction to prevent future discrimination and eliminate the effects of past discrimination. *See

Order Denying Mot. J. on Pleadings at 5(Dkt. #470). The jury and Court will holistically evaluate the

company's employment practices, an issue better suited to live testimony during trial over stilted attorney-edited deposition testimony. These considerations warrant contemporaneous video testimony. *See, e.g.*, *Chapman*, 2017 U.S. Dist. LEXIS 104344, at *3 ("T[]his lawsuit spans three states, includes thousands of class members, and involves millions of dollars. Its complexity weighs in favor of contemporaneous testimony."); *Mullins II*, 2017 U.S. Dist. LEXIS 17555, at *44 ("this consolidated [non-class] case, in and of itself, involves complex issues and multiple parties").

(3) TCS's Attempt to Secure Tactical Advantage: By refusing to produce its executives to testify at trial, TCS is attempting to secure three tactical advantages that would prejudice Plaintiffs, the jury, and the Court.

First, TCS seeks to avoid having its executives questioned about its eleventh-hour change-of-story regarding the leadership directive, and avoid being confronted with documents that disprove justifications it offered at the close of discovery. Throughout this case, TCS offered corporate testimony and affidavits denying the existence of a leadership directive, expressing concern about a directive to favor visa holders, and providing a false narrative as to how it staffs U.S. positions.[21] Then, with two weeks left in discovery, TCS reversed course, admitted to the existence of the leadership directive, and, on May 11, 2018, articulated (through Mr. Srinivasan) three justifications for the narrative. Srinivasan Dep. 72:2-74:22 (Ex. 3). These changes occurred after April 15, the last day upon which new discovery could be issued.

This conduct (likely by design) prevented Plaintiffs from questioning Mr. Kant, Mr. Ganapathy, Mr. Jindal, Mr. Kumar (Mr. Rangasamy's predecessor), or any other witnesses about TCS's three purported justifications for preferring expats. Plaintiffs are entitled to question key witnesses regarding key facts of the case. This is especially true where the untimely disclosures contradict prior witness statements and the company's representations throughout these proceedings. Any other outcome would come at the expense of resolving this dispute on the merits—the core

---

[21] *See e.g.*, 2017 Ganapathy 30(b)(6) Dep. 42:25-43:10 (Ex. 1);[21] 2017 Ganapathy Decl. ¶ 19, 22 (Dkt. #142); 2017 Kumar 30(b)(6) Dep. 82:9-16 (Ex. 16); 2017 Kumar Dec. ¶ 19 (Dkt. #152) ("Business Managers try to release expats/visa holders before local hires."); Def.'s Class Cert Opp'n at 20 (Dkt. #127) ("such a directive does not exist" and would be "a source of concern").

1  purpose of the Federal Rules. *See Hormel v. Helvering*, 312 U.S. 552, 557 (1941) ("Rules of practice

2  and procedure are devised to promote the ends of justice, not to defeat them.").

3       Second, TCS seeks to shield its executives from testifying regarding documents produced at

4  and after the close of discovery on May 15, including documents concerning TCS's preference for

5  expats, mapping of expats to accounts, affirmative action audits (including the Price Waterhouse

6  Coopers audit finding TCS lacked adequate anti-discrimination policies), involvement in setting

7  benching and termination policies, and the scope and involvement of Mr. Kant and Mr. Srinivasan in

8  TCS's severance payment and release program. *See* pp.4-5, *supra*. This untimely production

9  prevented Plaintiffs from questioning witnesses or issuing follow up discovery regarding the

10  documents.  While TCS assured the Court and Plaintiffs that documents it produced after the close

11  of discovery were largely immaterial, 796 of the 1,545 entries on TCS's preliminary exhibit list—

12  over half—are documents produced after the close of discovery. MvK Decl. ¶ 3; Pls.' Admin. Mot at

13  1-3 (Dkt. #486). Clearly, the late production of documents was designed to prejudice Plaintiffs and

14  assist TCS by preventing Plaintiffs from testing TCS's assertions.

