# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHRISTOPHER SLAIGHT, ET AL.,** | CASE NO. 15-cv-01696-YGR |
| Plaintiffs, | |
| vs. | **ORDER DENYING MOTION TO INVALIDATE RELEASE AGREEMENTS** |
| **TATA CONSULTANCY SERVICES, LTD,** | Re: Dkt. No. 371 |
| Defendant. | |

Plaintiffs Christopher Slaight, Seyed Amir Masoudi, and Nobel Mandili[1] bring this class action against defendant Tata Consultancy Services, Ltd. ("TCS") for discrimination in employment practices. (Dkt. No. 246, Fourth Amended Complaint.) Plaintiffs bring causes of action for disparate treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. 1981. (*Id.* ¶ 5.) Plaintiffs allege that TCS discriminated against them in their employment and/or termination practices based on race and national origin. (*Id.* ¶¶ 1-5.) Specifically, plaintiffs claim that TCS maintains a pattern and practice of intentional discrimination in its United States workforce whereby TCS treats persons who are South Asian[2] or of Indian national origin[3] more favorably than those who are not South Asian or of Indian national origin. (*Id.*)

---

[1] On July 23, 2018, this Court granted the TCS's motion to bifurcate from the class claims of plaintiff Brian Buchanan. (Dkt. No. 412.) Accordingly, the Court notes that the caption of this order has been revised to reflect the class action only.

[2] Plaintiffs define "South Asian race" as referring to individuals who trace their ancestry to the Indian sub-continent. (4AC ¶ 1, n. 3.)

[3] Plaintiffs define "Indian national origin" as referring to individuals born in India, or whose ancestors came from India. (*Id.*)

Now before the Court is plaintiffs' motion to invalidate release agreements between TCS and class members. (Dkt. Nos. 371, 442 ("Motion").)[4] Having carefully reviewed the papers and supplemental information submitted, as well as oral argument at the July 17, 2018 hearing, and for the reasons set forth more fully below, the Court **DENIES** plaintiffs' motion to invalidate the release agreements.

**I.  BACKGROUND**

The background giving rise to this action is well-known and the Court will not repeat it here.

Relevant to the instant motion, Steven Heldt, a terminated TCS employee, filed an initial EEOC charge on October 30, 2014 seeking to advance discrimination claims against TCS "on his own behalf, and on behalf of a class of individuals similarly affected by Tata's discriminatory practices." (*See* Dkt. No. 25-1.) Plaintiffs filed their initial class action complaint on April 14, 2015. (Dkt. No. 1.) On December 27, 2017, the Court certified the following class:

> All individuals who are not of South Asian race or Indian national origin who were employed by [TCS] in the United States, were subject to a policy or practice of benching and allocation, were place in an unallocated status and were terminated between April 14, 2011 and December 27, 2017 and who are not bound by an arbitration agreement with TCS.

(Dkt. No. 244 ("Cert. Order")); *see also* Dkt. No. 412 at 16.)

For the first time, in its answer to the *fourth* amended complaint filed on January 22, 2018, TCS asserted "release/arbitration" as an affirmative defense, averring that "[p]laintiffs' claims are barred to the extent any plaintiff has released any claim or has agreed to arbitration of such claims." (Dkt. No. 252 at 12.) On May 15, 2018, the deadline for completion of expert and non-expert discovery, TCS produced 346 separation and release agreements between TCS and former TCS employees, 246 of which plaintiffs estimate involve class members. (*See* Dkt. No. 258; Motion at 1.) TCS later clarified that for the total group of involuntarily terminated local employees, it had located 344 release agreements and for the group of those employees who were

---

[4] Plaintiffs' initially filed a redacted version of their motion at Docket Number 371. Following and in compliance with the Court's order on parties sealing motions at Docket Number 414, plaintiffs re-filed the instant motion at Docket Number 442. All references to the Motion herein will refer to the unredacted version of the document filed at Docket Number 442.

2

terminated due to being unallocated, TCS had located 283 release agreements. (Dkt. No. 424 ¶ 6.)

