DANIEL LOW, SBN 218387
dlow@kotchen.com
DANIEL KOTCHEN (*pro hac vice)*
dkotchen@kotchen.com
MICHAEL VON KLEMPERER (*pro hac vice*)
mvk@kotchen.com
LINDSEY GRUNERT (*pro hac vice*)
lgrunert@kotchen.com
AMY M. ROLLER (*pro hac vice*)
aroller@kotchen.com
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995

*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTOPHER SLAIGHT, et al.<br><br>Plaintiffs,<br>v.<br><br>TATA CONSULTANCY SERVICES, LIMITED,<br><br>Defendant. | Case No.: 4:15-cv-01696-YGR (SK)<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR NEW TRIAL**<br><br>Date: February 19, 2019<br>Time: 2:00 p.m.<br>Location: Courtroom 1, 4th Flr., Oakland |

**NOTICE OF MOTION AND MOTION FOR NEW TRIAL**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**: Please take notice that at 2:00 p.m. on February 19, 2019, in Courtroom 1, 4th Floor of the above-titled court, located at 1301 Clay Street, Oakland, California 94612, Plaintiffs Christopher Slaight, Seyed Amir Masoudi, Nobel Mandili, and the Class will, and hereby do, move this Court for a new trial pursuant to Federal Rule of Civil Procedure 59(a).

Date: January 15, 2019

/s/Daniel Kotchen
Daniel Kotchen (*pro hac vice*)
Daniel Low (SBN 218387)
Michael von Klemperer (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
Amy M. Roller (*pro hac vice*)
KOTCHEN & LOW LLP

*Attorneys for Plaintiffs and the Class*

## TABLE OF CONTENTS

**NOTICE OF MOTION AND MOTION FOR NEW TRIAL** .......... **1**

**TABLE OF CONTENTS** .......... **i**

**TABLE OF AUTHORITIES** .......... **ii**

**STATEMENT OF THE ISSUES TO BE DECIDED** .......... **iv**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A NEW TRIAL** .......... **1**

**I. Background** .......... **1**

**II. Legal Standard** .......... **2**

A. Granting a New Trial Based on a Verdict Against the Weight of the Evidence .......... 3

B. Granting a New Trial Based on Incorrect Evidentiary Rulings .......... 3

**III. Argument** .......... **4**

A. The Jury Returned a Verdict Against the Great Weight of the Evidence. .......... 4

*1. Plaintiffs' Statistical Evidence of Extraordinary Disparities in Workforce Composition and Termination Rates, which TCS Failed to Rebut, Proved Their Claims.* .......... *5*

a. Plaintiffs' Statistical Evidence Was Overwhelming. .......... 7

b. TCS Failed to Present Evidence Showing that Plaintiffs' Statistics Were Inaccurate or Statistically Insignificant. .......... 9

*2. Plaintiffs' Documentary Evidence Corroborated Their Statistical Evidence of Race and National Origin Discrimination and TCS Failed to Offer a Viable Non-Discriminatory Explanation for the Disparities.* .......... *10*

a. Plaintiffs' Overwhelming Statistical Evidence Was Corroborated by Documentary and Anecdotal Evidence of Discrimination Against Non-South Asian and Non-Indian Employees at TCS. .......... 11

b. TCS Failed to Show the Disparities Resulted from Legitimate Non-Discriminatory Factors. .......... 13

B. Incorrect Evidentiary Rulings Lead to an Unjust Result. .......... 16

*1. The Court's Ruling Excluding Evidence of Race and National Origin Discrimination in Hiring Was Incorrect and Prejudicial.* .......... *16*

*2. The Court Improperly Permitted Summary Testimony from Mr. Seetharaman.* .......... *20*

**IV. Conclusion** .......... **23**

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Ameritech Servs., Inc.*, 231 F.3d 414 (7th Cir. 2000) .......... 6, 8
*Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924 (9th Cir. 2003) .......... 13
*Anderson v. Zubieta*, 180 F.3d 329 (D.C. Cir. 1999) .......... 5, 6, 8
*Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977) .......... 13
*Bazemore v. Friday*, 478 U.S. 385 (1986) .......... 4, 13
*Beck v. Boeing*, 60 F. App'x 38 (9th Cir. 2003) .......... 22
*Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395 (D.C. Cir. 1988) .......... 6
*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015) .......... 4, 11
*Burgis v. N.Y. City Dep't of Sanitation*, 798 F.3d 63 (2d Cir. 2015) .......... 6, 8
*Castaneda v. Partida*, 430 U.S. 482 (1977) .......... 8
*Chess v. Dovey*, 790 F.3d 961 (9th Cir. 2015) .......... 4
*Coral Constr. Co. v. King Cnty.*, 941 F.2d 910 (9th Cir. 1991) .......... 5
*Crowley v. EpiCept Corp.*, 883 F.3d 739 (9th Cir. 2018) .......... 2
*EEOC v. Farmer Bros. Co.*, 31 F.3d 891 (9th Cir. 1994) .......... 16, 18
*EEOC v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575 (9th Cir. 1989) .......... passim
*EEOC v. Inland Marine Indus.*, 729 F.2d 1229 (9th Cir. 1984) .......... 5
*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012) .......... 4
*Experience Hendrix LLC v. Hendrixlicensing.com*, 762 F.3d 829 (9th Cir. 2014) .......... 3
*Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840 (9th Cir. 2004) .......... 4
*Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987) .......... 12
*Hadded v. Lockheed Cal. Corp.*, 720 F.2d 1454 (9th Cir. 1983) .......... 4
*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) .......... 5, 6
*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) .......... 7
*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .......... passim
*Jerden v. Amstutz*, 430 F.3d 1231 (9th Cir. 2005) .......... 4, 23
*Jones v. City of Bos.*, 752 F.3d 38 (1st Cir. 2014) .......... 6, 8
*Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406 (9th Cir. 1987) .......... 5
*Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365 (9th Cir. 1987) .......... 3
*Larez v. Los Angeles*, 946 F.2d 630 (9th Cir. 1991) .......... 16
*Lyons v. England*, 307 F.3d 1092 (9th Cir. 2002) .......... 16, 18
*Manatt v. Bank of Am.*, 339 F.3d 792 (9th Cir. 2003) .......... 4
*Mister v. Ill. Cent. Gulf R.R. Co.*, 832 F.2d 1427 (7th Cir. 1987) .......... 7, 14
*Moist Cold Refrig. Co. v. Lou Johnson Co.*, 249 F.2d 246 (9th Cir. 1957) .......... 2, 3

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) .......... 3

*Murphy v. City of Long Beach*, 914 F.2d 183 (9th Cir. 1990) .......... 3

*Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005) .......... passim

*Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365 (2d Cir. 1989) .......... 5

*Pac. Radiation Oncology, LLC v. The Queen's Med. Ctr.*, No. 12-00064, 2017 U.S. Dist. LEXIS 4043 (D. Haw. Jan. 11, 2017) .......... 20

*Paddock v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984) .......... 20, 21

*Palmer v. Shultz*, 815 F.2d 84 (D.C. Cir. 1987) .......... 5, 6, 9, 10

*Palmer v. Hoffman*, 318 U.S. 109 (1943) .......... 21

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493 (9th Cir. 2000) .......... 2

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) .......... 13

*Rollins v. Traylor Bros., Inc.*, No. C14-1414, 2016 U.S. Dist. LEXIS 7294 (W.D. Wash. Jan. 21, 2016) .......... 4

*Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041 (9th Cir. 1999) .......... 20

*Segar v. Smith*, 738 F. 2d 1249 (D.C. Cir. 1984) .......... 5

*Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008) .......... 17

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) .......... 16

*Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095 (10th Cir. 2001) .......... 22

*United States v. 99.66 Acres of Land*, 970 F.2d 651 (9th Cir. 1992). .......... 3

*United States v. Landau*, 155 F.3d 93 (2d Cir. 1998) .......... 3

*United States v. Meyers*, 847 F.2d 1408 (9th Cir. 1988) .......... 20, 22

*United States v. Seschillie*, 310 F.3d 1208 (9th Cir. 2002) .......... 4

*Waddell v. Commissioner*, 841 F.2d 264 (9th Cir. 1988) .......... 20

*Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370 (2d Cir. 1991) .......... 6, 8

**Rules**

Fed. R. Civ. P. 59(a) .......... 2

Fed. R. Evid. 1006 .......... 20

Fed. R. Evid. 401 .......... 16

Fed. R. Evid. 402 .......... 22

Fed. R. Evid. 403 .......... 17

Fed. R. Evid. 802 .......... 20

Fed. R. Evid. 803 .......... 20

**Treatises**

CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE (1973) .......... 3

CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE (3d ed.) .......... 2

## STATEMENT OF THE ISSUES TO BE DECIDED

(1) Whether the jury's verdict was contrary to the great weight of the evidence presented at trial.

