United States District Court
Northern District of California

1

2

3          **UNITED STATES DISTRICT COURT**

4          **NORTHERN DISTRICT OF CALIFORNIA**

5

6    **CHRISTOPHER SLAIGHT, ET AL.,**                CASE NO. 15-cv-01696-YGR

7              Plaintiffs**,**

8              vs.                                    **ORDER DENYING PLAINTIFFS' MOTION**
                                                      **FOR A NEW TRIAL**
9    **TATA CONSULTANCY SERVICES, LTD,**              Re: Dkt. No. 697

10             Defendant**.**

11

12         On November 28, 2018, following a twelve-day trial, a jury of nine rendered a unanimous

13   verdict in favor of the defendant in the above-captioned matter.  (*See* Dkt. No. 673 ("Verdict").)

14   Now before the Court is plaintiffs' motion for a new trial, pursuant to Federal Rule of Civil

15   Procedure 59.  (Dkt. No. 697 ("Motion").)  Therein, plaintiffs contend that (1) the jury returned a

16   verdict against the great weight of the evidence and (2) incorrect evidentiary rulings led to an

17   unjust result.  (*Id.* at 4, 16.)  Having carefully considered the papers submitted, the Court's own

18   observations in presiding over the trial and all pretrial motion practice, and for the reasons set

19   forth more fully below, the Court hereby **DENIES** plaintiffs' motion for a new trial.

20         **I.      BACKGROUND**

21         The basic background of this case is not in dispute and is well-known to the parties.  The

22   Court will not repeat it here.  Christopher Slaight, Seyed Amir Masoudi, and Nobel Mandili, on

23   behalf of themselves and on behalf of others similarly situated, claimed disparate treatment under

24   Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq*., and the Civil Rights Act of

25   1866, 42 U.S.C. 1981 against Tata Consultancy Services, Ltd. ("TCS").  (Dkt. No. 246 ("4AC") ¶

26   5.)  The Court certified a "Termination Class" under Federal Rule of Civil Procedure 23(b)(3),

27   with these plaintiffs as its representatives.  (Dkt. No. 244 ("Omnibus Order") at 30-39.)  Following

28   some modification, the class was defined as:

> All individuals who are not of South Asian race or Indian national origin who were employed by [TCS] in the United States, were subject to a policy or practice of benching and allocation, were placed in an unallocated status and were terminated between April 14, 2011, and [December 27, 2017] and who are not bound by an arbitration agreement with TCS.

(Dkt. No. 412 at 16 (alterations in original, emphasis omitted).)[1]

On November 2, 2018, the case proceeded to trial. (*See* Dkt. Nos. 630, 631.) The fact questions at issue included whether TCS had a pattern and practice of intentionally discriminating on the basis of race against non-South Asian employees, or on the basis of national origin against non-Indian employees, who were benched and then terminated. (*See* Verdict at 2; Dkt. No. 668 ("Jury Instructions") at 5.) As the Court instructed the jury, plaintiffs "had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure[, that is] the regular rather than the unusual practice." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977); *see also* Jury Instructions at 5.

At trial, each side presented one expert witness and numerous lay witnesses, all of whom discussed scores of exhibits. (*See* Dkt. Nos. 676-678.) The jury deliberated over two days before rendering a unanimous verdict in favor of TCS. (*See* Dkt. No. 676 ("Trial Sheet") at 1-2, 20-21; Verdict.) The Court observed during trial that the jurors worked very hard throughout the trial to determine how to resolve the parties' factual disputes. They paid close attention to the exhibit screens and the witnesses; many took extensive notes; jurors posed dozens of questions during trial; and the jury deliberated for approximately eight hours. (*See* Dkt. No. 674 ("Jury Notes") at 2-25; Dkt. No. 687 at 1919-20.) No hint of any irregularity arose.

The Court entered judgment on the verdict on December 18, 2018. (Dkt. No. 683 ("Partial Judgment").) The instant motion followed.