15       Third, the witnesses have key information regarding the issues in dispute, including the

16  creation, implementation, and effect of the leadership directive. When defendants seek to prevent key

17  witnesses from testifying, courts often infer that defendants are attempting to secure a tactical

18  advantage by limiting testimony to that given at deposition. *See, e.g.*, *Mullins I*, 2015 U.S. Dist.

19  LEXIS 163522, at *11-12 (inferring attempt to secure tactical advantage where "the witnesses are

20  relatively important and knowledgeable employees of the defendants, the defendants refuse to make

21  these witnesses available, and the defendants want to limit the testimony of these witnesses to

22  deposition testimony"). TCS's refusal to produce the witnesses is an attempt "to eliminate any

23  unpredictability and limit [the witness's] trial testimony to his 'canned' deposition testimony—a

24  purely tactical reason." *In re Vioxx*, 439 F. Supp. 2d at 643. [22]

25

26       [22] *See also In re Xarelto*, 2017 U.S. Dist. LEXIS 81047, at *8 ("Live testimony is preferable to
    deposition. This fact, along with [the witness's] importance in the Xarelto process, are good cause
27  and compelling circumstances under Rule 43."). *Cf. Draper v. Rosario*, 836 F.3d 1072, 1082 (9th Cir.
    2016) (upholding district court's finding that good cause did not exist where the witness's testimony
28  was largely cumulative of other live witnesses' testimony).

1   In addition, TCS has selected several of these individuals (and Mr. Rangasamy's predecessor)

2   to speak on behalf of the company by filing declarations and selecting them as 30(b)(6) deponents.

3   Accordingly, TCS's refusal to now produce these witnesses for trial appears largely tactical. *Cf.*

4   *Chapman*, 2017 U.S. Dist. LEXIS 104344, at *3 (holding that refusal to produce appears tactical

5   where a defendant itself relies on the witness).

6       (4) <u>Lack of True Prejudice to the Defendant</u>: TCS will not incur any true prejudice from the

7   live videoconference testimony of its executives because Plaintiffs' proposal imposes no burden on

8   TCS or its witnesses, beyond that ordinarily required of all witnesses in federal civil trials. Plaintiffs

9   do not seek to compel TCS's executives to travel beyond the 100-mile limit imposed by Rule 45(c)(1).

10   *See, e.g.*, *In re Xarelto*, 2017 U.S. Dist. LEXIS 81047, at *10;[23] *Allen v. Takeda*, 2014 U.S. Dist.

11   LEXIS 2231, at *51-52. Rather, Plaintiffs will subpoena each witness to testify less than twenty miles

12   from the witnesses' workplace. Traveling these short distances would not impose any significant

13   burden on the witnesses, who each have a duty to assist in the Court's truth-seeking function.

14       In addition, the appropriate safeguards, discussed below, will ensure TCS incurs no prejudice.

15   *See Lopez v. NTI, LLC*, 748 F. Supp. 2d 471, 480 (D. Md. 2010) (finding no prejudice because "[e]ach

16   of the witnesses will testify in open court, under oath, and will face cross-examination" and the jury

17   will be able to "observe the witness' demeanor and evaluate his credibility in the same manner as

18   traditional live testimony."). If the company actually harbors sincere concern over the use of well-

19   established videoconferencing technology, it can opt to produce the witnesses in person, as is its right.

20   *See, e.g.*, *Chapman*, 2017 U.S. Dist. LEXIS 104344, at *3 (granting Plaintiffs' request to compel

21   videoconference testimony but permitting in-person testimony, if defendant prefers).

22       (5) <u>Flexibility Needed to Manage Complex Litigation</u>: As explained above, this case involves

23   a nationwide class action, which is similar in complexity to multidistrict litigation. Courts have

24   compelled live videoconference testimony in similar circumstances. *See, e.g.*, *Chapman*, 2017 U.S.