On July 31, 2018, the Court determined that although it "was not inclined to order as expansive a corrective notice as plaintiffs have requested . . . . [A] corrective notice is still required" as was additional discovery regarding the circumstances giving rise to the releases. (Dkt. No. 430.) On August 9, 2018, the Court approved the parties' proposed corrective notice and ordered the parties to distribute the notice no later than August 17, 2018. (Dkt. No. 469.) Therein, the Court advised potential members of the class who had signed release agreements with TCS of their status as a potential class member in the instant action and their ability to participate in the lawsuit despite the fact that they had signed a release agreement. (*Id.*, Ex. A at 4.) The corrective notice also noted that the Court was "in the process of deciding how to address the payment you have already received." (*Id.*)

On August 10, 2018, and in response to the Court's July 31, 2018 order, TCS made available for deposition Jeevak Sharma, who served as TCS's human resources manager for employee retention and employee welfare, which included employee separations and employee records. (Dkt. No. 488-2, Deposition Transcript for Jeevak Sharma, ("Sharma Depo.") at 8.) During his deposition, Sharma testified that the determination as to which terminated employees would receive an offer for a release agreement and severance payment is based on a case-by-case evaluation. (*Id.* at 16.) Sharma provided examples of specific circumstances leading to a severance offer, including an employee's return from a long leave, medical issues, tenure at the company, or independent grievances. (*Id.* at 16-17.) Sharma also stated that all severance payments are calculated based on the employee's wages for a particular time period and noted that he was not aware of any instances in which TCS calculated a severance payment based on the value of a legal claim that the employee may have against the company. (*Id*. at 36-37.)

On August 24, 2018, and in response to the Court's August 17, 2018 order, TCS filed a chart detailing "each separation agreement signed by a class member." (Dkt. No. 488 at ECF 12.)[5] That list contains the names of approximately 370 former employees. (*See* Dkt. No. 488, Ex. A

---

[5] The Court uses ECF pagination because the last two pages of the document at Docket Number 488 does not have any page numbers of its own.

3

1 ("List of Class Releases").) The earliest "date of agreement" for the release agreements referenced there in is January 29, 2009. (*See id.* at ECF 2.) Of the 370 agreements listed, 30 pre-date the filing of the initial complaint in this lawsuit of which only 19 pre-date the filing of Heldt's EEOC charge. (*See id.*) Only 6 of the agreements post-date the Court's December 27, 2017 certification order. (*Id.* at ECF 11.)

## II. DISCUSSION

Before a class is certified in a class action, counsel for both plaintiffs and defendants may communicate with the putative class, ex parte, about the lawsuit. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Id.* at 100. "The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class certification process." *Retiree Support Grp. of Contra Costa Cty. v. Contra Costa Cty.*, No. 12-CV-00944-JST, 2016 WL 4080294, at *5 (N.D. Cal. July 29, 2016) (citing *O'Connor v. Uber Technologies, Inc.*, No. C-13-3826 EMC, 2014 WL 1760314, at *3 (N.D. Cal. May 2, 2014)).

In the context of class action litigation, whether pre- or post-certification, unsupervised communications between an employer and its workers present an acute risk of coercion and abuse. *See Guifu Li*, 270 FRD at 517; *Wang v. Chinese Daily News, Inc.*, 236 F.R.D. 485, 490 (C.D. Cal. 2006). "Courts applying the *Gulf Oil* standard have found that ex parte communications soliciting opt-outs, or even simply discouraging participation in a case, undermine the purposes of Rule 23 and require curative action by the court." *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 517 (N.D. Cal. 2010). In this regard, the Court already determined that a corrective notice was necessary to address the inadequacy of the release agreements at issue and ordered the distribution of such a notice. (*See* Dkt. Nos. 430, 469.)

The issue remaining is "what, if anything, should occur with respect to the payments already made and received." (Dkt. No. 430.) Here, the inquiry centers on TCS's conduct as

4

compared to the rights of the class members. The critical inflection point in this interaction is the Court's December 27, 2017 certification order, which substantially clarified and expanded the scope of this litigation. (Cert. Order at 35 (certifying a class of an estimated 896 to 1,116 members).) The timing and distribution of the releases at issue does not reflect a sudden or significant increase following certification. (*See* List of Class Releases at ECF 11.) Rather, only 5 of the 370 agreements were executed on or after December 27, 2017. (*Id.*) Moreover, the fact that "[a] small number of individuals . . . brought up this lawsuit in an effort to negotiate higher severance pay, and TCS rejected those efforts," supports the conclusion that prior to the December 27, 2017 certification order, TCS did not view the instant action as a genuine issue and that the payments made do not represent an effort to "discourage participation in the case." *See Guifu Li*, 270 F.R.D. at 517. Nor does the Court find evidence in the record showing an affirmative attempt to circumvent the protections of a Rule 23 action. *See*, by contrast, *Marino v. CACafe, Inc.*, No. 16-cv-6291-YGR, 2017 WL 1540717, at *3 (N.D. Cal. Apr. 28, 2017) (finding releases invalid where they were "obtained by *deceptive* omissions of material information") (emphasis supplied).

### III. CONCLUSION

Accordingly, for the reasons discussed above, the Court **DENIES** plaintiffs' motion to invalidate the Release Agreements.

This Order terminates Docket Number 371.

**IT IS SO ORDERED.**

Dated: September 10, 2018

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**