(2) Whether the Court issued incorrect evidentiary rulings and, if so, whether TCS can demonstrate that the Court's incorrect evidentiary rulings did not prejudice Plaintiffs.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A NEW TRIAL

Plaintiffs seek a new trial on their claims of race and national origin discrimination under Title VII and § 1981. The jury rendered a verdict against the weight of the evidence, which established that Defendant Tata Consultancy Services, Ltd. ("TCS") maintained a pattern or practice of discrimination against non-South Asian and non-Indian employees. In addition, the Court's incorrect evidentiary rulings—establishing a *per se* rule precluding Plaintiffs from introducing evidence related to hiring discrimination, and permitting summary testimony regarding the content of TCS's inadmissible termination forms—substantially prejudiced Plaintiffs. This Court should grant Plaintiffs a new trial to correct these errors and the resulting unjust verdict.

## I. BACKGROUND

This case was filed on April 15, 2015, alleging that TCS maintains a pattern and practice of discriminating against non-South Asian and non-Indian employees in violation of Title VII and § 1981. *See* Compl. (Dkt. #1); *see also* 4th Am. Compl. (Dkt. #246). The Court certified a terminations class, represented by Named Plaintiffs Christopher Slaight, Seyed Amir Masoudi, and Nobel Mandili, on December 27, 2017. *See* 1st Omnibus Order at 12, 42 (Dkt. #244).

The class consists of "[a]ll individuals who are not of South Asian race or Indian national origin who were employed by [TCS] in the United States, were subject to a policy or practice of benching and allocation, were placed in an unallocated status and were terminated between April 14, 2011, and [December 27, 2017] and who are not bound by an arbitration agreement with TCS." 2d Omnibus Order at 16 (Dkt. #412) (alterations in original) (emphasis omitted). Defendant "TCS is a foreign company headquartered in Mumbai, India, with approximately 29,900 employees in the United States." 1st Omnibus Order at 3 (Dkt. #244). TCS is an information technology company that "contracts with clients to provide consulting, technology, and outsourcing services." *Id.*

Generally, "[w]hen TCS secures a consulting contract it allocates or hires individuals to serve the client onsite." *Id.* TCS staffs these client projects with a combination of employees for whom it secures visas to work in the U.S. ("expats") and with individuals hired locally ("locals"). *See id.* "During the class period, [expats] . . . represented between 75% and 89% of TCS's workforce in the United States." *Id.* Over 99% of TCS's expats are South Asians from India. *Id.*; Pls.' Ex. 1077 ¶ 9.

When a TCS employee is not assigned to a client that employee is placed in an unallocated status, which is colloquially termed being "benched." *See* 1st Omnibus Order at 4. TCS's Resource Management Group ("RMG") is responsible for locating new projects for benched employees. *See id.* Employees who remain on the bench are terminated. *Id.*

Beginning November 5, 2018, Plaintiffs' class-wide race and national origin discrimination claims were tried over twelve days.[1] Plaintiffs contended that TCS has engaged in a systematic, companywide pattern and practice of discriminating against individuals who are not South Asian or Indian in staffing and termination decisions. *See generally* Tr. 30:13-51:18, 1778:4-1832:25, 1883:7-1894:25. Specifically, TCS preferentially staffs U.S. client projects with Indian and South Asian employees, which results in the disproportionate benching and termination of non-Indian and non-South Asian employees. *Id.* TCS denied Plaintiffs' allegations that it had a discriminatory standard operating procedure and maintained that its staffing and termination decisions were not based on race or national origin. *Id.* 52:2-71:9, 1837:18-1882:24. On November 28, 2018, the jury returned a verdict in favor of TCS, Verdict (Dkt. #673), and on December 18, 2018, the Court entered Judgment (Dkt. #683).

## II. LEGAL STANDARD

"[T]he district court has a wide discretion to order a new trial whenever prejudicial error has occurred." 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2531 (3d ed.).[2] "Under Rule 59, a court may grant a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court.' Such reasons may include a 'verdict [that] is contrary to the clear weight of the evidence,' . . . or 'to prevent a miscarriage of justice,'" *Crowley v. EpiCept Corp.*, 883 F.3d 739, 751 (9th Cir. 2018) (quoting Fed. R. Civ. P. 59(a)(1)(A); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)),

---

[1] The Court bifurcated Plaintiff Buchanan's claims for a separate trial. *See* 2d Omnibus Order.

[2] Compared to a Rule 50(b) motion for judgment as a matter of law, a "much more lenient test . . . is applicable to a motion for a new trial when it is based on the ground that the verdict is against the weight of the evidence." *Id.*; *see also Moist Cold Refrig. Co. v. Lou Johnson Co.*, 249 F.2d 246, 251 (9th Cir. 1957) ("[i]f the judge is of opinion that the verdict of the jury was against the weight of the evidence or based on evidence that was false, he should set it aside and grant a new trial, even though direction of a verdict or judgment n.o.v. was not warranted.").

and "errors in admission or rejection of evidence," *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). "Ultimately, the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." *Experience Hendrix LLC v. Hendrixlicensing.com*, 762 F.3d 829, 842 (9th Cir. 2014).

### A. <u>Granting a New Trial Based on a Verdict Against the Weight of the Evidence.</u>

When a motion for a new trial is based on a verdict contrary to the weight of the evidence, the Court has:

> the right, and indeed the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his conscientious opinion, the verdict is contrary to the clear weight of the evidence, or . . . to prevent, in the sound discretion of the trial judge, a miscarriage of justice.

*Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (quoting *Moist Cold Refrig. Co.*, 249 F.2d at 256) (alteration in original).

The court is "not required to draw all inferences in favor of the verdict and [can] reweigh the evidence and make credibility determinations." *Experience Hendrix*, 762 F.3d at 845. A judge looks at the facts and "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial." *Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (quoting 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2806 at 48-49 (1973)). "The trial judge is ultimately responsible for the conduct of the litigation, and . . . for ensuring that a party is not a victim of a miscarriage of justice." *Murphy*, 914 F.2d at 187. "[P]rinciples of deference to the jury do not override the trial judge's duty to see that there is no miscarriage of justice." *United States v. Landau*, 155 F.3d 93, 105 (2d Cir. 1998) (quotation marks omitted).

### B. <u>Granting a New Trial Based on Incorrect Evidentiary Rulings.</u>

A court may order a new trial "on the basis of an incorrect evidentiary ruling if the ruling substantially prejudiced a party." *United States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992). The court must "begin with a presumption of prejudice. That presumption can be rebutted by a showing that it is more probable than not that the jury would have reached the same verdict even if the evidence had been admitted." *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005) (citing

*Hadded v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983)). "The party benefitting from the error has the burden of persuasion, and 'in cases of equipoise, we reverse.'" *Id.* (quoting *United States v. Seschillie*, 310 F.3d 1208, 1214-15 (9th Cir. 2002)). The impact of incorrect rulings must be considered cumulatively, and "cumulative error in a civil trial may suffice to warrant a new trial even if each error standing alone may not be prejudicial." *Jerden v. Amstutz*, 430 F.3d 1231, 1240-41 (9th Cir. 2005).