\\

---

[1] The Court denied certification of a distinct "Hiring Class," which plaintiff Brian Buchanan sought to represent, consisting of non-Indian, non-South Asian persons not hired by TCS in the same timeframe. (*See* Omnibus Order at 34-35.) The Court later bifurcated Mr. Buchanan's individual claim for separate trial. (*See* Dkt. Nos. 412, 695.) Mr. Buchanan's claim has since settled in principal and the parties are currently engaged in finalizing the relevant agreement. (*See e.g.*, Dkt. No. 727.)

1    **II.    LEGAL STANDARD**

2         Under Federal Rule of Civil Procedure 59(a)(l), the court may grant a new trial "on all or

3    some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been

4    granted in an action at law in federal court."  Because "Rule 59 does not specify the grounds on

5    which a motion for a new trial may be granted," district courts are "bound by those grounds that

6    have been historically recognized."  *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th

7    Cir. 2003).  Those grounds include (1) a verdict that is contrary to the weight of the evidence, (2) a

8    verdict that is based on false or perjured evidence, (3) that damages are excessive, or (4) to prevent

9    a miscarriage of justice.  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).  Erroneous

10   evidentiary rulings and errors in jury instructions are also grounds for a new trial.  *See Ruvalcaba*

11   *v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995); *Murphy v. City of Long Beach*, 914

12   F.2d 183, 187 (9th Cir. 1990).

13   **III.    DISCUSSION**

14        In plaintiffs' instant motion for a new trial, they contend that (A) the jury returned a verdict

15   against the great weight of the evidence and (B) incorrect evidentiary rulings led to an unjust

16   result.  (Motion at 4, 16.)  The Court will address both in turn.

17   **A.  Challenge to Jury's Verdict**

18        When reviewing a motion for a new trial based on a verdict contrary to the weight of the

19   evidence, the court is "not required to draw all inferences in favor of the verdict and [can] reweigh

20   the evidence and make credibility determinations."[2] *Experience Hendrix LLC v.*

21   *Hendrixlicensing.com*, 762 F.3d 829, 845 (9th Cir. 2014).  Instead, a new trial should be granted

22   only where, after "giv[ing] full respect to the jury's findings, the judge on the entire evidence is

23   left with the definite and firm conviction that a mistake has been committed" by the jury, or by

24

25        [2] Plaintiffs correctly point out the court's power on a new trial motion to evaluate witness
26   credibility, but they make no specific argument as to why the Court should find any particular
     testimony more or less believable.  In all events, having closely observed all of the witnesses (and
27   reviewed the admitted exhibits as they were presented at trial to those witnesses), the Court finds
     no reason to disturb the jury's apparent choice to place more weight on testimony presented for
28   TCS than on testimony presented for plaintiffs.

3

United States District Court
Northern District of California

1    both the jury and the Court. *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1365

2    (9th Cir. 1987) (affirming denial of new trial); *see also Murphy v. City of Long Beach*, 914 F.2d

3    183 (9th Cir. 1990) (affirming grant of a new trial where the district court determined not only that

4    a negligence verdict was against the clear weight of the evidence, but also that it had made two

5    serious errors in the jury instructions).

6    Plaintiffs argue that they presented (1) compelling statistical evidence of discrimination

7    that TCS failed to rebut as well as (2) documentary and anecdotal evidence that corroborated the

8    disparities identified in their statistical evidence for which TCS failed to offer a viable non-

9    discriminatory explanation. The Court addresses each argument, as well as (3) TCS's affirmative

10   evidence and (4) additional failures in plaintiffs' affirmative case.

11           1.   Plaintiffs' Statistical Evidence

12   In support of their challenge to the jury's verdict, plaintiffs point primarily the testimony of

13   their labor economics expert Dr. David Neumark, namely his statistical analysis and resulting

14   opinion that "[t]he data on terminations and terminations from the bench are very statistically

15   strongly consistent with discrimination." (Motion at 8 (citing Trial Transcript at 101:17-19).)