25   Dist. LEXIS 104344, at *3 (compelling live videoconference testimony of defendant's COO at trial

26   for class action spanning three states). Using contemporaneous testimony creates a more manageable

27

28   [23] "Plaintiffs . . . have subpoenaed [the witness] to testify in Newark, NJ, within 50 miles from his home and place of business. Accordingly, Plaintiffs' subpoena is within the bounds of [Rule 45(c)(1)]." *Id.*

15

trial, in which the witnesses can be questioned in a more logical, coherent, and direct manner, as compared to playing clips of edited deposition testimony. *See Mullins II*, 2017 U.S. Dist. LEXIS 17555, at *47 ("Live video transmission will promote coherency, especially when the alternative is spliced, edited, and recompiled clips of depositions that took place over multiple days.") (quoting *Mullins I*, 2015 U.S. Dist. LEXIS 163522, at *12-13). This is especially true where, as here, the facts of the case and the corpus of produced documents have changed significantly since several of the witnesses were deposed. *In re Xarelto*, 2017 U.S. Dist. LEXIS 81047, at *11 (holding that live videoconference testimony is "preferable to a year-old video deposition that is, *en masse*, unrelated to the present case.").

Under the circumstances, live videoconference testimony better respects the jury's time by providing a more coherent account of each party's case. As one district court explained, "a trial, itself, is a dynamic, ever evolving process and the use of contemporaneous transmission of live testimony better allows for the witness and counsel to be responsive to the inevitable, unexpected developments and shifts that always occur during trial." *Allen v. Takeda*, 2014 U.S. Dist. LEXIS 2231, at *46-47. "In so doing, the jury is better served . . . as the witnesses . . . will be able to contemporaneously and most relevantly comment on the newest developments in real time and unedited watching and judging the witnesses as the trial unfolds—a possibility unavailable with previously recorded testimony or earlier more limited technology." *Id.* at *47. "Further, use of 'live' contemporaneous transmission grants the trier of fact . . . the added advantage inherent in observing testimony in open court that is truly contemporaneous and part of the whole trial experience, thus, better reflects the fluid dynamic of the trial they are experiencing." *Id.*.

### 2.   Plaintiffs' Proposal Ensures Appropriate Safeguards

Transmitting testimony from another federal courthouse within the subpoena range has been employed by multiple federal courts and provides the "appropriate safeguards" called for by Rule 43(a). *See In re Xarelto*, 2017 U.S. Dist. LEXIS 81047, at *12 (compelling appearance at Newark, NJ federal courthouse); *Allen v. Takeda*, 2014 U.S. Dist. LEXIS 2231, at *55-56 (same). "In assessing the safeguards of such contemporaneous transmissions, the courts focus on whether the testimony was made in open court, under oath, and whether the opportunity for cross examination was

16

available." *FTC v. Swedish Match N. Am.*, 197 F.R.D. 1, 2 (D.D.C. 2000); *see also Adam v. Carvalho*, 138 F. App'x 7, 8 (9th Cir. 2005) (holding that sworn videoconference testimony subject to cross-examination complies with Rule 43(a)); *King v. Deathriage*, No. 1:14-cv-00111, 2017 U.S. Dist. LEXIS 89972, at *3 (E.D. Cal. June 12, 2017) (finding appropriate safeguards where "the finder of fact may listen to and observe the testifying witness's demeanor, where there is adequate opportunity to cross-examine, and where the transmission will be instantaneous."); *Gonzalez Ambrioso v. Ledesma*, No. 2:16-cv-2091, 2016 U.S. Dist. LEXIS 147513, at *4 (D. Nev. Oct. 24, 2016) (holding that testifying under oath, subject to criminal prosecution for perjury, at the Secretary of Foreign Affairs Office located in Cancun, Mexico provides sufficient safeguards). Plaintiffs' proposal satisfies all these requirements.

**C.** **Deposition Testimony Is Not an Adequate Substitute for Live Testimony in This Case**

Although four of the witnesses at issue (Mr. Kant, Mr. Srinivasan, Mr. Ganapathy, and Mr. Jindal) have already been deposed, and although the Court could partially reduce the prejudice to Plaintiffs from the late-produced documents by permitting another round of depositions of the witnesses,[24] their depositions are not adequate substitutes for multiple reasons.