## III. ARGUMENT

To prevent a miscarriage of justice, a new trial should be granted pursuant to Rule 59 because (A) the jury returned a verdict against the great weight of the evidence, and/or (B) incorrect evidentiary rulings prejudiced Plaintiffs.[3]

### A. The Jury Returned a Verdict Against the Great Weight of the Evidence.

The jury's verdict was contrary to the great weight of the evidence and could only have been based on an idiosyncratic and erroneous application of the law to the facts of this case. In the absence of evidence in the record sufficient to support a verdict in favor of TCS, permitting the verdict to stand would result in manifest injustice for over one thousand class members and ongoing systematic discrimination against non-South Asian and non-Indian employees at TCS.

A pattern or practice "claim requires proof of a 'systemwide pattern or practice' of discrimination such that the discrimination is 'the regular rather than the unusual practice.'" *Brown v. Nucor Corp.*, 785 F.3d 895, 914 (4th Cir. 2015) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)); *Bazemore v. Friday*, 478 U.S. 385, 398 (1986); *Rollins v. Traylor Bros., Inc.*, No. C14-1414, 2016 U.S. Dist. LEXIS 7294, at *19 (W.D. Wash. Jan. 21, 2016) (quoting *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 518 (N.D. Cal. 2012)).[4] Statistics alone can prove

---

[3] The parties extensively briefed and argued the jury instructions with the District Court. *See, e.g,* Dkt. #577, 578, 636, 646, 647, 648, 649, 650, 651, 652, 656; Tr. 776:1-880:10; 1578:1-1589:3, 1633:14-1644:7, 1711:3-1742:3. Because of this, Plaintiffs forgo raising those issues yet again at this time, in favor direct appeal. *See Chess v. Dovey*, 790 F.3d 961, 970 (9th Cir. 2015) (explaining that raising an issue with the Court prior to charge preserves issue for appeal).

[4] Courts analyze Title VII and Section 1981 employment discrimination claims under the same legal principles. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004); *see also Manatt v. Bank of Am.*, 339 F.3d 792, 797 (9th Cir. 2003) ("those legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action."); *Jurado v. Eleven-Fifty Corp.*,

intentional discrimination. *Teamsters*, 431 U.S. at 339 ("We have repeatedly approved the use of statistical proof . . . to establish a prima facie case of racial discrimination in jury selection cases" and "[s]tatistics are equally competent in proving employment discrimination."); *Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 919 (9th Cir. 1991). Once a plaintiff makes her *prima facie* case, the burden then shifts to the defendant to rebut plaintiffs' *prima facie* case by demonstrating that plaintiffs' proof is inaccurate or statistically insignificant, or by proffering a persuasive nondiscriminatory explanation for the statistical discrepancy. *See Teamsters*, 341 U.S. at 360; *Segar v. Smith*, 738 F. 2d 1249, 1268 (D.C. Cir. 1984).

**1. Plaintiffs' Statistical Evidence of Extraordinary Disparities in Workforce Composition and Termination Rates, which TCS Failed to Rebut, Proved Their Claims.**

"The threshold question in [Title VII and § 1981 pattern-or-practice] disparate treatment cases . . . is: 'At what point is the disparity in selection rates sufficiently large, or the probability that chance was the cause sufficiently low, for the numbers alone to establish a legitimate inference of discrimination?'" *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371 (2d Cir. 1989) (quoting *Palmer v. Shultz*, 815 F.2d 84, 92 (D.C. Cir. 1987)) (alterations omitted)). Where gross statistical disparities exist, they alone may prove intentional discrimination. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977); *see also Anderson v. Zubieta*, 180 F.3d 329, 341 (D.C. Cir. 1999). In those cases, "a [fact finder] will infer from the numbers alone that, more likely than not, the disparity was a product of unlawful discrimination." *Palmer*, 815 F.2d at 91 (citing *Hazelwood*, 433 U.S. at 307-08; *Segar*, 738 F.2d at 1278).

"Statistical significance is a measure of the probability that a disparity is simply due to chance, rather than any other identifiable factor." *Ottaviani.,* 875 F.2d at 371. "Statisticians employ a number of different methods to assess statistical significance in a variety of different contexts. In the approach most relevant here, statisticians may compare outcomes for two different groups (e.g., black employees and white employees) presuming that members of the two groups have the same

---

813 F.2d 1406, 1412 (9th Cir. 1987) ("[t]he same standards apply, and facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim."); *EEOC v. Inland Marine Indus.*, 729 F.2d 1229, 1233 n.7 (9th Cir. 1984) ("A plaintiff must meet the same standards in proving a § 1981 claim that he must meet in establishing a . . . claim under Title VII.").

likelihood of receiving a given outcome (e.g., [being terminated]).” *Jones v. City of Bos.*, 752 F.3d 38, 43 (1st Cir. 2014) (citation omitted). Two such methods are calculating the standard deviations and the *p*-value.

A standard deviation expresses the degree of disparity between the expected racial composition of a workforce in the absence of discrimination (called the “null hypothesis”[5]) and the actual racial composition of the workforce. *See Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 (D.C. Cir. 1988). It is well-established that a difference of 2 to 3 standard deviations is a statistically significant disparity. *See, e.g.*, *Burgis v. N.Y. City Dep’t of Sanitation*, 798 F.3d 63, 70 n.6 (2d Cir. 2015) (citing *Hazelwood*, 433 U.S. at 308 n.14) (2 to 3 standard deviations renders non-discriminatory explanations suspect); *Adams*, 231 at 424 (2 standard deviations enough to show that disparity is extremely unlikely to be due to chance); *Anderson*, 180 F.3d at 341 (difference of 1.96 standard deviations sufficient to show intentional discrimination); *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376 (2d Cir. 1991) (2 standard deviations is statistically significant).

The “*p*-value,” measures the probability that the identified degree of disparity occurred as a result of chance, assuming equal opportunity. *Jones*, 752 F.3d at 43. A *p*-value of less than 5 percent is considered statistically significant. *Id.*; *Adams*, 231 F.3d at 424 (probability less than 5 percent is statistically significant); *Waisome*, 948 F.2d at 1376 (1 in 20 chance (5 percent probability) is statistically significant).

Once a plaintiff introduces compelling statistical evidence of discrimination, the defendant must put forth “‘evidence to support the contention that the missing factor can explain the disparities as a product of a legitimate, nondiscriminatory’” process. *EEOC v. Gen. Tel. Co. of NW, Inc.*, 885 F.2d 575, 580, 584 (9th Cir. 1989) (quoting *Palmer*, 815 F.2d at 101) (vacating judgment and remanding for a new trial); *Adams*, 231 F.3d at 424 (rejecting attack on plaintiff’s statistical analysis for failure to account for explanatory variables, and explaining that “importantly, it was the

[5] A null hypothesis represents “what the results would be for the salient variable (race in *Mister*, age in our case) if there were no discrimination. . . . If the relevant market is 40% African-American, for instance, one would expect 40% of hires to be African-American under the null hypothesis.” *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000).

[defendant] that had the responsibility of offering alternative explanations. The only one it actually advanced . . . was singularly unpersuasive"); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188-89 (9th Cir. 2002) ("the defendant must 'produce credible evidence that curing the alleged flaws would also cure the statistical disparity'") (quoting *Gen. Tel. Co.*, 885 F.2d at 583). These variables must themselves be non-discriminatory. *See Mister v. Ill. Cent. Gulf R.R. Co.*, 832 F.2d 1427, 1434 (7th Cir. 1987) (discussing "evidence that some counties, with relatively large black labor forces, had been skipped over while [defendant] hired from other, 'whiter' counties farther from its workplaces[,]" with the result that, per the defendant's analysis, "[d]iscrimination itself produces a statistical finding of no discrimination").