16   Plaintiffs characterize this statistical evidence as "overwhelming" and contend that TCS was

17   therefore "required to present evidence showing that plaintiffs' statistics were inaccurate or

18   statistically insignificant, or explain the disparities as the product of a legitimate,

19   nondiscriminatory selection criterion that he failed to present. (*Id.* at 9 (citing *Teamsters*, 431 U.S.

20   at 360; *Palmer v. Shultz*, 815 F.2d 84, 92 (D.C. Cir. 1987)) (internal quotations omitted).)

21   Plaintiffs describe their statistical evidence as reflecting "shockingly high" and statistically

22   significant disparities in TCS's workforce composition and termination rates between South Asian

23   and non-South Asian employees and assert that this evidence is therefore enough to shift the

24   burden to TCS under the *Teamsters* framework. (Motion at 7-8.) However, plaintiffs' motion

25   does not account for, or acknowledge, the evidence presented at trial that undermined Dr.

26   Neumark's testimony.

27   First, during cross-examination on the first day of trial, Dr. Neumark confirmed that his

28   opinions represented his third of three findings of statistics "consistent with discrimination" for

4

1   plaintiffs' counsel, Kotechn & Low LLP despite the fact that he also described the findings as

2   "unlike anything I almost ever see[s.] (Trial Transcript at 103:22-25; 78:11-14.) The cross-

3   examination significantly undermined Dr. Neumark's credibility and his conclusions. This is

4   especially poignant in a case such as this, where the analysis underlying Dr. Neumark's opinion

5   does not lend itself to independent evaluation by the jury.

6           Second, shortly thereafter, Dr. Neumark said that he limited the data in his analysis to TCS

7   employees who were merely coded as "unallocated" in TCS's system and therefore his did not

8   consider or account for why the employees whose data analyzed had become "unallocated." (*Id.*

9   at 109:20-110:4.) Reasonable jurors could easily infer that Dr. Neumark's statistical analysis

10  chose to ignore defendant's primary explanations for the results namely an employee's

11  unwillingness to relocate and the lack of suitable qualifications.

12          Finally, several of TCS's witnesses testified that Dr. Neumark's U.S. terminate rate

13  analysis and the resulting disparities between "local attrition" and "expat attrition" did not reflect

14  an accurate comparison. Specifically, they testified that there is almost no such thing as "expat

15  attrition" in TCS's U.S. workforce (except in the most extreme circumstances, such as

16  imprisonment or death) because expats' deputation agreements "prevent them from being

17  terminated in the U.S. . . . ." (*Id.* at 1326:24-1327:25 (Ganapathy); *id.* at 1221:4-1223:7

18  (Blandford).) Given the issues with Dr. Neumark's testimony, the Court is not at all convinced

19  that the jury's verdict was a mistake.

20          Moreover, TCS offered their own labor economics expert, Dr. Edward Lazear, who

21  presented an alternative statistical approach. Dr. Lazear compared TCS's actual rate of

22  involuntary termination for non-South Asian locally-hired employees (like plaintiffs) of 7.3%, and

23  with the national average for a corresponding group of 25.8%. (Trial Transcript at 1432:20-

24  1433:8.) Dr. Lazear opined that this data was inconsistent with a pattern of discrimination because

25  any company intending to discriminate against such employees should have a termination rate

26  higher than the national figure, not one-third of the national figure. (*Id.* at 1434:8-24.) As they

27  did on cross-examination at trial, plaintiffs criticize Dr. Lazear's approach but do not present

28  evidence or argument that his testimony should be disregarded in its entirety. (Motion at 9-10.)

5

1          2.   Plaintiffs' Corroborating Evidence

2          In terms of corroborating evidence, plaintiffs point primarily to the "'leadership directive,'

3    pursuant to which TCS's expats [mostly Indian and South Asian] were to be utilized in the U.S.