First, another round of depositions would be largely impractical given the impending trial date, and given Plaintiffs' ongoing review of the late-produced documents.

Second, there are inherent advantages of live videoconference testimony over depositions. Courts have consistently found that "[live videoconference t]estimony . . . may be less favorable than live testimony from a witness seated at the witness stand, but it is more favorable than an attorney's cut of deposition videos."[25] *Mullins I*, 2015 U.S. Dist. LEXIS 163522, at *13; *see also, e.g.*, *Swedish Match N. Am.*, 197 F.R.D. at 2 (live videoconference testimony is "a) equivalent to his presence in court and b) preferable to reading his deposition into evidence.").

---

[24] *See, e.g.*, *All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12-0146 2013 U.S. Dist. LEXIS 64587, at *41 (S.D. Cal. May 3, 2013) (holding that, based upon the late production of relevant documents, plaintiffs may re-depose two witnesses at defendant's expense);

[25] The Court also noted that "[w]hile live testimony in court may be preferable, it is not possible here because the defendants refuse to make these witnesses available and these witnesses cannot be haled to a West Virginia courthouse. The second-best option (i.e., live video testimony) is appropriate here for a number of reasons." *Id.* at *10.

1     Third, live video assists the jury in making credibility determinations. The "purpose of hearing

2 live testimony is to 'enable[ ] the finder of fact to see the witness's physical reactions to questions, to

3 assess the witness's demeanor, and to hear the tone of the witness's voice.' Where the veracity of

4 witnesses is at issue, the [jury] must make a credibility determination by listening to the witnesses,

5 testing their story, and gauging their demeanor." *Ransom v. Herrera*, No. 1:11-01709, 2018 U.S. Dist.

6 LEXIS 13261, at *2 (E.D. Cal. Jan. 25, 2018) (quoting *United States v. Mejia*, 69 F.3d 309, 315 (9th

7 Cir. 1995); citing *Earp v. Ornoski*, 431 F.3d 1158, 1169-1170 (9th Cir. 2005)) (alterations in

8 original).[26]

9     Credibility determinations will be a significant issue at trial. For example, jurors will need to

10 evaluate TCS's changed stories and witnesses' inconsistent representations regarding TCS's

11 leadership directive and preference for expats. The meanings of many documents are hotly disputed

12 (e.g., the leadership directive emails), and whether to credit TCS's pained interpretations is a classic

13 question of credibility. And Plaintiffs need to question witnesses about the late-produced documents

14 and their consistency with witnesses' prior testimony.

15     "[U]nder the circumstances at hand, Rules 43 and 45 . . . are not being used in lieu of the more

16 desirable live testimony in Open Court at the location of the Court, rather are being employed to more

17 closely provide 'live' testimony in Open Court" and would be a "'powerful force of truth-telling.'"

18 *Allen v. Takeda*, 2014 U.S. Dist. LEXIS 2231, at *39-40 (quoting Fed. R. Civ. P. 43, Advisory

19 Committee's Note to 1996 amendment).

20              **IV.**   **CONCLUSION**

21     For the forgoing reasons, Plaintiffs' motion to permit remote testimony should be granted.

[26] *See also Lopez*, 748 F. Supp. 2d at 480 ("With videoconferencing, a jury will also be to observe the witness' demeanor and evaluate his credibility in the same manner as traditional live testimony."); *In re Henson*, 302 B.R. 884, 890 (Bankr. N.D. Cal. 2003) ("modern technology offers a method of appearance that is fully equivalent to a personal appearance, in which demeanor can be observed as well as if the witness were present in the room").

18

Dated: September 10, 2018

KOTCHEN & LOW LLP

By: /s/ Daniel Kotchen
Daniel Kotchen (*pro hac vice*)
Daniel Low (SBN 218387)
Michael von Klemperer (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
KOTCHEN & LOW LLP

*Attorneys for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system.

Dated: September 10, 2018

By: /s/ Daniel Kotchen
Daniel Kotchen