***a. Plaintiffs' Statistical Evidence Was Overwhelming.***

Plaintiffs' statistical evidence showed that TCS has shockingly high disparities in its workforce composition and termination rates. *See generally* Tr. 73:16-101:21; Pls' Exs. 541-2, 554-2, 561, 566, 581A, 583A, 583B, 655-2, 1201, 1208, 1214, 1226. Plaintiffs' expert in labor economics, Dr. David Neumark, testified that TCS's U.S. workforce drastically skews South Asian. The company's employees are 76.42 percent South Asian, as compared to a 15.79 percent nationwide average for workers in similar occupations. Tr. 78:2-4; Pls.' Ex. 583A. Once benched, TCS's non-South Asian employees are significantly more likely to be terminated than their South Asian coworkers. TCS's employment data shows that, while 0.92% of South Asians who are placed on the bench were terminated, 10.61% of non-South Asians who are benched were terminated—10 times the rate among South Asian employees.[6] *See* Pls.' Ex. 583B; Tr. 85:3-9, 89:8-90:13. Among all terminations at TCS, non-South Asian employees were terminated at a rate almost 10 times the termination rate of South Asians (14.85% versus 1.65%). *See* Pls.' Ex. 583B; Tr. 84:8-18, 85:3-11. This analysis accounted for terminations occurring in the U.S. (including expats terminated in the U.S.) and terminations for expats who returned to India, whose inclusion made no material difference on the outcome of the analysis. Tr. 89:15-18.[7]

---

[6] These figures are based on data concerning 1,777 terminations from the bench between April 14, 2011 and December 31, 2016. Pls.' Ex. 583B.

[7] "Q. How were your probability calculations affected by including terminations outside of the united states? A. They made virtually no difference, no material difference whatsoever." *Id.*

These disparities are statistically significant. TCS's workforce composition varied from the null hypothesis by between 204 and 246 standard deviations (depending on the data used). Tr. 94:9-11, 94:14-15; Pls.' Ex. 583A. The disparity in terminations from the bench varied from the null hypothesis by 55 standard deviations. Tr. 90:5-13; Pls.' Ex. 583B. The disparity in all terminations varied from the null hypothesis by 62 standard deviations. Tr. 65:12-16; Pls.' Ex. 583B. These far exceed the 2 to 3 standard deviations that courts and statisticians consider sufficient to prove intentional discrimination. *See, e.g., Burgis*, 798 F.3d at 70 n.6; *Adams*, 231 F.3d at 424; *Anderson*, 180 F.3d at 341; *Waisome*, 948 F.2d at 1376; *cf.* Tr. 86:1-3 ("You don't really see standard deviations in this kind of work of 60 or 30 or 55, like you are seeing here. This is remarkably strong evidence [of discrimination].").

At these levels of deviation, the *p*-values are all less than 0.0000001%, which corresponds to a 1 in a billion chance that the identified disparities occurred as the result of happenstance. *See* Pls' Exs. 583A, 583B; *see also* Tr. 88:1-89:5. This negligible likelihood is far lower than the 5 percent chance that courts find evidence of disparate treatment. *See Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977) (describing 1 in 1,025 chance of a given racial composition occurring by chance as "negligible"); *see also, e.g.*, *Jones*, 752 F.3d at 43; *Adams*, 231 F.3d at 424; *Waisome*, 948 F.2d at 1376. As Dr. Neumark concluded, "[t]he data on terminations and terminations from the bench are very statistically strongly consistent with discrimination." Tr. 101:17-19.

Dr. Neumark also testified regarding termination disparities among locals, observing that non-South Asian locals are disproportionately terminated relative to South Asian locals. Tr. 97:5-24, 100:11-101:19; Pls' Exs. 1214, 1226. Non-South Asian employees accounted for 78 percent of terminations from the bench from 2011 through 2017, even though non-South Asians only accounted for a minority of TCS's workforce. Tr. 77:17-78:10, 92:6-18, 93:24-94:5, 97:5-24; Pls' Exs. 583A, 1214; Pls.' Ex. 1226 (between 2011 and 2015 TCS's local workforce was on average 54.8% South Asian). Plaintiffs presented evidence through an admission in a TCS internal document that the reason TCS favors South Asian and Indian employees is because of management's "comfort and

familiarity" with those individuals. Pls' Ex. 714.[8] TCS never addressed the racial disparity in local employee terminations, such that the jury's verdict was contrary to the clear weight of the evidence without even considering the greater disparity when accounting for expats.

***b. TCS Failed to Present Evidence Showing that Plaintiffs' Statistics Were Inaccurate or Statistically Insignificant.***

TCS failed to present any evidence that tended to undercut Plaintiffs' statistical evidence of discrimination, despite being required to present evidence showing that plaintiffs' statistics were inaccurate or statistically insignificant, *Teamsters*, 431 U.S. at 360, or "explain the disparities as the product of a legitimate, nondiscriminatory selection criterion." *Palmer*, 815 F.2d at 101. It did neither.

Dr. Lazear, TCS's statistical expert, did not dispute Dr. Neumark's numbers, testifying that: "as I said, I'm not disputing his numbers. I said that a few minutes ago, I'm not disputing his numbers," Tr. 1442:17-18, and "[w]hat I said earlier was, I'm not disputing his numbers." *Id.* 1445:25-1446:1. Indeed, Dr. Lazear failed to conduct any comparative analysis of TCS's non-South Asian and South Asian involuntary termination rates, likely because doing so would have revealed stark disparities. *Id*. 1445:9-11, 1446:8-11. As a result, he offered no explanation of the disparities identified by Dr. Neumark or testimony regarding a missing factor that can explain the disparities as a product of a legitimate, nondiscriminatory process. *See generally id*. 1431:15-1471:2; *see also Gen. Tel. Co.*, 885 F.2d at 582-84 (vacating judgment and remanding for a new trial where defendant "failed to show that if the EEOC had 'adequately' accounted for the alleged flaws, the disparities in its analyses would have been eliminated" because defendant "had to produce credible evidence that curing the alleged flaws would also cure the statistical disparity).

Rather than dispute Dr. Neumark's numbers or analyze termination rates comparing South Asians to non-South Asians, Dr. Lazear testified that because TCS terminates only 7.3% of non-South Asian locally-hired employees involuntary terminations would not be a particularly good way

[8] "But Vandana has said that for the Local Technical positions we are asked to fill in the USA and Canada, the resumes we give to the hiring managers is about 60% Indian males and 40% All Others. Yet according to her the split of whom we choose to hire is about 90% Indian males and 10% All Others. So some selection process is occurring with the Hiring Managers which may be based on 'comfort and familiarity' as well as legitimate skill reasons." *Id.* at 1.

of carrying out a campaign of intentional discrimination. *See* Tr. 1432:20-1436:16. But a low termination rate does nothing to counter the basic fact that when TCS fires someone, the company is 10 times more likely to select a non-South Asian employee than a South Asian employee. Tr. 84:8-18, 85:3-11, 89:8-90:13; Pls' Exs. 583B, 1214; *see also Gen. Tel. Co.*, 885 F.2d at 583 (explaining that inter-company comparisons do little to explain intra-company disparities in employee treatment). Moreover, even if Dr. Lazear's point regarding national termination rates had any probative value (which it doesn't), his analysis was based on erroneous figures. Dr. Lazear failed to include visa-holders deputed to the U.S., who are 99 percent South Asian and account for over 70 percent of TCS's U.S. workforce. Tr. 153:11-13, Tr. 164:6-7, 249:21-23, 1458:5-17; Pls.' Ex. 1077 ¶ 9. And his supposed national average termination rate of 25 percent was not for a comparable job category, and includes seasonal workers subject to periodic layoffs that artificially inflates the termination rate. Tr. 1461:23-1462:9, 1462:16-1463:3, 1467:15-18.