4    'to the maximum extent' permissible under their visas."  Motion at 11 (citing Trial Exs. 2, 9, 23,

5    28; Trial Transcript at 427:16-24.)  TCS presented evidence rebutting the inference that this

6    directive constituted evidence of discrimination.  First, TCS's trial representative Balaji

7    Ganapathy testified that maximizing the use of each visa was only one aspect of a larger company

8    strategy to fuel growth by retaining *all* employees it could.  (Trial Transcript at 1316:1-1322:11;

9    *see also id.* 1191:22-1198:13 (Blandford discussed specific efforts to improve retention of locals);

10   Trial Transcript 1325:6-1326:8 (same for Ganapathy; local attrition reduced to 18% by time of

11   trial, and TCS aimed to push it lower).)  Second, TCS presented evidence that maximizing the

12   value TCS obtained from each visa did not mean taking jobs from local U.S. workers.  (Trial

13   Transcript at 1320-1321.)  Plaintiffs never explained how TCS would engage in a pattern of

14   discrimination where TCS had more jobs to fill than qualified and willing employees to fill them.

15   (*Id.* at 1539:21–1540:13.)  The Court finds that a reasonable jury could have determined, based on

16   this evidence, that the leadership directive failed to establish, or a support, a finding of

17   discrimination.

18         Plaintiffs also argue that testimony of named plaintiffs and other class members and

19   various emails constituted anecdotal evidence of discrimination.  (Motion at 11, 13.)  While true,

20   cross-examination also revealed that many of the named plaintiffs' and class members had

21   location or other concerns with respect to allocation.  (*See* Trial Transcript 589:8-597:10 (plaintiff

22   Massoudi argumentatively denying that he was removed from TCS's Apple account at Apple's

23   request because he had been argumentative and stating that TCS "never offered [him] anything"

24   immediately before conceding that TCS offered him a position in Walnut Creek, which he turned

25   down due to the commute).)  The Court finds that a jury could reasonably discount much of this

26   testimony purporting to present evidence of actual discrimination with respect to allocation.

27   \\

28   \\

6

### 3. TCS's Affirmative Evidence

The Court recognizes that in support of the verdict, TCS presented affirmative evidence that it did not discriminate at all, much less intentionally. TCS witnesses, including executives and talent-engagement managers, testified that company policy and practice were to treat locals and expats equally, and internal job placement was driven by employees' skills and experience, as well as their availability for a new project (based on the expected end of a current role) and if practicable, employees' location preferences. (*See*, *e.g*., Trial Transcript at 1322:7-1323:24 (Ganapathy); *id.* at 351:1-13 (Kant); *id.* at 1098:14-1099:15 (Gwalani); *id.* at 1107:21-1109:5 (Gwalani, also explaining the few instances where a role may legitimately need a local or an expat).

TCS also highlighted two non-discriminatory factors contributing the Indian and South Asian majority in TCS's U.S. workforce. First, TCS witnesses testified that the U.S. education system produces fewer than half the computer science graduates that the I.T. industry demands each year for entry-level jobs. (Trial Transcript at 1331:4-1332:21.) Second, locals demonstrate far greater resistance to TCS's universal requirement, as an I.T. consulting business, that employees should relocate if the best role for them required it. Executives testified that the "refusal to relocate" is TCS's largest challenge in placing local hires (*id.* at 1104:3-11)—who by definition always have a U.S. home—and that this is the single largest reason why "unallocated" employees are terminated (*id.* at 346:20 – 347:5).

Additionally, and as acknowledged by plaintiffs, "TCS presented testimony that its local workforce increased in number and as a percentage of its overall workforce between 2011 and 2017." (Motion at 14 (citing Trial Transcript at 1321:9-17, 1541:14-25).) Although plaintiffs argue that TCS's work force became more local over time only because of the scarcity of H-1B and L-1 visas, a reasonably factfinder could also infer from this evidence that TCS had no practice of discriminating in favor of South Asians or Indians.

This additional evidence supports the jury's decision.