Dr. Lazear also testified that TCS has an economic incentive to retain as many employees as possible because the company sinks resources into training new employees. Tr. 1436:17-1437:9. However, that terminating locals is misaligned with the company's economic incentives strengthens the notion that something other than legitimate business justifications informed the company's termination decisions—a corporate cultural preference for South Asian and Indian employees. Pls' Ex. 714. Far from explaining the disparity as the product of non-discriminatory criterion, Dr. Lazear's testimony *eliminated* economic incentive as a possible non-discriminatory explanation for the disparity. *See Teamsters*, 431 U.S. at 360 n.46 (defendant must "provide a nondiscriminatory explanation for the apparently discriminatory result"); *Palmer*, 815 F.2d at 101 (holding that defendant must "introduce[e] evidence to support the contention that the missing factor can explain the disparities as the product of a legitimate, nondiscriminatory selection criterion").

Because Plaintiffs raised a strong inference of discrimination, which TCS failed to explain as the product of some non-discriminatory factor, statistics alone proved intentional discrimination in this case.

**2. Plaintiffs' Documentary Evidence Corroborated Their Statistical Evidence of Race and National Origin Discrimination and TCS Failed to Offer a Viable Non-Discriminatory Explanation for the Disparities.**

In *Teamsters* cases, although not required, a plaintiff may also present additional documentary and testimonial evidence to help "animate the statistical findings." *Nucor Corp.*, 785 F.3d at 908.

***a. Plaintiffs' Overwhelming Statistical Evidence Was Corroborated by Documentary and Anecdotal Evidence of Discrimination Against Non-South Asian and Non-Indian Employees at TCS.***

Plaintiffs introduced considerable documentary and anecdotal evidence that corroborated Plaintiffs' statistical evidence, further demonstrating that TCS engages in a pattern or practice of discrimination against non-South Asians and non-Indians. This evidence included documents and testimony demonstrating TCS's "comfort and familiarity" with South Asians; TCS's "leadership directive" to staff projects in the U.S. with its South Asian expat workforce "to the maximum extent," and anecdotal testimony from class members regarding the discrimination they suffered at TCS.

First, Plaintiffs introduced evidence that TCS's highly disproportionate workforce (about 76% South Asian) was the result of TCS managers' "comfort and familiarity" with South Asian and Indian workers. Pls.' Exs. 714 at 1;[9] Pls.' Ex. 583A (TCS's overall workforce is 76% South Asian); Pls.' Ex. 1226 (between 2011 and 2015 TCS's local workforce was on average 54.8% South Asian). The company's regularly conducted employee surveys also reflected this culture of discrimination. Pls.' Ex. 678 at 11 ("There is a lot of racism within TCS. . . . [I]t is a Chennai male dominated company"); Pls.' Ex. 736 at 6 ("Indian culture dominates TCS. And having an Indian background seems to get a definite head start.").

Second, Plaintiffs introduced evidence that, in 2012, TCS executives Surya Kant and Narasimhan Srinivasan devised and issued a "leadership directive," pursuant to which TCS's expats were to be utilized in the U.S. "to the maximum extent" permissible under their visas. *See* Trial Exs. 2, 9, 23, 28; Tr. 427:16-24. Over *99%* of the expats are Indian and South Asian. *See* Tr. 164:6-7, 249:21-23; *see also* Pls.' Ex. 1077 ¶ 9. Under the directive, expats completing projects were prohibited from returning to India, and RMG quickly reallocated them to new U.S. projects. Pls.' Exs. 23, 44, 51, 57, 303; Tr. 335:11-14, 499:6-11. Likewise, RMG prioritized visa ready South

---

[9] The Court erroneously excluded substantial other evidence of TCS's cultural preference for South Asians and Indians. *See* Section III.B.1, *infra.*

Asians waiting in India for placement in U.S. positions. Pls.' Exs. 307, 329, 352; Tr. 442:8-15. In Mr. Srinivasan's words, failing to fully utilize TCS's visa workers was tantamount to a "criminal offense." Pls.' Ex. 307 at 1. As Donna Gomez observed, and ample other evidence corroborated, "the preference was if there was any role, anything, it was favored for an expat to be placed in that role, bottom line." Tr. 1049:4 (Gomez Dep. Tr. 274:1-4); Pls.' Ex. 267 at 3 ("give your preference for expatriates only … expatriates followed by Locals and then BAs"); Pls.' Exs. 61-65, 192, 202, 206, 254, 469. TCS did not dispute the existence of the directive, and in fact admitted that it was still in place. Tr. 296:25-297:1, 299:7-9, 1082:7-9.

The leadership directive was communicated to RMG and TCS's business teams, but was kept secret from TCS's human resources personnel and its head of diversity. *Id.* 427:16-24, 183:10-12, 189:1-3, 189:15-18, 1273:15-19; 1490:20-21, 1491:5-9. This was almost certainly because the leadership directive had a substantial discriminatory effect on non-South Asian and non-Indian employees, resulting in a dramatic increase in attrition among those groups. When the leadership directive was implemented in 2012, for example, only four locals were terminated for being unallocated. *Id.* 330:9-331:1, 332:12-16; Pls.' Ex. 561. However, in the subsequent years, local attrition skyrocketed and remained high. For instance, in 2014, TCS terminated 274 locals for being unallocated, and in 2015 and 2016 it terminated well over 400. *Id.* 332:17-22, 333:21-24, 335:3-8; Pls.' Exs. 541-2 at 30, 548-2 at 11, 545-2 at 13. Yet over this same period, TCS was mapping vast numbers of South Asian expats to positions, and even removing locals from projects to make space for expats. Pls.' Ex. 329 at 1 ("plan for the travel of 2000 visa ready associates in India to USA in Q415. … We need this mapping completed [in 4 days]"); Pls.' Ex. 352 at 2 (mapping 2,500 visa ready Indians to U.S. positions); Tr. 464:1-9; Pls.' Ex. 307 at 3 (discussing relocating workers to map space for expats); Pls.' Ex. 537-2.

TCS's executives were well aware of these effects, as they regularly received the company's attrition reports. Tr. 237:19-21 (Kant), 426:12-14 (Srinivasan), 193:25-194:1 (Ganapathy), 206:22-24 (Ganapathy). "[A]n inference of discriminatory intent may arise from evidence of objective factors, including the inevitable or foreseeable consequences of the challenged policy or practice." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 685 n.2 (1987) (citing *Personnel Adm'r of Mass. v.*

*Feeney*, 442 U.S. 256, 279 n.25 (1979); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977)); *Bazemore*, 478 U.S. at 394-97; *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 943-44 (9th Cir. 2003). TCS's conscious choice to perpetuate the leadership directive for years, despite knowing that it resulted in the disproportionate termination of non-South Asian and non-Indian employees, evidenced the intentionality of the company's discrimination.

Finally, Plaintiffs presented days of testimony from the named plaintiffs, class members, and others regarding the discrimination they faced at TCS, and their ultimate benching and termination. Tr. 514:17-540:20, 552:1-570:2 (Seyed Amir Masoudi), 712:23-743:1 (Nobel Mandili), 980:14-1006:14 (Christopher Slaight), 620:5-638:21 (Chad Cooper), 680:15-691:21 (Frances Greitl), 946:13-952:7 (Salah Bedeiwi), 1027:3-1031:22 (Kim Waysack), 1120:25-1133:10 (John Goodwin), 766:4 (video deposition of Nasser Nahshal), 1048:9 (video deposition of Bonnie Kottke).

This evidence, combined with the statistical evidence on discrimination among locally hired employees, eliminated the possibility than an alternative hypothesis could account for the termination-rate disparities identified by Plaintiffs. And, although the defendant bears the burden of explaining gross statistical disparities, *see Gen. Tel. Co.*, 885 F.2d at 582-83, TCS did not proffer a viable alternative hypothesis supported by evidence.