\\

\\

7

1          4.   Failures in Plaintiffs' Affirmative Case

2          Plaintiffs' theory of discrimination relied on their contention that TCS intentionally

3   displaced class members by assigning Indian or South Asian employees to jobs that class members

4   were successfully filling or could have filled, resulting in class members' terminations from the

5   bench.  But that theory ignored the undisputed evidence that TCS had more jobs to fill nationwide

6   than qualified and willing employees to fill them.  (*See* Trial Transcript 1539:21 – 1540:13; *see*

7   *also* Trial Transcript 291:13-19 (indicating that it would not make economic sense to fail to map

8   any TCS employee to customer requirements).)  Further, in the final analysis, defendant had no

9   motive to discriminate, rather, as the Court identified in commenting on the verdict; the economic

10  model promoted the contrary:

> … I couldn't tell you what that jury was going do.  But there was a question that
> you never answered on the Plaintiffs' side and which I suspect might have been
> the reason for their verdict, and that is, what was the motive?  When you have
> more jobs available than people applying and the Defendant makes money every
> time they put someone in that position, what is the motive [for discriminatory
> termination]?  That question was never answered in this case.

(Trial Transcript at 1920.)  In sum, the Court finds it was not contrary to the clear weight of the

evidence for a reasonable fact finder to determine that TCS's case was more persuasive than

Plaintiffs'; nor does the Court find any basis to conclude that a definite or firm basis supports the

finding of any mistake.

**B. Challenge to the Court's Evidentiary Rulings**

To prevail on a motion for new trial based on evidentiary rulings, plaintiffs must persuade

the Court that either or both of the challenged rulings was an abuse of the Court's broad discretion

in such matters. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995)

(affirming denial of new trial; district court was within its discretion to permit limited testimony

on defendant's criminal history, where officer's knowledge of it was relevant to excessive-force

claim).  Further, "[a] new trial is only warranted on the basis of an incorrect evidentiary ruling if

the ruling substantially prejudiced a party." *United States v. 99.66 Acres of Land*, 970 F.2d 651,

658 (9th Cir. 1992).  Plaintiffs argue that two of the Court's evidentiary rulings, either

independently or cumulatively, were incorrect and necessitate a new trial: (1) the Court's ruling

8

1    granting in part TCS's motion *in limine* No. 9, thereby excluding evidence of discrimination in

2    hiring from plaintiffs' case-in-chief; and (2) the Court's ruling permitting testimony from Ashok

3    Seetharaman providing an overview of TCS's termination forms.

4                    i.    Plaintiffs' Exhibits Purporting to Show Hiring Discrimination

5         Responding to plaintiffs' list of proposed exhibits, TCS's Motion in Limine No. 9 argued

6    that "[t]o avoid long 'mini-trials' over irrelevant claims and parties, plaintiffs should be precluded

7    from presenting any evidence … regarding: (1) adverse employment actions other than benching

8    and termination decisions (meaning that evidence of failure to promote or other alleged adverse

9    actions would be excluded); (2) claims relating to non-parties; and (3) theories of discrimination

10    other than race and national origin." Dkt. No. 531, p. 2.   The Court granted one portion of that

11    motion, giving rise to the current argument:

          *The motion is GRANTED IN PART as to evidence of discrimination in hiring* and
12        DENIED IN PART as to the remaining evidence, including evidence non-hiring
          discrimination against non-class members. To the extent that parties cannot agree
13        whether a particular piece of evi[de]nce relates to hiring discrimination, they may
          raise the issue with the Court at trial.[3]
14

15    Dkt. No. 592, pp. 4-5.

16         In support of the instant motion, plaintiffs first argue that the Court's "*per se* exclusion of

17    all 'hiring' documents without individualized analysis" of each document violated the Supreme

18    Court's rule in *Sprint/United Mgmt. Co. v. Mendelsohn.*  (Motion at 18 (citing 552 U.S. 379, 387-

19    88 (2008)).)  Second, plaintiffs reiterate the same relevance arguments they made, and lost, in

20    opposition to defendant's Motion in Limine No. 9, which themselves represented a repetition of