***b. TCS Failed to Show the Disparities Resulted from Legitimate Non-Discriminatory Factors.***

Through its executives, TCS attempted to explain away Plaintiffs' statistical, documentary, and anecdotal evidence through arguments that were non-probative, implausible, unsupported by contemporaneous documents, and/or foreclosed by caselaw.

First, in an effort to present a non-discriminatory explanation of Dr. Neumark's termination rate analysis and the disparities evident in its own attrition reports, TCS presented testimony that expats' contracts prevent them from being terminated in the U.S., accounting for the disparity. *See* Tr. 1327:17-20, 1542:2-18, 1669:18-1670:3. But expats *are* terminated in the U.S., albeit very infrequently (consistent with the discrimination at issue). *Id.* 1221:20-1222:20,[10] 1221:10-11,

[10] "Q. Okay. So you do fire [visa dependent] folks in the U.S.? A. On a very exceptional basis. . . . Q. What were the circumstances of the one expat who was fired in your region? A. He was arrested at the client's site for child pornography." *Id.* 1221:24-25, 1222:17-20.

1553:9-13**.** Moreover, Dr. Neumark *did* include terminations occurring outside the U.S. in his analysis, and found that non-South Asian locals were still terminated at vastly higher rates. *Id*. 89:15-18 ("Q. How were your probability calculations affected by including terminations outside of the United States? A. They made virtually no difference, no material difference whatsoever."), 100:21-101:3; *see also* Pls.' Exs. 1214, 583-B. Moreover, TCS did not identify any provision of its deputation agreements preventing TCS from terminating expats in the U.S. *See* Def.'s Ex. 3371. Rather, the agreement introduced at trial requires *the employee* to return to India at the conclusion of their deputation, to provide training. *Id.* § 3.2; Tr. 1551:16-21. And offering employees different contractual terms is itself discriminatory because, in effect, South Asian and Indian employees receive more favorable terms of employment than non-South Asian and non-Indian employees. *See Mister*, 832 F.2d at 1434 (discussing "evidence that some counties, with relatively large black labor forces, had been skipped over while [defendant] hired from other, 'whiter' counties farther from its workplaces[,]" with the result that, per the defendant's analysis, "[d]iscrimination itself produces a statistical finding of no discrimination."

Second, TCS presented testimony that its local workforce increased in number and as a percentage of its overall workforce between 2011 and 2017. Tr. 1321:9-17, 1541:14-25. But such an increase is not probative of the comparative termination rates of its South Asian and non-South Asian employees, which were in fact disproportionate. Moreover, Plaintiffs presented evidence that the increase was a product of TCS's growing business paired with the limited availability of certain work visas, necessitating a larger local workforce. Tr. 262:8-23, 263:17-21, 264:5-24, 269:19-270:12; Pls.' Exs. 399, 401, 452 1214B. (because H-1B visas are capped, and TCS was having difficulty securing L-1 visas, it was required to increase local hiring). In other words, TCS did not increase local hiring out of a good faith desire to increase diversity, it did so because of economic necessity and then the company terminated those individuals at the earliest possible opportunity—the precise issue in this case. Even among these locals, a highly disproportionate number were South Asian. Pls.' Ex. 1226 (between 2011 and 2015 TCS's local workforce was on average 54.8% South Asian). Additionally, as addressed in Section III(B)(1) below, the Court erroneously excluded a

significant amount of evidence demonstrating that TCS discriminated in its local hiring, which would have further rebutted this argument.

Third, TCS sought to recast the leadership directive as having no impact, or even helping, locals. *See* Tr. 348:10-349:13, 1320:25-1321:4. But TCS was unable to produce a single contemporaneous document suggesting that the leadership directive concerned locals. Rather, all leadership directive documents introduced at trial reflected a concerted effort to maximize the use of TCS's workers from India in the U.S. Pls.' Ex. 2, 9; Pls.' Ex. 23 ("I have connected with some of you regarding the expatriates travel back to India. Given the current situation we want to utilize the visa ready associates in the geography fully."); Pls.' Ex. 28 at 1 ("Why is the person travelling back [to India]. As per recent Management decision we have been advised to hold on to any offshore travel back and re-deploy them at onsite if they are getting released."). Moreover, after the directive was implemented, TCS's own attrition analyses reflect that local attrition rates increased precipitously. Tr. 330:9-331:1, 332:12--22, 333:21-24, 335:3-8; Pls.' Exs. 561, 541-2, 548-2, 545-2. Mr. Ganapathy, who was unaware of the leadership directive, testified that this increase was concerning. Tr. 200:6-12. And Mr. Srinivasan implausibly dismissed the negative effects of the leadership directive as a mere "coincidence." Tr. 468:8-469:9.

Fourth, through Mr. Seetharaman's improper hearsay testimony (discussed further below), TCS presented testimony that a handpicked group of 845 local employees coded as being terminated for being unallocated were actually terminated for other reasons, such as being unwilling to relocate or performance problems. Tr. 1537:16-1539:11. But Mr. Seetharaman admitted that this testimony, even if true, is not probative of the underlying issue of non-South Asian employees being terminated at a disproportionate rate. Tr. 1648:8-23; Pls' Exs. 583B, 1214. And Plaintiffs' statistical and anecdotal evidence demonstrated that South Asian expats were effectively un-fireable, regardless of their mistakes. *See, e.g.*, Pls.' Ex. 51 at 3-4 (listing host of serious performance problems for expat ("deleted entire historical record") who was given another chance because TCS was going "extremely conservative on sending back visa ready associates"); Tr. 722:14-724:14 (discussing reassignment of Indian expat despite the fact that he caused a three-hour outage of American Airline's network), 1222:17-20 (noting that only expat terminated in the U.S. that Ms. Blandford

was aware of was "arrested at the client's site for child pornography"). Finally, Mr. Seetharaman's testimony conflicted with TCS's own data coding. All 845 individuals whose termination forms he purported to summarize were coded as being terminated for being unallocated. Tr. 1531:23-1532:9, 1533:3-4. The summary of purported actual reasons were simply cherry-picked excuses prepared for trial with the help of trial counsel, and were not credible. *See* Tr. 1646:3-25, 1647:6-8, 1647:25-1648:10; Hr'g Tr. 122:2-8 (Oct. 12, 2018) (Dkt. #594) (discussing "cherry-picked" nature of purported terminations form summary, and noting that "I didn't think the summary was consistent with what I saw in the documents").

**B. Incorrect Evidentiary Rulings Lead to an Unjust Result.**

Incorrect evidentiary rulings require a new trial, either independently or cumulatively. A new trial is appropriate where the district court incorrectly excluded "evidence directly probative of the defendant's discriminatory bias and pretext" and the evidence "was not merely tangential or cumulative; rather, it was directly probative of the central issues in dispute." *Obrey*, 400 F.3d at 701-02. Likewise, a new trial is appropriate where a court incorrectly admits significant hearsay evidence. *See Larez v. Los Angeles*, 946 F.2d 630, 642, 644 (9th Cir. 1991).

**1. The Court's Ruling Excluding Evidence of Race and National Origin Discrimination in Hiring Was Incorrect and Prejudicial.**

The Court's *per se* exclusion of all evidence of discrimination against non-South Asians and non-Indians in hiring was prejudicial error, warranting a new trial.