21    the arguments they made, and lost, in opposing bifurcation of plaintiff Buchanan's discrimination-

22    in-hiring claim from this termination-class trial.  (*Compare* Motion at 16-20 *with* Dkt. No. 556 at

23    2-4 *with* Dkt. No. 364 at 11-12.)  Plaintiffs argue that evidence of discrimination against non-

24

25             [3]  The Court notes that it did permit plaintiffs to elicit some evidence alleging
26    discriminatory hiring practices from TCS's corporate representatives.  (*See* Trial Transcript 378-
      384; 248:13-250:3; 267:20-269:1; 170:23-173:13.)  For example, the Court allowed plaintiffs to
27    question Mr. Ganapathy about resumes being 60% Indian males, but new hires being 90% Indian
      male and whether he knew of any reason for that disparity as well as whether TCS ever
28    implemented hiring quotas to correct racial imbalances pursuant to a suggestion from a prior Vice
      President of Human Resources.  (Trial Transcript at 376:6-378:6.)

United States District Court
Northern District of California

1   South Asian and non-Indian individuals in "hiring" is "centrally relevant to" plaintiffs' claims of

2   discrimination in "firing" because those claims center around project staffing, "which is

3   accomplished through (a) selecting internal candidates for projects or (b) hiring new candidates

4   from the market." (Motion at 18.) Plaintiffs further contend that the evidence is also relevant

5   because it rebuts two of TCS's defenses – that TCS lacked discriminatory intent based on the

6   significant increase in local hiring since 2011 and that if TCS discriminated, it was on the basis of

7   citizenship not race or national origin. (*Id.* at 19.)

8         Plaintiffs do not persuade. The Court in *Mendelsohn* held that courts may not apply broad

9   legal rules to exclude entire categories of evidence without regard for the "particular case" before

10   them. *Mendelsohn*, 552 U.S. at 387-88. Here, the Court did not so exclude. Instead, the Court

11   grounded its decision to excluding documents related to hiring discrimination because the

12   particulars of this case. (*See* ECF 244 at 33.) The Court reviewed numerous representative

13   documents and made judgment calls based on the relevance and probative value related to the

14   termination case itself, having previously found insufficient common evidence to support a class

15   action for a "hiring" case. Plaintiff's attempt to recharacterize this review as a "per se" rule is

16   without foundation.[4]

17              ii.     Mr. Seetharaman's Overview of TCS's Termination Forms

18         On this issue, the Court granted almost all the relief sought by plaintiffs' Motions in

19   Limine Nos. 7 and 8 and did not allow TCS to introduce any of its termination forms, nor its

20   written summary of those forms reflecting the termination code "unallocated." (*See* Dkt. No.

21   605.) However, plaintiffs assert that the Court erred in allowing the following tightly

22   circumscribed testimony by Ashok Seetharaman, summarizing some of the substantive reasons

23   that those 845 employees became unallocated. Despite having precise numbers:

24         [Mr. Seetharaman] testified that "a majority" of the terminated individuals had
              relocation restrictions, "quite a few" were released based on customer escalation

25         or performance issues, "a few" had abandoned their jobs or violated TCS policies,

26

27          [4] The Court conducted the analysis despite repeated requests to the parties to focus and
reasonably narrow their anticipated trial exhibits. Here, plaintiffs submitted an exhibit list with

28   over 1,220 proposed exhibits, and defendant submitted a list of over 3,480 proposed exhibits.
(Dkt. Nos. 611, 612.)

"a majority" were terminated or released because the client ended their role, and
"a vast majority" were released or terminated for more than two reasons. Tr.
1537:23-1539:13.

Dkt. No. 697, page 27.