Relevant evidence is any evidence tending to make the existence of any consequential fact "more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Under Rule 401, [a] district court's admission of evidence regarding [an employer's other acts of discrimination is] proper if the evidence made it 'more or less probable'" that the defendant discriminated on the basis of the protected trait. *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 897 (9th Cir. 1994). "In the context of a racial disparate treatment claim, admissible background evidence must be relevant to determine 'the ultimate question: whether … the defendant intentionally discriminated against [employees] because of [their] race.'" *Lyons v. England*, 307 F.3d 1092, 1110 (9th Cir. 2002) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). Other discriminatory acts based on the same protected trait are relevant if they bear on that ultimate

question in dispute—the basis upon which TCS discriminated. *Farmer Bros. Co.*, 31 F.3d at 898 ("Because hostility against women underlies decisions to discharge or to refuse to hire women because of their gender, evidence of sexual harassment often will be relevant to claims of gender-based employment discrimination.").

Relevant evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice. Fed. R. Evid. 403. The inquiry "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008) (holding that other employees' testimony that they were discriminated against is not "per se admissible or per se inadmissible," but its relevance "is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case"). *Mendelsohn* requires an individualized evaluation of each piece of evidence because "[r]elevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad *per se* rules." *Id.* at 387-88 ("had the District Court applied a *per se* rule excluding the evidence" it would have "abused its discretion").

TCS moved to exclude all evidence and argument of discrimination in hiring, and other non-termination adverse employment actions, arguing that such evidence was irrelevant. TCS's MIL No. 9 at 1-3, 5 (Dkt. #531). Plaintiffs opposed, arguing that evidence of other acts of discrimination premised on the same protected trait was highly relevant to TCS's discriminatory intent and a general attitude permissive of hostility to non-South Asians. *See* Pls.' Opp'n to MIL No. 9 at 2 (Dkt. #556). In addition, Plaintiffs argued that the evidence rebutted two of TCS's key defenses: (1) that it had undertaken considerable efforts to increase local hiring (and thus lacked discriminatory intent against locals), and (2) that Plaintiffs' evidence demonstrated, at most, discrimination based on citizenship (*i.e.,* expats versus citizens) and not discrimination based on race or national origin. *Id.* at 2-3. Nevertheless, the Court granted TCS's motion and excluded all "evidence of discrimination in hiring." Pretrial Order No. 4 at 4 (Dkt. #592); Hr'g Tr. at 75:14 (Dkt. #594) ("So my ruling is that if it relates to hiring, it's out"). This exclusion was erroneous for at least four reasons.

First, the Court's *per se* exclusion of all "hiring" documents without individualized analysis of each document's relevance to the issues at trial violated *Mendelsohn.* 552 U.S. at 387-88. Under *Mendelsohn*, the admissibility of each piece of evidence under Rules 401 and 403 requires "a fact-intensive, context-specific inquiry," that depends on plaintiff's "circumstances and theory of the case," making *per se* rules improper. *Id.*

Second, evidence of discrimination against non-South Asian and non-Indian in hiring is centrally relevant to Plaintiffs' claims. Ultimately, Plaintiffs' claims concern discrimination in TCS's project staffing, which is accomplished through (a) selecting internal candidates for projects, or (b) hiring new candidates from the market. *See, e.g.*, Tr. 1098:14-18 ("we will always look internally first … then we will go to the local market"). Discrimination in one element of TCS's staffing process is plainly relevant to discrimination in the other. Yet the Court excluded broad swathes of documents without any individualized inquiry that reflect an express preference for hiring "Indian" or "Desi"[11] candidates. *See* Pls.' Prelim. Ref. No. 117 (Dkt. #531-1); Pls.' Prelim. Ref. Nos. 703, 704, 707, 708, 709, 710, 711, 712, 714, 716, 720, 725, 841 (Dkt. #531-2). Other excluded documents refer to TCS employees by their race or national origin. *E.g.*, Pls.' Prelim. Ref. No. 721 (Dkt. #531-2) ("my best Indian is on it"); Pls.' Prelim. Ref. No. 722 (Dkt. #531-2) ("My little white kids are on it"); Pls.' Prelim. Ref. Nos. 719; 724; 728 (Dkt. #531-2). And others reflected flippant attitudes towards non-discrimination and diversity in employment matters. *E.g.*, Pls.' Prelim. Ref. No. 116 (Dkt. #531-1) (stating "[a]re they for real with this" in response to an email about diversity); Pls.' Prelim. Ref. Nos. 114, 115 (Dkt. #531-1). These documents all reflect a discriminatory animus of the type complained of in the suit and bear on the ultimate issue—whether TCS intentionally discriminated against non-South Asian and non-Indian employees. *See Farmer Bros. Co.*, 31 F.3d at 898; *Lyons*, 307 F.3d at 1110. Accordingly, these documents were both relevant and so central to Plaintiffs' case—discrimination in staffing projects—that their probative value could not have been

---

[11] Desi is a racial designation that refers to South Asians who live outside the Indian Subcontinent. *Desi*, OXFORD LIVING DICTIONARIES: ENGLISH, https://en.oxforddictionaries.com/definition/desi (last accessed October 3, 2018); SHALINI SHANKAR, DESI LAND 1 (Duke University Press, 2008).

outweighed by any undue prejudice. *See Obrey*, 400 F.3d at 701-702 (reversing judgment based on "erroneous exclusion of evidence directly probative of defendant's discriminatory bias and pretext").

Third, the evidence rebutted one of TCS's key defenses—its lack of discriminatory intent based on its significant increase in local hiring since 2011. For example, at trial, Mr. Ganapathy testified that:

> [S]ince 2011 … both in absolute numbers [and] also as in proportion, the number of local hires has increased during this period. In fact, this shows in FY 16 we were at 29 percent of local hires. Today we are at about 41, 42 percent of local hires.

Tr. 1321:9-17. Mr. Seetharaman then testified regarding TCS's growth from about 4,000 locals in 2012 to over 14,000 locals today, and TCS introduced a chart depicting this growth. Tr. 1541:14-25; Def.'s Ex. 3404. TCS then addressed this increase extensively in its closing, arguing that the company had made "a 400 percent increase since 2011 in TCS's local population. That is a huge, huge jump. That is a lot … of local hiring." Tr. 1843:4-20, 1869:11-15 (citing Def.'s Ex. 3404). Further, TCS argued that it had "invested over a hundred million dollars since Mr. Kant became president in retaining and hiring local employees…. Why would Mr. Kant spoil that hundred million dollar investment by entering into some scheme that plaintiffs allege to discrimination against local hires…?" Tr. 1842:2-15. By excluding Plaintiffs' hiring related evidence, the Court foreclosed Plaintiffs from responding to TCS's arguments by showing that TCS's discriminatory preference for South Asians from India extended to its increase in local hiring and thus rebutting its argument that such local hiring demonstrated a lack of discriminatory intent. *Cf. Gen. Tel. Co.*, 885 F.2d at 578 ("Thus, facilitating one-sided presentation of a defense prevents the factfinder from getting 'the full picture' of a defendant's conduct by precluding the plaintiff from enjoying a fair opportunity to challenge the evidence and the defendant's theory in offering it.").

Fourth, the evidence rebutted another of TCS's key defenses by demonstrating that TCS's true discriminatory animus was based on race and national origin, and not citizenship. At TCS's request (and over Plaintiffs' objections), the jury was prominently asked to determine whether TCS discriminated on the basis of race or national origin, and was instructed that discrimination solely on the basis of citizenship or visa status was not the same. *See* Jury Instructions at 5 (Dkt. #668); *see also* Verdict Form (Dkt. #673). While much of Plaintiffs' evidence used the terms "expats" or "visa

ready" individuals (who are over 99% Indian), much of the excluded evidence referred to "Indians" or "Desis," demonstrating that even when hiring locally, TCS's true preference was based on race and national origin, not simply visa status.

Because the evidence concerned central issues in dispute, including both Plaintiffs' claims and TCS's defenses, Plaintiffs were substantially prejudiced by the exclusion of this highly probative evidence, and TCS' cannot demonstrate otherwise, warranting a new trial. *See Obrey*, 400 F.3d at 701-02.