The Court rejects plaintiffs' contentions that this testimony was "summarized hearsay" or
the mere product of counsel-preparation. The testimony was fairly within the scope of Mr.
Seetharaman's knowledge as a manager. (*See, e.g.* Trial Transcript at 1566:16-18 ("I look at all
the documentation. Only when I am convinced that we have been fair to the employee, I will give
my approval.").) When asked "How many termination forms have you reviewed while acting as
TCS' Deputy Head of HR?" the witness answered: "Since January 2013, I've reviewed most of
the terminations to date." (*Id.* at 1529:25 – 1530:3.) Moreover, he explained that those forms are
the only source for anyone to learn the substantive reason or reasons that an employee coded in the
HR system as "unallocated" reached that status. (*Id.* at 1528-29.) In sum, the Court concluded
Mr. Seetharaman had adequate direct foundation to give the very limited testimony allowed, so
that such testimony brought no inadmissible hearsay before the jury.

### iii.    No Prejudice from Any Error

As set forth above, the Court is unpersuaded that it erred in either of the evidentiary rulings
raised by the motion. But even if either ruling were wrong, the Court finds that no such error
prejudiced Plaintiffs. As a threshold matter, the Court doubts Plaintiffs' proposition that it must
*presume* prejudice resulted from erroneous evidentiary rulings, requiring TCS to overcome such a
presumption by a showing that plaintiffs were *not* prejudiced by any such error.[5]

In any event, the Court independently concludes as follows:

---

[5] *See* Dkt. No. 697 at 9-10 (quoting *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005),
in turn citing *Haddad v. Lockheed Cal. Corp*., 720 F.2d 1454, 1459 (9th Cir. 1983)). It appears
TCS is correct that the Ninth Circuit has hewed to the contrary and more traditional rule since
*Shinseki v. Sanders*, 556 U.S. 396, 407–408 (2009). *See*, *e.g*., *Boyd v. City and County of San
Francisco*, 576 F.3d 938, 943 (9th Cir. 2009) ("A party seeking reversal for evidentiary error must
show that the error was prejudicial, and that the verdict was 'more probably than not' affected as a
result."); *Ollier v. Sweetwater Union High Sch. Dist*., 768 F.3d 843, 859 (9th Cir. 2014) ("a
showing of prejudice is required for reversal"); *Crowley v. Epicept Corp*., 883 F.3d 739, 752 (9th
Cir. 2018) (same); *Ludwig v. Astrue*, 681 F.3d 1047, 1054 (2012) ("Reversal on account of error is
not automatic, but requires a determination of prejudice . . . . The burden is on the party claiming
error to demonstrate not only the error, but also that it affected his 'substantial rights'. . . .").

11

1      First, even if it were an error to exclude plaintiffs' hiring-related exhibits, the verdict was

2   not likely affected by that exclusion. Accepting for the purpose of argument plaintiffs' assertion

3   that "[d]iscrimination in one element of TCS's staffing process is plainly relevant to

4   discrimination in the other," the exhibits discussed in the motion still reflect at most sporadic

5   comments by individuals concerning race or national origin. In light of all the evidence, the Court

6   does not conclude that such evidence would likely have affected the jury's assessment that

7   plaintiffs had failed to establish that TCS had a pattern or practice of discrimination. (*See* Motion

8   at 24.)

9      Second, even if it were an error to allow Mr. Seetharaman's testimony, the verdict was not

10   likely affected thereby because TCS presented other, similar evidence, in support of the verdict—

11   including other testimony to very similar facts without objection by plaintiffs on this ground.

12   (*See*, *e.g*., Trial Transcript at 346:20 – 347:5 (Surya Kant testifying that refusal to move was the

13   single largest reason why "unallocated" employees are terminated); *id.* at 1199-1200 (Melissa

14   Blandford explaining that a termination coded as "unallocated" could well have resulted from a

15   prior project-release due to poor performance).

16   **IV.**    **CONCLUSION**

17   For the foregoing reasons, the Court **DENIES** plaintiffs' motion for a new trial.

18   This Order terminates Docket Number 697.

19   **IT IS SO ORDERED.**

20

21   Dated: August 20, 2019

22                              **YVONNE GONZALEZ ROGERS**
                                      **UNITED STATES DISTRICT COURT JUDGE**

23

24

25

26

27

28