**2. The Court Improperly Permitted Summary Testimony from Mr. Seetharaman.**

The Court's decision to permit Ashok Seetharaman to testify, in summary fashion, regarding the content of TCS's inadmissible termination forms was prejudicial error warranting a new trial.

Hearsay is inadmissible. Fed. R. Evid. 802. Even if a document satisfies the requirements of Fed. R. Evid. 803(6)(A)-(D),[12] "it may still be excluded if 'the source of information or the method or circumstances of preparation indicate lack of trustworthiness.'" *Waddell v. Commissioner*, 841 F.2d 264, 267 (9th Cir. 1988) (quoting Fed. R. Evid. 803(6)(E)). "Courts are rightfully wary when parties create self-serving documents and seek to offer them as business records." *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1046 (9th Cir. 1999).

While voluminous writings may be summarized under Rule 1006, "[t]he proponent" of such a summary must "establish that the underlying materials upon which the summary is based are admissible in evidence." *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988); *Pac. Radiation Oncology, LLC v. The Queen's Med. Ctr.*, No. 12-00064, 2017 U.S. Dist. LEXIS 4043, at *21 (D. Haw. Jan. 11, 2017) (permitting "summary testimony" provided summarized documents are admissible). Thus, a summary that contains hearsay is inadmissible under Rule 1006. *Paddock v. Dave Christensen, Inc.*, 745 F.2d 1254, 1260-61 (9th Cir. 1984).

As discussed in Plaintiffs' Motions in Limine 7 and 8, TCS's termination forms are litigation-driven documents lacking in any indicia of reliability, and thus inadmissible. For instance, the forms

[12] Plaintiffs do not concede that TCS's termination files satisfy the requirements of Fed. R. Evid. 803(6)(A)-(D). For example, the "documentation" accompanying the forms consists of a jumble of emails, screen shots, and other miscellaneous materials that purport to "document" the termination process. These ad hoc materials are not kept in the course of a regularly conducted business activity, nor are they a regular practice of that business activity.

are never shared with the employees in question, are created for counsel's review and input (many were even produced with privilege redactions or withheld entirely), often contain multiple levels of hearsay, and are intended for use in litigation to justify the employees' terminations. *See* Pls.' MIL No. 7 at 2 (Dkt. #525) (seeking exclusion of forms); Ex. 254 at 2 ("Legal team … has been repeatedly advising us to beware of weak documentation, coupled with the risk of mass separations"). The termination forms are functionally indistinguishable from the accident report prepared by a railroad employee and found inadmissible in *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943), or the trust-fund audit in *Paddack*, 745 F.2d at 1260; Hr'g Tr. at 54:5-20 (Dkt. #594) ("Documents which are created for purposes and the potential of litigation do not have the level of credibility and reliability that one needs to make it past the Hearsay Rule").

Similarly, the purported summaries created from those forms for use in this litigation are deeply flawed and untrustworthy. For instance, the summaries misconstrued and misquoted the underlying termination form documents and contained purported termination reasons cherry-picked by TCS that often were not even contained in the underlying documentation. *See* Pls.' MIL No. 8 at 2-3 (Dkt. #527) (seeking exclusion of summaries); Hr'g Tr. at 122:2-8 (Dkt. #594) (discussing "cherry-picked" nature of purported terminations form summary, and noting that "I didn't think the summary was consistent with what I saw in the documents"). Accordingly, the Court properly excluded both the forms and TCS's purported summaries. Pretrial Order No. 6 (Dkt. #605).

Yet, over Plaintiffs' objection, the Court permitted Ashok Seetharaman to "testify generally to the [termination] reasons that were in [the forms]" and "give some general statements with respect to the nature of the reasons … to show lack of discriminatory intent." Tr. 1536:9-21. He then testified in summary fashion regarding the content of 845 forms from individuals coded as terminated for being unallocated. The summary was prepared for trial with the assistance of trial counsel. Tr. 1646:3-25, 1647:6-8, 1647:25-1648:10. Mr. Seetharaman did not even personally review all of the forms himself or have any personal knowledge of accuracy of the documents supporting the forms. Tr. 1566:12-13 ("If you ask me if I did all the 845 myself? No. I had a team that … helped me do this"); Tr. 1566:14-1567:3. Yet he testified that "a majority" of the terminated individuals had relocation restrictions, "quite a few" were released based on customer escalation or performance

issues, "a few" had abandoned their jobs or violated TCS policies, "a majority" were terminated or released because the client ended their role, and "a vast majority" were released or terminated for more than two reasons. Tr. 1537:23-1539:13.[13] His testimony was simply summarized hearsay and therefore inadmissible. *See Meyers*, 847 F.2d at 1412.

The forms were also irrelevant to Phase One, and inadmissible on that basis as well. *See* Fed. R. Evid. 402. The Ninth Circuit has explained that, at the liability phase of a *Teamsters* proceeding, the defendant is not "entitled to introduce individualized evidence that each of its employment decisions was motivated by a legitimate nondiscriminatory reason," as it was required instead to rebut Plaintiffs' class-wide statistical proof. *Beck v. Boeing*, 60 F. App'x 38, 39 (9th Cir. 2003); *Teamsters*, 431 U.S. at 343 n.24 (noting that "affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion," and "that individual proof concerning each class member's specific injury was appropriately left to proceedings to determine individual relief") (citation omitted); *accord Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1107 (10th Cir. 2001). This makes sense, as the purpose of Phase Two is to resolve individualized defenses and to permit the individual class members to be heard. *See Teamsters*, 431 U.S. at 361. Mr. Seetharaman's litigation-driven summary of TCS's termination forms simply summarized TCS's individual termination decisions and denied the class members an opportunity to respond (which was particularly important given the significant inaccuracies with both them forms and summaries). *Cf. Gen. Tel. Co.*, 885 F.2d at 578.

This evidence was central to TCS's case. TCS discussed it extensively in both its opening and closing. For instance, in its opening, TCS discussed the issue extensively and displayed a series of slides (over Plaintiffs' objections)[14] summarizing the forms. Tr. 61:19-63:24. TCS then discussed the content of the forms extensively in closing, explaining that "Dr. Neumark cannot opine on the critical element of their claims which is intent to discrimination … if you really want to know why

---

[13] Throughout this questioning, TCS counsel misleadingly conflated project "releases" and "terminations" from the company.

[14] The Court excluded these very slides in Pretrial Order No. 6 but overruled Plaintiffs' objections to their use in TCS's opening. *See* Minute Order (Dkt. #630) (noting denial of Dkt. #627).

locals were terminated in this case," you need to look at Mr. Seetharaman's termination form "analysis." Tr. 1855:8-1858:24.

Given that the evidence, by TCS's own account, concerned "a critical element of [Plaintiffs'] claims," Tr. 1855:9-11, its improper admission was highly prejudicial and warrants a new trial. *See Obrey*, 400 F.3d at 701-702 (reversing judgment based on "erroneous exclusion of evidence directly probative of defendant's discriminatory bias and pretext"). TCS cannot demonstrate otherwise. *See id.* at 701 (beneficiary of admission bears burden to show lack of prejudice). Moreover, the prejudice of the admission of this evidence must be considered cumulatively with the exclusion of Plaintiffs' evidence concerning hiring discrimination, making a new trial all the more necessary. *See Jerden*, 430 F.3d at 1240-41.

## IV. CONCLUSION

For the forgoing reasons, Plaintiffs' Motion for a New Trial should be granted.

Dated: January 15, 2019

KOTCHEN & LOW LLP

By: /s/ Daniel Kotchen
Daniel Kotchen (*pro hac vice)*
Daniel Low (SBN 218387)
Michael von Klemperer (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
Amy M. Roller (*pro hac vice*)
KOTCHEN & LOW LLP

*Attorneys for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system.

Dated: January 15, 2019

By: /s/ Daniel Kotchen
Daniel Kotchen